# In the United States Court of Federal Claims

No. 92-580C
(Filed: September 28, 2005)
(Reissued for Publication: October 19, 2005)[1]

| | | |
|---|---|---|
| **SPARTON CORPORATION,** Plaintiff, v. **THE UNITED STATES,** Defendant. | * | Claim construction; means plus function claim limitations; 35 U.S.C. § 112, paragraph 6; sonobuoy deployment system |

*Steven Kreiss*, of Washington, D.C., for Plaintiff.

*Gary L. Hausken*, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for Defendant, with whom were *John Fargo*, Director; and *Peter D. Keisler*, Assistant Attorney General.

---

**OPINION AND ORDER ON CLAIM CONSTRUCTION**

---

**DAMICH**, Chief Judge.

This case arises out of Sparton Corporation's ("Plaintiff") allegation, under 28 U.S.C. § 1498, of the use or manufacture of the invention described in United States Patent Nos. 3,921,120 ("the '120 patent") and 4,029,233 ("the '233 patent") which are directed to sonobuoy deployment technologies. Pursuant to the Claim Construction Procedures Order issued on May 6, 2005, this matter is presently before the Court on the parties' briefs regarding claim construction. A claim construction hearing was held on July 12, 2005, where the Court considered the parties' arguments with respect to the intrinsic evidence. Expert testimony was not necessary, and the parties did not present expert witnesses. At the hearing, Plaintiff's counsel cited a number of cases that were not in its briefs, so in the interest of fairness, the Court

[1] The original opinion was filed under seal on September 28, 2005. The parties have not requested that any redactions be made, and therefore the opinion is reissued for publication.

permitted Defendant to respond to those cases in a supplemental filing. On the same day as the claim construction hearing, the Court of Appeals for the Federal Circuit ("Federal Circuit") issued an *en banc* opinion in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005), which clarified and modified the law on claim construction by generally holding that intrinsic evidence should be the primary source for informing a court's interpretation of claims in a patent. After fully considering the parties' arguments, and in view of the standard set forth in *Phillips*, the Court's interpretation of the disputed claim terms and phrases follows.

## I. The Patented Technology

### A. '120 Patent

The '120 patent teaches a sonobuoy deployment system wherein sonobuoy components are housed within a cylindrical casing which is adapted to be dropped into the water from either the air or from a boat. The casing has a negative buoyancy, and therefore will sink in the water. The materials inside the casing, however, are part of a float deployment mechanism which is activated when the casing enters the water. The activation of the float deployment mechanism causes the float to inflate which deforms a metal release plate which had previously secured the float within the casing. As the casing sinks in the water, the sonobuoy components are deployed from the casing upper end. This configuration allows the sonobuoy signal receiving components to sink quickly to the desired operating depth. The following figure from the '120 patent shows this system:



B. ‘233 Patent

The ‘233 patent is a division of the application that matured into the ‘120 patent. The claims of the ‘233 patent are directed to the release plate component of the broader system claimed in the ‘120 patent. The release plate is secured in the cylindrical casing through the use of locking tabs that extend through the casing outer wall. When the float mechanism inflates, it bends the release plate so that the locking tabs are released from the casing wall thereby allowing the plate to separate from the casing.

## II. Claim Construction – Legal Standard

Claim construction is a question of law. *Cybor Corp. v. FAS Techs., Inc.*, 138 F.3d 1448, 1456 (Fed. Cir. 1998). As noted above, on the day of the claim construction hearing, the Federal Circuit issued a much-anticipated *en banc* opinion in *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. July 12, 2005) (*en banc*) (“*Phillips*”), which modified and clarified the correct approach to construing claims. The consideration of the *Phillips* case *en banc* arose out of what some perceived as conflicting approaches to claim construction which had evolved in the Federal Circuit in recent years. In particular, there was some uncertainty as to the proper use of dictionaries and other extrinsic evidence in construing the proper meaning of claim terms. Ultimately, the court reaffirmed most of its existing claim construction precedent, but found that its previous treatment of issues regarding the use of dictionaries and treatises in claim construction “require[d] clarification.” *Phillips*, 415 F.3d at 1312.

In *Phillips*, the court began by reaffirming the guiding principle that the scope of an invention is defined by the words of the claims themselves. *Id.* (citations omitted). Although words of a claim are “generally given their ordinary and customary meaning,” the ordinary and customary meaning of a claim term is the meaning as understood by one of skill in the art at the time of invention. *Id.* at 1313 (citations omitted). The ordinary and customary meaning of the claim terms is not an endpoint, but rather a jumping off point from which the court should begin interpreting claim language; it is based on the notion that inventors are persons skilled in the art and that patent documents are intended to be read and understood by others of ordinary skill in the art. *Id.* at 1313 (*citing Verve, LLC v. Crane Cams, Inc.*, 311 F.3d 1116, 1119 (Fed. Cir. 2002)).

The court also reaffirmed the importance of considering the meaning of disputed claim terms in context. A disputed claim term must be viewed not only within the context of the entire claim, but also in view of the entire patent specification. *Id.* Thus, the ordinary meaning of a claim term should not be viewed in a vacuum, but should be considered within the context of the written description and other intrinsic evidence. *Id*. (*citing Medrad Inc. v. MRI Devices Corp.*, 401 F.3d 1313, 1319 (Fed. Cir. 2005)).

