EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SPARTON CORPORATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 92-580C<br>Judge James P. Merow |

**DECLARATION OF RALPH C. NASH, JR.**

I, Ralph C. Nash, Jr., declare and state under penalty of perjury that:

1. I graduated magna cum laude with an A.B. degree from Princeton University in 1953 and earned a Juris Doctor degree from the George Washington University ("GWU") Law School in 1957. I am a member of the Phi Beta Kappa, Phi Alpha Delta and the Order of the Coif. From 1953-1959 I was employed by the Navy Department as a contract negotiator. Subsequently, from 1959-1960, I was employed as an Assistant Manager of Contracts and Counsel for the American Machine and Foundry Company. In 1960, I founded the Government Contracts Program at the GWU Law Center and was Director of that Program from 1960-1966 and from 1979-1984. I was

Associate Dean for Graduate Studies, Research and Projects, at the GWU Law School from 1966-1972.

2. During my career, I have specialized in the area of Government Procurement Law. I am active as a consultant for government agencies, private corporations and law firms on government contract matters. In recent years, I have served widely as a neutral advisor or mediator/arbitrator in alternate dispute resolution proceedings. I have been active in the Public Contracts Section of the American Bar Association, a member of the Procurement Round Table and a Fellow, and one who serves, on the Board of Advisors of the National Contract Management Association. During the 1990's, I have been active in the field of acquisition reform. I have served on the "Section 800 Panel" that recommended revisions to all laws affecting Department of Defense procurement and serve on the Defense Science Board Task Force on Defense Acquisition Reform. In 1995, I became a member of the Federal Aviation Administration's Blue Ribbon Committee on Acquisition Reform. I am the author of a text entitled Government Contract Changes, coauthor of a government contract casebook entitled, Federal Procurement Law and co-author of five other government contract textbooks and one textbook entitled Patents and Technical Data. I have written several monographs for the GWU Government Contracts Program monograph series and have

published articles in various law reviews and journals. I also co-author a monthly analytical report, the Nash and Cibinic Report, on government contract issues.

3. I have reviewed the Federal Circuit and Supreme Court decisions in Pfaff v. Wells Electronics, Inc., 124 F.3d 1429 (1998), aff'd, 119 S. Ct. 304 (1998), law review articles relating to the on-sale bar, Mas-Hamilton Group, Inc. v. Lagard Inc., 156 F.3d 1206, 48 USPQ2d 1010 (Fed. Cir. 1998), Weatherchem Corp. v. J.L. Clark, Inc., 163 F.3d 1326, 49 USPQ2d 1001 (Fed. Cir. 1998), other cases relating to the application of on-sale law, contracts N00019-69-C-0465 and N00019-72-C-0585 and amendments thereto as well as other documents, including those identified herein. In Pfaff, the Supreme Court granted certiorari because (a) the patent statutory on-sale "...provisions identify an interest in providing inventors with a definite standard for determining when a patent application must be filed" and (b) the Federal Circuit's standard or "...rule that makes the timeliness of an application depend on the date when an invention is 'substantially complete' seriously undermines the interest in certainty ... [and] finds no support in the text of the statute." 119 S. Ct. 311. In deciding Pfaff, the Supreme Court issued a two prong test which must be satisfied before the on-sale bar applies. The first prong is that "...the product must be the subject of a commercial offer for

sale...[inasmuch as] [a]n inventor can both understand and control the timing of the first commercial marketing of his invention." As the Court stated, "...we perceive no reason why unmanageable uncertainty should attend a rule that measures the application of the on-sale bar of ¶102(b) against the date when an invention that is ready for patenting is first marketed commercially." 119 S.Ct. 311-12. In this regard, the first issue to face when an on-sale bar is asserted is **whether "...the sale was commercial rather than experimental in character**." 119 S.Ct. 312 citing Rookledge & Jensen, Common Sense, Simplicity and Experimental Use Negation of the Public Use and On Sale Bars to Patentability, 29 John Marshall L.Rev. 1, 29 (1995)(which stated that "whether a particular activity is experimental is often clear"). (Emphasis added). The second prong of the test which must be satisfied before an on-sale bar applies is that "...the invention must be ready for patenting." 119 S.Ct. 312. The second prong "...may be satisfied in at least two ways: by proof of reduction to practice before the critical date; or by proof that prior to the critical date the inventor had prepared drawings or other descriptions of the invention that were sufficiently specific to enable a person skilled in the art to practice the invention." 119 S.Ct. 312. In deciding Pfaff, the Supreme Court rejected the Government's proposed rule that

"...a sale or offer to sell that is **primarily** for commercial purposes...renders the invention unpatentable...[because] the possibility of additional development after the offer for sale in these circumstances counsels against adoption of the rule...." (Emphasis added) 119 S.Ct. 312.

