IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 92-580C

Chief Judge Edward J. Damich

SPARTON CORPORATION,

Plaintiff,
v.

THE UNITED STATES,

Defendant.

# OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

October 20, 2006

## TABLE OF CONTENTS


I. PROCEDURAL HISTORY . . . . . 1

II. ARGUMENT . . . . . 3

A. REQUEST FOR PRODUCTION 5003 . . . . . 3
1. Timeliness of the Request . . . . . 3
2. Sufficiency of the Government's Response . . . . . 5

B. REQUEST FOR PRODUCTION 5006 . . . . . 10
1. Timeliness of the Request . . . . . 10
2. Sufficiency of the Government's Response . . . . . 11

C. REQUEST FOR PRODUCTION 5007 . . . . . 12
1. Timeliness of the Request . . . . . 13
2. Sufficiency of the Government's Response . . . . . 14

D. REQUESTS FOR ADMISSIONS 2001-2006, 2008 AND 2009 . . . . . 16
1. RCFC 36 Objection As to Form . . . . . 17
2. Timeliness of Requests for Admissions . . . . . 19
3. The Requests Are Unduly Burdensome . . . . . 21

III. CONCLUSION . . . . . 22

# TABLE OF AUTHORITIES

## CASES

*B.E. Meyers & Co., Inc. v. United States*,
41 Fed. Cl. 729 (1998) . . . . . . . . 8, 9

*Capital Properties, Inc.,v. United States*,
49 Fed. Cl. 607 (2001) . . . . . . . . 8

*Eisenberg v. Gagnon*,
766 F.2d 770 (3d Cir.),
*cert. denied*, 474 U.S. 946 (1985) . . . . . . . . 8

*Henry v. Champlain Enterprises, Inc.*,
212 F.R.D. 73 (N.D. N.Y. 2003) . . . . . . . . 17

*Pacific Gas and Elec. Co. v. United States*,
69 Fed. Cl. 784 (2006) . . . . . . . . 8

*Shell Petroleum, Inc. v. United States*,
46 Fed. Cl. 583 (2000) . . . . . . . . 4, 11, 14, 19

*Smithkline Beecham Corp. v. Apotex Corp.*,
193 F.R.D. 530 (N.D. Ill. 2000) . . . . . . . . 8

*Thalheim v. Eberheim*,
124 F.R.D. 34 (D. Conn.1988) . . . . . . . . 17

*United States v. Schwimmer*,
892 F.2d 237 (2d Cir., 1989) . . . . . . . . 8

## STATUTES AND RULES

Fed. R. Civ. P. 26 . . . . . . . . 9

RCFC 26 . . . . . . . . 3, 4, 8, 11, 14, 16, 21

RCFC 30 . . . . . . . . 2

RCFC 34 . . . . . . . . 1, 7, 12, 23

RCFC 36 . . . . . . . . . . 1, 17, 19, 21, 23

RCFC 45 . . . . . . . . . . 2

**OTHER AUTHORITIES**

Department of Defense Appropriations Act, 1991,
Pub. L. 101-511, 104 Stat. 1856 (1990) . . . . . . . . . . 15

Proposed Trial Preparation Order . . . . . . . . . . 20, 21

## TABLE OF EXHIBITS


1 Excerpt from Defendant's Responses and Objections to Plaintiff's Requests for Production of Documents Nos. 17-204, dated . . . . . . . . . . . . . . . A1

2 Letter from Janice Mueller, Attorney, Dep't of Justice to Robert C. Miller, Esq., Oblon, Spivak, McClelland, Maier and Meustadt, P.C., dated July 8, 1994 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A29

3 Letter from Steven Kreiss, Esq., to Suzanne T. Michel, Attorney, Dep't of Justice, dated November 16, 1996 . . . . . . . . . . . . . . . . . . . . . . . . . . A32

4 Letter from Suzanne T. Michel, Attorney, Dep't of Justice to Steven Kreiss, Esq., dated December 19, 1996 . . . . . . . . . . . . . . . . . . . . . . . . A38

5 Letter from Suzanne T. Michel, Attorney, Dep't of Justice to Steven Kreiss, Esq., dated April 17, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . . . A41

6 Letter from Suzanne T. Michel, Attorney, Dep't of Justice to Steven Kreiss, Esq., dated August 21, 1997 . . . . . . . . . . . . . . . . . . . . . . . . . . A43

7 Excerpt from the Deposition of Chuck Logar, taken by Plaintiff on August 19, 1998 at Fort Wayne, Indiana and an excerpt of Plaintiff's Exhibit 1, thereto . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A47

8 Sparton's Answer to Interrogatory No. 5 from Sparton Corporation's Answers to the Defendant's First Set of Interrogatories to Plaintiff, Sparton Corporation, dated Sept. 28, 2005 . . . . . . . . . . . . . . . . . . . . . . . . . . A58

9 Excerpt from Declaration of Ralph C. Nash, Jr. . . . . . . . . . . . . . . . . . . . . . . . A62

10 Excerpt from PMA-264 Strategic Plan . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A67

11 Excerpt from NAVAIR Acquisition Guide . . . . . . . . . . . . . . . . . . . . . . . . . . A73

12 ANA Bulletin No. 445 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A81

13 NAVAIR Supplement No. 1 to ANA Bulletin No. 445 . . . . . . . . . . . . . . . . . . A83

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| Plaintiff, | ) | |
| | ) | No. 92-580 |
| v. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

In Sparton Corporation's Motion to Compel Sufficient Answers to Requests for Admissions Pursuant to RCFC 36(a) and the Production of Documents Pursuant to RCFC 34(b), Docket No. 280 (hereinafter Motion to Compel), Sparton seeks an order of the Court compelling the United States to answer certain discovery requests notwithstanding the Government's objections. For the reasons stated below, the Government's objections are well-taken and the Court should not compel further answers. And, in any event, Sparton has previously contended that fact discovery closed long before the current discovery requests were served. Thus, Sparton's request are untimely.

## I. PROCEDURAL HISTORY

On August 20, 2006, Sparton served seven requests for production (nos. 5001-5007) and nine requests for admissions (nos. 2001-2009) on the Government. Mot. to Compel, Ex. A-C.

Subsequently, the Government sought the deposition of James W. Widenhofer. *Order*, Docket No. 279 (Sept. 13, 2006) (hereinafter *Order*, Docket No. 279). Sparton moved to quash the deposition of Mr. Widenhofer. *Id.*; Sparton Corporation's Motion to Quash the Defendant's Notice of Deposition of James W. Widenhofer and Subpoena Attached Thereto Pursuant to RCFC 30 and 45, Docket No. 278 (hereinafter Motion to Quash). In that motion, Sparton argued that fact discovery had closed on January 3, 2006, and therefore any deposition of Mr. Widenhofer was improper. *Id.* at 2.

The Court held a status conference on September 12, 2006. *Order*, Docket No. 279. During the conference, the Government agreed to withdraw the subpoena for Mr. Widenhofer. And, following that conference, the Court set a shortened response period, with the Government to respond to Sparton's outstanding discovery no later than September 18, 2006. The Government served its responses to the requests for admissions on September 13, 2006 (*Id.*, Ex. C at 22[1]) and to the requests for production on September 18, 2006 (*Id.*, Ex. B at 11).

In light of the discussions at the status conference relating to the closure of fact discovery, the Government objected to each of Sparton's discovery requests on the grounds that it was untimely. Sparton now seeks to compel answers to Requests for Production Nos. 5003, 5006 and 5007, and to Request for Admissions 2001 through 2006, 2008 and 2009 We address each of the requests, below, in the order presented by Sparton.

---

[1] Sparton did not sequentially number the pages of the its appendix. For the benefit of the Court, we provide internal citations to the appendix using the page number imprints provided by the Court's Electronic Case Files system.

## II. ARGUMENT

### A. REQUEST FOR PRODUCTION 5003

Sparton's Request for Production No. 5003 reads as follows:

> All documents, other than those previously produced, relating to Magnovox'[s] AN/SSQ-53B sonobuoy, including but not limited to (a) said sonobuoy's inability to satisfy the Navy specification for that sonobuoy, (b) said sonobuoy's inability to perform satisfactorily at a 1000 foot depth, (c) Magnavox'[s] request to obtain a waiver from the Navy because said sonobuoy could not satisfy the Navy specification for said sonobuoy, (d) Magnavox'[s] obtention [sic] of a waiver from the Navy due to the performance of said sonobuoy, (e) correspondence relating to the performance of said sonobuoy, and (f) Magnavox correspondence relating to the performance of said sonobuoy.

Mot. to Compel, Ex. B at 5-6. The Government objected that the request was untimely because it sought fact discovery. *Id.* at 6. The Government further answered that any responsive records were within those that had been provided for inspection and copying on at least two occasions.

#### 1. Timeliness of the Request

As noted above, Sparton has previously argued that fact discovery closed on January 3, 2006. And Sparton's Request No. 5003 certainly seeks factual information. Sparton contends, however, that its request for discovery was timely submitted because it relates to expert discovery in that "defendant's expert witness McGavock considered this sonobuoy a non-infringing alternative in his calculation of lost profits[[2]] and a reasonable royalty in his May 2006 expert report." Mot. to Compel at 2. Sparton's argument is incorrect.

The distinction between "fact discovery" and "expert discovery" finds its origin in RCFC 26. Rule 26(b)(4) precludes the deposition of expert witnesses from whom a report is required

[2] Mr. McGavock's report does not "calculate lost profits." McGavock's opinions criticize Sparton's lost profit's argument as lacking adequate support.

until after report has issued. Further, RCFC 26(a)(2)(C) provides that, unless otherwise ordered or agreed upon, the report is to be issued no later than 70 days from the end of discovery. In this case, the Court specifically ordered the dates on which expert reports were to be issued. *See* Order, Docket No. 266 (Mar. 28, 2006); Order, 279. The report required by RCFC 26(a)(2)(C) and 26(b)(4) is to be

> a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions; the qualifications of the witness, including a list of all publications authored by the witness within the preceding ten years; the compensation to be paid for the study and testimony; and a listing of any other cases in which the witness has testified as an expert at trial or by deposition within the preceding four years.

RCFC 26(a)(2)(C).

The Court's Rules contemplate that "expert discovery" is only to insure the full disclosure of opinions, bases for those opinions and the data or information that the expert relied on to support the opinions. RCFC 26, R. Comm. Note for the 2002 Rev. (RCFC 26 amended to parallel Fed. R. Civ. P. 26); Fed. R. Civ. P. 26, R. Comm. Note to the 1993 Amend. (The requirement for a complete and detailed report from experts "may … eliminate the need for some [expert] depositions or at least reduce the length of the depositions"); *see also Shell Petroleum, Inc. v. United States*, 46 Fed. Cl. 583, 584 (2000) (Damich, J.):

> The order differentiated between "fact discovery" and "expert discovery." The purpose of this distinction was to allow the parties to investigate, completely, all "facts" before the parties proceeded to expert discovery. During expert discovery, the parties would have an opportunity to learn about the experts' opinions, which the Court perceived as different from the facts of the case. If the experts know (or should know) all the facts before setting out their opinions in expert reports, then the opinions should not change because of the discovery of "new" facts.

Here, however, Sparton is not seeking Mr. McGavock's opinions, nor is it seeking evidence that formed the basis of those opinions or that he considered in rendering those opinions. Rather, Sparton seeks evidence to *rebut* Mr. McGavock's opinions. The proper time for seeking rebuttal evidence was during fact discovery. By Sparton's own calculation, fact discovery is now closed. Mot. to Quash at 2. Accordingly, the request is untimely.

**2. Sufficiency of the Government's Response**

The Government's response also answered by asserting that all document had been previously provided during one of at least two document inspections. One inspection was conducted by Mr. Kreiss at Naval Surface Warfare Center, Crane, Indiana; the other at a Navy office known as "PMA-264." Mot. to Compel, Ex. B at 7. Sparton concedes that those document inspections occurred. Mot. to Compel at 2. Nonetheless, Sparton makes three arguments in support of compelling disclosure.

First, Sparton suggests that the "AN/SSQ-53B sonobuoy was not raised as an issue … until defendant's expert witness McGavock considered this sonobuoy a noninfringing alternative." Mot. to Compel at 2. This suggestion is simply not true.

In 1994, the Government responded to Sparton's third set of requests for production of documents and things. Requests Nos. 69 and 70 specifically sought *inter alia* copies of all sonobuoy contracts entered into between the Navy and Magnavox during the period from November 18, 1975 to June 14, 1994. Exhibit 1 at A6, A10. This request is broad enough to encompass the Magnavox AN/SSQ-53B sonobuoys. The Government responded to the request by noting that it had agreed to provide all such contracts in response to earlier requests (Nos. 67

and 68). *Id.* at A9, A13. The Navy's responses to requests Nos. 67 and 68 agrees to make its records available for inspection and copying. *Id.* at A21-A23, A27.

Subsequently, the Navy made the documents available to Sparton's original counsel for inspection and copying at the Naval Air Warfare Center, Indianapolis[3] and at the Naval Surface Warfare Center, Crane Division. Exhibit 2 at A30. After Mr. Kreiss became counsel for Sparton, he made five trips to PMA-264 to inspect documents, and an additional trip to Crane. Exhibit 4 at A39; Exhibit 5 at A42; Exhibit 6. During at least one of the trips to PMA-264, he specifically requested documents related to the Magnavox AN/SSQ-53B. Exhibit 3 at A36.

In 1998, Sparton took the deposition of Chuck Logar, an employee of Magnavox. During that deposition, Mr. Kreiss specifically questioned Mr. Logar concerning the the deployment system of the Magnavox AN/SSQ-53B sonobuoy. Exhibit 7 at A53-A57. Further, the Government's Interrogatory No. 5 asked whether Sparton was asserting that the AN/SSQ-53B infringed either of the patents in suit. Exhibit 8 at A60. Sparton responded the AN/SSQ-53B was not accused of infringement. *Id.*

Given this background, Sparton had sufficient information from which to logically deduce that it would likely be raised as a non-infringing alternative for at least some of the accused sonobuoys since the Magnavox AN/SSQ-53B did not infringe. In any event, whether the issue has been raised is not the proper question. Here, Sparton certainly had access to the requested information and was free to evaluate the facts before it. Nothing more is required.

---

[3] The Indianapolis facility was closed as part of the Base Realignment and Closure (BRAC) process, and the records were moved to the Naval Surface Weapons Center, Crane, Indiana. Mr. Kreiss subsequently inspected the same records at Crane.

Sparton's interpretation of the Rules would lead to never-ending discovery. According to Sparton, whenever it had not anticipated an issue being raised, it would be entitled to re-open discovery. This time it is because Mr. McGavock utilized the available information in his expert report, but we see no reason under Sparton's reasoning why the same would not be true if information is produced during the pretrial briefing.

