IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 92-580C<br><br>Chief Judge Edward J. Damich |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SPARTON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 92-580C<br>Judge James P. Merow |

**DECLARATION OF RALPH C. NASH, JR.**

I, Ralph C. Nash, Jr., declare and state under penalty of perjury that:

1. I graduated magna cum laude with an A.B. degree from Princeton University in 1953 and earned a Juris Doctor degree from the George Washington University ("GWU") Law School in 1957. I am a member of the Phi Beta Kappa, Phi Alpha Delta and the Order of the Coif. From 1953-1959 I was employed by the Navy Department as a contract negotiator. Subsequently, from 1959-1960, I was employed as an Assistant Manager of Contracts and Counsel for the American Machine and Foundry Company. In 1960, I founded the Government Contracts Program at the GWU Law Center and was Director of that Program from 1960-1966 and from 1979-1984. I was

not Sparton's production line, nor was the Jackson plant the SSQ-53 sonobuoy production facility. See the Martin and Melvin Declarations attached hereto. Thus, the engineering and manufacturing cost figures establish that non-production work was being performed by Sparton's Engineering Department under Mod. 4 to the 0465 contract.

**19.** I have reviewed Navy documents to ascertain if it was Navy practice to utilize the ECP process to obtain contractor development work to improve the performance of production sonobuoys. I found that the Navy has recognized that sonobuoys are dynamic devices that continue to evolve to meet fleet requirements and the perceived threat (017088-89). The Navy stated that its sonobuoy program has averaged 20-25 ECP's per year to meet changing threat conditions and operational requirements;. Id. The Navy sonobuoy program office PMA-264 Strategic Plan (021043-52) identifies ECPs as the "...only practical way that...[the Navy's sonobuoy] capabilities can be improved..." (021045). In the late 1970s, the Navy documented the current status of all ECP actions which included a significant sonobuoy redesign for a third hydrophone depth and a 99 Channel Transmitter as well as an improvement in an air descent retardation device (020521-26). In the 1980s and 1990s, this trend continued (016463-73, 017019-28, 022518-26) (e.g., Hermes changed the SSQ-53B sonobuoy's radio frequency amplifier (022519),

B0026

Sparton made extensive changes to the SSQ-62B sonobuoy floatation system, surface electronics housing and transducer (022522), and Magnavox incorporated "extensive design changes" to its SSQ-77A sonobuoy (022522). The NAVAIR Acquisition Guide states that ECPs are to be used by the Navy to incorporate changes into equipment for operational improvement, etc. (016311, 016349-50). Based upon these documents, it is clear that the Navy used ECPs on production contracts to obtain developmental work. This confirms the fact that ECP 0465-2 was issued by the Navy to Sparton to perform developmental (not commercial) work, i.e., to improve the capability of the SSQ-53 sonobuoy to include dual depth operation.

**20.** I have reviewed the follow-on contract that was issued by the Navy to Sparton, Letter Contract N00019-72-C-0585 ("0585 contract")(012248-012302), dated May 25, 1972, to ascertain whether it shows that experimental work was performed on contract 0465 (012248-012302). This contract required Sparton to conduct a product improvement program ("PIP") for the SSQ-53 sonobuoy (011571, 011579). The letter contract was superseded by a definitized contract in March 1973 (002272-78, 002099-2116). In item 0002 of the Schedule, Sparton was required to provide further engineering effort for "Selectable Dual Depth" capability (012250). Significantly, 57 PIP SSQ-53 sonobuoys, which

of a limited quantity of sonobuoys first occurred in 1975, nearly four years after the issuance of Mod. 4.

22. It is my opinion that the first prong of the <u>Pfaff</u> test, whether the sale or offer was commercial or experimental, is not satisfied in this case. Mod. 4 to the 0465 contract, the Sparton March 17, 1971 letter and ECP 0465-2 do not constitute a commercial sale or offer to sell the Sparton SSQ-53 Dual Depth sonobuoys. A multiplicity of documents I reviewed plus witness statements all indicate that the work under Mod. 4, as proposed by ECP 0465-2, was considered by both parties to be developmental in nature. In contrast, I found no documents or witness statements that would lead to the conclusion that this was a commercial sale or offer.

