IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 92-580

Chief Judge Damich

SPARTON CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# MOTION TO PRECLUDE THE TESTIMONY OF PROFESSOR NASH

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

October 23, 2006

Attorneys for Defendant, United States

## TABLE OF CONTENTS

I. BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. PROFESSOR NASH'S REPORT FAILS TO COMPLY WITH FED. R. EVID. 702 AND THE *DAUBERT* STANDARD FOR RELIABILITY . . . . . . . 3

A. PROFESSOR NASH'S REPORT FAILS TO COMPLY WITH RCFC 26(a)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

B. PROFESSOR NASH'S OPINIONS ARE LEGAL ARGUMENTS DRESSED AS EXPERT TESTIMONY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

C. PROFESSOR NASH'S TESTIMONY WILL NOT BE HELPFUL TO THE COURT . . . . . . 11

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

# TABLE OF AUTHORITIES

## CASES

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993) . . . . . . . . . . 1, 3, 7

*Endress + Hauser, Inc. v. Hawk Measurement Sys. Ltd.*,
122 F.3d 1040 (Fed. Cir. 1997) . . . . . . . . . . 10, 11

*G. L. Christian & Assoc. v. United States*,
312 F.2d 418, *aff'd on reh'g*,
320 F.2d 345 (1963) . . . . . . . . . . 2, 8

*Hebert v. Lisle Corp.*,
99 F.3d 1109 (Fed. Cir. 1996) . . . . . . . . . . 9, 11

*Hunt Constr. Group, Inc. v. United States*,
281 F.3d 1369 (Fed. Cir. 2002). . . . . . . . . . . 7, 10, 11

*Kumho Tire Co. v. Carmichael*,
526 U.S. 137 (1999) . . . . . . . . . . 3, 7

*Liquid Dynamics Corp. v. Vaughan Co., Inc.*,
449 F.3d 1209 (Fed. Cir. 2006) . . . . . . . . . . 3

*Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*,
169 F.3d 747 (Fed. Cir. 1999) . . . . . . . . . . 7

*Paul Morelli Design, Inc. v. Tiffany & Co.*,
200 F. Supp. 2d 482 (E. D. Pa. 2002) . . . . . . . . . . 12

*S. J. Amoroso Constr. Co. v. United States*,
12 F.3d 1072 (Fed. Cir. 1993) . . . . . . . . . . 2, 8, 9

*Shahid v. Detroit,*
889 F.2d 1543 (6th Cir. 1989) . . . . . . . . . . 12

*TEG-Paradigm Envtl., Inc. v. United States*,
___ F.3d ____, 2006 WL 2788413 (Sept. 29, 2006) . . . . . . . . . . 7, 10, 11

*Upshur-Smith Labs. v. Mylan Labs.*,
944 F. Supp. 1411 (D. Minn. 1996) . . . . . . . . . . 4

## OTHER AUTHORITIES

35 U.S.C. § 102 . . . . . . . . . . 3

Fed. R. Evid. 702 . . . . . . . . . . 1, 3, 7, 11

Fed. R. Evid. 704 . . . . . . . . . . 12

RCFC 26 . . . . . . . . . . 1

RCFC 37 . . . . . . . . . . 1

# TABLE OF EXHIBITS

1 Expert Report of Ralph C. Nash, Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

2 Excerpt of the Declaration of Ralph C. Nash, Jr. . . . . . . . . . . . . . . . . . . . . . . . . . . A9

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| Plaintiff, | ) | |
| | ) | No. 92-580 |
| v. | ) | |
| | ) | Chief Judge Damich |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**MOTION TO PRECLUDE THE TESTIMONY OF PROFESSOR NASH**

The United States hereby moves to preclude the testimony at trial of Ralph C. Nash, Jr., pursuant to Fed. R. Evid. 702, RCFC 37(c)(1), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) and its progeny.

While Professor Nash is a distinguished professor of contract law, he has no relevant, admissible testimony to present to the Court in this case. Further, his testimony would invade the province of the Court and constitutes nothing more than presenting legal argument in the guise of expert testimony. Accordingly, the Court should exercise its "gatekeeper" authority to preclude his testimony under Fed. R. Evid. 702 and *Daubert.*

## I. BACKGROUND

Ralph C. Nash, Jr. is a professor emeritus of government contracts law. Exhibit 1 at A7. (Report of Professor Nash, Curriculum Vitae). He last worked for the Department of the Navy in 1959. Exhibit 1 at A7. Sparton timely served the Government with a copy of Professor Nash's

RCFC 26(a)(2)(B) report on October 10, 2006. Exhibit 1 at A1; Order, Docket No. 279, at 1-2 (Sept. 13, 2006). The report is slightly over 5 pages long, or 7 pages when the curriculum vitae and list of previous testimony are included. Exhibit 1 at A2-A8.

