IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 92-580

Chief Judge Damich

SPARTON CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

**DEFENDANT'S PROPOSED ADDITIONAL FINDINGS OF FACT**

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JOHN FARGO
Director

GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

February 4, 2008

Attorneys for Defendant, United States

## I. INTRODUCTION & BACKGROUND

1. A sonobuoy is a device that detects underwater objects such as submarines. Sonobuoys have been utilized since the 1940's by the Department of the Navy (Navy) in its anti-submarine warfare (ASW) operations, and are presently in use. DX-115 at D115.2, D115.6. The term "sonobuoy" is a contraction of "sonar buoy." [D]X-220 at D220.3. [citation corrected]

Sparton Response to No. 1:

The cited text is imprecise. A sonobuoy is a device that is capable of detecting underwater objects such as submarines. While a sonobuoy is primarily used to detect, locate and classify submerged submarines (B459, 948), it is also used for underwater geological exploration and other submarine purposes (PX 259 at 4), such as allowing aircraft in flight to communicate with friendly submarines and to monitor and radio oceanographic conditions such as temperature thermoclines to aircraft. DX 115, pp. 115.11-12 [D115.11-12]. The text in the second sentence is unsupported by the PX-220 at 3 citation.

2. Sonobuoys were first used near the end of the Second World War by the British and U.S. Navies to detect German submarines. DX-100 at D100.1. Sonobuoys are primarily used to detect, locate and classify submerged submarines, but have also been used for seismic offshore oil exploration. DX-100 at D100.2; PX 259 at page 4.

Sparton Response to No. 2:

The text in the second sentence is imprecise as the cited exhibit indicates. A sonobuoy can provide "… local ocean temperature data to allow crews to plan search patterns" as well as other functions. DX-100 at D100.3.

3. Since World War II the general size of the sonobuoy and its purpose have remained the same, but the capabilities and complexity [of sonobuoys] have increased many times in keeping pace with technology. DX-100 at D100.1.

Sparton Response to No. 3

Although the proposed fact is substantially as stated in the cited exhibit, the exhibit does not indicate when a sonobuoy was first used to provide "… local ocean temperature data to allow crews to plan search patterns." Id. Thus, the purpose of using a sonobuoy may not have remained the same since World War II. Sparton suggests adding the bracketed material.

4. High-technology solid-state electronics replaced earlier vacuum tube designs and allowed the addition of more capabilities and greater sensitivity. DX-100 at D100.1.

Sparton Response to No. 4

Although the proposed fact is substantially as stated in the cited exhibit, the nature of the "more capabilities" and "greater sensitivity" referenced in the exhibit are unexplained and unknown.

5. A sonobuoy is a sophisticated underwater electroacoustic device capable of detecting and locating the source of underwater sounds. DX-100 at D100.2.

Sparton Response to No. 5

Sparton would add to this proposed finding the following after the word "sounds": and monitoring oceanographic conditions, such as temperature thermoclines, for transmission to aircraft.

6. There are two types of sonobuoys: passive sonobuoys and active sonobuoys. DX-100 at D100.2.

Sparton Response to No. 6:

There are three distinct types of sonobuoys. See PPFF 9, DX 115, pp. 115.11-12, [D115.11-12] and DX-100 at 016455 [D100.3]. The third type is a special purpose sonobuoy. Special purpose sonobuoys include the AN/SSQ-36 sonobuoy which provides local ocean temperature data to crews to plan search patterns, the AN/SSQ-86 sonobuoy which provides communication from aircraft to submarine, and the AN/SSQ-71 sonobuoy which provides two-way communication between aircraft and submarine. Id.

7. Passive sonobuoys are strictly listening devices and, therefore, do not reveal their presence to submarines; they can detect the presence of submarines at great distances. DX-100 at D100.2.

Sparton Response to No. 7:

The cited exhibit includes the words "even the most modern submarines" after the words "presence of" in the text of this finding. Thus, the finding is imprecise without the additional text. Furthermore some sonobuoys do not detect submarines at great distances, but are used for different purposes. Accordingly, "they" should be changed to "some."

8. Early passive sonobuoys had no directional sense: the submarine could be located by deploying patterns of three or more sonobuoys and plotting the signals from all of them in the aircraft. DX-100 at D100.2.

Sparton Response to No. 8:

The cited exhibit includes the terminology "types of" after the word "Early" and thus this finding is imprecise without this additional text.

9. Newer passive sonobuoys have a built-in compass and a directional hydrophone so that a single sonobuoy can provide direction or bearing information. DX-100 at D100.2.

Sparton Response to No. 9:

The word "newer" is indefinite and should be made more specific by identifying the sonobuoys under discussion.

10. An active sonobuoy is a miniature sonar system similar to those installed in ships. DX-100 at D100.2.

Sparton Response to No. 10:

No comment.

11. The active sonobuoy uses a "transducer," a device that can both send out and receive sound energy under water. DX-100 at D100.2.

Sparton Response to No. 11:

The word "device" is indefinite. The finding would be more precise as follows. The active sonobuoy uses a transducer that can transmit acoustic signals into the ocean through a projector and receive through its hydrophone(s) acoustic energy underwater. B428-32, 459-60, 1415-16.

12. The active sonobuoy sends out short pulses of sound and locates the presence of a submarine by detecting the returning pulses reflected by the target. DX-100 at D100.2.

Sparton Response to No. 12:

No comment.

13. Equipment in the aircraft measures the time taken for the sound pulses to reach the target and return to the sonobuoy. DX-100 at D100.2.

Sparton Response to No. 13:

This finding is imprecise since a vessel or ship may drop sonobuoys into the ocean and be the hunter of the submarine. B428-32, 459-60, 1415-16, PX 259 at 4.

14. Deleted

15. To locate submarines, sonobuoys are dropped into the ocean from an aircraft and send detection information back to the aircraft via a radio frequency transmission. DX-100 at D100.2; PX 259 at 4.

Sparton Response to No. 15:

This finding is imprecise since a vessel or ship may drop sonobuoys into the ocean and be the hunter of the submarine. B428-32, 459-60, 1415-16, PX 259 at 4.

16. Most sonobuoys are compact and easily handled. DX-100 at D100.2. Sonobuoys are expendible devices: they are used one time and then self-destruct by means of a scuttling mechanism. DX-100 at D100.2. Before launch, sonobuoys are generally packaged in cylindrical shells about five inches in diameter and three feet long, known as an "A" size sonobuoy. DX-100 at D100.2.

Sparton Response to No. 16:

This finding is imprecise in the use of the words "easily" in the first sentence and "generally" in the third sentence. Furthermore, the dimensions of an "A" size sonobuoy are not referenced in the citation.

### A. SONOBUOYS AND BATHYTHERMOGRAPHS

17. The AN/SSQ-36 is a bathythermograph buoy that allows Anti-submarine Warfare (ASW) crews to plan sonobuoy deployment patterns based on oceanic temperature readings. PX-114 at B0460; DX-100 at D100.2.

Sparton Response to No. 17:

The third type of sonobuoy is a special purpose type sonobuoy. PX-114 at 016455; DX-100 at 016454 [D100.2]. One special purpose type sonobuoy type, the AN/SSQ-36,

may measure the temperature of the ocean at various depths to determine the location of thermoclines (i.e. density-pressure and/or temperature differences between oceanic layers). Id. Instead of listening for acoustic energy with a hydrophone(s), like the passive or active sonobuoy, this sonobuoy may contain a probe for sensing water temperature and transmitting the temperature reading to hunter aircraft. Other special purpose sonobuoys include the AN/SSQ-86 sonobuoy which provides communication from aircraft to submarine, and the AN/SSQ-71 sonobuoy which provides two-way communication between aircraft and submarine. DX-100 at 016455 [D100.3], B428-32, 459-60, 1415-16, DX-100 at 016455 [D100.3].

18. Bathythermographs cannot transmit or receive acoustic signals. PX-111 at B0428. Bathythermograph buoys are used to determine the ocean temperature, an important factor affecting acoustic transmission through water. PX-111 at B0428. Bathythermograph buoys perform their function by deploying a thermistor temperature probe. DX-220 at D220.3, D220.16. The probe continually senses water temperature as it descends from the surface. DX-238.

Sparton Response to No. 18:

The Bathythermograph sonobuoy type may measure the temperature of the ocean at various depths to determine the location of thermoclines (i.e. density-pressure and/or temperature differences between oceanic layers), an important factor affecting acoustic transmission through water. B428-32, 459-60, 1415-16, DX-100 at 016455 [D100.3]. Instead of listening for acoustic energy with a hydrophone(s), like the passive or active sonobuoy, this sonobuoy may contain a probe for sensing water temperature and transmitting electrically the temperature reading to hunter aircraft. Id.

19. The AN/SSQ-53 (SSQ-53) class of sonobuoys are passive. They are called DIFAR sonobuoys, a contraction of Directional LOFAR sonobuoy. DX-97 at D97.3; PX-111 at B0429; DX-126 at D126.40-41. LOFAR stands for Low Frequency Analysis and Ranging. Testimony of Boyle, Testimony of Hudson.

Sparton Response to No. 19:

The citation to DX-126 at D126.40-41 does not support the second sentence. DIFAR is a contraction for Directional Frequency Analysis and Recording, not Directional LOFAR. DX-126 at D126.41. The third sentence is unsupported by a verifiable citation.

20. The DIFAR sonobuoy was the first "A" size sonobuoy that was capable of tracking an enemy submarine with a single sonobuoy and fixing the location of an enemy submarine with as few as two sonobuoys. DX-116 at D116.117.

Sparton Response to No. 20:

The cited exhibit is hearsay. The finding should be as follows. Types of passive sonobuoys earlier than the AN/SSQ-53 sonobuoys had no useful directional sense. B429, 459-60, 953-56, 1415-16, 16499, 16454-55. A submarine could only be located by deploying patterns of three or more sonobuoys in a given area and plotting signals from all in an airplane or ship. Id. The location of a submarine was then derived through geometry. Id. This process was time consuming and was not effective against high speed submarines that could "run away" from the sonobuoy before the "location" process was completed. Id. Beginning with fleet use of SSQ-53 sonobuoys, which contained a built-in compass, an omnidirectional hydrophone and a directional hydrophone, the U.S. fleet was able to obtain detection and bearing information from a single SSQ-53 sonobuoy. Id. A pair of SSQ-53 sonobuoys provided the specific location of a targeted submarine. Id.

21. The first SSQ-53 sonobuoys were delivered to the fleet in 1974. DX-116 at D116.117.

Sparton Response to No. 21:

This finding is contradicted by defendant's proposed findings 81, 270, 293 and 295 establishing 1972 fleet use.

22. AN/SSQ-57 sonobuoys are passive sonobuoys with calibrated audio. DX-100 at D100.3. The SSQ-57 sonobuoy is used to measure ambient noise levels and detect submarine noise. DX-100 at D100.3.

Sparton Response to No. 22:

The citation to DX-100 at 016455 [D100.3] does not support the proposed finding. The finding should read as follows. The SSQ-57 class sonobuoys are passively used to measure target submarine sound and ambient noise levels which assist aircraft personnel in the planning of a submarine search pattern. B16455, 16500.

23. AN/SSQ-62 sonobuoys are active, commandable sonobuoys which provide range and bearing information about objects. DX-100 at D100.3. The SSQ-62 sonobuoys are known as DICASS buoys, which is short for Directional Command Activated Sonobuoy System. DX-100 at D100.3.

Sparton Response to No. 23:

The citation to DX-100 at 016455 [D100.3] does not support the proposed finding. The finding should read as follows. The SSQ-62 class sonobuoys are active, commandable ones which provide range and bearing information about a target submarine. B16454-55, 16501. They are called DICASS sonobuoys, the acronym standing for Directional Command Active Sonobuoy System. Id. When this sonobuoy is deployed, it remains passive

until commanded to an active function by an ASW aircraft. Id. This sonobuoy is used to provide simultaneous range, Doppler and bearing information for localizing and attacking subsurfaced targets. Id.

24. After deployment, the SSQ-62 buoy remains in a passive state, *i.e.*, it does not send sonar pulses, until it receives an activation command; it then becomes an active sonobuoy and will send sonar pulses. DX-100 at D100.3.

Sparton Response to No. 24:

See Sparton response to DPFF 23.

25. AN/SSQ-77 sonobuoys are also passive sonobuoys; they are also known as VLAD buoys, which is a contraction of Vertical Line Array DIFAR. DX-100 at D100.3. SSQ-77 sonobuoys contain a vertical array of omni-directional hydrophones and a single-directional hydrophone that can provide direction and bearing information. DX-100 at D100.3.

Sparton Response to No. 25:

The citation to DX-100 at 016455 [D100.3] does not support the proposed finding. The finding should read as follows. The SSQ-77 class sonobuoys are passive also. B16502, 16455. These sonobuoys provide improved passive detection in deep water because they are highly sensitive. Id. To achieve this sensitivity, these sonobuoys use a vertical line array of omni-directional hydrophones which form directional beam patterns to increase detection range and help discriminate against noise. Id. They also utilize a standard DIFAR hydrophone to determine the bearing of detected submarines. Id. Thus, the passive SSQ-77 class sonobuoys are more effective than the passive SSQ-53 DIFAR sonobuoys in deep ocean areas. Id.

26. Deleted

**B. The Patented Inventions**

27. Deleted

28. Deleted

29. Deleted

30. Deleted

31. "Conception of the 120 and 233 claimed inventions occurred between July 29, 1971 and November 23, 1971 when this single part release plate was conceived for use in the dual depth sonobuoy." DX-17 at D17.13.

Sparton Response to No. 31:

This finding calls for a legal conclusion regarding the conception of the claimed inventions and is thus inappropriate and objectionable.

32. The '120 patent's term expired at midnight, November 18, 1992. 35 U.S.C. § 154 (1975). JX-1.

Sparton Response to No. 32:

No comment.

33. The '233 patent's term expired at midnight, June 14, 1994. 35 U.S.C. § 154 (1975). JX-3.

Sparton Response to No. 33:

No comment.

34. The accounting period for the '120 patent in this case begins on August 25, 1980, twelve years prior to the date when this case was filed. 35 U.S.C. § 286. The accounting period for the '120 patent ends on November 18, 1992. DX-221.

Sparton Response to No. 34:

No comment.

35. The accounting period for the ‘233 patent in this case begins on August 25, 1980 and ends on June 14, 1994. DX-221.

Sparton Response to No. 35:

No comment.

36. Sparton filed patent application no. 345,871 on March 29, 1973, naming James W. Widenhofer as the inventor. That application issued as patent no. 3,921,120 (the ‘120 patent), entitled “Float Actuation Release Mechanism,” on November 18, 1975. The patent is assigned to Sparton Corporation. PX 259 at page 1.

Sparton Response to No. 36:

No comment.

37. Sparton filed patent application no. 612,698 on September 12, 1975, as a division of application no. 345,871. That application, which has an effective filing date of March 29, 1973, issued as patent no. 4,029,233 (the ‘233 patent), entitled “Sonobuoy Retainer Plate,” on June 14, 1977. James W. Widenhofer is the inventor of the ‘233 patent and Sparton Corporation is the assignee. PX 260 at page 1.

Sparton Response to No. 37:

No comment.

## II. OBVIOUSNESS

38. The patents asserted in this litigation are U.S. Patent Nos. 3,921,120 (the '120 patent) and 4,029,233 (the '233 patent). Both patents name James W. Widenhofer as inventor and have an effective filing date of March 29, 1972. Complaint.

Sparton Response to No. 38:

No comment.

39. After release from the aircraft, the sonobuoy is slowed and stabilized during descent using fins, foils or parachutes. PX 259 at page 4; DX-100 at D100.2.

Sparton Response to No. 39:

Defendant cites two exhibits in support of this finding. The second citation, DX-100 at D100.2 does not support the finding. The first citation, PX-259 at 4 is to the 120 suit patent. The finding is imprecise in light of the first citation, and it should be modified to quote the 120 suit patent as follows. When airdropped, sonobuoys normally employ velocity reducing devices such as fins, foils or parachutes in order to retard the velocity of the sonobuoy casing as it falls through the air, and minimize the liklihood of damage as it enters the water. PX-259 at 4.

40. Upon entering the water, the sonobuoy's contents deploy so that its transducer or hydrophone drops to a predetermined depth below the water's surface while the antenna for transmitting radio signals back to a plane or ship remains above surface level. PX 259 at 4. The transducer detects acoustical energy in the water, and the sonobuoy then relays a corresponding radio signal to a plane or ship where the signal can be interpreted. PX 259 at 4.

Sparton Response to No. 40:

The cited exhibit does not support the finding. The exhibit states as follows. "Upon the sonobuoy entering the water the components thereof, such as the sound producing and/or receiving transducers, transmitters, damping means, and other conventional components are deployed from the casing in order that they might best perform their desired function. With some sonobuoy constructions the sonobuoy casing itself floats upon the water surface and the components are dropped therefrom." PX-259 at 4.

**A. PERSON OF ORDINARY SKILL IN THE ART**

41. The relevant discipline is mechanical engineering. DX-13 at D13.1, D13.7; DX-220; DX-126.

Sparton Response to No. 41:

This finding is unsupported by DX-126, the Boyle deposition testimony and DX-220, the Hudson expert report, because there is no page reference in either and the number of pages in Boyle's testimony exceeds 400 and in the Hudson report exceeds 50. DX-13 at D13.1 and D13.7 are the Affidavits of James Widenhofer and Donald Depew, and they do not support the finding.

42. The particular art is sonobuoy design. DX-220.

Sparton Response to No. 42:

The citation to this finding is the Hudson expert report which contains over 50 pages. None of those pages is referenced as supporting the proposed fact. Thus, this finding is objectionable as requiring plaintiff to guess at which page of the exhibit defendant intended to rely for support of this finding.

43. A person of ordinary skill in the art during the period 1970-72 would have had a bachelors degree in mechanical engineering. The person of ordinary skill also would have had some experience with the design of sonobuoys. DX-220; Testimony of Charles Boyle.

Sparton Response to No. 43:

This finding is objectionable for the same reasons given in Sparton's above response to proposed finding 41.

### B. PRIOR ART

#### 1. Magnavox AN/SSQ-39(XN-1)

44. Magnavox Corporation developed the AN/SSQ-39(XN-1) sonobuoy pursuant to Navy Contract No. 59-6151. The development effort for the SSQ-39(XN-1) lasted at least from July 15, 1959 through June 1, 1962. DX-126 at D126.313, D126.314; DX-160 at D160.5.

Sparton Response to No. 44:

This finding is unsupported by DX-126 at D126.313-314 and DX-160 at D160.5. These cited pages do not establish that the referenced SSQ-39(XN-1) sonobuoy was developed by Magnavox pursuant to the referenced contract. Furthermore, the cited pages do not indicate that the development effort lasted from at least July 15, 1959 through June 1, 1962. DX-160 at D160.5 indicates only that the report was prepared under a BUWEPS contract and the document is a Final Engineering Report.

45. A final engineering report for the SSQ-39(XN-1) was prepared by Magnavox employee R.N. Lotter, and submitted to the Navy, dated June 30, 1962. That report was received in records of Defense [Data] Center on May 6, 1965. DX-160 at D160.5. The document was indexed and retreivable to users of the Defense Data Center by no later than the end of 1965. DX-222.

Sparton Response to No. 45:

This finding is unsupported by DX-160 at D160.5. The exhibit does not establish that the report was "submitted to the Navy, dated June 30, 1962." Defendant relies upon an affidavit (DX-222) that is hearsay to establish that DX-160 was indexed and retrievable to users of the Defense Data Center by no later than the end of 1965. Thus, the statement has not been tested under cross examination. Furthermore, it is doubtful that DX-160 was indexed and

retrievable to users of the Defense Data Center because DX-160 appears to be a draft of a report, not the actual finalized version of the report. Note the handwritten interlineations in the report which suggests it is a draft report.

46. Sparton obtained an unclassified copy of the Magnavox report from the Defense Technical Information Center, successor to the Defense Document Center. DX-222. A copy of the report was retrieved from the Sparton library during this litigation. DX-126 at D126.313, D126.314; DX-160 at D160.5.

Sparton Response to No. 46:

This finding is unsupported by DX-222. This exhibit does not establish that Sparton obtained an unclassified copy of DX-160 from the Defense Technical Information Center.

47. Mr. Boyle, a Sparton employee, first became aware of the SSQ-39(XN-1) design through briefings provided by the Navy. DX-126 at D126.61-62.

Sparton Response to No. 47:

No comment.

48. The Magnavox SSQ-39(XN-1) sonobuoy was designed to operate at a depth of 12,000 feet. DX-160 at D160.15. The SSQ-39(XN-1) was designed to be released from an aircraft using conventional techniques. DX-160 at D160.131. A rotochute was used to retard the fall of the sonobuoy through the air. DX-160 at D160.131.

Sparton Response to No. 48:

The cited reference, DX-160 at D160.15, does not establish that the SSQ-39(XN-1) sonobuoy was designed to operate at a depth of 12,000 feet. Instead, it states that "[t]he design and development of Sonobuoy AN/SSQ-39(XN-1) was undertaken to achieve sonobuoy

operation at a depth of 12000 …" The cite does not establish that Magnavox, through its Sonobuoy AN/SSQ-39(XN-1) actually achieved sonobuoy operation at a depth of 12000.