The court also noted the importance of the statutory role played by the specification as required by 35 U.S.C. § 112, paragraph 1 (specification must describe the invention in “full,

clear, concise, and exact terms"), and its resulting importance in interpreting the language of the claims. Because the inventor must provide in the specification a full and exact description of the invention, the specification must necessarily inform the proper meaning given to the claims. *Id.* at 1316 (*citing Merck & Co. v. Teva Pharms. USA, Inc.*, 347 F.3d 1367, 1371 (Fed. Cir. 2003)). The inventor may give a meaning to a term that differs from its ordinary meaning. *Id*. Also, an inventor may intentionally limit the scope of his invention by a disavowal or disclaimer of claim scope. *Id*. The court noted that in these instances, the inventor's intention, as expressed in the specification, is dispositive. *Id.* at 1316 (*citing CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002); *SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001)).

The court also addressed the proper use of prosecution history in construing claims of a patent. The prosecution history is considered part of the intrinsic evidence available in evaluating a patent. It includes not only the complete record of proceedings before the patent office, but also the prior art cited during the examination of the patent. *Id* at 1317 (*citing Autogiro Co. of America v. United States*, 384 F.2d 391, 399 (Ct. Cl. 1967)). Although it is proper to consider the prosecution history, because the prosecution history represents an ongoing negotiation between the patent office and an applicant, it "often lacks clarity and thus is less useful for claim construction purposes." *Id*. Even so, the prosecution history can inform the court's inquiry by "demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution, making the claim scope narrower than it would otherwise be." *Id.*

Lastly, the *Phillips* opinion overruled the approach to claim construction articulated in *Texas Digital Sys., Inc. v. Telegenix, Inc*, 308 F.3d 1193 (Fed. Cir. 2002), which placed greater emphasis on dictionary definitions of claim terms and assigned a less prominent role to intrinsic evidence. While noting the soundness of the purpose underlying the *Texas Digital* approach—to "avoid the danger of reading limitations from the specification into the claim"—the court nevertheless found that the focus must remain on how the claims would be understood by one of ordinary skill in the art at the time of the invention. *Id.* at 1323.

Although *Phillips* made clear that intrinsic evidence should be accorded greater weight than extrinsic evidence, it took care to note that the ordinary meaning of a disputed claim term as understood by one of skill in the art may be readily apparent to even lay judges, and that claim construction in those instances involves little more than the application of the widely accepted meaning of that term. In such circumstances, general purpose dictionaries remain useful to inform the court's inquiry. *Id.* at 1314 (*citing Brown v. 3M*, 265 F.3d 1349, 1352 (Fed. Cir. 2001).

It is by applying this reformulated standard that the Court must construe the claims in this case. Although *Phillips* was decided after briefing was completed in this case, the Court sees no need for supplemental briefing, because all of the necessary intrinsic evidence is available to the Court, and no expert witness testimony was heard in the course of claim construction

proceedings. Thus, the parties have not relied upon extrinsic evidence such that the result in *Phillips* would prejudice their position by rendering arguments presented to the Court as no longer valid.

## III. Discussion

### A. '120 Patent

#### 1. Signal Receiving and Transmitting Apparatus

Claim 1 of the '120 patent reads in relevant part:

> A sonobuoy component deployment system comprising . . . a nonbuoyant casing having an open upper end and a permanently closed lower end, *signal receiving and transmitting apparatus* within said casing slidably removable therefrom through said upper end thereof . . . .

'120 patent, col. 6, ll. 25-30 (emphasis added). The parties dispute whether the term "signal receiving and transmitting apparatus" should be construed to cover both active sonobuoys and passive sonobuoys, or only active sonobuoys.[2] Related to this dispute is the issue of whether the electronics within electronics housing 26 should be construed as part of the "signal receiving and transmitting apparatus." If the electronics housing is part of the apparatus, then the limitation clearly covers both active and passive sonobuoys.

Plaintiff argues that "signal receiving and transmitting apparatus" covers both active and passive sonobouys for three reasons. First, Plaintiff points to the sequential placement of the terms "receiving" and "transmitting," arguing that the signal is first received, and then transmitted. According to Plaintiff, such a sequence covers both active and passive sonobuoys. Second, Plaintiff argues that the specification fully supports its interpretation, pointing to various portions of the specification which refer to the invention's use in both active and passive sonobuoy technology. Third, Plaintiff relies on the file history of the '120 patent in which it alleges that both the Examiner and the applicant made clear that the claims covered both active and passive sonobuoy technology. Defendant responds by arguing that the word "transmitting" refers to the transmission of a signal that is sent out by a transducer for the purpose of receiving a return signal, and therefore is limited to active sonobuoys.