**4.** In Pfaff, the inventor accepted a purchase order for commercial quantities, 30,100, of his patented sockets prior to the critical date. "When Pfaff accepted the purchase order...his invention was ready for patenting...[since a] manufacturer was able to produce the [patented] socket using...[the inventor's] detailed drawings and specifications....[and the] sockets contained all the elements of the invention claimed...." 119 S. Ct. 312.

**5.** In Mas-Hamilton, supra at 1019, decided before the Supreme Court Pfaff case, the on-sale issue centered around a November 1989 meeting between the inventor, La Gard, and a potential licensee, Mosler. The district court had found that, at the November 1989 meeting, La Gard had presented a prototype of essentially the patented device to Mosler, offered to furnish additional prototypes of essentially the patented device, "...the devices were for testing or show, only, and did not represent commercial sales of the lock even though money changed hands" and Mosler had provided a purchase order that was never filled. (Emphasis added). Id. On this record, the Federal Circuit affirmed the district

court's conclusion that the patent was not invalid based on the on-sale bar. Id.

6. In Weatherchem, decided by the Federal Circuit after the Pfaff decision, the assignee Weatherchem began a cap design project in late 1984 for Durkee Foods, exchanged cap configuration designs with Durkee in early 1985 and received a February 19, 1985 purchase order from Durkee for 500 caps (per a cap design drawing disclosing the features of the claims of one of the patents in suit) to which Weatherchem issued an acceptance of order on May 13, 1985, charging Durkee $300 for the 500 samples. 163 F.3d 1330-31. On July 17, 1985, Durkee ordered 990 more "sample caps." (Emphasis added). Id. at 1331. Durkee evaluated these caps and notified Weatherchem on August 15, 1985 of an "ovality" problem which made the caps unacceptable. On August 16, 1985, Weatherchem quoted Durkee a firm price of $156.04 per thousand caps for a quantity of 500,000 caps and, on August 23, 1985, outlined its plan to modify its mold by the week of September 16, 1985 to address the "ovality" problem. Id. On September 3, 1985, Durkee responded to Weatherchem's August 16, 1985 quote and issued a purchase order to Weatherchem for 275,000 caps to be manufactured by the revised mold noted, and at the price quoted, on August 16, 1985 by Weatherchem. Id. The record established that full production was about 440,000 caps per week. Id. The

critical date was October 17, 1985. Between October 11 and 16, 1985, correspondence was exchanged between Weatherchem and Durkee relating to mold changes, an invoice for additional tool work on the mold and who should bear the cost specified on the invoice for tool work in view of the mold modifications constituting "fine tuning" for "expected acceptable cap performance." Id. After October 16, 1985, Weatherchem continued to work out some "kinks" in the cap mold and adjustments to the design before regular mass production of caps for Durkee began on January 3, 1986.

The district court held the patent invalid because the invention was on sale "at the very latest, in late September 1985." Id. The Federal Circuit affirmed, indicating that while Weatherchem received the benefit of at least three commercial transactions with Durkee prior to the critical date, it was the last of these transactions which constituted at least an offer for sale, if not an outright commercial transaction, which Durkee accepted. Id. at 1333. Delivery by and payment to Weatherchem after the critical date were considered immaterial. The Court considered Durkee's order of 275,000 caps to be **"a commercial quantity of the invention."** Id. at 1334. On this record, the Federal Circuit invalidated the Weatherchem patent as being on-sale, but only on the basis of the last Weatherchem transaction with Durkee (275,000 caps) which it considered to be "an

outright commercial sale transaction." Id. at 1333. The first two Weatherchem transactions with Durkee (for 500 and 990 sample caps) were not determined by the Federal Circuit to constitute invalidating offers for sale or sales under the on-sale bar. The quantities of 500 and 990 sample caps apparently were not indicative of commercial quantities.

7. I have reviewed contract N00019-69-C-0465 ("0465 contract") between Sparton and the Navy. The contract was issued in March 1969 and required Sparton to furnish 1600 SSQ-53 sonobuoys for Aircraft Drop Tests, Design Data, 200 Technical Manuals, 50 SSQ-53 sonobuoys for First Article Tests and 9600 production SSQ-53 sonobuoys subsequent to First Article approval (Gov. Ex. 3 at A26-29, 34-49). On July 13, 1971, the 0465 contract was amended by the issuance of Mod. 4, which referenced Sparton's letter dated 17 March 1971, together with enclosure ECP 0465-2 (Gov. Exs. 5, 6 at A22-25, 181-195). Sparton's letter dated March 17, 1971 enclosing ECP 0465-2 (which included a technical proposal) is incorporated into Mod. 4 by reference thereto and forms the basis of the Government's allegation that Sparton's patents are invalid under the on-sale bar. Thus, the threshold issue on which the Government must prevail before it can invalidate the Sparton patents under the on-sale bar is whether Mod. 4 to the 0465 contract and the Sparton March 17, 1971 letter together with enclosed ECP 0465-2 (including

the technical proposal) constitute a commercial offer or sale rather than one for experimentation.