Second, Sparton argues that during the inspections "[n]o documents were … specifically segregated by the Navy in regard to the subject request." Mot. to Compel at 2. Sparton mis-comprehends the Court's Rules.

A party producing documents for inspection has two options: "A party who produces documents for inspection shall produce them as they are kept in the usual course of business or shall organize and label them to correspond with the categories in the request." RCFC 34(b). Here, the Government chose the former: it produced the records "as they are kept in the usual course of business." Having done, so the burden was on Sparton to sort through the records and locate the documents. Sparton has not identified any requirement that the Government "segregate" the records.

Third, Sparton contends that Sparton is entitled to discovery of two documents withheld by the Government as being privileged. Mot. to Compel at 2. Sparton cites two entries on the Government's privilege log:

(*i*) Letter re Sparton Corp. v. United States, Court of Federal Claims No. 92-580C, from Richard T. Seeger, Patent Counsel, Magnavox Electronic Systems Co., to Janice Mueller, Attorney, Department of Justice, dated 3-8-83 (Bates No. 000151); and

(*ii*) Letter re Sparton Corp. v. United States, Court of Federal Claims No. 92-580C, from Richard T. Seeger, Patent Counsel, Magnavox

Electronic Systems Co., to Janice Mueller, Attorney, Department of Justice, re N00019-70-C-0407, dated 3-8-83 (Bates No. 010975)

Mot. to Compel, Ex. E at 2, 4. Sparton asks that the Court review the documents *in camera*. Sparton cites no relationship to the issues raised in its motion, nor does it cite any authority for the requested *in camera* review.

The joint-defense doctrine – also known as the common interest or community of interest privilege – is an extension of the attorney-client privilege. The joint defense doctrine is simply stated: "It serves to protect the confidentiality of communications passing from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.,1989); *Capital Properties, Inc.,v. United States*, 49 Fed. Cl. 607, 613 (2001) (Merow, J.); *see also Eisenberg v. Gagnon*, 766 F.2d 770, 787 (3d Cir.), *cert. denied*, 474 U.S. 946 (1985); *B.E. Meyers & Co., Inc. v. United States*, 41 Fed. Cl. 729, 734 (1998) (Merow, J.).

The Court's Rules provide:

> When a party withholds information otherwise discoverable under these rules by claiming that it is privileged or subject to protection as trial preparation material, the party shall make the claim expressly and shall describe the nature of the documents, communications, or things not produced or disclosed in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the applicability of the privilege or protection.

RCFC 26(b)(5). "It is the party asserting the privilege who bears the burden of establishing its applicability." *Smithkline Beecham Corp. v. Apotex Corp.*, 193 F.R.D. 530, 534 (N.D. Ill. 2000). But, "the rule does not attempt to define for each case what information must be provided" in a privilege log, *Pacific Gas and Elec. Co. v. United States*, 69 Fed. Cl. 784, 812 (2006) (Hewitt, J.)

(citing Fed. R. Civ. P. 26(b)(5) Advisory Comm. Note). This Court has recognized that the privilege log itself may serve as the basis for resolving a privilege issue. *Pacific Gas*, 69 Fed. Cl. at 814.

In this instance, Sparton did not challenge the substance of the privilege log or the propriety of the claimed privileges for over eight years.[4] After the close of all discovery, Sparton now asserts that the Government should have produced the two documents.

Under the present circumstances, the Government's privilege log is adequate to determine the existence of at least the Joint Defense Privilege. Each of the entries indicates that the document is a letter originating with a Magnavox patent attorney and directed to Janice Mueller, a Justice Department attorney assigned to this case. Further, each of the entries indicates that the subject of the letter relates to the present case. And, as Sparton concedes, Magnavox was a contractor which supplied sonobuoys to the Navy. Mot. to Compel at 2. Government contractors have been recognized as sharing a community of interest with the Government in cases under § 1498. *See B. E. Meyers*, 41 Fed. Cl. at 734.

The privilege log are adequate to show, at least, that the Joint Defense Privilege was validly invoked. Accordingly, Sparton's motion must be denied.

---

[4] Sparton does not include the signature page which would include the date that this privilege log was served. Exhibit E to the Motion to Compel appears to be a privilege log that was served on Sparton on November 13, 1998, signed by Gary L. Hausken, as counsel of record. On its face, however, Exhibit E indicates that Judge Merow was still assigned to the case at the time the privilege log was served. *See* Mot. to Compel, Ex. E at 1. Thus, the privilege log was served no later than September 12, 2002. *See* Docket No. 212 (Order transferring the case from Judge Merow to Chief Judge Damich).

**B. REQUEST FOR PRODUCTION 5006**

Sparton's Request for Production No. 5006 reads as follows:

> All documents showing a Navy policy to utilize the changes clause in its fixed price supply contracts to obtain development work from its contractor without including in said contracts, or need to include in said contracts, a patent rights clause granting the government a royalty free license to utilize inventions conceived or first actually reduced to practice in the performance of said contracts.

Mot. to Compel, Ex. B at 8. The Government objected because the request was untimely and did not relate to expert discovery. Mot. to Compel, Ex. B at 9. The Government then answered that no such documents were know to exist. *Id.*

**1. Timeliness of the Request**

Here again, Sparton's request is directed to factual information, *i.e.*, a purported Navy policy to use the Changes clause in its contracts to obtain development work. Sparton asserts that it needs the information in order for Professor Nash to formulate his opinions and because Sparton's previous fact discovery request "did not cover the Navy policy which is the subject matter of this request." Mot. to Compel at 3-4. While that may be so, it does not justify submission of the Request for Production after the close of fact discovery.

First, as Sparton concedes, the amendment to the Government's interrogatory answer after the close of fact discovery did not change the *theory* under which the Government was arguing that it was licensed or otherwise lawful. Mot. to Compel at 3(the *Christian* doctrine defense "was raised by the defendant in its answer to Sparton's Interrogatory No. 1 in June 2005 and then was amended in June 2006 to add another contract under which the asserted license occurred"). In both its original answer, served before the close of fact discovery, and its amended answer, served afterward, the Government's reliance on the *Christian* Doctrine was the

same. Mot. to Compel at 3. Thus, Sparton had knowledge of the Government's theory before the close of fact discovery and, therefore, the ability to seek discovery to meet its needs during the period reserved for fact discovery.

Second, Sparton is not attempting to conduct discovery of the *Government's* expert, but to provide a basis for formulating its own opinions. As discussed with respect to Request for Production No. 5003, the purpose of expert discovery is to provide the opportunity learn the bases and opinions of the opponent's experts, not to provide further discovery in support of one's own experts. RCFC 26, R. Comm. Note for the 2002 Revision (RCFC 26 amended to parallel Fed. R. Civ. P. 26); Fed. R. Civ. P. 26, R. Comm. Note to the 1993 Amendment (The requirement in for a complete and detailed report from experts "may … eliminate the need for some [expert] depositions or at least reduce the length of the depositions"); *see also Shell Petroleum*, 46 Fed. Cl. at 584.

Sparton's request for fact discovery was untimely.

**2. Sufficiency of the Government's Response**

Sparton also challenges the sufficiency of the Government's answer. The Government answered that no responsive documents were known to exist, but all documents relating to the Navy's policies relating to sonobuoy procurement were produced for inspection and copying.

Sparton contends that "no search has been made to ascertain if documents responsive to this request exist." Mot. to Compel at 4. Sparton's statement is misleading. The Government has not searched the records provided at Crane or those originating from Indianapolis for the documents, nor is it required to do so. Pursuant to the RCFC 34, the United States had previously made the procurement records available for inspection and copying on numerous

occasions. *See* Exhibits 2-5. As to those records, Sparton bore the burden of inspecting the records and copying any that were pertinent to its case. *See* RCFC 34(b).

Further, the Government permitted inspection of its records relating to procurement policy from the Records of PMA-264. Exhibit 4 at A39. Indeed, Sparton has produced a Declaration by Ralph C. Nash, dated March 15, 1999. Exhibit 9 at A64-65. In paragraph 19 of that declaration, Professor Nash addresses what he describes as a "Navy practice" of using engineering change proposals to "improve the performance of sonobuoys." *Id.* Further, Professor Nash cites to several documents, which he claims support his position. Each of those documents appears to have been produced by the Government. *See* Exhibits 10 at A68-A72 (PMA-264 Strategic Plan) & 11at A75-A77 (NAVAIR Acquisition Guide).

And, the Government is aware of two other documents which it produced and which recite a Navy policy regarding procurement of sonobuoys: ANA Bulletin No. 445 and the NAVAIR Supplement to ANA Bulletin No. 445. Exhibits 12 & 13. These two documents are the basis for the Government's contention that no documents responsive to Request No. 5006 are known to exist. ANA Bulletin No. 445 purports to establish a uniform Air Force/Navy policy with regard to the use engineering change proposals. The production of these documents further supports the Government's view that all documents relating to the Navy's policy were provided for Sparton's inspection and copying.

### C. REQUEST FOR PRODUCTION 5007

Sparton's Request for Production No. 5007 reads as follows:

> All documents showing the Navy appropriations for the purchase of production sonobuoys and for the separate purchase of research and development work regarding sonobuoys in the period January 1, 1965 to January 1, 1994.

Mot. to Compel, Ex. B at 8. The Government responded that "The United States is unsure that any documents exist that are responsive to the request as stated." Mot. to Compel, Ex. B at 10.

**1. Timeliness of the Request**

Like Request for Production 5006, Request for Production No. 5007 is again directed to factual information, this time budget information for a 29-year span. Sparton again asserts that it needs the information in order for Professor Nash to formulate his opinions and because Sparton's previous fact discovery requests "did not cover the Navy appropriations which are the subject matter of this request." Mot. to Compel at 4-5. As with the previous request, Sparton's failure to seek discovery earlier does not justify submission of Request for Production No. 5007 after the close of fact discovery.

As Sparton again concedes (Mot. to Compel at 4) the amendment to the Government's interrogatory answer after the close of fact discovery did not change the *theory* under which the Government was arguing that it was licensed or otherwise lawful. Both the Government's original answer and its amended answer rely on the *Christian* Doctrine. Mot. to Compel at 4 (the *Christian* doctrine defense "was raised by the defendant in its answer to Sparton's Interrogatory No. 1 in June 2005 and then was amended in June 2006 to add another contract under which the asserted license occurred"). Thus, Sparton had knowledge of the Government's theory before the close of fact discovery.

And again, Sparton is not attempting to conduct discovery of the *Government's* expert, but to provide a basis for formulating its own opinions. As discussed with respect to Request for

Production No. 5003, the purpose of expert discovery is to provide the opportunity learn the bases and opinions of the opponent's experts, not to provide further discovery in support of one's own experts. RCFC 26, R. Comm. Note for the 2002 Rev. (RCFC 26 amended to parallel Fed. R. Civ. P. 26); Fed. R. Civ. P. 26, R. Comm. Note to the 1993 Amend. (The requirement in for a complete and detailed report from experts "may … eliminate the need for some [expert] depositions or at least reduce the length of the depositions"); *see also Shell Petroleum*, 46 Fed. Cl. at 584.

Sparton's request for fact discovery was untimely.

**2. Sufficiency of the Government's Response**

As noted, the Government responded that it was unsure that any documents were responsive to the request as written. The difficulty arises from Sparton's choice of terminology. Sparton asks for all documents "showing the Navy appropriations for the purchase of production sonobuoys and for the separate purchase of research and development work …." Mot. to Compel, Ex. B at 8. The Sparton request assumes the both procurement of production sonobuoys and sonobuoy research or development work are under discrete "appropriations" that are discernable. Indeed, in its motion, Sparton states:

> It is believed that the Navy receives a separate and distinct appropriation for the purchase of production sonobuoys as distinguished from the purchase of sonobuoy research and development work *which may be a line item in its research and development appropriation.*

Mot. to Compel at 5 (emphasis added). Thus, Sparton's request is based on its own assumptions of how the United States Government accounts for the funds used by Navy for sonobuoy work. Those assumptions appear to be flawed.

As an initial matter, Sparton is inconsistent in describing its request. Request No. 5007 asks for documents relating to two distinct "appropriations" (notably in the plural): one for production sonobuoys and one for "sonobuoy research and development work." But its Motion to Compel, suggests that only one appropriation – for production sonobuoys – is discrete, while the research and development work is performed under a general appropriation. *Compare* Mot. to Compel at 5 *with* Mot. to Compel, Ex. B at 9.

The procurement of sonobuoys traditionally has not been the subject of a line item appropriation. For example, for Fiscal Year 1991, the appropriation was accounted for under the category "Other Procurement, Navy":

> For procurement, production, and modernization of support equipment and materials not otherwise provided for, Navy ordnance …; the purchase of not to exceed 2 vehicles required for physical security of personnel,…; expansion of public and private plants, including the land necessary therefor, and such lands and interests therein, may be acquired, and construction prosecuted thereon prior to approval of title; and procurement and installation of equipment, appliances, and machine tools in public and private plants; reserve plant and Government and contractor-owned equipment layaway; $5,627,160,000, to remain available for obligation until September 30, 1993, *of which not less than $160,000,000 shall be for the procurement of sonobuoys*….

Department of Defense Appropriations Act, 1991, Pub. L. 101-511, 104 Stat. 1856, 1866 (1990). The 1991 appropriations act is consistent with the Government's knowledge of the historical funding of sonobuoys for the Navy.

The funding of sonobuoys historically has not been through discrete appropriations for those devices. Rather it has been funded through discretionary allocation of funds for sonobuoys through general appropriations, like the Navy's 1991 "Other procurement" funding. Thus, the Government does not believe that any documents responsive to plaintiff's request exist because

there is no fixed or determinable amount that is "appropriated" specifically for sonobuoys, either for procurement or research and development.

Further, to the extent that Sparton is asserting that it is looking for *any* information as to Navy's funding of its sonobuoy program, that information was already provided at Sparton's request during the previous document inspections. Exhibits 4-5.

All available documents relating to the procurement of sonobuoys have been previously provided. The Navy's appropriations are a matter of public record, and widely-available through both print media and internet-based services, such as Lexis-Nexis and Westlaw. Sparton can easily acquire all available information as to the Navy's appropriations through those public sources. *See* RCFC 26(b)(2) (court may limit use requests for production where the "discovery sought … is available from some other source that is more convenient [or] less expensive").

Sparton has not demonstrated that the Government has withheld any responsive documents from discovery. The request should be denied.