Date: 3/15/99

Ralph C. Nash, Jr.

**B0030**

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | ) | No. 92-580C<br><br>Chief Judge Edward J. Damich |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 10

DATE ? ?

# PMA-264 STRATEGIC PLAN

PMA-264 is charged with developing Air ASW sensors to support current and future ASW aircraft, both fixed wing and helicopter. This mission must be accomplished in an environment of diminishing funding resources. Consequently, it is essential that a top level corporate strategy or plan be set forth that focuses the efforts of the PMA-264 team towards a single goal of providing effective sensor systems for Air ASW use.

There are five basic elements to the strategy:

I Respond to the threat

II Respond to ASW mission requirements.

III Provide platform/sensor integration leadership.

IV Manage the R&D and the production programs.

I - Responding to the threat

ASW sensor programs must be responsive to the threat. The primary threat remains the Soviet submarine force. This threat is not represented by a single target, but a mix of submarine types. For the purpose of this plan, the 1995 threat mix represents the requirements for current (SSQ-53, SSQ-77B), near term (6.4) sensors (TSS, ERAPS) and potential ECP's to current sensors such as AIS and VLF. The 2000 mix sets the primary requirements for midterm (6.3) sensors (ETSS, ADAR/AAA, AAS) and therefore is a major focus for the strategic plan. For the far-term (i.e. beyond 2000) new sensors can be designed to meet the 2010 threat.

The current projected threat lay downs are based on Soviet force levels that may be subject to significant revision as a result of recent political change. Soviet force levels are expected to shrink, however those units retired will likely be older units resulting in a smaller but ~~for~~ more modern force. The most demanding 1995 Soviet Threat is assumed to be the Akula at five knots velocity.

The growing secondary threat to the U.S. involves Low Intensity Conflict (LIC) between or with third world countries who will have a growing force of conventionally powered, but modern and capable submarines. Potential conflict countries with significant numbers of submarines include India, Pakistan, Libya, China, and N. Korea. Many others have enough submarines to be a threat as the two Argentinean Type 209s were in the Falklands. Approximately 20% of third world submarines are modern or less than five years old. The operating environments for these submarines generally represent shallow Seas or Oceans which provide a difficult detection challenge.

021043

1995/2000

Detection performance using sensors against the 1995 threat mix shows the following trends. Loosing ground, but probably adequate against the overall Soviet nuclear threat. Unsatisfactory against the third world diesel threat on battery and poor against a snorkeling dieselly. Poor in shallow water. (to unsatisfactory in deep water)

The Soviet 2000 threat mix ~~will approach~~ 50% post 1990 hulls. The third world threat mix is less clear, but will likely include significant numbers of advanced technology air independent propulsion systems (AIP) such as closed cycle engines, fuel cells and low power nuclear reactors. All of these will result in less detectability. The potential mix of modern type diesel submarines in third world Navys could approach 50%. Given continuation of current world trends, the primary war potential for the US will LIC scenarios such as a Korean conflict that could involve significant ASW in shallow seas. Passive performance against both the Soviet and third world threat will continue to decline.

II Responding to ASW mission requirements.

The air ASW missions cover a multitude of scenarios but they can be condensed to a few major categories:

A. Surveillance in deep and shallow water, where and when IUSS assets are not available.

B. Independent area search and barriers to localize ~~loinlize,~~ track and destroy, if required, enemy submarines. This is primarily an attrition mission in wartime.

C. Area search in support of a battle group (e.g. modloc sanitization)

D. Barriers in support of a battle group outer zone.

E. Battle group inner zone search, localization, track and attack. (normally a rotary wing air asset mission)

The sensor systems that are designed and bought ~~brief~~ by the PMA-264 team must respond to each of these missions effectively and consistent with existing force levels. When the ASW mission requirements and force levels of aircraft and crews are examined it becomes obvious that a *primary measure of effectiveness for the sensor system* must be "single mission capability". Not withstanding what is technically achievable, the desired single mission capabilities are on the order of the following:

Mission: Search Pd = 0.9
Area: Deep Water 40,000 $NM^2$
Shallow Water 10,000 $NM^2$

021044

III Providinq platform/sensor inteqration leadership.