Professor Nash's report addresses the applicability of the *Christian* Doctrine to this case. *See G. L. Christian & Assoc. v. United States*, 312 F.2d 418, *aff'd on reh'g*, 320 F.2d 345 (1963); *S. J. Amoroso Constr. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993) ("[u]nder the so-called *Christian* doctrine, a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law"). In his report, Professor Nash states:

(*i*) his understanding of the *Christian* doctrine (Exhibit at A3-A4);

(*ii*) his opinion that the "Navy properly exercised [its] discretion not to include a Patent Rights clause in the 0465 fixed-price supply contract" (*id.* at A4);

(*iii*) his understanding of Navy policy (*id.* at A5);

(*iv*) his opinion as to the meaning of section 7-301 of the Armed Services Procurement Regulation (ASPR) and its application to the present case (*id.* at A5), and

(*v*) his analyses of what he refers to as the "parties' contemporaneous actions" that he asserts demonstrate what the parties did not intend (*id.* at A5).

Professor Nash also incorporates by reference paragraph 19 of his Declaration, which purports to describe a "long established policy" of the Navy's PMA-264 office. Exhibit 1 at A4. Finally,

Professor Nash reserved the right to supplement his report after the Government "fully explains the basis of defendant's position" with respect to the *Christian* doctrine. Exhibit 1 at A3.

Professor Nash previously provided a 30-page Declaration, of which paragraph 19 is part, which was placed in the record as part of Sparton's response to the Government's motion for summary judgment. Append. Sparton's Response to Def's Summ. J. Mot. on the On-Sale Issue of Invalidity Under 35 U.S.C. § 102(b), Exh. 1 (Mar. 19, 1999). For the convenience of the Court, an excerpt of Professor Nash's Declaration is reprinted as Exhibit 2 to this motion.

## II. PROFESSOR NASH'S REPORT FAILS TO COMPLY WITH FED. R. EVID. 702 AND THE *DAUBERT* STANDARD FOR RELIABILITY

Federal Rule of Evidence 702 imposes "a special obligation upon a trial judge to 'ensure that any and all scientific testimony … is not only relevant, but reliable.'" *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999) (quoting *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993)). The Supreme Court has denominated this role as "gatekeeping." *Id.* And, while the Supreme Court has suggested several factors that a trial court may consider in fulfilling its role, the exact methodology to be employed is within the trial court's discretion. *Kumho Tire*, 526 U.S. at 149-150.

> These factors include (1) whether the methodology can and has been tested, (2) whether the methodology is subject to peer review, (3) the potential rate of error, and (4) the general acceptance of the methodology.

*Liquid Dynamics Corp. v. Vaughan Co., Inc.,* 449 F.3d 1209, 1221 (Fed. Cir. 2006) (citing *Daubert*, 509 U.S. at 592-594);*see also Kumho Tire*, 526 U.S. at 149-150. The court's role as "gatekeeper" applies to all manner of expert testimony. *Kumho Tire*, 526 U.S. at 148-149.

### A. PROFESSOR NASH'S REPORT FAILS TO COMPLY WITH RCFC 26(a)(2)(B)

In pertinent part, RCFC 26(a)(2)(B) provides:

> The report shall contain a complete statement of all opinions to be expressed and the basis and reasons therefor; the data or other information considered by the witness in forming the opinions; any exhibits to be used as a summary of or support for the opinions ….

At just over four pages in length, Professor Nash's report fails to provide the "basis and reasons" for Professor's Nash's opinions. Professor Nash's report is conclusory and unhelpful. Accordingly, it should be excluded. *Upshur-Smith Labs. v. Mylan Labs.*, 944 F. Supp. 1411, 1440 (D. Minn. 1996) (exclusion is proper where report fails to disclose "in any intelligible way, the facts and rationale that underlie the opinions expressed").

For example, Professor Nash asserts that he "has analyzed the *Christian* Doctrine and Armed Forces Procurement Regulations …, in light of the cited documents, and have formed the opinion that they do not provide the defendant with a license or lawful right to use the inventions …." Exhibit 1 at A4. But Professor Nash provides little basis or rationale for that conclusion. He only states that "I have been unable to find any support for [the Government's] argument in the ASPR or the evidence I have reviewed in this case." *Id.* In short, while he alleges an absence of support for the Government's argument,[1] he states no basis for the opinions he expresses.

Similarly, Professor Nash states that "[i]t appears that the Navy properly exercised this discretion not to include the Patent Rights clause in the 0465 fixed price supply contract …."

---

[1] The absence of support is not surprising since the time for the United States to file its pretrial brief has not yet arrived.

Exhibit 1 at A4. Yet, his support is only a series of conclusions and his belief that the "Navy sonobuoy PMA-264 program office" had a "long established policy." Exhibit 1 at A4.

Next, Professor Nash makes the unsupported assertion that "[s]ince Mod. 4, was properly issued under the Changes clause, it can not [sic] be construed as a research and development contract." This statement is also supported only by further conclusions, such as "[i]t is clearly a proper modification to a supply contract which the *Christian* Doctrine does not transform into a research and development contract." Exhibit 1 at A5.

Finally, Professor Nash asserts that "[t]he parties' contemporaneous actions during the performance of the subject supply contract support the conlusion that a Patent Rights clause should not be incorporated therein…." Exhibit 1 at A5. This opinion, like the previous ones, is only supported by further conclusory statements.