49. Upon water entry, the SSQ-39(XN-1) began its deployment. DX-160 at D160.131. The SSQ-39(XN-1) would sink for a short period, then the rotochute would be jettisoned. DX-160 at D160.131, D160.174. Immediately after the rotochute falls away, gas generators begin inflating a float bag. DX-160 at D160.131, D160.174. The casing would then be used as a descent vehicle, paying out the transmission cable from the top of the casing as it descends. DX-160 at D160.131, D160.174. The nose cone on the bottom of the casing is released to slow the descent of the casing as it approaches the end of the payout. DX-160 at D160.175. Near the end of the payout, the hydrophone preamplifier and the hydrophones pay out of the top of the casing. DX-160 at D160.175.

Sparton Response to No. 49:

This finding is imprecise and should be modified as follows. The SSQ-39 (XN-1) sonobuoy teaches away from the Sparton patented inventions. There is no disclosure of a release plate within this sonobuoy. The float is shown stored outside the sonobuoy casing. The casing as shown in Fig. 5 does not have a permanently closed lower end. Accordingly, the float is not used to impart a force to a retainer plate within the sonobuoy casing, and the float and a plate are not ejected from the casing to permit the casing and apparatus to fall to the desired operating depth. PX-249 rebuttal report at 5.

**2. U. S. Patent No. 2,687,541**

50. United States Patent No. 2,687,541 (the Bannister or '541 patent), entitled "Apparatus for Refloating Submerged Objects," was issued on August 31, 1954 to Bryant Bannister. '541 patent, first page, heading. DX-224.

Sparton Response to No. 50:

No comment.

51. The Bannister patent is for a fishing rod, gun or other object that is dropped into the water from a boat. DX-224 at D224.3 col 2, lns 24-39.

Sparton Response to No. 51:

No comment.

52. One claimed embodiment includes an "inflatable member" that is inflated by a compressed gas cartridge, a thin elastic seal, and an closure retained by a friction fit. DX-224 at D224.3, col 1, lns 1-7. In use, when the object containing the patented device is submerged in water, hydrostatic pressure causes a plunger to puncture a compressed gas cartridge. DX-224 at D224.3 col 2, lns5-49. Puncturing the gas cartridge causes the inflatable member to inflate. As it inflates, the inflatable member pushes the closure out of the seal, and thereby allowing the free escape of the inflatable member.

Sparton Response to No. 52:

This finding is irrelevant because the Bannister reference is not analogous art and thus not prior art against the patents in suit. The Bannister reference has not been alleged to be in the field of Mr. Widenhofer's endeavor or reasonably pertinent to the problem with which he was concerned. PX-249, Boyle rebuttal report at 11. Furthermore, Bannister does not disclose a release plate (a) with tabs inserted into a casing to retain a float and apparatus within a casing, (b) which is deformable and with hinge portions and openings to facilitate deformation. Id. at 5-6. In fact, Bannister only discloses a float exiting a casing to refloat a foreign object. Id.

**3. U. S. Patent No. 3,093,808**

53. United States Patent No. 3,093,808 (the Tatnall or '808 patent), entitled "Air-Dropped Miniature Sonobuoy," was issued on June 11, 1963 to George J. Tatnall, Albert F. Scarcelli and George A. Gimber, as assignors to the United States, as represented by the Secretary of the Navy. DX-225 at D225.4, col 1, lns 1-6.

Sparton Response to No. 53:

No comment.

54. The Tatnall patent describes a miniature sonobuoy, dispensed from an aircraft, for use in searches for submarines and other underwater objects. DX-225 at D225.4 col 1, lns 19-29, and col 2, lns 1-6.

Sparton Response to No. 54:

This finding is unsupported by DX-225 [at D225.4], col. 1, ls 19-29 and col. 2, ls 1-6. This citation addresses an object of the Tatnall invention and a description of the state of the art. Id.

55. In one embodiment of the Tatnall sonobuoy, the operating depth of the hydrophone is determined by selecting one of two effective cable lengths. DX-225 at D225.6 col 6, lns 35-40. A rotochute slows the aerial descent of the sonobuoy. DX-225 at D225.6 col 6, lns 48-55. Upon immersion in sea water, a sea water battery is activated which, in turn, activates three squibs. DX-225 at D225.6 col 6, lns 53-59. A first squib activates a device that releases the rotochute assembly; a second squib actives a device that releases the nose section, allowing the hydrophone to descend to operating depth. DX-225 at D225.6 col 6, lns 59-64. After a delay created by a timing circuit, the third squib fires, opening a pressurized gas cartridge. DX-225 at D225.6 col 6, lns 64-68. The pressurized gas expands a float and simultaneously erects an antenna contained in the float. DX-225 at D225.6 col 6, lns 67-72 & D225.3 fig. 3. The

hydrophone section descends, paying out cable, until it reaches its operating depth as determined by a cable length selection. DX-225 at D225.6-7 col 6, ln 37 - col 7, ln 5. Upon reaching operating depth, the casing falls away and the sonobuoy is in condition to receive underwater sounds. DX-225 at D225.7 col 7, lns 2-10.

Sparton Response to No. 55:

This finding is imprecise and addresses the Tatnall reference cited in the file history of the 120 patent. The finding should be modified as follows. Tatnall does not disclose a casing permanently closed lower end because such a configuration would interfere with the acoustic performance of the Tatnall hydrophone. PX-249, Boyle rebuttal report at 4. Furthermore, the electrical apparatus is not slidably removable from the casing in Tatnall. The Tatnall retaining means is not located between the float and upper end of the sonobuoy, does not exit from the upper end of the sonobuoy, does not retain the float and apparatus within the casing and does not permit the float and apparatus to deploy from the casing upper end when the retaining means is released from the casing. Tatnall does not disclose (a) an inflatable float located adjacent the above noted retaining means on the opposite side thereof with respect to the casing upper end, (b) a slidably removable inflatable float, and (c) an inflatable float, nor a float inflating means mounted, within the casing. Id. at 7-8.

**4. U. S. Patent No. 3,074,671**

56. United States Patent No. 3,074,671 (the Dinolfo or ‘671 patent), entitled “Air Dropped Buoy Release Mechanism,” was issued on January 22, 1963 to Michael Dinolfo and Everett W. Farmer, employees of Sanders Associates. DX-226 at D226.3 col 1, lns 1-7.

Sparton Response to No. 56:

No comment.

57. The Dinolfo patent is directed to a mechanism for use in a sonobuoy that is "capable of releasing by the operation of a force in one direction but which will not release under even greater force in the opposite direction." DX-226 at D226.3 col 1, lns 9-13. The mechanism is described as being capable of easily releasing upon water impact, permitting deployment of the sonobuoy, but capable of resisting the force caused by the the sudden shock of the sonobuoy's parachute opening during descent. DX-226 at D226.3 col 1, lns 13-35.

Sparton Response to No. 57:

This finding is imprecise and addresses the Dinolfo reference cited in the file history of the 233 patent. Certain aspects of the finding are unsupported by the citation. For example, while the finding states that the sonobuoy mechanism easily releases upon water impact, it does not state that the deployment of the sonobuoy components, including the referenced mechanism, occurs at the bottom end of the casing. DX-226 at col. 1, ls. 13-35. [D226.3] Furthermore, Dinolfo discloses a plate at the bottom of a buoy with locking tabs engaging casing slots. The plate does not bend or deform. There are no hinges or openings on the plate. There is no float acting upon the plate, and the apparatus located above the plate deploys from the bottom of the buoy as does the plate. Since the force is applied on the underside of the plate, the locking tabs bend, not the plate as claimed in the Sparton patents. PX-249, Boyle rebuttal report at 6. The Dinolfo retaining means is not located between the float and upper end of the sonobuoy, does not exit from the upper end of the sonobuoy, does not retain the float and apparatus within the casing and does not permit the float and apparatus to deploy from the casing upper end when the retaining means is released from the casing. Id. at 7.

58. The Dinolfo patent describes a sonobuoy with a release mechanism at the bottom. DX-226 at D226.3 col 1, lns 36-42. The release mechanism comprises a "disc" of cast iron or

steel, which is flat and generally circular with tabs at the periphery. DX-226 at D226.4, col 3, lns 20-42 & D226.1, Figs. 3-4. In the preferred embodiment, the force of the sonobuoy hitting the water causes the tabs to fracture, thereby freeing the plate and allowing the contents of the sonobuoy housing to deploy. DX-226 at D226.4, col 3, lns 8-54 & D226.1, Fig. 2. The Dinolfo patent further explains the principle by which the preferred embodiment operates:

> It should be noted that Hookes Law states that, within the elastic limit, deformation produced is proportional to the stress. In view of the fact that cast iron inherently does not follow Hookes Law, there is little opportunity for the stresses that appear in the section **28** and **32** in tab **19** for example, which are defined and depicted in the FIGURE 6*a*, to be redistributed. Therefore, when the bridge is under tension, the stresses are comparatively high in its outer surface and once its starts to crack, i.e., fracture, the crack is propagated throughout the entire section and a resultant fracture cross section typical to that shown in FIGURE 6*a* results. A study of FIGURE 6*a* and the FIGURE 2 reveals that the section produced by the fracture of the tabs at the point of the bridge where notch **32** of the plate and reduced intermediate bridge section **28** are located has resulted because the above noted notch portions establish the weakest points of the disc.

DX-226 at D226.4 col 3, lns 55-72.

Sparton Response to No. 58:

This finding is imprecise and addresses the Dinolfo reference cited in the file history of the 233 patent in suit. Certain aspects of the finding are unsupported by the citation. For example, the cited material does not state that the plate is "flat." Dinolfo discloses a plate at the bottom of a buoy with locking tabs engaging casing slots. The plate does not bend or deform. There are no hinges or openings on the plate. There is no float acting upon the plate, and the apparatus located above the plate deploys from the bottom of the buoy as does the plate. Since the force is applied on the underside of the plate, the locking tabs bend, not the plate as claimed in the Sparton patents. PX-249, Boyle rebuttal report at 6. The Dinolfo retaining means is not located between the float and upper end of the sonobuoy, does not exit from the upper end of the sonobuoy, does not retain the float and apparatus within the casing and does not permit the

float and apparatus to deploy from the casing upper end when the retaining means is released from the casing. Id. at 7.

59. The Dinolfo patent also describes an alternative embodiment wherein the "disc" is made from sheet metal, but the tabs are sightly bent downward so as to abut and rest on the edge of the cooperating slots in the housing. DX-226 at D226.4 col 4, lns 21-40 & D226.2, Figs 5, 5*a*. When the sonobuoy hits the water, the force imparted on the plate causes the plate to be forced up into the housing. DX-226 at D226.4 col 4, lns 21-40 & D226.2 Figs 5, 5*a*. As the plate is forced upward, the tabs are cammed inward toward the center of the housing so that the base of the tab no longer abuts the edge of the slots in the housing. DX-226 at D226.4 col 4, lns 21-40 & D226.2 Figs 5, 5*a*. As a result, the plate falls free, and the sonobuoy is free to deploy through the bottom of the housing. DX-226 at D226.4 col 4, lns 21-40 & D226.2 Figs 5, 5*a*.

Sparton Response to No. 59:

See comment to 58.

**5. U. S. Patent No. 3,140,886**

60. United States Patent No. 3,140,886 (the Cotilla or '886 patent), entitled "Coupling Device," was issued on July 14, 1964 to Edward J. Cotilla and George A. Gimber, assignors to the United States, as represented by the Secretary of the Navy. DX-227 at D227.2 col 1, lns 1-7.

Sparton Response to No. 60:

No comment.

61. The device described in the Cotilla patent is asserted to be useful in sonobuoys containing to portions, one housing the hydrophone, the other housing the radio transmitter. DX-227 at D227.2, col 1, lns 20-26, and col 2, lns 9-18. The invention of the Cotilla patent is a

mechanism for coupling the radio transmitter portion to the hydrophone portion until the sonobuoy is deployed. DX-227 at D227.3 col 3, ln 63 - col 4, ln 7.

Sparton Response to No. 61:

The finding is not supported by its citation. The Cotilla reference is cited in the file history of the 120 patent in suit. The citation states "[a]fter water immersion, the outer casing separates to form a radio buoy and a hydrophone depending therefrom by a long cable." This is different than saying, as defendant does, that the Cotilla patent is asserted to be useful in sonobuoys containing to [sic] portions, one housing the hydrophone, the other housing the radio transmitter." Lastly, this finding refers to the invention of the Cotilla patent. This invention can not be gleaned from a review of only the patent.

62. The two sections of the sonobuoy are held together by a "cross-shaped leaf spring" of a concave configuration when it relaxed. DX-227 at D227.2 col 2, ln 33 - col 3 ln 61 & D227.1, Figs 1*a* - 2*b*. During the manufacturing process, the leaf spring is placed under tension, forcing it into a flat configuration and causing the ends of the arms of the cross into corresponding slots in each half of the sonobuoy housing. *Id.* The ends of the cross thus lock the two halves of the sonobuoy together. *Id.* The leaf spring is held in the flat configuration by a bolt assembly. *Id.*

Sparton Response to No. 62:

The Cotilla reference is cited in the file history of the 120 patent in suit. Cotilla does not disclose (a) a planar plate constructed of deformable material, (b) a plate containing a hinge line or weakened sections, and (c) a float actuated release plate. PX-249, Boyle rebuttal report at 7.

63. During deployment, a sea water activated battery generates a current, which detonates an explosive charge in the bolt assembly. DX-227 at D227.2 col 2, ln 33 - col 3 ln 61 & D227.1, Figs 1*a* - 2*b*. As a result, the leaf spring is allowed to relax to its normal unstressed concave configuration, which withdraws the ends from the slots in the housing and thereby allowing the hydrophone to separate from the radio transmitter. *Id.*

Sparton Response to No. 63:

The citation does not support the finding. When the leaf spring withdraws the ends from the housing slots, the hydrophone does not separate from the radio transmitter. DX-227 at col. 2, ls. 9-15. [D227.2] Cotilla does not disclose (a) a planar plate constructed of deformable material, (b) a plate containing a hinge line or weakened sections, and (c) a float actuated release plate. PX-249, Boyle rebuttal report at 7.

**6. U. S. Patent No. 3,220,600**

64. United States Patent No. 3,220,600 (the Wojciechowski or ‘600 patent), entitled “Closure Having Pressure-activated Release Mechanism,” was issued on November 8, 1965 to Francis X. Wojciechowski and Harald E. Karlson. DX-228 at D.228.3, col 1, lns 1-6.

Sparton Response to No. 64:

No comment.

65. The ‘600 patent describes a release mechanism that is useful in air-launched sonobuoys. DX-228 at D.228.3, col 1, lns 18-23. The release mechanism releases the hydrophone and cable from the bottom of the casing upon impact of the casing with the water. DX-228 at D.228.3, col 1, lns 24-39. As described in the ‘600 patent, the casing of the sonobuoy has a groove on the inner surface adjacent the lower end. DX-228 at D228.4 col 3, lns 4-45 & D228.2, Figs. 3A-3C. The release plate is disc-shaped with a plurality of tabs around its

periphery. *Id.* The release mechanism is formed into a dome shape, such that when inserted in the casing, the tabs cooperate with the groove in the casing to retain the sonobuoy contents within the casing. *Id.* The domed portion extends toward the exterior of the housing. *Id.* Upon impact with water, the fluid pressure against the exterior of the plate causes the plate to flex inward, thereby releasing the tabs from the groove and allowing the sonobuoy contents to deploy. *Id.*

Sparton Response to No. 65:

The citation, DX-228 at col. 1, ls 18-23 [D228.3], does not support the finding. The citation addresses the state of the art and not a release mechanism that is useful in air launched sonobuoys. The second sentence of this finding pertains to the prior art, not the Wojciechowski patented subject matter. Wojeciechowski does not disclose a flat plate, a float acting upon a release plate, and a plate with a weakened hinge line or radially extending locking tabs. PX-249, Boyle rebuttal report at 6. In Wojeciechowski, the retaining means is not disclosed as being located between the casing upper end and the float, is not released from the casing upper end, and a float is not disclosed. Id. at 8.

**7. U. S. Patent No. 3,291,092**

66. United States Patent No. 3,291,092 (the Halberg or ‘092 patent), entitled “Mooring Apparatus,” was issued on December 13, 1966, to Paul V. Halberg and Clinton S. Myers, assignors to the Magnavox Company. DX-229 at D229.6, col 1, lns 1-7.

Sparton Response to No. 66:

No comment.

67. The Halberg patent describes a system of mooring a buoy to the ocean floor. DX-229 at D229.6 col 1, lns 9-13. At Figure 1, the Halberg patent show deployment of the claimed

system. ‘DX-229 at D229.6 col 2, lns 30-57. At stage A, the device enters the water and, at stage B, there is “separation” of the float from the cannister containing the device. DX-229 at D229.6 col 2, lns 30-57 & fig. 1. The Halberg patent states that “[t]he apparatus for achieving this result upon entry into the water is not shown in detail, because such devices are well known in the art.” ‘DX-229 at D229.6 col 2, lns 37-40. In stage C, the Halberg patent shows the canister containing the device descending and paying out cable as it descends. DX-229 at D229.6 col 2, lns 30-57. In further describing the operation of the moored buoy, the Halberg patent states: “Upon entering the water, the float **14**, which can be inflatable or of fixed configuration, is separated from the canister by any suitable means, whereupon the cable **18** begins to pay out of the canister as the canister descends.” DX-229 at D229.7 col 4, lns 65-69.

Sparton Response to No. 67:

This finding is irrelevant because the Halberg reference is not analogous art and thus not prior art against the patents in suit. The Halberg reference has not been alleged to be in the field of Mr. Widenhofer’s endeavor or reasonably pertinent to the problem with which he was concerned. PX-249, Boyle rebuttal report at 11. Furthermore, Halberg does not disclose the float 14 within the sonobuoy casing or a permanently closed lower end. Id at 4, 7 and 8. Fig. 2 of Halberg discloses the components within the sonobuoy casing 17. Id. Float 14 is not within said casing 17. Id. Halberg does not teach to inflate a float before it exits from the casing. Id. Halberg inflates the float after it exits from said casing. Id. Thus, Halberg does not disclose a slidably removable inflatable float or an inflatable float within the casing. Id. Halberg does not even disclose a release plate or an inflatable float located adjacent the release plate on the opposite side thereof with respect to the casing upper end; and his float is used for an entirely

different reason and located in an entirely different location than Sparton's use for and location of same. Id.

**8. U. S. Patent No. 4,093,934**

68. United States Patent No. 4,093,934 (the Urick or '934 patent), entitled "Free-Falling Sonobuoy," was issued on June 6, 1978, to Robert J. Urick and Robert L. Parris, and was assigned to the United States, as represented by the Secretary of the Navy. DX-230 at D230.1, cover page, items 11, 45, 54, 73 and 75. The Urick patent issued from an application filed on April 28, 1965. DX-230 at D230.1, cover page, items 21 & 22.

Sparton Response to No. 68:

No comment.

69. The sonobuoy described in Urick was designed to operate at a depth of approximately 12,000 feet. DX-230 at D230.4, col 4, lns 7-10.

Sparton Response to No. 69:

The citation, DX-230 at col. 4, ls 7-10 [D230.4], does not support the finding. The text of the citation is as follows. "The essential feature of a sonobuoy constructed in accordance with the search-in-depth concept is that it is operational while if falls, gravity, from near the surface to a depth of about 12,000 feet in deep water." This is different than saying "[t]he sonobuoy described in Urick was designed to operate at a depth of approximately 12,000 feet."

70. The Urick sonobuoy consists of a float and radio transceiver, a cable, an electronics unit and a hydrophone or transducer array. DX-230 at D230.4, col 3, lns 5-45. The sonobuoy is packaged in a cannister. DX-230 at D230.4, col 3, lns 30-33. The float and radio transceiver remain at the surface. DX-230 at D230.4, col 3, lns 5-16 & D230.2, fig. 2. As the

cannister descends, the cable is payed out of the cannister until operating depth is reached. DX-230 at D230.4, col 3, lns 5-45.

Sparton Response to No. 70:

The citation, DX-230 at col. 3, ls 5-45 [D230.4] & Fig.2 [D230.2], is misleading. The Urick reference does not disclose (a) a float or a release plate as having ever been contained within the sonobuoy casing, (b) the electronic apparatus, float or release plate releasing from the upper end of the sonobuoy casing, or (c) the casing being used as a descent vehicle for the electronic apparatus before falling below said apparatus when said apparatus reaches its operating depth. Id.

**9. U. S. Patent No. 4,189,786**

71. United States Patent No. 4,189,786 (the Adler or '786 patent), entitled "Radio Buoy Assembly," was issued on February 19, 1980 to Ronald Adler. DX-231 at D231.1, cover page, items 11, 45, 54, and 76. The Adler patent issued from an application filed on June 29, 1962. DX-231 at D231.1 cover page, items 21 & 22. The Adler patent states that the invention may be manufactured and used by or for the United States government without the payment of any royalties. DX-231 at D231.4 col 1, lns 4-7.