The Court finds that the term "signal receiving and transmitting apparatus" covers both active and passive sonobuoys because this construction comports with the ordinary meaning of

---

[2] An active sonobuoy is one that is capable of both transmitting acoustic signals into the water and receiving return signals. In contrast, a passive sonobuoy is one that is only capable of receiving acoustic signals, but not transmitting them.

the claim term, and it also finds considerable support in the intrinsic record. *See Phillips*, 415 F.3d. at 1313-15. For example, the specification discloses that "[s]onobuoys may be either active, wherein a transmitted signal is produced, and the reflected signal is received and transmitted, or the sonobuoy may be passive wherein received signals are sensed and transmitted." '120 patent, col. 1, ll. 15-19. Thus, according to the specification, both active and passive sonobouys perform the functions of receiving and transmitting signals. In describing an embodiment of the invention, the specification also describes a system that can include either an active sonobuoy or a passive sonobuoy:

> The sonobuoy casing serves as a housing for a plurality of components, and in FIG. 4 such components are only schematically illustrated, and may include a transducer weight 22, a transducer 24, which may be both a transmitter and receiver, *or merely a receiver*, a housing 26 for electrical components, damping means 28 . . . for damping the components against underwater movement due to underwater currents . . . .

'120 patent, col. 3, ll. 55-60 (emphasis added). The fact that transducer 24 is described as being either a transmitter and receiver (active) or *merely a receiver* (passive), indicates that both active and passive sonobuoys are being described. Consideration of the specification does not settle the question, however, because it is the words of the claims that define the invention. *Innova/ Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). The language of the claim specifically requires that the apparatus be a "signal receiving and transmitting apparatus." A transducer which only receives signals would thus not appear to be within the scope of that claim language. The specification, however, suggests otherwise in its statement:

> [C]onductors and supports are interposed between the components to permit the signals ultimately received by the transducer to be transmitted *as radio signals* from the float antenna.

'120 patent, col. 3, ll. 65-67 (emphasis added). This statement is important for two reasons. First, it indicates that the transmitting that is described in the claim is the transmission of the radio signals to the float antenna above the water. Second, the fact that the signals are transmitted as radio signals indicates that they have been converted from acoustic (sonar) signals to radio signals prior to transmission. Thus, it seems clear that the written description of the invention supports a construction of the term "signal receiving and transmitting apparatus" wherein the claimed "transmitting apparatus" includes those parts of the device which transmit the received signal to the antenna. The components in electronics housing 26 are the place where the conversion and transmission of the signal takes place. Additional support for this interpretation is found in other portions of the specification. For example, the claimed sonobuoy is described as comprising "sound producing and/or receiving tranducers, transmitters, damping means, and other conventional components . . . ." '120 patent, col. 1, ll. 29-31. The fact that

transmitters and transducers are separately mentioned indicates that a part of the sonobuoy other than the transducers is transmitting signals.

Accordingly, the Court holds that the claim element "signal receiving and transmitting apparatus" covers both active and passive sonobuoys, and that, in the preferred embodiment described in the '120 patent, the electronics housing 26 is part of the signal receiving and transmitting apparatus because it transmits converted radio signals to the antenna at the surface of the water.

2. Inflatable Float Means

Independent claims 1 and 7 and their corresponding dependent claims 2 and 8 each include an "inflatable float means[,] . . . inflation of said float means releasing said retaining means." The parties dispute whether "inflatable float means" is a means-plus-function claim limitation subject to interpretation under 35 U.S.C. § 112, paragraph 6. Because the limitation includes the word "means," it is presumptively subject to section 112, paragraph 6. *Al-Site Corp. v. VSI Intern., Inc.*, 174 F.3d 1308, 1318 (Fed. Cir. 1999). This presumption may be overcome, however, if (1) the "means" does not perform a function that is recited in the language of the claim or (2) the claim recites structural components that are sufficient to perform the recited function. *Id.*

Plaintiff argues that this limitation is a means-plus-function limitation because there is no structure for "inflatable float means" recited in the claim, and that the "inflatable float means" performs the function of "releasing said retaining means from said casing wherein release of said retaining means from said casing permits said casing to fall below said float means and deploy said apparatus from said casing upper end at the operating depth of said apparatus."

Defendant argues that the "inflatable float means" is a structural limitation because the claim element does not include a recited function as required by section 112, paragraph 6. Specifically, Defendant argues that because the function pointed to by Sparton is recited in a separate claim limitation, it cannot comply with the statute, which states that "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function." 35 U.S.C. § 112, paragraph 6. According to Defendant, this language in the statute dictates that the function for a means-plus-function limitation must be expressed in the same claim element as the means, and Defendant further argues that there is no case law that supports the notion that the "means" and the "function" may be claimed in separate limitations.

The Court, therefore, must address the issue of whether the recited function of a means-plus-function claim limitation must be recited immediately following the first mention of the means in the language of the claim. If so, then the "inflatable float means" limitation must be structural because it recites no function in its initial recitation. However, as articulated by the Federal Circuit in *Sage Prod., Inc. v. Devon Indus., Inc.*, 126 F.3d 1421, 1428 (Fed. Cir. 1997), the recited function need only be recited somewhere in the claim and need not be recited in the

same clause as the "means."[3] In *Sage*, the court considered the question of whether a "closure means" claim limitation should be construed as a means-plus-function limitation. The claim at issue referenced the "closure means" both in the main body of the claim and also in a "wherein" clause at the end of the claim. The Federal Circuit determined that the recited function for the "closure means" could be found in the separate "wherein clause."