**8.** Mod. 4 required Sparton to incorporate into 335 SSQ-53 sonobuoy units selectable depths of 90 or 1000 feet as delineated in ECP 0465-2 of Sparton's March 17, 1971 letter. A not to exceed dollar limitation of $198,000 was specified for the required work in Mod. 4. An analysis of the March 17, 1971 letter and enclosed ECP 0465-2 , as well as other documents, leads to my conclusion that this offer and/or sale was experimental, not commercial, in character, and under Pfaff and Weatherchem, cannot form the basis of an on-sale bar.

**9.** The March 17, 1971 letter states that the ECP "...proposes to incorporate the added capability of pre-selected dual depth operation to the DIFAR Sonobuoy." By this ECP, Sparton proposed "...to perform a 7-1/2 month program which would accomplish the following":

> The redesign, modification and test of engineering models to verify feasibility of design approach. Sparton's method of adding the dual depth capability is outlined in the enclosed ECP.
>
> Modify and deliver 300 units in accordance with conditions described in the enclosed ECP.

In order to construct engineering models and deliver 300 modified units, Sparton requested 335 completed (GFE) SSQ-53 units to be made available from the subject contract for this ECP program. The formal ECP 0465-2 attached to the

March 17, 1971 letter justified the requested change by indicating that "[t]his proposed change will add the capability to the AN/SSQ-53 to operate at 1,000 ft. depth as well as 90 ft." (Emphasis added). Sparton completed the "Developmental Requirements" section of the ECP by recommending "...that 300 completed AN/SSQ-53 units be modified as described in proposal and submitted for test and evaluation." (Emphasis added). Sparton noted that it knew of no "Alternative Solutions." Importantly, production effectively of the change was to occur in "Future Procurement," but only "...if evaluation tests prove the proposed merits [of the change]." This proposed engineering change was not to affect other SSQ-53 sonobuoy units required to be delivered by Sparton under the 0465 contract. On page 10 section 1.0 of the ECP, a "Statement of Work" was proposed. Sparton segregated the work into two phases:

> Phase 1: Design and construct engineering models and perform sea tests.
>
> Phase 2:
> (1) Modify and deliver one production lot of 300 GFE AN/SSQ-53 Sonobuoys for dual depth operation.
> (2) Deliver operating manual.

Sparton proposed to use "Thirty-Five (35) GFE Sparton AN/SSQ-53 Sonobuoys" for Phase 1 and "Three Hundred (300) GFE Sparton AN/SSQ-53 Sonobuoys" for Phase 2. The SSQ-53 sonobuoys were to be shipped "in place," and no "drop tests" were to be required for the modified buoys.

**10.** The clear language of ECP 0465-2 establishes that Mod 4 to the 0465 contract, as incorporating Sparton's March 17, 1971 letter and enclosed ECP 0465-2, constitutes a sale which was entirely experimental in character. For example, the language in Phase 1, to wit: "Design and construct engineering models and perform sea tests" clearly represents experimental work. This is further buttressed by Sparton requesting "...aircraft and support facilities for engineering sea tests." (Emphasis added). Even the 300 deliverable units, which were modified "for dual depth operation" represent experimental work because (a) government furnished equipment had to be modified and reconstructed and (b) the 300 units, according to the ECP, were being "...submitted for test and evaluation."

**11.** I have reviewed many documents (SPA 2779-2993) to ascertain whether Sparton's performance under ECP 0465-2 incorporated into Mod. 4 to the 0465 contract constituted commercial or experimental work. Prior to the March 17, 1971 proposal, Sparton (a) proposed in September 1970 a schedule to complete design modifications required for providing the deep capability for its SSQ-53 sonobuoy (SPA 2779-80), (b) proposed on December 2, 1970 a "Proposed Test Program" for its "1,000 Foot DIFAR Preliminary Mechanical Design" (SPA 2783-86), (c) conducted at Key West, Florida, in December 1970 a test "of [its] 'deep' DIFAR preliminary

mechanical design" (SPA 2787-90), (d) conducted at Key West, Florida in February 1971 a test of its "Preliminary...Deep DIFAR" design (SPA 2792-99), (e) prepared a proposed Deep DIFAR "Test Program" in March 1970 to be conducted at the NOL 100 foot tank facility (SPA 2800-2802), (f) proposed in March 1971 an evaluation of "the cable break problem" it experienced in the February 1971 test (SPA 2803-2812) and (g) proposed an updated program "Schedule" in March 1971 which included an NOL test that "was determined to be necessary due to the design uncertainties related to the cause of cable failures during the [February 1971] Key West drop tests" (SPA 2813-14). All of these documents indicate that experimental work was performed prior to the March 17, 1971 ECP 0465-2.