### D. Requests for Admissions 2001-2006, 2008 and 2009

Sparton's Motion to Compel separately addresses the following groups of requests for admissions: 2001-2003, 2004, 2005-2006, 2008 and 2009. *See* Mot. to Compel at 5-8. In the end, however, there are only insubstantial differences in the treatments of these groups in the Motion to Compel. Accordingly, we address Requests for Admissions Nos. 2001-2006, 2008 and 2009 collectively. The Government has objected to each of these Requests for Admission (RFA) as being in improper form, untimely, and unduly burdensome. We address each argument in turn.

### 1. RCFC 36 Objection As to Form

The proper form for every request for admission is established by RCFC 36(a), which requires: "Each matter of which an admission is requested shall be separately set forth." In order to comply with the rule "the requesting party bears the burden of setting forth its requests simply, directly, not vaguely or ambiguously, and in such a manner that they can be answered with a simple admit or deny without an explanation …." *Henry v. Champlain Enterprises, Inc.*, 212 F.R.D. 73, 77 (N.D. N.Y. 2003) (address identical language in Fed. R. Civ. P. 36(a)). Examples of proper single-matter requests for admissions are found in *Thalheim v. Eberheim*, 124 F.R.D. 34, 35 (D. Conn.1988) (*e.g.*, "Request No. 7[:] On September 27, 1985 Stardust Too came free from its mooring."). RFA Nos. 2001-2008 fail to separately state each matter to be admitted, as required by the rule.

RFA No. 2001 states "[a]dmit each sentence in Sparton Corporations's [sic] Statement of Relevant Facts 1-27 contained on pages 30 through 45 of Sparton's Pretrial Submissions." Mot. to Compel, Ex. C at 5. Even if one were to assume[5] that each sentence in those 15 pages constituted a single matter, in excess of 75 "matters" are stated in the 27 paragraphs. Similarly, RFA No. 2002 states: "[a]dmit each sentence in Sparton Corporations's [sic] Statement of Relevant Facts 30 contained on page 48 of Sparton's Pretrial Submissions …." Mot. to Compel, Ex. C at 7. Paragraph 30 contains five sentences. Mot. to Compel, Ex. F at 22. And RFA 2003 parallels RFA 2001, but asks about different paragraphs: "[a]dmit each sentence in Sparton Corporation's Statement of Relevant Facts 31 through 53 contained on pages 48 through 63 of

[5] Such an assumption would not be well-founded. *See* Mot. to Compel, Ex. F at 14, ¶ 19, second sentence (single sentence stating eight factors that "affect the propagation of sound waves in the ocean").

Sparton's Pretrial Submissions." Mot. to Compel, Ex. F at 9. Thus, Sparton failed to comply with the requirement to separately set forth each matter it for which it requests an admission.

RFA Nos. 2004 through 2006 and 2009 request admissions relating to Exhibit 24 to Sparton's Pretrial Submissions, which contains information relating to 62 contracts for sonobuoys accused in this litigation. Exhibit 24 is Exhibit I to the Motion to Compel. RFA No. 2004 request admission that"at least one" of "each accused device identified in the two accounting base charts included as exhibit 24" were used during each of six stated permutations of the accounting period. Mot. to Compel, Ex. C at 11. RFA No. 2005 requests admissions to correctness of the delivery dates in Exhibit 24, and RFA No. 2006 asks for admissions as to the correctness of each contract value in Exhibit 24. Mot. to Compel, Ex. C at 13, 14. RFA No. 2009 asks the Government to admit that neither Magnavox nor the Navy proposed the Magavox SSQ-53B sonobuoy as an alternative to the accused sonobuoys manufactured under 62 contracts listed in Exhibit 24. Mot. to Compel, Ex. C at 19. Each of these requests suffers from the same disability: Exhibit 24 contains multiple data points relating to the 62 contracts which must be independently verified and either admitted or denied. The Government, however, cannot do that in simple "admit" or "deny" fashion because the data points have not been separately set forth.

RFA No. 2008 requests that Government admit the correctness of (1) selling price, (2) number of sonobuoys quoted, (3) fee, (4) cost of money, (5) total cost through G&A and (6) requested profit percent for each of 15 bids that Sparton submitted contracts or bids. Mot. to Compel, Ex. C at 17. As such, it requires admission or denial of 90 data points. *See* Mot. to Compel, Ex. J (Exhibit 26 that is referenced in RFA No. 2008). On its face, this request for

admission clearly violates of the mandate in RCFC 36(a) to "separately set forth" each matter to be admitted or denied.

**2. Timeliness of Requests for Admissions**

All of the requests for admission (RFA Nos. 2001-2006, 2008 and 2009) are untimely for the reasons previously addressed with respect to Sparton's requests for production. Each of the these requests inherently raises issues of fact not expert opinion.

Sparton concedes that the RFA No. 2001-2003 are directly related to facts on which "defendant's experts *relied*." Mot. to Compel at 5 (emphasis added). But Sparton does not seek the opinions or bases from the Government's experts. Rather Sparton merely seeks to obtain admissions that certain of the facts are true. Such a request does not seek "expert discovery," but "fact discovery." *See Shell Petroleum*, 46 Fed. Cl. at 584. Sparton further contends that Mr. Hudson relied on matters very similar to those which are the subject of these requests for admissions. Sparton's claim is both inaccurate and irrelevant.

Sparton cites to Mr. Hudson's report, where Mr. Hudson states "Counsel has informed me that I may consider factual matters in Exhibits C and D as having been established." Mot. to Compel at 5 & Ex. H at 3, 5-9. Mr. Hudson's report is irrelevant to the present issue. Whether or not Mr. Hudson relied on matter of which he was advised by counsel is not germane to whether the Government must answer the present requests for admission. The issue here is whether Sparton has properly framed its requests for admissions, whether the requests were timely presented and whether those requests are unduly burdensome for failure to provide citations. Mr. Hudson's report does not help answers any of those inquiries.

Sparton also points to the Government's submission of 415 proposed stipulations to Sparton as providing a basis for the serving the requests for admission. *Id.* at 5 & Ex. G. Sparton's reliance on the Government's proposed stipulations is equally misplaced. The Court's Proposed Trial Preparation Order, which is published on the Court's internet site, requires that the parties file:

> (2) a Joint Stipulation of Facts, Witnesses, and Exhibits as follows:
>
> (a) a statements of the facts on which the parties agree, separately numbered and based on the parties' Proposed Findings of Fact;
>
> (b) a listing of all witnesses to which neither party objects, with a brief description of each such witness;
>
> (c) a descriptive listing of all exhibits to which neither party objects on the grounds of authenticity or admissibility ….

Proposed Trial Preparation Order at ¶ 2.c.*ii*.(2). The Government's proposed stipulations were merely a effort to start the process of preparing the required Joint Stipulation of Facts. Sparton, on the other hand, chose not to propose any stipulations in response to the Government's proposal. Instead, Sparton served these present requests for admissions. Sparton does not explain why it chose the present method (rather than discussing possible stipulations with opposing counsel), nor does it explain why it waited until well after the close of fact discovery to do so.

Finally, Sparton contends that the requests for admissions are proper expert discovery because they "directly relate to … the facts upon which defendant's" experts rely. Mot. to Compel at 6. Here, again, Sparton misconstrues the purpose of expert discovery. The requests for admissions are not a form of expert discovery because Sparton does not seek the to discovery the experts' opinions or the bases of those opinions. Rather, Sparton *already knows the*

*operative facts* and is simply trying to obtain admissions to the truth of those facts. Sparton seeks fact discovery, not expert discovery.

**3. The Requests Are Unduly Burdensome**

RCFC 26 requires the Court to limit the scope of discovery where "the burden or expense of the proposed discovery outweighs its likely benefit, taking into account … the importance of the proposed discovery in resolving the issues." That the requests for admission place undue burden on the Government in this instance flows from Sparton's failure to comply with the requirement to state each fact separately.

Through its multi-part requests for admission, Sparton has attempted to unfairly place the burden on the Government to parse out separate facts information and separately admit or deny each such fact. That burden is assigned to the author of the requests by RCFC 36(b). Rather than re-write its Pretrial Submissions as separate facts, however, Sparton simply attempts to write broad request that cover multiple sentences, and in some cases, multiple paragraphs of its Pretrial Submissions.

The burden imposed on the Government is further increased because Sparton has not provided citations for virtually any of the asserted facts. Thus, the Government is first forced to determine the source of the information before it can determine the accuracy of the requested stipulation. By comparison, the Court's Proposed Trial Preparation Order, at ¶¶ 2.a.*i*.(1)(c) & 2.a.*i*.(1)(b), requires that the each party identify the basis for each asserted fact.

Finally, denying Sparton's motion to compel will not impede the prompt and fair resolution of the issues in this case. As discussed above, the Court will undoubtedly require the parties to discuss stipulations as part of the pretrial procedures. Proposed Trial Preparation Order

at ¶ 2.c.*ii*.(2). As Sparton points out (Mot. to Compel at 5), the Government has already proposed 415 potential stipulations. Thus, the Government has already demonstrated its willingness to discuss stipulations for the purpose of trial. We see no reason why Sparton's requests cannot be addressed as part of that stipulation process.

## III. CONCLUSION

Sparton has failed to demonstrate that it is entitled to relief. All of Sparton's discovery requests at issue here were untimely when served. Further, the Government's responses to the requests for production were sufficient. And Sparton's requests for requests for admission fail to comply with the Court's Rules. For all of these reasons, and others addressed above, the Government requests that the Court deny Sparton Corporation's Motion to Compel Sufficient

Answers to Requests for Admissions Pursuant to RCFC 36(a) and the Production of Documents Pursuant to RCFC 34(b).

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

s/*Gary L. Hausken*
GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

October 20, 2006

Attorneys for the United States

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) ) ) ) ) ) ) ) ) ) | No. 92-580C<br><br>Chief Judge Edward J. Damich |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 1

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, Plaintiff, | ) | |
| v. | ) | No. 92-580C |
| THE UNITED STATES, Defendant. | ) | Judge James F. Merow |

**DEFENDANT'S RESPONSES AND OBJECTIONS TO PLAINTIFF'S REQUESTS FOR PRODUCTION OF DOCUMENTS NOS. 17-204**

Defendant, the United States (hereafter "the government") objects and responds to "Plaintiff's Requests for Production of Documents Nos. 17-204," served May 4, 1994, pursuant to Rule 34 of the Rules of the United States Court of Federal Claims (RCFC). The government's response includes that of the Department of Justice and incorporates by reference the accompanying "Responses on Behalf of the Department of the Navy to Plaintiff's Requests for Production Nos. 17-204."

Pursuant to RCFC 34, the government will make available for inspection and copying by plaintiff all non-privileged, non-classified portions of the documents and things, not subject to any objection, which are responsive to plaintiff's requests for production. The documents and things will be produced at the location(s) noted in the responses of the Department of the Navy, in the manner in which they are normally kept, at a mutually convenient time to be arranged through government counsel.

The government's investigation in response to these requests for production is ongoing. The government and its agencies

reserve the right to supplement their responses should additional responsive documents or things be located.

The government's objections to each request for production are stated herein. The government's identification or production of any document or thing in response to any request for production is not to be considered as a waiver of any objection stated herein, or as a waiver of any claim that other documents or things are covered by attorney-client privilege or attorney work-product immunity or otherwise protected from discovery in whole or in part.

The following General Objections are expressly referred to in the government's specific objections to each request for production, and should be deemed as incorporated by reference where noted.

**GENERAL OBJECTIONS**

The government, on behalf of itself, the Department of Justice, and the Department of the Navy, generally objects pursuant to RCFC 34(b) to plaintiff's requests for production on the following general grounds:

I. The government objects to plaintiff's requests for production to the extent that they seek documents or things which are protected from discovery by any evidentiary privilege, restriction or exemption including but not limited to attorney-client privilege or attorney work-product immunity.

II. The government objects to plaintiff's requests for production to the extent that they seek documents or things which are classified for reasons of national security.

III. The government objects to plaintiff's requests for production as unduly burdensome to the extent that they seek documents or things which:

(a) plaintiff has or should have;

(b) the government has previously produced to plaintiff during this lawsuit;

(c) is or will be equally available to plaintiff, particularly after the government's production of documents;

(d) requires the government to perform an analysis which can be as easily performed by plaintiff;

(e) requires an investigation of or discovery from a non-party, such as a contractor; or

(f) requires an investigation beyond the scope of discovery permitted by RCFC 26(b).

IV. The government objects to plaintiff's requests for production as unduly burdensome in scope to the extent that plaintiff defines the terms "sonobuoy," "sonobuoy release plate," and "sonobuoy related hardware" to encompass subject matter other than that claimed in the patents in suit.

V. The government objects to plaintiff's requests for production to the extent that plaintiff defines the term "purchased" as defined by U.C.C. § 1-201(32) (1990). The Uniform

Commercial Code is not binding on the federal government. See Marine Midland Bank v. United States, 687 F.2d 395, 401 n.5 (Ct. Cl. 1982), cert. denied, 460 U.S. 1037 (1983); Hubbs v. United States, 20 Cl. Ct. 423, 427 (1990), aff'd, 925 F.2d 1480 (Fed. Cir. 1991) (Table).

**Request for Production No. 69:**

As to each contract for either sonobuoy(s) or sonobuoy release plate(s) between the government and Magnavox Government and Industrial Electronics Company (see government's Amended Answer, paragraph 7) within the period from and including November 18, 1975 through and including June 14, 1994, produce:

(a) the executed contract including technical specifications, performance specifications and statement(s) of work;

(b) contract modification(s), engineering change proposal(s), change order(s) and contract change proposals;

(c) documents submitted as required by a Contract Data Requirement List(s) (CDRL) under the contract;

(d) technical descriptions referring to or relating to the sonobuoy(s);

(e) technical descriptions referring to or relating to the sonobuoy release plate(s);

(f) operational description(s) referring to or relating to the sonobuoy(s);

(g) operational description(s) referring to or relating to the sonobuoy release plate(s);

(h) drawings, including engineering drawings, referring to or relating to the sonobuoy(s);

(i) drawings, including engineering drawings, referring to or relating to the sonobuoy release plate(s);

(j) documents referring to or relating to performance testing and evaluation for the sonobuoy(s);

(k) documents referring to or relating to performance testing and evaluation for the sonobuoy release plate(s);

(l) documents referring or relating to acceptance criteria for the sonobuoy(s);

(m) documents referring or relating to acceptance criteria for the sonobuoy release plate(s);

(n) documents referring or relating to bills of material under the contract;

(o) documents referring or relating to engineering test procedures;

(p) documents referring or relating to production test procedures;

(q) documents referring or relating to billing;

(r) documents referring or relating to payments made to the contractor;

(s) documents referring or relating to acceptance by the government of the sonobuoy(s) under the contract;

(t) documents referring or relating to acceptance by the government of the sonobuoy release plate(s) under the contract;

(u) documents referring or relating to acceptance by the government of the sonobuoy related hardware under the contract;

(v) documents referring or relating to delivery of sonobuoy(s) under the contract;

(w) documents referring or relating to delivery of sonobuoy release plate(s) under the contract;

(x) documents referring or relating to delivery of sonobuoy related hardware under the contract;

(y) documents referring or relating to the quantity of sonobuoy(s) delivered or to be delivered under the contract;

(z) documents referring or relating to the quantity of sonobuoy release plate(s) delivered or to be delivered under the contract;

(aa) documents referring or relating to the quantity of sonobuoy related hardware delivered or to be delivered under the contract;

(bb) a representative sample of each type or model of sonobuoy delivered or to be delivered under the contract;

(cc) a representative sample of each type of sonobuoy release plate delivered or to be delivered under the contract; and

(dd) a representative sample of each item of sonobuoy related hardware delivered or to be delivered under the contract.