It is of primary importance that the sensor systems built by the PMA-264 team be smoothly and efficiently integrated into the various ASW aircraft systems. This task takes considerable advanced planning and coordination and <u>money</u>! In the near and mid-term, the aircraft programs must be the drivers and sensor integration must be consistent with schedules, uplinks, memory, displays etc. However, to achieve optimum system performance for the far-term it is imperative that the roles reverse and the sensor systems that must respond to the threat and ASW mission requirements be optimized. Therein lies the reason the PMA-264 team must provide the leadership that helps direct the development of far-term aircraft system improvements.

IV Manaqinq the R&D and the production proqrams.

A. Constraints

At this point it is important to review some of the more significant constraints and considerations that will drive the development of sonobuoys during the next decade.

(1) The Soviet threat still exists and must be countered. The Aknla at 5kts represents the most demanding Soviet threat that we face in deep water in the 1990 to 1995 period. We cannot lose of the fact that our systems must provide a credible defense against this threat.

(2) Due to the higher potential for conflicts involving Third World countries, and due to our lack of capability against this threat, particularly in shallow water, it is imperative that we direct our concentration on this challenge. The Operational Requirements documents for this threat are in preparation but until they are fully defined we know enough to begin analysis and system definition. For the surveillance mission we should assume ETSS will be the mid-term sensor system and it will be required to provide intelligence on conventional threats that move in and out of areas of interest. For analysis purposes assume these areas of interest are Past and ~~must~~ of N. Korea, the Bay of Bengal, Arabian Sea approaches to the Persian Gulf and the Gulf of Sidra. Areas on the order of 50,000 NM$^2$ can be assumed for shallow water and probability of detection of 90%. For the search mission we should assume fixed wing ASW has the mission to sanitize MODLOC areas of 100 NM radius. Assume the threat is comparable to a Type 209 ~~and~~ it is holding position in an area (i.e. assume no relative ~~matron)~~. The MODOLOC search mission must be to probability of detection of at least 90% and the area must be sanitized in 24 hours or less. Six hours is desirable and would lower the probability of the ~~patenting~~ enemy keying on this area. While multiple aircraft on station at the same time is possible, from a force level consideration we should assume the MODLOC search mission must be accomplished by six serial S-3 missions or four serial P-3 missions. If technology cannot provide these capabilities then

021045

force levels in an area of conflict can be planned accordingly.

(3) From the data available, active systems appear to be the only acoustic option that is practical. Since the target is assumed to be near zero, relative velocity, it is further assumed that and FM/replica correlation system will achieve the highest possible performance. Measures of effectiveness for system comparisons are area coverage per mission and area covered per dollar. Realistic models must be used to compare system performance (i.e. not COX's law). Multiple "pings" per station must be assumed and ping rates cannot exceed: 3.0 x detection range ÷ speed of sound. Any assumptions of auto ping, auto detect and auto alert must be fully defined and associated risks must be evaluated. Pattern drop times should be based on 250 kt airspeeds.

(4) A-size devices are highly desirable. Larger than A-size systems must show "substantial" improvement in MOE to be practical. Substantial is not easy to quantity but the fleet "knows it when it sees it". Larger-than-A-size sensors are a logistic nightmare that pertubate shipping, storage, handling, loading and ~~arrange~~. From a "performance" point of view, single mission effectiveness is greatly effected by sensor size due to the number of sensors that can be carried.

(5) The numbers of different types of sonobuoys must be strictly controlled. Fleet logistics and crew use considerations dictate this number must be kept to an absolute minimum. Unless performance differences ~~and~~ are absolutely overwhelming, there cannot be a different sonobuoy for the same mission in deep and shallow water. The use of Remote Function Select (RFS) and/or Command Function Select (CFS) to program a sensor for a particular scenario is obviously needed for the future. This fact must be sold to all platforms as future modifications. In the interim it is imperative the we "neck-down" the numbers of sonobuoy types wherever it is feasible in our programs.