Most telling of the conclusory nature of the report, however, is the lack of citations. In the report proper (*i.e.*, without the incorporated Declaration paragraph), the only citations are to the *Christian* case, an ASPR provision (to which citations were necessary so as to identify the subject under discussion), and the Reply of the United States to Sparton's Opposition to the Government's Motion to Preclude Professor Nash From Offering Testimony at Trial, Docket No. 274 (July 14, 2006). Professor Nash cites no documents produced in this case or any other source for his facts. Nor does he cite to treatises or case law to support his position.

Professor Nash's report is conclusory in nature and fails to establish any basis for the opinions he asserts.

### B. PROFESSOR NASH'S OPINIONS ARE LEGAL ARGUMENTS DRESSED AS EXPERT TESTIMONY

Of the four topics discussed in Professor Nash's report, three are nothing more than his opinions as to what the law is or should be. Certainly, his interpretation of the *Christian* doctrine and ASPR Section 7-301 are legal opinions, pure and simple. His opinion that the "Navy properly exercised [its] discretion not to include a Patent Rights clause in the 0465 fixed-price supply contract" is also a legal opinion in substance. Specifically, Professor Nash argues that the "Navy properly exercised [its] discretion not to include a Patent Rights clause in the 0465 fixed-price supply contract." Exhibit 1at A4. That opinion addresses a substantial issue which this Court must address in deciding the *Christian* doctrine issue, *i.e.*, whether the Patent Rights clause was mandatory or whether that Navy had discretion to exclude that clause. His only role is to package legal argument in the guise of expert testimony, and testify as to the Sparton's legal arguments.

The remaining matters addressed in Professor Nash's report involve opinions based on the application of law to facts. But even here, Professor Nash has nothing to offer the court since he will not be testifying based on facts known to him, but only based on those facts that he has read in documents provided to him. For example, Professor Nash – who last worked for the Navy in the 1959 (Exhibit 1 at A7) – has no personal knowledge from which to opine as to the Navy's policy, nor does he attempt to do so. Rather, he readily admits that his only knowledge of the "Navy's policies" is from the documents he has reviewed. Exhibit 1 at A3-A5; Exhibit 2 at A10-A11. The Court should not hear such evidence, as it is nothing more than having the witness parrot Sparton's legal arguments from the witness stand.

Further, Professor Nash does not use any scientific method nor is his testimony based in scientific, technical or other specialized methodology that will assist the trier of fact. Fed. R. Evid. 702; *Daubert*, 509 U.S. at 592-93; *Kumho Tire*, 526 U.S. at 147-48. Rather, Mr. Nash presents his own opinions as to what the law is or should be. To be sure, Mr. Nash has is an expert in the law of government contracts, but that does not make every statement he asserts a matter of scientific or specialized knowledge. The report fails to establish that the views he expresses are widely held or established in the field. *Daubert*, 509 U.S. at 593-95; *Kumho Tire*, 526 U.S. at 147-48.

As a general rule, the meaning of contract terms must be that which would be understood by a reasonably intelligent person acquainted with the contemporaneous circumstances. *TEG-Paradigm Envtl., Inc. v. United States*, ___ F.3d ____, 2006 WL 2788413 (Sept. 29, 2006), *citing Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin.*, 169 F.3d 747, 752 (Fed. Cir.1999). And where the terms of the contract are unambiguous, they must given their "plain and ordinary meaning." *TEG-Paradigm*, 2006 WL 2788413 at *7. Extrinsic sources cannot be used to impart ambiguity into an otherwise unambiguous contract. *Hunt Constr. Group, Inc. v. United States*, 281 F.3d 1369, 1373 (Fed. Cir. 2002).

Professor Nash's proffered testimony, however, does not address any terms of art that require construction because the term has a specific meaning to artisans in the field of endeavor. Rather, he simply pontificates as to what the contract as whole means to him and tells the Court how it should rule.

Next, Professor Nash makes the unsupported assertion that "[s]ince Mod. 4, was properly issued under the Changes clause, it can not [sic] be construed as a research and development

contract." This statement puts the cart before the horse: the question under the *Christian* Doctrine, is whether a clause must be incorporated into the contract, as a matter of public policy, even if the contract appears to be complete on its face. Put differently, the *Christian* Doctrine does not depend on the intent of the parties, it protects the Legislative Branch and the public fisc, as a matter of public policy, from both the intentional acts of the lesser official and from conduct that is merely negligent. *Amoroso Constr.*, 12 F.3d at 1075 ("[a]pplication of the Christian doctrine turns not on whether the clause was intentionally or inadvertently omitted, but on whether procurement policies are being 'avoided or evaded (deliberately or negligently) by lesser officials,'" citing *G. L. Christian*, 320 F.2d at 351).

Whether the modification superficially appears to be properly issued answers the wrong question: rather the question is whether, even if proper on its face, the procurement regulations were evaded. And, therefore, it is not of great significance to state that "Mod. 4 was properly issued," since every contract document that is subject to the *Christian* Doctrine is "properly issued" to the extent that it appears valid on its face and is signed by an appropriate official. The question is not what clauses were included, but which *should* have been included as a matter of law or policy.