Sparton Response to No. 71:

No comment.

72. The Adler patent describes a system consisting of a number of submarine-laid, vertical array detectors designed to be moored to the ocean floor, with one or more "intelligence capsules" for transmitting information. 'DX-231 at D231.4, col 2, lns 10-29 & D231.5, col 3, lns 21-24.

Sparton Response to No. 72:

This finding is irrelevant because the Adler reference is not analogous art and thus not prior art against the patents in suit. The Adler reference has not been alleged to be in the field of Mr. Widenhofer's endeavor or reasonably pertinent to the problem with which he was concerned. PX-249, Boyle rebuttal report at 11. Furthermore, although Adler references detectors moored to the ocean floor with "intelligence capsules," it does not disclose a sonobuoy deployment system. DX-231 at col. 2, ls. 10-29 [D231.4] & col. 3, ls. 21-24 [D231.5].

73. The Adler patent describes the intelligence capsule as having a subsurface float that is inflated using a pressure-time actuator. DX-231 at D231.6, col 5, lns 8-43. When dropped from the submarine, the actuator triggers inflation of the float. DX-231 at D231.6, col 5, lns 8-43. Expansion of the float as it inflates forces the float against a dome on the capsule. '786 patent, D231.6, col 5, lns 8-43. The Adler patent teaches that the force of the float may be used to either push the dome off the cannister or, if the dome is frangible, to break the dome. DX-231 at D231.6, col 5, lns 8-43. In either case, the Adler patent teaches that upon removal or breaking of the dome, the float continues to inflate, and is freed from the capsule. DX-231 at D231.6, col 5, lns 8-43.

Sparton Response to No. 73:

Although the Adler patent discloses a subsurface float breaking off a frangible plastic dome or pushing the capsule, the float never rises to the surface. DX-231 at col. 5, ls. 8-43 [D231.6]. The Adler capsule is not a plate, is not deformed and does not perform the functions of the plate disclosed in the Sparton patents.

**10. Sparton's Early DIFAR Developments**

74. Magnavox Corporation and Sanders Associates, Inc. were selected by the Navy in the 1964-65 fiscal year time frame to design and develop the DIFAR sonobuoy ('SSQ-53' or

'DIFAR')." DX-17 at D17.2. The Navy assigned DIFAR sonobuoys the designation "AN/SSQ-53." Testimony of Madera; Testimony of Boyle.

Sparton Response to No. 74:

No comment.

75. A AN/SSQ-53 sonobuoy is generally deployed for operation in the following manner: the internal components of the DIFAR sonobuoy are packed inside a housing which is dropped from an airplane into a targeted location of the ocean. DX-116 at D116.96. Once deployed, a float or "buoy" remains at the surface of the ocean, with an attached antenna for transmitting radio signals. DX-116 at D116.96. Electronic devices called "hydrophones" are suspended beneath the buoy at a desired depth to "listen" for enemy submarines and receive acoustic signals therefrom. DX-116 at D116.96. The received signals are converted to electrical signals, which can be transmitted. DX-116 at D116.96.

Sparton Response to No. 75:

This finding is not supported by the citations therein. The subject matter of the citation may be the SSQ-57A/B sonobuoy, not the AN/SSQ-53 sonobuoy. DX-116 at G100095 [D116.96].

76. [first sentence deleted]. In conjunction with the National Defense Mobilization Program, the Navy issued RFP N00019-69-C-0075 (the '-0075 RFP) to six other contractors for the purpose of obtaining a third source for DIFAR sonobuoys. DX-241.

Sparton Response to No. 76:

The first sentence is unsupported by a citation. The second sentence contains portions, underlined above, which are unsupported by the citation.

77. The development of the original SSQ-53 spanned a 3-4 year time period, with production of the SSQ-53 sonobuoy first occurring in Fiscal Year 1968. DX-17 at D17.2.

Sparton Response to No. 77:

No comment.

78. Sparton became a third supplier for SSQ-53 DIFAR sonobuoys in Fiscal Year 1969 when the Navy issued Sparton Contract No. N00019-69-C-0465 ('the '-0465 contract')." DX-17 at D17.2.

Sparton Response to No. 78:

No comment.

79. The SSQ-53 sonobuoy initially sold under the '-0465 contract incorporated a rotochute that slowed its descent from an airplane and vertically oriented the buoy so that it would impact the ocean at its bottom end. DX-126 at D126.55-57, D126.59, D126.188-192. The SSQ-53 sonobuoy produced under the '-0465 contract had a release plate located at the bottom end of the sonobuoy housing which was caused to release from the housing by the sonobuoy's impact with the water. DX-126 at D126.55-57, D126.59, D126.188-192. This permitted the components to exit the lower part of the housing and to descend to their operating depth. DX-126 at D126.55-57, D126.59, D126.188-192.

Sparton Response to No. 79:

No comment.

80. The DIFAR listening components for SSQ-53 sonobuoys produced under the original '-0465 contract extended 90 feet below the water's surface. PX 6 at B0066.

Sparton Response to No. 80:

The cited page of the cited exhibit states that the standard DIFAR subsurface components extend 90 feet below the float and cable spool assembly. PX 6 at A000192 [B0066]. The finding should thus be modified accordingly.

81. The U.S. naval fleet was provided with production SSQ-53 sonobuoys by all three manufacturers, and upon using them at the depth of 90 feet, recommended that they include a dual depth capability, i.e., the deployed hydrophone could be deployed to a shallow depth of 90 feet or to deeper depths of 500 or 1,000 feet. DX-17 at D17.2-3-4.

Sparton Response to No. 81:

The use occurred in 1972.

82. "The Naval Development Center ('NADC') had conducted theoretical studies and sea tests which confirmed that a deeper hydrophone would result in an improved submarine detection capability." DX-17 at D17.2-3; DX-123 at D123.4.

Sparton Response to No. 82:

No comment.

83. The U.S. Navy determined that nominal depths of 90 and 1000 feet would improve the operation of its SSQ-53 sonobuoys. DX-223 at D223.7-.8; Sparton Pretrial Br. at 43, ¶ 25.

Sparton Response to No. 83:

Although the citations, the SSQ-53A specification and Sparton's pretrial brief, do not support the finding as written, the finding may be modified to indicate that the U.S. Navy determined that 1000 feet was an optimum deep depth for the operation of its SSQ-53 sonobuoy.

**11. The S3A-Launched Sonobuoy Proposal**

84. At some time before October 1970, Sparton learned that the Navy intended to use S-3A aircraft to launch sonobuoys, rather than P-3 or S-2 aircraft. DX-159 at D159.2, D159.4. The P-3 was a land-based aircraft, the S-2 and S-3 were carrier-based. DX-126 at D126.115-116, D126.308-311.

Sparton Response to No. 84:

The citation, DX-159 at SPA 26777, 26779,[D159.2, D159.4] does not support the first sentence of this finding. When and what Sparton learned prior to October 1970, as concerns the referenced aircraft, is unspecified in the cited material.

85. The S-3A aircraft introduced launch conditions that would adversely affect or destroy the sonobuoys being used by the Navy in 1970 because it could launch sonobuoys from higher altitudes and at greater speeds than the earlier aircraft. DX-159 at D159.4.

Sparton Response to No. 85:

The citation, DX-159 at SPA 26779 [D159.4], does not support the first sentence of this finding. The wording used in the cited document is "can" and not "would" and "flight capabilities," not "launch conditions." DX-159 at SPA 26779 [D159.4]. Mr. Boyle indicated that the faster speed of the S-3A aircraft compared with the S-2A aircraft did not necessarily necessitate the use of a parachute. DX-126 at 645 [D126.310].

86. On October 1, 1970, Sparton submitted an unsolicited proposal to the Navy, offering to perform a study with the objective of designing a drogue parachute system capable of meeting the S-3A sonobuoy launch and descent time requirements. DX-159 at D159.1-D159.18.

Sparton Response to No. 86:

The citation, DX-159 at SPA 26776 [D159.1], 26793 [D159.18], 26788 [D159.13], does not support this finding. The exhibit does not indicate that Sparton submitted this proposal to the Navy and maintained the noted objective.

87. Sparton proposed that Mr. Donald R. Depew would be the Senior Mechanical Engineer on the project. DX-159 at D159.16. In proposing him, Sparton cited Mr. Depew's experience in working on the AN/SSQ-62 (DICASS) stabilizer parachute and a heavy moored sonobuoy as making Mr. Depew ideally suited to be Senior Mechanical Engineer on the study. DX-159 at D159.16.

Sparton Response to No. 87:

The citation, DX-159 at SPA 26791 [D159.16] does not support this finding because the cited exhibit does not indicate or establish that a proposal was made to the Navy.

88. With respect to the AN/SSQ-62 (DICASS) sonobuoy, Sparton further stated in the proposal:

> Sparton has developed performance parameters and specifications for a drogue stabilizer chute to meet DICASS sonobuoy design requirements. This particular chute [] has been subjected to several launch tests. At Key West, a 35.5-pound mechanical model sonobuoy was successfully dropped from an altitude of 500 feet at a speed of 300 knots. Drop time was 4.7 seconds and the water entry angle was 90º. Another drogue chute test was conducted in Maine, where a mechanical model was dropped from 2000 feet at 250 knots. The water entry angle was 90º and drop time was 21 seconds. This drogue chute design allows a sonobuoy descent velocity of 100-130 feet per second. By using a drogue in lieu of the standard 4-blade rotochute, space and weight savings, as well as increased reliability, have been achieved in the DICASS sonobuoy.

DX-159 at D159.17.

Sparton Response to No. 88:

The citation, DX-159 at SPA 26792 [D159.17], does not support this finding because the cited exhibit does not indicate or establish that a proposal was made to the Navy.

89. In the late 1960s, prior to introduction of the S-3 aircraft, sonobuoys were launched from S-2 or P-3 aircraft. DX-159 at D159.4. The sonobuoy "drop envelope" for S-2 and P-3 aircraft was up to approximately 20,000 feet altitude and up to a maximum launch speed of approximately 300 knots. DX-159 at D159.6. The sonobuoy "drop envelope" for the S-3A aircraft was up to 40,000 feet altitude and up to 400 knots. DX-159 at D159.6.

Sparton Response to No. 89:

The citation, DX-159 at SPA 26779 [D159.4], 26781 [D159.6], 26792 [D159.17], does not support this finding because the cited exhibit does not indicate or establish that (a) sonobuoys were launched from S-2 and P-3 aircraft in the late 1960s prior to the introduction of S-3 aircraft, (b) the S-2 or P-3 are the slower conventional aircraft referred to on SPA 26781, and (c) the sonobuoy "drop envelope" for the S-3A aircraft was up to 40,000 feet altitude and up to 400 knots instead of "possibly" being up to 40,000 feet altitude and up to 400 knots. DX-159 at SPA at 26781 [D159.6].

90. In its proposal, Sparton stated that "the High-Speed Rotochute Deployment Study (conducted by NADC and Sparton) indicates that the maximum feasible launch speed for the rotochute is 350 knots. DX-159 at D159.8.

Sparton Response to No. 90:

The citation, DX-159 at SPA 26783 [D159.8], does not support this finding because the cited exhibit does not indicate or establish that such a proposal was made to the Navy and the referenced "Study" is not provided as an exhibit by defendant.

91. Sparton suggested several methods of retarding and stabilizing the descent of sonobuoys launched from S-3A aircraft, including drogue chutes. DX-159 at D159.8. Sparton then stated:

> With the exception of the simple drogue chute, all of the retarding devices require a water impact operated release mechanism to clear the buoy[.] However, the use of drogue chute on floatation bag type sonobuoys would eliminate the need for a chute release mechanism. By eliminating the complex mechanical linkage presently used in AN/SSQ-47, -50 and -53, increased reliability and cost reductions may be achieved.

DX-159 at D159.8.

Sparton Response to No. 91:

The citation, DX-159 at SPA 26783 [D159.8], does not support this finding because the cited exhibit does not indicate or establish that a suggestion was made to the Navy.

**12. Sparton's DICASS Contract Efforts**

92. Sparton was awarded Government Contract No. N00019-69-C-0592 (the '-0592 contract) to design, develop, fabricate, test and furnish fifty experimental over-the-side models and fifty developmental air-drop models of AN/SSQ-62(XN-2) Directional Command Active Sonobuoy System (DICASS). DX-169 at D169.11.

Sparton Response to No. 92:

The citation, DX-169 at 1, does not support this finding because there is no DX-169 at 1. It is believed that defendant may, however, have intended to refer to DX-169 at 9 [D169.11]. In this case, the citation still does not support this finding because DX-169 is not the '-0592 contract, but rather is an Interim Report and does not establish the contract that Sparton may have been awarded or its terms.

93. On September 5, 1970, Sparton submitted a report of its activities under the '-0592 contract covering the period May 9, 1970 through August 8, 1970, entitled "DICASS Sonobuoy AN/SSQ-62(XN-2), Interim Report No. 5" ("XN-2 Interim Report 5"). DX-232 at D232.5. XN-2 Interim Report 5 was submitted to Naval Air Systems Command. DX-232 at

D232.5. XN-2 Interim Report 5 was received by the Defense Data Center on October 6, 1970. DX-232 at D232.4.

Sparton Response to No. 93:

The cited document does not establish that Sparton submitted the report to NAVAIR on September 5, 1970 or that it was received by the DDC on October 6, 1970.



SECTION C-C

94. Figure 16 of XN-2 Interim Report 5 is a drawing of the mechanical layout of the SSQ-62(XN-2) sonobuoy. DX-232 at D232.41-42. Section C-C of that layout drawing shows the release mechanism. DX-232 at D232.41-42. The release mechanism is located at the bottom of the housing. DX-232 at D232.41-42. The release mechanism shown in Section C-C is as shown below:

DX-232 at D232.41-42. 30.

Sparton Response to No. 94:

This finding is unsupported by the cited document. Section C-C of the drawing does not indicate that it is a release mechanism.

95. On December 5, 1970, Sparton submitted a report of its activities under the '-0592 contract covering the period August 9, 1970 through November 8, 1970, entitled "DICASS Sonobuoy AN/SSQ-62(XN-2), Interim Report No. 6" ("XN-2 Interim Report 6"). DX-169 D169.11, ¶1. XN-2 Interim Report 6 was submitted to Naval Air Systems Command. DX-169 at D169.5. XN-2 Interim Report 6 was received by the Defense Data Center on December 20, 1970. DX-169 at D169.5.

Sparton Response to No. 95:

The cited document does not establish that Sparton submitted the report to NAVAIR on December 5, 1970, or that it was received by the DDC on December 20, 1970.

96. XN-2 Interim report 6 "describes work completed during the sixth quarter of the contract." DX-169 at D169.6. The abstract of Interim Report 6 states:

> Final air-drop tests of mechanical model sonobuoys have been successfully completed and approval of mechanical design has been granted by NADC [Naval Air Development Center].

DX-169 at D169.6.

Sparton Response to No. 96:

The cited document does not contain the referenced quote.

97. In describing the SSQ-62(XN-2) sonobuoy, XN-2 Interim Report 6 states:

> Descent stabilization following an air launch will be accomplished with a drogue chute. This device requires less space than the conventional sonobuoy rotochute and will preclude rotational motion as well as centrifugal and vibrational forces imparted by a rotochute. In addition, the drogue chute will reduce the depth to which the sonobuoy will descend immediately following water impact. A reduction in subsurface descent velocity will facilitate float inflation and minimize the possibility of float damage.

DX-169 at D169.14, ¶1.c(4)(g).

Sparton Response to No. 97:

No comment.

98. In Interim Report 6, Sparton concluded that the "final air-drop test of the mechanical model sonobuoys was successfully completed and approval of the mechanical design granted by NADC." DX-169 at D169.57, ¶5.

Sparton Response to No. 98:

The writer of the report indicated that the sea test results were gratifying "considering the phase of the program." Sparton did not draw any conclusion given the phase of the program.

99. At some time in September 1971, Sparton submitted a report of its activities under the '-0592 contract covering the period February 9, 1971 through June 1, 1971, entitled "DICASS Sonobuoy AN/SSQ-62(XN-2), Final Report" ("XN-2 Final Report"). DX-234 at D234.5. The XN-2 Final Report was submitted to Naval Air Systems Command. DX-234 at D234.5. The XN-2 Final Report was received by the Defense Data Center on November 1, 1971. DX-234 at D234.5.

Sparton Response to No. 99:

The cited exhibits, DX-233 at 1/2 [D233.5] and DX-234 at D234.5. 1/2, do not support the proposed finding. These exhibits do not establish that Sparton submitted the report sometime in September 1971 to NAVAIR or that it was received by DDC on November 1, 1971.

100. The XN-2 Final Report states: "DICASS Sonobuoy AN/SSQ-62(XN-2) is a development based on Sonobuoy AN/SSQ-50 (the sonobuoy component of the Command Active Sonobuoy System)." DX-234 at D234.11 at ¶ 1.b(1). The report further states that "mechanical

design features that have proven reliable in the AN/SSQ-50 were utilized to the fullest extent for like functions in the AN/SSQ-62 (XN-2). DX-234 at D234.11, ¶ 1.c(1).

Sparton Response to No. 100:

No comment.

101. The XN-2 Final Report describes the development of the Float Inflation System as follows:

> The major departure in the AN/SSQ-62(XN-2) DICASS floatation system compared to the AN/SSQ-50 CASS floatation system is the use of 3 $CO_2$ cartridges as opposed to 4 $CO_2$ in the CASS system. …
>
> The time delay between water entry and squib firing was eliminated by use of a drogue parachute. Rotochute blades used on other types of sonobuoys require a time delay to allow the rotochute to separate and clear the sonobuoy housing before the squib firing and buoy surfacing sequence.

DX-234 at D234.18, ¶ 3.b(1)

Sparton Response to No. 101:

No comment.

102. The mechanical design of the SSQ-62(XN-2) sonobuoy was a "conventional" design. DX-234 at D234.67, ¶ 3.c(2)(b). The only "radical change from the CASS design" was the use of a drogue parachute rather than a rotochute. DX-234 at D234.67, ¶ 3.c(2)(b). The drogue parachute was employed because "less packaging space is required for storage" of a parachute than for a rotochute. DX-234 at D234.67, ¶ 3.c(2)(b)5. Use of the drogue parachute also improved reliability because it did not interfere with or endanger the float. DX-234 at D234.71, ¶ 3.c(2)(c)1. Eleven major field tests were conducted to insure that the mechanical system "function properly with a high degree of reliability." DX-234 at D234.71-73, ¶ 3.c(2)(c)3.

Sparton Response to No. 102:

The finding is not worded to indicate that the report addresses the substance of this finding.

103. The AN/SSQ-62 (XN-2) was designed to operate at a depth of 1500 feet. DX-234 at D234.75, ¶ 5. Sparton found that the operating life of the sonobuoy was reduced by half when the sonobuoy operated at 1500 feet rather than at "a shallower depth." DX-234 at D234.59-60, ¶¶ 2.b(21)(a), 5.

Sparton Response to No. 103:

This finding is unsupported by the cited document. The cited document does not state that the (XN-2) was designed to operate at a 1500 foot depth. In fact, it states that water circulation through the battery will be impaired at the 1500 foot depth. DX-234 at 74 [D234.75]. Furthermore, the exhibit does not state that Sparton found anything. It merely states that a severe change in environment such as changing from shallow to deep depths, causes a 50% reduction in battery life. DX-234 at 59 [D234.60].

### 13. SPARTON'S DEEP DIFAR PROGRAM

104. In approximately 1969 or 1970, the Navy became interested in developing a sonobuoy having the capability to operate at both shallow and deep depths. The basis of this interest was a belief that the sonobuoy would be more sensitive at deeper depths due to the characteristics of acoustic propagation through the ocean. DX-121 at D121.36-37.

Sparton Response to No. 104:

The Navy became interested in a sonobuoy capability to operate at both shallow and deep depths at least as early as 1962 and probably earlier. PPFF 17-18. 19.

105. In its proposal to the Navy in response to Request for Proposals N00019-69-R-0075 (which became the '-0465 contract), Sparton suggested that its design would permit the

Navy to incorporate a dual depth capability that could either be command controlled or manually set. DX-142 at D142.144-149. The sonobuoy design in the '-0075 proposal called for a bottom water-actuated release plate and a rotochute. DX-142 at D142.29, D142.31.

Sparton Response to No. 105:

This finding is misleading because the dual depth reference therein is not the same as containing a deep depth reference since none is supported by the exhibit.

106. Between the late 1960's and early 1970, Sparton employee Widenhofer suggested deploying the SSQ-53 DIFAR sonobuoy to a depth of 1000 feet to Sparton's management by using (a) the top end of the sonobuoy as an exit for deployable sonobuoy internal components, (b) a release plate mechanism actuated by a force imparted by a float assembly to either retain or deploy the sonobuoy internal components within or from the sonobuoy housing, and (c) the sonobuoy housing as a descent vehicle to assist the rapid deployment of sonobuoy internal components to a deep depth. DX-17 at D17.5.