Construing the limitation as a means-plus-function limitation makes sense because even though the parties characterize the separate clauses that reference the "float means" as separate limitations, in fact, they are not. The relevant portions of claim 1 recite:

> inflatable float means mounted in said casing adjacent said upper end slidably removable from said casing and located intermediate said casing upper end and said signal receiving and transmitting apparatus . . . inflation of said float means *releasing said retaining means from said casing wherein release of said retaining means from said casing permits said casing to fall below said float means and deploy said apparatus from said casing upper end* . . . .

'120 patent, col 6, ll. 30-34 and 47-51 (emphasis added). Although the "float means" is described in multiple sections of the claim, the "float means" is a single claim element. That the "float means" is described as having certain attributes in various parts of the claim does not change the essential fact that each of these attributes describes the "[inflatable] float means." The text in italics above clearly recites a function ("releasing said retaining means . . ."). Thus, the presumption that "inflatable float means" is not a means-plus-function limitation is not rebutted for lack of a recited function.

The presumption that the limitation is subject to interpretation under section 112, paragraph 6 may also be overcome if the claim recites structure sufficient to perform the recited function (although Defendant did not make this argument in its brief). *Rodime PLC v. Seagate Tech., Inc.*, 174 F.3d 1294, 1302 (Fed. Cir. 1999); *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1376 (Fed. Cir. 2003). The word "inflatable" is clearly structural. However, even if a means-plus-function limitation recites structure, the presumption that the limitation is subject to section 112, paragraph 6 is overcome only if the recited structure is sufficient to perform the recited function. "Inflatable" is not enough structure to perform the recited function of releasing the retaining means. The remainder of the claim language describing the "inflatable float means" is not structural, but instead describes the locational/positional aspect of the "float means." Put more simply, the language describes where it is, not what it is. Because the presumption that the

[3] At the hearing, Plaintiff suggested that the opinion *Seal-Flex, Inc. v. Athletic Track and Court Const.*, 172 F.3d 836 (Fed. Cir. 1999), resolved this issue. However, Plaintiff failed to note that the specific language he pointed to was in a *concurring* opinion which is not binding authority for this Court.

"inflatable float means" is a means-plus-function claim is not overcome, the Court finds that this limitation is subject to interpretation under 35 U.S.C. § 112, paragraph 6.

Having determined that the "inflatable float means" is a means-plus-function limitation, the court must also determine the corresponding structure that performs the recited function of "releasing said retaining means from said casing." In determining the relevant structure, the Court must keep in mind the function recited in the claim. As discussed above, the recited function is "releasing said retaining means from said casing." Thus, the corresponding structure is the structure described in the specification that causes the retaining means (*i.e.*, the release plate) to be released from the casing.

With that function in mind, it becomes clear that the relevant structure is the float envelope 30. The '120 patent specification states:

> Energizing of the gas cylinder causes *the float envelope 30* to very rapidly inflate[,] imposing a pressure on the underside of the release plate 38. This pressure exerted upon the release plate deforms the same as shown in FIG. 9, and such deformation causes the release plate to release from the casing, and further inflation of the float envelope forces the release plate from the casing upper end 14, FIG. 10, and "throws" the release plate, and the attached parachute away from the casing upper end. The float envelope therein completes inflation, and the heavier lower portion 42 of the float assembly will slide out of the casing upper end and orient the float in a manner apparent from FIG. 2.

'120 patent, col. 4, ll. 34-47 (emphasis added). From the above recited passage, it is clear that the float envelope is the structure that releases the release plate from the casing. Accordingly, the Court holds that the "inflatable float means" is a means-plus-function claim element which performs the recited function of "releasing said retaining means from said casing," and that the corresponding structure is float envelope 30 as described in the '120 patent specification.

3. Flexible Cable Means

Each of the independent claims (1 and 7) in the '120 patent includes a "flexible cable means connecting said [receiving and transmitting] apparatus to said float means of a length determining the operating depth of said [receiving and transmitting] apparatus." '120 patent, col. 6, ll. 34-36 and col. 7, l. 23 to col. 8, l. 2. The parties agree that this is a means-plus-function limitation, and that it performs the recited function of "connecting said apparatus to said float means of a length determining the operating depth of said apparatus."

Although the parties initially disagreed over what constitutes the structure in the specification that performs the function, at the hearing, the parties appeared to agree on the relevant structure:

| | |
|---|---|
| THE COURT: | Okay, so the [flexible cable means includes the] entire length of the cable ending at the transducer? |
| MR. HAUSKEN: | Yes. |
| THE COURT: | Is that OK with you, Mr. Kreiss? |
| MR. KREISS: | As it goes down, yes, to the Transducer 24 [sic]. |

(July 12, 2005 hearing, Transcript at 66-67 [hereinafter "Tr."].) The Court sees no reason to disagree with the parties on this issue, as the specification supports the agreed upon construction:

> As the casing falls, the compliant cables 44, connected to the float assembly, are deployed from the casing upper end and, as the casing descent continues . . . . Of course, the depth at which the components are deployed depends upon the length of the cables 44 and length of cables interconnecting adjacent components.

'120 patent, col. 4, ll. 50-59. Therefore, the Court holds that the corresponding structure for the "flexible cable means" is the entire length of compliant cable 44, ending at transducer 24.