**12.** I also reviewed documents dated subsequent to the March 17, 1971 Sparton letter and ECP 0465-2, but prior to the July 13, 1971 Mod. 4 effective date, to determine if the work performed in that period was experimental or commercial. These documents indicate that Sparton (a) prepared on March 23, 1971 a "Proposed test program" for its Deep DIFAR sonobuoy at the NOL 100 foot tank (SPA 2815-21), (b) completed at the end of March 1971 the construction of twenty final engineering hydrophone models for its 1,000 foot DIFAR sonobuoy although a drawing package with accompanying specifications had not been generated for the

1,000 foot DIFAR hydrophone (SPA 2822-23), (c) conducted in April 1971 NOL 100 foot tank tests on its two Deep DIFAR designs (SPA 2824-38), (d) constructed in May 1971 twenty 1,000 foot Deep DIFAR sonobuoy "Engineering Models" for aircraft drop testing (SPA 2839), (e) prepared a memo identifying the required mechanical design effort and design problems to be encountered in its dual depth DIFAR sonobuoy program (SPA 2840-42), and (f) prepared a final report on June 21, 1971 for its Deep DIFAR program, describing its projected Deep DIFAR sonobuoy final mechanical design including (1) the modifications made to correct the "cable break" problem encountered in the February 1971 air drop test (even though those modifications had not yet been tested) and (2) the major mechanical design considerations, which included "Release Plate Design," involved in converting the Deep DIFAR design to a dual depth DIFAR design (SPA 2843-50). These documents also lead to the conclusion that work performed between March 17, 1971 and July 13, 1971 was experimental and not commercial.

**13.** I then reviewed documents dated subsequent to the July 13, 1971 execution of Mod. 4 to the 0465 contract to ascertain if this work was commercial or experimental. These documents indicate that Sparton (a) instructed its Engineering Department in Jackson, Michigan on July 20, 1971 that it could utilize the twenty 1,000 foot SSQ-53

engineering models as it saw fit (e.g., for deep tests ". . . to gain further confidence in the design and . . . to check out design revisions" (SPA 2851), (b) outlined internally on July 20, 1971 (i) the work plan for supplying 300 Dual Depth DIFAR sonobuoys within the ECP specified 7-1/2 month period, (ii) the design philosophy of satisfying contract requirements, "proving an engineering approach" and demonstrating "the feasibility of a design which is capable of being produced with further refinements" but which is not suitable for large quantity production, (iii) the manner by which to define the status of the 335 GFE SSQ-53 sonobuoys supplied from the Sparton Florida production line, (iv) some changes that needed to be made to the 335 GFE sonobuoys, (e.g., removing and testing hydrophone potted plugs, allowing for electrical testing from the top of the cased unit), (v) a need to mechanically redesign the release plate and the interior of the sonobuoy to allow for space to house a larger battery (although not to be included under the ECP), and (vi) a need to conduct further aircraft drop tests ". . . to gain more confidence in the existing design" (SPA 2852-53), (c) considered on July 29, 1971 developing a low pressure heat sealed polyurethane film float (SPA 2854-63), (d) prepared on August 3, 1971 for its Jackson, Michigan Engineering Department to commence evaluating engineering

model subsurface electronics stacks and hydrophones similar to the manner by which Sparton's DeLand production facility performs this evaluation (SPA 2864), (e) decided on August 9, 1971 to change its ECP 0465-2 Dual Depth DIFAR sonobuoys being reconstructed in the Engineering Department/Model Shop in Jackson from the prohibitively large Q-57 omni hydrophone on standard SSQ-53 sonobuoys to a small modified Q-41 type omni hydrophone (SPA 2865), (f) compared on August 18, 1971 the cost of an existing Q-47 float to be used in the Dual Depth DIFAR sonobuoy to a new low pressure float (SPA 2866), (g) conducted an Engineering Test on August 31, 1971 at the Naval facility in St. Croix, Virgin Islands, during which time a strong strum problem was noticed, the previous cable problem seemed solved (SPA 2867) and a change to the float attachment and storage system was made because antenna ground clips were pulled loose as a result of restricted antenna coax cables (SPA 2867-80), (h) proposed on October 5, 1971 a shallow water air drop to evaluate the performance of the proposed Dual Depth DIFAR sonobuoy "new single part float pressure activated release plate design," parachute retainer mechanism, parachute attachment, float attachment system and depth selector operation (SPA 2881-84), (i) considered on October 12, 1971 using modified floats on its Dual Depth sonobuoy with a modified volume to reduce gauge pressure (SPA 2886), (j) provided instructions on October