**Response to Request for Production No. 69:**

General Objections I-IV are made to Request for Production No. 69.

The government further objects to Request for Production No. 69 on the ground that it is duplicative of Requests for Production Nos. 67-68.

The government further objects to Request for Production No. 69 on the ground that it is unduly burdensome to the extent that production is sought of documents and things having an effective date prior to plaintiff's recovery period, which plaintiff has stated begins on February 11, 1981.

The government objects to subparts (j)-(m) and (o)-(p) of this request for production as vague and ambiguous. Plaintiff does not define nor distinguish the terms "performance testing and evaluation," "acceptance criteria," "engineering test," and "production test."

**Request for Production No. 70:**

As to each contract for either sonobuoy(s) or sonobuoy release plate(s) between the government and Magnavox Electronics Systems Company (see government's Amended Answer, paragraph 7) within the period from and including November 18, 1975 through and including June 14, 1994, produce:

(a) the executed contract including technical specifications, performance specifications and statement(s) of work;

(b) contract modification(s), engineering change proposal(s), change order(s) and contract change proposals;

(c) documents submitted as required by a Contract Data Requirement List(s) (CDRL) under the contract;

(d) technical descriptions referring to or relating to the sonobuoy(s);

(e) technical descriptions referring to or relating to the sonobuoy release plate(s);

(f) operational description(s) referring to or relating to the sonobuoy(s);

(g) operational description(s) referring to or relating to the sonobuoy release plate(s);

(h) drawings, including engineering drawings, referring to or relating to the sonobuoy(s);

(i) drawings, including engineering drawings, referring to or relating to the sonobuoy release plate(s);

(j) documents referring to or relating to performance testing and evaluation for the sonobuoy(s);

(k) documents referring to or relating to performance testing and evaluation for the sonobuoy release plate(s);

(l) documents referring or relating to acceptance criteria for the sonobuoy(s);

(m) documents referring or relating to acceptance criteria for the sonobuoy release plate(s);

(n) documents referring or relating to bills of material under the contract;

(o) documents referring or relating to engineering test procedures;

(p) documents referring or relating to production test procedures;

(q) documents referring or relating to billing;

(r) documents referring or relating to payments made to the contractor;

(s) documents referring or relating to acceptance by the government of the sonobuoy(s) under the contract;

(t) documents referring or relating to acceptance by the government of the sonobuoy release plate(s) under the contract;

(u) documents referring or relating to acceptance by the government of the sonobuoy related hardware under the contract;

(v) documents referring or relating to delivery of sonobuoy(s) under the contract;

(w) documents referring or relating to delivery of sonobuoy release plate(s) under the contract;

(x) documents referring or relating to delivery of sonobuoy related hardware under the contract;

(y) documents referring or relating to the quantity of sonobuoy(s) delivered or to be delivered under the contract;

(z) documents referring or relating to the quantity of sonobuoy release plate(s) delivered or to be delivered under the contract;

(aa) documents referring or relating to the quantity of sonobuoy related hardware delivered or to be delivered under the contract;

(bb) a representative sample of each type or model of sonobuoy delivered or to be delivered under the contract;

(cc) a representative sample of each type of sonobuoy release plate delivered or to be delivered under the contract; and

(dd) a representative sample of each item of sonobuoy related hardware delivered or to be delivered under the contract.

**Response to Request for Production No. 70:**

General Objections I-IV are made to Request for Production No. 70.

The government further objects to Request for Production No. 70 on the ground that it is duplicative of Requests for Production Nos. 67-68.

The government further objects to Request for Production No. 70 on the ground that it is unduly burdensome to the extent that production is sought of documents and things having an effective date prior to plaintiff's recovery period, which plaintiff has stated begins on February 11, 1981.

The government objects to subparts (j)-(m) and (o)-(p) of this request for production as vague and ambiguous. Plaintiff does not define nor distinguish the terms "performance testing and evaluation," "acceptance criteria," "engineering test," and "production test."

Respectfully submitted,

FRANK W. HUNGER
Assistant Attorney General

VITO J. DiPIETRO
Director

Janice M. Mueller

JANICE M. MUELLER
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D.C. 20530
(202) 616-8116

June 3, 1994

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 92-580C |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

RESPONSES ON BEHALF OF THE
DEPARTMENT OF THE NAVY TO PLAINTIFF'S
REQUESTS FOR PRODUCTION Nos. 17-204

In response to Plaintiff's Requests for Production to Defendant, The United States, the Department of the Navy provides the following responses to Requests for Production Nos. 17-68, 76-82, 88 and 89 as far as they pertain to the Department of the Navy (including the Marine Corps). It is understood that the Department of Justice will respond and/or object to certain of Plaintiff's Requests for Production. Information relating to the residential addresses of persons may not be disclosed in accordance with the Privacy Act, Title 5 U.S.C. 552a.

Responses are limited to records and things in the possession, custody or control of the Department of the Navy in accordance with the Rules of the United States of Court Federal Claims. A diligent search has been made of those Navy activities

likely to use sonobouys. Documents and things responsive to the requests for production will be produced pursuant to Rule 34(b) of the United States of Court Federal Claims, in the manner in which they are kept in the usual course of business, at the locations noted herein. Such production is not a waiver of Defendant's right to exclude any document which is subject to attorney-client, attorney work-product, state secrets, or any other evidentiary privilege.

In response to those Requests for Production where specific documents are produced, production of the documents is not to be considered as a waiver of any claim that such document or any information contained therein is immune from discovery in whole or in part.

Some documents which are subject to Plaintiff's Requests for Production may contain information which is of a business confidential nature and may only be produced subject to proper limitation. See 18 U.S.C. 1905. Accordingly, the Government's production of such documents for inspection will be subject to the condition that any third party, who claims such document or information to be proprietary or confidential, agrees to the disclosure of such documents or information or is ordered by the Court to comply with a suitable protective order.

Some of the documents responsive to Plaintiff's Requests for Production may contain classified information. Production of such documents will be made only to persons with proper security clearances and authorization. Any copying of such documents must be subject to the applicable Government regulations governing the handling of classified material.

The search for responsive documents and things by the Department of the Navy is on-going, and these responses may be supplemented if necessary as additional documents and things are located.

**Request No. 67:**

Other than those contracts which are the subject of **Production Request Nos. 17-66** above, as to each contract entered into by the government for either sonobuoy(s) or sonobuoy release plate(s), entered into by the government within the period from and including November 18, 1975 through and including June 14, 1994, produce:

(a) the executed contract including technical specifications, performance specifications and statement(s) of work;

(b) contract modification(s), engineering change proposal(s), change order(s) and contract change proposals;

(c) documents submitted as required by a Contract Data Requirement List(s) (CDRL) under the contract;

(d) technical descriptions referring to or relating to the sonobuoy(s);

(e) technical descriptions referring to or relating to the sonobuoy release plate(s);

(f) operational description(s) referring to or relating to the sonobuoy(s);

(g) operational description(s) referring to or relating to the sonobuoy release plate(s);

(h) drawings, including engineering drawings, referring to or relating to the sonobuoy(s);

(i) drawings, including engineering drawings, referring to or relating to the sonobuoy release plate(s);

(j) documents referring to or relating to performance testing and evaluation for the sonobuoy(s);

(k) documents referring to or relating to performance testing and evaluation for the sonobuoy release plate(s);

(l) documents referring or relating to acceptance criteria for the sonobuoy(s);

(m) documents referring or relating to acceptance criteria for the sonobuoy release plate(s);

(n) documents referring or relating to bills of material under the contract;

(o) documents referring or relating to engineering test procedures;

(p) documents referring or relating to production test procedures;

(q) documents referring or relating to billing;

(r) documents referring or relating to payments made to the contractor;

(s) documents referring or relating to acceptance by the government of the sonobuoy(s) under the contract;

(t) documents referring or relating to acceptance by the government of the sonobuoy release plate(s) under the contract;

(u) documents referring or relating to acceptance by the government of the sonobuoy related hardware under the contract;

(v) documents referring or relating to delivery of sonobuoy(s) under the contract;

(w) documents referring or relating to delivery of sonobuoy release plate(s) under the contract;

(x) documents referring or relating to delivery of sonobuoy related hardware under the contract;

(y) documents referring or relating to the quantity of sonobuoy(s) delivered or to be delivered under the contract;

(z) documents referring or relating to the quantity of sonobuoy release plate(s) delivered or to be delivered under the contract;

(aa) documents referring or relating to the quantity of sonobuoy related hardware delivered or to be delivered under the contract;

(bb) a representative sample of each type or model of sonobuoy delivered or to be delivered under the contract;

(cc) a representative sample of each type of sonobuoy release plate delivered or to be delivered under the contract; and

(dd) a representative sample of each item of sonobuoy related hardware delivered or to be delivered under the contract.

**Response by the Department of the Navy to Request No. 67**

See Table 1. A search of Department of the Navy records has located documents which may be responsive to this Request for Production. Existing documents satisfying this Request for Production will be made available at the Naval Air Warfare Center, Aircraft Division, Indianapolis facility.

The following contracts listed in Table 1 (excluding Sparton contracts) were destroyed subsequent to six years and three months after final payment in accordance with FAR 4.805:

N00019-79-C-0162

N00019-79-C-0163

N00163-79-C-0161

N00163-79-C-0220

N00163-80-C-0213 ( The contract was destroyed, however the cooorespondance file is available.)

The following contracts listed in Table 1 (excluding Sparton contracts) cannot be located and were presumed to have been destroyed six years and three months after final payment in accordance with FAR 4.805:

N00019-76-C-0228

N00019-76-C-0234

N00019-77-C-0066

N00019-77-C-0167

N00019-77-C-0168

N00019-78-C-0056

N00019-78-C-0128

N00019-78-C-0199

N00163-78-C-0112

N00163-81-C-0287

N00163-82-C-0067

N00163-83-C-0003

The Department of the Navy is unable to locate the following contracts:

N00163-87-C-0001

N00163-89-C-0010

**Request No. 68:**

Other than those contracts which are the subject of **Production Request Nos. 17-67** above, as to each contract entered into by the government for either sonobuoy(s) or sonobuoy release plate(s), for which delivery of either sonobuoy(s) or sonobuoy release plate(s) under the contract is or would be within the period from and including November 18, 1975 through and including June 14, 1994, produce:

(a) the executed contract including technical specifications, performance specifications and statement(s) of work;

(b) contract modification(s), engineering change proposal(s), change order(s) and contract change proposals;

(c) documents submitted as required by a Contract Data Requirement List(s) (CDRL) under the contract;

(d) technical descriptions referring to or relating to the sonobuoy(s);

(e) technical descriptions referring to or relating to the sonobuoy release plate(s);

(f) operational description(s) referring to or relating to the sonobuoy(s);

(g) operational description(s) referring to or relating to the sonobuoy release plate(s);

(h) drawings, including engineering drawings, referring to or relating to the sonobuoy(s);

(i) drawings, including engineering drawings, referring to or relating to the sonobuoy release plate(s);

(j) documents referring to or relating to performance testing and evaluation for the sonobuoy(s);

(k) documents referring to or relating to performance testing and evaluation for the sonobuoy release plate(s);

(l) documents referring or relating to acceptance criteria for the sonobuoy(s);

(m) documents referring or relating to acceptance criteria for the sonobuoy release plate(s);

(n) documents referring or relating to bills of material under the contract;

(o) documents referring or relating to engineering test procedures;

(p) documents referring or relating to production test procedures;

(q) documents referring or relating to billing;

(r) documents referring or relating to payments made to the contractor;

(s) documents referring or relating to acceptance by the government of the sonobuoy(s) under the contract;

(t) documents referring or relating to acceptance by the government of the sonobuoy release plate(s) under the contract;

(u) documents referring or relating to acceptance by the government of the sonobuoy related hardware under the contract;

(v) documents referring or relating to delivery of sonobuoy(s) under the contract;

(w) documents referring or relating to delivery of sonobuoy release plate(s) under the contract;

(x) documents referring or relating to delivery of sonobuoy related hardware under the contract;

(y) documents referring or relating to the quantity of sonobuoy(s) delivered or to be delivered under the contract;

(z) documents referring or relating to the quantity of sonobuoy release plate(s) delivered or to be delivered under the contract;

(aa) documents referring or relating to the quantity of sonobuoy related hardware delivered or to be delivered under the contract;

(bb) a representative sample of each type or model of sonobuoy delivered or to be delivered under the contract;

(cc) a representative sample of each type of sonobuoy release plate delivered or to be delivered under the contract; and

(dd) a representative sample of each item of sonobuoy related hardware delivered or to be delivered under the contract.

**Response by the Department of the Navy to Request No. 68:**

Same response as to Request for Production No. 67

**Request No. 89:**

All Documents relied upon in answering Interrogatory No. 83.

**Response by the Department of the Navy to Request No. 89:**

The Department of the Navy is unable to respond to this Request for Production at this time. If necessary, the Navy's response to Request for Production will be supplemented at a later date.

Frank G. Nieman

FRANK G. NIEMAN

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, Plaintiff, | ) | |
| v. | ) | No. 92-580C |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, Defendant. | ) | |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 2

OBLON, SPIVAK, McCLELLAND, MAIER & NEUSTADT, P.C.
ATTORNEYS AT LAW
FOURTH FLOOR
1755 JEFFERSON DAVIS HIGHWAY
ARLINGTON, VIRGINIA 22202 U. S. A.