(6) Engineering Change Proposals (ECPs) to existing sensors are the only practical way that our capabilities can be improved in the near term (not counting ERAPS and TSS). If there are system options that can give us real performance improvements in the near term they must be exploited. The relative poor capability we have in shallow water versus the conventional threat dictates we move rapidly to make as much progress as soon as possible to fill this vital need. There may not be any ECP's that make sense in this regard but we must rapidly ~~standby~~ the technical and programmatic issues to determine what can be ~~down~~ done and when it can be done.

(7) Aircraft compatibility is a critical issue in sensor development and must be considered in the analysis and system tradeoff phases of each program. The aircraft programs do not have money to integrate new sensors into their systems and they have no money for ~~se~~new hardware. In most system configurations today there is physically no space or weight allowance available for additional hardware. Until the year 2000, sensor systems will have

021046

to be limited to requiring only software changes in the aircraft and these changes must fit schedule-wise with the planned aircraft software update schedules. Additionally, the sensor programs must provide the funding for the software development and implementation.

(8) New program starts are unlikely until at least 1994 due to the two-year budget cycle for DOD. With the severe cut-backs projected in the next few years for DOD, it is imperative that new starts be well analyzed and development risks be carefully assessed early-on. This must be a high priority task for the PMA-264 team. For the 1994 POM we must be ready with the correct program or programs that give us the highest probability of meeting the threat and mission needs at the lowest risk and most cost effectively. Every member of the R&D should have inputs into this process and should be aware of our needs and constraints.

(9) Relatively low-cost demonstrations and validations of emerging technologies are a smart way to limit risk and should be planned wherever they are practical. The history of sensor development is replete with errors that have been made be advancing projects to full scale development before key technologies were proven. These same kinds of errors can only be ~~precented~~ in the future by good planning that provides for dem/vals early-on when sensor concepts are being developed.

B. Development Strategy.

(1) General

After the technological and program constraints are defined and understood then a development strategy can be created to ensure our programs come as close as possible in filling the threat and mission needs. Time constraints dictate that in the near-term (i.e. prior to 1995) the only changes to sensors will be engineering change proposals to existing sensors plus the two full scale engineering development projects, ERAPS and TSS. In the mid-term (prior to 2000) existing advanced development programs can be modified to fill shortcomings ~~we~~ identify in the mid-term requirements. In the far-term (beyond 2000) new starts can be created to fill the far-term needs.

(2) Near and Mid Term Requirements.

The most critical need ~~for the need~~ for the near and mid-term is for a shallow water search capability. First we need to understand what capability exists in current sensors and those in FSED. Then we need to understand what capability can be achieved by ECP's to current sensor systems and those in FSED and by restructing the advanced development programs (ADAR/AAA, AAS). Programmatic and technical questions must be answered before programs are ~~re-~~structed and ECP's are developed.

021047

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 92-580C<br><br>Chief Judge Edward J. Damich |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 11

264E

DEPARTMENT OF THE NAVY
NAVAL AIR SYSTEMS COMMAND
NAVAL AIR SYSTEMS COMMAND HEADQUARTERS
WASHINGTON, DC 20361-1002

IN REPLY REFER TO
13000
AIR-10031/2805G
19 Dec 89

MEMORANDUM

From: ACQUISITION EXECUTIVE

Subj: NAVAIR ACQUISITION GUIDE

Ref: (a) AIR-01 memo AIR-10031/1886G of 20 Jan 87

Encl: (1) NAVAIR Acquisition Guide of 19 Dec 89

1. Enclosure (1) is the seventh edition of the NAVAIR Acquisition Guide, which was originally issued by reference (a). Changes from the previous edition are highlighted by a vertical line in either the left or right margin. As stated in reference (a), the Guide will be updated and reissued periodically so that changes to the acquisition process can be disseminated to program managers, and those who support program managers, as quickly as possible.