Professor Nash next asserts that an indicium that the *Christian* Doctrine was not applicable is that the Navy used production funds for the contract rather than research and development funds, and further asserts that the Navy had a *policy* of using production funds for such work. Here, again, Professor Nash misses the point. Even if the Navy "policy" were as Professor Nash states, it would not prevent the application of the *Christian* Doctrine. *Amoroso Constr.*, 12 F.3d at 1075 ("the Christian doctrine echoes Supreme Court law that the United

States is neither bound nor estopped by its agents who act beyond their authority or contrary to statute and regulations" (citations omitted)). Indeed, if the "policy" is as Professor Nash claims, the use of production funds would be unhelpful, since it would merely confirm what Navy actually did, not what it should have done. The latter is the question to be answered by the *Christian* Doctrine inquiry.

Finally, Professor Nash contends that the "parties' contemporaneous actions during the performance of the subject supply contract support the conclusion that the Patent Rights clause should not be incorporated …." Exhibit 1 at A5. Professor Nash again misses the mark: the intention of the parties cannot be determined from their subsequent acts, nor are those intentions relevant. *Amoroso Constr.*, 12 F.3d at 1075. To be sure, if the government officials responsible for awarding and administering the contract *did intend* to avoid the strictures of the governing regulations, they certainly would not comply with the policy that they were trying to avoid. In this case, they would not use research and development funds if the purpose of avoiding the appropriate ASPR provisions was to use procurement funds rather than research and development funds.

The Federal Circuit has encouraged trial courts to employ their gatekeeper authority when presented with law in guise of expert testimony:

> We encourage exercise of the trial court's gatekeeper authority when parties proffer, through purported experts, not only unproven science, … but markedly incorrect law. Incorrect statements of law are no more admissible through "experts" than are falsifiable scientific theories.

*Hebert v. Lisle Corp.*, 99 F.3d 1109, 1117 (Fed. Cir. 1996) (citation omitted). And the Federal Circuit has further cautioned judges to be wary of attorneys parading as "experts" on the ultimate issue before the court:

> [T]his court has on numerous occasions noted the impropriety of patent attorneys giving their opinion regarding the proper interpretation of a claim as a matter of law, the ultimate issue for the court to decide.

*Endress + Hauser, Inc. v. Hawk Measurement Sys. Ltd.*, 122 F.3d 1040, 1042 (Fed. Cir. 1997). And, with respect to contracts, if the contract is unambiguous, expert testimony and other extrinsic evidence is only admissible to construe terms that have a special meaning through "trade practice or custom." *TEG-Paradigm*, 2006 WL 2788413.

The Federal Circuit recently addressed the role of experts and other extrinsic evidence in interpretation of contracts. *TEG-Paradigm Enviromental,* 2006 WL 2788413 at *7. *TEG-Paradigm* involved a question of whether the government had required performance (specifically asbestos debris and residue removal) to higher standard than what had been stated in the contract, thus justifying an equitable adjustment in favor of the contractor. *Id.* at *2. At trial, TEG sought to introduce parol evidence in the form of expert testimony and a letter from another bidder. *Id.* at *9. The *TEG* court went on to state that where a contract is unambiguous, expert testimony and other extrinsic evidence is only admissible to construe terms that have a special meaning through "trade practice or custom." *Id.* (citing *Hunt Constr.*, 281 F.3d at 1369).

While acknowledging that the expert testimony and letter "could be considered evidence of trade practice and custom," which would be admissible to define terms in an unambiguous contract, the Federal Circuit concluded that "neither of these documents aids in the interpretation of a term of art in the asbestos abatement field." *TEG-Paradigm*, 2006 WL 2788413at *9. The court went on to point out that extrinsic evidence cannot be used to "impart ambiguity into an otherwise unambiguous contract." *Id.* Where the contract is unambiguous, evidence of practice and custom in the relevant trade may be introduced to ensure that the contract is interpreted

consistent with the intent of the contracting parties. *TEG-Paradigm*, 2006 WL 2788413 at *7. This is so because the parties to a contract are free to be their own lexicographers. *Id.* at *7; *Hunt Constr.*, 281 F.3d at 1373. Accepted industry meanings may inform the court as to what the contracting parties intended by their use of a term of art. *Id.* at *7. Expert testimony is not available to construe otherwise unambiguous terms of the contract.

The present facts demonstrate the sagacity of the Federal Circuit in *Hebert* and *Endress*. Professor Nash's report contains "markedly incorrect law." Sparton is free to present its legal argument in its briefs. However, as *Hebert* and *Endress* make clear, Sparton is not entitled to present its legal arguments from the witness stand in the guise of expert testimony.

### C. PROFESSOR NASH'S TESTIMONY WILL NOT BE HELPFUL TO THE COURT

Under Fed. R. Evid. 702, expert testimony is only admissible if it "will assist the trier of fact to understand the evidence or to determine a *fact* in issue." Mr. Nash's testimony, as discussed previously, is not directed to *facts*, but rather to the *law*. Nor is expert testimony necessary to understand the evidence.

The Court of Federal Claims regularly hears disputes between the Government and its contractors. And it is beyond cavil that the judges of the Court have experience and expertise in government contract law. Given that level of experience, there should be no need for Professor Nash's testimony as to the *Christian* Doctrine and application of that doctrine to the facts of this case.