Sparton Response to No. 106:

The finding is not supported by the exhibit. Mr. Widenhofer made no suggestion to Sparton management. He did begin thinking about the idea. DX-17 at 6-7 [D17.5-6].

107. Mr. Widenhofer called this deployment scheme the 'inverse' or 'upside-down' deployment design because all SSQ-53 production sonobuoys up to that time contained release plate assemblies located at the bottom of the sonobuoy to deploy sonobuoy components from the bottom end of the sonobuoy. DX-17 at D17.5-6.

Sparton Response to No. 107:

No comment.

108. By September 16, 1970, Sparton had a proposed program and schedule for modifying the SSQ-53 sonobuoy to incorporate the capability of listening at a depth of 1000 feet. DX-20 at D20.1-2. Under this schedule, the mechanical design was to be complete on about January 17, 1971, and 20 complete sonobuoys were to be tested on or about February 28, 1971. DX-20 at D20.1-2.

Sparton Response to No. 108:

The program and schedule were for designing and testing to demonstrate an acceptable design for a Deep DIFAR

109. In September 1970, Sparton's project engineer, Mr. Devereaux, prepared a Program Schedule to complete a design phase and then a testing phase "to demonstrate an acceptable design for [Sparton's] Deep DIFAR" sonobuoy. DX-17 at D17.6.

Sparton Response to No. 109:

No comment.

110. By September 1970, Sparton had initiated work on the 1000 feet deep DIFAR design. DX-23 at D23.2. Sparton's Engineering Department's Monthly Progress Report for September 1970, describes the proposed mechanical design as "a drop-away sonobuoy housing." DX-23 at D23.2. According to the report, this feature "leaves only the float and surface assembly at the water surface while the housing serves as a probe descent vehicle. DX-23 at D23.2. Forces exerted by float inflation actuate the release mechanism." Laboratory tests of this design had given "satisfactory results." DX-23 at D23.2.

Sparton Response to No. 110:

The report states that "a drop-away sonobuoy housing" is a primary feature and that radical changes in the design were proposed. DX-23.

111. In November 1970, Sparton's employee , Mr. Depew ,was assigned the responsibility to prepare a technical description of Sparton's proposed dual depth sonobuoy in the proposal to be given the Navy. DX-17 at D17.6; DX-112 at D112.7-16; DX-113. His technical description was to be hardware oriented and include a layout. DX-17 at D17.6; DX-112 at D112.7-16; DX-113.

Sparton Response to No. 111:

No comment.

112. On December 2, 1970, James W. Widenhofer proposed a test program for Sparton's deep DIFAR sonobuoy design. DX-24 at D24.1. The purpose of the test was "[t]o evaluate the performance of the proposed inverse sonobuoy package with particular reference to the float pressure activated release plate design." DX-24 at D24.1.

Sparton Response to No. 112:

No comment.

113. As of December 2, 1970, Sparton had completed much of the design effort for the inverse sonobuoy design. DX-24 at D24.3.

Sparton Response to No. 113:

The finding is unsupported by the cited exhibit.

114. On or about December 8, 1970, James W. Widenhofer prepared a report entitled "Patent Information on a Float Pressure Actuated Release Plate Mechanism." DX-25; DX-119 The report is dated, on a handwritten version as having been signed on December 8, 1970 and on a typed version as having been signed on January 7, 1971. DX-25 at D25.1-4; DX-119 at D119.1-4. The "Patent Information" report defines a release plate as "a device which serves to retain the stowed components inside a common housing during storage, shipment and air

descent." DX-25 at D25.1-4. Upon water entry, the release plate falls clear of the sonobuoy housing, allowing the various components to deploy. DX-25 at D25.1.

Sparton Response to No. 114:

The finding is unsupported by the cited exhibit. No typed version is contained in the cited exhibits.

115. The "Patent Information" report describes a release plate which is "blown out of the top end of the sonobuoy" by pressure from the inflating stowed float located directly below the release plate. DX-25 at D25.2.

Sparton Response to No. 115:

No comment.

116. A handwritten note adjacent to Mr. Widenhofer's signature on the second page of typed version states:

> This idea was first documented in a report, "Mechanical Feasibility Design for a Reference Sonobuoy" by J. Widenhofer and C. Werner dated 15 April 1970.

DX-119 at D119.2.

Sparton Response to No. 116:

The finding is unsupported by the cited exhibit. No typed version is contained in the cited exhibit.

117. The description of the report in the handwritten note is substantially identical to the description of the fifth report for which Sparton requested permission to retain classified information upon completion of the '-0133 contract for the Beartrap Program. DX-25 at D25.2; DX-117: DX-119.

Sparton Response to No. 117:

This finding is irrelevant, indefinite and unsupported by the cited exhibit.

118. On December 19, 1970, Sparton, with the assistance of the Navy, conducted an air-drop test of the deep DIFAR sonobuoy mechanical design at Key West, Florida, in accordance with Mr. Widenhofer's proposal of December 2, 1970. DX-26 at D26.1. Six sonobuoy test units were dropped from a Navy airplane into the water at the December 19 test. DX-26 at D26.1. The six units contained the mechanical but not the electronic components of the deep DIFAR design. DX-26 at D26.1.

Sparton Response to No. 118:

Sparton conducted the actual test according to a proposed test plan, not a proposal.

119. Four of the six sonobuoys tested on December 19, 1970, "performed as intended," according to Mr. Widenhofer's report on the test. DX-26 at D26.1.

Sparton Response to No. 119:

This finding is irrelevant.

120. On February 18, 1971, Sparton tested six fully operational deep DIFAR sonobuoys at the Navy base in Key West, Florida. DX-28 at D28.1. The purpose of the tests was to evaluate the mechanical and electrical deep DIFAR design prior to constructing a final engineering lot of twenty sonobuoys. DX-28 at D28.1.

Sparton Response to No. 120:

The finding is misleading because the test was a failure inasmuch as many sonobuoys did not function properly.

121. The six sonobuoys were dropped into the sea from a Navy plane flown by Navy military personnel. DX-2 at D2.1. A Navy vessel operated by military personnel and a charter boat paid for by the United States also were used in the tests. DX-2 at D2.1.

Sparton Response to No. 121:

This finding is irrelevant.

122. The float-pressure-actuated release plate "operated as designed" on all units tested according to Mr. Widenhofer's February 26, 1971 report on the testing. DX-28 at D28.3.

Sparton Response to No. 122:

The test was a failure as was established by subsequent events. See DPFF 131-133.

123. As a result of the February 18, 1971 test, Mr. Widenhofer concluded:

> The objective of the two 6 sonobuoy engineering tests has been achieved. The principles involved in the operation of the inverse sonobuoy design with a float pressure actuated release mechanism, or the so call [sic, called] "upside down" design, have been proven workable and, within the limited scope of the testing accomplished to date, reliable.
>
> With only minor modifications to the cable pack assembly, the design is acceptable for construction of the final engineering lot of twenty sonobuoys for the purpose of demonstrating Sparton's deep DIFAR capability.

DX-28 at D28.2.

Sparton Response to No. 123:

The test was a failure as was established by subsequent events. See DPFF 131-133.

124. Figures 2A and 2B of Mr. Widenhofer's February 26, 1971, report illustrate the deployment sequence of the inverse sonobuoy design tested on February 18, 1971. DX-28 at D28.8-9.

Sparton Response to No. 124:

No comment.

125. In stage one of that deployment sequence, the sonobuoy enters the water, causing a battery to activate and inflate a float. DX-28 at D28.7. Inflation of the float triggers the release plate, causing the plate to disengage from the sonobuoy and jettison the parachute. DX-28 at D28.7.

<u>Sparton Response to No. 125</u>:

No comment.

126. In stage two of that deployment sequence, the float, radio transmitter and battery rise to the water's surface, while the remainder of the buoy, including the housing, descends while paying out the cable, which is attached to the surface level assembly, through the top of the housing. DX-28 at D28.7.

<u>Sparton Response to No. 126</u>:

No comment.

127. In stages three and four of that deployment sequence, the subsurface sonobuoy components exit from the top of the housing which then falls away. DX-28 at D28.9.

<u>Sparton Response to No. 127</u>:

No comment.

128. Figure 2A of the February 26, 1971, report includes drawings which are <u>essentially</u> identical to figures 1 and 2 of the '120 and '233 patents. PX 259 at page 2; PX 260 at page 2; DX-28 at D28.7.

<u>Sparton Response to No. 128</u>:

The underlined material is vague and indefinite.

129. Figure 2B of the February 26, 1971, report includes a drawing which is essentially identical to figure 3 of the ‘120 and ‘233 patents. PX 259 at page 2; PX 260 at page 2; DX-28 at D28.9.

Sparton Response to No. 129:

The underlined material is vague and indefinite.

130. Although the device tested by Sparton in December 1970 and February 1971 at Key West and the follow-on device described in the March 17, 1971 ECP were not the patented inventions, they incorporated many of the features included within said inventions. Sparton Pretrial Br. at 45-46, ¶ 28.

Sparton Response to No. 130:

The underlined material is vague and indefinite.

131. On about March 23, 1971, Mr. Widenhofer proposed a test program for identifying the cause of the cable break in the deep DIFAR sonobuoy design tested on February 18, 1971, evaluating modifications intended to correct the cable break problem, and to examine other areas of the deployment sequence. DX-33 at D33.1.

Sparton Response to No. 131:

The underlined material is misleading because the test program was to examine other areas of concern including the release of the subsurface assembly from the sonobuoy housing.

132. Sparton conducted tests in accordance with that proposal at the Naval Ordinance Laboratory (NOL) 100 foot tank facility with the assistance of NOL personnel on April 1, 1971. DX-35 at D35.1.

Sparton Response to No. 132:

The underlined material is vague and indefinite because Sparton did the testing, not the Navy.

133. As a result of NOL tests, Sparton identified the design feature causing the cable break problem and modified the design tested on February 18, 1971, to incorporate two thin, narrow mylar strips at the lower end of the sonobuoy housing. DX-39 at D39.6.

Sparton Response to No. 133:

The underlined material is unsupported because Sparton had conducted in-house tests for the same purpose.

134. Mr. Widenhofer submitted a "Final Report" concerning the deep DIFAR program on June 21, 1971, in which he stated:

> The Deep DIFAR program, Job 7400 is complete. The final engineering lot consisting of twenty sonobuoys has been assembled and is waiting a final determination as to how the buoys may best be utilized.

DX-39 at D39.1.

Sparton Response to No. 134:

No comment.

135. One of the major design parameters for the deep DIFAR program was that it lend itself to an easy conversion to a dual depth DIFAR sonobuoy. DX-39 at D39.7.

Sparton Response to No. 135:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

136. Widenhofer designed a multi-piece plate mechanism, called a spider plate, for use in the mechanical design referenced in the September 1970 Program Schedule. The Sparton

sonobuoys sea tested on February 18, 1971 contained the multi-piece spider plate mechanism. DX-17 at D17.7.

Sparton Response to No. 136:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

137. Figure 3, below, is a sectional view of the upper end of the Deep DIFAR sonobuoy illustrating the release mechanism, the parachute and the parachute release device. The "spider plate" is located at reference number 13:



PX 160 at B0816; B0821. Figure 4, below, is a plan and elevation view of the spider plate and one of three associated latches that are the key elements of the release mechanism. PX 160 at B0816; B0822.




Sparton Response to No. 137:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

138. In Sparton's Deep DIFAR sonobuoy, the float (6) is attached to the surface electronics unit by means of a collar (7) which is a "necked down" portion of the surface electronics unit housing. PX 160 at B0817. A float cup (8) is positioned over and around the float. The closed (upper) end of the float cup is attached to a piston (9). PX 160 at B0817.

Sparton Response to No. 138:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

139. The piston (9) is guided and held in place by two plates: support plate (10) and milled plate. PX 160 at B0817-B0818. The two plates are separated by a load spring (12) which

accounts for variations in the length of the subassemblies that are contained with the casing (1). PX 160 at B0817-B0818.

Sparton Response to No. 139:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

140. The spider plate has three long narrow legs that extend radially from a central ring. PX 160 at B0818. The central ring of the spider plate resides on the shoulder of the piston prior to deployment. Each leg of the spider plate ends in an enlarged end section. PX 160 at B0818. The enlarged end sections engage one of three latches (16); the latches, in turn, extend through and engage the casing (1). PX 160 at B0818. The latches also retain a fiber parachute housing (22) that is located over the end of the casing. PX 160 at B0818. The spider plate is made of cold rolled steel. The legs are drawn easily in a direction perpendicular to the plane that contains the three legs. PX 160 at B0818.

Sparton Response to No. 140:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

141. The spider plate is "sandwiched" between the milled plate and a radius plate (17). The radius plate has a center hole and a large radius. PX 160 at B0818.

Sparton Response to No. 141:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

142. In operation, submersion of the casing, causes a sea water squib battery (18) to activate and fire a squib (19) to pierce the $CO_2$ bottles (20). PX 160 at B0818. The $CO_2$ inflates the float. PX 160 at B0818.

Sparton Response to No. 142:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

143. As the float (6) inflates, pressure is applied to the float cup (8) resulting in movement of the float cup (8) and piston (9) toward the upper end of the casing. PX 160 at B0818-B0819. As the piston (9) passes through the radius plate (17), the legs of the spider plate (13) are drawn around the radius. PX 160 at B0818-B0819. Continued upward movement of the piston (9) results in the spider legs and attached latches (16) moving inward until the latches (16) disengage from the sonobuoy casing (1) . PX 160 at B0818-B0819. When the latches (16) disengage from the casing (1), the release mechanism (i.e., the float cup, piston, support plate, milled plate, load spring, spider plate, latches and radius plate), parachute housing (22) and parachute (4) are forcefully ejected. PX 160 at B0818-B0819.

Sparton Response to No. 143:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

144. Widenhofer prepared a Final Report on June 21, 1971 for the deep DIFAR program in which he considered the Final Design, Design Problems Encountered, Design Modifications made to the sonobuoy, Possible Problems in the Final Design, and Modification [considerations] for Dual Depth, which included a new Release Plate Design. DX-17 at D17.8-9.

Widenhofer suggested that a new release plate (to replace the nonpatented spider plate) be designed for Sparton's dual depth sonobuoy. DX-17 at D17.8-9.

Sparton Response to No. 144:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

145. The nonpatented Widenhofer sonobuoy containing the spider plate was the one tested by Sparton to and through the July 13, 1971 execution of Mod 4. DX-17 at D17.8-9.

Sparton Response to No. 145:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

**14. Sparton's Development of a Dual Depth DIFAR**

146. Sparton's dual depth DIFAR program began in about July 1971. DX-126 at D126.196-197.

Sparton Response to No. 146:

The finding is unsupported by the cited exhibit (see DPFF 104-145), and the underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

147. The "upside-down" design used for deep DIFAR, which was developed by James Widenhofer, was applied to the dual depth DIFAR proposal of the ECP. DX-126 at D126.113-114.

Sparton Response to No. 147:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

148. In his June 15, 1971, Inter-Department Correspondence, James Widenhofer stated, "[t]he mechanical design considerations for dual depth DIFAR are based on an examination of the existing Deep DIFAR design. . . . The intention is to modify the existing design to meet the requirements of the Dual Depth feature." DX-38 at D38.1.

Sparton Response to No. 148:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

149. In his Final Report on the dual depth DIFAR project, Mr. Widenhofer stated, "[t]he expressed design philosophy followed under the ECP was to demonstrate the feasibility of using the principle of the float actuated release plate (the so-called upside-down approach), as developed on the previous Deep Difar program, to create a reliable Dual Depth Difar design capable of being produced economically in large quantities . . . ." DX-73 at D73.1.

Sparton Response to No. 149:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

**15. Engineering Change Proposal 0465-2 and the Mod 4 Buoys**

150. Prior to November 1970, the Navy conducted tests that concluded that having a deeper depth sonobuoy sensor would be advantageous. DX-126 at D126.125-126; DX-132 at D132.5. The Navy made that information available to industry representatives through Navy Security Industrial Association (NSIA) meetings. DX-126 at D126.91-94. The NSIA meetings were attended by industry representatives including Sparton and other sonobuoy contractors. DX-126 at D126.91-94.

Sparton Response to No. 150:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit. It is also vague and indefinite and unsupported by the cited exhibit.

151. Sparton learned of the Navy's desire to implement dual depth capability (deep depth and the traditional depth) through a NSIA meeting. DX-126 at D126.91-94. By at least March 1971, Sparton and other members of the sonobuoy community knew that the Navy was looking for a dual depth sonobuoy. DX-126 at D126.93-94.

Sparton Response to No. 151:

The underlined material is unsupported by the cited exhibit. Furthermore, Mr. Boyle is not and was not a Sparton officer and thus is not Sparton. The finding is contradicted by PPFF 17-25 is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

152. The Naval Air Systems Command ('NAVAIR'), as a result of the fleet recommendations, NADC theoretical studies and sea tests, granted an Engineering Change Proposal ('ECP') at about the same time to each of three SSQ-53 producers, to supply the Navy with 500 buoys deployable at 90 or 500 feet (Magnavox), 300 buoys at 90 or 1000 feet (Sanders) and 300 buoys at 90 or 1000 feet (Sparton). DX-17 at D17.4.

Sparton Response to No. 152:

No comment.

153. Sparton prepared and provided to the Navy Engineering Change Proposal 0465-2, dated November 30, 1970. DX-132. It was reviewed by NADC employee William Graff. DX-121 at D121.21-24; DX-132. Mr. Graff described the November 30, 1970 ECP 0465-2 as an

"unofficial proposal." DX-121 at D121.21-24. *See also* Pl. Proposed Finding of Uncontroverted Fact in Support of Its Cross Mot. for Summ. J. at 14, ¶ 25.

Sparton Response to No. 153:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

154. The inside front cover of the November 30, 1970 ECP 0465-2 bore the following restrictive legend:

> These data shall not be disclosed outside the government or be duplicated, used or disclosed in whole or in part for any purpose other than to evaluate the proposal, provided that if a contract is awarded to this offeror as a result of or in connection with the submission of such data, this legend shall be of no force or effect, and in such event this offeror will assert no rights against the government with respect to these data, unless based on patents or provisions in the contract. This restriction does not limit the government's right to use information contained in such data if it is obtained from another source.

DX-168 at D168.2.

Sparton Response to No. 154:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

155. By letter dated March 17, 1971, Sparton submitted an Engineering Change Proposal 0465-2 (the ECP) to contract N00019-69-C-0465 to the Navy. DX-19, DX-129.

Sparton Response to No. 155:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

156. Plaintiff's ECP submission included: (1) a two-page cover letter dated March 17, 1971; (2) a two-page standard government Form ME-1017, titled "Engineering Change Proposal

(For Use with ANA Bulletin No. 445)," filled out by plaintiff; and (3) a ten-page document titled "Engineering Change Proposal for the Dual Depth DIFAR Sonobuoy." DX-128; DX-129; DX-130.

Sparton Response to No. 156:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

157. The inside front cover of the March 17, 1971 ten-page "Engineering Change Proposal for the Dual Depth DIFAR Sonobuoy" submission bore the following restrictive legend:

> These data shall not be disclosed outside the government or be duplicated, used or disclosed in whole or in part for any purpose other than to evaluate the proposal, provided that if a contract is awarded to this offeror as a result of or in connection with the submission of such data, this legend shall be of no force or effect, and in such event this offeror will assert no rights against the government with respect to these data, unless based on patents or provisions in the contract. This restriction does not limit the government's right to use information contained in such data if it is obtained from another source.

DX-130 at D130.3.

Sparton Response to No. 157:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

158. The ANA Bulletin No. 445 referred to in the title of Form ME-1017 that accompanied the "Engineering Change Proposal for the Dual Depth DIFAR Sonobuoy" is "Air Force-Navy Aeronautical Bulletin – Engineering Changes to Weapons, Systems, Equipments, and Facilities," dated 12 July 1963. DX-129; DX-235. The ANA Bulletin No. 445 identified four types of engineering change proposals: "Preliminary," "Formal," "Compatibility," and

"Expedited." DX-235 at D235.3. Plaintiff indicated in its March 17, 1971 cover letter and on the accompanying Form ME-1017 that its ECP was a "Preliminary"-type ECP. DX-128; DX-129.

Sparton Response to No. 158:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

159. According to ANA Bulletin No. 445, a preliminary ECP may be used for the following purposes: (1) to furnish the procuring activity with available information relative to a proposed change, in order to permit a preliminary evaluation of the change; (2) to permit a preliminary choice of one of various alternative proposals; or (3) to facilitate early contractual coverage for changes that require study before a formal-type engineering change proposal can be submitted. DX-235 at D235.3-4 at ¶ 4.3.2(a)

Sparton Response to No. 159:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

160. Although the ANA Bulletin required that all boxes of Form ME-1017 be filled in, DX-235 at D235.10 at ¶ 7.1, plaintiff left blank the item titled "Development Status." DX-129. Plaintiff's response to the item titled "Production Effectivity" was "Future Procurement (if evaluation tests prove proposed merits)." DX-129 at D129.1.