4. Releasable Retaining Means (claim 1 & 7)

Claim 1 includes a "releasable retaining means . . . [for] retaining said float means and apparatus within said casing and permitting said float means and apparatus to deploy from said casing upper end upon said retaining means releasing from said casing . . . ." '120 patent, col. 6, ll. 36-42. Claim 7 also includes a retaining means, although it is worded slightly differently from claim 1: "[R]etaining means releasably mounted on said casing . . . [for] retaining said float means and said apparatus in said casing and releasing said float means from said casing upon said casing being immersed . . . ." '120 patent, col. 8, ll. 2-6. Although the language is slightly different in each independent claim, the parties agree that "retaining means" in claims 1 & 7 is a means-plus-function limitation subject to interpretation under 35 U.S.C. § 112, paragraph 6, because no corresponding structure is recited in the claim.[4] The parties agreed at the hearing that the recited function in claim 1 is "retaining said float means and apparatus within said casing and permitting said float means and apparatus to deploy from said casing upper end . . . ." (Tr. at 69-70.)

---

[4] Dependent claim 2 also includes reference to the "retaining means." It is clear that sufficient structure is recited in claim 2 such that section 112, paragraph 6 will not apply to that claim.

Although the parties agree that the structure disclosed in the specification that corresponds to the retaining means is release plate 38, they disagree as to whether the release plate should be characterized as "generally circular." Plaintiff argues that none of the claims in the '120 patent include any reference to a "generally circular" release plate, and that the government is attempting to import limitations from the '233 patent into the '120 patent claims. (See Tr. at 73.) Defendant argues that in construing the "retaining means" limitation under section 112, paragraph 6, the Court must look to the specification rather than the claim language to determine the relevant structure.

Defendant's approach is the correct application of the law. Title 35, section 112, paragraph 6 of the United States Code provides that:

> An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts *described in the specification* and equivalents thereof.

35 U.S.C. § 112, ¶ 6 (2004) (emphasis added). It is clear that the release plate 38 shown in FIGS. 5, 6, 7, 9 & 10, and described at col. 5, ll. 10-27, of the '120 patent is the structure that performs the recited function for the retaining means. The description in the specification specifically states that the release plate is "of a generally circular configuration." '120 patent, col. 5, ll. 11-12.

Accordingly, the Court holds that in applying section 112, paragraph 6, the corresponding structure for the "retaining means" of claims 1 and 7 is the generally circular release plate 38 shown in the specification in FIGS. 5-7, 9 & 10, and described in more detail at col. 5, ll. 10-27, and equivalents thereof.

5. Periphery

The parties disagree as to the proper construction for the term "periphery" as it appears in claims 2 and 6 of the '120 patent. Claim 2 recites in relevant part:

> [The sonobuoy of claim 1 wherein the release plate] comprises a . . . flat plate having *a periphery*, and locking tabs outwardly projecting from said periphery received within openings defined in said casing . . . .

'120 patent, col. 6, ll. 54-57 (emphasis added). Claim 6 also includes reference to the term "periphery." Claim 6 recites:

> In a sonobuoy component deployment system as in claim 5 wherein said anchor means are located on said plate adjacent said *plate periphery* and said locking tabs.

'120 patent, col. 7, ll. 9-12 (emphasis added). The term "periphery" in claim 2 and "plate periphery" in claim 6 refer to the same element. Plaintiff argues that "periphery" should be construed to include "the complete outside edge or surface of a body, especially that of a rounded object or body, such as a perimeter." In that regard, Plaintiff posits that "the periphery of plate 38 includes all edges of the plate, including the flats 46, the radiused [sic] surface 50 and the outer edges of the locking tabs [48]." Plaintiff believes that the periphery of plate 38 should include the edges of the flats and locking tabs because the flats and the locking tabs are part of the plate, and the claim language simply refers to the "plate periphery."

Defendant, citing Webster's Seventh New Collegiate Dictionary (1984), argues that the ordinary meaning of "periphery" is "the external boundary or surface of a body," which would seem to include the complete outer edge of the release plate. Defendant further argues, however, that both the specification and the claims adopt a more narrow meaning for "periphery" than the commonly understood meaning of the term. Specifically, Defendant argues that "periphery" cannot be construed to include the outer edges of the flats 46 and locking tabs 48 because to do so would be contrary to the specification and the claims. Defendant points to the language of claim 2 which requires that the "locking tabs [are] outwardly projecting from said periphery." According to Defendant, because the locking tabs extend outward from the periphery, they cannot be part of the periphery.

Defendant's position is correct. The specification describes the release plate as follows:

> The release plate 38 is of a flat configuration formed of sheet steel, and is of a generally circular configuration. Flats 46 are defined on the periphery 50 in diametrically opposed relationship, and locking tabs 48 located upon opposite sides of the periphery radially *extend beyond the periphery*.