21, 1971 for converting an auxiliary assembly to a Dual Depth auxiliary assembly and for modifying the lower electronics assemblies from regular to Dual Depth by changing or adding resistors (SPA 2887-88), (k) considered on November 10, 1971 altering the schedule for an Engineering Test slated for the week of December 5, 1971 (SPA 2889), (l) prepared a test report on November 11, 1971 in regard to an air drop test on November 5, 1971 which indicated that the "new single part float pressure activated release plate design," as well as other aforementioned parts, was tested and three mechanical parts needed modification (SPA 2890-99), (m) implemented on November 16, 1971 test procedures and a quality control role to monitor workmanship on the Dual Depth DIFAR sonobuoys (SPA 2900-03), (n) prepared on December 22, 1971 a cost summary, which included the Engineering estimate which formed the basis of the ECP and a re-estimate of the job when the ECP was released on July 16, 1971, which noted that additional developmental work not foreseen in these estimates had been conducted including a drop test of mechanical dummies conducted in November 1971 (SPA 2910-14), (o) identified on January 19, 1972 outstanding Model Shop work orders that were delaying completion of Model Shop parts needed for tests and the construction of the 300 buoys (SPA 2916-17), (p) prepared a test report on January 31, 1972 regarding a

St. Croix air drop test on January 13, 1972 to evaluate the Dual Depth DIFAR design (which was modified in three ways) prior to commitment to a final design (SPA 2920-23), (q) prepared a test report on February 17, 1972, regarding a St. Croix air drop and over the side test during the week of February 7, 1972, in which a further design modification (i.e., the deletion of a cable spool signal shunt) and another field test were suggested (SPA 2925-2951), (r) conducted a meeting on February 28, 1972 at which the Dual Depth Program status for the construction of 300 units was discussed in terms of material being ordered and sonobuoy units being assembled by Sparton's Jackson Operations Section in conjunction with Sparton's Quality Control and Engineering Sections (SPA 2952), (s) conducted a test during the week of March 6, 1972 at St. Croix to evaluate overall performance parameters of the sonobuoy design (which was modified to overcome mechanical problems encountered during the previous test) prior to final design release for the 300 deliverable sonobuoys (SPA 2953-2959), (t) was awaiting on March 21, 1972 a computer printout of detailed bearing data from the Navy (SPA 2953-2959) and (u) prepared on April 28, 1972 a Dual Depth DIFAR Final Report under ECP 0465-2 which (i) identified the expressed design philosophy followed under the ECP as demonstrating ". . . the feasibility of using the principle of the float actuated release plate (the

so-called upside down approach), as developed on the previous Deep DIFAR program, to create a reliable Dual Depth DIFAR design capable of being produced economically in large quantities -- the goal being necessarily subject to budget limitations," (ii) clearly indicated that ". . . this goal required a major mechanical redesign and some modifications to the existing DIFAR electronics," (iii) stated that "[t]he Engineering Development Phase of ECP 0465-2 was completed on March 9, 1972, with the highly successful air drop of ten final design buoys," and (iv) identified "several unique mechanical design features, including a float pressure actuated release plate system, and a single part release plate . . .." and design changes since the "original concept" (SPA 2960-87). These documents make it clear that the Mod. 4 work was experimental, not commercial.

**14.** I have reviewed a number of documents to determine the Navy practice in purchasing production quantities of sonobuoys. The Declarations of Sparton employees Henry Melvin and Gerry Martin and charts attached to their Declarations establish that normal or typical production quantities of sonobuoys delivered to the Navy by the industry's sonobuoy contractors are in the thousands and tens of thousands. These normal or typical production quantities are further supported by government documents that I have reviewed, such as a NAVAIR document (16497-

16523) which identifies "FY86 Production Sonobuoy Contract Awards" (16505), a Navy document (16453-57) which indicates the Navy purchases "between 200,000 and 350,000 Sonobuoys each year for a continuing surveillance and tracking operation of submarines all over the world" (16453), a Navy "NAC Sonobuoy Procurement Branch" memo regarding the "History of Sonobuoy Contractors, Unit Prices, Quantities Awarded, As Well As Type And Method Of Awards" (16525-26), a Navy "Sonobuoy Schedule Status Summary" (16475), and a Navy Request For Authority To Negotiate "IND 10168 and Class D&F No. 81-42" (23223-54) containing quantity information (23226-27, 23231, 23233-34, 23236-38, 23240-42, 23245-47, 23249-50, 23252-53). See also a Navy "AUDIT REPORT" dated 30 June 1987 which states that sonobuoys ". . . are procured in large quantity contracts . . .." and "[a] salient feature of sonobuoys, which it is important to understand, is that the expenditure of large numbers is fundamental to the attainment of ASW readiness each year and that such expenditures represent most of each year's purchase" (16166, 16182-83). These documents establish that typical production quantities are in the thousands and tens of thousands.