TELEPHONE
(703) 413-3000
FACSIMILE
(703) 413-2220
TELEX
248855 OPAT UR

NORMAN F. OBLON
MARVIN J. SPIVAK
C. IRVIN McCLELLAND
GREGORY J. MAIER
ARTHUR I. NEUSTADT
ROBERT C. MILLER
RICHARD D. KELLY
JAMES D. HAMILTON
ECKHARD H. KUESTERS
ROBERT T. POUS
DAVID J. KERA
CHARLES L. GHOLZ
VINCENT J. SUNDERDICK*
WILLIAM E. BEAUMONT
STEVEN B. KELBER*
STUART D. DWORK
ROBERT F. GNUSE
JEAN-PAUL LAVALLEYE, PH.D.
JEFFREY H. KAUFMAN
BRIAN D. ANDERSON*
ROBERTA S. BREN
WILLIAM B. WALKER*
TIMOTHY R. SCHWARTZ, PH.D
JOHN H. WEBER
STEPHEN G. BAXTER, PH.D.
GILBERTO M. VILLACORTA, PH.D.*

MILTON STERMAN*
SAMUEL H. BLECH*
JOHN O. TRESANSKY*
ALTON D. ROLLINS

JOHN H.O. CLARKE*
JAMES R. BOLER*
JOHN T. GOOLKASIAN*

DAVID A. NOVAIS
MARTIN M. ZOLTICK
CARL E. SCHLIER
STEVEN P. WEIHROUCH
P. JAY HINES
BARRY P. MILLER
SURINDER SACHAR
JAMES J. KULBASKI
TIMOTHY L. SCOTT*
CHRISTOPHER W. WELLS
CATHERINE M. BAX*
WILLIAM G. CONGER*
ANNETTE L. BADE*
JOHN C. BROSKY
MARC ASPERAS
FREDERICK D. VASTINE, PH.D.*
MURRAY TILLMAN*
ROBERT W. HAHL, PH.D.*
RICHARD L. CHINN, PH.D.*
ANDREW D. FORTNEY, PH.D.*
MARC R. LABGOLD, PH.D.*
RICHARD A. NEIFELD, PH.D.*
J. DEREK MASON, PH.D.*
KENNETH B. WELLS*
ANDREW B. GRIFFIS*
RICHARD L. TREANOR, PH.D.*
KAREN L. SHANNON, PH.D.*

PATENT, TRADEMARK AND COPYRIGHT LAW
AND RELATED FEDERAL AND ITC LITIGATION

WEST COAST OFFICE
224 AIRPORT PARKWAY, SUITE 300
SAN JOSE, CALIFORNIA 95110
TELEPHONE
(408) 436-2070
FACSIMILE
(408) 436-2075

*BAR MEMBERSHIP OTHER THAN VIRGINIA
*REGISTERED PATENT AGENT

July 11, 1994
via facsimile

CONFIRMATION

Steve Ahlrich
ALCO Management Services
440 N. Meridian
Indianapolis, IN 46204

Re: On-site document inspections

Dear Steve:

In accordance with our recent telephone conversations, I am requesting your services for two on-site document inspections at the Naval Avionics Center in Indianapolis, IN and the Naval Surface Warfare Center in Crane, IN. We have agreed to place two copy machines with operators from you offices at both facilities. The copy operators can begin copying at 9:30 a.m. on July 13 in Indianapolis and 12:00 p.m. on July 18 in Crane. Thereafter the operators will be allowed to copy Monday - Friday, 7:30 a.m. - 4:30 p.m., until the job is complete. They are to make one copy of all documents which will be flagged with a "post it" note. Any two-sided documents are to be converted to one-sided. All oversize documents should be reduced to 8-1/2" X 11" where possible. Those which cannot be reduced to that size shall be copied size-for-size.

We have estimated that given my description of the type of copying involved and the potential number of documents, that it will take two operators, each copying an estimated 2500 pages/day, approximately two weeks at each site to complete the project (the actual number of documents will not be known until the inspection has commenced). You quoted me a rough cost estimate of $.15/page based on statements I made to you regarding the nature of the job. The cost of installing and remc--ing the copy machines is a flat rate of $200 per machine. In addition, travel charges for your operators will consist of a mileage cost of $.30/mile.

In order to facilitate the Navy's security requirements, a list of the operators which you intend to place at each facility will be necessary. On Friday you identified three potential operators for the Indianapolis facility. Please fax to me this afternoon a complete verification list of operators for both facilities so that it can forwarded to the Government's attorney. I will meet you at the Naval Avionics facility in Indianapolis, IN at 9:30 a.m. on July 13 so that you may review the type of documents to be copied.

As we also discussed, I am requesting that upon completion of copying every three boxes, that they be forwarded to my office so that we may begin to process them. Should you have any questions, please do not hesitate to contact me. My direct dial number is (703) 412-6004. Thank you for your assistance in this matter.

Very truly yours,

OBLON, SPIVAK, McCLELLAND,
MAIER & NEUSTADT, P.C.

Kevin M. Bell

Kevin M. Bell
Senior Legal Assistant

cc: Janice M. Mueller, Esq.
KMB/dsb

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, Plaintiff, | ) | |
| v. | ) | No. 92-580C |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, Defendant. | ) | |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 3

**Steven Kreiss**
Attorney at Law

1275 Pennsylvania Avenue N.W., Suite 1100, Washington, DC 20004
Telephone (202) 347-6382 Facsimile (202) 347-7711

November 16, 1996

Suzanne Michel, Esq.
Carl M. DeFranco Jr., Esq.
Commercial Litigation Branch
Civil Division
Department of Justice
Washington D.C. 20530

Re: Sparton Corporation v. United States,
Court of Federal Claims No. 92-580C

Dear Suzanne and Carl:

This letter is to confirm my recent discussions with Suzanne regarding: (a) Sparton's document inspection at the Navy's PMA-264 facility; (b) my request for a security clearance; (c) Sparton's request to the Justice Department for assistance in obtaining from Hermes Electronics, Inc. ("Hermes"), a division of Ultra Electronics Limited, total compliance with the subpoena Sparton served upon Hermes dated April 29, 1996, particularly the production of complete engineering or technical drawings of the Hermes' sonobuoy devices which were procured by the Navy and are identified on the list attached to the subpoena (also attached hereto as Exhibit A), DD-250 forms or, in the absence of same, internal Hermes contract or other accounting documentation indicating or evidencing the delivery dates of said sonobuoy devices sold by Hermes to the Navy; (d) the Hazeltine and Sippican proposed protective orders sent to the Justice Department by Sparton and Sippican on September 9 and 10, 1996 respectively; and (e) Sparton's Navy document inspection at the Crane, Indiana naval facility which is tentatively scheduled for the first week in December 1996.

In connection with (a) above, Suzanne has arranged for me to visit PMA-264 (in Crystal City, Virginia) on November 26, 1996 and inspect contracts, budget requests, technical information and a few notebooks which are available at that location. If a second or third day is needed to complete

this inspection, then Suzanne and I will amicably arrange for a further inspection at PMA-264 later in December 1996.

With regard to (b) above, many of the documents already produced in this case were at one time classified inasmuch as the patents and accused devices relate to ASW (antisubmarine warfare) technology. Some of the contract and technical information requested by Sparton from the Government relates to very recently (1990-1994) prepared documentation because the last to expire Sparton suit patent expired on June 14, 1994. Thus, it is quite possible, if not very likely, at some point in the present or future document production or deposition phase of this case that relevant classified information may be requested and need to be inspected by Sparton's counsel. Furthermore, the Justice Department may already have refused to produce some previously requested documentation on the ground that the requested document(s) is classified. As a result, to avoid any future delay and needless expense in the retaking of depositions or reinspection of documents, I request, as Sparton's counsel of record, a security clearance for purposes of this case only. Please process this request and let me know whether I can obtain a security clearance and what steps, if any, must be taken or documents executed for a security clearance to be issued to me.

As you know, in regard to (c) above, for many months Sparton attempted informally in late 1995 and early 1996 and then formally through subpoena dated April 29, 1996 to obtain relevant documentation from Hermes. In partial compliance with the subpoena, Hermes produced some of the requested contracts. Nevertheless, none of the requested DD-250 forms or other Hermes documentation relating to the delivery dates of the Hermes sonobuoy devices procured by the Government under the contracts identified in the attachment to the subpoena were produced in compliance with the subpoena. Furthermore, Hermes also refused to produce its technical drawings, (see as Exhibit B the attached Hermes May 13, 1996 letter) despite Sparton's protest and repeated requests for Hermes to produce sufficient drawings (see Sparton's May 16, 30 and June 5, 1996 letters attached hereto as Exhibit B). Finally, Hermes produced on June 11, 1996 one incomplete drawing allegedly of the sonobuoy devices it manufactured for the Government under the contracts identified on the list attached to the subpoena (see as Exhibit B the attached Hermes June 11 and Sparton June 13, 1996 letters). Given Hermes' recalcitrance in complying with Sparton's April 29, 1996 subpoena, Sparton believes that Hermes will be more cooperative in producing the requested documents if the Government either gives its

blessing to Hermes to produce the requested documentation under Sparton's subpoena or requests the same documentation from Hermes under its Notice and Assistance clause. Hermes has indeed indicated in its May 14, 1996 letter, attached as Exhibit B, that its drawings "could be supplied for court review ... [or to] an individual who is deemed acceptable to Hermes in writing." Sparton wishes to stress, moreover, that it will agree to pay Hermes its reasonable expenses incurred in copying the requested documentation. Sparton is not attempting to shift any document production burden upon the Government through this request even though the contracts and technical drawings requested under its subpoena served upon Hermes were indeed previously requested from the Government in this case in May 1994, over two years ago. If the Government does invoke its Notice and Assistance clause in response to Sparton's request and obtains the requested documentation (i) the Government will bear no expense in requiring its contractor to provide Sparton with this relevant documentation (either under the subpoena or Notice and Assistance clause), (ii) the case will not be delayed by court proceedings aimed at compelling Hermes to produce the requested documentation, (iii) the Court will not be unduly burdened by subpoena enforcement proceedings which could have been avoided if the Government had invoked its Notice and Assistance clause, (iv) the Government will not tarnish the credibility of any trial witness from Hermes, and (v) the Justice Department ("DOJ") can ascertain the Government's potential exposure by determining which accused devices fall within the potential accounting periods in this case. This information will be highly relevant to any future settlement discussions engaged in by the parties in this suit.

In connection with the proposed protective orders identified in (d) above, they were sent to the Justice Department over two months ago (see attached Exhibit C) and relate to the Sippican and Hazeltine documents subpoenaed on March 3 and 11, 1996 respectively. Would you kindly process and execute these proposed protective orders so that they can be filed with the Court. If you do not wish to file them because it was Sparton who requested the discovery, then please return an executed original of them to me so that Sparton can file them with the Court. We would like to timely obtain the requested documents from these contractors so that the depositions relating thereto can go forward. As you may recall, the Government did not produce any requested drawings relating to these two contractors' sonobuoys despite Sparton's previous request for same which was made upon the Government over two years ago (see Sparton's May 1994 production requests Nos. 44, 57, 58, 63, 72, 76, 77, 79

and 82 for example). In order to obtain the requested, but not previously produced, documents, these protective orders need to be executed by the Government and approved by and filed with the Court.

In connection with (e) above, Sparton would like to inspect the following contract documents and files:

i. The herebelow identified Magnavox contracts for the procurement of the AN/SSQ-53B sonobuoy:

1. N00163-83-C-0001
2. " 85-C-0002
3. " 87-C-0002
4. " 84-C-0001
5. " 86-C-0006
6. " 88-C-0002
7. " 89-C-0012
8. " 84-C-0008.

ii. The herebelow identified Sippican contract for the procurement of the AN/SSQ-77A sonobuoy:

1. Sippican N00163-81-C-0372.

iii. All contracts listed in Exhibit D hereto which were also identified in Exhibit C to my letter to DOJ of October 6, 1995 and DOJ's December 6, 1995 response (for those contracts designated by the Navy as being destroyed, we would appreciate another search to confirm said reported destruction).

iv. The herebelow identified Hermes contracts for the procurement of the AN/SSQ-53B, 58E and 77A sonobuoys:

1. N00163-87-C-0155
2. N00163-91-C-0243
3. N00163-87-C-0007.

v. All DD-250 forms or other government accounting documentation indicating or evidencing all delivery dates for the sonobuoys procured under the contracts identified in (a) Exhibit E hereto, and (b) "i." above relating to the procurement by the Navy of Magnavox AN/SSQ-53B sonobuoys.

vi. All files for the contracts noted below:

1. Magnavox' (PIP) contract for the 53A sonobuoy which we believe was N00019-72-C-0590

2. Sanders' (PIP) contract for the 53A sonobuoy for which we do not have a contract number, but believe said number should be within the following contract number sequence: N00019-72-C-0580 to N00019-72-C-0600

3. Magnavox' (SSQ-53A) N00019-76-C-0267 contract

4. Hermes' (SSQ-53A/B) N00019-76-C-0507 contract

5. Rockwell's (SSQ-53B) N00163-82-C-0115 contract

6. Raytheon's (SSQ-62) N00019-77-C-0224 contract

7. Hazeltine's (SSQ-77) N00163-79-C-0516 contract

8. Magnavox' (SSQ-53E) N00163-91-C-0244 contract

9. Magnavox' (SSQ-53) N00019-71-C-0349 contract

10. Sanders' (SSQ-53) N00019-70-C-0432 contract.

We believe that the contracts noted above with the prefix N00163 may be located at Crane while those having the prefix N00019 may be located locally. Accordingly, please inform me of the identity of the documents that will be provided at Crane and those which we may inspect elsewhere. I will attend the inspection at Crane, along with John Bodde, to prevent any problem with the inspection of proprietary information. We look forward to your response.

Very truly yours,

Steven Kreiss

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 92-580C |
| v. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 4

**U.S. Department of Justice**

STM
154-92-580

Telephone: (202) 616-8116
Facsimile: (202) 307-0345

*Washington, D.C. 20530*

December 19, 1996

**BY MESSENGER**

Steven Kreiss, Esquire
1275 Pennsylvania Avenue, N.W.
Suite 1100
Washington, D.C. 20004

Re: Sparton Corporation v. United States,
Court of Federal Claims No. 92-580C

Dear Mr. Kreiss:

I have enclosed documents bearing Bates-stamped numbers 13659-15928 which you requested as a result of your document inspection at the Naval Air Systems Command PMA-264 office on November 26, 1996. In your letter of December 6, 1996, you requested that I provide a copy of these documents to both your office and to Sparton Electronics, Inc. I am providing one set of copies to your office and expect that you will provide a second set to your client if necessary.

Your letter of December 6, 1996, also requested the Navy's ASW sonobouy Budget Item Justification for fiscal years 1960-1982. These documents, if extant, will most likely be found at the PMA-264 office which prepares them. Therefore, we will produce any such existing documents during the course of your document inspection at PMA-264. Please contact me as soon as possible to arrange a mutually convenient time to complete that document inspection, already begun on November 26 and December 6, 1996.

If you have any questions regarding this matter, you can reach me at (202) 616-8116.