2. Significant changes from the previous Guide, dated 23 May 1989, are as follows:

a. The events and time standards shown on page 2 were updated to reflect a FY 1991 procurement.

b. In Chapter V, titled Program Authorization Process, a section on the Acquisition Strategy Report has been added.

c. In Chapter X, titled Key Issues, new sections have been added on Past Performance and Best Value, the Procurement Planning Conference, Quality Assurance, the Logistics Review Group Audit Process, Value Engineering, Disbursement Rates and the Acquisition Process, and Environmental Issues. Also in Chapter X, several sections that appeared in the sixth edition have been deleted. These sections were titled Obligation Rates and the Acquisition Process, the Naval Aviation Lessons Learned Program, the Microcircuit Obsolescence Management Program, Manufacturing Technology, and the Industrial Modernization Incentives Program. Copies of these sections can be obtained from AIR-1003.

d. The Acquisition Improvement Bulletins have been removed from the Guide with the exception of Bulletins #3, #9, and #11. These three were retained as they are referenced in other sections of the Guide. Copies of the other Bulletins can be obtained from AIR-1003.

3. Questions or requests for additional copies of the Guide should be directed to Mrs. Julie Voniak, AIR-10031C (x692-7952, room 1012/JP-1).

R G Harrison
R. G. HARRISON

Distribution:
See next page

016308

DEPARTMENT OF THE NAVY
AIR SYSTEMS COMMAND



# NAVAIR Acquisition Guide

SEVENTH EDITION

016311

CHAPTER IX: CONFIGURATION MANAGEMENT

PART B: ENGINEERING CHANGE PROPOSAL PROCESS

Flow Process: ECP Approval Process

NAVAIR, Contractor, CFA hold strategy and technical meetings — NAVAIR requests ECP — ECP arrives NAVAIR — Program Manager issues decision memo —

— PMA, AIR-05 and AIR-04 prepare CCB request, coordination and staffing — PMA verifies acceptability and funds availability — PMA presents CCB request to CCB

— CCB approval — PMA, AIR-05, AIR-04, AIR-02, ACO, ASO, NATSF, and CFA implement change — TDSA is updated

Purpose: Engineering Change Proposals (ECPs) are requested from contractors, Naval Aviation Depots (NADEPs), or other cognizant field activities for incorporation of changes into weapon systems and equipments for operational improvement, support improvement, safety, and correction of deficiency.

Source Documentation/Guidance: MIL-STD-480B, Configuration Control-Engineering Changes, Deviations and Waivers of 15 July 1988; SECNAVINST 4130.2, DON Configuration Management Policy of 11 May 1987; and in accordance with NAVAIRINST 4130.1B, NAVAIR Configuration Management Manual of 23 April 1986.

Critical Prior Events: Conduct engineering investigations to define the scope of the change and find possible solutions to meet the identified requirement. Hold working meetings with contractors and cognizant field activities, logistics managers and program management personnel to definitize the change and establish an acquisition strategy and plan. PMA initiates the PMP and budget process. AIR-05 engineer drafts letter requesting ECP. Program Manager ensures that there is an approved PMP, if required, and a decision memorandum and a fully staffed CCB request, including logistics impact, prior to submitting the ECP to the Change Control Board (CCB) for approval.

Critical Post Events: After CCB approval, formal implementation action is needed to initiate activities required to design, develop, test, incorporate, and support the change. The approved CCB change request/directive (NAVAIR Form 13050/2) is the Procurement Request (PR) used by NAVAIR contracts (AIR-02) for implementing the change. The cognizant program or system managers will ensure that an implementation letter is issued which covers all areas affected by the ECP. This letter will state the NAVAIR CCB decision, delineate approved implementation actions, state what actions the NAVAIR PCO will accomplish (if applicable) and provide the ACO or field activity with required information to enable issuance of orders for designated actions. The

implementation letter will clearly identify what we are buying and the appropriate contract/BOA line items or AIRTASK/WORK REQUEST which will be used. It will also include complete form 1423 information for deliverable contract data requirements and the PCO authorization (Sole Source Authorization) and will identify the funding documents to be used. The number and date for each funded task must be clearly stated in the implementation letter.

When Required: ECPs are required throughout the life cycle of a program for any change to a weapon system or equipment baseline.

Responsibilities: AIR-102 is responsible for developing and maintaining the policies and procedures governing the NAVAIR Configuration Management (CM) Program. This includes administration of CCBs which review and approve or disapprove ECPs. The Office of Primary Responsibility (OPR), usually the PMA, WSM, or other organization having overall program management responsibility for a weapon system or equipment, is responsible for CM. CM responsibilities are to be performed in accordance with an approved OPR CM plan prepared by the program manager. The program manager is assisted by the AIR-05 assistant program manager for systems and engineering (class desk) and APML in staffing ECPs for approval by the CCB. Program managers are also supported by AIR-02 PCOs, AIR-514, and others in the NAVAIR matrix organization responsible for ECP implementation actions.