Further, the testimony invades the province of the Court by presuming to tell the Court how it should rule on an issue of law. In substance, Professor Nash merely applies government

contract law to facts he has been provided by Sparton's counsel or otherwised learned through his employment in this case. Thus, his methodology is no different than that any lawyer would employ in advocating a client's position.

And it is true that expert testimony that embraces an ultimate issue is not *per se* inadmissible. Fed. R. Evid. 704. But neither must such evidence be admitted. The Court, exercising its "gatekeeper" authority, must still find the opinions to be helpful to the trier of fact. Fed. R. Evid. 702. Here, however, the Court will have the briefs of the parties and will hear the facts at trial. Thus, the court will have all of the information it needs to decide the issues before it. The Court has no need to hear Sparton's arguments being repeated from the witness stand, which would only waste valuable trial time and possibly confuse the issues. See, *Shahid v. Detroit,* 889 F.2d 1543, 1547-48 (6th Cir. 1989) (not error for court to exclude expert testimony that amounted to a legal opinion); *Paul Morelli Design, Inc. v. Tiffany & Co.*, 200 F. Supp. 2d 482, 487 (E. D. Pa. 2002) (expert testimony on ultimate issues of copyright originality and copyrightability would not have been helpful where the jury had available to it all of the evidence and the court had carefully instructed the jury as to the law).

Sparton will, of course, have its opportunity to advocate its position in the briefs. No reason exists to allow them a second opportunity to present the same argument through an expert witness.

## III. CONCLUSION

Professor Nash's report is conclusory and fails to specify the bases and support for his opinions. Further, the proffered testimony of Professor Nash is nothing more than impermissible legal argument in guise of legal testimony. Accordingly, the Government requests that the Court exclude Professor Nash's report from the trial record and bar Professor Nash from testifying.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

s/*Gary L. Hausken*
GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

October 23, 2006

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 92-580C |
| v. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION TO PRECLUDE THE TESTIMONY OF PROFESSOR NASH**

# EXHIBIT 1

J. Fargo
G. HAUSKEN

Steven Kreiss
Attorney at Law

1120 Connecticut Avenue N.W., Suite 240, Washington, DC 20036
Telephone (202) 347-6382 Facsimile (202) 347-7711

October 10, 2006

Gary L. Hausken, Esq.
Commercial Litigation Branch
Civil Division
Department of Justice
Washington D.C. 20530

**BY FACSIMILE**
(202) 307-0345

Re: Sparton Corporation v. United States,
U.S. Court of Federal Claims, No. 92-580C

Dear Mr. Hausken:

Pursuant to the Court's September 13, 2006 Order and our telephone discussion this date, please find enclosed an expert report, curriculum vitae and List of Cases For Which Ralph C. Nash Was Deposed Or Testified In The Last Four Years for Professor Ralph C. Nash. I am contacting Amy Nelson, Chief Judge Damich's legal assistant, to inform chambers pursuant to the Court's September 13, 2006 Order that Sparton has served defendant this date with the above identified material.

Very truly yours,

Steven Kreiss

**EXPERT REPORT FROM RALPH NASH**

I have been requested by the plaintiff Sparton Corporation to provide an expert report regarding the defense of license raised by the defendant United States in the Court of Federal Claims, case No. 92-580C. More specifically, I have been shown the Defendant's First Amended Answers To Plaintiff's Interrogatories 1-6 and more specifically Interrogatory No. 1 and defendant's answer thereto set forth below:

"Interrogatory No. 1

For each of U.S. Patent Nos. 3,921,120 and 4,029,233, Sparton requests the United States to identify the basis for the contention that Sparton has granted to the United States a license or lawful right to use or manufacture the subject matter of the claims of the '120 and '233 patents, including but not limited to:

(a) identification of the basis in statute and case law upon which the United states contends an implied license or right to use was established;

(b) identification of all documents or other evidence which the United States contends establishes the existence of an implied license or right to use/manufacture, and specifically how such evidence establishes the existence of an implied license or right to use/manufacture; and

(c) identification of the dates through which the United states contends an implied license or right to use/manufacture existed.

*Answer to Interrogatory No. 1*

(a) The legal basis for defendant's defense of a lawful right to use the inventions claimed in the '120 and '233 patents is the *Christian* Doctrine, see *G.L. Christian & Associates v. United States*, 312 F.2d 418, *aff'd on reh'g*, 320 F.2d 345 (1963), and Armed Forces Procurement Regulation, §§7.301, 7.302, 7.302-23 and 9.107 (especially 9.107-1, 9.107-4 and 9.107-5) (1968-1972). With respect to the '120 patent, the Government may also assert a defense of lawful right based solely on the contractual provisions of Contract No. N00019-70-C-0133.

(b) The principal documents on which the United States will rely at trial to prove a lawful right to use the inventions claimed in the '120 and '233 patents are:

i. the '0465 contract;
ii. ECP 0465-2;
iii. Plaintiff's briefs in opposition to the motion for summary judgment on the issue (sic) of invalidity;
iv. Plaintiff's briefs on its appeal to the Court of Appeals for the Federal Circuit;
v. The opinion of the 2005 Federal Circuit in this case;
vi. Exhibits 1-53 to Defendant's Motion for Partial Summary Judgment, filed on October 3, 1997;
vii. Contract No. N00019-70-C-0133;
viii. The following documents: SPA42084-SPA42088, SPA30734, SPA30710-SPA30712; and
ix. Defendant's Summary Judgment Exhibit 10.