Sparton Response to No. 160:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

161. The restrictive legend included by plaintiff in its ECP differs from that required by the "Restrictions on Disclosure and Use of Data in Proposals" clause of the '-0465 contract. *Compare* DX-130 *with* DX-1. The "Restrictions" clause of the '-0465 contract provided in pertinent part that "if a contract is awarded … as a result of … the submission of this data, the Government shall have the right to duplicate, use, or disclose the data to the extent provided in the contract." DX-1.

Sparton Response to No. 161:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit. The cited exhibit, as provided to Sparton's counsel, does not contain the "Restrictions on Disclosure and Use of Data in Proposals."

162. None of the pages of plaintiff's ECP other than the inside cover bore a restrictive legend. DX-130; DX-128. None of the pages of the ECP complied with the requirement of the "Restrictions on Disclosure and Use of Data in Proposals" clause of the '-0465 contract that each subsequent page intended to be restricted was to be so labeled. DX-130.

Sparton Response to No. 162:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit. The cited exhibit, as provided to Sparton's counsel, does not contain the "Restrictions on Disclosure and Use of Data in Proposals."

163. Engineering Change Proposal 0465-2 became effective on July 13, 1971 when the Navy executed Modification 4 to the '-0465 contract. DX-17 at D17.10-11 (citing effective date of Mod. 4 and ECP 0465-2 as both being July 13, 1971); DX-128, DX-129.

Sparton Response to No. 163:

No comment.

164. The ECP proposed to incorporate capability to operate at depths of either 1000 feet or 90 feet (dual depth capability) into the AN/SSQ-53 sonobuoy produced under the '-0465 contract. DX-130.

Sparton Response to No. 164:

No comment.

165. Sparton proposed adding the 1000 foot listening capability to the existing 90 foot capability of the SSQ-53 sonobuoy based on briefings by the Navy to sonobuoy manufactures. DX-126 at D126.91-94, 239.

Sparton Response to No. 165:

This finding is not supported by the cited exhibit.

166. Sparton submitted the ECP with the hope of providing an improved product capability that would be incorporated into future procurement. DX-126 at D126.91-94, 239.

Sparton Response to No. 165:

No comment.

### C. MOTIVATION TO COMBINE

167. On August 4, 1972, Sparton submitted a report of its activities under the N00019-72-C-0341 covering the period April 1, 1972 through June 29, 1972, entitled "DICASS Sonobuoy AN/SSQ-62(XN-4), Interim Report No. 1" ("XN-4 Interim Report 1"). DX-171 at D171.4. XN-4 Interim Report 1 was submitted to Naval Air Systems Command. DX-171 at D171.4. XN-4 Interim Report 1 was received by the Defense Data Center on November 20,

1972. DX-171 at D171.4. In that report identifies a "new packaging concept." DX-171 at D171.30, ¶3.c(4)(b). In pertinent part, that concept includes:

> The drogue parachute is stored above the float-actuated release plate. Upon water entry, a battery is activated firing a squib which releases carbon dioxide gas ($CO_2$) and inflates the float (figure 14). When sufficient pressure is present in the float, the release plate releases, allowing the float to completely inflate. At this time, the drogue parachute is jettisoned.

DX-171 at D171.30, ¶ 3.c(5)(c). Figure 14 is a drawing of the mechanical configuration of the AN/SSQ-62 (XN-4). The release plate is shown in Section A-A of Figure 14:




DX-171 at D171.32-33.

Sparton Response to No. 167:

This finding is not supported, and the underlined material is irrelevant and immaterial.

168. Sparton submitted an administrative claim to the Navy on February 11, 1981, requesting compensation for the unauthorized use of the inventions claimed in the '120 and '233 patents by Magnavox, Sippican and Hazeltine Corporations. DX-85.

Sparton Response to No. 168:

The underlined material is irrelevant and immaterial.

169. Attorney Paul J. Ethington responded for Sparton to document requests by the Navy in a letter dated February 27, 1992. DX-95. The letter included numerous Sparton documents as attachments in response to the Navy's requests for more information regarding the conception and reduction to practice of the claimed inventions. DX-95.

Sparton Response to No. 169:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

170. In the February 27 letter, from Mr. Ethington explained that "[a] thorough search has failed to locate any written material which is approximately contemporaneous with the ECP 465-2 and which provides a description of the configuration and operating principle of the release plate of the proposal of ECP465-2." DX-95 at D95.7.

Sparton Response to No. 170:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit..

171. With respect to the '120 patent, the February 27, 1992 letter stated that the information regarding the date of conception reported in the July 2, 1981, letter was believed to be correct. DX-95 at D95.12.

Sparton Response to No. 171:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit..

172. The February 27 letter enclosed Attachment M, the affidavit of James W. Widenhofer, and Attachment N, the affidavit of Donald R. Depew, as evidence of the design of the release plate proposed in ECP 0465-2. DX-95 at D95.7. At the time they signed their

declarations, both Mr. Widenhofer and Mr. Depew were employees of Sparton Corporation. DX-13 at D13.1, D13.7.

Sparton Response to No. 172:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit..

173. Both the Widenhofer and Depew affidavits assert that the release plate assembly proposed by the ECP had two sliding latch plates which disengaged from the sonobuoy housing slots in response to the upward motion of the cam, as urged by the float inflation. DX-13.

Sparton Response to No. 173:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit..

174. Mr. Widenhofer, in his declaration, indicates that Exhibit M-1(DX-13 at D13.4) to his declaration is copy of a portion of Figure 1 of the ECP that includes the release plate assembly. DX-13 at D13.2, ¶ 4. Mr. Widenhofer further identifies Exhibit M-2 (DX-13 at D13.2, ¶ 5) to his declaration as a drawing prepared by Mr. Depew with assistance from Mr. Widenhofer that depicts in plan view the release mechanism that is depicted only in sectional elevation in the ECP. DX-13 at D13.2, ¶ 5. Mr. Widenhofer further identifies Exhibit M-3 to his declaration as a description of how the release mechanism described in Exhibit M-2 operates. DX-13 at D13.2, ¶ 6. Mr. Widenhofer states that he assisted in the preparation of the description at Exhibit M-3 and that together Exhibits M-2 and M-3 "accurately describe the configuration and operating principles of the release plate assembly of ECP465-2." DX-13 at D13.2, ¶ 6-7.

Sparton Response to No. 174:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

176. Mr. Depew, in his declaration, recognized Figure 1 of the ECP as a drawing that he prepared. DX-13 at D13.7, ¶ 3; DX-237. Mr. Depew further identified Exhibit N-1 (DX-13 at D13.12) as a copy of a portion of Figure 1 of the ECP showing the release plate assembly in sectional view. DX-13 at D13.7, ¶ 3-4; DX-237. Mr. Depew identified Exhibit N-2 to his declaration as a drawing that he prepared with the assistance of Mr. Widenhofer, that shows the release plate assembly of the ECP design in both plan view and sectional elevation. DX-13 at D13.8, ¶ 5. Mr. Depew also identified Exhibit N-3 to his declaration as a description of the operating principles ECP design release mechanism. DX-13 at D13.8, ¶ 6-7. According to Mr. Depew, Exhibits N-2 and N-3, "taken together, accurately describe the configuration and operating principles of the release plate assembly of ECP465-2." DX-13 at D13.8, ¶ 7.

Sparton Response to No. 176:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

177. In his declaration, Mr. Depew descries Exhibits N-4 and N-5 as a photocopies of notes that Mr. Depew made in a spiral-bound notebook on March 20-21, 1969. DX-13 at D13.8-16, ¶ 9. Mr. Depew describes the Exhibit N-5 as follows:

> The sketches of Exhibit N-5 represent a sonobouy release plate of the water impact type which is similar, in principle, to that of Exhibit N-4. The view immediately below the spiral binder of N-5 is a cross-sectional view showing an inverted cup which would fit into the open bottom end of the sonobuoy casing. Within the cup is a sheet metal, saucer-shaped disk which carries a V-shaped actuator at its center and which "oil cans" from the lower position shown to the higher, over-center position, also shown, when the sonobuoy impacts the water. The sketch immediately below the cross-sectional view is a plan view of a release plate which comprises two complementary slide plates each of which has two radial locking tabs which interlock with slots in the lower end of the casing at an

elevation just below the top inner surface of the cup described above. One arm of the V-shaped actuator is seated against a flat place on one slide plate and the othe arm in seated against a flat place on the other slide plate. When the saucer-shaped disk "oil cans" upon water impact, the actuator arms collapse extending outwardly, to move the slide plates to retract the locking tabs radially inwardly to release the interlock with the sonobuoy casing.

DX-13 at D13.9-10, ¶10; DX-237.

Sparton Response to No. 177:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

178. Mr. Depew further stated: "The release plate of the ECP-0465-2, as shown in Exhibits N-1, N-2 and N-3, operates on the same principle as the release plate of Exhibit N-5 except that the former is actuated by a cam which is moved by the force of the float inflation whereas the latter is actuated by the arms of the V-shaped actuator which are moved by the 'oil canning' of a saucer shaped disk upon impact with water." DX-13 at D13.10-11, ¶ 11; DX-237.

Sparton Response to No. 178:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

## III. THE CLAIMED INVENTIONS

### A. THE '-0465 CONTRACT

179. In response to the '0075 RFP, Sparton submitted to the Navy a proposal dated January 2, 1969 for production of DIFAR (SSQ-53) sonobuoys. DX-1; DX-126. The DIFAR sonobuoy disclosed in the proposal included a listening device called a "hydrophone" which was deployed at a depth of approximately ninety (90) feet below the ocean surface. DX-1. The components of the disclosed DIFAR sonobuoy were housed in a housing having a "release plate assembly" at its lower end (as deployed). DX-126 at D126.188-191.

Sparton Response to No. 179:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

180. The Navy accepted plaintiff's offer, and awarded it Contract No. N00019-69-C-0465 ('-0465 contract) with the Naval Air Systems Command (NAVAIR), a component of the Navy. The '-0465 contract was effective March 5, 1969. It consisted of (a) the '0075 RFP and plaintiff's offer; (b) an "Amendment No. 1" of January 3, 1969, and (c) an executed "Award/Contract" Standard Form 26. DX-1 at D1.13. The contract was a multi-year contract for the supply of DIFAR sonobuoys. The total contract price was approximately $7.6 million. DX-1 at D1.13.

Sparton Response to No. 180:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

181. The "Supplies or Services" to be delivered by plaintiff under the '-0465 contract included: (1) "AN/SSQ-53 Sonobuoy"; and (2) "Design Data." DX-1 at D1.14; DX-1 at D1.32-D1.34. Eleven (11) individual data items required by the "Design Data" heading were enumerated in DD Form 1423, "Contract Data Requirements List," of the '-0465 contract. DX-1 at D1.73-D1.75.

Sparton Response to No. 181:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

182. The '-0465 contract also included a clause titled "Engineering Change Procedure" (Clause A) (March 1968) (NAVAIR 430-2). DX-1 at D1.40. This clause required that any

Engineering Change Proposal (ECP) affecting an item being procured under the '-0465 contract be submitted by plaintiff to NAVAIR via the Contract Administration Office. The "Engineering Change Procedure" clause also provided that

> [e]ach ECP … shall be prepared and submitted in accordance with the provisions of Air Force-Navy Aeronautical [ANA] Bulletin No. 445, entitled "Engineering Changes to Weapons, Systems, Equipments and Facilities," dated 12 July 1963, and NAVAIR Supplement No. 1 thereto, dated 5 February 1968, and in accordance with any subsequent modification thereto or superseding document ordered in writing by the Procuring Contracting Officer prior to the date the ECP is submitted. If any such document modification or superseding document is ordered and affects the cost of performance of this contract, the contract price shall, pursuant to the procedures provided in the "Changes" clause, be equitably adjusted.

DX-1 at D1.40.

Sparton Response to No. 182:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

183. The '-0465 contract also included a "Changes" clause which provided in pertinent part:

> The Contracting Officer may at any time, by a written order . . . make changes, within the general scope of this contract, in any one or more the following: (i) Drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this contract, whether changed or not changed by any such order, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change ….

DX-1.

Sparton Response to No. 183:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

184. The '-0465 contract did not list any of the clauses in ASPR § 9.107-5 as being incorporated by reference in the contract.

Sparton Response to No. 184:

No comment.

### B. SPARTON'S PARTICIPATION IN THE "BEARTRAP" PROGRAM

185. Sparton entered into Contract No. N00019-70-C-0133 ('0133 contract) with NAVAIR having an effective date of November 6, 1969 and a contract dollar value of $18,260. DX-240. The Schedule of the '0133 contract required Sparton to:

> (1) "Gather BEARTRAP sensor requirements from several different Navy activities, including NADC …,"
>
> (2) "Perform an investigation to determine the limits and constraints of available state-of-the-art sensors…,"
>
> (3) "Determine the impact of the state-of-the-art sensors on the overall BEARTRAP program," and
>
> (4) Prepare and furnish … a final report reviewing the steps taken in Items 1 through 3 and recommend the steps necessary for future action concerning sensors necessary and practical for the BEARTRAP program."

DX-240 at D240.65-.66.

Sparton Response to No. 185:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

186. The '-0133 contract contained ASPR clause 9-107.5(a)(c) entitled "Patent Rights (Deferred) (1968 Sep)." DX-240 at D240.81. The clause provided that "[e]xcept as provided in

(e) and (h) of this clause, the Contractor agrees to provide the Government all right, title and interest in and to each Subject Invention (made by the contractor), subject to the reservation of a nonexclusive and royalty-free license to the Contractor." DX-240 at D240.81. "Subject Invention" was defined as "any invention or discovery, whether or not patentable, conceived or first actually reduced to practice in the course of or under this contract." DX-240 at D240.81. Paragraph (h) permitted the contractor to request that it receive "greater rights" in the invention. DX-240 at D240.81-.84. The clause also required Sparton to file written reports to the contracting officer disclosing all inventions "except those which are obviously unpatentable under the patent laws of the United States" conceived or first reduced to practice under the contract. DX-240 at D240.81-.84.

Sparton Response to No. 186:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

187. The '-0133 contract also contained ASPR clause 9-106, entitled "Filing of Patent Applications (Jan. 1955)." DX-240 at D240.81-.84. That clause required the contractor to notify the contracting officer before filing any patent application "disclosing any subject matter of this contract, which subject matter is classified 'Secret' or higher." DX-240 at D240.81-.84.

Sparton Response to No. 187:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

188. The '-0133 contract also contained ASPR clause 9-203(b), entitled "Rights in Technical Data (Feb. 1965)." DX-240 at D240.41-.43, D240.46-.47.

Sparton Response to No. 188:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

189. The contract Description for Item (2) of the Schedule required Sparton to investigate a number of factors including "[p]hysical configuration" (item h) and "depth" (item i). The contract Description for Item (4) of the Schedule required Sparton's final report to include "review and analysis of the data derived from the first three items with positive recommendations for future action." DX-240 at D240.64-.65. On December 1, 1970, Sparton forwarded to the Navy DD Form 882, "Report of Inventions and Subcontracts." DX-240 at D240.64-.65. The DD Form 882 stated that the report was a Final report. DX-240 at D240.64-.65. In block 4of the form, Sparton checked box "a," indicating "there were no inventions which reasonably appear to be patentable." DX-240 at D240.64-.65.

Sparton Response to No. 189:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

190. On January 1, 1971, Sparton published a classified report entitled the Beartrap Sensor Study. DX-239. In that study, Sparton describes the upside down delivery system and referenced the paper entitled "Mechanical Feasibility Design for a Reference Sonobuoy" by J. Widenhofer and C. Werner dated 15 April 1970. DX-239.

Sparton Response to No. 190:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

191. On January 28, 1971, the Defense Supply Agency requested that Sparton return or destroy all classified information gathered or generated in performance of the '-0133 contract, or

obtain permission to retain such information for a specified time. DX-118. By letter dated February 11, 1971, Mr. John H. Bodde, on behalf of Sparton, requested permission from the Navy to retain five documents gathered or generated in performance of the contract that contained classified information. DX-117. The fifth document requested to be retained was numbered "S-8286," was entitled "Mechanical Feasibility Design for a Sound Reference Sonobuoy – IDC to Cartwright from Werner and Widenhofer" and was dated "15 April 1970." DX-117.

Sparton Response to No. 191:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

### C. CONCEPTION AND REDUCTION TO PRACTICE OF THE RELEASE PLATE

192. A June 15, 1971 Sparton internal memo states: "Release Plate Design - Highly simplified designs are feasible and should be investigated at this time (a major cost feature). The existing design used on Deep DIFAR appears to be dependable." DX-38 at D38.2.

Sparton Response to No. 192:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

193. A log of 900 series drawings was kept by Sparton. DX-40. On page 19 of Book No. 2 of that log, there is an entry stating: "900-4623, A, JWW, Sonobuoy Release Plate, 6-30-71, 8000, 100." DX-40. The entry indicates that James Widenhofer was responsible for the number 900-4623 being assigned to a sonobuoy release plate on June 30, 1971. DX-126 at D126.264-267; D126.273-274; DX-40 at D40.20; DX-95 at D95.11, D95.112-113.

Sparton Response to No. 193:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

194. Sparton mechanical drawings are assigned numbers sequentially. A draftsman receives input from the design engineer in the form of a sketch or verbal guidance. DX-126 at D126.17-19.

Sparton Response to No. 194:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

195. The size of a Sparton mechanical drawing is identified by the letters A, B, C, D, or E, A being the smallest. DX-126 at D126.23, D126.40.

Sparton Response to No. 195:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

196. The number assigned to a Sparton mechanical drawing is the same as the number assigned to the corresponding part. DX-126 at D126.20.

Sparton Response to No. 196:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

197. Sparton has been unable to locate and produce A sized drawing 900-4623 in response to requests by the government. DX-126 at D126.272-273.

Sparton Response to No. 197:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

198. A memo by R. T. White, dated July 20, 1971, summarizes a meeting held to discuss the work plan for supplying dual depth DIFAR sonobuoys under the ECP, which would be based on the deep DIFAR sonobuoy design work. Mr. Widenhofer attended that meeting. In reporting on items for the mechanical redesign, the memo stated, "[t]he release plate mechanism should be simplified." DX-42 at D42.2.

Sparton Response to No. 198:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

199. On or about August 13, 1971, Mr. Widenhofer performed calculations to determine what pressure an inflating float must exert to bend a release plate. DX-46; DX-95 at D95.4-5.

Sparton Response to No. 199:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

200. On August 31, 1971, Sparton conducted engineering tests of its dual depth DIFAR design at St. Croix, U.S. Virgin Islands with Navy assistance. Ten operational sonobuoys were dropped from an airplane into the sea. DX-50 at D50.1.

Sparton Response to No. 200:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

201. According to Mr. Widenhofer's test report, the modifications made to the cable assembly as a result of testing at NOL worked as intended at the August 31, 1971 test,

demonstrating that the cable break problem observed at the drop tests of February 18, 1971 had been solved. DX-50 at D50.2.

Sparton Response to No. 201:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

202. On or about October 13 and 14, 1971, Mr. Widenhofer made calculations entitled "D2 Difar - Release Plate Bending Moment Considerations" in which he calculated the pressure an inflating float must exert to bend a release plate. DX-4; DX-95 at D95.4-5.

Sparton Response to No. 202:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

203. Sparton drawing no. 900-4709 is titled "Preliminary Layout, Dual Depth DIFAR, 7400-1008," and dated October 10, 1971. The area of the drawing labeled "Section AA" shows parts labeled "900-4623, Plate, Release, Steel," "R-32, Rubber Band," and "900-4746 Bridle Racket Assy, Steel." DX-52.

Sparton Response to No. 203:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

204. The release plate identified as "900-4623" in section AA of drawing no. 900-4709 is a generally circular steel plate having a pair of locking tabs which would be inserted into openings in the sonobuoy housing. The plate also has three elongated openings along the diameter which form a hinge line. DX-126 at D126.243-264; DX-52.

Sparton Response to No. 204:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

205. The release plate shown in section AA of drawing no. 900-4709 has a pair of slots in each tab which serve as a receptacle for the bridle bracket assembly to which the parachute shroud lines are connected. A line connecting the slots is perpendicular to the hinge line. DX-126 at D126.246-247; DX-52.

Sparton Response to No. 205:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

206. On November 5, 1971, Sparton conducted an air-drop test of four dual depth sonobuoys at Key West, Florida, with Navy assistance. The purpose of the test, according to a report by Mr. Widenhofer, was "[t]o evaluate the performance of the proposed dual depth DIFAR sonobuoy package with particular reference to the new single part float pressure activated release plate design," among other features. DX-60 at D60.1.

Sparton Response to No. 206:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

207. The single part float pressure activated release plate functioned normally on two of the four units tested on November 5, 1971, according to Mr. Widenhofer's test report. DX-60 at D60.2.

Sparton Response to No. 207:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

208. The malfunctioning of the other two units was caused by the bottom casting of the sonobuoy separating from the housing. This problem was caused by sheared screws attaching the bottom casting to the sonobuoy housing. It could be fixed by simply using longer, stronger screws. This malfunction was unrelated to the release plate design. DX-60 at D60.2.