'120 patent, col. 5, ll. 10-15 (emphasis added). Plaintiff argues that the locking tabs 48 are part of the periphery. To adopt Plaintiff's construction would contradict the specification because something that extends beyond the periphery cannot logically be part of the periphery. Further, Plaintiff's proposed construction would exclude the only embodiment described in the specification. '120 patent, FIG 7 and col. 5, ll. 10-27. The Federal Circuit has held that such a construction is rarely, if ever, correct. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

It is clear from the specification that "periphery" is referring to the outer portions of the release plate that fit within the inner circle of the casing 10. This excludes the locking tabs 48, because they extend through openings 62 in the casing, which allows them to be "locked" into

position within the casing. Therefore, the Court concludes that “periphery,” as used in claims 2 and 6 of the ‘120 patent, means “the outer edges of the release plate that fit within the inner wall of the nonbuoyant casing.”

6. Diametrically

The parties dispute the meaning of the terms “diametrically defined” and “diameter” as they are used in claim 4. Claim 4 recites:

> In a sonobuoy component deployment system as in claim 3, wherein said hinge line comprises at least one elongated opening *diametrically defined* in said plate, the length of said opening being substantially perpendicular to a *diameter* interconnecting said locking tabs.




FIG. 6 FIG. 7

‘120 patent, col. 6, l. 66 to col. 7, l. 2 (emphasis added). In the embodiment described in the ‘120 patent specification, three elongated openings 54 are shown in FIGS. 6 & 7. Plaintiff, citing Webster’s New World Dictionary, Second College Edition (1968), argues that “diametrically” refers to “something along a diameter or designating an opposite.” Defendant seems to largely agree, setting forth its own dictionary definition, “a chord or line passing through the center of an object figure or body.”

Prior to the hearing, it was not immediately apparent why there was disagreement as to the meaning of this term. At the hearing, the parties clarified the nature of their disagreement. Plaintiff argued that because the “elongated opening diametrically defined in said plate” needed only to be “substantially perpendicular to a diameter interconnecting said locking tabs,” the elongated opening need not pass through the center of the release plate. Defendant’s counsel, succinctly explained Plaintiff’s argument to the Court during the hearing:

> [I]f we look at the clock up there and you consider one diameter to be from 12 to six, what we have been talking about so far would be [that] another diameter from three to nine would be perpendicular

> to the first . . . . What Mr. Kreiss is suggesting is you could have an [elongated] opening that is diametrically defined if you had the opening running between 10 and two so that it's still perpendicular to the diameter, but is not itself a diameter. It's defined by the fact that it's perpendicular to the diameter.

(Tr. at 103.) The problem with Plaintiff's interpretation is that the specification clearly shows that the elongated openings must be aligned across a diameter of the plate:

> The plate 38 is provided with three elongated openings 54 aligned in diametrical relation to define a hinge line disposed across the plate in a manner perpendicularly disposed between an imaginary line connecting the slots 52.

'120 patent, col. 5, ll. 19-23. Thus, the teachings of the '120 patent specification confirm that the elongated openings must be across a diameter of the release plate. Accordingly, the Court holds that the phrase "at least one elongated opening diametrically defined in said plate" means that the elongated opening must pass through the center of the release plate and be at least close to, but not necessarily exactly, perpendicular to the diameter connecting the locking tabs on the release plate.

7. Parachute Anchor Means

Claim 5 of the '120 patent recites:

> In a sonobuoy component deployment system as in claim 2, *parachute anchor means* defined on said plate, and a parachute anchored to said anchor means for retarding the rate of descent of said casing while falling through the atmosphere and released from said casing upon said plate releasing from said casing.

'120 patent, Col. 7, ll. 3-9 (emphasis added). The parties disagree on whether the "parachute anchor means" claim limitation is subject to interpretation under section 112, paragraph 6. Defendant argues that the limitation is not a means-plus-function limitation for two reasons. First, Defendant argues that because there is no function recited for the "parachute anchor means" in the language of the claim, it cannot be subject to interpretation under section 112, paragraph 6. Second, Defendant contends that a "parachute anchor" is a specific structure identified in the specification that connects the parachute to the release plate, and therefore that parachute anchor means is a structural limitation.

Plaintiff argues that the "parachute anchor means" is subject to interpretation under section 112, paragraph 6 because "parachute anchor means" is synonymous with "means for anchoring a parachute." Thus, according to Plaintiff, the "parachute anchor means" performs the

function of anchoring a parachute. In support of its interpretation, Plaintiff points to *Signtech USA, Ltd. v. Vutek, Inc.*, 174 F.3d 1352 (Fed. Cir. 1999) ("*Signtech*"), in which the Federal Circuit found that a claim limitation "ink delivery means" used the term "means" in association with a function, namely "ink delivery." Plaintiff contends that just as "ink delivery means" is akin to "means for delivering ink," "parachute anchor means" in this instance should be interpreted as "means for anchoring a parachute."

Because the limitation uses the term "means" it is presumptively a means-plus-function limitation. Thus, unless the evidence clearly indicates that this limitation is not a means-plus-function limitation, the Court will presume that section 112, paragraph 6 should apply.

The key to properly understanding the meaning of this claim element is provided by considering the element within the context of the language in the remainder of the claim. As pointed out by Plaintiff at the hearing, the language of the claim itself requires that the "parachute anchor means" be "defined on said [release] plate." Thus, the parachute anchor means must be part of the release plate. Defendant argues that "parachute anchor means" refers to parachute anchors 40 which are described in the specification. The problem with Defendant's argument is that parachute anchors 40 are not defined on the release plate, but rather are separate components from the release plate. Thus, the fact that parachute anchors 40 are clearly described in structural terms, cannot be relied upon to overcome the presumption that "parachute anchor means" is a means-plus-function limitation because the parachute anchors are not "defined on said plate" as required by the language of the claim. Accordingly, the Court holds that the "parachute anchor means" is a means-plus-function claim limitation that performs the function of "anchoring the parachute."