**15.** I have reviewed a number of documents to determine the Navy practice in purchasing developmental sonobuoys to be used for test and evaluation purposes. A "Summary of

Hazeltine Sonobuoy Contracts" (21529), which was prepared by Hazeltine for a meeting with Navy representatives, identifies various quantities of Hazeltine sonobuoys sold to the Navy (21505,21529). In this summary, the quantity in 1970 for Vertical Line Array DIFAR ("VLAD") Development was 50, the quantity in 1973 for AN/SSQ-77 VLAD was 200 and the quantity in 1976 for AN/SSQ-77 VLAD (OP-EVAL) was 700 (21529). A May 7, 1979 "Study Of Navy-Wide Sonobuoy Management" identifies OPEVAL and Engineering Development as functions that occur prior to production (16187). Navy document 21503-04 describes the nature of the work performed under (a) Hazeltine's 1970 contract N00019-70-C-0518 as proving ". . . the feasibility of incorporating a vertical line array into DIFAR sonobuoy AN/SSQ-53...[and as developing and building] feasibility models for laboratory and over-the-side sea tests to conduct testing and to provide a design for an air droppable buoy," (b) Hazeltine's 1972 contract N00019-72-C-0594, to wit, ". . . to design, develop, fabricate and test an air droppable VLAD," (c) Hazeltine's 1976 contract N00019-76-C-0516, to wit, ". . . to design and fabricate forty (40) VLAD buoys for at-sea testing (Phase I) and to fabricate and test 1,775 VLAD buoys for OPEVAL testing (Phase II)," all of which was restructured into three phases, Phase I ". . . to design and fabricate 137 buoys for lab and sea testing," Phase II ". .

. to fabricate 321 buoys for testing" and Phase III "...to fabricate 575 buoys on a production lot basis" (21503). The quantities involved in these Hazeltine development testing efforts are much smaller than typical production quantities. Furthermore, I have reviewed the Navy's "Evaluation Plan" for "Selectable Depth AN/SSQ-53 Sonobuoys" (000002-17) and have ascertained that Magnavox offered or provided the Navy a quantity of 500 selectable depth SSQ-53 sonobuoys, and Sanders offered or provided the Navy with a quantity of 300 selectable depth SSQ-53 sonobuoys (000013). This sonobuoy quantity information, together with the manner by which these sonobuoys were to be used, establishes that the Navy typically procured small numbers of sonobuoys, such as in the hundreds, to perform experimental testing. Accordingly, the quantity of sonobuoys provided by Sparton to the Navy under ECP 0465-2 is a typical quantity procured by the Navy for experimental purposes and leads to the conclusion that Mod. 4 to the 0465 contract was experimental, not commercial, in character.

**16.** I have reviewed the deposition transcript of former Navy employee William Graff and deposition exhibits thereto to determine whether the Mod. 4 work was experimental or commercial. Mr. Graff testified that (a) while employed at the Navy Air Development Center ("NADC"), he always worked on sonobuoy research and development programs (GTr. 7-8,

23), (b) prior to the Navy's 1969-1970 interest in developing a dual depth sonobuoy capability, there was no commercially available sonobuoy that had that capability (GTr. 36-37), (c) the Navy initiated steps to obtain a dual depth capability in the SSQ-53 sonobuoy by amending Sparton's contract with the Navy (GTr. 38), (d) his responsibility was to evaluate Sparton's Dual Depth sonobuoy capability in comparison with a standard SSQ-53 sonobuoy (GTr. 43), (e) he was familiar with the Sparton development program which spanned the period mid-1971 to 1972 and attended Sparton 1971 Dual Depth sonobuoy development tests (e.g., aircraft drop tests and over the side vessel tests) to ascertain if the sonobuoys performed electrically and acoustically in accordance with the specification (GTr. 46, 67, 149-150), (f) he considered the Sparton Dual Depth 1971 tests to be a development phase of that sonobuoy (GTr. 150), (g) he did not generate any reports as a result of the 1971 Sparton Dual Depth sonobuoy tests (GTr. 150), (h) he received on or about April 26, 1972, per deposition Exhibit 4, and in accordance with Mod. 4 to the 0465 contract, 100 Sparton Dual Depth sonobuoys for "Special Tests" (GTr. 91-93, SPA 2355-57) as well as Magnavox and Sanders dual depth sonobuoys in about the same time period (GTr. 95), (i) he received an additional 160 Sparton Dual Depth sonobuoys in June 1972 for "Special Tests", per deposition Exhibit 7 and