Very truly yours,

Suzanne Michel

SUZANNE T. MICHEL
Attorney
Commercial Litigation Branch
Civil Division

Enclosures

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 92-580C |
| v. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 5

**U.S. Department of Justice**

STM
154-92-580

Telephone: (202) 616-8116
Facsimile: (202) 307-0345

*Washington, D.C. 20530*

April 17, 1997

**BY MESSENGER**

Steven Kreiss, Esquire
1275 Pennsylvania Avenue, N.W.
Suite 1100
Washington, D.C. 20004

Re: Sparton Corporation v. United States,
Court of Federal Claims No. 92-580C

Dear Mr. Kreiss:

I have enclosed documents bearing Bates-stamped numbers 015929-017992 which you requested as a result of your document inspection at the Naval Air Systems Command PMA-264 office on February 5, 1997, February 20, 1997, and March 31, 1997.

If you have any questions regarding this matter, you can reach me at (202) 616-8116.

Very truly yours,

Suzanne Michel

SUZANNE T. MICHEL
Attorney
Commercial Litigation Branch
Civil Division

Enclosure

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 92-580C<br><br>Chief Judge Edward J. Damich |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 6

**U. S. Department of Justice**

STM
154-92-580

Telephone: (202) 616-8116
Facsimile: (202) 307-0345

*Washington, D.C. 20530*

August 21, 1997

**BY MESSENGER**

Steven Kreiss, Esquire
1275 Pennsylvania Avenue, N.W.
Suite 1100
Washington, D.C. 20004

Re: Sparton Corporation v. United States,
Court of Federal Claims No. 92-580C

Dear Mr. Kreiss:

I have enclosed documents bearing Bates-stamped numbers 023762-024400 which you requested be produced from the contract files located at the Crane Division of the Naval Surface Warfare Center. Please note that the documents bearing Bates-stamped number 024292-024392 are marked either "Proprietary" or "For Official Use Only" and are released pursuant to the protective order in place in this case.

Certain documents which you requested from NSWC were labeled "Proprietary" by the Government contractor which generated that document. We have contacted the pertinent contractors to inquire whether they continue to consider these documents to be proprietary. We will produce the documents after receiving a response.

We have also withheld a document entitled "Memorandum For the Chairman," dated September 25, 1987, by R. W. Vandergrift, Jr., while the Navy ascertains its classification status. If the contents of that document are not classified we will produce it shortly.

We are withholding as not relevant to the subject matter involved in this case and not reasonably calculated to lead to the discovery of admissible evidence a letter by P. D. Coon of the Naval Avionics Center to Hazeltine Corporation dated April 14, 1983, with attachments,

concerning the security clearance application of a Hazeltine employee. In addition, we are withholding the following documents under the attorney-client privilege:

"Request for Counsel Opinion/Review" from Tim Perry to Counsel, dated April 16, 1992, regarding "Hermes Tip-Over Testing Problems;"

"Request for Counsel Opinion/Review" from W. Case to Counsel, dated January 22, 1992, regarding patent indemnity provisions;

"Request for Counsel Opinion/Review" from W. Case to Counsel, dated April 28, 1986, regarding contract no. N00163-90-C-0004;

Memorandum from Counsel, Donald Sherfick, to Margie Bachmann, dated February 14, 1984, regarding "Exchange of Sonououys Among Producers; Extent of Application of Patent Indemnity Clause;"

Memorandum from Margie Bachmann to Counsel, dated January 19, 1984, regarding "Exchange of Sonobuoys;"

Memorandum from Counsel, Donald Sherfick, to Director, Special Programs Division, dated December 22, 1983, regarding "Exchange of Sonououys;"

Memorandum from P. A. Kaczmarek to Don Sherfick, dated December 21, 1983, regarding "Exchange of Sonobuoys among Manufacturers;"

Memorandum from Counsel, Donald Sherfick, to Margie Bachmann, dated July 15, 1983, regarding "Exchange of Sonououys;"

Memorandum from Margie Bachmann, to Counsel, dated June 24, 1983, regarding "Bouy Exchange;"

Memorandum from P. A. Kaczmarek to Counsel, dated May 26, 1983, regarding "Exchange of Sonobuoys among Manufacturers;"

Undated note from Counsel to Division 603 regarding sonobouy exchange; and

Memorandum from W. Fisher to Counsel, dated November 5, 1979, regarding "Interchange of Sonobuoys among Manufacturers."

Finally, I have also enclosed a document bearing Bates-stamped number 023273 which is marked "Proprietary." This document, bearing the same Bates number, was inadvertently produced on August 7, 1997, without the "Proprietary" marking. Please exchange the enclosed, properly marked document for that produced on August 7, 1997, and destroy the latter.

If you have any questions regarding this matter, please do not hesitate to contact me at the above number.

Very truly yours,

Suzanne Michel

SUZANNE T. MICHEL
Attorney
Commercial Litigation Branch
Civil Division

Enclosure

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 92-580C |
| v. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 7

IN THE UNITED STATES CLAIMS COURT

| | |
|---|---|
| SPARTON CORPORATION, Plaintiff, vs. THE UNITED STATES, Defendant. | CASE NO. 92-580C |

# DEPOSITION OF CHUCK LOGAR

*Taken on behalf of Plaintiff*

DATE: August 19, 1998

TIME: 8:31 a.m.

LOCATION: Hilton Hotel
Room 914
1020 South Calhoun Street
Fort Wayne, Indiana 46802

BY: Subpoena

REPORTER: Diann Hunt

**APPEARANCES:**

Steven Kreiss
Attorney at Law
1440 New York Avenue, N.W.
Suite 400
Washington, D.C. 20005
COUNSEL FOR PLAINTIFF

Gary L. Hausken
U.S. Department of Justice
1100 L Street, N.W.
Room 11120
Washington, D.C. 20005
COUNSEL FOR THE U.S. DEPARTMENT OF JUSTICE

Robert J. Zeitler
Jones, Day, Reavis & Pogue
77 West Wacker
Chicago, Illinois 60601-1692
COUNSEL FOR RAYTHEON SYSTEMS COMPANY

ALSO PRESENT: Charles Boyle

# INDEX


| | | Page |
|---|---|---|
| DIRECT EXAMINATION | | |
| QUESTIONS BY: | Steven Kreiss . . . . . . . . . . . . | 5 |
| CROSS EXAMINATION | | |
| QUESTIONS BY: | Gary L. Hausken . . . . . . . . . . | 145 |
| REDIRECT EXAMINATION | | |
| QUESTIONS BY: | Steven Kreiss . . . . . . . . . . . | 151 |
| RECROSS EXAMINATION | | |
| QUESTIONS BY: | Gary L. Hausken . . . . . . . . . . | 158 |


## Exhibits

**Plaintiff:**


| | | |
|---|---|---|
| 1 | Patent Information . . . . . . . . . . . . . | 34 |
| 2 | Housing/Parachute Assembly Drawing | 35-37, 40 44, 49-51, 54, 57, 60, 61, 64, 68, 148, 154 |
| 3 | Release Plate (Drawing 949303) . . . | 35, 36 . . 60-64, 67-71, 73-75, 77, 78, 81-84, 113 . . . . . . . . . . 146, 148-150, 154, 159 |
| 4 | Buckle Plate . . . . . . . . . . . . . . | 85, 157 |
| 5 | DIFAR Flyer . . . . . . . . . . . . . . . . | 86 |
| 6 | Release Plate (Drawing 945830) | 87-89, 99-101 . . . . . 87-89, 99-101, 104-110, 151, 153 |
| 7 | SSQ-57B Sonobuoy Brochure . . . . . . . | 87, 89 . . . . . . . . . . 92, 94, 95, 99, 101, 153 |
| 8 | Q-53D Sonobuoy Drawing . . . . | 111, 114, 156 |

# Exhibits


| | | Page |
|---|---|---|
| 9 | Release Plate (Drawing 949303) . . . . . . . . . . . . . . . . . . . | 111, 112, 114, 156 |
| 10 | SSQ-53D Sonobuoy Brochure . . . . . . . . . | 119 |
| 11 | Material Inspection/Receiving Report . . . . . . . . . . . . . | 123, 126, 127, 129, 133, 141 |
| 12 | Delivery Schedules . . . . . . . | 129, 131, 132 |

CHUCK LOGAR

being first duly sworn
testified as follows, to-wit:

**DIRECT EXAMINATION**

**QUESTIONS BY:** Steven Kreiss

Q. Would you state your name for the record, please?

A. Chuck Logar.

Q. And your address, please?

**MR. LOGAR**: Home address?

**MR. KREISS**: Yes, please.

A. 923 Simon Road, Huntertown, Indiana 46748.

**MR. LOGAR**: How close to this thing do I need to be?

**MS. REPORTER**: You're fine.

Q. Would you state your educational background after high school?

A. Bachelor of Science in electrical engineering from Purdue University, Master of Science in business, Indiana University.

Q. Did there come a time when you commenced employment at the Magnavox Company?

**MR. LOGAR**: You're asking me when did I start?

would you have been program manager on that?

A. Probably '88 or '89 through '94.

Q. And with regard to the 53E, when did you become program--production program manager?

A. Well, like I said, that's a future event. We're not in production yet.

(Interruption)

(At this time, a brief recess was had off the record.)

**MR. LOGAR:** Would you state that again, can you? Where we going--

Q. Let me, instead of--when did you become involved with the 53E at Magnavox?

A. Probably at its inception. I was program manager for most of these buoys as you can see. I was involved in the bid of all this work.

**MR. KREISS:** (To the reporter) Would you mark that as Exhibit 1. Thank you.

Q. Mr. Logar, would you kindly review Exhibit 1, and my question will be, is the Magnavox 53B release plate mechanism shown and described in this particular document?

A. (Witness reviews document.)

**MR. KREISS:** And so that I can direct your attention to certain things that you

might want to look at to make that determination, specifically, I refer you to figure six and the description at columns five and six.

**MR. LOGAR**: Figure six?

**MR. KREISS:** Figure six.

**MR. LOGAR:** I'm not familiar with this document. What was your question again?

Q. Does this show the release mechanism that was used on Magnavox's 53B sonobuoy?

A. Yes.

Q. The 53B was a passive sonobuoy, is that correct?

A. That's correct.

Q. Would you look at--

**MR. KREISS:** (To the reporter) Mark this Exhibit 2, please.

Q. Would you briefly review Exhibit 2?

A. (Witness complies.)

Q. Is that a Magnavox drawing of the outer shell of the SSQ-77B?

A. Yes, it appears to be.

**MR. KREISS:** (To the reporter) Would you mark this as Exhibit 3?

**MR. HAUSKEN:** Is that the one marked

**United States Patent** [19] | [11] **Patent Number: 4,654,832**
**Barker** | [45] **Date of Patent: Mar. 31, 1987**

[54] **SONOBUOY RETAINING AND RELEASE APPARATUS**

[75] Inventor: **Robert L. Barker, Ossian, Ind.**

[73] Assignee: **Magnavox Government and Industrial Electronics Company, Fort Wayne, Ind.**

[21] Appl. No.: **555,978**

[22] Filed: **Nov. 29, 1983**

[51] Int. Cl.[4] .................. **B63B 21/52**
[52] U.S. Cl. .................. **367/4; 441/33**
[58] Field of Search .................. 367/4; 441/7, 24, 25, 441/33; 294/82.25

[56] **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,646,505 | 2/1972 | Kirby | 340/2 |
| 3,825,213 | 7/1974 | Saunders et al. | 244/138 A |
| 3,921,120 | 11/1975 | Widenhofer | 340/2 |
| 4,020,514 | 5/1977 | Bourgeois | 9/8 R |
| 4,029,233 | 6/1977 | Widenhofer | 220/89 A |
| 4,033,529 | 7/1977 | Bourgeois | 367/4 |
| 4,247,143 | 1/1981 | Putman | 294/82.25 |

*Primary Examiner*—Richard A. Farley
*Attorney, Agent, or Firm*—Thomas A. Briody; William J. Streeter; Richard T. Seeger

[57] **ABSTRACT**

Sonobuoy parachute shroud line ends are retained by a cup mounted in and adjacent one end of the sonobuoy outer casing. A heavy ejection spring is beneath the cup for forcibly ejecting the cup outwardly from the one end of the casing. The cup is retained in the casing against the spring force by a pair of partially overlapping elongated plates each having one end releasably inserted in a circumferential slot in the outer casing, the slots being adjacent the casing one end and diametrically opposed. The upper plate is in retentive contact near the other of its ends by a first retainer rod pivoted at one of its ends to the cup bottom surface. The first rod contacts the upper plate near the pivoted rod end and is in retentive contact near its other end with a second retainer rod pivoted at one of its ends to the cup bottom surface. The second rod contacts near its pivoted end the first rod and is in retentive contact at its other end with a one shot spring motor driven pin. The location of the points of contact between the plates, the upper plate and the first rod, the first and second rods and the pin and the second rod provide lever arms that result in a very high mechanical advantage between the retaining force of the pin on the second rod and the ejection spring force. Upon ejection, the cup, parachute, and shroud lines are ejected and other sonobuoy components are released from the outer casing.

**10 Claims, 14 Drawing Figures**



PENGAD-Bayonne, N.J. PLAINTIFF'S EXHIBIT 1 RL-8/19/98




FIG. 1




FIG. 2




FIG. 3




FIG. 4




FIG. 14


176
168
174
170
166
160
162
156
164
158
150
154
152
148
144
146
138
134
136
132
142
136
140
130
126
120
124
122
128
124
98
86
100
88
90
92
172
76
178
94
96
74
66
72
70
78
64
82
60
61a
60a
61
84
62
80
68
60
64
64
112
46
46
110
116
114
108
22
182
106
104
183
184a
184
30

FIG. 5

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, Plaintiff, | ) | |
| v. | ) | No. 92-580C |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, Defendant. | ) | |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 8

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SPARTON CORPORATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 92-580C<br>Chief Judge Edward Damich |

**SPARTON CORPORATION'S ANSWERS TO THE DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF, SPARTON CORPORATION**

Sparton Corporation ("Sparton"), through its counsel, answers the Government's contention interrogatories as follows:

**Interrogatory No. 2**

(a) For each patent in suit, state the date on which Sparton contends Mr. Widenhofer conceived of the invention or inventions claimed in that patent.

(b) For each date stated in Sparton's response to part (a), above, identify all documents and communications that support Sparton's answer.

**Answer To Interrogatory No. 2**

(a) See pages 17-19 of Sparton's Cross Motion For Partial Summary Judgment and Statement of Facts 55-70 of Sparton's Proposed Findings Of Uncontroverted Fact In Support Of Its Cross Motion For Partial Summary Judgment filed December 16, 1999.

**Interrogatory No. 5**

Does Sparton contend that the AN/SSQ-53B sonobuoy manufactured by Magnavox infringes either the '120 patent or the '233 patent?