Lessons Learned:

1) NAVAIR processes approximately 1200 ECPs and Requests for Deviations/ Waivers per year.

2) The time frame for processing varies greatly from urgent safety ECPs, to routine ECPs/VECPs which may take up to a year or even longer for approval. The most prevalent cause for processing delays is lack of prior planning. Many program offices fail to establish acquisition strategies and plans for their ECPs. At times, even informal planning is overlooked. Good coordination between program office, class desk, APML and contractor/NADEP personnel in the planning and development stages of an ECP is essential to avoid disaster. Poor planning causes long delays in ECP processing as a result of logistical problems or technically unacceptable ECPs, which must be esubmitted. Delays further occur due to lack of tracking and attention by managers. The primary delay in implementation of retrofit changes is due to the failure to anticipate the contracting administrative lead time required for negotiations to obtain a bilateral agreement in placing orders. With proper planning, parallel accomplishment of these administration times can be accomplished.

3) Many ECPs are not processed early enough to allow timely obligation of funds which results in budget cuts or reallocation of funds required to implement a change.

<u>NAVAIR POC</u>: F. Lewis, AIR-1022, room 411 JP-1, x692-8047.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 92-580C |
| v. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 12

ANA BULLETIN NO. 445
12 JULY 1963

Superseding
ANA Bulletin No. 390a
12 February 1953
ANA Bulletin No. 391a
4 October 1956

AIR FORCE-NAVY AERONAUTICAL BULLETIN

ENGINEERING CHANGES TO WEAPONS, SYSTEMS, EQUIPMENTS, AND FACILITIES

1. PURPOSE

The purpose of this bulletin is to provide (a) a uniform procedure for submission of proposed engineering changes to the Government for approval, (b) the technical, fiscal and logistic supporting information required to define the impact of the proposed engineering change on the management of the weapon, system, equipment, or facility program, (c) an aid in maintaining configuration control.

2. SCOPE

This bulletin establishes the procedure for proposing weapon, system, equipment, and facility engineering changes as defined in 4.1. In addition, this bulletin establishes the procedure for proposing engineering changes involving the furnishing of change instructions and retrofit kits for accepted (or to be accepted prior to production effectivity) items, spares, or repair parts, and repair parts kits.

3. POLICIES

3.1 Shortening development lead time and reducing development costs will be considered equal in importance to achieving ultimate performance or design goals in systems and equipment.

3.2 Technical feasibility will not be considered as the sole justification for an engineering change.

3.3 This bulletin is directed at defining the impact of an engineering change to the extent necessary to evaluate the change. The contractor shall define the effect of all changes to the elements he provides, and the effects on any other elements of the program he suspects will occur.

3.4 Engineering changes will be held to a minimum consistent with the safety and overall effectiveness of the weapon, system, equipment, or facility concerned. Engineering changes have a direct effect on military support capability. Production and retrofit changes will be devised so as to minimize the variety of configurations in the inventory, whenever feasible. Considered judgment will be exercised to ensure a minimum effect on logistic support requirements.

3.5 The information required by this bulletin is essential to:

(a) Provide timely identification of those requirements essential to accomplishment of the change and efficient support of the contract item.

011215

THIS DOCUMENT CONTAINS 24 PAGES.
A79

2376

7.3.8 Line 7. Justification for change.- The justification for the proposed change shall contain a comprehensive definition of the problem which the ECP proposes to correct or of the new capability which the change proposes to provide (see 5.7). The nature of the defect, failure, incident, malfunction, etc., which substantiates the need for the change shall be described in detail. Full utilization shall be made of failure data which may be supplied by the procuring activity and to the extent determined by the procuring activity in defining the requirement for the change. When the ECP is directed towards providing a new capability, the improvements in range, speed, endurance, striking power, defensive capability, etc., shall be described in specific numerical terms. The correspondence or previous coordination that established the requirement for a change shall be summarized and identified. A resume of any testing accomplished prior to the submission of the ECP shall be included.