(c) The entire life of the patents-in-suit, November 18, 1975-June 14, 1994."

My expert report will concern the defendant's contention that it has a license or lawful right to use the inventions claimed in the '120 and '233 patents based upon the *Christian* Doctrine, 312 F.2d 418, aff'd on reh'g, 320 F.2d 345, cert. denied, 375 U.S. 954 (1963) and Armed Forces Procurement Regulations, §§7.301, 7.302, 7.302-23 and 9.107 (especially 9.107-1, 9.107-4 and 9.107-5) (1968-1972) cited by defendant. The defendant's answer to Interrogatory No. 1 does not indicate, much less "specify" as the interrogatory requests, how the evidence cited by the defendant in regard to the applicability of the *Christian* Doctrine and cited Armed Forces Procurement Regulations establishes the existence of an implied license or right to use/manufacture the claimed inventions of the cited patents. In this regard, defendant states in footnote 3 of page 6 of its Reply Of The United States To Sparton's Opposition To The Government's Motion To Preclude Professor Nash From Offering Testimony At Trial that defendant's counsel "… will address our legal analysis of the [license] issue through attorney argument, not by having an 'expert,' in effect, read our brief into the record." Accordingly, I reserve the right to supplement this report when defendant's counsel fully explains the basis of defendant's position that the *Christian* Doctrine and Armed Forces Procurement Regulations, §§7.301, 7.302, 7.302-23 and 9.107 (especially 9.107-1, 9.107-4 and 9.107-5) (1968-1972), in light of the cited

documents, provide the defendant with a license or lawful right to use the inventions claimed in the '120 and '233 patents. Nevertheless, I have analyzed the *Christian* Doctrine and Armed Forces Procurement Regulations, §§7.301, 7.302, 7.302-23 and 9.107 (especially 9.107-1, 9.107-4 and 9.107-5) (1968-1972), in light of the cited documents, and have formed the opinion that they do not provide the defendant with a license or lawful right to use the inventions claimed in the '120 and '233 patents.

The *Christian* doctrine establishes the principle that when a clause is required to be inserted into a contract by the applicable regulations, it will be read into that contract unless the agency has obtained a proper regulatory deviation. Thus, the Government's argument appears to be that the Patent Rights clause is a mandatory clause in the supply contract 0465 under which ECP 0465-2 was implemented through mod. 4 thereof. I have been unable to find any support for this argument in the ASPR or evidence that I have reviewed in this case.

In reaching this conclusion, I reviewed ASPR §VII which specifies which clauses are to be inserted in various types of contracts. The Patent Rights clause is a mandatory clause for fixed-price research and development contracts (see ASPR §7-302.23) and cost-reimbursement research and development contracts (see ASPR §7-402.22). However, the Patent Rights clause is not a mandatory clause for fixed-price supply contracts, but was specified as a clause to be used when applicable. See ASPR §7-104.7 (Jan. 1969). This makes the inclusion of the Patent Rights clause in fixed-price supply contracts discretionary in January 1969 and therefore not subject to the *Christian* doctrine.

It appears that the Navy properly exercised this discretion not to include the Patent Rights clause in the 0465 fixed-price supply contract for sonobuoys. In addition, it appears that the Navy properly used the Changes clause of that contract to obtain the development work called for by Mod. 4 because that work was within the general scope of contract 0465. It is unlikely that the Navy would have negotiated a Patent Rights clause in Mod. 4 because ASPR §7-104.7 was revised prior to July 1971 removing said clause from the list of fixed-price supply contract discretionary clauses. See ASPR §7-104.7 (Rev. 1, March 31, 1969 and Rev. 10, April 30, 1971). This appears in accordance with Navy sonobuoy PMA 264 program office long established policy. I incorporate herein by reference thereto paragraph 19 of my earlier filed Declaration in this case which describes this policy in detail.

It appears that the Government may be arguing that a modification to a fixed-price supply contract calling for development is actually a fixed-price research and development contract. Such an argument, however, is not supported by ASPR §7-301 which states:

> [T]he term "fixed-price research and development contract" means any contract (other than a letter contract, a notice of award, or **a modification not affecting new procurement)** ... and is for experimental, developmental or research work.

Under the above definition, "modifications not affecting new procurement" are excluded from being construed as research and development contracts. Modifications not affecting new procurement are normally issued under the authority of the Changes clause. Since Mod. 4 was properly issued under the authority of the Changes clause, it can not be construed as a research and development contract. It was clearly a proper modification to a supply contract which the *Christian* doctrine does not transform into a research and development contract. Another indication that Mod. 4 was not a research and development contract is the fact that the Mod. 4 was funded with production funds and not research and development funds. The long standing practice of the Navy in obtaining most sonobuoy development work through modifications to fixed-price supply contracts, which did not include a Patent Rights clause, indicates that the Navy's interpretation of these regulations was in accordance with my above opinions and interpretation of these regulations.