Sparton Response to No. 208:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

209. As stated in his report based on the November 5, 1971 test, Mr. Widenhofer concluded that the designs for the single part release plate, the parachute release mechanism, the parachute attachment system and the float attachment system were acceptable for further evaluation without modification. DX-60 at D60.2.

Sparton Response to No. 209:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

210. On or about November 31, 1971, James Widenhofer initialed "C" sized drawing 900-4623 of a single part float pressure activated release plate. The "C" sized drawing is the second version of this drawing produced, as indicated by the numeral "2" located next to the drawing number. DX-126 at D126.249-250; DX-66.

Sparton Response to No. 210:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

211. Mr. Widenhofer designed the release plate shown in the drawing 900-4623. DX-126 at D126.249; DX-66.

Sparton Response to No. 211:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

212. The plate shown in drawing no. 900-4623 is generally circular. The flat plate has a pair of locking tabs for engagement of the sonobuoy housing. Three elongate openings at the diameter of the plate form a hinge line. The plate would deform along the hinge line if sufficient force were applied. Slots within the tabs accept the bridle bracket assemblies to which the parachute shroud lines can be attached. A line connecting the slots is perpendicular to the hinge line. DX-126 at D126.250-254; DX-66.

Sparton Response to No. 212:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

213. On January 13, 1972, Sparton conducted an air-drop test of ten fully operational dual depth DIFAR sonobuoys at St. Croix with Navy assistance. DX-67 at D67.1.

Sparton Response to No. 213:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

214. The purpose of the January 13, 1972 test was to evaluate the dual depth DIFAR design prior to commitment of a final design to be applied to the ECP's 300 production sonobuoys. DX-67 at D67.1.

Sparton Response to No. 214:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

215. As reported by Mr. Widenhofer, two problems noted at the previous test of November 5, 1971, had been corrected by the newer design. The redesigned "float spacer can" performed as intended. The problem of bottom casting separation was corrected by using larger screws to fasten the bottom plate to the sonobuoy housing. DX-67 at D67.2.

Sparton Response to No. 215:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

216. The only major problem observed at the January 13, 1972 tests was a loss of electronic audio signal on five of the ten buoys tested. A report of the testing co-authored by Mr. Widenhofer does not mention any malfunction of the upside-down deployment design or the release plate. Nor does the report indicate any relationship between the electronic failure and the upside-down deployment design. DX-67.

Sparton Response to No. 216:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

217. On February 9, 1972, Sparton conducted an air-drop test of eight dual depth DIFAR sonobuoys at the St. Croix facility with Navy assistance. Six of the eight buoys appeared to deploy normally. DX-70 at D70.2.

Sparton Response to No. 217:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

218. Of the two that did not deploy normally, the first had a sea water leak around the plug in the cable weight assembly. The second had a broken strap on the bottom end of the mass

damper. Mr. Widenhofer did not report any problems with the upside-down deployment design or the release plate. DX-70 at D70.2.

Sparton Response to No. 218:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

219. On February 10, 1972, Sparton conducted an "over-the-side" test on seven dual depth DIFAR sonobuoys at St. Croix with Navy assistance. An over-the-side test is performed by dropping the sonobuoy into the ocean from a boat. According to Mr. Widenhofer's report, all seven buoys deployed normally. DX-70 at D70.3.

Sparton Response to No. 219:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

220. By February 28, 1972, all assemblies for the 300 dual depth DIFAR sonobuoys to be delivered under the ECP had been completed and released by the Sparton Engineering department. As of that date, Sparton expected delivery of the 300 buoys to commence during April 1972. DX-71 at D71.1.

Sparton Response to No. 220:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

221. On March 9, 1972, Sparton conducted air-drop engineering tests of the dual depth DIFAR design on 10 sonobuoys at St. Croix with assistance from the Navy and VAST, a government contractor. DX-126 at D126.139-142; DX-72 at D72.1.

Sparton Response to No. 221:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

222. The purpose of the March 9, 1972 test was to evaluate the overall performance parameters of the dual depth sonobuoy design prior to final design release for the 300 production sonobuoys to be delivered under the ECP. DX-72 at D72.1.

Sparton Response to No. 222:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

223. Mr. Widenhofer's test report for the March 9, 1972 test states that the test was "very successful." DX-72 at D72.1.

Sparton Response to No. 223:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

224. Mr. Widenhofer reported that Navy personnel Bill Graff and Bill Mellis observed the March 9, 1972 test and were satisfied with the performance of the buoys. DX-72 at D72.1.

Sparton Response to No. 224:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

225. All 10 sonobuoys deployed normally at the test on March 9, 1972. DX-72 at D72.2.

Sparton Response to No. 225:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

226. The float-pressure-actuated single part release plate, the parachute attachment system, the parachute release mechanism, the float attachment system, and the rotary depth selector "proved to be acceptable" according to Mr. Widenhofer's Final Report on the dual depth DIFAR effort under the ECP, dated April 28, 1972 (Final Report). DX-73 at D73.22.

Sparton Response to No. 226:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

227. The March 9 test concluded the engineering test phase of the dual depth DIFAR program and the engineering development phase of the ECP. DX-72 at D72.1; DX-73 at D73.2.

Sparton Response to No. 227:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

228. Mr. Widenhofer stated in the Final Report that "[a]lthough a number of design problems were confronted during development, all were successfully overcome." Modifications made to correct the mechanical problems encountered in previous tests were successful in the March 9 test. DX-73 at D73.2-3.

Sparton Response to No. 228:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

229. As of the engineering test on March 9, "[t]he existing design on the sonobuoy top end, incorporating the parachute, the parachute retainer, and release plate, and the float spacer, ha[d] proven to be inexpensive and reliable" according to Mr. Widenhofer's Final Report on the dual depth DIFAR project. DX-73 at D73.26.

Sparton Response to No. 229:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

230. Following the March 9 test, Mr. Widenhofer reported that improving reliability or producibility of the dual depth DIFAR design did not require any change to the basic design concept. DX-73 at D73.2, D73.14, D73.23.

Sparton Response to No. 230:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

231. Sparton used the March 9 test as the basis for releasing the dual depth DIFAR design for production of the 300 sonobuoys to be delivered under the ECP. DX-73 at D73.23.

Sparton Response to No. 231:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

232. When a drawing is "released" within Sparton Corporation, it is released for general use by the company, including for use by the manufacturing and purchasing departments. The project engineer and the chief engineer for a product authorize the release of the drawings. DX-126 at D126.193-195.

Sparton Response to No. 232:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

233. As of April 28, 1972, Sparton expected to complete the 300 ECP production sonobuoys by May 19, 1972. DX-73 at D73.2.

Sparton Response to No. 233:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

### D. ENGINEERING CHANGE PROPOSAL 0465-2

234. The ECP effort with Sparton occurred under the '-0465 contract as ECP 0465-2. DX-17, DX-130. Sparton assigned "Log Number 5272" to the ECP 0465-2. DX-126 at D126.94-95. A "log number" was an internal accounting system used by Sparton to collect information relating to a specific proposal. DX-126 at D126.94-95. "Log Number 5272" was specific to ECP 0465-2. DX-126 at D126.94-95.

Sparton Response to No. 234:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

235. Sparton proposed two phases to the work which would be done under the ECP. Phase one covered design and construction of engineering models and performance of sea tests. Phase two required modification and delivery of one production lot of 300 AN/SSQ-53 sonobuoys designed for dual depth operation. In addition, Sparton proposed to deliver an operating manual for the dual depth sonobuoys. DX-130.

Sparton Response to No. 235:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

236. Phase one required that the government furnish 35 Sparton sonobuoys and supply aircraft and support facilities for conducting engineering sea tests. Phase two required that the government furnish 300 Sparton sonobuoys. DX-130.

Sparton Response to No. 236:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

237. Sparton proposed modifying the '-0465 contract in accordance with the ECP for a fixed price of $198,000. DX-130.

Sparton Response to No. 237:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

238. "By October 1971, Widenhofer considered the 'bending moment' of a 'new [single-piece release] plate design,' and made a 'Preliminary Layout' drawing 900-4709 of the dual depth sonobuoy with the new release plate design identified in Section AA by part No. 900-4263." DX-17 at D17.12 (bracketed material in original).

Sparton Response to No. 238:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

239. "The single piece release plate was also the subject of (a) an October 5, 1971 Sparton memo relating to a Proposed Test Program for the 'new single part float pressure activated release plate design' and (b) a November 11, 1971 memo relating to a November 5, 1971 air drop test conducted to evaluate the performance of among other things the 'new single part … release plate design ….' (and parachute anchoring and release mechanism). Two out of four of the new single part release plates functioned normally in the November 5 test, such that Widenhofer considered the design 'acceptable for further evaluation without modification." DX-17 at D17.12-13.

Sparton Response to No. 239:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

240. "On November 23, 1971, a Sparton engineering drawing 900-4623 was created for the new single part release plate design." DX-17 at D17.13.

Sparton Response to No. 240:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

241. "Aircraft drop tests of the Sparton dual depth sonobuoy with single part release plate were conducted in January, February and March 1972, the last being conducted during the week of March 6, 1972." DX-17 at D17.13.

Sparton Response to No. 241:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

242. "The April 28, 1972 Widenhofer Final Report on the dual depth sonobuoy addresses the history of design problems encountered in Sparton's dual depth DIFAR program, the modifications made to the dual depth sonobuoy to solve these problems, and the number of sea tests (3) performed on fully operational sonobuoys as well as other tests (4) performed on Sparton's dual depth sonobuoys." DX-17 at D17.14.

Sparton Response to No. 242:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

243. The 300 Sparton dual depth sonobuoys were delivered to the Navy in three shipments dated April 25 (100 buoys), June 9 (40 buoys) and June 13, 1972 (160 buoys). "Sparton substituted the single piece bendable release plate recited in all 120 and 233 patent claims for the Depew multipiece release plate mechanism proposed in the ECP as incorporated in Mod 4." DX-17 at D17.15-16-17.

Sparton Response to No. 243:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

### E. DESIGN OF THE ECP 0465 SONOBUOYS

244. The purpose of Mr. Widenhofer's Final Report on the dual depth DIFAR project, dated April 28, 1972, was to describe the "final design" of the dual depth DIFAR sonobuoy, of which 300 would be delivered under the ECP. DX-73 at D73.2.

Sparton Response to No. 244:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

245. The sonobuoys used to conduct the March 9 test conform to the "final design" described in the April 28 Final Report. DX-73 at D73.2, D73.23.

Sparton Response to No. 245:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

246. The 300 sonobuoys delivered under the ECP conform to the "final design" described in the April 28 Final Report. DX-73 at D73.2.

Sparton Response to No. 246:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

247. Sparton has produced no documentation indicating that the design of the sonobuoys tested on March 9, 1972, or delivered under the ECP differed from that described in the Final Report, dated April 28, 1972.

Sparton Response to No. 247:

The underlined material is without citation, irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

### F. DEPLOYMENT

248. The deployment sequence of the final design is illustrated in figures 2A, 2B and 2C of the Final Report. DX-73 at D73.5-8.

Sparton Response to No. 248:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

249. Drawings in figures 2A, 2B and 2C of the April 28 Final Report are substantially the same as figures 2A and 2B of the February 26, 1971, Interdepartmental Correspondence, figures 1, 2 and 3 of the '120 and '233 patents and figure 2 of the ECP. PX 259 at page 2; PX 260 at page 2; DX-130 at D130.9; DX-28 at D28.7-8; DX-73 at D73.6-8.

Sparton Response to No. 249:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

250. The SSQ-53 dual depth sonobuoy tested on March 9, 1972, and delivered to the Navy by Sparton under the ECP, was designed to be dropped into the sea from an aircraft. A

parachute slowed its fall. Immediately after water entry, a seawater-activated battery caused a gas cylinder to inflate the sonobuoy float. Inflation of the float provided a pressure force releasing the release plate from the top end of the sonobuoy, thereby jettisoning the parachute. DX-73 at D73.5-8.

Sparton Response to No. 250:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

251. When the float inflated, it exited from the top of the housing and rose to the surface, with the radio transmitter. DX-73 at D73.5-8.

Sparton Response to No. 251:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

252. The sonobuoy housing served as a descent vehicle. The subsurface components, including the transducer or hydrophone, descended with the housing, paying out cable through the top of the housing. The housing separated from the sonobuoy's subsurface assembly at the operating depth. DX-73 at D73.5-8.

Sparton Response to No. 252:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

**G. RELEASE PLATE**

253. The layout shown in drawing 900-4709 (DX-52) was used in the final design and, therefore, in the sonobuoys tested on March 9, 1972, and delivered under the ECP. DX-73 at D73.5.

Sparton Response to No. 253:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

254. The release plate used in the 300 sonobuoys delivered under the ECP conforms to Sparton drawing nos. 900-4623 and 900-4709 at Section AA. DX-126 at D126.240-242, D126.255-256, D126.258-259; DX-52; DX-66.

Sparton Response to No. 254:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

255. The release plate used in the sonobuoys delivered under the ECP, as described by plaintiff's expert, Mr. Charles Boyle, is a generally circular metal plate. It has tabs which are inserted into the housing of the sonobuoy. Three elongated openings form a hinge line through the plate such that the plate would deform along the hinge line if sufficient force were applied. Slots in the tabs hold in place rings, or anchors, to which the parachute shroud lines can be attached. A line connecting the slots would be orthogonal to the hinge line. DX-126 at D126.259-262.

Sparton Response to No. 255:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

256. The release plate of the final design reported in Mr. Widenhofer's Final Report dated April 28, 1972, was a simple one-piece, stamped steel plate. The plate had a center hinge line which bent during actuation by the float. Sets of tabs at opposite points on the plate circumference engaged slots in the sonobuoy housing. DX-73 at D73.5-10.

Sparton Response to No. 256:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

257. In the final design, the parachute shroud lines were attached to brackets which engaged slots between the sets of tabs on the release plate. DX-73 at D73.9-11.

Sparton Response to No. 257:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

258. The outline of the "release plate" labeled in figure 3 of the April 28 Final Report is nearly identical to the plate shown in figure 7 of the '120 and '233 patents and drawing no. 900-4623. PX 259 at page 3; PX 260 at page 3; DX-66; DX-73 at D73.9.

Sparton Response to No. 258:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

259. The "riser bracket" labeled in figure 3 of the April 28 Final Report is identical to the parachute anchor shown in figure 11 of the '120 and '233 patents. PX 259 at page 3; PX 260 at page 3; DX-73 at D73.9.

Sparton Response to No. 259:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

### H. SPARTON'S REQUEST FOR EQUITABLE ADJUSTMENT

260. By letter dated October 22, 1971, Sparton presented to the Navy a claim for equitable adjustment for the work being performed pursuant to the ECP and Mod. P00004 of the '-0465 contract. Sparton requested an additional $110,440.61 to complete the work. DX-6.

Sparton Response to No. 260:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

261. In support of this request, Sparton submitted DD Form 633 and Reference Data with the October 22 letter. DX-5.

Sparton Response to No. 261:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

262. Line 14 of DD Form 633 lists a "Profit or Fee" of $40,231.38 as a component of the total requested. This "Profit or Fee" request is 13% of the total payment requested. DX-5 at D5.3.

Sparton Response to No. 262:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

263. Reference 4, entitled "Material List & Estimated Cost," is a list of parts to be included in sonobuoys produced under the ECP. Included on that list is a release plate having part number 900-4623. Sparton listed a unit price of $1.00 for the release plate and a tooling cost of $300. DX-5 at D5.15.

Sparton Response to No. 263:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

264. Part 900-4623 listed in reference 4 corresponds to the release plate labeled 900-4623 shown in Section AA of Drawing No. 900-4709. DX-126 at D126.159; DX-66; DX-5 at D5.15.

Sparton Response to No. 264:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

265. By letter dated February 3, 1972, Sparton again indicated to the Navy that an additional $110,000 would be required to complete work under the ECP. The letter states, "it appears that the funding limitation of $198,000 will be reached by the end of February 1972, assuming a set aside of 15 percent as fee for work performed." DX-7.

Sparton Response to No. 265:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

266. On May 2, 1972, the Navy issued Modification P00009 to the '465 contract which authorized an additional $96,000 to be paid for work performed under the ECP. DX-1 at D1.5-D1.8.

Sparton Response to No. 266:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

267. By letter dated June 21, 1972, Sparton again submitted a claim for equitable adjustment for work done pursuant to the ECP for the amount $297,820.88. The "Option Cost

Determination" enclosed with the letter listed a "Margin" of $31,909.38 as a component of the total claim. DX-8.

Sparton Response to No. 267:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

268. The Navy issued a clearance memorandum entitled "Definitization of Change Orders P00004 and P00009" on November 16, 1972. That document recommended approval of a definitive modification for work done pursuant to the ECP for a total price of $282,000. The recommendation assumes that amount includes a profit for Sparton of 10.99%. DX-9 at D9.3-6.

Sparton Response to No. 268:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

269. On February 1, 1973, the Navy issued Modification P00011 to the '-0465 contract to authorize a total payment of $282,000 for work done under the ECP and Modifications P00004 and P00009. DX-1 at D1.1-D1.3.

Sparton Response to No. 269:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

### I. THE NAVY'S USE OF THE ECP SONOBUOYS

270. On April 25, 1972, the Navy received a shipment of 100 dual depth sonobuoys produced under the ECP. The sonobuoys were shipped to the attention of William Graff. DX-122 at D122.1; DX-121 at D121.40-42.

Sparton Response to No. 270:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

271. At that time William Graff was an electronic engineer at the Naval Air Warfare Center in Warminster, Pennsylvania. DX-121 at D121.2-3.

Sparton Response to No. 271:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

272. The ECP sonobuoys were shipped to the attention of Mr. Graff so that he could then distribute them to Navy P-3 squadrons in the Atlantic fleet and the Pacific fleet as well as to those located at Hawaii, Bermuda, Iceland and the Mediterranean. The squadrons were to test the ECP sonobouys alongside standard SSQ-53 buoys. DX-121 at D121.41-44.

Sparton Response to No. 272:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

273. The purpose of those tests conducted with ECP sonobuoys was to evaluate the acoustical performance of the sonobuoys in various operating areas of the world where ocean temperatures and conditions differ. The tests compared the operation of dual depth SSQ-53 sonobuoys to standard SSQ-53 sonobuoys to determine which would perform better under certain conditions. DX-121 at D121.43-44.

Sparton Response to No. 273:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

274. The testing procedure used with the ECP sonobuoys, authored by William Graff, was recorded in an "Evaluation Plan" for "Selectable Depth AN/SSQ-53 Sonobuoys," dated February 28, 1972. DX-121 at D121.43-44; DX-123.

Sparton Response to No. 274:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

275. The purpose of the tests conducted according to the Evaluation Plan was "to evaluate the anticipated advantages of a deep hydrophone array with SSQ-53 DIFAR sonobuoys." DX-83 at D83.4.

Sparton Response to No. 275:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

276. The tests used dual depth sonobuoys produced by Magnavox, Sanders and Sparton, each produced according to an Engineering Change Proposal under an existing production contract. The tests were not specifically directed to the Sparton sonobuoys. DX-121 at D121.48.

Sparton Response to No. 276:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

277. The Sparton dual depth sonobuoy tested used the "upside-down" deployment design. The Magnavox and Sanders models did not deploy in this manner. In those models, the electronic components deployed from the bottom of the sonobuoy housing. DX-121 at D121.59-60.

Sparton Response to No. 277:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

278. The Evaluation Plan does not mention the different methods of deployment used by the different models because it would not be significant to the conduct of the tests. DX-121 at D121.61.

Sparton Response to No. 278:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

279. The Evaluation Plan does not request any information be gathered on the deployment of the sonobuoys. DX-123.

Sparton Response to No. 279:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

280. Mr. Graff's primary interest in conducting the testing was in learning the accuracy with which dual depth sonobuoys operated and tracked submarines in the deep mode. He was not interested in the specifics of each sonobuoy's design. DX-121 at D121.61.

Sparton Response to No. 280:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

281. Navy fleet squadrons conducted the tests in accordance with their standard operational tests involving tracking a submarine. According to the test procedure, if a squadron planned to track a submarine using a DIFAR sonobuoy, it would also use a Dual Depth SSQ-53

sonobuoy for tracking at the same time in order to collect data from the two types of buoys in a uniform manner. DX-121 at D121.46-47.

Sparton Response to No. 281:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

282. The "Evaluation Plan" instructed the Navy aircraft to: (1) deploy both a standard, shallow depth SSQ-53 sonobuoy and a dual depth sonobuoy set for deep depth in the same location; (2) fly to a second location 15 or 25 miles from the first; (3) deploy the two sonobuoys at the second location; (4) communicate with the participating submarine which would then proceed along a predetermined course; and (5) collect data from the sonobuoys. DX-123 at D123.6-9.

Sparton Response to No. 282:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

283. The Navy's testing of dual depth sonobuoys according to the Evaluation Plan lasted approximately one year. DX-121 at D121.49.