Having determined the function of "parachute anchor means," the Court must also determine the structure disclosed in the specification which performs the function of anchoring the parachute. According to the specification, "[t]he purpose of slots 52 is to receive the parachute anchors 40, FIG. 11." '120 patent, col. 5, ll. 18-19. As is readily apparent from FIG. 7, slots 52 are part of the release plate, and therefore are "defined on said plate" as required by the claims.

The Federal Circuit has repeatedly indicated that words in a claim should not be viewed in a vacuum, but rather must be interpreted in the context of the surrounding claim language. *Phillips*, 415 F.3d at 1313. Viewing the language of claim 5 as a whole, it becomes clear that the parachute anchor means must be: "defined on the release plate" and that the parachute is "anchored to said anchor means."

In other words, there is a locational aspect to the "parachute anchor means" which requires that the relevant structure for the "parachute anchor means" be part of the release plate. The structures described in the specification that both perform the function of anchoring the parachute and are also part of the release plate are slots 52. FIG. 7 clearly shows that slots 52 are part of the release plate. The specification further describes that by receiving parachute anchors

40, the slots 52 are able to secure the parachute to the sonobouy: "The anchors 40 include a reduced neck 68 received within the slots 52 and resist being pulled from the slot by the enlarged head 70." '120 patent, col. 5, ll. 54-56.

Because claim language requires that the parachute anchor means be "defined on said [release] plate," the Court concludes, in accordance with 35 U.S.C. § 112, paragraph 6, that the corresponding structure for the "parachute anchor means" element are the slots 52, defined on release plate 38, and equivalents thereof.

B. '233 Patent

1. Generally, Generally Circular, and Generally Planar

Claim 1 of the '233 patent recites in relevant part:

> A retainer plate for a sonobuoy comprising a *generally planar body member* of deformable material having a *generally circular periphery*, a pair of locking tabs radially extending from said body periphery located . . . on said body member . . . .

'233 patent, col. 6, ll. 33-39 (emphasis added). The parties disagree over how the term "generally" should be construed with respect to the elements highlighted above. Plaintiff argues that the above recited claim language should be construed to include any "single-piece, bendable release plate body member shaped in a circular and non-circular configuration . . . ." (P. Rep. at 18.) Plaintiff further argues that the "generally circular periphery" includes the entire outer edge of the release plate, including locking tabs 48.

Defendant argues that the term "generally" should be accorded its customary and ordinary meaning—"for the most part." Thus, Defendant contends that the claim language requires that the body of the retaining plate be planar for the most part, and that the body member's periphery be circular for the most part. Defendant also disputes Plaintiff's position that locking tabs 48 are part of the "generally circular periphery" because claim 1 also states that the "locking tabs [are] radially extending from said body periphery" and therefore cannot be part of something that they extend from.

As an initial matter, Plaintiff's argument that "generally" only requires that there be some circularity (rather than circularity for the most part) must fail. Plaintiff's definition is contrary to the ordinary meaning of the word, and Plaintiff points to nothing in the specification that indicates the patentee accorded such a special meaning to the word "generally." The words of a claim "are generally given their ordinary and customary meaning." *See Vitronics*, 90 F.3d at 1582. Under Plaintiff's proposed definition, anything that is at all circular would fall within "generally circular." Thus, a plate that is almost completely square, but has rounded edges, would fall within the scope of the claim under Plaintiff's proposed meaning. Such a construction

is incorrect. In contrast, Defendant's proposed construction is in accord with the generally understood meaning of the term "generally" and is consistent with the embodiments disclosed in the specification. The retainer plate shown in FIGS. 6 & 7 shows a plate that is rounded (*i.e.* circular) for the majority of its circumference, but has flat parts 46 (which are not circular). Thus, the majority of the periphery is circular, but some of it is not. (See FIG. 6 & 7 below).

The remaining issue that the Court must address with respect to this claim element is whether locking tabs 48 should be included as part of the "body member periphery." Because the claim language itself indicates that the "locking tabs" extend beyond the body member periphery, the Court finds that locking tabs 48 are not part of the "generally circular periphery" as recited in claim 1.

Therefore, the Court holds that "generally," as used in claim 1 of the '233 patent, means "for the most part." "Generally planar body member" means that the release plates covered by claim 1 must be planar "for the most part." "Generally circular periphery," as used in claim 1 of the '233 patent means that body member's periphery must be circular for the most part, and that the periphery does not include locking tabs 48.

2. Diameter, Diametrical, and Diametrically Defined

The parties agree that these terms should be interpreted similarly in each patent. Therefore, the discussion in section III.A.6, *supra*, adequately addresses this issue.

3. Defined in, Defined on

Claim 1 in the '233 patent recites in relevant part (emphasis added):

> [A retaining plate with a generally planar body member with a] weakened hinge line *defined on* said body member . . . said hinge line being diametrically *defined on* said body member . . . [wherein] said hinge line comprises at least one elongated opening diametrically *defined in* said body member . . . .