in accordance with Mod. 4 to the 0465 contract, totaling 260 delivered sonobuoys (GTr. 122, SPA 2349-51), (j) he did not participate in the Magnavox and Sanders dual depth sonobuoy development testing, but he did participate in the Sparton Dual Depth sonobuoy development tests (GTr. 95), (k) he was responsible for distributing the 260 Sparton Dual Depth sonobuoys to the Atlantic, Pacific, Mediterranean, Hawaiian, Bermuda and Iceland U.S. Fleets for the purpose of testing the acoustical performance of these sonobuoys (as well as the Magnavox and Sanders sonobuoys) alongside standard Q-53 sonobuoys in various operating areas of the world (GTr. 101, 122-123), (l) he drafted test procedures and incorporated them in an Evaluation Plan to test the acoustical performance of these sonobuoys (GTr. 104, 000002-17), (m) 40 Sparton Dual Depth sonobuoys were shipped in June, 1972 to Navy employee Dan Probert in Key West, Florida at Graff's direction to perform the same acoustical tests, according to the same test procedures, for NADC as were being conducted by the U.S. Fleets (GTr. 123-125), (n) a P-3 aircraft squadron, called "VX-1", whose mission was to perform experimental testing (not fleet operation), performed the "experimental" tests on the 40 Sparton Dual Depth sonobuoys at Key West in accordance with Graff's Evaluation Plan (GTr. 123-125), (o) Sparton's Dual Depth sonobuoys delivered to the Navy in accordance with Mod. 4 to the 0465 contract were

used by the U.S. Fleet to track "the bad guys submarines" (GTr. 105), (p) the test period for these 300 sonobuoys spanned approximately one year (GTr. 107), (q) reports of these tests were sent to Graff who summarized them and sent his summaries to NAVAIR for review (GTr. 107-108), (r) the test reports established that the dual depth sonobuoys provided enhanced performance (e.g. tracked enemy submarines for longer periods) as compared with standard SSQ-53 sonobuoys (GTr. 108-110), and (s) he provided Sparton, Magnavox and Sanders with unofficial feedback of fleet tests of their dual depth sonobuoys (GTr. 135). None of the DD 250 shipping documents or the 300 Sparton Dual Depth sonobuoys supplied to the Navy by Sparton contained Federal or National stock numbers (Gov. Exs. 4, 6 and 7, 000208). Instead, the 300 sonobuoys were designated by serial number, contract number "per Mod. P0004" and model number "AN/SSQ-53 (DD)" (000208) per Navy instruction (SPA 2349-51, and 2355-57 and 4881). In contrast, the DD 250 shipping documents for the SSQ-53 production DIFAR sonobuoy, which was supplied by Sparton to the Navy under the 0465 contract, contained Federal stock numbers (009614-15). Graff's deposition and the exhibits referenced above further support the experimental character of Mod. 4 to the 0465 contract and ECP 0465-2 and demonstrate that they were not a commercial offer or sale as contemplated by Pfaff and Weatherchem.

**17.** I have reviewed the Graff Evaluation Plan (000002-17) and note that the Fleet recommended that SSQ-53 sonobuoys include a selectable depth hydrophone with a deep setting to provide improved detection capability and that theoretical studies and sea tests conducted by NADC indicated that a deeper hydrophone would result in improved detection capability (000005). Graff testified that no existing commercial sonobuoy at that time had dual depth capability (GTr 36-37). This Plan establishes that as a result of fleet recommendations, NAVAIR granted ECPs to its SSQ-53 contractors, Sparton, Magnavox and Sanders, to obtain a dual depth capability not previously existing. Id. These facts indicate that the Navy was soliciting ECPs for developmental work to obtain a dual depth capability that it did not previously possess.

**18.** I have reviewed the Navy and Sparton estimates used to negotiate Sparton's equitable adjustment of $282,000 under Mod. 4 (1054-66, 1082-92, 1120). These estimates reveal that engineering labor and overhead roughly approximates manufacturing labor and overhead in cost for the work performed by Sparton under Mod. 4. I have reviewed the manufacturing work in these estimates and found that the sonobuoys and engineering models were constructed in the Engineering Department/Model Shop in Sparton's Jackson, Michigan plant. This Engineering Department/Model Shop was

not Sparton's production line, nor was the Jackson plant the SSQ-53 sonobuoy production facility. See the Martin and Melvin Declarations attached hereto. Thus, the engineering and manufacturing cost figures establish that non-production work was being performed by Sparton's Engineering Department under Mod. 4 to the 0465 contract.

**19.** I have reviewed Navy documents to ascertain if it was Navy practice to utilize the ECP process to obtain contractor development work to improve the performance of production sonobuoys. I found that the Navy has recognized that sonobuoys are dynamic devices that continue to evolve to meet fleet requirements and the perceived threat (017088-89). The Navy stated that its sonobuoy program has averaged 20-25 ECP's per year to meet changing threat conditions and operational requirements,. Id. The Navy sonobuoy program office PMA-264 Strategic Plan (021043-52) identifies ECPs as the "...only practical way that...[the Navy's sonobuoy] capabilities can be improved..." (021045). In the late 1970s, the Navy documented the current status of all ECP actions which included a significant sonobuoy redesign for a third hydrophone depth and a 99 Channel Transmitter as well as an improvement in an air descent retardation device (020521-26). In the 1980s and 1990s, this trend continued (016463-73, 017019-28, 022518-26) (e.g., Hermes changed the SSQ-53B sonobuoy's radio frequency amplifier (022519),