**Answer To Interrogatory No. 5**

Sparton's contention with respect to the identity of all sonobuoys which infringe either the '120 patent or the '233 patent is contained in the Exhibit 24 charts of Appendix I, Volume II to its Pretrial Submissions filed on or about January 29, 1999. The AN/SSQ-53B sonobuoy manufactured by Magnavox is not contained in said charts.

**Interrogatory No. 18**

With respect to reasonable and entire compensation sought by plaintiff in this action:

(a) State plaintiff's contention as to the beginning and end of the alleged accounting period for each accused equipment type.

(b) State fully and completely plaintiff's contention as to how reasonable and entire compensation allegedly due should be determined.

**Answer To Interrogatory No. 18**

(a) Plaintiff's contention as to the beginning and end of the alleged accounting period for each accused equipment type is contained in the Exhibit 24 charts of Appendix I,

Respectfully submitted,
Sparton Corporation, Plaintiff

Dated: September 28, 2005

/Steven Kreiss/
Attorney for Plaintiff
1120 Connecticut Avenue NW
Suite 240
Washington D.C. 20036
(202) 347-6382

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of SPARTON CORPORATION'S ANSWERS TO THE DEFENDANT'S FIRST SET OF INTERROGATORIES TO PLAINTIFF, SPARTON CORPORATION were sent, by first class mail, postage prepaid, this 28th day of September, 2005, to:

Gary L. Hausken, Esquire
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
Washington D.C. 20530
Attorney for Defendant

---------------------------------------
Steven Kreiss

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 92-580C |
| v. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SPARTON CORPORATION, Plaintiff, v. THE UNITED STATES, Defendant. | No. 92-580C<br>Judge James P. Merow |

**DECLARATION OF RALPH C. NASH, JR.**

I, Ralph C. Nash, Jr., declare and state under penalty of perjury that:

1. I graduated magna cum laude with an A.B. degree from Princeton University in 1953 and earned a Juris Doctor degree from the George Washington University ("GWU") Law School in 1957. I am a member of the Phi Beta Kappa, Phi Alpha Delta and the Order of the Coif. From 1953-1959 I was employed by the Navy Department as a contract negotiator. Subsequently, from 1959-1960, I was employed as an Assistant Manager of Contracts and Counsel for the American Machine and Foundry Company. In 1960, I founded the Government Contracts Program at the GWU Law Center and was Director of that Program from 1960-1966 and from 1979-1984. I was

not Sparton's production line, nor was the Jackson plant the SSQ-53 sonobuoy production facility. See the Martin and Melvin Declarations attached hereto. Thus, the engineering and manufacturing cost figures establish that non-production work was being performed by Sparton's Engineering Department under Mod. 4 to the 0465 contract.

**19.** I have reviewed Navy documents to ascertain if it was Navy practice to utilize the ECP process to obtain contractor development work to improve the performance of production sonobuoys. I found that the Navy has recognized that sonobuoys are dynamic devices that continue to evolve to meet fleet requirements and the perceived threat (017088-89). The Navy stated that its sonobuoy program has averaged 20-25 ECP's per year to meet changing threat conditions and operational requirements;. Id. The Navy sonobuoy program office PMA-264 Strategic Plan (021043-52) identifies ECPs as the "...only practical way that...[the Navy's sonobuoy] capabilities can be improved..." (021045). In the late 1970s, the Navy documented the current status of all ECP actions which included a significant sonobuoy redesign for a third hydrophone depth and a 99 Channel Transmitter as well as an improvement in an air descent retardation device (020521-26). In the 1980s and 1990s, this trend continued (016463-73, 017019-28, 022518-26) (e.g., Hermes changed the SSQ-53B sonobuoy's radio frequency amplifier (022519),

B0026

Sparton made extensive changes to the SSQ-62B sonobuoy floatation system, surface electronics housing and transducer (022522), and Magnavox incorporated "extensive design changes" to its SSQ-77A sonobuoy (022522). The NAVAIR Acquisition Guide states that ECPs are to be used by the Navy to incorporate changes into equipment for operational improvement, etc. (016311, 016349-50). Based upon these documents, it is clear that the Navy used ECPs on production contracts to obtain developmental work. This confirms the fact that ECP 0465-2 was issued by the Navy to Sparton to perform developmental (not commercial) work, i.e., to improve the capability of the SSQ-53 sonobuoy to include dual depth operation.

**20.** I have reviewed the follow-on contract that was issued by the Navy to Sparton, Letter Contract N00019-72-C-0585 ("0585 contract")(012248-012302), dated May 25, 1972, to ascertain whether it shows that experimental work was performed on contract 0465 (012248-012302). This contract required Sparton to conduct a product improvement program ("PIP") for the SSQ-53 sonobuoy (011571, 011579). The letter contract was superseded by a definitized contract in March 1973 (002272-78, 002099-2116). In item 0002 of the Schedule, Sparton was required to provide further engineering effort for "Selectable Dual Depth" capability (012250). Significantly, 57 PIP SSQ-53 sonobuoys, which

of a limited quantity of sonobuoys first occurred in 1975, nearly four years after the issuance of Mod. 4.

22. It is my opinion that the first prong of the Pfaff test, whether the sale or offer was commercial or experimental, is not satisfied in this case. Mod. 4 to the 0465 contract, the Sparton March 17, 1971 letter and ECP 0465-2 do not constitute a commercial sale or offer to sell the Sparton SSQ-53 Dual Depth sonobuoys. A multiplicity of documents I reviewed plus witness statements all indicate that the work under Mod. 4, as proposed by ECP 0465-2, was considered by both parties to be developmental in nature. In contrast, I found no documents or witness statements that would lead to the conclusion that this was a commercial sale or offer.

Date: 3/15/99

Ralph C. Nash, Jr.

B0030

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 92-580C<br><br>Chief Judge Edward J. Damich |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 10

# PMA-264 STRATEGIC PLAN

PMA-264 is charged with developing Air ASW sensors to support current and future ASW aircraft, both fixed wing and helicopter. This mission must be accomplished in an environment of diminishing funding resources. Consequently, it is essential that a top level corporate strategy or plan be set forth that focuses the efforts of the PMA-264 team towards a single goal of providing effective sensor systems for Air ASW use.

There are five basic elements to the strategy:

I Respond to the threat

II Respond to ASW mission requirements.

III Provide platform/sensor integration leadership.

IV Manage the R&D and the production programs.

## I - Responding to the threat

ASW sensor programs must be responsive to the threat. The primary threat remains the Soviet submarine force. This threat is not represented by a single target, but a mix of submarine types. For the purpose of this plan, the 1995 threat mix represents the requirements for current (SSQ-53, SSQ-77B), near term (6.4) sensors (TSS, ERAPS) and potential ECP's to current sensors such as AIS and VLF. The 2000 mix sets the primary requirements for mid-term (6.3) sensors (ETSS, ADAR/AAA, AAS) and therefore is a major focus for the strategic plan. For the far-term (i.e. beyond 2000) new sensors can be designed to meet the 2010 threat.

The current projected threat lay downs are based on Soviet force levels that may be subject to significant revision as a result of recent political change. Soviet force levels are expected to shrink, however those units retired will likely be older units resulting in a smaller but for modern force. The most demanding 1995 Soviet Threat is assumed to be the Akerla at five knots velocity.

The growing secondary threat to the U.S. involves Low Intensity Conflict (LIC) between or with third world countries who will have a growing force of conventionally powered, but modern and capable submarines. Potential conflict countries with significant numbers of submarines include India, Pakistan, Libya, China, and N. Korea. Many others have enough submarines to be a threat as the two Argentinean Type 209s were in the Falklands. Approximately 20% of third world submarines are modern or less than five years old. The operating environments for these submarines generally represent shallow Seas or Oceans which provide a difficult detection challenge.

1995/2000

Detection performance using sensors against the 1995 threat mix shows the following trends. Loosing ground, but probably adequate against the overall Soviet nuclear threat. Unsatisfactory against the third world diesel threat on battery and poor against a snorkeling diesel. Poor in shallow water.

The Soviet 2000 threat mix will approach 50% post 1990 hulls. The third world threat mix is less clear, but will likely include significant numbers of advanced technology air independent propulsion systems (AIP) such as closed cycle engines, fuel cells and low power nuclear reactors. All of these will result in less detectability. The potential mix of modern type diesel submarines in third world Navys could approach 50%. Given continuation of current world trends, the primary war potential for the US will LIC scenarios such as a Korean conflict that could involve significant ASW in shallow seas. Passive performance against both the Soviet and third world threat will continue to decline.

II Responding to ASW mission requirements.

The air ASW missions cover a multitude of scenarios but they can be condensed to a few major categories:

A. Surveillance in deep and shallow water, where and when IUSS assets are not available.

B. Independent area search and barriers to loinlize, track and destroy, if required, enemy submarines. This is primarily an attrition mission in wartime.

C. Area search in support of a battle group (e.g. modloc sanitization)

D. Barriers in support of a battle group outer zone.

E. Battle group inner zone search, localization, track and attack. (normally a rotary wing air asset mission)

The sensor systems that are designed and brief by the PMA-264 team must respond to each of these missions effectively and consistent with existing force levels. When the ASW mission requirements and force levels of aircraft and crews are examined it becomes obvious that a primary measure of effectiveness for the sensor system must be "single mission capability". Not withstanding what is technically achievable, the desired single <u>mission</u> capabilities are on the order of the following:

| | |
|---|---|
| Mission: | Search Pd = 0.9 |
| Area: | Deep Water 40,000 NM$^2$ |
| | Shallow Water 10,000 NM$^2$ |

III Providing platform/sensor integration leadership.

It is of primary importance that the sensor systems built by the PMA-264 team be smoothly and efficiently integrated into the various ASW aircraft systems. This task takes considerable advanced planning and coordination and <u>money</u>! In the near and mid-term, the aircraft programs must be the drivers and sensor integration must be consistent with schedules, uplinks, memory, displays etc. However, to achieve optimum system performance for the far-term it is imperative that the roles reverse and the sensor systems that must respond to the threat and ASW mission requirements be optimized. Therein lies the reason the PMA-264 team must provide the leadership that helps direct the development of far-term aircraft system improvements.

IV Managing the R&D and the production programs.

A. Constraints

At this point it is important to review some of the more significant constraints and considerations that will drive the development of sonobuoys during the next decade.

(1) The Soviet threat still exists and must be countered. The Akula at 5kts represents the most demanding Soviet threat that we face in deep water in the 1990 to 1995 period. We cannot lose sight of the fact that our systems must provide a credible defense against this threat.

(2) Due to the higher potential for conflicts involving Third World countries, and due to our lack of capability against this threat, particularly in shallow water, it is imperative that we direct our concentration on this challenge. The Operational Requirements documents for this threat are in preparation but until they are fully defined we know enough to begin analysis and system definition. For the surveillance mission we should assume ETSS will be the mid-term sensor system and it will be required to provide intelligence on conventional threats that move in and out of areas of interest. For analysis purposes assume these areas of interest are east and ~~must~~ of N. Korea, the Bay of Bengal, Arabian Sea approaches to the Persian Gulf and the Gulf of Sidra. Areas on the order of 50,000 $NM^2$ can be assumed for shallow water and probability of detection of 90%. For the search mission we should assume fixed wing ASW has the mission to sanitize MODLOC areas of 100 NM radius. Assume the threat is comparable to a Type 209 ~~and~~ it is holding position in an area (i.e. assume no relative ~~matron)~~. The MODOLOC search mission must be to a probability of detection of at least 90% and the area must be sanitized in 24 hours or less. Six hours is desirable and would lower the probability of the ~~patenting~~ enemy keying on this area. While multiple aircraft on station at the same time is possible, from a force level consideration we should assume the MODLOC search mission must be accomplished by six serial S-3 missions or four serial P-3 missions. If technology cannot provide these capabilities then

021045

force levels in an area of conflict can be planned accordingly.

(3) From the data available, active systems appear to be the only acoustic option that is practical. Since the target is assumed to be near zero, relative velocity, it is further assumed that and FM/replica correlation system will achieve the highest possible performance. Measures of effectiveness for system comparisons are <u>area</u> coverage <u>per mission</u> and <u>area covered per dollar.</u> Realistic models must be used to compare system performance (i.e. not COX's law). Multiple "pings" per station must be assumed and ping rates cannot exceed: 3.0 x detection range ÷ speed of sound. Any assumptions of auto ping, auto detect and auto alert must be fully defined and associated risks must be evaluated. Pattern drop times should be based on 250 kt airspeeds.

(4) A-size devices are highly desirable. Larger than A-size systems must show "substantial" improvement in MOE to be practical. Substantial is not easy to quantity but the fleet "knows it when it sees it". Larger-than-A-size sensors are a logistic nightmare that pertubate shipping, storage, handling, loading and ~~arrange~~. From a "performance" point of view, single mission effectiveness is greatly effected by sensor size due to the number of sensors that can be carried.

(5) The numbers of different types of sonobuoys must be strictly controlled. Fleet logistics and crew use considerations dictate this number must be kept to an absolute minimum. Unless performance differences ~~and~~ absolutely overwhelming, there cannot be a different sonobuoy for the same mission in deep and shallow water. The use of Remote Function Select (RFS) and/or Command Function Select (CFS) to program a sensor for a particular scenario is obviously need for the future. This fact must be sold to all platforms as future modifications. In the interim it is imperative the we "neck-down" the numbers of sonobuoy types wherever it is feasible in our programs.

(6) Engineering Change Proposals (ECPs) to existing sensors are the only practical way that our capabilities can be improved in the near term (not counting ERAPS and TSS). If there are system options that can give us real performance improvements in the near term they must be exploited. The relative poor capability we have in shallow water versus the conventional threat dictates we move rapidly to make as much progress as soon as possible to fill this vital need. There may not be any ECP's that make sense in this regard but we must rapidly ~~standby~~ the technical and programmatic issues to determine what can be ~~down~~ and when it can be done.

(7) Aircraft compatibility is a critical issue in sensor development and must be considered in the analysis and system tradeoff phases of each program. The aircraft programs do not have money to integrate new sensors into their systems and they have no money for new hardware. In most system configurations today there is physically no space or weight allowance available for additional hardware. Until the year 2000, sensor systems will have

021046

to be limited to requiring only software changes in the aircraft and these changes must fit schedule-wise with the planned aircraft software update schedules. Additionally, the sensor programs must provide the funding for the software development and implementation.

(8) New program starts are unlikely until at least 1994 due to the two-year budget cycle for DOD. With the severe cut-backs projected in the next few years for DOD, it is imperative that new starts be well analyzed and development risks be carefully assessed early-on. This must be a high priority task for the PMA-264 team. For the 1994 POM we must be ready with the correct program or programs that give us the highest probability of meeting the threat and mission needs at the lowest risk and most cost effectively. Every member of the R&D should have inputs into this process and should be aware of our needs and constraints.