7.3.9 Line 8. Developmental requirements.- When applicable, the contractor shall make recommendations as to the additional tests, trial, installations, prototyping, fit checks, etc., which will be required to substantiate the proposed change. This recommendation shall include the test objective, test vehicle(s) to be used, and estimated cost of the test program.

7.3.10 Line 9. Alternative solutions.- The contractor shall determine if the problem for which the ECP was requested, can be resolved by revised operation or maintenance procedures, revised inspection or servicing requirement, revised part replacement schedules, etc. The contractor shall state the advantages and disadvantages inherent in feasible alternative approaches to the problem.

7.3.11 Line 10. Production effectivity.- The contractor's estimated production effectivity point for the change in terms of the production items, serial numbers, or other item identification as approved by the procuring activity, and the estimated date of delivery of the item in terms of days after contractual approval. Partial production installation of a change shall not be accomplished, unless specifically authorized by the Government. In determining the effectivity date for the proposed change, the contractor shall consider, in addition to the time factor, the most economic point of incorporating the ECP change, consistent with all of the salient factors involved. The firm effectivity by date and serial number shall be confirmed as soon as practicable after receipt of contractual authority.

7.3.12 Line 11. Estimated cost for change in production.- An estimate of costs, either increased or decreased, which will result if the change is approved by the Government. If there are charges for special tooling, installations, or unusable material, etc., estimates for these charges are to be shown separately. In addition, if the same change affects equipment used by more than one service, the special tooling, facilities, unusable material charges, etc., are to be shown separately for each service based upon the percent of equipment furnished to each. This information will be used for planning purposes only and will not be binding upon the contractor. If the contractor at the time of submission of the ECP has available the firm cost proposal, this proposal shall be submitted and shall be accompanied by the appropriate cost breakdown.



011228



2389

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 92-580C<br><br>Chief Judge Edward J. Damich |

**OPPOSITION OF THE UNITED STATES TO SPARTON'S MOTION TO COMPEL ANSWERS TO ITS REQUESTS FOR ADMISSIONS AND REQUESTS FOR PRODUCTION OF DOCUMENTS**

# EXHIBIT 13

AIR-10414

5 February 1968
Supersedes BuWeps
Supplement No. 1 of
29 January 1964
and revision thereof
dated 1 March 1966

NAVAL AIR SYSTEMS COMMAND
SUPPLEMENT NO. 1 TO ANA BULLETIN 445

1. PURPOSE OF SUPPLEMENT

This supplement contains requirements which clarify, modify or add to paragraphs in ANA Bulletin 445 of 12 July 1963. Paragraph numbers shown below correspond with like numbered paragraphs in ANA 445, the symbol "R" or "A" being added as follows:

1.1 The symbol "R" following a paragraph number indicates revision of the correspondingly numbered paragraph in the bulletin.

1.2 The symbol "A" indicates the addition of an entire supplemental paragraph.

4. DEFINITIONS

4.1.3 (R) Class I change. Any proposed engineering change to (1) an accepted or unaccepted end item (weapon, equipment, unit or sub-assembly), or (2) an accepted or unaccepted part listed on a provisioning list(s), whether such part is to be incorporated in the end item or stocked in the supply system, shall be designated a Class I change when one or more of the following is affected:

(a) (R) Contract specification, contract price or fee by either increase or decrease, contract weight, contract guarantees, contract delivery or contract test schedules.

(b) through (j) of 4.1.3 apply without change.

4.1.3.1 (A) Any proposed change involving retrofit (service change or ordalt) of an accepted item shall be designated a Class I change.

4.20 (A) For purposes of this Supplement, when project orders and AIRTASKS are placed at Government-owned, NAVAIR-managed activities, such activities are considered to be contractors with the Commanding Officer functioning as the head or chief, CAO (Contract Administration Office).

5. PROCEDURE FOR ENGINEERING CHANGES

5.4 Responsibilities for Initiation of Class I changes

(e) (A) When production to a detail design documented by another contractor or by a Government design activity is prescribed by the contract,

011239