The parties' contemporaneous actions during the performance of the subject supply contract support the conclusion that a Patent Rights clause should not be incorporated therein under the *Christian* doctrine. At no time in the performance of the subject contract did Sparton inform or report to the Navy that subject inventions or no subject inventions were made thereunder as required by the ASPR standard Patent Rights provisions and clauses referenced by the defendant. Similarly, the Navy never requested Sparton to report subject inventions under the 0465 contract or any modification thereto. Neither contracting party suggested to or discussed with the other in any document that I have reviewed that patent rights could or should be conveyed to the Government under the subject contract. The opposite was known to both parties because a Patent Rights clause was never included in, or proposed for, the 0465 contract or any modification thereto.

My curriculum vitae is attached. The documents that I have reviewed to prepare this report are identified above and in my earlier filed Declaration in this case. I have (a) authored publications within the preceding 10 years, and (b) testified as an expert at trial or by deposition within the past four years. That information is contained in my curriculum vitae. My compensation rate is $450.00 per hour.

Ralph Nash

10/10/06

RALPH C. NASH, JR.

Ralph C. Nash, Jr., is Professor Emeritus of Law of The George Washington University, Washington, D.C., from which he retired in 1993. He founded the Government Contracts Program of the university's National Law Center in 1960, was Director of the Program from 1960 to 1966 and from 1979 to 1984, and continues to be actively involved in the Program. He was Associate Dean for Graduate Studies, Research and Projects, of the Law Center from 1966 to 1972.

Professor Nash has specialized in the area of Government Procurement Law. He worked for the Navy Department as a contract negotiator from 1953 to 1959, and for the American Machine and Foundry Company as Assistant Manager of Contracts and Counsel during 1959 and 1960.

He graduated *magna cum laude* with an A.B. degree from Princeton University in 1953, and earned his Juris Doctor degree from The George Washington University Law School in 1957. He is a member of Phi Beta Kappa, Phi Alpha Delta, and the Order of the Coif.

Professor Nash is active as a consultant for government agencies, private corporations, and law firms on government contract matters. In recent years, he has served widely as neutral advisor or mediator/arbitrator in alternate dispute resolution proceedings. He is active in the Public Contracts Section of the American Bar Association, is a member of the Procurement Round Table, and is a Fellow and serves on the Board of Advisors of the National Contract Management Association.

During the 1990s, Professor Nash was active in the field of acquisition reform. He served on the "Section 800 Panel" that recommended revisions to all laws affecting Department of Defense procurement, the Defense Science Board Task Force on Defense Acquisition Reform, and the Blue Ribbon Panel of the Federal Aviation Administration.

He is the coauthor of a casebook, *Federal Procurement Law* (3d ed., Volume I, 1977, and Volume II, 1980) with John Cibinic, Jr., and author of a text, *Government Contract Changes* (2d ed. 1989, 1993 supp.). He and Professor Cibinic have also coauthored five textbooks: *Formation of Government Contracts* (3d ed. 1998), *Administration of Government Contracts* (4th ed. 2006), *Cost Reimbursement Contracting* (3d ed. 2004), *Government Contract Claims* (1981) and *Competitive Negotiation: The Source Selection Process* (2d ed. 1999). He is coauthor with Leonard Rawicz of the textbook *Patents and Technical Data* (1983) and the three volume compendium, *Intellectual Property in Government Contracts* (5th ed. 2001), coauthor with seven other authors of the textbook *Construction Contracting* (1991), and coauthor with Steven L. Schooner and Karen O'Brien of *The Government Contracts Reference Book* (2d ed. 1998). He has written several monographs for The George Washington University Government Contracts Program monograph series, and has published articles in various law reviews and journals. Since 1987 he has been coauthor of a monthly analytical report on government contract issues, *The Nash & Cibinic Report*.

List of Cases For Which Ralph C. Nash, Jr.
Was Deposed Or Testified In The Last Four Years

2002

1. Raytheon E-Systems, Inc. v. Comptroller of Public Accounts, State of Texas, Texas Dist. Ct., Civil Action GN-101511, decision for plaintiff - Deposition (Contact: Jim Cloudt, Office of Attorney General, Austin, TX)

2. Ericsson, Inc. v. Harris Corp., D. Tex., Civil Action 3-98CV2903-M, Deposition (Contact: Brett Govett, Fulbright & Jaworski, Dallas, TX)

2003

3. Innovative Concepts, Inc. v. Symetrics Industries, Inc., E.D. Va., Civil Action 02-CV-1040, plaintiff granted injunction - Deposition (Contact: Laurin Mills, Nixon Peabody LLP, Washington, DC)

4. Dun & Bradstreet v. Department of General Services, Iowa Department of Inspections and Appeals, Docket 02D65001 - Deposition & Trial (Contact: William Goodrich, Arent Fox Kintner Plotkin & Kahn PLLC, Washington, DC)

5. Hi-Shear Technology Corp. v. United Space Alliance, 18th Judicial Circuit, Brevard County, FLA, Case No. 05-2000-CA-24754 - Deposition (Contact: David Lerner, Litchford & Christopher, Orlando, FLA)