Sparton Response to No. 283:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

284. The data collected by the fleet was sent to William Graff at the Naval Air Development Center at Warminster, Pennsylvania. DX-121 at D121.47; DX-123 at D123.4.

Sparton Response to No. 284:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

285. Usually, Mr. Graff received data from the tests in the form of a paper recording of acoustical information received from a buoy as a function of time. DX-121 at D121.49-50.

Sparton Response to No. 285:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

286. Mr. Graff prepared approximately four to six reports based on this data over the course of approximately a year for the Naval Air Systems Command in Washington, D.C. DX-121 at D121.54-55.

Sparton Response to No. 286:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

287. n his reports based on this data, Mr. Graff stated that the sonobuoys operating at a deep depth showed an improved detection capability because they were able to track a given submarine for a longer period of time as compared to those operating at a shallow depth. On this basis, Graff suggested that it was "worthwhile" adding dual depth capability to the SSQ-53 sonobuoy. DX-121 at D121.51-52, D121.55-58.

Sparton Response to No. 287:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

288. Mr. Graff did not recommend the purchase of dual depth sonobuoys from any one manufacturer over those of the other two. DX-121 at D121.53.

Sparton Response to No. 288:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

289. Because the testing of the dual depth sonobuoys was considered internal to the Navy, none of the three contractors who produced the buoys were given any written reports regarding the results of the testing. DX-121 at D121.66.

Sparton Response to No. 289:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

290. Mr. Graff or other Naval Air Development Center personnel provided only "unofficial" feedback to the contractors if they experienced a reliability problem with the sonobuoy during testing. DX-121 at D121.66-67.

Sparton Response to No. 290:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

291. Sparton personnel had no input into the Evaluation Plan or control over the manner in which the tests were conducted. DX-121 at D121.44-46, D121.66.

Sparton Response to No. 291:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

292. At the end of approximately one year of testing dual depth sonobuoys in the deep mode, Mr. Graff had received enough data to confidently report that the sonobuoys had improved tracking abilities when operating in the deep mode. DX-121 at D121.77.

Sparton Response to No. 292:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

293. Mr. Graff received a second shipment of 160 Sparton dual depth sonobuoys produced in accordance with the ECP on June 13, 1972. DX-121 at D121.57; DX-125 at D125.1.

Sparton Response to No. 293:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

294. The second shipment of 160 sonobuoys was distributed to the fleet for testing in accordance with the Evaluation Plan. Mr. Graff received data reports from these tests, which he analyzed and reported as he had with the first shipment. DX-121 at D121.57, D121.62.

Sparton Response to No. 294:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

295. On the instructions of William Graff, 40 Sparton dual depth sonobuoys produced under Mod P00004 of the '-0465 contract were delivered to the Naval Air Station at Key West, Florida, on June 9, 1972. DX-121 at D121.64-66; DX-124 at D124.1.

Sparton Response to No. 295:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

296. The sonobuoys shipped to Key West were evaluated there according to the Evaluation Plan by a Navy squadron located in Key West known as "VX-1" whose mission was to evaluate new avionics systems. DX-121 at D121.62-63, D121.67-69

Sparton Response to No. 296:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

297. Mr. Graff called his decision to have 40 sonobuoys sent to the VX-1 squadron "arbitrary." DX-121 at D121.65.

Sparton Response to No. 297:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

298. Mr. Graff believed it was desirable to have the VX-1 squadron involved in evaluating the sonobuoys in order to have the sonobuoys distributed and tested by as many different squadrons within the fleet, and at as many different locations around the world, as possible. DX-121 at D121.72-73.

Sparton Response to No. 298:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

299. The Naval Air Development Center (Warminster) also conducted, with the involvement of William Graff, some sea tests of sonobuoys at the Key West Navy base. The results of the tests were incorporated into reports of the testing done by the fleet. DX-121 at D.121.73.

Sparton Response to No. 299:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

**J. THE ADMINISTRATIVE CLAIM**

300. Sparton submitted an administrative claim to the Navy on February 11, 1981, requesting compensation for the unauthorized use of the inventions claimed in the '120 and '233 patents by Magnavox, Sippican and Hazeltine Corporations. DX-85.

Sparton Response to No. 300:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

301. In response, the Office of Naval Research requested information on the date of conception and the date of reduction to practice of the invention claimed in each of the patents in a letter dated June 8, 1981. DX-10.

Sparton Response to No. 301:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

302. In a letter dated July 2, 1981, Sparton advised the Navy that the '120 and '233 patents had a conception date of September 1970 and a reduction to practice date of February 18, 1971. DX-87.

Sparton Response to No. 302:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

303. The Office of Naval Research requested that Sparton provide evidence of both dates. DX-11.

Sparton Response to No. 303:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

304. Sparton submitted evidence to support these dates as attachments to a letter dated October 8, 1981. DX-89. As evidence of the September 1970 conception date, Sparton submitted Sparton Inter-Department Correspondence (IDC) from N. Devereaux to R. Hungerford, dated September 16, 1970, entitled "Program Schedule for 1000 ft. Difar," which outlined Sparton's proposed schedule to provide deep depth capability to the DIFAR sonobuoy. DX-20; DX-89 at D89.3-4. According to the cover letter, this memo provides the schedule for the program "which eventually lead to [the] subject patents." DX-89 at D89.1.

Sparton Response to No. 304:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

305. As further evidence of the September 1970 conception date, Sparton submitted a handwritten description of the invention, entitled, "Patent Information On A Float Pressure Actuated Release Plate Mechanism" dated December 8, 1970, by the inventor James Widenhofer (DX-25; DX-89 at D89.5-8) "for use by Sparton's Patent Attorney in preparation of the patent application." DX-89 at D89.1.

Sparton Response to No. 305:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

306. As evidence of the reduction to practice date, Sparton submitted the February 26, 1971, Inter-Department Correspondence by James Widenhofer to Neil Devereaux, reporting on the February 18, 1971 tests of deep DIFAR sonobuoys at Key West, Florida. DX-28; DX-89 at D89.9-15. According to Sparton, "[t]hese tests proved that the concepts [of the patents] were valid and that the overall sequence of deployment was workable." DX-89 at D89.2.

Sparton Response to No. 306:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

307. By a letter dated February 9, 1982, the Office of Naval Research informed Sparton that ECP 0465-2 appeared to offer for sale the inventions of the '120 and '233 patents, rendering them invalid under 35 U.S.C. § 102(b). DX-12.

Sparton Response to No. 307:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

308. Sparton responded in a letter dated April 13, 1982, that it disagreed with the Navy's position that ECP 0465-2 constituted an "on sale" bar. However, Sparton also stated that it "concur[red]" with the Navy that "this document (ECP-0465-2) includes many details of patent number 3,921,120." DX-91 at D91.1.

Sparton Response to No. 308:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

309. Sparton sent a letter to Deputy Secretary of Defense, Frank Carlucci, dated May 19, 1982, regarding its administrative claim. In that letter, Sparton stated that by early 1971 it

had developed and tested a unique sonobuoy design that, when deployed, rapidly sank to deep operating depths. DX-92 at D92.1.

Sparton Response to No. 309:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

310. Sparton submitted additional evidence of the conception and reduction to practice dates with a letter signed by its President, David Hockenbrocht, dated June 11, 1991. DX-93.

Sparton Response to No. 310:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

311. Mr. Hochenbrocht's letter describes its Attachment 3 as "documentation of significant events in the evolution cycle which lead to the inventions that ultimately resulted in Patents 3,921,120 and 4,029,233." DX-93 at D93.1.

Sparton Response to No. 311:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

312. Attachment 3 included: (1) the September 16, 1970, IDC from N. Devereaux entitled "Program Schedule for 1000 ft Difar"; (2) the December 2, 1970, IDC from J. Widenhofer entitled "Proposed Test Program--Shallow Water Air Drop of 1000-Foot Difar Preliminary Mechanical Design"; (3) handwritten notes by J. Widenhofer dated December 8, 1970, entitled "Patent Information On A Float Pressure Actuated Release Plate Mechanism"; (4) typed notes by J. Widenhofer dated January 7, 1971, entitled "Patent Information On A Float Pressure Actuated Release Plate Mechanism"; (5) the February 26, 1971, IDC by J. Widenhofer

entitled, "Test Report - Air Drop of the Preliminary Design of the Operational Deep DIFAR at Key West, Florida on February 18, 1971"; and (6) the March 23, 1971, IDC by J. Widenhofer entitled "Proposed test program - Evaluation of descent vehicle characteristics for the Deep DIFAR sonobuoy at the NOL 100 foot tank facility." DX-93 at D93.4-30; *see also* DX-20; DX-24; DX-25; DX-28.

Sparton Response to No. 312:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

313. The letter describes Attachment 4 as "depicting the release plate assembly which we intended to use on ECP 0465-2." The letter continues, "[t]his design was used in Sparton's company funded deep DIFAR development program." DX-93 at D93.1. Attachment 4 includes figure 3 of the April 28, 1972, Final Report by J. Widenhofer, which shows a single part release plate having a center "hinge" and locking tabs. DX-73 at D73.9; DX-93 at D93.32.

Sparton Response to No. 313:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

314. According to the June 11, 1991, letter, "[t]he actual release plate used in the test items for 0465-2 is described on Drawing No. 900-4623 provided as Attachment 5 of this letter." DX-93 at D93.1.

Sparton Response to No. 314:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

315. Attorney Paul J. Ethington responded for Sparton to a document request made by the Navy in a letter dated November 18, 1991. DX-94 at D94.1-8. Attachment A to that letter was an IDC by J. Widenhofer of April 28, 1972, entitled "Job 7400 - Dual Depth Difar Final Report (AN/SSQ-53 (DD)) Contract No. N00019-69-C-0465 ECP 0465-2." DX-73; DX-94 at D94.9-36.

Sparton Response to No. 315:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

316. Mr. Ethington's November 18, 1991, letter states that the June 11, 1991, letter from Mr. Hockenbrocht was in error when it stated that ECP 0465-2 proposed the release plate shown in Attachments 4 and 5 of his letter. According to the letter, Attachment 5, drawing no. 900-4623, was drawn on November 23, 1971. DX-94 at D94.4-5.

Sparton Response to No. 316:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

317. Attorney Paul J. Ethington again responded for Sparton to document requests by the Navy in a letter dated February 27, 1992. The letter included numerous Sparton documents as attachments in response to the Navy's request. DX-95.

Sparton Response to No. 317:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

318. The February 27 letter explained that "[a] thorough search has failed to locate any written material which is approximately contemporaneous with the ECP 465-2 and which

provides a description of the configuration and operating principle of the release plate of the proposal of ECP465-2." DX-95 at D95.7.

Sparton Response to No. 318:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

319. The February 27 letter enclosed Attachment M, the affidavit of James W. Widenhofer, and Attachment N, the affidavit of Donald R. Depew, as evidence of the design of the release plate proposed in ECP 0465-2. DX-95 at D95.7.

Sparton Response to No. 319:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

320. Both the Widenhofer and the Depew affidavits assert that the release plate assembly proposed by the ECP had two sliding latch plates which disengaged from the sonobuoy housing slots in response to the upward motion of the cam, as urged by the float inflation. DX-95 at D95.96-111.

Sparton Response to No. 320:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

321. Neither the Widenhofer nor the Depew affidavit discusses the configuration of the release plate used on the sonobuoys delivered under the ECP. DX-95 at D95.96-111.

Sparton Response to No. 321:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

322. With respect to the '120 patent, the February 27, 1992, letter stated that the information regarding the date of conception reported in the July 2, 1981, letter was believed to be correct. DX-95 at D95.12.

Sparton Response to No. 322:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

323. In discussing the reduction to practice date of the '120 patent, the February 27 letter stated that, "[a]lthough not necessarily the earliest, there was a reduction to practice at least as early as the test on March 9, 1972, which is reported in Sparton report 'Job 7400 - Dual Depth Difar Final Report' by J. Widenhofer dated April 28, 1972…." DX-73; DX-95 at D95.12.

Sparton Response to No. 323:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

324. With regard to the '233 patent, the February 27, 1992, letter stated, "[t]he conception date is believed to be in the period of about August 1971 to October 1971 as evidenced by the documents of Attachments 01, 02, 03, and 04, cited above. The first reduction to practice is believed to be March 9, 1972, as reported in the Widenhofer report of April 28, 1972, Attachment A." DX-73; DX-95 at D95.12-113.

Sparton Response to No. 324:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

325. Attachments 01, 02, 03 and 04 to the February 27, 1992 letter are, respectively: (1) hand-written sketches and calculations bearing the initials JWW of James W. Widenhofer,

dated 8/12/71 and entitled "DIFAR Release Plate Activation Pressure"; (2) hand-written sketches and calculations bearing the initials JWW of James W. Widenhofer, dated 8/13/71 and entitled "DIFAR Release Plate Activation Pressure"; (3) hand-written sketches and calculations bearing the initials JWW of James W. Widenhofer, dated 10/13/71 and entitled "DIFAR Release Plate Bending Moment Considerations"; and (4) hand-written sketches and calculations bearing the initials JWW of James W. Widenhofer, dated 10/14/71 and entitled "DIFAR Release Plate Bending Moment Revision." DX-95 at D95.4-5, D95.83-95; *see also* DX-3; DX-4.

Sparton Response to No. 325:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

326. In a letter to the Navy dated August 7, 1992, Mr. Ethington provided another opinion regarding the dates of conception and reduction to practice. He stated, "[f]urther investigation has revealed information which refutes a reduction to practice on March 9, 1972. It is now my opinion that the first reduction to practice of both patents occurred on some undetermined date after July 12, 1972." DX-96.

Sparton Response to No. 326:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

327. The letter provided no information regarding the "further investigation," and no documentation to support its assertion. DX-96.

Sparton Response to No. 327:

The underlined material is irrelevant and immaterial and was the subject matter of defendant's on-sale defense which has been dismissed by the Federal Circuit.

**IV. ACCUSED SONOBUOYS**

328. Exhibit 3 to the May 15, 2006 Expert Report of Daniel McGavock accurately reports the revenue obtained by each sonobuoy contractor for each of the contracts that Sparton has asserted should be included in the compensation base. DX-221.

Sparton Response to No. 328:

The report of Gerry Martin accurately reports the revenue obtained by each sosobuoy contractor for each of the contracts that Sparton has asserted should be included in the compensation base. PX-235.

**A. MAGNAVOX AN/SSQ-53A**

329 The Navy procured AN/SSQ-53A sonobuoys from Magnavox Government and Industrial Corporation (Magnavox) during the accounting periods for the '120 and '233 patents under each of four contracts: Nos. N00163-79-C-0166, N00163-80-C-0215, N00163-81-C-0291, and N00163-82-C-0070. DX-221.

Sparton Response to No. 329:

No comment.

330. The SSQ-53A sonobuoys procured under these contracts included a release mechanism for releasing the float, cable and hydrophone from the casing during deployment. DX-176 at D176.8. The release mechanism in these sonobuoys is released when the float is inflated. DX-176 at D176.8. The release mechanism consists of two parts: a "retainer plate" and float cup. DX-176 at D176.8.

Sparton Response to No. 330:

In Sparton's charge of infringement, it is the accused release plate that is charged as being corresponding to the release plate shown and described in the suit patents. Thus

defendant's use of the term mechanism is misleading, immaterial and irrelevant. See PX214-234.

331. The "retainer plate" is configured as shown in the drawing below:




Some of the retainer plates used on the Magnavox SSQ-53A sonobuoys contain two slots (5 & 6), while others contained only one (21) or three (5, 6 and a round hole at 21). DX-176 at D176.8-9, D176.26. All of the retainer plates are interchangeable. Sparton Pretrial Submissions, Exhibit 3.

Sparton Response to No. 331:

The three 1980-1982 contracts utilized the 1-hole plate shown on B175 and B178 while the 1979 contract utilized either the 2-hole "Part 1", 1-hole "Part 2" or 3-hole plate disclosed on B157, 158, 167-170, 175 and 178. PX-214-215.

334. In the three-hole design, the round center hole was used as part of the parachute retention mechanism. DX-182 at D182.21-22. The center hole holds a plastic part, known as a "witch's hat," that protrudes through the hole and is held in place by the plate. DX-182 at D182.21-22. The parachute lines are attached to the witch's hat. DX-182 at D182.21-22. When the release plate is released, the witch's hat falls free with the attached parachute lines and parachute. DX-182 at D182.21-22.

Sparton Response to No. 334:

In Sparton's charge of infringement, it is the accused release plate that is charged as being corresponding to the release plate shown and described in the suit patents. Thus, defendant's use of the term mechanism is misleading, immaterial and irrelevant. The parachute retention mechanism, as distinguished from the release plate, is irrelevant. See PX214-234.

335. Sonobuoys manufactured under Contract No. N00163-79-C-0166 may have included retainer plates of the one-hole, two-hole or three-hole designs. DX-176 at D176.9. Sonobuoys manufactured under Contract Nos. N00163-80-C-0215, N00163-81-C-0291, and N00163-82-C-0070 contained retainer plates of the one hole design. DX-176 at D176.9.

Sparton Response to No. 335:

No comment

336. The parachute cup and its relationship to the "retainer plate" is shown in Figure 5 above. DX-176 at D176.26. As shown, the parachute cup (13) is first inserted into the top of the

sonobuoy casing (14), then the retainer plate is mounted by sliding it through voids (17 & 18) in the wall of the casing and corresponding voids (15 & 16) in the wall of the parachute housing. DX-176 at D176.26. The end portions (10 & 11) of the retaining plate contact the casing, and vertical tabs (9) hold the plate in place. DX-176 at D176.26. When mounted together, the sonobuoy casing, parachute cup and retainer plate appear as shown in the cross-sectional view above. DX-176 at D176.26. The parachute lines of the Magnavox SSQ-53A are attached to pins 20 in space 19. DX-176 at D176.26.

Sparton Response to No. 336:

See Sparton's response to No. 334.

337. When the Magnavox SSQ-53A is immersed in sea water, the battery energizes, causing the squib to puncture the gas bottle. DX-176 at D176.8-9. The gas from the bottle inflates the float. DX-176 at D176.8-9. As the float inflates, the pressure of the float against the retainer plate causes the plate to buckle, releasing the parachute cup. DX-176 at D176.8-9. Upon release of the parachute cup, the casing falls below the float and descends into the ocean, deploying the cable and hydrophone, in turn. DX-176 at D176.8-9.

Sparton Response to No. 337:

See Sparton's response to No. 334. In the last sentence in No. 337, change "parachute cup" to "release plate."

**B. MAGNAVOX AN/SSQ-53D & AN/SSQ-53E**

338. For purposes of this litigation, the Magnavox AN/SSQ-53D and AN/SSQ-53E sonobuoys are substantially the same as the Magnavox AN/SSQ-53A, with the exception of the configuration of the retainer plate. DX-176 at D176.4-26.

Sparton Response to No. 338:

Compare PX-214-215 with 218-219.

339. The Navy procured AN/SSQ-53D sonobuoy from Magnavox Government and Industrial Corporation (Magnavox) during the accounting periods for the ‘120 and ‘233 patents under each of three contracts: N00163-89-C-0012, N00163-90-C-0003 and N00163-91-C-0081. DX-221.

Sparton Response to No. 339:

No comment.

340. The Navy, during the accounting periods for the ‘120 and ‘233 patents, contracted for the manufacture of AN/SSQ-53E sonobuoys from Magnavox Government and Industrial Corporation (Magnavox) under Contract No. N00163-91-C-0244, but no deliveries of sonobuoys were made during the accounting period for either patent. DX-221.

Sparton Response to No. 340:

A manufacture or use of the AN/SSQ-53E by or for the Navy occurred under the referenced contract.

341. The retainer plate of the Magnavox AN/SSQ-53D and AN/SSQ-53E sonobuoys is identical to the AN/SSQ-53A retainer plate with three holes (two elongated openings and central round hole). DX-176 at D176.40-41.

Sparton Response to No. 341:

No comment.

342. For purposes of this litigation, the Magnavox AN/SSQ-53D and AN/SSQ-53E sonobuoys procured under the cited contracts deploy in substantially the same manner as Magnavox AN/SSQ-53A sonobuoys discussed above. DX-182 at D182.11-17.

Sparton Response to No. 342:

No comment.

**C. MAGNAVOX AN/SSQ-57**

343. For purposes of this litigation, the Magnavox AN/SSQ-57 sonobuoys are substantially the same as the Magnavox AN/SSQ-53A, with the exception of the configuration of the release plate and the sensor. DX-176.

Sparton Response to No. 343:

See PX-218 and citations thererin.

344. The retainer plate of the Magnavox AN/SSQ-57 sonobuoys is identical to the AN/SSQ-53A retainer with the three elongated openings in the plate. DX-176 at D176.38.

Sparton Response to No. 344:

No comment.

345. The Navy procured AN/SSQ-57 sonobuoys from Magnavox Government and Industrial Corporation (Magnavox) during the accounting periods for the ‘120 and ‘233 patents under each of two contracts: N00163-88-C-0004 and N00163-89-C-0014. DX-221.

Sparton Response to No. 345:

No comment.