'233 patent, col. 1, ll. 39-48 (emphasis added). The parties disagree on the meaning of "defined" as it is used in this claim. Plaintiff offers a proposed definition that is somewhat circular: "[Defined] covers something defined 'in' a body (such as the retaining plate) or on that same body." (P. Br. at 16.) Defendant sets forth a dictionary definition: "to fix or mark the limits of."

To the extent that Plaintiff's proposed meaning is a circular definition (*i.e.*, one that uses the word that it attempts to define in the definition itself), it is clearly improper. Defendant's proposed meaning, on the other hand, is consistent with the manner in which the term is used both in the specification and the claims.

As a result, the Court adopts Defendant's proposed construction and holds that "defined" means "to fix or mark the limits of."

4. Parachute Anchor Receiving Slots

Claim 2 of the '233 patent recites:

> In a retainer plate for a sonobuoy as in claim 1, a pair of parachute anchor receiving slots defined in said body member periphery adjacent said locking tabs.

'233 patent, col. 6, ll. 52-54. The parties differ on the proper meaning for the term "parachute anchor receiving slots." Plaintiff argues that this term encompasses "component slots through which a parachute can be anchored." Defendant argues that Plaintiff's definition is too broad because the parachute is not anchored to the slot, but rather that the slot receives a "parachute anchor."

Defendant points to the specification and prosecution history in support of its position. In the specification, the '233 patent teaches that "[t]he purpose of the slots is to receive the parachute anchors 40, FIG. 11." '233 patent, col. 5, ll. 17-18. The "parachute anchors" are described as specific structural components: "The anchors 40 include a reduced neck 68 received within the slots 52 . . . ." '233 patent, col. 5, ll. 52-53. Also, FIG. 11 is characterized as "a perspective view of a parachute anchor." '233 patent, col. 3, l. 44. Defendant also points to the prosecution history, in which Plaintiff argued that "the parachute is attached to support members located in slots." This constitutes further evidence that the slots receive anchors, rather than the parachute itself.

The evidence clearly favors Defendant's view. Not only does the specification and prosecution history support Defendant's interpretation, but the ordinary meaning of the phrase "parachute anchor receiving slots" comports with Defendant's proposed definition. Accordingly, the Court holds that "parachute anchor receiving slots" as used in claim 2 of the '233 patent means "slots which receive parachute anchors."

5. Periphery, Peripheral Edge

See discussion of "periphery" *supra* at III.A.5. The parties agree that this term should be defined similarly in both patents.

6. Indefiniteness – Claim 3

Defendant maintains that claim 3 is indefinite because it is inconsistent with claim 2. Claim 2 recites:

> In a retainer plate for a sonobuoy as in claim 1, a pair of parachute anchor receiving slots *defined in said body member periphery* adjacent said locking tabs.

'233 patent, col. 6, ll. 52-54 (emphasis added). Claim 3 recites:

> In a retainer plate for a sonobuoy as in claim 2 wherein said slots are *defined in said locking tabs and intersect the peripheral edge* thereof.

'233 patent, col. 6, ll. 55-57 (emphasis added). Claim 2 requires that the parachute anchor receiving slots be defined in the body member periphery. Claim 3 states that the slots are defined in the locking tabs. Defendant maintains that claim 3 is indefinite because the slots cannot be defined both "in the body member periphery" (claim 2) while at the same time "intersecting the peripheral edge" of the tabs (claim 3).

35 U.S.C. §112, paragraph 2 requires that each claim be definite. A determination that a claim is indefinite for failing to meet the requirement of section 112, paragraph 2 is a legal conclusion drawn from claim construction. *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d 1374, 1378 (Fed. Cir. 1999). To be found indefinite, a claim must be incapable of claim construction.

In FIG. 7, the parachute anchor slots are denoted as item 52. Defendant's argument rests on the premise that slots 52 are part of the periphery of the locking tabs. Recalling, however, the definition of periphery from above, this is not true. "Periphery" has been construed to mean "the outer edges of the release plate that fit within the inner wall of the nonbuoyant casing." The part of the outer edge of the release plate 38 that includes slots 52 falls within this definition of the periphery of the release plate because they fit inside the inner wall of the casing 10. The only part of the outer edge of the release plate that does not fit within the inner wall of the casing are the outer edges of the locking tabs 48, which extend into holes in the inner wall of the casing. Thus, slots 52 are both defined in the body member periphery and defined in locking tabs 48. They also clearly intersect the outer periphery of the locking tabs (which are not part of the body member periphery) as is obvious from FIG. 7 (shown below). Because it can be properly construed, claim 3 in the '233 patent is not indefinite.




FIG. 6




FIG. 7

## IV. Conclusion

The disputed terms of the '120 and '233 patents have been interpreted by the Court in this opinion and order. This matter is subject to a Protective Order. This opinion shall be **filed under seal** until the parties review it to see if any information should be redacted prior to publication in accordance with the terms of the protective order. The parties shall file a joint report indicating any such information that should be redacted on or before October 12, 2005.

s/ Edward J. Damich
EDWARD J. DAMICH
Chief Judge