Sparton made extensive changes to the SSQ-62B sonobuoy floatation system, surface electronics housing and transducer (022522), and Magnavox incorporated "extensive design changes" to its SSQ-77A sonobuoy (022522). The NAVAIR Acquisition Guide states that ECPs are to be used by the Navy to incorporate changes into equipment for operational improvement, etc. (016311, 016349-50). Based upon these documents, it is clear that the Navy used ECPs on production contracts to obtain developmental work. This confirms the fact that ECP 0465-2 was issued by the Navy to Sparton to perform developmental (not commercial) work, i.e., to improve the capability of the SSQ-53 sonobuoy to include dual depth operation.

**20.** I have reviewed the follow-on contract that was issued by the Navy to Sparton, Letter Contract N00019-72-C-0585 ("0585 contract")(012248-012302), dated May 25, 1972, to ascertain whether it shows that experimental work was performed on contract 0465 (012248-012302). This contract required Sparton to conduct a product improvement program ("PIP") for the SSQ-53 sonobuoy (011571, 011579). The letter contract was superseded by a definitized contract in March 1973 (002272-78, 002099-2116). In item 0002 of the Schedule, Sparton was required to provide further engineering effort for "Selectable Dual Depth" capability (012250). Significantly, 57 PIP SSQ-53 sonobuoys, which

included selectable dual depth capability, were required to pass the first step in the production process, First Article Testing, per item 0014 of the Schedule (012250). In item 18, the Navy reserved an option to order 2000 SSQ-53 PIP sonobuoys if First Article approval was obtained by Sparton (012251, 001981-82). A Federal Stock Number was "to be assigned" to each of these sonobuoys. Id. The Navy verbally requested Sparton on March 5, 1973 to quote the production of 2,000 SSQ-53 PIP sonobuoys (002118), but Sparton informed the Navy in June 1973 that the SSQ-53 PIP sonobuoys were developmental, still on the drawing board and were not defined by a bill of material (011370, 011374). Sparton further stated that, since final design drawings could not be released until all technical difficulties were resolved (001969-74), it could not provide the Navy with a breakdown of material and labor into specific amounts and costs. Id. The quantity of 2,000 was changed to 1850 and then 500 by contract amendments (012182-96). Sparton did not pass First Article Testing until about March 5, 1975 and was thereupon requested to commence production (002257-61). The Sparton SSQ-53 Dual Depth PIP sonobuoy was first designated by the Navy as SSQ-53 (XN-1), but then when the SSQ-53 specification was changed or thought to require a change, that same sonobuoy was designated SSQ-53A (012818, 012239-42, 12975-80). Since First Article Testing approval and the

commencement of pilot production first occurred in 1975 for the Sparton Dual Depth sonobuoy, I conclude that Mod. 4 to the 0465 contract, Sparton's March 17, 1971 letter and ECP 0465-2 did not constitute a commercial offer or sale of the Sparton Dual Depth sonobuoy.

**21.** I also found and reviewed documents indicating that the Navy fully understood the span of the Sparton Dual Depth sonobuoy development program and when production commenced. There was certainty to these events from the Navy's perspective. A Declaration by Charles Boyle refers to a March 1979 Request For Authority To Contract (024312-38), in which the Navy indicated that the SSQ-53A was developed by Sparton in Fiscal Year 1972, the Mod. 4 work, and was manufactured by Sparton in limited production quantities by virtue of awards in Fiscal Years 1974 and 1975, the PIP (SSQ-53 (XN-1)/SSQ-53A) pilot production (024333). This indication is consistent with documents 013595-96 and 002127. Based on these documents and the Boyle Declaration, I conclude under Pfaff that Mod. 4 to the 0465 contract and the March 17, 1971 letter and attached ECP 0465-2 did not constitute a commercial sale or offer to sell Sparton's Dual Depth sonobuoy, but instead were understood by both parties to the 0465 contract to be experimental in nature, particularly since First Article Testing and the production

of a limited quantity of sonobuoys first occurred in 1975, nearly four years after the issuance of Mod. 4.

22. It is my opinion that the first prong of the Pfaff test, whether the sale or offer was commercial or experimental, is not satisfied in this case. Mod. 4 to the 0465 contract, the Sparton March 17, 1971 letter and ECP 0465-2 do not constitute a commercial sale or offer to sell the Sparton SSQ-53 Dual Depth sonobuoys. A multiplicity of documents I reviewed plus witness statements all indicate that the work under Mod. 4, as proposed by ECP 0465-2, was considered by both parties to be developmental in nature. In contrast, I found no documents or witness statements that would lead to the conclusion that this was a commercial sale or offer.

Date: 3/15/99

Ralph C. Nash, Jr.

B0030