(9) Relatively low-cost demonstrations and validations of emerging technologies are a smart way to limit risk and should be planned wherever they are practical. The history of sensor development is replete with errors that have been made be advancing projects to full scale development before key technologies were proven. These same kinds of errors can only be ~~prevented~~ in the future by good planning that provides for dem/vals early-on when sensor concepts are being developed.

B. Development Strategy.

(1) General

After the technological and program constraints are defined and understood then a development strategy can be created to ensure our programs come as close as possible in filling the threat and mission needs. Time constraints dictate that in the near-term (i.e. prior to 1995) the only changes to sensors will be engineering change proposals to existing sensors plus the two full scale engineering development projects, ERAPS and TSS. In the mid-term (prior to 2000) existing advanced development programs can be modified to fill shortcomings ~~we~~ identify in the mid-term requirements. In the far-term (beyond 2000) new starts can be created to fill the far-term needs.

(2) Near and Mid Term Requirements.

The most critical need ~~for the need~~ for the near and mid-term is for a shallow water search capability. First we need to understand what capability exists in current sensors and those in FSED. Then we need to understand what capability can be achieved by ECP's to current sensor systems and those in FSED and by restructing the advanced development programs (ADAR/AAA, AAS). Programmatic and technical questions must be answered before programs are ~~re-~~structed and ECP's are developed.

021047

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SPARTON CORPORATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 92-580C<br>Chief Judge Edward J. Damich |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 11

264E

DEPARTMENT OF THE NAVY
NAVAL AIR SYSTEMS COMMAND
NAVAL AIR SYSTEMS COMMAND HEADQUARTERS
WASHINGTON, DC 20361-1002

IN REPLY REFER TO
13000
AIR-10031/2805G
19 Dec 89

MEMORANDUM

From: ACQUISITION EXECUTIVE

Subj: NAVAIR ACQUISITION GUIDE

Ref: (a) AIR-01 memo AIR-10031/1886G of 20 Jan 87

Encl: (1) NAVAIR Acquisition Guide of 19 Dec 89

1. Enclosure (1) is the seventh edition of the NAVAIR Acquisition Guide, which was originally issued by reference (a). Changes from the previous edition are highlighted by a vertical line in either the left or right margin. As stated in reference (a), the Guide will be updated and reissued periodically so that changes to the acquisition process can be disseminated to program managers, and those who support program managers, as quickly as possible.

2. Significant changes from the previous Guide, dated 23 May 1989, are as follows:

a. The events and time standards shown on page 2 were updated to reflect a FY 1991 procurement.

b. In Chapter V, titled Program Authorization Process, a section on the Acquisition Strategy Report has been added.

c. In Chapter X, titled Key Issues, new sections have been added on Past Performance and Best Value, the Procurement Planning Conference, Quality Assurance, the Logistics Review Group Audit Process, Value Engineering, Disbursement Rates and the Acquisition Process, and Environmental Issues. Also in Chapter X, several sections that appeared in the sixth edition have been deleted. These sections were titled Obligation Rates and the Acquisition Process, the Naval Aviation Lessons Learned Program, the Microcircuit Obsolescence Management Program, Manufacturing Technology, and the Industrial Modernization Incentives Program. Copies of these sections can be obtained from AIR-1003.

d. The Acquisition Improvement Bulletins have been removed from the Guide with the exception of Bulletins #3, #9, and #11. These three were retained as they are referenced in other sections of the Guide. Copies of the other Bulletins can be obtained from AIR-1003.

3. Questions or requests for additional copies of the Guide should be directed to Mrs. Julie Voniak, AIR-10031C (x692-7952, room 1012/JP-1).

R G Harrison
R. G. HARRISON

Distribution:
See next page

016308

DEPARTMENT OF THE NAVY
AIR SYSTEMS COMMAND



# NAVAIR Acquisition Guide

SEVENTH EDITION

016311

CHAPTER IX: CONFIGURATION MANAGEMENT

PART B: ENGINEERING CHANGE PROPOSAL PROCESS

Flow Process: ECP Approval Process

NAVAIR, Contractor, CFA hold strategy and technical meetings — NAVAIR requests ECP — ECP arrives NAVAIR — Program Manager issues decision memo —

— PMA, AIR-05 and AIR-04 prepare CCB request, coordination and staffing — PMA verifies acceptability and funds availability — PMA presents CCB request to CCB

— CCB approval — PMA, AIR-05, AIR-04, AIR-02, ACO, ASO, NATSF, and CFA implement change — TDSA is updated

Purpose: Engineering Change Proposals (ECPs) are requested from contractors, Naval Aviation Depots (NADEPs), or other cognizant field activities for incorporation of changes into weapon systems and equipments for operational improvement, support improvement, safety, and correction of deficiency.

Source Documentation/Guidance: MIL-STD-480B, Configuration Control-Engineering Changes, Deviations and Waivers of 15 July 1988; SECNAVINST 4130.2, DON Configuration Management Policy of 11 May 1987; and in accordance with NAVAIRINST 4130.1B, NAVAIR Configuration Management Manual of 23 April 1986.

Critical Prior Events: Conduct engineering investigations to define the scope of the change and find possible solutions to meet the identified requirement. Hold working meetings with contractors and cognizant field activities, logistics managers and program management personnel to definitize the change and establish an acquisition strategy and plan. PMA initiates the PMP and budget process. AIR-05 engineer drafts letter requesting ECP. Program Manager ensures that there is an approved PMP, if required, and a decision memorandum and a fully staffed CCB request, including logistics impact, prior to submitting the ECP to the Change Control Board (CCB) for approval.

Critical Post Events: After CCB approval, formal implementation action is needed to initiate activities required to design, develop, test, incorporate, and support the change. The approved CCB change request/directive (NAVAIR Form 13050/2) is the Procurement Request (PR) used by NAVAIR contracts (AIR-02) for implementing the change. The cognizant program or system managers will ensure that an implementation letter is issued which covers all areas affected by the ECP. This letter will state the NAVAIR CCB decision, delineate approved implementation actions, state what actions the NAVAIR PCO will accomplish (if applicable) and provide the ACO or field activity with required information to enable issuance of orders for designated actions. The

implementation letter will clearly identify what we are buying and the appropriate contract/BOA line items or AIRTASK/WORK REQUEST which will be used. It will also include complete form 1423 information for deliverable contract data requirements and the PCO authorization (Sole Source Authorization) and will identify the funding documents to be used. The number and date for each funded task must be clearly stated in the implementation letter.

When Required: ECPs are required throughout the life cycle of a program for any change to a weapon system or equipment baseline.

Responsibilities: AIR-102 is responsible for developing and maintaining the policies and procedures governing the NAVAIR Configuration Management (CM) Program. This includes administration of CCBs which review and approve or disapprove ECPs. The Office of Primary Responsibility (OPR), usually the PMA, WSM, or other organization having overall program management responsibility for a weapon system or equipment, is responsible for CM. CM responsibilities are to be performed in accordance with an approved OPR CM plan prepared by the program manager. The program manager is assisted by the AIR-05 assistant program manager for systems and engineering (class desk) and APML in staffing ECPs for approval by the CCB. Program managers are also supported by AIR-02 PCOs, AIR-514, and others in the NAVAIR matrix organization responsible for ECP implementation actions.

Lessons Learned:

1) NAVAIR processes approximately 1200 ECPs and Requests for Deviations/ Waivers per year.

2) The time frame for processing varies greatly from urgent safety ECPs, to routine ECPs/VECPs which may take up to a year or even longer for approval. The most prevalent cause for processing delays is lack of prior planning. Many program offices fail to establish acquisition strategies and plans for their ECPs. At times, even informal planning is overlooked. Good coordination between program office, class desk, APML and contractor/NADEP personnel in the planning and development stages of an ECP is essential to avoid disaster. Poor planning causes long delays in ECP processing as a result of logistical problems or technically unacceptable ECPs, which must be esubmitted. Delays further occur due to lack of tracking and attention by managers. The primary delay in implementation of retrofit changes is due to the failure to anticipate the contracting administrative lead time required for negotiations to obtain a bilateral agreement in placing orders. With proper planning, parallel accomplishment of these administration times can be accomplished.

3) Many ECPs are not processed early enough to allow timely obligation of funds which results in budget cuts or reallocation of funds required to implement a change.

<u>NAVAIR POC</u>: F. Lewis, AIR-1022, room 411 JP-1, x692-8047.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 92-580C |
| v. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 12

ANA BULLETIN NO. 445
12 JULY 1963

Superseding
ANA Bulletin No. 390a
12 February 1953
ANA Bulletin No. 391a
4 October 1956

AIR FORCE-NAVY AERONAUTICAL BULLETIN

# ENGINEERING CHANGES TO WEAPONS, SYSTEMS, EQUIPMENTS, AND FACILITIES

## 1. PURPOSE

The purpose of this bulletin is to provide (a) a uniform procedure for submission of proposed engineering changes to the Government for approval, (b) the technical, fiscal and logistic supporting information required to define the impact of the proposed engineering change on the management of the weapon, system, equipment, or facility program, (c) an aid in maintaining configuration control.

## 2. SCOPE

This bulletin establishes the procedure for proposing weapon, system, equipment, and facility engineering changes as defined in 4.1. In addition, this bulletin establishes the procedure for proposing engineering changes involving the furnishing of change instructions and retrofit kits for accepted (or to be accepted prior to production effectivity) items, spares, or repair parts, and repair parts kits.

## 3. POLICIES

3.1 Shortening development lead time and reducing development costs will be considered equal in importance to achieving ultimate performance or design goals in systems and equipment.

3.2 Technical feasibility will not be considered as the sole justification for an engineering change.

3.3 This bulletin is directed at defining the impact of an engineering change to the extent necessary to evaluate the change. The contractor shall define the effect of all changes to the elements he provides, and the effects on any other elements of the program he suspects will occur.

3.4 Engineering changes will be held to a minimum consistent with the safety and overall effectiveness of the weapon, system, equipment, or facility concerned. Engineering changes have a direct effect on military support capability. Production and retrofit changes will be devised so as to minimize the variety of configurations in the inventory, whenever feasible. Considered judgment will be exercised to ensure a minimum effect on logistic support requirements.

3.5 The information required by this bulletin is essential to:

(a) Provide timely identification of those requirements essential to accomplishment of the change and efficient support of the contract item.

011215

THIS DOCUMENT CONTAINS 24 PAGES.



2376

7.3.8 Line 7. Justification for change.- The justification for the proposed change shall contain a comprehensive definition of the problem which the ECP proposes to correct or of the new capability which the change proposes to provide (see 5.7). The nature of the defect, failure, incident, malfunction, etc., which substantiates the need for the change shall be described in detail. Full utilization shall be made of failure data which may be supplied by the procuring activity and to the extent determined by the procuring activity in defining the requirement for the change. When the ECP is directed towards providing a new capability, the improvements in range, speed, endurance, striking power, defensive capability, etc., shall be described in specific numerical terms. The correspondence or previous coordination that established the requirement for a change shall be summarized and identified. A resume of any testing accomplished prior to the submission of the ECP shall be included.

7.3.9 Line 8. Developmental requirements.- When applicable, the contractor shall make recommendations as to the additional tests, trial, installations, prototyping, fit checks, etc., which will be required to substantiate the proposed change. This recommendation shall include the test objective, test vehicle(s) to be used, and estimated cost of the test program.

7.3.10 Line 9. Alternative solutions.- The contractor shall determine if the problem for which the ECP was requested, can be resolved by revised operation or maintenance procedures, revised inspection or servicing requirement, revised part replacement schedules, etc. The contractor shall state the advantages and disadvantages inherent in feasible alternative approaches to the problem.

7.3.11 Line 10. Production effectivity.- The contractor's estimated production effectivity point for the change in terms of the production items, serial numbers, or other item identification as approved by the procuring activity, and the estimated date of delivery of the item in terms of days after contractual approval. Partial production installation of a change shall not be accomplished, unless specifically authorized by the Government. In determining the effectivity date for the proposed change, the contractor shall consider, in addition to the time factor, the most economic point of incorporating the ECP change, consistent with all of the salient factors involved. The firm effectivity by date and serial number shall be confirmed as soon as practicable after receipt of contractual authority.

7.3.12 Line 11. Estimated cost for change in production.- An estimate of costs, either increased or decreased, which will result if the change is approved by the Government. If there are charges for special tooling, installations, or unusable material, etc., estimates for these charges are to be shown separately. In addition, if the same change affects equipment used by more than one service, the special tooling, facilities, unusable material charges, etc., are to be shown separately for each service based upon the percent of equipment furnished to each. This information will be used for planning purposes only and will not be binding upon the contractor. If the contractor at the time of submission of the ECP has available the firm cost proposal, this proposal shall be submitted and shall be accompanied by the appropriate cost breakdown.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, Plaintiff, | ) | No. 92-580C |
| v. | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, Defendant. | ) | |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 13

 AIR-10414

5 February 1968
Supersedes BuWeps
Supplement No. 1 of
29 January 1964
and revision thereof
dated 1 March 1966

NAVAL AIR SYSTEMS COMMAND
SUPPLEMENT NO. 1 TO ANA BULLETIN 445

1. PURPOSE OF SUPPLEMENT

This supplement contains requirements which clarify, modify or add to paragraphs in ANA Bulletin 445 of 12 July 1963. Paragraph numbers shown below correspond with like numbered paragraphs in ANA 445, the symbol "R" or "A" being added as follows:

1.1 The symbol "R" following a paragraph number indicates revision of the correspondingly numbered paragraph in the bulletin.

1.2 The symbol "A" indicates the addition of an entire supplemental paragraph.

4. DEFINITIONS

4.1.3 (R) Class I change. Any proposed engineering change to (1) an accepted or unaccepted end item (weapon, equipment, unit or subassembly), or (2) an accepted or unaccepted part listed on a provisioning list(s), whether such part is to be incorporated in the end item or stocked in the supply system, shall be designated a Class I change when one or more of the following is affected:

(a) (R) Contract specification, contract price or fee by either increase or decrease, contract weight, contract guarantees, contract delivery or contract test schedules.

(b) through (j) of 4.1.3 apply without change.

4.1.3.1 (A) Any proposed change involving retrofit (service change or ordalt) of an accepted item shall be designated a Class I change.

4.20 (A) For purposes of this Supplement, when project orders and AIRTASKS are placed at Government-owned, NAVAIR-managed activities, such activities are considered to be contractors with the Commanding Officer functioning as the head or chief, CAO (Contract Administration Office).

5. PROCEDURE FOR ENGINEERING CHANGES

5.4 Responsibilities for Initiation of Class I changes

(e) (A) When production to a detail design documented by another contractor or by a Government design activity is prescribed by the contract,

011239