2004

6. Night Vision Corp. v. Insight Technology, Inc., E.D. Va., Civil Action 03-691, Deposition (Contact: Jay DeVecchio, Miller & Chevalier, Washington, DC)

7. United States v. United Technologies, Inc., S.D. Ohio, Civil Action C-99093, Deposition (Contact: Peter Work, Crowell & Moring, Washington, DC)

8. Basic Management, Inc. v. United States, Deposition (Contact: William Duffy, Davis, Graham & Stubbs, Denver, Col.)

2006

9. Aerotek, Inc. v. Tyonek Native Corp., E.D. Va., Civil Action, Deposition & Trial (Contact: Charles Wayne, DLA Piper Rudnick Gray Cary, Washington, DC)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 92-580C |
| v. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**MOTION TO PRECLUDE THE TESTIMONY OF PROFESSOR NASH**

# EXHIBIT 2

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SPARTON CORPORATION,<br>Plaintiff,<br>v.<br>THE UNITED STATES,<br>Defendant. | No. 92-580C<br>Judge James P. Merow |

**DECLARATION OF RALPH C. NASH, JR.**

I, Ralph C. Nash, Jr., declare and state under penalty of perjury that:

1. I graduated magna cum laude with an A.B. degree from Princeton University in 1953 and earned a Juris Doctor degree from the George Washington University ("GWU") Law School in 1957. I am a member of the Phi Beta Kappa, Phi Alpha Delta and the Order of the Coif. From 1953-1959 I was employed by the Navy Department as a contract negotiator. Subsequently, from 1959-1960, I was employed as an Assistant Manager of Contracts and Counsel for the American Machine and Foundry Company. In 1960, I founded the Government Contracts Program at the GWU Law Center and was Director of that Program from 1960-1966 and from 1979-1984. I was

not Sparton's production line, nor was the Jackson plant the SSQ-53 sonobuoy production facility. See the Martin and Melvin Declarations attached hereto. Thus, the engineering and manufacturing cost figures establish that non-production work was being performed by Sparton's Engineering Department under Mod. 4 to the 0465 contract.

**19.** I have reviewed Navy documents to ascertain if it was Navy practice to utilize the ECP process to obtain contractor development work to improve the performance of production sonobuoys. I found that the Navy has recognized that sonobuoys are dynamic devices that continue to evolve to meet fleet requirements and the perceived threat (017088-89). The Navy stated that its sonobuoy program has averaged 20-25 ECP's per year to meet changing threat conditions and operational requirements;. Id. The Navy sonobuoy program office PMA-264 Strategic Plan (021043-52) identifies ECPs as the "...only practical way that...[the Navy's sonobuoy] capabilities can be improved..." (021045). In the late 1970s, the Navy documented the current status of all ECP actions which included a significant sonobuoy redesign for a third hydrophone depth and a 99 Channel Transmitter as well as an improvement in an air descent retardation device (020521-26). In the 1980s and 1990s, this trend continued (016463-73, 017019-28, 022518-26) (e.g., Hermes changed the SSQ-53B sonobuoy's radio frequency amplifier (022519),

Sparton made extensive changes to the SSQ-62B sonobuoy floatation system, surface electronics housing and transducer (022522), and Magnavox incorporated "extensive design changes" to its SSQ-77A sonobuoy (022522). The NAVAIR Acquisition Guide states that ECPs are to be used by the Navy to incorporate changes into equipment for operational improvement, etc. (016311, 016349-50). Based upon these documents, it is clear that the Navy used ECPs on production contracts to obtain developmental work. This confirms the fact that ECP 0465-2 was issued by the Navy to Sparton to perform developmental (not commercial) work, i.e., to improve the capability of the SSQ-53 sonobuoy to include dual depth operation.

**20.** I have reviewed the follow-on contract that was issued by the Navy to Sparton, Letter Contract N00019-72-C-0585 ("0585 contract")(012248-012302), dated May 25, 1972, to ascertain whether it shows that experimental work was performed on contract 0465 (012248-012302). This contract required Sparton to conduct a product improvement program ("PIP") for the SSQ-53 sonobuoy (011571, 011579). The letter contract was superseded by a definitized contract in March 1973 (002272-78, 002099-2116). In item 0002 of the Schedule, Sparton was required to provide further engineering effort for "Selectable Dual Depth" capability (012250). Significantly, 57 PIP SSQ-53 sonobuoys, which

of a limited quantity of sonobuoys first occurred in 1975, nearly four years after the issuance of Mod. 4.

22. It is my opinion that the first prong of the Pfaff test, whether the sale or offer was commercial or experimental, is not satisfied in this case. Mod. 4 to the 0465 contract, the Sparton March 17, 1971 letter and ECP 0465-2 do not constitute a commercial sale or offer to sell the Sparton SSQ-53 Dual Depth sonobuoys. A multiplicity of documents I reviewed plus witness statements all indicate that the work under Mod. 4, as proposed by ECP 0465-2, was considered by both parties to be developmental in nature. In contrast, I found no documents or witness statements that would lead to the conclusion that this was a commercial sale or offer.

Date: 3/15/99

Ralph C. Nash, Jr.

B0030