346. For purposes of this litigation, the Magnavox AN/SSQ-57 sonobuoys procured under the cited contracts deploy in substantially the same manner as Magnavox AN/SSQ-53A sonobuoys discussed above.

Sparton Response to No. 346:

No comment.

**D. MAGNAVOX AN/SSQ-62**

347.For purposes of this litigation, the Magnavox AN/SSQ-62 sonobuoys are substantially the same as the Magnavox AN/SSQ-53A, with the exception of the configuration of the retainer plate. DX-178 at D178.20-21.

Sparton Response to No. 347:

The sonobuoys are substantially the same. See PX-217.

348. The retainer plate of the Magnavox AN/SSQ-62A and AN/SSQ-62B sonobuoys are shown below.



DX-181; DX-178 at D178.49-50. The retainer plate of the Magnavox AN/SSQ-62C sonobuoys is configured as shown below. PX 251 (Lewis Exhibit 8); DX-178 at D178.50-51.




Sparton Response to No. 348:

No comment.

349. The Navy procured AN/SSQ-62 sonobuoys from Magnavox Government and Industrial Corporation (Magnavox) during the accounting periods for the ‘120 and ‘233 patents under each of eight contracts: N00019-79-C-0593, N00163-81-C-0345, N00163-82-C-0230, N00163-83-C-0082, N00163-84-C-0006, N00163-85-C-0005, N00163-88-C-0007 and N00163-90-C-0004. DX-221. The Navy, during the accounting periods for the ‘120 and ‘233 patents, also entered into Contract No. N00163-92-C-0016 for the procurement of AN/SSQ-62C sonobuoys, but no sonobuoys were delivered during the accounting period for either patent under either contract. DX-221.

Sparton Response to No. 349:

A manufacture or use of the AN/SSQ-62C by or for the Navy occurred under the referenced contract.

350. For purposes of this litigation, the Magnavox AN/SSQ-62 sonobuoys procured under the cited contracts deploy in substantially the same manner as Magnavox AN/SSQ-53A sonobuoys discussed above. DX-176.




Sparton Response to No. 350:

No comment.

**E. MAGNAVOX AN/SSQ-77**

351. For purposes of this litigation, the Magnavox AN/SSQ-77 sonobuoys are substantially the same as the Magnavox AN/SSQ-53A, with the exception of the configuration of the retainer plate and the signal receiving device. DX-176.

Sparton Response to No. 351:

The sonobuoys are substantially the same. Compare PX-214, 215 with PX-220, 221.

352. The retainer plate of the Magnavox AN/SSQ-77A sonobuoys is identical to the retainer plate of those AN/SSQ-53A sonobuoys having a retainer plate with a single opening. DX-176.




Sparton Response to No. 352:

No comment.

353. The Navy, during the accounting periods for the '120 and '233 patents, procured at least one AN/SSQ-77 sonobuoy from Magnavox Government and Industrial Corporation (Magnavox) under each of eleven contracts: N00163-80-C-0457, N00163-81-C-0370, N00163-82-C-0175, N00163-83-C-0080, N00163-84-C-0008, N00163-85-C-0007, N00163-86-C-0010, N00163-87-C-0006, N00163-88-C-0009, N00163-89-C-0016, and N00163-90-C-0139. DX-221. The Navy also entered into Contracts Nos. N00163-92-C-0078 and N00163-93-C-0087 for the procurement of AN/SSQ-77B sonobuoys during the accounting periods for the'120 and'233 patents, but no sonobuoys were delivered during the accounting period for either patent under either contract. DX-221.

Sparton Response to No. 353:

A manufacture or use of the AN/SSQ-77B by or for the Navy occurred under the referenced contracts.

354. For purposes of this litigation, the Magnavox AN/SSQ-77 sonobuoys procured under the contracts cited in the preceding paragraph deploy in substantially the same manner as Magnavox AN/SSQ-53A sonobuoys discussed above. DX-176.

Sparton Response to No. 354:

No comment.

**F. HAZELTINE AN/SSQ-77**

355. The Navy, during the accounting periods for the ‘120 and ‘233 patents, Vertical Line Array DIFAR or AN/SSQ-77 sonobuoys was procured from Hazeltine Corporation (Hazeltine) under Contract No. N00019-79-C-0591. DX-221. The Navy also entered into Contract No. N00163-81-C-0391 for the procurement of AN/SSQ-77 sonobuoys from Hazeltine during the accounting periods for the ‘120 and ‘233 patents, but no sonobuoys were delivered during the accounting period for either patent under that contract. DX-221. The design of the SSQ-77 sonobuoys procured under Contract No. N00019-79-C-0591 included a release mechanism for releasing the float, cable and hydrophone from the casing during deployment. The release mechanism in these sonobuoys is released when the float is inflated. The release mechanism consists of two parts: a “retainer plate” and parachute cup. DX-197 through DX-200. The “retainer plate” is configured as show in the drawing below:




DX-197 through DX-200.

Sparton Response to No. 355:

In Sparton's charge of infringement, it is the accused release plate that is charged as being corresponding to the release plate shown and described in the suit patents. Thus, defendant's use of the term mechanism is misleading, immaterial and irrelevant. The parachute retention mechanism or cup, as distinguished from the release plate, is irrelevant. See PX229-230.

### G. SIPPICAN AN/SSQ-36 BATHYTHERMOGRAPH

356. The Navy, during the accounting periods for the '120 and '233 patents, procured AN/SSQ-36 Bathythermograph buoys from Sippican Corporation (Sippican) under Contract No. N00163-80-C-0134. DX-221.

Sparton Response to No. 356:

The AN/SSQ-36 is a sonobuoy and should be so designated. See Sparton's response to defendant's proposed findings 6, 7, 18.

357. The SSQ-36 bathythermographs procured under this contract included a release mechanism for releasing the float, cable and thermistor from the casing during deployment. The release mechanism in these bathythermographs is released when the float is inflated. The release mechanism consists of two parts: a "release plate" and parachute housing. DX-214 through DX-218.

Sparton Response to No. 357:

See Sparton's responses to DPFF 355-356.

### H. SIPPICAN AN/SSQ-77 SONOBUOYS

358. The Navy, during the accounting periods for the ‘120 and ‘233 patents, procured AN/SSQ-77 sonobuoys from Sippican Corporation (Sippican) pursuant to three contracts: Nos. N00019-81-C-0372, N00019-85-C-0121 and N00019-86-C-0202. DX-221.

Sparton Response to No. 358:

No comment.

359. The Navy, during the accounting periods for the ‘120 and ‘233 patents, also entered into Contract No. N00019-84-C-0117 for procurement of AN/SSQ-77 sonobuoys from Sippican, but no sonobuoys were delivered during the accounting period for either patent under that contract. DX-221.

Sparton Response to No. 359:

A manufacture or use of the AN/SSQ-77 by or for the Navy occurred under the referenced contract.

360. The release mechanism in these sonobuoys is released when the float is inflated. The release mechanism consists of two parts: a “release plate” and parachute housing.

Sparton Response to No. 360:

See Sparton’s response to DPFF 355.

361. The Sippican sonobuoys deploy in substantially the same manner as the Hazeltine SSQ-77 sonobuoys described above. DX-214 through DX-218.

Sparton Response to No. 361:

No comment.

### I. ROCKWELL AN/SSQ-53B SONOBUOYS

362. The Navy, during the accounting periods for the '120 and '233 patents, procured sonobuoys from Rockwell Corporation (Rockwell) under each of two contracts: Nos. N00019-82-C-0115 and N00019-83-C-0068. DX-221.

Sparton Response to No. 362:

No comment.

363. The SSQ-53B sonobuoys procured under these contracts included a release mechanism for releasing the float, cable and hydrophone from the casing during deployment. The release mechanism in these sonobuoys is released when the float is inflated. The release mechanism consists of two parts: a "buckle plate" and "retainer plate." The plates are configured as shown in the drawing below:




DX-203 through DX-205.

Sparton Response to No. 363:

See Sparton's response to DPFF 355.

### J. RAYTHEON AN/SSQ-62 SONOBUOYS

364. The Navy procured AN/SSQ-62 and AN/SSQ-62B sonobuoys during the relevant period from Raytheon Corporation (Raytheon) pursuant to three contracts: Nos. N00019-77-C-0224, N00019-79-C-0220, and N00019-81-C-0346. DX-221.

Sparton Response to No. 364:

No comment.

365. The Raytheon SSQ-62 and -62B sonobuoys procured under these contracts included a release mechanism for releasing the float, cable and hydrophone from the casing during deployment. The release mechanism in these sonobuoys is released when the float is inflated. The release mechanism consists of two parts: a "release plate" and parachute cup. The "release plate" is configured as show in the drawing below:



DX-211 through DX-213.

Sparton Response to No. 365:

See Sparton's response to DPFF 355.

### K. HERMES AN/SSQ-53 (FIRST DESIGN) SONOBUOYS

366. The Navy, during the accounting periods for the '120 and '233 patents, procured AN/SSQ-53B sonobuoys from Hermes Corp. (Hermes) under Contract No. N00019-76-C-0507. DX-221.

Sparton Response to No. 366:

No comment.

367. Mr. Logan provided testimony on behalf of Hermes Corporation at a deposition on March 10-11, 1998, conducted in Halifax, Nova Scotia. DX-193 at D193.3, D193.6. Mr. Logan has had substantial experience in the sonobuoy field, primarily relating the administration and management of companies engaged in manufacturing sonobuoys for the Canadian and United States governments. DX-193 at D193.2, ln1-4; D193.3, ln 9-20.

Sparton Response to No. 367:

Mr. Logan was designated as a Rule 30(b) (6) witness by defendant's contractor, Hermes, capable of addressing all technical and administrative aspects of Hermes' sonobuoy business.

368. Mr. Logan testified that Hermes used three distinct release mechanisms at different times in its production of the SSQ-53 sonobuoys for the United States Government. DX-193 at D193.15:26-D193.16:3. The first design is shown and described in Defendant's Exhibit 25. DX-193 at D193:24-D193.5:10; DX-194. The first design was used on SSQ-53A sonobuoys manufactured under Contract No. N00019-76-C-0507. DX-193 at D193.5:6-10; D193.14:19-26. The first design of the release mechanism consisted of five parts: two flat plates,

two springs and a button. DX-193 at D193.6:7-D193.9:13. The two plates together formed a circular plate, when held apart by the button located at the center. *Id.* Two lugs on each plate engaged the outer housing, which kept the sonobuoy components encased in the housing. *Id.* When the floatation bag began to inflate, the bag exerted an upward force on the button, pushing it out from between the two plates. *Id.* When the button was removed, the springs caused the two plates to move toward each other, making the circumference of the plates smaller than the outer housing and thereby disengaging the lugs from the outer housing. *Id.* The release mechanism in the first design did not include a bendable plate. DX-193 at D193.9:28-D193.10:6.

Sparton Response to No. 368:

This finding is entirely irrelevant and immaterial to issues in this case because plaintiff has not charged as an infringement Hermes AN/SSQ-53A sonobuoy with infringement.

369. The SSQ-53B sonobuoys procured under the '-0507 contract included a multipart release mechanism for releasing the float, cable and hydrophone from the casing during



deployment. The release mechanism in these sonobuoys is released when the float is inflated.

The release mechanism is configured as shown in the drawing below:

Sparton Response to No. 369:

The Hermes AN/SSQ-53B sonobuoy, including release plate, procured under Contract No. N00019-76-C-0507 is not the configuration specified by defendant in this finding, but instead is the configuration shown in DPFF 375. See also Sparton's response to DPFF 355.

370. In this design, during assembly, the float is inserted within the housing (11). The flotation bag spacer ring (9) and its cover (12) and the deflector plate assembly (4) are then inserted. The two half ring housings (10) are then inserted over the flotation bag spacer ring. The parachute release plate (8) is fitted within the two half ring housings and the latch button (5) is placed between the latches, holding the latches (6) in the housing. DX-194.

Sparton Response to No. 370:

The Hermes AN/SSQ-53B sonobuoy, including release plate, procured under Contract No. N00019-76-C-0507 is not the configuration specified by defendant in this finding, but instead is the configuration shown in DPFF 375.

371. Upon immersion in sea water, a saltwater battery is activated opening a gas cartridge and releasing gas into the float. Inflation of the float causes the deflector plate assembly (4) to deflect upward, dislodging the latch button (5) from between the latches (6). With the latch button removed, the latches (6) are forced to pivot by the parachute release spring (7). The pivoting action causes the latches to release from the casing. Freed from the casing, the force generated by the expanding float expels the deflector plate assembly, latches, parachute

release plate, half ring housings and flotation bag spacer ring from the end of the housing. DX-194.

Sparton Response to No. 371:

The Hermes AN/SSQ-53B sonobuoy, including release plate, procured under Contract No. N00019-76-C-0507 is not the configuration specified by defendant in this finding, but instead is the configuration shown in DPFF 375.

**L. HERMES AN/SSQ-53 (SECOND DESIGN) SONOBUOYS**

372. The Navy, during the accounting periods for the '120 and '233 patents, procured AN/SSQ 53B sonobuoy from Hermes Corp. (Hermes) pursuant to two contracts: Nos. N00163-83-C-0066 and N00163-84-C-0003. DX-221.

Sparton Response to No. 372:

There were 3 contracts, the missing one being No. N00019-76-0507. PX-235 and see DPFF 373.

373. The second design for the release mechanism is shown and described in Defendant's Exhibit 195 [Logan Exhibit 6]. DX-193 at D193.11:13-28. That design was used for SSQ-53B sonobuoys in the latter part of Contract No. N00019-76-C-0507 and for all of Contracts Nos. N00163-83-C-0066 and N00163-84-C-0003. DX-193 at D193.11:18-D193.12:14. It could have been developed in the 1977-1980 time period (D193.12:6-11), but may have been developed as late as 1983. DX-193 at D193.13:10-20. Mr. Logan estimated that the redesign effort to go from the first design to the second took approximately one to two years. DX-193 at D193.17:8-D193.18:28.

Sparton Response to No. 373:

The underlined sentence is speculative, and see also Sparton's response to DPFF 355.

374. The second design consists of five parts: two half ring housings, a float cap, a pressure plate and a parachute release bender. DX-195; DX-193 at D193.19:4-17. The float cap allows the float to put even pressure on the pressure plate and release bender. DX-193 at D193.38:27-D193.39:15. If it were not present, the inflating float would go wherever it could find the least resistence. *Id.* The pressure plate is a tight fit and forces the release bender to bend at the ends. DX-193 at D193.39:11-15.

Sparton Response to No. 374:

See Sparton's response to DPFF 355.

375. The parachute bender bends in two locations, at each end of the bender. DX-193 at D193.19:4-12. The line marked "bend line" is an error; the release bender does not bend in the center, it bends at both ends. DX-193 at D193.21:16-23. There is a raised portion on the pressure plate. DX-193 at D193.20:7-13. The pressure plate is circular. DX-193 at D193.23:27-D193.24:1.

Sparton Response to No. 375:

The pressure plate is irrelevant, and the witness correctly marked the drawing to show that the bending and/or deformation occurs as a result of the holes in the Hermes parachute release bender plate. Logan Ex. 6, PX-234.

376. In operation, pressure from the float bag pushes on the float cap, which applies a force to the pressure plate and release bender, causing it to "fold over" and release the half ring housings. DX-193 at 124:4-12, 202:21-203:18. Release of the half ring housings, in turn,

release the parachute and allow the remaining components of the sonobuoy out of the housing. DX-193 at D193.19:4-12, D193.22:13-21.

Sparton Response to No. 376:

The pressure plate is irrelevant, and the witness correctly marked the drawing to show that the bending and/or deformation occurs as a result of the holes in the Hermes parachute release bender plate. Logan Ex. 6, PX-234.

377. The SSQ-53B sonobuoys procured under these contracts included a release mechanism for releasing the float, cable and hydrophone from the casing during deployment. The release mechanism in these sonobuoys is released when the float is inflated. The release mechanism includes four parts: a "parachute release bender," a "pressure plate" and two half ring housings. The release mechanism is configured as shown in the drawing below:




DX-195.

Sparton Response to No. 377:

See Sparton's response to DPFF 355.

378. When the Hermes SSQ-53B sonobuoy of the '-0066 or '-0003 contract design is immersed in sea water, the battery energizes, causing the squib to puncture the gas bottle. The gas from the bottle inflates the float. As the float inflates, the pressure of the float against the float cap pushes the pressure plate against the parachute release bender. As the parachute release bender is forced upward, relief cuts in the parachute release bender, located near either end, permit the ends of the bender to deflect downward. As the ends of the bender deflect, the parachute release bender is freed from the openings in the casing, allowing the bender, pressure plate, half ring housings, and parachute assembly to eject from the end of the casing. Upon release of the parachute and release mechanism, the float emerges from the casing, the casing falls below the float and descends into the ocean, deploying the cable and hydrophone, in turn.

Sparton Response to No. 378:

Defendant provides no citation for this finding. See Sparton's response to DPFF 355.

### M. HERMES AN/SSQ-53 (THIRD DESIGN) and AN/SSQ-77 SONOBUOYS

379. The Navy, during the accounting periods for the '120 and '233 patents, procured AN/SSQ-53 or AN/SSQ-77B sonobuoys from Hermes under each of seven contracts: Nos. N00163-86-C-0008, N00163-87-C-0007, N00163-87-C-0155, N00163-88-C-0003, N00163-89-C-0013, N00163-90-C-0001, and N00163-91-C-0080. DX-221.

Sparton Response to No. 379:

The Navy procured AN/SSQ-53B sonobuoys under the following contracts: N00019-76-C-0507; N00163-83-C-0066; N00163-84-C-0003; N00163-86-C-0008; N00163-87-

C-0155; N00163-88-C-0003. The Navy procured AN/SSQ-77A sonobuoys under the following contract designated by defendant in this finding: N00163-87-C-0007. The Navy procured AN/SSQ-53D sonobuoys under the following contracts designated by defendant in this finding: N00163-89-C-0013; N00163-90-C-0001; and N00163-91-C-0080. PX-235.

380. The third design for the release mechanism is shown and described in Defendant's Exhibit 196 [Logan Exhibit 12]. DX-193 at 52:2-11. It was used on the Hermes SSQ-53D, 53E and SSQ-77B model sonobuoys manufactured under the contracts identified in Logan Exhibit 12 (DX-196). DX-193 at D193.15:14-18. The third release mechanism design consists of two parts: a parachute release housing and a float cap. DX-193 at D193.25:3-D193.26:28. The third design is known at Hermes as a "release mechanism," not a "release plate." DX-193 at D193.33:8-17.

Sparton Response to No. 380:

See Sparton's response to DPFF 355.

381. The float cap is a necessary part of the release mechanism. DX-193 at D193.33:17-D193.34:3. It provides a hard surface to push against the release housing. *Id.* If it were not present, the float bag would not properly apply pressure to the bottom release housing. *Id.*

Sparton Response to No. 381:

The subject matter of this finding is irrelevant and immaterial.

382. The parachute release housing is a plastic part. DX-193 at D193.25:27-D193.26:2. The release housing has two locking tabs on each "side" of the housing. DX-193 at D193.25:3-15, D193.27:27-D193.28:5. There is a "release plate" or "cross horizontal bar" in the release housing of the third design that is similar to the release bender of the second design. DX-

27; DX-193 at D193.25:27-D193.26:8, D193.30:20-D193.31:13. A bend line is correctly located on the "release plate" depicted in DX-27, although there is no scoring or other indication on the plastic part. DX-193 at D193.25:27-D193.26:5. The bend line marks the center of the area that bends; the bending actually occurs across the entire "release plate." D193.31:20-D193.32:8. The "release plate" or horizontal bar is not a separate part, but is molded into the parachute release housing, which is one plastic part. DX-193 at D193.35:16-20.

Sparton Response to No. 382:

See Sparton's response to DPFF 355.

383. That "release plate" has a "plug tab" in the center, on the under side. DX-193 at D193.26:6-13. In operation, the inflation of the float applies a force to the float cap, which applies a force to the "plug tab." DX-193 at D193.28:6-D193.29:28, D193.33:17-D193.37:15. Application of the force to the "plug tab" causes the "release plate" to bend, thereby causing the locking tabs on the sides of the release housing to disengage from the slots in the sides of the sonobuoy housing. *Id.* The change from the second design to the third design was driven by price not function: the third design was cheaper. DX-193 at D193.16:17-29. The third design is a bendable plastic part that allows a one-piece installation. DX-193 at D193.27:13-18.

Sparton Response to No. 383:

See Sparton's response to DPFF 355. The other underlined subject matter is irrelevant.

384. The sonobuoys procured under the '-0008, '-0007, '-0155, '-0003, '-0013, '-0001, and '-0080 contracts included a release mechanism for releasing the float, cable and hydrophone(s) from the casing during deployment. The release mechanism in these sonobuoys

is released when the float is inflated. The release mechanism consists of a single formed plastic piece, configured as shown in the drawing below:




DX-196.

Sparton Response to No. 384:

See Sparton's response to DPFF 355.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JOHN FARGO
Director

*s/Gary L. Hausken*

GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

February 4, 2008

Attorneys for Defendant, United States