IN THE UNITED STATES COURT OF FEDERAL CLAIMS

No. 92-580

Chief Judge Damich

SPARTON CORPORATION,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S RESPONSE TO SPARTON'S PROPOSED FINDINGS OF FACT

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

November 19, 2007

Attorneys for Defendant, United States

In accordance with paragraph 2.a.ii(1) of the court's Pretrial Order [Docket No. 290], The United States hereby provides its responses to Plaintiff's Proposed Findings of Fact. The government's responses are set out below in Times Roman type face and indented to distinguish them from plaintiff's use of Courier type.

## I. BACKGROUND

**A.**

**1.** World War ("WW") I illustrated the effectiveness of the submarine as an attack vessel. **B885, 896-97.** During WW II, the submarine was even more lethal. Id. The German submarine fleet almost single-handedly won the battle for the Atlantic. Id. About a month before the end of WWII, July 26, 1945, the infamous U.S.S. Indianapolis transported the Hiroshima and Nagasaki atomic bombs to the Tinian Island B-29 U.S. airbase. **500008-9.** Four days later on its journey to the Philippines, it was sunk in 12 minutes by a Japanese submarine. Id. This submarine claimed about 880 U.S. military lives. **500009-10.**

*Government Response*:

Defendant does not dispute that the cited reference states information substantially the same as the statement of fact. But the cited text is imprecise as to when and where the stated events occurred and does not cite its sources. The cited text is hearsay and, in any event, cannot be held up to scrutiny or challenged due to lack of detail or sources. And the characterization of the USS Indianapolis

and "infamous" is unsupported and inaccurate. Finally, the proposed statement of fact is irrelevant to any issue in this litigation.

**2.** Since WW II, the submarine has become an important warship in the Soviet Navy. **B885-87, 896, 906, 914-15, 500017-18, 500063-74.** Subsequent to WW II, there was a tremendous growth in the Soviet submarine fleet. Id. and **500022-74.** As a result, the Soviet fleet soon had more submarines than any other Navy in the world. Id. Between 1962-1970, the Soviet Union produced many different classes of nuclear powered submarines having submerged missile launch capability with which to destroy targets hundreds of miles away. Id. and **B891-94, 500049-61.** For example, the Soviet nuclear powered Yankee Submarine Class contained missiles having a range of about 1,500 statute miles (1 statute mile = 5,280 feet). Id. The Soviet nuclear powered Charley Submarine Class possessed cruise missiles capable of following an electronic map of terrain, flying at a low altitude and destroying a distant target. Id.

*Government Response*:

Defendant cannot evaluate the truth of this statement. Plaintiff cites at least 60 pages of text in support of this allegation. In particular, 52 pages of a book are cited, but plaintiff fails to adequately identify on which pages the asserted facts are found. A review of the citations did not reveal any statements that would support the entire paragraph. It is unreasonable to make Defendant

search through such voluminous materials to try to find the asserted facts without clear internal citation. Further, the book is hearsay and fails to cite its sources. Accordingly, it is not possible to check the truth of the statements. Further, the proposed statement of fact is irrelevant to any issue in this litigation.

**3.** As a result of the capability of its submarines, the Soviets have issued subtle warnings to the U.S. when the Cold War had a tendency to "heat up." **500062.** On one such occasion, Soviet General Chervov stated that the Soviets might deploy submarines armed with nuclear missiles 100 miles off the U.S. coast. Id. Traveling time of missiles launched from Soviet submarines a few hundred (or a 1,000) miles from a U.S. coastline would still be very short. Id. Such a strike would make it difficult for U.S. anti-missile forces to shoot them down. Id. Much worse, it would give the President little time to evaluate the attack and launch a counterattack. Id.

*Government Response*:

Defendant does not dispute that the cited page states information substantially the same as the statement of fact. But the cited text is imprecise as to when and where the stated events occurred and does not cite its sources. Accordingly, the text is hearsay and, in any event, cannot be held up to scrutiny or challenged. Further, the proposed statement of fact is irrelevant to any issue in this litigation.

**4.** From the Soviets point of view, placing their submarines close enough to the U.S. coastline is an acceptable response to the deployment of American missiles, such as the Pershing II, close to Soviet borders. **500062.** Since the Yankee submarine missile range was about 1500 miles, the placement of a Yankee submarine 100 miles off the U.S. East and West coasts would enable said submarines to attack just about any city or target in the United States. Id.

*Government Response*:

Defendant does not dispute that the cited page states information substantially the same as the statement of fact. But the cited text is imprecise as to when and where the stated events occurred and does not cite its sources. Accordingly, the text is hearsay and, in any event, cannot be held up to scrutiny or challenged. Indeed, any presentation of "the Soviet point of view" is heresay. Further, the proposed statement of fact is irrelevant to any issue in this litigation.

**5.** Normally, the Soviets have a Yankee Class submarine on patrol off each U.S. (mainland) coastline with a third in transit to or from its home base port. **500062.** These submarines are positioned so that they may be close enough to their targets. Each of these submarines carries 16 missiles that can travel up to 3,000 kilometers (~1875 miles) and hit a target within 1,400 meters (~4666 feet or less than a mile).

*Government Response*: Defendant does not dispute that the cited page states information substantially the same as the statement of fact, except that the text does not support the text "the Soviets have a Yankee Class submarine on patrol off each U.S. (mainland) coastline." The text however supports the proposition that "the Soviets have a Yankee Class submarine on patrol off each U.S. coastline." But the cited text is imprecise as to when and where the stated events occurred and does not cite its sources. Accordingly, the text is hearsay and, in any event, cannot be held up to scrutiny or challenged. Further, the proposed statement of fact is irrelevant to any issue in this litigation.

**6.** The first Soviet Charley Class submarine appeared in 1968 and was able, as was the Soviet Yankee Class, to fire missiles from a submerged position. **B891-94, 1414-15**. Boyle. These two submarines illustrated below further helped fuel the Soviet Cold War threat which further prompted the U.S. Navy to seek a dual depth DIFAR sonobuoy. Id.

*Government Response*:

6a. The first Soviet "Charley Class" submarine is reported to have appeared in service initially in 1968. PX-171 at B891-94. The Charley class submarines and Soviet Yankee Class submarines were reported to have had the capability to fire missiles from a submerged position. PX-171 at B891-94.

The second sentence is a statement of opinion, not of fact, and the sentence is not supported by the factual statements of the references.

**7.** While a submarine's primary strategic role during the world wars was against surface warships and sea born logistic traffic, the evolution of submarine launched ballistic missiles and later cruise missiles has enabled the submarine to perform an even more important strategic role, that of striking at targets in an enemy's homeland. **B885-86, 1415.** Boyle. Indeed, no spot on earth is now beyond the reach of a submarine launched weapon. Id. Nuclear powered submarines are an underwater weapon system capable of world-wide deployment and destruction. Id. Nuclear powered submarines travel submerged at speeds at least equal to those of attacking surface vessels. Id. In its current role, the ballistic missile nuclear submarine is the ultimate deterrent, while its inherent survivability gives it a virtually guaranteed second strike defense role. Id.

*Government Response*:

*See* PX-171 (Although submerged submarines are difficult to locate, all underwater craft give both acoustic and non-acoustic indications of their presence. SB886. There is no such thing as an undetectable submarine. B886.)

**B.**

**8.** The U.S. Navy purchases hundreds of thousands of sonobuoys a year, mainly because they are expendable devices, i.e. they are used just once and thereafter self-

destruct through a scuttling mechanism. Boyle, G. Martin, **B285-354, 356, 359-60, 458-59, 1430-31**. A sonobuoy is a sophisticated underwater electroacoustic device capable of detecting and locating the source of underwater sounds. Id. It is primarily used to detect, locate and classify submerged submarines. Id. To perform these functions, it is dropped into the ocean from a hunter aircraft or vessel ("the hunter"). Id. The sonobuoy detects underwater sounds, i.e. acoustic energy from a submarine, through the use of a transducer containing a hydrophone, converts them to electrical signals which are then transmitted by the hydrophone to a transmitter located in an electronics housing within the sonobuoy. Id. The sonobuoy transmitter transmits the electrical detection information to an antenna for transmission to the hunter. **B459, 948**.

*Government Response*:

8a**.** The U.S. Navy purchased hundreds of thousands of sonobuoys a year, during at least part of the relevant time period for this action. Testimony of McGavock.

8b. Sonobuoys are expendable devices, *i.e.*, they are used just once and thereafter are expended or self-destruct through a scuttling mechanism. PX-114 at B459.

8c. A sonobuoy is a sophisticated underwater electro-acoustic device capable of detecting and locating the source of underwater sounds. PX-114 at

B459. It is primarily used to detect, locate and classify submerged submarines. PX-114 at B459. Dropped into the ocean by an aircraft, the sonobuoy is equipped with a radio transmitter to send detection information back to the aircraft. Together, the sonobuoy and aircraft provide submarine surveillance capability over vast ocean areas. To perform its function, it is dropped into the ocean from an aircraft or vessel. PX-114 at B459.

8d. The sonobuoy transmitter then transmits the electrical signal through an antenna and then by radio signal to an aircraft or vessel. PX-114 at B459; PX-176.

**9.** There are three distinct types of sonobuoys. **B428-32, 459-60, 1415-16.** The passive sonobuoy is strictly a device for acoustic energy detection and does not reveal its presence to the hunted submarine. Id. A passive sonobuoy can detect with its hydrophone(s) the presence of even the most modern submarines at great distances and transmits this detection information to the hunter. Id. The active sonobuoy is a miniature sonar system similar to those installed on ships. Id. The active sonobuoy uses a transducer that can transmit acoustic signals into the ocean through a projector and receive through its hydrophone(s) acoustic energy underwater. Id. The active sonobuoy transmits short pulses of sound into the ocean and locates the presence of a submarine by detecting the return pulses

reflected by the target. Id. These return pulses are transmitted to the hunter and are used to measure the time taken for the pulses to reach the target and return to the sonobuoy. Id. From this time measurement, accurate distance information is computed. Id. The third type of sonobuoy is a special purpose type sonobuoy. Id. This sonobuoy type may measure the temperature of the ocean at various depths to determine the location of thermoclines (i.e. density-pressure and/or temperature differences between oceanic layers). Id. Instead of listening for acoustic energy with a hydrophone(s), like the passive or active sonobuoy, this sonobuoy may contain a probe for sensing water temperature and transmitting the temperature reading to hunter aircraft. Id. Generally speaking, the passive sonobuoys are used to detect the submarine target; then, the active sonobuoys are used to attack it. Id. and **16454-55, 16501.**

*Government Response*:

9a. There are two basic types of sonobuoys. PX-114 at B459-60. The passive sonobuoy is strictly a listening device and does not reveal its presence. PX-114 at B459-60. A passive sonobuoy can detect even the most modern submarines at great distances and can transmit this information to an aircraft or vessel. PX-114 at B459-60.

9b. The active sonobuoy is a miniature sonar system similar to those installed on ships. PX-114 at B459-60. The active sonobuoy uses a transducer

that can transmit acoustic signals into the ocean and receive acoustic energy back from the water. PX-114 at B459-60. The active sonobuoy transmits short pulses of sound and locates the presence of an object by detecting the return pulses reflected by the target. PX-114 at B459-60. These return pulses are transmitted to the aircraft, where equipment is used to measure the time taken for the pulses to reach the target and return to the sonobuoy. PX-114 at B459-60. From this time measurement, accurate distance information is computed. PX-114 at B459-60. The latest types of active sonobuoys can provide both distance and bearing information from a single sonobuoy.

9c. Bathythermograph buoys are sometimes referred to as "special purpose sonobuoys," although bathythermographs do not transmit or receive sound. PX-111 at B428. The bathythermograph measures the temperature of the ocean down to 1000 feet. PX-111 at B428. The temperature information is used to determine sound paths and the location of thermoclines (i.e. density-pressure and/or temperature differences between oceanic layers). PX-111 at B428. This information is useful in selecting optimal hydrophone depths. PX-111 at B428. Instead of listening for acoustic energy with a hydrophone(s), like the passive or active sonobuoy, this buoy contains a probe that measures the difference in impedance, which varies with ocean temperature. Testimony of Mr. Hudson. The measurements are then transmitted to an aircraft or vessel where the measurements are correlated to determine the water temperature. Testimony of Mr. Hudson.

**10**. The AN/SSQ-53 ("SSQ-53" or "DIFAR") class sonobuoys are passive and called DIFAR sonobuoys because they are DIrectional Frequency Analysis and Recording devices. **B429, 459-60, 953-56, 1415-16, 16499, 16454-55.** Earlier types of passive sonobuoys had no useful directional sense. Id. A submarine could only be located by deploying patterns of three or more sonobuoys in a given area and plotting signals from all in an airplane or ship. Id. The location of a submarine was then derived through geometry. Id. This process was time consuming and was not effective against high speed submarines that could "run away" from the sonobuoy before the "location" process was completed. Id. Beginning with fleet use of SSQ-53 sonobuoys, which contained a built-in compass, an omnidirectional hydrophone and a directional hydrophone, the U.S. fleet was able to obtain detection and bearing information from a single SSQ-53 sonobuoy. Id. A pair of SSQ-53 sonobuoys provided the specific location of a targeted submarine. Id.

*Government Response*:

10. The AN/SSQ-53 ("SSQ-53" or "DIFAR") class sonobuoys are passive and called DIFAR sonobuoys, which is an acronym of DIrectional LOFAR. PX-111 at B429. The LOFAR was an earlier model of sonobuoy the name of which was an acronym for Low Frequency Analysis and Ranging. Earlier types of passive sonobuoys had no useful directional capability. PX- 114 at B459. A

submarine could only be located by deploying patterns of three or more sonobuoys in a given area and plotting signals from the buoys in an airplane. PX-114 at B459. The location of a submarine was then derived through geometry. PX- 114 at B459. Beginning with fleet use of SSQ-53 sonobuoys, which contained a built-in compass and a directional hydrophone, the U.S. fleet was able to obtain detection and bearing information from a single SSQ-53 sonobuoy. PX-114 at B459.

**11.** The SSQ-36 is <u>a special purpose sonobuoy which determines a profile of ocean temperature</u> and permits aircraft crews dropping their sonobuoys to plan search patterns based on these oceanic temperature readings. **B16455, 16498.**

*Government Response*:

11. The bathythermograph measures the temperature of the ocean down to 1000 feet. PX-111 at B428.

**12.** <u>The SSQ-62 class sonobuoys are active, commandable ones which provide range and bearing information about a target submarine. **B16454-55, 16501.** They are called DICASS sonobuoys, the acronym standing for Directional Command Active Sonobuoy System. Id. When this sonobuoy is deployed, it remains passive until commanded to an active function by an ASW aircraft. Id. This sonobuoy is used to provide</u>

simultaneous range, Doppler and bearing information for localizing and attacking subsurfaced targets. Id.

*Government Response*:

12. The AN/SSQ-62 sonobuoys are active, commandable sonobuoys which provide range and bearing information about a target submarine. PX-114 at B454. They are called DICASS sonobuoys, an acronym standing for Directional Command Active Sonobuoy System. PX-111 at B431. When this sonobuoy is deployed, it remains passive until commanded to an active function by an ASW aircraft. PX-111 at B431. This sonobuoy is used to provide simultaneous range, Doppler and bearing information for localizing subsurface targets. PX-111 at B431.

**13.** The SSQ-57 class sonobuoys are passively used to measure target submarine sound and ambient noise levels which assist aircraft personnel in the planning of a submarine search pattern. **B16455, 16500.**

*Government Response*:

13. The SSQ-57 class sonobuoys are calibrated passive listening devices primarily used for special applications where accurate sound measurements are required and are uniquely used for obtaining ambient noise level measurements. PX-111 at B430.

**14.** The SSQ-77 class sonobuoys are passive also. **B16502, 16455.** These sonobuoys provide improved passive detection

in deep water because they are highly sensitive. Id. To achieve this sensitivity, these sonobuoys use a vertical line array of omni-directional hydrophones which form directional beam patterns to increase detection range and help discriminate against noise. Id. They also utilize a standard DIFAR hydrophone to determine the bearing of detected submarines. Id. Thus, the passive SSQ-77 class sonobuoys are more effective than the passive SSQ-53 DIFAR sonobuoys in deep ocean areas. Id.

*Government Response*:

14. The SSQ-77 class sonobuoys are passive. PX-111 at B432. These sonobuoys "provide improved passive acoustic detection against the new generation subsurface threat and are compatible with the processors in the DIFAR capable P-3, S-3 and SH-60 aircraft." PX-111 at B432. The SSQ-77 uses a line array of omnidirectional hydrophones and DIFAR directional hydrophone. PX-111 at B432. "The line array hydrophones form directional beam patterns which increase detection range and help discriminate against noise[,] while the DIFAR hydrophone elements enable determination of the bearing of detection frequencies." PX-111 at B432.

**15.** Prior to the development of the Sparton patented inventions, the deployment of the electronic or electrical receiving devices (e.g., hydrophone(s) within transducer(s)) contained within active, passive and special purpose

production sonobuoys was through the bottom end of these sonobuoys. **B1416.**

*Government Response*:

Testimony of Messrs. Hudson and Boyle.

C. Sound Waves In The Ocean

**16.** Although sound waves propagate in the ocean, they are also absorbed (attenuated) by the ocean, with high frequencies being absorbed at a faster rate per unit distance than low frequencies. **B950.** There are varying factors which affect the propagation of sound waves in the ocean. Id. Among these are weather changes, density changes affected by changes in water pressure and/or temperature, water salinity changes, subsurface currents, changing ocean floor topography and the existence of macro and micro-organisms in the ocean. Id. Density changes in the oceans at the thermoclines, i.e. a thermocline is the interface between two or more layers of sea water each having different temperatures and thus densities, have a major influence on sound propagation and antisubmarine warfare ("ASW") as they affect the velocity and direction of sound propagation. Id. The velocity of sound reaches a minimum in the permanent thermocline in the oceans, which may be found at depths hundreds of feet below the surface of the ocean. Id. Sound propagation in the ocean depths is reflected or

refracted when sound waves strike a thermocline. Id. Thus, a submarine can remain undetected if traveling below or in a thermocline if the detecting device is located above the thermocline. **B867-68; A109-11, 929-37, 950, 1416-18, B15929-16165, 21005.** Submariners learned quite well how to manage this information so as to hide their boats in and under the thermoclines. Id. The illustrations below show the reflection or refraction of sound waves as they strike a thermocline. B887-90.

*Government Response*:

16a. Although sound waves propagate in the ocean, they are also absorbed (attenuated) by the ocean, with high frequencies being absorbed at a faster rate per unit distance than low frequencies. PX-76 at B950. There are varying factors which affect the propagation of sound waves in the ocean, including: weather changes, density changes affected by changes in water pressure and/or temperature, water salinity changes, subsurface currents, changing ocean floor topography and the existence of macro and micro-organisms in the ocean. PX-76 at B950.

16b. A thermocline is an area in the ocean where the temperature changes more rapidly per unit of depth than in the areas above and below. PX-171 at B887. As such, it represents a transition zone between the layer above and the layer below. PX-171 at B887; PX-174 at 933. Thermoclines affect the velocity and direction of sound propagation. PX-171 at B887; PX-174 at 933. Sound

propagation in the ocean depths is reflected or refracted when sound waves strike a thermocline. PX-174 at 933.

D. The Navy's Need for a Dual Depth DIFAR Sonobuoy

**17.** Captain Peter Huchthausen, U.S. Navy retired, served aboard navy destroyers involved in ASW operations and search and rescue operations for the lost submarine USS Thresher. **500075.** He participated in the Cuban Missile Crisis blockade, and his ship, the USS Blandy, forced a Soviet submarine to surface in the height of the Cuban Missile Crisis. Id. He also served as Chief Engineer aboard the destroyer USS Orleck and operated off the coast of Vietnam. Id. He commanded a River unit of ten river patrol boats in combat on the Mekong River. Id. He served as a Soviet naval submarine analyst and in ASW warfare positions on the staffs of Naval Forces Europe, the U.S. First and Third Fleets, and the Commander in Chief Pacific. Id. He was assigned as the senior U.S. Naval Attaché to Yugoslavia and Romania and subsequently became the chief of attaché and human intelligence collection operations in Western Europe for the Defense Intelligence Agency. Id. He served three years in Moscow, 1987-1990, as the senior U.S. Naval Attaché to the USSR during the years immediately preceding the fall of the Soviet Union. Id.

*Government Response*:

17. This statement simply recites, almost verbatim, Captain Huchthausen's résumé on his web page http://www.peterhuchthausen.com. However, CAPT Huchthausen was not identified as a potential witness and his

deposition has not been taken. Unless he testifies, the information is irrelevant. Accordingly, the Government has no basis for agreeing or disagreeing with the stated information.

**18.** Captain Huchthausen was personally knowledgeable of (a) the use by the Soviet submarines and U.S. ASW forces during the Cuban Missile Crisis of the hide and seek tactics employed by them vis-à-vis the thermocline layer and (b) the inability of U.S. ASW forces to detect one or more of these Soviet submarines sailing at deep depths, i.e. below the thermocline layer. Captain Huchthausen wrote a book, entitled "October Fury," about these hide and seek tactics. **500075-124.**

*Government Response*:

18. The information in this proposed statement of fact appears to have been taken largely from CAPT Huchthausen's book *October Fury*, published in 2002. On his website, however, CAPT Huchthausen admits that the book is a "reconstruction" of an event that happened some 40 years before the book was published. *See* http://peterhuchthausen.com/octfury.htm. In short, it is at least partly fictional. Further, contrary to this proposed statement, CAPT Huchthausen could not have had personal knowledge of what the Soviet submarine forces knew or did in 1962, since he was aboard a U.S. Navy destroyer at the time. Accordingly, the citations fail to provide factual support for the statement proposed.

**19**. By September 1962, the Soviets, pursuant to a mission called Anadyr, installed ballistic missiles with nuclear warheads in Cuba causing the U.S. to create a naval blockade of Cuba preventing further Soviet military shipments from landing in Cuba. **500078, 500083, 500103.** Soviet Admiral Rybalko supervised the naval part of that mission, called Kama. Id. Pursuant to this mission, four Soviet Foxtrot attack submarines, each armed with a nuclear tipped torpedo, were to (a) covertly proceed to Cuba to reconnoiter approaches to Cuba, (b) log acoustic conditions in these approaches and (c) enter the Cuban Port Mariel to make preparations for the arrival of seven ballistic missile submarines to home base there. **500078, 500080.** The B-4, B-36, B-59 and B-130 Soviet submarines departed the Soviet Union for Cuba on October 1, 1962 to perform their covert mission. **500087-92.** On October 20, 1962, two days before President Kennedy ordered the Cuban blockade, their mission changed, and they were ordered to curtail transits to Port Mariel and take combat patrols in the Sargasso Sea off the Islands of the Bahamas. **500101-103.**

*Government Response*:

19. The information in this proposed statement of fact appears to have been taken largely from CAPT Huchthausen's book *October Fury*, published in 2002. On his website, however, CAPT Huchthausen admits that the book is a

"reconstruction" of an event that happened some 40 years before the book was published. *See* http://peterhuchthausen.com/octfury.htm. Accordingly, the citations fail to provide factual support for the statement proposed.

**20.** U.S. ASW forces in the Caribbean responsible for implementing the Cuban blockade consisted of carrier groups comprising destroyers and aircraft. **500084-86.** The four Soviet attack submarines contained diesel engines, and as a result, they were required to snorkel or surface from time to time to recharge their batteries. **500087-92.** The art of ASW, including the effect of a thermocline upon sound propagation and submarine detection above and below it was well understood by U.S. ASW and Soviet forces. **500084-86.**

*Government Response*:

20. The information in this proposed statement of fact appears to have been taken largely from CAPT Huchthausen's book *October Fury*, published in 2002. On his website, however, CAPT Huchthausen admits that the book is a "reconstruction" of an event that happened some 40 years before the book was published. *See* http://peterhuchthausen.com/octfury.htm. Accordingly, the citations fail to provide factual support for the statement proposed.

**21.** At the Caicos Passage near Cuba, the B-36 submarine settled below a thermocline to avoid acoustic detection until a Norwegian tanker ship arrived at which point the B-

36 submarine slipped under the tanker to further avoid detection through the Caicos Passage. **500096-100.** After the tanker sailed away, the B-36 continued on its journey. **500099-100.** On October 29, 1962, the B-36 was traveling 400 miles north of San Juan Puerto Rico in Caribbean waters having a constant temperature to depths of a 100 meters which made it difficult to hide under the isothermic layer. **500108.** The B-36 had plotted the hydroacoustic conditions, i.e. water temperature at various depths, to plot the thermocline layer. Id. As a result, the USS Cecil destroyer, which was the escort for the carrier USS Randolph, was able to detect the B-36 submarine because the isothermic layer was below 300 feet and that depth was too deep for a submarine to hide beneath. **500109.**

*Government Response*:

21. The information in this proposed statement of fact appears to have been taken largely from CAPT Huchthausen's book *October Fury*, published in 2002. On his website, however, CAPT Huchthausen admits that the book is a "reconstruction" of an event that happened some 40 years before the book was published. *See* http://peterhuchthausen.com/octfury.htm. Accordingly, the citations fail to provide factual support for the statement proposed.

**22.** On October 31, 1962, the B-36 submarine was forced to surface, thereby not achieving the secrecy required of its

mission as a result of being unable to hide below the isothermic layer. **500109-114.** After remaining surfaced for two days, the B-36 submarine escaped by diving below the thermocline and resumed its patrol. **500114.** While on patrol, it went to periscope depth, only to determine that USS ships were near. Id. The B-36 descended below the thermocline layer and drifted off not being further detected. Id. It was ordered to return to the Soviet Union on November 7, 1962. Id.

*Government Response*:

22. The information in this proposed statement of fact appears to have been taken largely from CAPT Huchthausen's book *October Fury*, published in 2002. On his website, however, CAPT Huchthausen admits that the book is a "reconstruction" of an event that happened some 40 years before the book was published. *See* http://peterhuchthausen.com/octfury.htm. Accordingly, the citations fail to provide factual support for the statement proposed.

**23.** The B-59 submarine initially sailed from the USSR at a deep depth to avoid detection on its journey to Cuba and only surfaced to charge its batteries. **500094.** On October 29, 1962, the B-59 submarine was about 380 miles southeast of Bermuda and had no isothermic layer to hide beneath, inasmuch as it was traveling 60-100 meters below the surface, when it had to charge its batteries. **500105-107.**

It was detected by the USS carrier Randolph which had one of its escort destroyers, the USS Cony, track the B-59 submarine for 12 hours. Id. The B-59 submarine was forced to surface, thereby not achieving the secrecy required of its mission as a result of being unable to hide below the isothermic layer. Id.

*Government Response*:

23. The information in this proposed statement of fact appears to have been taken largely from CAPT Huchthausen's book *October Fury*, published in 2002. On his website, however, CAPT Huchthausen admits that the book is a "reconstruction" of an event that happened some 40 years before the book was published. *See* http://peterhuchthausen.com/octfury.htm. Accordingly, the citations fail to provide factual support for the statement proposed.

**24.** On October 30, 1962, the USS Blandy destroyer, on which was Ensign Peter Huchthausen was located, was sailing 300 miles northeast of the Caicos Passage, east of Cuba and north of Haiti, when it received a message from a U.S. P3 aircraft that it had radar and visual contact of the B-130 submarine. **500115.** The B-130 determined that a U.S. destroyer had detected it, and as a result, it dove to 150 meters which was well below the thermocline layer it had measured when it was at 75 meters. **500115-116.** By plotting the thermocline line and sailing beneath it where sound

waves were refracted differently, the B-130 believed that its 150 meter depth would render it partially or completely invisible to the U.S. destroyer's sonar, the SQS-23, which was actively scouring the ocean depths for the B-130. **500117.** The B-130 then held depth at 120 meters and drifted for hours while the destroyer circled two miles away. Id. The USS Blandy had classified its contact with the B-130 as a Soviet Foxtrot submarine. **500118.** The B-130 was finally forced to surface by the USS Blandy after the B-130 suffered casualties to all three diesel engines and only had one of them working with reduced power. **500119.** The USS Blandy had held the B-130 submerged for almost 17 hours and upon the surfacing of the B-130, the USS Blandy escorted the B-130 for an additional 24 hours. **500119-120.** The B-130 was instructed by Moscow to rendezvous with a rescue tug and return home since it could no longer submerge with its malfunctioning engines. **500119.**

*Government Response*:

24. The information in this proposed statement of fact appears to have been taken largely from CAPT Huchthausen's book *October Fury*, published in 2002. On his website, however, CAPT Huchthausen admits that the book is a "reconstruction" of an event that happened some 40 years before the book was published. *See* http://peterhuchthausen.com/octfury.htm. Accordingly, the citations fail to provide factual support for the statement proposed.

**25.** The B-4 submarine had passed through the Windward Passage between Cuba and Haiti on October 20, 1962 when it received the order to abort its transit to Port Mariel in Cuba and instead assume covert combat patrol. **500121.** The B-4 hid below a thermocline layer on its journey into Cuban waters through the Sargasso Sea off the Islands of the Bahamas. **500102, 500121.** Then after passing through the Windward Passage between Cuba and Haiti, the B-4 headed south and around the southeastern point of Cuba to avoid contact with a host of U.S. ASW warships in the area. **500122.** On November 2, 1962, an S2F Tracker aircraft from the USS Independence carrier group and a helicopter obtained radar contact on the B-4. Id. While the B-4 surfaced momentarily to receive orders from Moscow, a U.S. P2V aircraft detected the surfaced B-4. **500123.** The B-4 immediately submerged to a hundred meters to evade further detection by the aircraft. Id. After a few hours, the B-4 sailed at a depth of 60 meters which was just below the thermocline layer as plotted by the ship's navigator. **500124.** The thermocline layer had given them acoustic protection. Id. Despite all the sonobuoys being dropped to detect and locate the B-4, the U.S. lost contact with the B-4 and was unable to detect it again either on radar or with sonobuopy patterns. Id. When the B-4 was safe from

detection, it surfaced to charge its batteries and resumed covert combat patrol. Id. The B-4 used a new RG-10 passive sonar to obtain early and greater range detection of U.S. shipping than its normal acoustic systems were capable of obtaining. Id. Whenever a U.S. ship came close to it, the B-4 descended to 120 meters below the thermocline layer to prevent detection. Id. The B-4 was the sole submarine that was not forced to surface by U.S. forces during the Cuban Missile Crisis as a result of its ability to avoid detection by hiding below the thermocline layer. Id. On November 20, 1962, the B-4 received orders to return home. Id.

*Government Response*:

25. The information in this proposed statement of fact appears to have been taken largely from CAPT Huchthausen's book *October Fury*, published in 2002. On his website, however, CAPT Huchthausen admits that the book is a "reconstruction" of an event that happened some 40 years before the book was published. *See* http://peterhuchthausen.com/octfury.htm. Accordingly, the citations fail to provide factual support for the statement proposed.

**26.** About 2-3 years after the Cuban Missile Crisis, Magnavox and Sanders Corporations ("Magnavox and Sanders") were selected by the Navy in the 1964-65 fiscal year time frame to design and develop the SSQ-53 sonobuoy. This development spanned a 3-4 year time period. Production of the SSQ-53

sonobuoy first occurred in fiscal year ("FY") 1968. Sparton was added by the Navy as an SSQ-53 third supplier in FY 1969 by virtue of contract N00019-69-C-0465 ("the 0465 contract"). **B31-50, 770.**

*Government Response*:

26. In Fiscal Year ("FY") 1964-65 time period, Magnavox and Sanders Corporations ("Magnavox and Sanders") were selected by the Navy to design and develop the DIFAR sonobuoy as an improvement of the then-extant Low Frequency and Ranging (LOFAR) sonobuoys. PX-152 at B770. This development spanned a 3-4 year time period. PX-152 at B770. Production of the SSQ-53 sonobuoy first occurred in FY 1968. PX-152 at B770. Sparton was added by the Navy as an SSQ-53 third supplier in FY 1969 when it was awarded contract N00019-69-C-0465 ("the 0465 contract") by the Navy. PX-152 at B770.

**27.** The SSQ-53 was the first production passive sonobuoy providing the Navy with both target detection and bearing information from a single sonobuoy. **B1416.** The U.S. naval fleet was provided with production SSQ-53 sonobuoys and, upon using them at their deployed depth of 90 feet, recommended that they include a dual depth capability, i.e. the deployed hydrophone(s) functioning at a shallow 90 foot or deep 500 or 1,000 foot depth (below the 300 foot thermocline). **B503-18.** The Naval Air Development Center ("NADC"), the Navy's sonobuoy research and development arm,

had conducted theoretical studies and sea tests which confirmed that a deeper hydrophone would result in an improved submarine detection capability. **B506.**

*Government Response*:

27. The U.S. naval fleet was provided with production SSQ-53 sonobuoys and, upon using them at their deployed depth of 90 feet, recommended that they include a dual depth capability, i.e. the deployed hydrophone(s) functioning at a shallow 90 foot or deeper depth. PX-120 at B506. The Naval Air Development Center ("NADC") had conducted theoretical studies and sea tests which confirmed that a deeper hydrophone would result in an improved submarine detection capability. PX-120 at B506.

**28.** According to the Navy, as told to its defense contractors at National Security Industrial Association ("NSIA") meetings, the Soviet Union had developed technology for rapidly sending submarines deep below the oceanic thermocline located hundreds of feet below the oceanic surface. **A109-112; B867-68.** Sonobuoys deployed at a depth of 90 feet either could not detect or obtained reduced detection of these Soviet submarines because the thermocline, located *between* the targeted submarine below the thermocline and the deployed sonobuoy above the thermocline, prevented or impaired the transmission of submarine acoustic signals through the thermocline to the

sonobuoy. Id. A failure to rapidly and accurately detect these new, fast, deep diving Soviet submarines posed a national security threat the U.S. Navy needed to counter. Id.; **B1418.**

*Government Response*:

28. The National Security Industrial Association ("NSIA") was an organization created to foster a close working relationship and effective communication between the Navy and the industries which support it. Testimony of Pickrell, Dep. at 12:4-18:13. Through the NSIA, the Navy informed its contractors that it was interested in obtaining sonobuoys capable of deploying to deeper depths in order to improve the ability of the sonobuoys to detect submarines below thermoclines. Testimony of Boyle (*see* Dep. of Boyle at 205:16 - 207:4); PX-120 at B506.

**29.** The problem of obtaining a rapidly deploying deep depth sonobuoy persisted for years. **B506, 867-68, 1418.** The U.S. sonobuoy contractors were aware of it. Id. The U.S. Navy finally funded the three contractors manufacturing the SSQ-53 sonobuoy to solve the deep depth rapid deployment problem. **B506, 514.** The Sanders Associates and Magnavox Company were the original manufacturers of the SSQ-53 sonobuoy. Id. They attempted to solve the problem through conventional techniques. **B503-18.** They lengthened the existing cable connecting the electronics to the upper part

of the sonobuoy so that the electronics would deploy to a 1,000 foot depth. Id. Deployment of the electronics within the sonobuoy was effectuated through the lower end of the sonobuoy. Id.

*Government Response*:

The cited references do not support the first two sentences.

29. The U.S. Navy finally funded its three contractors manufacturing the SSQ-53 sonobuoy to design a dual depth DIFAR sonobuoy. PX-120 at B506. Sanders Associates and Magnavox Company were the original manufacturers of the SSQ-53 sonobuoy. PX-120 at B506; PX-152 at B770. They produced dual depth sonobuoys that were similar to standard production models. PX-120 at B506. On the Sanders and Magnavox dual depth sonobuoys, a rotochute was used to retard the descent of the sonobuoy through the air and the electronics within the sonobuoy were deployed through the lower end of the sonobuoy.

**30.** On the other hand, Sparton, the third SSQ-53 manufacturer, recognized that this purported solution was ill advised. **B506** Rapid deployment was unobtainable with this approach. By the time the electronics deployed to depth under this purported solution, the submarine to be detected would have sped away, thus evading detection. **B867-68, 1418-20.** Accordingly, the primary factor to the solution of developing a deep depth sonobuoy was the speed at which the sonobuoy could deploy its electronics. Id.

Sparton departed from conventional wisdom and was the company which developed a rapidly deploying deep depth sonobuoy. Sparton solved one of our country's most pressing Cold War ASW problems. Id. That solution formed the basis of the two patented inventions in suit. Id.

*Government Response*:

The cited references do not support the proposed statement of fact. *See* PX-120 at B506; Deposition of Mr. Graff 111:1-15 (no differences in performance between Sparton buoys and those of Magnavox and Sanders); Testimony of Mr. Madera.

**31**. As a result of U.S. fleet recommendations, NADC theoretical studies and sea tests, the Naval Air Systems Command ("NAVAIR"), the Navy's sonobuoy contracting arm, granted an Engineering Change Proposal ("ECP") at about the same time (FY70-72) to each of its three SSQ-53 producers, to supply the Navy with 500 buoys deployable at 90 or 500 feet (Magnavox), 300 buoys at 90 or 1000 feet (Sanders) and 300 buoys at 90 or 1000 feet (Sparton). **B506, 514, 967-68.** The ECP effort with Sparton occurred under the 0465 contract as ECP 0465-2. **B514.** The U.S. Navy determined that 1,000 feet was an optimum deep depth for the operation of its SSQ-53 sonobuoy. The Navy decided to remove Sanders from its mobilization base of qualified SSQ-53 suppliers when Sanders was unsuccessful in developing the deep depth deployment

function in its SSQ-53 sonobuoy (which already contained a 90 foot shallow depth deployment function) under its ECP. **B770.**

*Government Response*:

31. The Naval Air Systems Command ("NAVAIR") approved Engineering Change Proposals ("ECPs") at about the same time (FY70-72) to each of its three SSQ-53 producers to supply the Navy with dual depth sonobuoys. The Magnavox ECP required delivery of 500 sonobuoys capable of deployment to either 90 foot or 500 foot depths; Sanders' required 300 sonobuoys capable of deployment to either 90 foot or 1000 foot depth; and Sparton's required delivery of 300 sonobuoys capable of deployment to 90 foot or 1000 foot depths. B506, 514, 967-68. The ECP effort with Sparton occurred under the '-0465 contract as ECP 0465-2. B514. The U.S. Navy determined that 1,000 feet was an optimum deep depth for the operation of its SSQ-53 sonobuoy. The Navy decided to remove Sanders as a qualified SSQ-53 supplier when Sanders was unsuccessful in developing its dual depth SSQ-53 sonobuoy (which already contained a 90 foot shallow depth deployment function) under its ECP. B770; Testimony of A. Madera.

**32.** Notwithstanding Sanders' failure, Sparton's ECP program was a huge success. Sparton's developmental ECP program led to deliveries in April and June 1972 (at about the same time the other contractors delivered their sonobuoys) of a developmental quantity of 300 dual depth sonobuoys with

which the Navy was "extremely pleased," a specification and nomenclature change (from SSQ-53 to SSQ-53A) and the commencement of pilot production in FY74 under a follow-on contract N00019-72-C-0585 ("the 0585 contract"). **A445-48, 510-16, B281-82, 628-82, 770-71, 967-68.** The Navy concluded that "[t]he AN/SSQ-53A was developed as a part of a Product Improvement Program by Sparton in FY72 [ECP 0465-2]and limited production quantities were awarded solely to Sparton in FY74 and FY 75 [0585 contract]." **B770-771.** The SSQ-53A was Sparton's dual depth sonobuoy and became the Navy's first dual depth DIFAR sonobuoy purchased to combat the Soviet nuclear submarine threat during the height of the Cold War and end of the Viet Nam War. **B1418.**

*Government Response*:

32a. Sparton's ECP program was a success. Sparton's developmental ECP program led to deliveries in April and June 1972 of a developmental quantity of 300 dual depth sonobuoys. At about the same time, Sanders and Magnavox delivered their ECP sonobuoys. Sparton employee Widenhofer reported that Navy employee Earl Rice was "extremely pleased" with the performance of Sparton's Mod 4 sonobuoy during a June 7, 1972 test. B282.

32b. A Navy business clearance proposal stated that "[t]he AN/SSQ-53A was developed as a part of a Product Improvement Program by Sparton in FY72 and limited production quantities were awarded solely to Sparton in FY74 and FY

75." B770-771. Sparton's dual depth sonobuoy became the Navy's first dual depth DIFAR sonobuoy.

32c. On June 30, 1975 the Navy published a new specification for DIFAR sonobuoys in which the designation was changed from AN/SSQ-53 to AN/SSQ-53A. DX-223. That specification required that AN/SSQ-53A sonobuoys have a dual depth capability, with a nominal depth of 30 meters (approximately 90 feet) in shallow mode and 300 meters (approximately 1000 feet) in deep mode. DX-223.7-223.8. The specification does not require the use of the so-called "inverse" or "upside-down" deployment method. DX-223.

**33.** Although the ECPs were issued and performed by the SSQ-53 producers, FY 1972 funding limitations prevented the Navy from entirely funding the "previously authorized SSQ-53 product improvement program," which involved "non-recurring" (engineering) costs with the three SSQ-53 producers. B776, 506, 778. In this regard, Sparton expended a substantial amount of its own funds to develop this new dual depth sonobuoy in the interests of national security to counter a threat perceived by our Navy. **B355-58, 424-26, 1418.**

*Government Response*:

Sparton's statement that "FY1972 funding limitations prevented the Navy from entirely funding the 'previously authorized SSQ-53 product improvement program,' which involved 'non-recurring' (engineering) costs with the three SSQ-53 producers" is not supported by Sparton's citations. Page B776 relates to the

SSQ-57A not the SSQ-53A. Page B506 is part of Mr. Graff's test plan and does not establish the level of funding. And page B778 does not support Sparton's contention. In pertinent part, B778 states:

> 2. Initial procurement of the improved sonobuoys was accomplished with FY 1972 funds on a NAVAIR contracting officer's determination and funding. The procurement was negotiated under an exception 10[,] due to the involvement of proprietary processes in fabrication and the contractor's control of the engineering definition of their SSQ-53 sonobuoy.
>
> 3. The pilot production of the 2000 improved sonobuoys is a continuation of the FY 72 program and is a separate consideration from the major production procurements authorized by reference (c) of the basic correspondence.
>
> 4. Since pilot production is involved for the 2000 improved sonobuoys, and OPN funds have been programmed and are available, it is recommended that NAVAIR proceed with procurement using the same rationale and method employed for the FY 72 pilot procurement at Magnavox. NAVAIR must insure that an appropriate D&F is obtained prior to exercising the option.

The 2000 sonobuoys do not appear to be the same as Sparton's 300 ECP sonobuoys (the contract for which must have been accomplished using FY 1971 or earlier funding).

Sparton's second sentence, while perhaps literally true, gives a false impression. First, Sparton states: "Sparton expended a substantial amount of its own funds to develop this new dual depth sonobuoy in the interests of national security to counter a threat perceived by our Navy." Sparton's statement overlooks the fact that ECP, as integrated into the '-0465 contract, was a full fixed price modification. PX-4. Sparton bore the risk that it would lose money on the modification. Testimony of Boyle; Testimony of McGavock. That it did so was

not "in the interest of national security," but merely because it made a business judgment with respect to the cost of the project. PX-4.

II.

A. Sparton's Deep Depth Sonobuoy Program

**34.** Sparton established a DIFAR research and development company sponsored program in the mid 1960s. **B945-47, 1418.** This program was soley funded by Sparton to assist in its efforts to obtain a Navy contract for the production of the SSQ-53 sonobuoy. Sparton obtained this contract in March 1969 in the form of the 0465 contract. **B31-34, 1419.**

*Government Response*:

The citations do not support Sparton's statement that "[t]his program was solely funded by Sparton to assist in its efforts to obtain a Navy contract for the production of the SSQ-53 sonobuoy."

34. Sparton established a company-sponsored DIFAR research and development program in approximately 1966. B945-47 (stating that "Sparton has engaged in DIFAR-related projects for the past three years" prior to submitting its bid for the '-0465 contract). The Navy awarded the '-0465 contract to Sparton in March 1969. B31-34.

**35.** Sparton was informed by the Navy in the mid-late 1960's or early in 1970 of its dual depth need and the reason which created it. **A109-112.** The 0465 contract executed March 5,

1969 was a fixed price supply contract which required Sparton to provide the Navy in the first program year with 50 SSQ-53 sonobuoys for first article testing, 1,600 SSQ-53 sonobuoys subjected to production sampling aircraft drop tests prior to delivery for typical fleet use (with a Federal Stock Number to be assigned to them), and 200 technical manuals. In the second program year, Sparton was required to supply the Navy with 9,600 production SSQ-53 sonobuoys provided that the first article testing of Sparton's SSQ-53 sonobuoy was successful. **B31-34.** Successful first article testing was required for and triggered the commencement of production. **B31-34.**

*Government Response*:

35a. Sparton was informed by the Navy prior to March 1971 of its dual depth need and the reason which created it. Testimony of Boyle (*see* Dep. of Boyle at 206-07).

35b. Contract No. N00019-69-C-0465 was awarded on March 5, 1969, which is the effective date of the contract. B31, B35. The original '-0465 contract was a fixed price supply contract based on Sparton's offer, dated January 3, 1968. B31, B35.

35c. The '-0465 contract was divided into two parts – the "First Program Year (Fiscal Year 1969)" and the "Second Program Year (Fiscal Year 1970)" – based on the year the program funds became available. B40-41. Under the '-0465 contract, the First Program Year effort, required Sparton to provide the Navy with

50 SSQ-53 sonobuoys for preproduction first article testing beginning 10 months after the contract effective date; delivery of an initial production quantity of 1,600 SSQ-53 sonobuoys in lots of 100-600 sonobuoys during each of the 19th through 23d months, inclusive, after the contract effective date; delivery of 200 manuals; and delivery of design data. B40-41, B46, B48. The initial production quantity was to be delivered in accordance with Navy instructions.

35d. The Second Program Year (Fiscal Year 1970) effort required Sparton to supply the Navy with 9,600 production SSQ-53 sonobuoys. B41. Funding for the Second Program Year (Fiscal Year 1970) effort was made contingent upon formal notification of the contractor by the contracting officer not more than 45 days after Government approval of the preproduction First Article models. B32, B41.

35e. Successful pre-production First Article testing was prerequisite to the commencement of production of either the 1600 sonobuoys or the 9600 sonobuoys. B48-49.

**36.** The 0465 contract contained a security classification specification, DD Form 254, which indicated that any information relative to the following subjects was classified, such that its disclosure to the public was prohibited by law, 18 U.S.C. §793-94: detection range and reliability, bearing range, military application of sonobuoy and technical advances in the state of the art. **B31-50,**

**781, 811-14.** The 0465 contract did not contain a Patent Rights Clause. Id.

*Government Response*:

36a. The '-0465 contract incorporated a DD Form 254 (Contract Security Classification Specification) and DD Form 254C (Contract Security Classification Specification (Continued)). PX-158 at B811-14. Together, the forms which indicate that information relative to the following subjects was classified, such that its disclosure to the public was prohibited by law, 18 U.S.C. §793-94: detection range and reliability, bearing range, military application of sonobuoy and technical advances in the state of the art. PX-158 at B811-14. However, the external view of the device was not classified, the quantities procured and the cost were not classified. B814. Information regarding the SSQ-53 sonobuoys was available to personnel having "reciprocal clearances." PX-158 at B812.

36b. The '-0465 contract does not identify any of the clauses in Armed Services Procurement Regulation (ASPR) § 9.107-5 (Patent rights clauses for domestic contracts) as being incorporated in the contract either *in haec verba* or by reference.

**37.** Between the late 1960s and early 1970, Sparton mechanical design engineer Widenhofer conceived of an idea for rapidly deploying the SSQ-53 DIFAR sonobuoy to a deep depth by using (a) the top end of the sonobuoy as an exit for deployable sonobuoy internal components, (b) a release plate mechanism actuated by a force imparted by a float

assembly to either retain or deploy the sonobuoy internal components within or from the sonobuoy housing, and (c) the sonobuoy housing as a descent vehicle to assist the rapid deployment of sonobuoy internal components to a deep depth. The idea was called an "inverse" or "upside-down" deployment design because all production sonobuoys up to that time routinely contained release plate assemblies located at the bottom of the sonobuoy to deploy sonobuoy components from the bottom end of a sonobuoy. The "upside-down" design completely departed from convention wisdom in the manner by which sonobuoy components should be deployed. **A205-08, B62-66, 1418-20.**

*Government Response*:

37a. Sparton mechanical design engineer James Widenhofer conceived of an idea for rapidly deploying a sonobuoy having a parachute-type decelerator and an inflating float by using pressure from the inflating float to actuated the release plate. DX-119, DX-17. As initially conceived by Mr. Widenhofer, a sonobuoy having an inflatable floatation device (a float) stored at the "top" end of the housing could be deployed out of that end by incorporating a release plate just above the float. DX-119, DX-17. Mr. Widenhofer further conceived that upon water entry, a sea water battery would actuate an explosive device, which would mechanically puncture a $CO_2$ cartridge. DX-119, DX-17. Mr. Widenhofer recognized that the inflating float would "produce a large directed force[,] which

may be applied to cause the release mechanism to operate and literally be blown out of the top end of the sonobuoy." DX-119, DX-17.

37b. The first documentation of Mr. Widenhofer's idea was in a report entitled "Mechanical Feasibility Design for a Sound Reference Sonobuoy," prepared by Mr. Widenhofer and C. Werner, and dated April 15, 1970. DX-119. The existence of that report, and the information it contained, was reported in a note on Sparton internal document entitled "Patent Information on a Float Pressure Actuated Release Plate Mechanism," signed by Mr. Widenhofer on January 7, 1971. DX-119.

37c. Mr. Widenhofer's initial conception of this release mechanism did not include the specific single-piece substantially-circular plate design which is described in the '120 and '233 patents. DX-222.

37d. The idea became known as the "inverse" or "upside-down" deployment design because most sonobuoys being produced at that time contained "impact" release plate assemblies located at the bottom of the sonobuoy to deploy sonobuoy components from the bottom end of a sonobuoy. DX-119; Dep. of Boyle at 434.

**38.** On September 16, 1970, Sparton project engineer Devereaux issued a memorandum to his superior, lab manager Hungerford, which outlined a program schedule under company sponsored Job number 7400 for developing a 1,000 foot DIFAR sonobuoy. The proposed schedule concerned design modifications required for providing a deep 1,000 foot

capability for the SSQ-53 sonobuoy. The major redesign areas were the hydrophone, electrical and mechanical sections. The mechanical design changes were considered the most extensive and required the greatest effort. **B70-71.** This program was called a "Deep DIFAR" sonobuoy program because Sparton had already developed and produced the SSQ-53 sonobuoy for shallow depth operation. With a solution to rapid deployment for deep operation, Sparton would then have a DIFAR sonobuoy capable of shallow or deep depth operation, i.e. a dual depth DIFAR sonobuoy. **B1419-20.**

*Government Response*:

38. On September 16, 1970, Sparton project engineer Neill Devereaux prepared a memorandum to R. Hungerford, which outlined a program schedule under company-sponsored Job Number 7400. PX-7 at B70. The program called for development of a DIFAR sonobuoy capable of deploying its hydrophone to a 1,000 foot depth. PX-7 at B70. The proposed schedule concerned design modifications required for providing a deeper operating depth, but did not include a dual depth capability. PX-7 at B70. Mr. Devereaux identified the major areas of redesign as being those with respect to the hydrophone design, electrical design and mechanical design. PX-7 at B70-71. The mechanical design changes were considered the most extensive and required the greatest effort. PX-7 at B70. Mr. Devereaux indicated that Sparton was proposing a five hour battery life because "an eight hour battery would be larger, more expensive and entail additional

design complications including the necessity of qualification testing." PX-7 at B70.

**39.** The program schedule required the fabrication of six (6) dummy hydrophone engineering models and twenty (20) final hydrophone engineering models to be designed and constructed between December 13, 1970 and January 31, 1971. The preliminary mechanical design was to commence on November 1, 1970 and be completed by January 17, 1971. A drop test of six (6) mechanical dummy sonobuoy models was to occur on November 22, 1970, redesign was to follow and another drop test of fully operational models was to occur on January 10, 1971. Although the mechanical design was to be completed by January 17, 1971, the 20 engineering models constructed to that design were to be assembled and tested by February 21 and March 7, 1971, respectively. **B70-71.**

*Government Response*:

39. The program schedule required the fabrication of six (6) deep depth hydrophone prototypes by December 13, 1970 and twenty (20) "final" hydrophone prototypes by January 31, 1971. PX-7 at B71. The preliminary mechanical design was to be completed by November 1, 1970 and be completed by January 17, 1971. PX-7 at B71. A drop test of six (6) mechanical dummy sonobuoy models was to occur by November 22, 1970, redesign after testing was to be completed by December 31, 1970.

PX-7 at B71. A drop test of fully functional models was to be completed by January 10, 1970, completion of the mechanical design phase no later than January 17, 1971. PX-7 at B71. Completion of the program was to be achieved by building an additional 20 fully functional models by February 28, 1971, and testing those models by March 7, 1971. PX-7 at B71.

**40.** On October 21, 1970, Devereaux informed Hungerford that it was not feasible to incorporate a battery package in Sparton's deep DIFAR sonobuoy to perform at a 1,000 foot depth and yet operate over an eight (8) hour period. Thus, battery life for this sonbouoy had to be shortened in any proposal to the Navy. **B72**.

*Government Response*:

The cited reference does not support the second sentence of plaintiff's statement of fact.

40. On October 21, 1970, Mr. Devereaux informed Mr. Hungerford that Sparton employee R. William did not believe that it was feasible to incorporate a battery that would operate for eight hours at a 1000 foot depth at that time. B72.

**41.** On November 11, 1970, Sparton chief engineer Passman issued a memorandum to Hungerford addressing a proposal to be made to the Navy for a dual depth SSQ-53 DIFAR sonobuoy. Sparton's technical proposal for this dual depth SSQ-53

sonobuoy was to (a) contain manually selectable hydrophone depths of 90 and 1,000 feet, (b) tabulate equipment specification changes and additions, (c) be hardware oriented, (d) contain a layout and a diagrammatic assembly drawing identifying the location and function of all significant subassemblies, (e) avoid detailing parts and subassemblies in order to maintain flexibility of design, (f) emphasize common use of many critical items of the existing SSQ-53 sonobuoy, including the directional and omni-directional hydrophones, subsurface suspension system, and VHF transmitter, (g) state that the directional hydrophone had already been tested at pressures in excess of that required for 1,000 foot operation, and (h) indicate that only minor changes in the construction of the subsurface electronics housing was required to withstand the additional pressure involved in a 1,000 as distinguished from a 90 foot deployment. In describing the mechanical design approach, Passman wanted Sparton's proposal to emphasize the necessity for improvement in space utilization to accommodate additional cable and "the need for insuring rapid deployment [of components] to depth," with "no sacrifice in mechanical function and deployment reliability." The proposal was to include the following items: "(a) Introduction[,] (b) Scope of work[,] (c) Technical approach, electrical[,] (d) Technical approach,

mechanical[,] (e) Specification changes[,] (f) Proposed schedule (bar chart)[,] and (g) Related experience[.]" Sparton mechanical design engineer Depew was assigned the responsibility to prepare the technical mechanical description section of Sparton's proposed dual depth sonobuoy. **B839-40.**

*Government Response*:

41a. On November 11, 1970, Sparton employee Mr. B. Passman issued a memorandum to Mr. R. Hungerford and several other Sparton employees addressing a proposal to be made to the Navy for a dual depth SSQ-53 DIFAR sonobuoy. PX-162 at B839. Mr. Passman directed the employees to prepare an unsolicited proposal for a SSQ-53 sonobuoy that had manually selectable hydrophone depths of 90 and 1,000 feet. PX-162 at B839. Mr. Passman further directed the employees that they were to include a "tabulation of equipment specification changes and additions" that would be necessary to the specification to which Sparton was then currently manufacturing production sonobuoys. PX-162 at B839.

41b. The proposal was to be "hardware oriented," with "no emphasis [to] be placed on feasibility or theoretical studies." PX-162 at B839. The proposal was to include a battery with an eight-hour life to comply with the specification. PX-162 at B839.

41c. Further, Mr. Passman directed that the proposal contain "a somewhat diagrammatic assembly drawing" identifying the location and function of all significant subassemblies." PX-162 at B839. He further stated that "[w]e should

avoid detailing parts and subassemblies so as to maintain flexibility of design." PX-162 at B839.

41d. Mr. Passman also directed that the proposal emphasize "common use of many of the critical items of the current AN/SSQ-53 buoy including, specifically, the directional and omni directional [sic] hydrophones, subsurface electronics, subsurface suspension system and VHF transmitter." PX-162 at B839. Further, the proposal was to state that the hydrophones had been previously tested at pressures exceeding those required for operation at 1,000 feet. PX-162 at B839. The proposal's mechical design approach was to emphasize the necessity for improved space utilization and rapid deployment to depth, without sacrifice in mechanical function or deployment reliability. PX-162 at B839-840.

41e. Mr. Passman's memorandum does not mention the use of the "upside-down" design. PX-162 at B839-840.

41f. Mr. Passman's memorandum does not assign specific tasks to anyone. PX-162 at B839-840. The memorandum, however, does indicate that Don Depew had previously prepared an incomplete layout for a sonobuoy. PX-162 at B839.

**42.** The scope of work to be contained in the Sparton proposal was to be divided into three major phases, each separately priced: "(a) Design, including six engineering models and sea test[,] (b) Qualification, including CD [contractor demonstration] tests, preproduction approval, manufacturing drawings, hand-book and design data items

(MIL-D-18300)[,] and (c) Rebuild and deliver one production lot (500) of AN/SSQ-53 sonobuoys." In all three phases of the program it was assumed that GFE buoys were to be utilized from current production contracts. Sparton's schedule for completion of the proposal and estimate was as follows: (a) bill of material and sketches by November 16, 1970, (b) written material for proposal by November 16, 1970, (c) engineering estimate sheets by November 18, 1970 and (d) proposal and prices for delivery to the Naval Air Sea Center ("NASC") by November 30, 1970. **B840.**

*Government Response*:

42. The scope of work to be contained in the Sparton proposal was to be divided into three major phases, each separately priced: "(a) Design, including six engineering models and sea test[,] (b) Qualification, including CD [contractor demonstration] tests, preproduction approval, manufacturing drawings, hand-book and design data items (MIL-D-18300)[,] and (c) Rebuild and deliver one production lot (500) of AN/SSQ-53 sonobuoys." PX-162 at B840. The proposal team was to assume that GFE buoys would be utilized from current production contracts. PX-162 at B840. Sparton's schedule for completion of the proposal and estimate was as follows: (a) bill of material and sketches were to be provided to Sparton employee Beaudrie by November 16, 1970, (b) written material for the proposal were to be provided to Sparton employee Rudowski by November 16, 1970, (c) engineering estimate sheets were to be provided to Sparton employee Briggs by November 18, 1970 and (d) proposal and prices for delivery to the Naval Air Systems Command ("NASC") by November 30, 1970. PX-162 at B840.

**43.** A dual depth sonobuoy proposal was prepared by Sparton and was reviewed by NADC employee Graff. B963-65, 1012-51. That proposal contained a confidentiality legend which prevented a disclosure of its contents by the Navy to any member of the public. **B1012-47, 1420.**

*Government Response*:

43. Sparton's November 30, 1970 unsolicited proposal for a dual depth sonobuoy was reviewed by NADC employee Graff. B963-65, 1012-51. That proposal contained the following confidentiality legend:

> These data shall not be disclosed outside the government or be duplicated, used or disclosed in whole or in part for any purpose other than to evaluate the proposal, provided that if a contract is awarded to this offeror as a result of or in connection with the submission of such data, this legend shall be of no force or effect, and in such event this offeror will assert no rights against the government with respect to these data, unless based on patents or provisions in the contract. This restriction does not limit the government's right to use information contained in such data if it is obtained from another source.

PX-179 at B1014.

**44.** On December 2, 1970, Widenhofer issued a memorandum to his superior Devereaux relating to a proposed test program for the Sparton 1,000 foot DIFAR preliminary mechanical design. The purpose of the test program was "[t]o evaluate the performance of the proposed inverse sonobuoy package with particular reference to the float pressure activated

release plate design." Other areas of interest were "...the air deployment and subsequent descent with parachute and the deployment of various subsurface components of the sonobuoy." Six air deployable sonobuoys, which were mechanically operational only, were to be tested. The quantity of signal cable and the length of the suspension system were selected to permit deployment of components only to a depth of 75 feet. The sonobuoy was configured so that the total depth of the deployed unit would not exceed 65 feet. Widenhofer noted that testing in shallow water (65-75 feet) would "...maximize the evaluation of the float pressure activated release plate[,] [but would] limit the objectives for testing the 1,000-foot design." B74-75.

*Government Response*:

44. On December 2, 1970, Widenhofer issued a memorandum to his superior Devereaux relating to a proposed test program for the Sparton 1,000 foot DIFAR preliminary mechanical design. PX-10 at B74. The purpose of the test program was "[t]o evaluate the performance of the proposed inverse sonobuoy package with particular reference to the float pressure activated release plate design." PX-10 at B74. Other areas of interest were "...the air deployment and subsequent descent with parachute and the deployment of various subsurface components of the sonobuoy." PX-10 at B74. Six air deployable sonobuoys were to be available for testing. PX-10 at B74. The six sonobuoys were to be mechanically operational only, with the weight of the electronics to be simulated

and the center of gravity controlled. PX-10 at B74, 76. The quantity of signal cable and the length of the suspension system were selected to permit deployment of components so as to allow full deployment in water that was 75 feet deep. PX-10 at B74,77. The sonobuoy was configured so that the total depth of the deployed unit would not exceed 65 feet. Mr. Widenhofer explained that "[t]esting in shallow water will maximize the evaluation of the float pressure activated release plate. It does, however, limit the objectives for testing the 1000-foot design." PX-10 at B74. The preferred test date was December 15, 1970, with December 16 and 17, 1970 being backup dates. PX-10 at B76.

**45.** The following personnel and equipment were required by Sparton from the Navy to conduct this proposed test because Sparton did not possess them: (a) one aircraft equipped with sonobuoy launchers; (b) an aircraft mounted high speed movie camera; (c) one boat and crew; (d) divers with underwater still cameras; (e) a boat deck located high speed movie camera; (f) one Q-57 (or other passive) sonobuoy, and (g) receiving equipment for the Q-57 sonobuoy (to monitor squib fire). **B74.**

**46.** On December 20, 1970, Widenhofer issued a memorandum indicating that on December 19, 1970, Sparton had tested six experimental sonobuoys, mechanically operational only (no electronics or a hydrophone were included), in shallow water

at the Navy's facility in Key West, Florida. These sonobuoys contained a Sparton deep DIFAR preliminary mechanical design. NADC personnel John Tenuto, Al Waynich and Bill Myers witnessed the test. Although no underwater photographs were taken during the test (because the water was murky) and no squib times were available, Widenhofer indicated that sonobuoy units 1 through 4 performed as intended (although unit 2 had a soft float), unit 5 lost its subsurface electronic unit and suspension system (as a result of a badly tied strain relief) and had a soft float, and the parachute on unit 6 did not deploy (although the release plate actuated to support the surface unit). **B78-81.**

*Government Response*:

46. On December 20, 1970, Widenhofer prepared a memorandum indicating that on December 19, 1970, Sparton had tested six experimental sonobuoys, mechanically operational only (no electronics or a hydrophone were included), in shallow water at the Navy's facility in Key West, Florida. PX-11 at B78. These sonobuoys employed a Sparton deep DIFAR preliminary mechanical design. NADC personnel John Tenuto, Al Waynich and Bill Myers witnessed the test. PX-11 at B78. No underwater photographs were taken during the test because the water was murky, and the time from water impact to squib activation could not be measured due to an equipment malfunction. PX-11 at B78. Widenhofer stated that sonobuoy units 1 through 4 performed as intended,

although unit 2 had a soft float upon recovery. PX-11 at B78. Unit 5 lost its subsurface electronic unit and suspension system (as a result of a badly tied strain relief) and had a soft float. PX-11 at B78. The parachute on unit 6 did not deploy, resulting in a "broadside water impact." PX-11 at B78. The release plate on unit 6 did activate and the float inflated to support the release unit. PX-11 at B78. The parachutes on all of the six sonobuoys were "DICASS parachutes" of a type that had been successful in past tests. PX-11 at B80.

**47.** A multipiece spider release plate mechanism was incorporated by Widenhofer within the sonobuoys tested on December 19, 1970 and an illustration thereof is shown below. A description of the construction and operation of the sonobuoys tested on December 19, 1970 is also contained below, except that the hydrophone and electronics referred to therein were not contained in the sonobuoys tested on December 19, 1971. **B816-22.**

*Government Response*:

This proposed statement of fact is not supported source document, PX-160. While that document supports the "deep DIFAR" design, these were experimental models, not deep DIFAR sonobuoys.

**48.** On February 26, 1971 Widenhofer issued a memorandum addressing a February 18, 1971 airdrop test of Sparton's preliminary deep DIFAR sonobuoy design at Key West, Florida.

The purpose of this test was "[t]o evaluate the present mechanical and electrical designs prior to constructing a final engineering lot of twenty sonobuoys intended to demonstrate an acceptable design for a deep DIFAR." Naval personnel present during the test were John Tenuto and Al Waynich. Six fully operational sonobuoys were airdropped during this test. All six sonobuoys contained the Widenhofer multipiece spider plate mechanism. Four out of six of these sonobuoys tested on February 18, 1971 failed when cables therein snapped causing the lower electronics units attached thereto to fail and sink to the ocean floor. Although Widenhofer considered this a "serious problem," he also considered it to be "...a correctable malfunction of the cable spool...[and noted that] the problem is still being investigated." Widenhofer concluded in this memorandum that "[t]he objective [completion of a preliminary design, not the testing of the 20 sonobuoys to determine the workability of the design] of the two 6 sonobuoy engineering tests has been achieved." **B83-90**.

*Government Response*:

48. On February 26, 1971 Widenhofer prepared a memorandum addressing a February 18, 1971 airdrop test of Sparton's preliminary deep DIFAR sonobuoy design at Key West, Florida. PX-13 at B83. The purpose of this test was "[t]o evaluate the present mechanical and electrical designs prior to constructing a final engineering lot of twenty sonobuoys intended to demonstrate

an acceptable design for a deep DIFAR." PX-13 at B83. Navy personnel present during the test were John Tenuto and Al Waynich. PX-13 at B83. Six fully operational sonobuoys were airdropped during this test. PX-13 at B83. Four lower units were lost when cables therein snapped at 70-80 feet below the surface. PX-13 at B86. Mr. Widenhofer concluded:

> The objective of the two 6[-]sonobuoy engineering tests has been achieved. The principles involved in the operation of the inverse sonobuoy design with a float pressure actuated release mechanism, or the so call [sic] "upside down" design, have been proven workable and, within the limited scope of the testing accomplished to date, reliable.

PX-13 at B84. Mr. Widenhofer also concluded that "[t]he fact that two sonobuoys did 'play' indicates that the principles of and the sequence of deployment are workable." PX-13 at B85.

The underlined sentence is not supported by the cited document.

**49.** A <u>description of the construction and operation of the sonobuoy tested on February 18, 1971 is as follows and refers to the three figures which follow:</u> The sonobuoy consists of numerous parts and assemblies all stowed within a cylindrical casing (1). The casing is closed on the lower end and serves as a descent vehicle. The lower end is provided with a weight (2). A directional hydrophone and an omnidirectional hydrophone (22) are located adjacent to the bottom end weight. The subsurface electronics assembly (23) is positioned above and adjacent to the hydrophone elements.

A damper element and associated compliant cable subassembly (24) is located between the subsurface electronics assembly and a cable spool wound with flexible cable (25). A sea water activated battery (26) that provides power to the electronics assemblies and a sea water activated squib battery (18) that activates the float inflation system is intermediate the surface electronics assembly (3) and the cable spool. Underwater acoustic signals transduced to an electrical analog by a hydrophone are imparted to the subsurface electronics assembly and then are transmitted, by a line driver, to the surface electronics assembly, which contains a VHF transmitter, by means of a signal path existing through the compliant cable, the flexible cable wound on the cable spool and its extension (27) through the bulkhead (28) at the bottom of the surface electronics assembly. There is a flexible wire interconnection between the bottom of the surface electronics assembly and the VHF transmitter. Radio frequency ("RF") energy is coupled from the VHF transmitter to the base of the antenna (29), which is located within the float assembly, by a flexible coaxial cable (30) located above the VHF transmitter and below the float assembly. An RCA phone plug and socket (31) facilitate connection of the flexible coaxial cable to the transmitter output.

A surface electronics/float assembly (3) resides near the upper end adjacent to the release mechanism (21[)]. A parachute (4) and parachute release device (5) reside above the release mechanism. The float (6) is stowed within and is attached to the surface unit by means of a collar (7) which is a necked down portion of the surface electronics housing. The float cup (8) is positioned over and around the float. The closed end of the float cup is attached to a piston (9). The piston is guided and held in place by a support plate (10) and a milled plate (11). The two plates are separated by a load spring (12) which allows for variations in the length of the subassemblies that are contained within the sonobuoy casing. A spider plate with a central ring (13) resides on the shoulder of a piston (15). The spider plate is made from cold rolled steel. It has three long narrow legs attached to and extending radially from the central ring. The legs have large tensile strength along their length axis but are drawn easily in a direction perpendicular to the plane that contains the three legs. An enlarged end on each of the three legs engages with a key hole feature in each of three latches (16). The latches are located in positions such that they each retain a fiber housing (22) and extend through and engage the sonobuoy casing. The arms of the spider plate (17) are located above the milled plate. The radius plate in conjunction with the

milled plate capture the spider plate and associated latches in a sandwich like fashion. The radius plate has a center hole with a large radius on the side adjacent to the spider plate.

When the Deep DIFAR sonobuoy is deployed into the ocean, sea water causes the sea water squib battery (18) to be activated which in turn fires a squib actuated bottle piercing mechanism (19) that results in the opening of two $CO_2$ bottles (20) causing $C0_2$ to inflate the float. As the float inflates, pressure is applied to the float cup (8) resulting in upward movement of the float cup and the attached piston (15). As the piston passes through the hole in the radius plate, (17) the thin arms of the spider plate are drawn around the radius. Continued upward movement of the piston results in the spider arms and attached latches moving inward until the latches (16) disengage from the sonobuoy casing, whereupon the release mechanism along with the parachute housing and attached parachute are forcefully ejected. This action permits the surface electronics assembly to exit through the top end of the casing, and the casing with the balance of its contents descend to operating depth whereupon the casing is shed and the subsurface components assume their operating configuration. **B816-22.**

*Government Response*:

A description of the construction and operation of Sparton's "Deep Depth" sonobuoy is as follows and refers to the three figures which follow:

> The sonobuoy consists of numerous parts and assemblies all stowed within a cylindrical casing (1). The casing is closed on the lower end and serves as a descent vehicle. The lower end is provided with a weight (2). A directional hydrophone and an omnidirectional hydrophone (22) are located adjacent to the bottom end weight. The subsurface electronics assembly (23) is positioned above and adjacent to the hydrophone elements. A damper element and associated compliant cable subassembly (24) is located between the subsurface electronics assembly and a cable spool wound with flexible cable (25). A sea water activated battery (26) that provides power to the electronics assemblies and a sea water activated squib battery (18) that activates the float inflation system is intermediate the surface electronics assembly (3) and the cable spool. Underwater acoustic signals transduced to an electrical analog by a hydrophone are imparted to the subsurface electronics assembly and then are transmitted, by a line driver, to the surface electronics assembly, which contains a VHF transmitter, by means of a signal path existing through the compliant cable, the flexible cable wound on the cable spool and its extension (27) through the bulkhead (28) at the bottom of the surface electronics assembly. There is a flexible wire interconnection between the bottom of the surface electronics assembly and the VHF transmitter. Radio frequency ("RF") energy is coupled from the VHF transmitter to the base of the antenna (29), which is located within the float assembly, by a flexible coaxial cable (30) located above the VHF transmitter and below the float assembly. An RCA phone plug and socket (31) facilitate connection of the flexible coaxial cable to the transmitter output.
>
> A surface electronics/float assembly (3) resides near the upper end adjacent to the release mechanism (21[)]. A parachute (4) and parachute release device (5) reside above the release mechanism. The float (6) is stowed within and is attached to the surface unit by means of a collar (7) which is a necked down portion of the surface electronics housing. The float cup (8) is positioned over and around the float. The closed end of the float cup is attached to a piston (9). The piston is guided and held in place by a support plate (10) and a milled plate (11). The two plates are separated by a load spring (12) which allows for variations in the length of the subassemblies that are contained within the sonobuoy casing. A spider plate with a central ring (13)

> resides on the shoulder of a piston (15). The spider plate is made from cold rolled steel. It has three long narrow legs attached to and extending radially from the central ring. The legs have large tensile strength along their length axis but are drawn easily in a direction perpendicular to the plane that contains the three legs. An enlarged end on each of the three legs engages with a key hole feature in each of three latches (16). The latches are located in positions such that they each retain a fiber housing (22) and extend through and engage the sonobuoy casing. The arms of the spider plate (17) are located above the milled plate. The radius plate in conjunction with the milled plate capture the spider plate and associated latches in a sandwich like fashion. The radius plate has a center hole with a large radius on the side adjacent to the spider plate.
>
> When the Deep DIFAR sonobuoy is deployed into the ocean, sea water causes the sea water squib battery (18) to be activated which in turn fires a squib actuated bottle piercing mechanism (19) that results in the opening of two $CO_2$ bottles (20) causing $C0_2$ to inflate the float. As the float inflates, pressure is applied to the float cup (8) resulting in upward movement of the float cup and the attached piston (15). As the piston passes through the hole in the radius plate, (17) the thin arms of the spider plate are drawn around the radius. Continued upward movement of the piston results in the spider arms and attached latches moving inward until the latches (16) disengage from the sonobuoy casing, whereupon the release mechanism along with the parachute housing and attached parachute are forcefully ejected. This action permits the surface electronics assembly to exit through the top end of the casing, and the casing with the balance of its contents descend to operating depth whereupon the casing is shed and the subsurface components assume their operating configuration.

PX-160 at B816-22.

**50.** In four of the six sonobuoys tested on February 18, 1971, the following sonobuoy components did not function properly: “signal receiving and transmitting apparatus” and “flexible cable means”. **B83-90, 1421-22.** The February 18, 1971 sonobuoys did contain a “signal receiving and

transmitting apparatus" (in the form of a hydrophone and its electronics for converting acoustic signals to electrical ones and transmitting them to a vhf transmitter for conversion to radio frequency signals and then transmitting them to an antenna for radiation to an aircraft/boat) and "flexible cable means" (in the form of cables, coils and wires connecting the "signal...apparatus" with an inflatable float). Id.

*Government Response*:

50. In four of the six sonobuoys tested on February 18, 1971, the following sonobuoy components did not function properly: the cable pack in four of the units and the float in two units. PX-13 at B83-86. The sonobuoys tested on February 18, 1971 were fully operational units including both a directional and an omnidirectional hydrophone for converting acoustic signals to electrical ones and transmitting them to a vhf transmitter for conversion to radio frequency signals and then transmitting them to an antenna for radiation, a flexible cable and an inflatable float. PX-13 at B83-86; PX-160 at B816-22.

**51.** On March 8, 1971 Widenhofer issued a memorandum indicating that a proposed test program was developed by Sparton for evaluating descent vehicle characteristics of its deep DIFAR sonobuoy at the Naval Ordnance Laboratory ("NOL") 100 foot tank facility. The purpose of the test program was to evaluate the "serious" "cable break problem"

experienced during the February 18, 1971 test by identifying "the cause of the cable breaks" and "...evaluat[ing]...modifications intended to correct the problem." This evaluation was justified on the basis that "...the cable breaks are not due simply to a 'cable pack problem.'" Widenhofer also acknowledged that Sparton did not possess the facilities required to evaluate "...these type of problems as they require "[a] deep tank of large diameter with view ports and movie camera coverage for the full depth." He also acknowledged that sea tests were of limited value because movie coverage of deployment during sea tests was "impossible." **B84, 91-93**.

*Government Response*:

51. On March 8, 1971, Widenhofer prepared a memorandum in which he sought approval for a proposed Sparton test program for evaluating the descent vehicle characteristics of its deep DIFAR sonobuoy at the Naval Ordnance Laboratory ("NOL") 100 foot tank facility. PX-14 at B91. The purpose of the test program was to evaluate the "cable break problem" experienced during the February 18, 1971 test by "attempting to identify the cause of the cable breaks" and "... evaluat[ing] ... modifications intended to correct the problem." PX-14 at B91. Mr. Widenhofer justified the proposed program, stating that "... the cable breaks are not due simply to a 'cable pack problem'" but were more likely due to the "stability of the descent vehicle and to the drag and hydrodynamic forces existent during the 'initial plunge' immediately after squib fire and float

inflation." PX-14 at B91. Widenhofer justified the need to use the NOL facility because Sparton did not possess the facilities required to evaluate "...these type of problems as they require a deep tank of large diameter with view ports and movie camera coverage for the full depth." PX-14 at B91. He also acknowledged that sea tests were of limited value because movie coverage of deployment during sea tests was "impossible." PX-14 at B91.

**52.** In another March 8, 1971 Sparton memorandum concerning the evaluation of the "cable break problem," Widenhofer noted that "[t]he unique nature of the deep DIFAR design invites a close scrutiny of all conceivable cable break possibilities in an attempt to better understand the peculiarities inherent in the inverse approach to sonobuoy design." **B94-103.**

*Government Response*:

52. In another March 8, 1971 Sparton memorandum, addressing his evaluation of the "cable break problem," Mr. Widenhofer noted that "[t]he unique nature of the deep DIFAR design invites a close scrutiny of all conceivable cable break possibilities in an attempt to better understand the peculiarities inherent in the inverse approach to sonobuoy design." PX-15 at B94.

**53.** As a result of the "serious" cable pack problem, an updated schedule for the completion of the Sparton deep depth DIFAR program, Job 7400, was prepared by Devereaux for

his superior Hungerford on March 16, 1971. This updated schedule was necessary for two reasons: first, the test data for the final 20 sonobuoy units had not been taken and was contingent on Sparton's making of necessary arrangements with VAST, the Navy's facility contractor, at St. Croix; and second, the NOL test was required to be added to the schedule "...due to the design uncertainties related to the cause of cable failures during the Key West drop tests." Devereaux believed that the completion of the preliminary mechanical design would occur on April 4, 1971, with the building and testing of the 20 engineering models occurring between April 11-25, 1971. **B104-05**

*Government Response*:

53. On March 16, 1971, Mr. Devereaux provided Mr. Hungerford with an updated schedule for the completion of the Sparton deep depth DIFAR program, Job 7400. PX-16 at B104. The schedule was updated in two respects: first, the test data for the final 20 sonobuoy units was contingent on Sparton's making of necessary arrangements with VAST, the Navy's facility contractor, at St. Croix; and, second, the NOL test was added to the schedule "...due to the design uncertainties related to the cause of cable failures during the Key West drop tests." PX-16 at B104. Mr. Devereaux projected that the completion of the preliminary mechanical design would occur on April 4, 1971, that the 20 models would be completed by April 15, 1971 and testing of the 20 models would be completed by April 22, 1971. PX-16 at B105.

B. Sparton's March 17, 1971 ECP
And Mod. 4 To The 0465 Contract

**54.** On or about March 17, 1971 Sparton submitted to the Navy a letter and enclosed engineering change proposal for an experimental test program which would result in Sparton's supply of 300 sonobuoys to the Navy "for test and evaluation[.]" These sonobuoys were not intended for normal fleet use. **B1422.** Sparton proposed to perform a 7-1/2 month program which would accomplish the following:

> The redesign, modification and test of engineering models to verify feasibility of design approach. Sparton's method of adding the dual depth capability is outlined in the enclosed ECP.
>
> Modify and deliver 300 units in accordance with conditions described in the enclosed ECP.

In order to construct and test the engineering models and deliver the 300 modified units per the ECP, Sparton requested 335 completed (GFE) SSQ-53 units to be made available from the 0465 contract. **B55-56, 780-81.**

*Government Response*:

54. On or about March 17, 1971 Sparton submitted to the Navy a letter and enclosed an engineering change proposal "to incorporate the added capability of pre-selected dual depth operation to the DIFAR sonobuoy." PX-5 at B55. For a fixed price of $198,000.00, Sparton proposed to perform a 7-1/2 month program which would accomplish the following:

> The redesign, modification and test of engineering models to verify feasibility of design approach. Sparton's method of adding the dual depth capability is outlined in the enclosed ECP.
>
> Modify and deliver 300 units in accordance with conditions described in the enclosed ECP.

PX-5 at B55. In order to complete the program, Sparton requested 335 completed (GFE) SSQ-53 units to be made available from the '-0465 contract. PX-5 at B55.

**55.** The formal ECP 0465-2 attached to Sparton's March 17, 1971 letter justified the requested change by indicating that "[t]his proposed change will add the capability to the AN/SSQ-53 to operate at 1,000 ft. depth as well as 90 ft." Sparton completed the "Developmental Requirements" section of the ECP by recommending "...that 300 completed AN/SSQ-53 units be modified as described in the proposal and submitted for test and evaluation." Sparton noted that it knew of no "Alternative Solutions." Importantly, production effectivity of the change was to occur in "Future Procurement," but only "...if evaluation tests prove the proposed merits [of the change]." This proposed engineering change was not to affect other SSQ-53 sonobuoy units required to be delivered by Sparton under the 0465 contract. On page 10 section 1.0 of the ECP, a "Statement of Work" was proposed. Sparton segregated the work into two phases:

> Phase 1: Design and construct engineering models and perform sea tests.

Phase 2: (1) Modify and deliver one production lot of 300 GFE AN/SSQ-53 sonobuoys for dual depth operation.

(2) Deliver operating manual.

Sparton proposed to use "Thirty-Five (35) GFE Sparton AN/SSQ-53 Sonobuoys" for Phase 1 and "Three Hundred (300) GFE Sparton AN/SSQ-53 Sonobuoys" for Phase 2. The 335 completed SSQ-53 sonobuoys were to be shipped "in place," and no "drop tests" were to be required for the 335 sonobuoys. **B57-69, 780-81**.

*Government Response*:

55. The Engineering Change Proposal form that accompanied Sparton's March 17, 1971 letter stated in the "Justification for Change" block that "[t]he proposed change will add the capability to the AN/SSQ-53 to operate at 1,000 ft. depth as well as 90 ft." PX-6 at B57. Sparton completed the "Developmental Requirements" section of the ECP by stating that "[i]t is recommended that 300 completed AN/SSQ-53 units be modified as described in proposal and submitted for test and evaluation." PX-6 at B57. In the "Alternative Solutions" block, Sparton entered "None." PX-6 at B57. In the "Production Effectivity" block, Sparton entered: "Future Procurement (if evaluation tests prove the proposed merits [of the change])." PX-6 at B57. This proposed engineering change was not to affect SSQ-53 sonobuoy units required to be delivered by Sparton under the 0465 contract, other than the configuration of the 335 units subject to ECP

0465-2. PX-6 at B57. On page 10 section 2.0 of the ECP, a "Statement of Work" was proposed. PX-6 at B69. Sparton segregated the work into two phases:

Phase 1: Design and construct engineering models and perform sea tests.

Phase 2: (1) Modify and deliver one production lot of 300 GFE AN/SSQ-53 sonobuoys for dual depth operation.

(2) Deliver operating manual.

PX-6 at B69. Sparton proposed to use "Thirty-Five (35) GFE Sparton AN/SSQ-53 Sonobuoys" for Phase 1 and "Three Hundred (300) GFE Sparton AN/SSQ-53 Sonobuoys" for Phase 2. PX-6 at B69. The 335 completed SSQ-53 sonobuoys were to be shipped "in place," and no "drop tests" were to be required for the 335 sonobuoys. PX-6 at B69.

**56.** The language in Phase 1, to wit: "Design and construct engineering models and perform sea tests" represents experimental work. So does Sparton requesting "...aircraft and support facilities for engineering sea tests." Even the 300 deliverable units, which were modified "for dual depth operation," represent experimental work because (a) government furnished equipment had to be modified and reconstructed before it could be supplied to the Navy and (b) the 300 units, according to the ECP, were being "...submitted for test and evaluation." **B57-69, 780-81.** Sparton submitted the ECP to the Navy because it desired the Navy to defray in part Sparton's development program costs,

inasmuch as it was the Navy that requested a solution to the dual depth problem. **B1422.**

*Government Response*:

56. The language in Phase 1, to wit: "Design and construct engineering models and perform sea tests" represents experimental work. So does Sparton requesting "... aircraft and support facilities for engineering sea tests." The 300 dual depth units to be delivered in accordance with the statement of work were a "production lot" to be delivered to the Government. PX-6 at B69. The ECP did not require any specific use of the 300 sonobuoys, but only provided that the 300 sonobuoys be submitted by the contractor to the Navy "for test and evaluation." PX-6 at B57. Those sonobuoys were later used by the Navy in accordance with a test plan prepared by Mr. Graff that provided for use of the 300 sonobuoys in various routine fleet activities. PX-120; Deposition of Mr. Graff at 102:5-112:1. Sparton agreed to perform the work as a fixed price modification to the '-0465 contract for a fee of $198,000 plus the 335 GFE sonobuoys. PX-5 at B55; PX-6 at B69.

**57.** Pursuant to his assignment to prepare a technical mechanical description of Sparton's proposed dual depth sonobuoy in ECP 0465-2, Sparton employee Depew conceived of using a multipiece release plate mechanism (he had earlier thought of using as a water impact plate) shown below with the "inverse sonobuoy design" described in the ECP. The DePew plate is the one described in ECP 0465-2 and

corresponds to the ECP 0465-2 description: "As the float inflates, it pushes a trigger plate located below the release plate assembly. This action disengages the release plate from the buoy." **B784-85, 823-38; A190**. The DePew release plate, i.e. a water impact plate, needed to be redesigned in order to function as a float activated release plate. Boyle.

*Government Response*:

57. In 1971, Mr. Depew was a senior mechanical design engineer at Sparton Electronics and was primarily engaged in preparation of technical proposals relating to sonobuoys. PX-161 at B829. Pursuant to his duties, he prepared at least part of the mechanical description, including Figure 1, of ECP 0465-2. PX-161 at B829. Sparton employee Depew conceived of using a multipiece release plate mechanism in ECP sonobuoys, a mechanism which he had originally created for use as a water impact plate. PX-161 at B829-31. Mr. DePew's design is shown below with the "inverse sonobuoy design" described in the ECP. PX-161 at B829-38. The DePew plate is the one described in ECP 0465-2 and corresponds to the ECP 0465-2 description: "As the float inflates, it pushes a trigger plate located below the release plate assembly. This action disengages the release plate from the buoy." B784-85, B823-38; PX-4 at B64. The DePew release plate was a water impact plate that had been redesigned in order to function as a float activated release plate. PX-161 at B829-38.

**58.** Widenhofer was aware of the preparation of ECP 0465-2, but did not actively en[g]age in its preparation. Id. His multipiece Spider plate mechanism was not described or proposed in ECP 0465-2. **B784-85, 823-38; A190.**

*Government Response*:

58. Widenhofer was aware of the preparation of ECP 0465-2, but was not part of the proposal team. PX-161 at B823-24. The multipiece Spider plate mechanism of the Deep DIFAR design was not described or proposed in ECP 0465-2. PX-161 at B829; PX-160 at B816-22.

**59.** On July 13, 1971, ECP 0465-2 and Sparton's March 17, 1971 letter proposal were incorporated into the 0465 contract as Mod. 4. The Navy was knowledgeable that experimental, i.e. redesign and testing, work was to be performed under Mod. 4, that 300 Sparton SSQ-53 sonobuoys, modified for dual depth operation, were to be submitted by Sparton to the Navy for test and evaluation purposes and that production of a Sparton dual depth SSQ-53 sonobuoy was contingent upon the Navy's evaluation tests proving the proposed merits of the engineering change. **B51-69, 780-81.**

*Government Response*:

59. On July 13, 1971, ECP 0465-2 was incorporated into the '-0465 contract by Mod. 4. PX-6 at B51-69. The Navy knew that by the terms of Mod 4 to the '-0465 contract Sparton was obligated to deliver one production lot of 300

Sparton AN/SSQ-53 sonobuoys, modified for dual depth operation to the Navy, but that future production of a Sparton dual depth SSQ-53 sonobuoy was contingent upon the Navy's evaluation tests proving the proposed merits of the engineering change. PX-6 at B51-69.

**60.** The Depew multipiece release plate mechanism proposed for incorporation into the 300 sonobuoys to be provided to the Navy under Mod. 4 of the 0465 contract was projected as having a dry weight of 1.2 lbs. **B67.**

*Government Response*:

60. The release plate mechanism described in ECP 0465-2 as being proposed for incorporation into the 335 sonobuoys that were to be tested or provided to the Navy under Mod. 4 of the 0465 contract had a dry weight of 1.2 lbs. PX-6 at B67.

C. Events Subsequent To The Sparton March 17, 1971 ECP But Prior To Conception of the 120 and 233 Patented Inventions

**61.** On March 23, 1971, Widenhofer issued a memorandum containing a proposed Sparton test program at NOL designed "...to identify the cause of the cable breaks on the February Deep DIFAR sea test, ..." by studying: (1) "[t]he effects of 'Initial Plunge' conditions[,]" including "(a) Initial high cable drag[,] (b) Initially high relative descent rate[,] (c) Hydrodynamic lift force on cable pack

assembly[,] [and] (d) Initial descent vehicle stability[,]" (2) "[s]tability or instability [of sonobuoy descent] and its effect on cable payoff[,]" (3) "[s]hock absorber deployment, the mass damper deployment, and the release of the subsurface unit from the sonobuoy housing[,]" and (4) "[c]haracteristic descent times for a DIFAR subsurface unit and for the last 90 feet of a deep DIFAR subsurface unit." **B106-12.**

*Government Response*:

61a. On March 23, 1971, Widenhofer prepared a memorandum proposing, and seeking approval for, a threefold Sparton test program at NOL. PX-17 at B106. The program was designed (1)"...to identify the cause of the cable breaks on the February Deep DIFAR sea test"; (2) evaluating "modifications intended to correct the cable break problem"; and "(3) examine other areas of concern in the deployment sequences . . .." PX-17 at B106. Mr. Widenhofer indicated that the program would run tests for both an SSQ-47 program and the Dual Depth DIFAR program. PX-17 at B106-07.

61b. In the first test, "each of four complete, mechanically operational buoys is launched vertically into the water at 88 ft./sec." PX-17 at 107-08. The purpose of the first test was to study "[t]he effects of 'Initial Plunge' conditions[,]" including "(a) Initial high cable drag[,] (b) Initially high relative descent rate[,] (c) Hydrodynamic lift force on cable pack assembly[,] [and] (d) Initial descent vehicle stability[.]" PX-17 at 107-08.

61c. In the second test, "[e]ach of four descent vehicles, two 'February Drop" designs, and two of the latest design were to be hand dropped at the surface [of the water] with cable pay off to 100 feet" to study the "[s]tability or instability [of sonobuoy components] and the effect on cable payoff[.]" PX-17 at 107-08.

61d. In the third test, each of four descent vehicles, two 'February Drop" designs, and two of the latest design," were to be hand dropped at the surface with only 75 feet of cable remaining on the spool, and a "proving ring setup" would

measure cable tension over time. PX-17 at 107-08. This test was to study "[s]hock absorber deployment, the mass damper deployment, and the release of the subsurface unit from the sonobuoy housing[]" PX-17 at B108

61e. In the final test, "[e]ach of three DIFAR type suspension systems with subsurface assembly" were to be hand dropped from the surface, with one having the "damper restrained to open near the end of descent," one having "the damper fixed to open near the surface," and one having the damper "stowed normally." PX-17 at 107-08. This test was to study "[c]haracteristic descent times for a DIFAR subsurface unit and for the last 90 feet of a deep DIFAR subsurface unit." PX-17 at 108.

**62.** By March 30, 1971, Sparton was informed by its Engineering department that 20 final hydrophone engineering models were ready to be delivered to Sparton's sonobuoy group. **B113-14.**

**63.** On April 6, 1971, Widenhofer issued a memorandum indicating that on April 3, 1971, he conducted deep DIFAR tests at NOL on four Sparton deep DIFAR sonobuoys to evaluate descent vehicle characteristics "...to identify the cause of the cable breaks on the February Deep DIFAR sea test, to evaluate modifications intended to correct the cable break problem, and to examine other areas of concern in the deployment sequence...." One Navy tank operator and

two photographers were involved in the test. Four sonobuoys, mechanically operational only, were tested in accordance with Widenhofer's proposed test plan. Although Widenhofer concluded that no sound conclusions could be drawn until the films taken during the test were viewed, he did make a few observations: "1. [t]he new design descent vehicle is more stable during descent than the 'February' design descent vehicle[;] 2. [t]he shock absorber design has a good safety margin[;] 3. [t]he key arrangement between the cable pack assembly and the subsurface electronics housing must be modified to prevent jamming[;] 4. [h]ydraulic forces acting on the cable pack assembly during 'Initial Plunge' may be the cause of the cable breaks[;] [and] 5. [t]he stretched length of compliant rubber on a DIFAR suspension system may not meet the required specified depth." **B115-28.**

*Government Response*:

63. On April 6, 1971, Widenhofer prepared a preliminary test report for his evaluation of descent vehicle characteristics for the Deep DIFAR sonobuoys tested at NOL. PX-19 at B115. He stated that, on April 3, 1971, he conducted tests at NOL on four Sparton deep DIFAR sonobuoys to "attempt to identify the cause of the cable breaks on the February Deep DIFAR sea test, to evaluate modifications intended to correct the cable break problem, and to examine other areas of concern in the deployment sequence." PX-19 at B115. One Navy tank operator and two photographers assisted in the test. PX-19 at B115. Four test

sonobuoys, which were mechanically operational, but not electronically operational, were tested in accordance with Widenhofer's proposed test plan. PX-19 at B115. Two of the buoys were of the same design as the February Drop Test units and two were of the new design. PX-19 at B115. Although Widenhofer stated that "no sound conclusions could be drawn until the films are viewed," he observed that:

1. The new design descent vehicle is more stable during descent than the "February" design descent vehicle.

2. The shock absorber design has a good safety margin.

3. The key arrangement between the cable pack assembly and the subsurface electronics housing must be modified to prevent jamming.

4. Hydraulic forces acting on the cable pack assembly during "Initial Plunge" may be the cause of the cable breaks.

5. The stretched length of compliant rubber on a DIFAR suspension system may not meet the required specified depth.

PX-19 at B116-17.

**64.** On May 3, 1971, Sparton knew that official Navy approval for the design and development of a Sparton dual depth DIFAR was imminent. Sparton employees were informed to "... develop a test program and schedule including any necessary sea tests at Key West or elsewhere, which would ascertain all the deep DIFAR cable parameters and their limits by May 17, 1971." **B129**. Sparton did not want the cable break problem to derail its development efforts. **B1422**.

*Government Response*:

64. On May 3, 1971, Sparton employee C. Huntoon prepared a memorandum to Sparton employee W. Weston in which he stated that "[t]he official go-ahead for the design and development of a Sparton dual depth DIFAR is imminent." PX-20 at B129. Mr. Huntoon further informed Mr. Weston to "develop a test program and schedule including any necessary sea tests at Key West or elsewhere, which would ascertain all the deep DIFAR cable parameters and their limits by May 17, 1971." PX-20 at B129.

**65.** On May 21, 1971, Passman informed Sparton program manager Rice that the twenty 1,000 foot sonobuoy models had been completed, tested, packed and were ready for airdrop testing. The Sparton project group was instructed to retain these sonobuoys and make no firm arrangements for drop testing them pending negotiations with the Navy, i.e. the Naval Air Sea Center ("NASC"), and receipt of the SSQ-53 dual depth ECP. Passman indicated that, in the event Sparton was unsuccessful in its attempt to sell these buoys to the Navy for special test purposes, Sparton should proceed with its plan to run an engineering drop test of them as part of its dual depth development program. At this point in time the Sparton deep DIFAR program was merging with and into its dual depth DIFAR program, also identified as Job No. 7400. **B130, 793.**

*Government Response*:

65. On May 21, 1971, Mr. Passman informed Sparton program manager E. Rice that the twenty 1,000 foot sonobuoy models had been completed, tested, packed and were ready for airdrop testing. PX-21 at B130. Mr. Passman further stated that this was "the last phase of our in-house development program, Job # 7400." PX-21 at B130. Mr. Passman further stated that "The Sparton project group has been instructed to hold these sonobuoys and make no firm arrangements for drop test[ing] [Mr. Rice's] pending negotiations with the NASC and receipt of the AN/SSQ-53 Dual Depth ECP." PX-21 at B130. Mr. Passman indicated that, in the event Sparton was unsuccessful in its attempt to sell these buoys to the Navy for special test purposes, Sparton should proceed with its plan to run an engineering drop test of them as part of its dual depth development program. PX-21 at B130. At this point in time the Sparton deep DIFAR program was merging with and into its dual depth DIFAR program, also identified as Job No. 7400. Testimony of Boyle.

**66.** On June 15, 1971, Widenhofer issued a memorandum indicating the mechanical design considerations necessary for the development of a Sparton dual depth DIFAR. The purpose of the memo was (a) to indicate the mechanical design effort required in a dual depth DIFAR program and (b) to review design problems to be encountered in that program. The mechanical design considerations for the dual depth DIFAR were based on an examination of the existing deep

DIFAR design. _Widenhofer suggested eleven design considerations, of which the third stated as follows: "3. Release Plate Design - Highly simplified designs [of the release plate] are feasible and should be investigated at this time (a major cost feature). The existing design used on deep DIFAR appears to be dependable. It could be somewhat simplified and made less expensive." **B131-33.**

*Government Response*:

66a. On June 15, 1971, Mr. Widenhofer prepared a memorandum to Mr. Devereaux, entitled "Mechanical Design Considerations" PX-22 at B131. The purpose of the memorandum was "to provide some idea of the required mechanical design effort for a dual depth DIFAR program and to provide a look at some of the design problems that will be encountered." PX-22 at B131. Mr. Widenhofer's analysis of the mechanical design considerations for the dual depth DIFAR was based on an examination of the existing deep DIFAR design and he only considered what he thought to be "the more important requirements." PX-22 at B131. Mr. Widenhofer also noted that the "intention is to modify the existing design to meet the requirements of the Dual Depth feature." PX-22 at B131.

66b. Mr. Widenhofer addressed eleven design considerations. PX-22 at B131-33. Mr. Widenhofer's third consideration states:

> "3. Release Plate Design - Highly simplified designs are feasible and should be investigated at this time (a major cost feature). The existing design used on deep DIFAR appears to be dependable. It could be somewhat simplified and made less expensive."

PX-22 at B132.

**67**. On June 21, 1971, Widenhofer issued a final report under Job #7400 for the Sparton deep DIFAR sonobuoy. The purpose of this final report was to describe the final mechanical design of the deep DIFAR sonobuoy. The final engineering lot of 20 sonobuoys had been assembled, were awaiting final evaluation and were awaiting final determination as to how they could best be utilized. They were never tested under Sparton's deep DIFAR program to demonstrate an acceptable design for Sparton's deep DIFAR sonobuoy. **B793**. Modifications had been made to Sparton's deep DIFAR design as a result of the testing it had conducted at NOL to correct the cable break problem encountered during the February 18, 1971 airdrop test. Widenhofer noted that, "[t]hese modifications and others made since the February air drop have not been evaluated by air deployment and sea testing." As a result, he concluded that "...the reliability of said changes [the major modifications to the deep DIFAR design] has not been established." **B134-41**.

*Government Response*:

67a. Mr. Widenhofer prepared a final report under Job #7400 for the Sparton deep DIFAR sonobuoy, dated June 21, 1971. The purpose of the final report was to "describe the final mechanical design of the deep DIFAR sonobuoy, Job # 7400." PX-23 at B134. The report also "included a brief history of the problems encountered during development, the resolution of those problems

through testing at NOL, and the design modifications incorporated as a result of the NOL test series." PX-23 at B134.

67b. Mr. Widenhofer stated that the "Deep DIFAR program, Job # 7400[,] is complete." PX-23 at B134. He further stated: "The final engineering lot of 20 sonobuoys has been assembled and is awaiting final determination as to how the buoys may best be utilized." PX-23 at B134. He also stated:

> It should be noted that the Deep DIFAR design has been well documented. The layout is finished, the Bill of Material[s] is completed and there are a full set of engineering part drawings. There are, however, no assembly drawings.

PX-23 at B138.

67c. Modifications had been made to Sparton's deep DIFAR design as a result of the testing it had conducted at NOL. PX-23 at B138-39. Mr. Widenhofer's final report expressly addressed three modifications: (1) adding mylar strips attached to the lower end of the housing to prevent the cable pack from leaving the housing until approximately the 850-foot depth; (2) relocation of a load spring to just under the release plate to increase stowage volume and minimize the effects of parchute opening shock, and water impact shock; and (3) the use of "less expensive 'irrigation tubing'" for the sonobuoy housing. PX-23 at B139-40. Mr. Widenhofer noted that:

> None of these modifications have been sea tested. Therefore, the reliability of said changes has not been established. It is imperative that these modifications be evaluated as soon as possible.

PX-23 at B140.

**68.** The layout for the deep DIFAR design with multipiece spider plate mechanism had been finished; a bill of material for that design had also been completed; there was a full set of engineering part drawings for this sonobuoy; no assembly drawings, however, had been prepared for this deep DIFAR sonobuoy design by June 21, 1971. Assembly drawings were necessary to manufacture this deep DIFAR sonobuoy. **B134-141, 797.**

*Government Response*:

68. The layout for the deep DIFAR design with a multipiece spider plate mechanism had been finished; a bill of material for that design had also been completed; there was a full set of engineering part drawings for this sonobuoy; no assembly drawings, however, had been prepared for this deep DIFAR sonobuoy design by June 21, 1971. PX-23 at B134, B138. Assembly drawings were only necessary to manufacture the deep DIFAR sonobuoy, if it was to be manufactured on an assembly line. Boyle Testimony. Sparton could, and did, use the engineering drawings as is demonstrated by the fact that Sparton built 20 Deep Depth sonobuoys. PX-23 at B135.

**69.** In his June 21, 1971 final report, Widenhofer also commented upon the cable break design problem encountered during the February 18, 1971 test of Sparton's deep DIFAR sonobuoy. He stated that "[t]he cable break problem, thought initially to be an easily correctable, 'cable pack'

defect, turned out to be quite elusive. Much effort was invested in a study of the many possible causes of cable breakage. Many in-house tests were performed in an attempt to pin down the cause. The result of this study was a definite recommendation for a descent vehicle dynamic study at the NOL 100 foot tank facility." As a result of this NOL study, Widenhofer determined "...that the cable pack was withdrawing from the descent vehicle prematurely [due to] 'initial plunge' conditions... [and] would spin on its side until the signal cable would catch [and sever] in a [sharp edged] slot milled into the ballast weight attached to the cable spool." Based on this determination, Widenhofer suggested that the cable pack problem could be solved by the incorporation of two thin narrow mylar strips attached to the lower end of the sonobuoy housing. The upper ends of the two strips could be sandwiched between layers of cable on the cable spool. This solution would prevent the cable spool from separating from the descent vehicle until it reached approximately 850 feet. The proposed solution to the cable break problem, however, had not been sea tested. The workability of this change had not been established as of June 21, 1971. **B134-41**.

*Government Response*:

69. In his June 21, 1971 final report, Widenhofer also commented upon the cable break design problem encountered during the February 18, 1971 test of Sparton's deep DIFAR sonobuoy. He stated:

> Only one problem of a design nature was encountered. Four of the six sonobuoys lost lower units as a result of severed cables. The cables were cut approximately 70 to 80 [feet] down from the surface unit. Note that the two sonobuoys not troubled by this malfunction performed entirely as intended providing electronic data as good, if not superior to, standard DIFAR.
>
> The cable break problem, thought initially to be an easily correctable 'cable pack' defect, turned out to be quite elusive. Much effort was invested in a study of the many possible causes of cable breakage. Many in-house tests were performed in an attempt to pin down the cause. The result of this study was a definite recommendation for a descent vehicle dynamic study at the NOL 100 foot tank facility. The purpose of this recommendation was to study descent vehicle stability and the effect on the cable pack of "initial plunge" conditions. The theory of "initial plunge" was that at the time that the surface unit is separating from the decent vehicle, there are excessive hydraulic drag forces existent that may cause the cable pack to withdraw prematurely from the descent vehicle.
>
> The tests at NOL were preformed in March[] 1971 with the following results. Modifications made to the buoy to improve the submerged C.G. [center of gravity] of the descent vehicle greatly increased the descent stability. But more important – evidence was produced that established the fact that the cable pack was withdrawing from the descent vehicle prematurely. It was established to be a result of the "initial plunge" conditions. Other findings resulted in minor modifications to the design.
>
> Additional tests back at the plant showed that the instable cable pack would spin on its side after leaving the descent vehicle until the signal cable would catch in a slot milled into the ballast weight attached to the cable spool. It was this sharp edged slot that was cutting the signal cable.
>
> The cure for the problem was the incorporation of two thin, narrow mylar strips which were attached to the lower end of the sonobuoy

> housing. The upper ends of the strips were sandwiched between layers of cable on the cable spool. This fix prevents the cable spool from separating from the descent vehicle until it reaches approximately 850 feet.

PX-23 at B135.

**70.** Shock and vibration had not been considered as parameters during the design of the deep DIFAR sonobuoy. These aspects of the sonobuoy had not been investigated. There was some concern that the surface electronics section design was marginal in this respect. Eleven major mechanical design considerations were suggested to convert the Sparton deep depth DIFAR sonobuoy design to one with a dual depth capability. The "Release Plate Design" was one of the eleven considerations. **B134-141.**

*Government Response*:

> 70. Mr. Widenhofer's final test report states:
>
> One other subject needs clarification. Shock and vibration were not considered as parameters during the design of the deep DIFAR sonobuoy. This does not mean the subject was ignored. It does mean that it was not investigated. There is some concern that the surface electronics section design is marginal in this respect.

PX-23 at B140. Mr. Widenhofer further stated: "The memo – dual depth DIFAR – Mechanical Design Considerations, dated June 15, 1971 describes the major mechanical design considerations involved in the conversion [from deep depth DIFAR to dual depth DIFAR]." PX-23 at B141. The eleven major mechanical design considerations from the June 15 memo are then listed. PX-23

at B141. The "Release Plate Design" was the third of the eleven considerations. PX-23 at B141.

**71.** Per a Sparton July 10, 1971 memorandum, the twenty 1,000 foot SSQ 53 sonobuoys completed under Job 7400 were to be used by Sparton's Engineering department as it saw fit. It was planned that some of the 20 sonobuoy units would "...be drop tested to gain further confidence in the design and some of them..[would] be modified and drop tested to check out design revisions." **B142.**

*Government Response*:

71. In a July 10, 1971 Sparton memorandum, E. Rice confirmed a previous instruction by R. T. White that the twenty 1,000 foot AN/SSQ-53 sonobuoys completed under Job 7400 were to be used by Sparton's Engineering department as it saw fit. Mr. Rice further informed Mr. White that he planned to use some of the 20 sonobuoy units in drop tests "to gain further confidence in the design and some of them may be modified and drop tested to check out design revisions." PX-24 at B142.

D. Sparton's Dual Depth DIFAR Program Subsequent To The March 17, 1971 ECP Offer And Mod. 4 Sale

**72.** A meeting was held at Sparton on July 20, 1971 to discuss the work plan for supplying 300 dual depth DIFAR sonobuoys under ECP 0465-2. This meeting was memorialized in a memorandum written by Sparton assistant chief engineer

White on July 20, 1971. It was decided at this meeting that the 300 modified sonobuoys referenced in the ECP were to be delivered to the Navy 7 1/2 months from July 13, 1971. The amount of design time included in the ECP was "rather small" as a result of Sparton's completion of the deep DIFAR sonobuoy design work under Job #7400. The design philosophy under the ECP was to supply the Navy with 300 sonobuoys to "...demonstrate the feasibility of a design... capable of being produced with further refinements." The design of the 300 units was not to be "...limited to merely proving an engineering approach, nor...[would] the design be suitable for producing large quantities." **B143-44, 1433, A273-79, 293-98, B175-76, 195-200.**

*Government Response*:

72. A meeting was held at Sparton on July 20, 1971 to discuss the scope of work for supplying 300 dual depth DIFAR sonobuoys under ECP 0465-2. PX-25 at B143. This meeting was attended by Messrs Passman, Hungerford, Widenhofer, and R. White and is memorialized in a memorandum written by Mr. White on July 20, 1971. PX-25 at B143. It was pointed out at the meeting that "delivery of the 300 modified sonobuoys[,] as spelled out in the ECP[,] is 7 1/2 months from July 13, 1971, which is the end of February[] 1972." PX-25 at B143. Mr. White further stated:

> The estimate of design effort for the ECP was based upon the completion of the Deep DIFAR sonobuoy design work under Job 7400. Consequently, the amount of design time included in the ECP is rather small. The design philosophy to be followed under

> this ECP is to supply 300 sonobuoys which meet the contract requirements and will also demonstrate the feasibility of a design which is capable of being produced with further refinements. The design of these units will not be limited to merely proving an engineering approach, nor will the design be suitable for producing large quantities. The producibility will be considered in sor far as it is practial within the budget limitations of this ECP. A report at the end of the program will define those areas which will need further design work in order to have a producible sonobuoy design.

PX-25 at B143.

**73.** There were two mechanical redesign items addressed at this meeting, the second of which was: "b. The release plate mechanism should be simplified. It may be advisable to make a drop test of mechanical dummy units in order to check out a new release plate design prior to the engineering drop test of six complete sonobuoys." Rice had indicated that the 20 deep DIFAR sonobuoys from Job #7400 were available for Engineering department use, and ten "...should be drop tested as soon as possible...to gain more confidence in the existing design." **B143-44.**

*Government Response*:

73. There were two mechanical redesign items addressed at this meeting, the second of which was:

> b. The release plate mechanism should be simplified. It may be advisable to make a drop test of mechanical dummy units in order to check out a new release plate design prior to the engineering drop test of six complete sonobuoys.

PX-25 at B144. Separately, Mr. Rice stated that the 20 Deep DIFAR sonobuoys from Job #7400 were available for Engineering department use. PX-25 at B144.

During the meeting it was decided that ten of those sonobuoys "should be drop tested as soon as possible in order to gain more confidence in the existing design." PX-25 at B144. The remaining ten would be modified "if some particular redesign area should be tested." PX-25 at B144.

**74.** On July 29, 1971, Widenhofer proposed to develop for the dual depth DIFAR sonobuoy a low cost low pressure heat sealed polyurethane film surface float. A preliminary investigation had proven the feasibility of this type of float. **B145-54.**

*Government Response*:

74. On July 29, 1971, Mr. Widenhofer proposed the development of a low-cost low-pressure polyurethane film surface float that would meet the requirements of the SSQ-47, SSQ-53 and Dual Depth DIFAR sonobuoys. PX-26 at B145. Mr. Widenhofer claimed that a "preliminary investigation had proven the feasibility of this type of float." PX-26 at B145. The advantages of such a float were lower fabrication costs, less required stowage volume and improved producibility. PX-26 at B145.

**75.** On August 3, 1971, Devereaux issued a memorandum indicating that Sparton would commence evaluating engineering model subsurface electronics stacks and hydrophones for use on the ECP contract. Although Sparton wished to start tests on the 300 deliverable ECP sonobuoys

at its Jackson engineering facility, it needed at that facility a final stack test station similar to that used in its DeLand production facility and a version of Sparton employee J. Voegeli's new hydrophone test box to commence testing. **B155.**

*Government Response*:

75. On August 3, 1971, Mr. Devereaux authored a memorandum indicating that "in the next couple of weeks" Sparton would commence evaluating engineering model subsurface electronics "stacks" and hydrophones for use on the ECP contract, which was now referred to as Job # 7400. PX-27 at B155. In order to perform the testing, Devereaux needed a "final stack test station similar to that used" at Sparton's Deland facility, "a version of J. Voegeli's new hydrophone test box," and a "final sonobuoy check-out station that is capable of performing all bulkhead calibration steps and measurements." PX-27 at B155.

**76.** On August 9, 1971, Devereaux indicated in a memorandum that the original plan was to use the Q-57 hydrophones on the GFE sonobuoys shipped from Sparton's DeLand, Florida plant for the dual depth DIFAR. However, the 20 deep DIFAR engineering models used a small, modified SSQ-41 type omnihydrophone. It was apparent, morever, that the SSQ-57 type omni-hydrophone on the GFE sonobuoys was prohibitively large. Accordingly, Devereaux proposed to remove the SSQ-57 type omnihydrophone on each GFE SSQ-53 sonobuoy and replace

it at Sparton's Jackson, Michigan plant with an SSQ-41 type for each of the 300 dual depth DIFAR sonobuoys to be supplied under ECP 0465-2. **B156**.

*Government Response*:

76. On August 9, 1971, Mr. Devereaux prepared a memorandum regarding changes to the hydrophones for the dual depth DIFAR, ECP 0465-2 (Job #7400). PX-28 at B156. The memorandum states:

> The original plan on Dual Depth DIFAR was to use the hydrophones shipped from Florida. The twenty Deep DIFAR engineering models built earlier in the year used a small modified Q-41 type omni hydrophone. It is now apparent that the Q-57 type omni hydrophone on the standard buoys is prohibitively large.
>
> We propose to ship the hydrophone assemblies back to Deland and obtain directional hydrophone assemblies only from Sparton Southwest. The modified Q-41 type element will be added at Jackson. We also can take advantage of the superior potting of the plug which has been observed in the Sparton Southwest phone. Since it has always been intended to eventually phase out the Q-57 type omni phone and use the smaller type, it makes sense to make the change at this time. We have not yet determined the proper procedure for accomplishing this change.

PX-28 at B156.

**77.** In August 1971, Widenhofer was investigating release plate activation pressures to derive an acceptable plate design and disclosed in his work notes a "bending function" in connection with this design. **A273-79**.

*Government Response*:

77. In August 1971, Mr. Widenhofer was investigating release plate activation pressures to in his effort to develop a cheaper, more reliable release

plate, as is disclosed in his work notes on a "bending function" in connection with this design. DX-46.

**78.** On August 31, 1971, Sparton conducted an engineering test at St. Croix of 10 deep DIFAR sonobuoys. One of the tested sonobuoys sank without resurfacing; one activated with no audio; but the balance of the eight sonobuoys deployed normally. There were no broken cables, such that it was believed that the "serious cable break problem...has been solved." All sonobuoy units, however, exhibited a strong, strum problem at approximately 30 hertz, preventing accurate bearing data from being taken. Widenhofer noted that "[t]he strum problem could result in a significant delay to successful conclusion of the dual depth DIFAR E.C.P." As a result, Sparton contemplated "...a test series at Trumbull Lake to determine the source of the strum." The August 31 test was observed by NADC employee Bill Graff. **B158-70.**

*Government Response*:

78a. On August 31, 1971, Mr. Devereaux prepared a report in which he stated that Sparton employee Carl Huntoon reported the results of an engineering test of ten deep DIFAR sonobuoys at St. Croix. PX-30 at B158. The test was observed by Bill Graff, NADC. PX-30 at B158. One of the tested sonobuoys sank without resurfacing; one activated with no audio; and the balance (eight

sonobuoys) deployed normally. PX-30 at B158. There were no broken cables. PX-30 at B158. All sonobuoy units exhibited a strong strum problem at approximately 30 hertz. PX-30 at B158. The strum signal made the phase lock erratic and accurate bearing data could not be taken from the DBI. PX-30 at B158. Quadrant information was acceptable. PX-30 at B158.

78b. On September 15, 1971, Messrs. Huntoon and Widenhofer prepared a test report of the August 31, 1971 test. PX-31 at B159. They reported that "[e]lectrically the sonobuoys functioned normally with few exceptions." PX-31 at B159. They also reported that "[t]he phase lock indicating meter was also observed to be fluctuating at approximately a 10 Hz rate. … When the frelator was used to expand the spectrum around the phase pilot, the low frequency strum lines evident in the photographs were detected." PX-31 at B159-60. But they also noted that

> [i]n general, the electrical portion of this test was satisfactory. We proved that we can put power down, and get signals back up a 1000 ft. cable, with a battery life in excess of 5 hours. Cleaning up the VHF center frequency error and the strumming should give us a very good deep DIFAR buoy. We should also investigate how close the pilot and at what amplitudes sidebands affect the phase locking capabilities of our DBIs.

PX-31 at B159. With respect to the mechanical aspects, Messrs. Huntoon and Widenhofer reported that "[o]ne important aspect of the test is not obvious on the drop sheet[:] The serious cable break problem which affected four of six units on the last air drop and which necessitated a special test series at Naval Ordnance Laboratory, has been solved." PX-31 at B159.

78c. Messrs. Huntoon and Widenhofer further explained the strum:

> All operational units appeared to strum at 30 Hertz. This was not observed on the last air drop in spite of the fact that the deployed system was essentially the same. … The deadline on these units has been modified from the standard. It is now 36 inches long and was originally 12 inches long. This fact in addition to the fact that the nylon support cord is of a diameter that would cause a strum at about 30 Hertz makes [this possible cause] a prime suspect.

PX-31 at B160-61. Messrs. Huntoon and Widenhofer indicated that they

> intended to run, as soon as possible, a series of tests at Trumbull Lake to determine the source of the strum. If the strum condition can be simulated at the lake, the problem can most certainly be eliminated. If, however, the problem cannot be isolated by this test series, it may be necessary to modify some of the existing deep DIFAR sonobuoys (there are ten left) and run sea tests. The strum problem could result in significant delay to successful conclusion of the dual depth DIFAR E.C.P.

PX-31 at B161.

**79.** By October 1971, Widenhofer <u>was considering</u> the "bending moment" of a "new [single piece release] plate design," and made a "Preliminary Layout" drawing No. 900-4709 of the dual depth sonobuoy with new release plate design identified in Section AA by part No. 900-4623. **A293-98, B195-200.**

*Government Response*:

79. By October 10, 1971, Mr. Widenhofer had considered the "bending moment" of the "new [single piece release] plate design," and made a "Preliminary Layout" drawing No. 900-4709 of the dual depth sonobuoy with new release plate design identified in Section AA by part No. 900-4623. DX-54; PX-40 at B195-200.

**80**. On October 5, 1971, Widenhofer proposed another test program to evaluate the performance of the proposed dual depth DIFAR sonobuoy with particular reference to a "...new single part float pressure activated release plate design, the parachute retainer mechanism, the parachute attachment, the float attachment system, and depth selector operation." Sparton needed the following Navy equipment and personnel to assist in conducting the tests desired because Sparton did not possess same: an aircraft equipped with sonobuoy launchers; aircraft mounted high speed movie camera; 2 boats with crews; one for observation and one for recovery; divers with underwater still cameras; and a deck located high speed movie camera. Six air deployable sonobuoys, mechanically operational only, were to be tested. The quantity of signal cable and the length of the suspension system were to be selected to permit complete deployment of individual stowed components in a water depth of 75 feet. Three units were to function in a shallow depth mode, and the other three were to function in a deep depth mode. The deployed configuration for the "deep depth" mode was to include a short length of signal cable directly below the surface unit, a short compliant rubber "shock absorber" directly above a cable spool with a ballast weight, a shortened prewound compliant rubber-signal cable, a standard DIFAR damper, and a standard configured subsurface assembly. The

total depth of the deployed unit was not to exceed 70 feet. Visual observations were to be taken by a pair of divers, and pictures were to be taken of any unusual condition. Sparton was to recover the sonobuoy housing and miscellaneous parts. The suggested test date was November 1-5, 1971. **B171-74.**

*Government Response*:

80. On October 5, 1971, Mr. Widenhofer proposed a test "to evaluate the performance of the proposed dual depth DIFAR sonobuoy package with particular reference to the new single part float pressure activated release plate design, the parachute retainer mechanism, the parachute attachment, the float attachment system, and depth selector operation." PX-32 at B171. The test was to be performed at the Navy's Key West facilities because "[t]esting in shallow water will maximize the evaluation of the float pressure activiated release plate and other systems by making it possible to recover all components. PX-32 at B173. Mr. Widenhofer expected that he would need the following Navy equipment and personnel to assist in conducting the tests:

A. an aircraft equipped with sonobuoy launchers

B. an aircraft mounted high speed movie camera

C. 2 boats with crews; one for observation and one for recovery

D. divers with underwater still cameras

E. and a deck located high speed movie camera.

PX-32 at B171. Mr. Widenhofer planned to use six air deployable

mechanically operational models in the test. PX-32 at B171. Three units were to function in a shallow depth mode, and the other three were to function in a deep depth mode. PX-32 at B171. The length of signal cable and suspension system for all of the units was to be shortened to permit complete deployment of individual stowed components in a water depth of 75 feet. PX-32 at B171. The deployed configuration for the "deep depth" mode was to include "a short length of signal cable directly below the surface unit, a short compliant rubber 'shock absorber' directly above a cable spool with a ballast weight, a shortened prewound compliant rubber-signal cable, a standard DIFAR damper, and a standard configured subsurface assembly." PX-32 at B171. In shallow mode, the deployed configuration was: a surface unit with attached cable spool assembly, a shortened prewound compliant rubber-signal cable, a standard DIFAR damper, and a standard configured subsurface assembly. PX-32 at B171-72. The total depth of either deployed unit was not to exceed 70 feet. PX-32 at B172. Visual observations were to be taken by a pair of divers, and pictures were to be taken of any unusual condition. PX-32 at B172. Mr. Widenhofer sought to recover the sonobuoy housing and miscellaneous parts of those units where the floatation mechanism failed or the unit sank after float inflation. PX-32 at B172. The requested test date was November 1-5, 1971. PX-32 at B173.

**81.** On October 12, 1971. Widenhofer issued a memorandum to Hungerford in connection with the Q-47 float suggested for use with Sparton's dual depth sonobuoy. Widenhofer desired

to use dual depth DIFAR sonobuoy floats having a gauge pressure of 4.0 psig nominal with the existing 16 gram $CO_2$ capacity. Widenhofer intended to phase in this float modification during the first scheduled fully operational air drop during the first week of December 1971. **B177.**

*Government Response*:

81. On October 12, 1971, Mr. Widenhofer prepared a memorandum to Mr. Hungerford regarding his review of a report prepared by Sparton employee M. Beard, dated October 5, 1971, relating to a new float for Sparton's SSQ-47 sonobuoy. PX-33 at B177. Mr. Widenhofer sought permission to apply Mr. Beard's findings to the dual depth sonobuoy. PX-33 at B177. Widenhofer desired to use dual depth DIFAR sonobuoy floats having a gauge pressure of 4.0 psig nominal with the existing 16 gram $CO_2$ capacity, consistent with Mr. Beard's findings. PX-33 at B177. Mr. Widenhofer intended to phase in this float modification during the first scheduled fully operational air drop of a dual depth DIFAR buoy, scheduled to occur during the first week of December 1971. PX-33 at B177.

**82.** In October 1971, Sparton conducted a test series at its Trumbull Lake test facility in hopes of reproducing the strum condition experienced in the August 31, 1971 test. No usable data was obtained from this Trumbull Lake test series due to power harmonics in the water and poor ground return in the fresh water. **B265, 274.**

*Government Response*:

82. In October 1971, Sparton conducted a test series at its Trumbull Lake test facility in hopes of reproducing the strum condition experienced in the August 31, 1971 test. PX-50 at B265, B274. No usable data was obtained from this Trumbull Lake test series due to power harmonics in the water and poor ground return in the fresh water. PX-50 at B265, B274. "[B]eing unable to analyze the strum problem at Trumbull Lake, it was decided to add a sea test to the Dual Depth D[IFAR] program specifically to study the strum problem." PX-50 at B265. The remaining 10 Deep DIFAR units and six standard DIFAR units were to be used for this test. PX-50 at B265.

**83.** On October 21, 1971, Sparton electrical design engineer Huntoon informed Sparton that conversion of the SSQ-53 DIFAR auxiliary board for use in Sparton's dual depth DIFAR sonobuoy required changing nine electrical components, two of which related to the life-timer circuit and seven of which related to the DC-DC converter circuit. Huntoon also recommended that Sparton include a one megohm resistor to raise the level of the phase pilot by 1.5 db and a 6.8 k resistor to compensate for the phase change caused by the increased output capacity of the omnihydrophone. These two changes were necessary because of the different characteristics of the longer cable and the Q-41 type omni

directional hydrophone required for the dual depth DIFAR sonobuoy. **B178-79.**

*Government Response*:

83. On October 21, 1971, Sparton electrical design engineer Huntoon prepared two memoranda. PX-35 at B178; PX-36 at B179. In one memorandum to Sparton employee F. Clark, Mr. Huntoon stated that conversion of the SSQ-53 DIFAR auxiliary board for use in Sparton's dual depth DIFAR sonobuoy required that nine electrical components be changed; two of which related to the life-timer circuit and seven of which related to the DC-DC converter circuit. PX-35 at B178. Mr. Huntoon further stated that making the changes "on a complete 100-6589 circuit assembly[] will convert it to a 900-4741 assembly." PX-35 at B178. In the other memorandum, also to Mr. Clark, Mr. Huntoon stated that two components for the Dual Depth DIFAR would have to be "juryrigged to the already assembled stacks received from DeLand." PX-36 at B179. First, to "raise the level of the phase pilot by 1.5 db," he directed that a one megaohm resistor be connected in parallel with the summing resistor on the line driver board. PX-36 at B179. Second, he directed that a 6.8 k resistor to be connected between the signal output and the adjacent ground pin of the omni amplifier board to compensate for the phase change caused by the increased output capacity of the omnihydrophone. PX-36 at B179. These two changes were necessary because of the different characteristics of the longer cable and the Q-41 type omni directional hydrophone required for the dual depth DIFAR sonobuoy. PX-36 at B179.

**84.** On November 10, 1971, Deveraux requested Rice to arrange for a December 1971, engineering sea test at St. Croix.

**B180.** On November 11, 1971, Widenhofer issued a report of a November 5, 1971 test at Key West of a "new single part float pressure activated release plate design, the parachute release mechanism, the parachute attachment system, the float attachment system, and the depth selector mechanism." Three government employees, including John Tenuto, Bob Irwin and Ed Koszarek were present during the test. During the November 5, 1971 test, four mechanically operational dual depth sonobuoys were air dropped. Two of the sonobuoys were preset to deploy in a deep mode and two were preset to a shallow mode. The hydrophone was set to deploy at 70 feet in either mode for purposes of this test. Only four of the six sonobuoys were air dropped due to difficulties encountered with the Navy's P-3 aircraft. The air drops occurred at an altitude of 500 feet and at an air speed of 250 knots. The following results were noted. All parachute release mechanisms operated normally. All parachute attachment systems functioned well. Air descent was stable on all sonobuoys. The float attachment system functioned as intended. The release plate functioned normally on two units, numbers 1 and 2, but did not function properly on units 3 and 4 because the bottom casting - sonobuoy housing bottom - separated from the sonobuoy housing shortly after

water entry. The depth selector mechanism functioned normally on two units, numbers 1 and 2, but because of bottom casting separation, normal deployment was not possible for units 3 and 4. Unit 1 also had a float puncture caused by a deformed float spacer can. Widenhofer concluded that the following designs were acceptable for further evaluation without modification: 1) the new parachute release mechanism; 2) the new parachute attachment system; 3) the single part release plate; and 4) the twist lock float attachment system. Notwithstanding these conclusions, the following problem areas needed further modification: 1) the float spacer can design needed to be revised since it had a tendency to jam, caused a float leak and could cause a release plate failure; 2) the depth selector mechanism needed strengthening because in one unit, the mechanism jarred loose when the sonobuoy was bumped hard against the boat; 3) the bottom casting needed larger and stronger screws because it separated from the sonobuoy housing as a result of sheared screws. Widenhofer believed that the bottom casting separation problem required further evaluation. Recommendations were made to solve these problem areas. Because of difficulty experienced with scheduling test aircraft, no underwater photography was possible. Since the tests occurred late in the afternoon, the last two buoys, 5 and 6, were not airdropped because (a) the test

aircraft was low on fuel and returning to base and (b) sufficient data had been obtained from the four sonobouys that were air dropped. Widenhofer recommended that future proposed test plans specifically request from the Navy an early morning start to avoid logistical problems. **B181-90.**

*Government Response*:

84a. On November 10, 1971, Mr. Deveraux requested that Mr. Rice arrange for a December 1971, engineering sea test at St. Croix. PX-37 at B180.

84b. On November 11, 1971, Mr. Widenhofer prepared a test report describing a November 5, 1971 test at Key West of the "new single part float pressure activated release plate design, the parachute release mechanism, the parachute attachment system, the float attachment system, and the depth selector mechanism." PX-38 at B181. Three government employees – John Tenuto, Bob Irwin and Ed Koszarek – were involved in the testing. PX-38 at B181. The test was carried out in accordance with Mr. Widenhofer's October 5, 1971 test plan (PX-32). PX-38 at B181. During the November 5, 1971 test, four mechanically operational dual depth sonobuoys were air dropped. PX-38 at B181. Two of the sonobuoys were preset to deploy in a deep mode and two were preset to a shallow mode. PX-38 at B181. The hydrophone was set to deploy to a depth of 70 feet in either mode for purposes of this test. PX-38 at B181, B186-87. Although the test plan had called for dropping a total of six buoys, only four of the six sonobuoys were air dropped due to difficulties encountered with the Navy's P-3 aircraft. PX-38 at B182; PX-35 at B171. The four buoys were dropped from an altitude of 500 feet at an air speed of 250 knots.

84c. In his report, Mr. Widenhofer summarized the following, in bullet form:

- All parachute release mechanisms operated normally.
- All parachute attachment systems functioned well.
- Air descent was stable on all buoys.
- The float attachment system functioned as intended.
- The release plate functioned normally on units, No. 001 & 002 but did not function properly on units No. 003 & 004 because the bottom casting separated from the sonobuoy housing shortly after water entry.
- The depth selector mechanism functioned normally on units No. 001 & 002. Because of bottom casting separation on units 003 & 004, normal deployment was not possible.
- Unit No. 001 also had a float puncture caused by a deformed float spacer can.

PX-38 at B182. Mr. Widenhofer then concluded:

> [t]he following designs were acceptable for further evaluation without modification:
>
> 1. The new parachute release mechanism.
> 2. The new parachute attachment system.
> 3. The single part release plate.
> 4. The twist lock float attachment system.
>
> The following areas need modification:
>
> 1. The float spacer can design must be revised – the can has a tendency to jam. This problem *did* cause a float leak and *could* cause a release plate failure.
> 2. The depth selector mechanism should be strengthened. During recovery of unit No. 001 (preset shallow) the depth selector mechanism was jarred loose when the

buoy was bumped hard against the boat. This will be a relatively minor modification.

3. The bottom casting separated from the sonobuoy housing because of sheared screws. Larger and/or stronger screws will be substituted. The problem does require further evaluation.

PX-38 at B182. Mr. Widenhofer provided recommendations for each of the areas where he indicated that modification was needed. PX-38 at B183-84.

84d. Because of difficulty experienced with the test aircraft, the tests occurred late in the afternoon. PX-38 at B183. At that time of the day, no underwater photography was possible. PX-38 at B181.

84e. The last two buoys, Nos. 005 and 006, were not airdropped because the test aircraft was announced that it was low on fuel and returning to base and thereafter was out of communication with the test team. PX-38 at B183. The field station reported to Mr. Widenhofer that the plane would be available the next day to drop the remaining two buoys. PX-38 at B183. Mr. Widenhofer determined that sufficient data had been obtained from the four sonobuoys that had been air dropped so that additional delay was not justified. PX-38 at B183. Mr. Widenhofer recommended that future proposed test plans specifically request from the Navy an early morning start to avoid logistical problems. PX-38 at B183.

84f. Commenting on the program schedule, Mr. Widenhofer noted that "the problems encountered on the shallow water air drop will result in any significant delay of the program." PX-38 at B184.

**85.** On November 16, 1971, Devereaux established test procedures and the role of the Sparton Quality Control department for Job No. 7400. Although the exact setup for these procedures existed only at Sparton's Deland facility, where the SSQ-53 standard shallow depth sonobuoy was being manufactured, Sparton's Jackson plant had similar apparatus with which to perform some equivalent tests on the dual depth DIFAR sonobuoys. There were, however, exceptions. For example, the dual depth DIFAR hydrophone was smaller, less sensitive and was required to function at a 1000 foot depth as compared with the standard DIFAR hydrophone which was set to function at a 100 foot depth. Hence, the appropriate pressure for 1000 foot operations needed to be used in these test procedures for the following assemblies: hydrophone, subsurfrace electronics and mass damper and cable assembly. **B191-94.**

*Government Response*:

85. On November 16, 1971, Devereaux prepared a memorandum that set out the test procedures to be followed and the role of the Sparton Quality Control department for the Dual Depth DIFAR, Job No. 7400. PX-39 at B191. Although the exact setup for conducting these procedures existed only at Sparton's Deland facility, Sparton's Jackson plant had similar apparatuses with which Sparton personnel could perform equivalent tests. PX-39 at B191. In his memorandum, Mr. Devereaux identified "TEO's" to be "used only as a reference." Mr.

Devereaux explained that "[i]t is not intended that the Quality Control section necessarily perform or approve these tests; however, we are concerned that Q.C. monitor the various assembly or modification operations to assure satisfactory workmanship." PX-39 at B191. The significant difference in applying the TEOs to the dual depth DIFAR was that the hydrophone was required to function at a 1000 foot depth, rather than 100 feet. PX-39 at B191-92, B194. Hence, the appropriate pressure for 1000 foot operations needed to be used in these test procedures for the following assemblies: hydrophone, subsurfrace electronics and mass damper and cable assembly. B192-94.

**86.** On November 23, 1971, drawing number 900-4623 was prepared showing the release plate which is illustrated in the patents in suit. [PX-33 at] **B175-76.** This drawing number is the one identified in the October 1971 Preliminary Layout drawing No. 900-4709.

E. The Completion of Phase I Under ECP 0465-2

**87.** On December 22, 1971, White provided Passman with a summary of dual depth DIFAR engineering labor costs under Job No. 7400-1008. Three cost groups were provided in attachment 1 of the summary. The first group was a March 15, 1971 estimate which formed the basis for ECP contractual negotiations. The second group was Sparton's Engineering department estimate of the Job dated July 22, 1971. The

last group was an estimate through November of 1971. Sparton noted that the November 5, 1971 drop test of mechanical dummies was not included in the original scope of work under ECP 0465-2. The largest increase in Sparton's cost was Sparton's Operations department's estimate for the construction and testing of 300 buoys. **B201-205.**

*Government Response*:

87. On December 22, 1971, Mr. White provided Mr. Passman with a summary of dual depth DIFAR engineering labor costs under Job No. 7400-1008. PX-41 at B201. Mr. White states that he prepared the cost summary attached to the memorandum. PX-41 at B201. Three cost estimates were provided in Attachment #1 of the summary. PX-41 at B201. The first estimate was a March 15, 1971 estimate which formed the basis for ECP contractual negotiations. PX-41 at B201. The second estimate was Sparton's Engineering department estimate of the Job, dated July 22, 1971. PX-41 at B201. The third estimate was through November, 1971. PX-41 at B203. Sparton noted that the design support had increased more than four fold, due to Model Maker time, and that the November 5, 1971 drop test of mechanical dummies was not included in the original scope of work under ECP 0465-2. PX-41 at B201. The largest increase in cost was in the Operations department's estimate for the construction and testing of 300 buoys. PX-41 at B202.

**88.** In December 1971, Sparton attempted to conduct a hydrophone strum test at the St. Croix Naval facility, but

was unable to study the strum due to a lack of sufficient water current differential. **B267, 274.**

*Government Response*:

88. In December 1971, Sparton conducted another strum test at the Navy's facility in St. Croix. PX-50 at B267, B274. A standard deep DIFAR was deployed and operated with no trace of strum. PX-50 at B267. But, due to the low current differential – .07 knots at 100 feet versus .08 knots at 1000 feet – any strum noise would have been at a very low frequency and "probably not detectable." PX-50 at B267.

**89.** On January 19, 1972, Widenhofer informed White that there was a delay in the completion of Sparton's Model Shop dual depth DIFAR sonobuoy parts. Widenhofer indicated that he may be unable to meet Sparton's planned test date for the week of February 7, 1972 as a result of not having sufficient Model Shop parts. He provided White with a list of outstanding Model Shop work orders affecting the final engineering drop test and the construction of the 300 deliverable sonobuoys under ECP 0465-2. **B207-08.** Parts for the 300 deliverable sonobuoys were being made in Sparton's Model Shop. On January 19, 1972, Widenhofer again informed Sparton of overdue parts orders. One part, the ballast weight, affected the engineering drop test schedule for the week of February 7, 1972. It appeared that the assembly of

the 300 deliverable sonobuoys under ECP 0465-2 would be delayed by a lack of parts. Widenhofer needed to know when he could expect the needed parts. **B209.**

*Government Response*:

89. On January 19, 1972, Mr. Widenhofer wrote two memoranda detailing delays in production of the 300 sonobuoys by Sparton's "Model Shop." PX-43 at B207; PX-44 at B209. In one memorandum, to Mr. White, he indicated that there was a delay in the completion of work orders by the Model Shop, which he attributed to a "conflict with the Q-50 contract schedule." PX-43 at B207. Mr. Widenhofer indicated that he may be unable to meet the planned Dual Depth DIFAR test date for the week of February 7, 1972 as a result of not having test buoys. PX-43 at B207. He provided Mr. White with a list of outstanding Model Shop work orders affecting the final engineering drop test and the construction of the 300 deliverable sonobuoys under ECP 0465-2. PX-43 at B207. In the other January 19, 1972 memorandum, to Mr. Walters, Mr. Widenhofer again stated that that the lack of parts may affect the drop scheduled for the week of February 7. PX-44 at B209. One overdue part, the ballast weight, could affect the scheduled February 7 engineering drop test. PX-44 at B209. He also stated that the assembly of the 300 deliverable sonobuoys under ECP 0465-2 would be delayed by the lack of parts. PX-44 at B209.

**90.** On January 31, 1972, Widenhofer and Huntoon issued a report to Devereaux regarding an airdrop test of ten fully operational (including electronic sections) dual depth DIFAR

sonobuoys at the Navy's VAST test site in St. Croix, Virgin Islands, on January 13, 1972. The purpose of the test was to evaluate the dual depth DIFAR design prior to commitment to a final design for the 300 deliverable sonobuoys. Two Navy employees, Graff and Lamchak, were present during the test. During the January 13 test, six sonobuoys were dropped in a deep mode and four were dropped in a shallow mode. The four shallow mode sonobuoys deployed and operated normally. While all six deep sonobuoys deployed and operated normally, one "major problem" was experienced. Five of the six tested deep sonobouys experienced intermittent and finally loss of audio, a failure in the "signal receiving and transmitting apparatus" and "flexible cable means" apparatus. The problem was determined to be related to cable damage caused when the cable packs were wound around defective plastic cable spools. The cable breaks occurred near the strain relief grommet at the extreme end of the 900 foot cable. The problem was corrected. Four comments were made by Widenhofer. First, the initial mechanical design had been modified to exclude the complicated cable pack retainer strap mechanism included in the prior design. This resulted in a significant simplification of the system. Second, the redesigned float spacer can performed as intended, correcting a problem noted in the November 5 airdrop. Third, the bottom plate

(casting) separation problem noted in the November 5, 1971 airdrop was corrected. Larger screws were used to fasten the bottom plate to the housing. Fourth, the signal shunt around the cable pack was determined not to be necessary. Two other minor problems were noted. A float was found to have a ground clip pulled loose, and all four shallow sonobuoys exhibited slightly bent depth selector latch tabs. Widenhofer recommended certain design modifications for these problems. Widenhofer noted that the resurfacing time for the dual depth DIFAR design is approximately two to four seconds. To achieve this result, the inflation system squib had to fire quickly between .12 and .50 seconds. Thus, initial deployment, i.e. separation between surface unit and descent vehicle, had to occur before the sonobuoy had slowed to terminal velocity. He concluded that initial impact occurs at about 90 feet per second, and initial deployment could occur anywhere from 60 feet per second down to 20 feet per second. He theorized that since the float acts like a dive break, separation between surface unit and descent vehicle may be quite violent. Evidence from past airdrops indicated that this violence had been a factor in premature cable pack deployment where a high hydraulic force pulled the cable pack from the descent vehicle. He suggested that a small increase in the squib firing time would alleviate or

even eliminate the violence of the initial deployment.

**B211-14.**

*Government Response*:

90a. On January 31, 1972, Messrs. Widenhofer and Huntoon prepared a test report to Mr. Devereaux regarding the airdrop test of ten fully operational (including electronic sections) dual depth DIFAR sonobuoys at the VAST test site in St. Croix, Virgin Islands, on January 13, 1972. PX-45 at B211. The purpose of the test was to evaluate the dual depth DIFAR design prior to commitment to a final design for the 300 deliverable sonobuoys. PX-45 at B211. Two Navy employees, Messrs. Graff and Lamchak, were present during the test. PX-45 at B211.

90b. During the January 13 test, six sonobuoys were dropped in the deep mode and four were dropped in the shallow mode. PX-45 at B211. The four shallow mode sonobuoys deployed and operated normally. PX-45 at B211. All six deep sonobuoys deployed and operated normally, "with a singular exception." PX-45 at B211. "Five of the six deep sonobuoys experienced intermittent[,] and finally [total,] loss of audio." PX-45 at B211. The problem was determined to be related to cable damage caused when the cable packs were wound and to defective plastic cable spools. PX-45 at B211. The problem was corrected "with no significant delay to the program." PX-45 at B211.

90c. Messrs. Widenhofer and Huntoon made four general comments in their report. PX-45 at B212.

1. The initial mechanical design was modified to exclude the somewhat complicated cable pack retainer strap mechanism. The test results indicate that the redesign was successful. The safety straps were cut loose on each buoy prior to launch. There is no indication of premature cable pack deployment. This results in a significant simplification of the system.

2. The redesigned float spacer can performed as intended, correcting a problem noted on the previous air drop.

3. The problem of the bottom plate separation noted on the last airdrop has been corrected. Larger screws are being used to fasten the bottom plate to the sonobuoy housing.

4. Preliminary results indicate that the signal shunt around the cable pack is not necessary. It was noted that there was no obvious bearing change when the shunts were pulled loose from the shallow buoys. Further evaluation will be required. When the tape reloading is available, a close examination will determine if there is any significant change in bearing accuracy or pilot levels.

PX-45 at B212. Under the heading "Problem Areas," Messrs. Widenhofer and Huntoon stated that

> [t]he only major problem was a loss of audio on five of the six deep buoys. Characteristically the audio would become intermittent and finally would quit entirely. … Only one probe was recovered. The others showed similar cable breaks and cold flow marks near the breaks. Post drop analysis showed that the breaks occurred near the strain relief grommet at the extreme end of the 900 foot cable. Microscopic analysis showed one conductor corroded away, the other broken in tension, and a peculiar condition of the isomer insulation. Examination of the cable packs from the recovered shallow buoys showed an extreme cold flowing of the ionomer insulation near the strain relief grommet exposing one or both of the conductors. The cause was determined to be a sharp edged and burred hole in the cable spool lower flange near the spool core…."

PX-45 at B212-13. Messrs. Widenhofer and Huntoon also describe how six deep sonobuoys performed:

> The six deep buoys performed well exhibiting good bearings and a remarkably low noise level. The probe, however, was lost after seven hours of operation due to a brading of a strain relief rope at the battery bracket.

PX-45 at B212-13. Finally, Messrs. Widenhofer and Huntoon stated that “[t]wo other minor problems were noted during post mortem.” PX-45 at B213. One float was found to have the ground clip pulled back and all four shallow buoys exhibited a slight bent. PX-45 at B213. A float was found to have a ground clip pulled loose, and all four shallow buoys exhibited slightly bent depth selector latch tabs. PX-45 at B213.

90d. Messrs. Widenhofer and Huntoon recommended certain design modifications to correct these problems. PX-45 at B213. They indicated that “[t]here had been no delay to the program resulting from any problems encountered on this air drop.” PX-45 at B214. They also indicated that the final air drop will provide an opportunity to evaluate each of the proposed modifications. PX-45 at B213-14.

**91**. On February 17, 1972, Widenhofer and Huntoon issued another test report with regard to a dual depth DIFAR engineering test at St. Croix on February 9-10, 1972. Seven dual depth DIFAR sonobuoys were airdrop tested on February 9, 1972. Five and three sonobuoys were set in deep and shallow modes respectively. A standard DIFAR sonobuoy (channel 10) was dropped over the side of the boat for comparison purposes. One deep set sonobuoy (channel 6) did

not deploy normally because it lost audio 32 seconds after activation. One shallow set sonobuoy (channel 12) also did not deploy normally because its electronics activated without any modulation. Three other deep set sonobuoys (channels 2, 7, and 8) had a sonic frequency response of approximately -20 db, which rolled off drastically above 1.2 kHz. One shallow sonobuoy (channel 17) transmitted intermittently and sank before recovery. One deep set sonobuoy (channel 5) lost all audio after one and one-half hours of operation. Channels 2, 5 and 12 were recovered without subsurface assemblies. After troubleshooting the tested sonobuoys, six (channels 2, 7, 8, 12, 15, 17) had wiring errors, one had a frayed Chinese finger (channel 5), one had a leak in the ballast weight (channel 6), one had a cable break at the bottom of the mass damper (channel 12), and one scuttled shortly after normal deployment (channel 17). On February 10, 1972, seven dual depth sonobuoys were dropped over the side of a boat. Of those seven, five lost their probe (channels 20, 22, 24, 25, 28), and five (channels 18, 24, 25, 28, 16) appeared to perform satisfactorily. Notwithstanding that two channels (24, 25) were damaged by the boat, one (channel 20) had an intermittent signal caused by a cable break at 912 feet; and one (channel 22) had a frayed Chinese finger. Based upon the problems encountered during this test, Huntoon and

Widenhofer concluded that (a) extra subassemblies would need to be constructed "...for the express purpose of serving as first piece samples...[,]" (b) "[f]irst piece samples of all subassemblies will be provided, and prime personnel will be briefed on assembly procedures[,]" (c) [w]e have not proven out the deployment characteristics of the Dual Depth DIFAR as yet [,]" and (d) "[o]ne more field test will be required." As of February 17, 1972, Sparton was awaiting receipt of the computer printout of the RF and bearing data. **B216-42.**

*Government Response*:

91a. On February 17, 1972, Messrs. Widenhofer and Huntoon prepared a test report for a Dual Depth DIFAR test at St. Croix during the week of February 7, 1972. PX-47 at B216.

91b. Eight Dual Depth DIFAR sonobuoys were airdrop tested on February 9, 1972. PX-47 at B217. Five units were set for deep mode, three for shallow mode. PX-47 at B217. A standard DIFAR sonobuoy was dropped over the side of the boat for comparison purposes. PX-47 at B217. One deep mode sonobuoy (channel 6) did not deploy normally and lost audio 32 seconds after activation. PX-47 at B217. One shallow mode sonobuoy (channel 12) did not deploy normally and activated without any modulation. PX-47 at B216. Five sonobuoys (channels 2, 7, 8, 15, and 17) had a sonic frequency response of approximately -20 db, which rolled off drastically above 1.2 kHz. PX-47 at B217. One shallow mode sonobuoy (channel 17) had a limp float, transmitted

intermittently, and sank before recovery. PX-47 at B217. One deep set sonobuoy (channel 5) operated normally in all respects. PX-47 at B217. After operating for 1 ½ hours, the channel 5 buoy suddenly lost all audio. The test was then aborted and the channel 2, 5 and 12 were recovered without subsurface assemblies. PX-47 at B217. After troubleshooting the tested sonobuoys, six (channels 2, 7, 8, 12, 15, 17) had wiring errors, one had a frayed Chinese finger (channel 5), one had a leak at a plug in the cable weight assembly (channel 6), one had a cable break at the bottom of the mass damper (channel 12), and one scuttled shortly after normal deployment (channel 17). PX-47 at B217.

91c. On February 10, 1972, seven dual depth sonobuoys were dropped over the side of a boat because the units had been uncased to correct the wiring error experienced on February 9 and could not be recased in the field. PX-47 at B218. It was determined that the floats could be replaced and the units dropped over the side with a high degree of reliability. PX-47 at B218. Of those seven, five lost their probe (channels 20, 22, 24, 25, 28), and five (channels 18, 24, 25, 28, 16) appeared to perform satisfactorily. PX-47 at B218. One buoy (channel 22) had a frayed Chinese finger. At the request of Navy personnel, Sparton deployed a Dual Depth DIFAR strum buoy. PX-47 at B218. As of February 17, 1972, Sparton was awaiting receipt of the computer printout of the RF and bearing data. PX-47 at B218.

91d. Based upon this test, Messrs. Huntoon and Widenhofer reached several conclusions:

1. The improperly wired battery activation fuse was a most unfortunate incident. In order to prevent the reoccurrence

> of this, or a similar type incident in the future, our QC has been strengthened. First piece samples of all subassemblies will be provided, and prime personnel will be briefed on assembly procedures.
>
> 2. …. We have not proven out the deployment characteristics of the Dual Depth sonobuoy as [of] yet.
>
> ….
>
> 5. The cable spool signal shunt is unnecessary where frequency response is not critical.
>
> 6. A modification to prevent fraying of the chinese finger is required.
>
> 7. One more field test will be required.

PX-47 at B222.

**92.** A Sparton meeting was held on February 28, 1972. The following points were addressed: Materials were ordered for the 300 sonobuoy units to be supplied to the Navy. One hundred and twenty new castings were to be transferred from Sparton's DeLand facility to the Jackson plant. All assemblies were completed and released by Sparton's Engineering department. Sparton's Operations department in Jackson was working on the modification and assembly of the 300 sonobuoys, but needed "first piece samples" and Engineering department assistance to complete its task. It was believed that delivery under ECP 0465-2 would commence in April, 1972. **B243.**

*Government Response*:

92. On March 3, 1972, Mr. Rice provided minutes of a meeting regarding the construction of the 300 Dual Depth DIFAR sonobuoys for Job # 7400, which was held at Sparton on February 28, 1972. PX-48 at B243. According to Mr. Rice, as of the meeting date, all of the materials had been ordered and no delivery problems were expected. PX-48 at B243. One hundred and twenty new castings were to be transferred from Sparton's DeLand facility to the Jackson plant to take care of a shortage resulting from leaks encountered during pressure testing. PX-48 at B243. All assemblies were completed and released by Sparton's Engineering department. PX-48 at B243. Sparton's Operations department in Jackson was working on the modification and assembly of the 300 sonobuoys, but required "first piece samples" that had been "signed off by Q.C." PX-48 at B243.

Engineering department was to begin assisting Operations on March 6, 1972 to provide the approved "first piece samples." PX-48 at B243. "Barring any major problems," delivery under ECP 0465-2 was expected to commence during April 1972. PX-48 at B243.

**93.** On February 28, 1972, NADC employee Graff issued a classified Evaluation Plan for the dual depth sonobuoys to be supplied by Magnavox, Sanders and Sparton. **B503-18.** Graff requested the fleet to use the sonobuoy samples only in a deep mode, in view of their limited number and since the Navy already knew how the standard SSQ-53 DIFAR performed in a shallow mode. **B503-18; 988.**

*Government Response*:

93. On February 28, 1972, NADC issued an "Evaluation Plan, Selectable Depth AN/SSQ-53 for the dual depth sonobuoys to be supplied by Magnavox, Sanders and Sparton. PX-120 at B503. The plan was classified "Confidential" (it was automatically declassified in 1984). PX-120 at B503. The plan was prepared by NADC employee William Graff. PX-120 at B503. The plan called for a series of exercises by fleet aircraft and U.S. submarines to be conducted in the Mediterranean Sea, the Atlantic Ocean and the Pacific Ocean. PX-120 at B508-12. The Plan stated:

> 3.3 (U) Because of the limited quantity of selectable depth buoys, it is requested that operating units use them only in their deep mode. The selectable depth mechanism will be clearly marked on the buoy and readily operated with a screwdriver. For shallow operation, the use of a standard production model is recommended.

PX-120 at B506. Mr. Graff confirmed that it was the intent of the Plan that all dual depth units would be used only in the deep mode for the side-by-side comparison of dual depth and standard buoys. PX-177 at B988. The data gathered from the side-by-side use of the sonobuoys was to be submitted to the Naval Air Development Center, Warminster, Pennsylvania. PX-120 at B512.

**94.** On March 21, 1972, Widenhofer and Huntoon <u>issued</u> a report regarding a dual depth DIFAR engineering test at St. Croix on <u>March 9</u>, 1972. The purpose of the test was to evaluate the overall performance parameters of the dual depth sonobuoy design prior to final design release for the

300 deliverable sonobuoys. Navy employees Graff, Lamchak and Mellis were present during the test. No previously encountered problem reoccurred. Widenhofer and Huntoon considered this test to conclude Sparton's "...engineering test phase of the Dual Depth Difar Program." Ten dual depth DIFAR final design configuration sonobuoys were airdropped. These sonobuoys contained modifications to overcome mechanical problems encountered on the previous airdrop. Seven of the sonobuoys were dropped in deep mode and three were dropped in shallow mode. Four of the seven deep sonobouys operated as intended; one exhibited slight noise on directional signals; one had a 50 kHz deviation in the 7.5 kHz pilot; and one lost audio during deployment because of water in its probe. Two of the three shallow depth sonobuoys had a parachute abnormality. As of March 21, 1972, the cause of the parachute problem could not be ascertained because Sparton had not yet obtained launch films from the Navy. While the bearing data taken by Sparton during the test "appeared to be good," the Navy's computer printout of detailed bearing data had not yet arrived at Sparton for comparison purposes with Sparton's bearing data. Thus, by March 21, 1972, Sparton could not ascertain if the "signal receiving and transmitting apparatus" and "flexible cable means" were functioning properly. Similarly, Sparton could not have ascertained by

March 21, 1972 whether the functioning of the release plate had any adverse affect upon the bearing information provided by its dual depth sonobuoy. Bearing information was the key to the uniqueness of the DIFAR sonobuoy. In a contemporaneous document, Sparton considered the obtention of this bearing information to be "very important." **B244-50, 811-14, 1049, 1423.**

*Government Response*:

94a. On March 21, 1972, Messrs. Widenhofer and Huntoon prepared a report regarding a dual depth DIFAR engineering test at St. Croix during the week of March 6, 1972. The purpose of the test was to evaluate the overall performance parameters of the dual depth sonobuoy design prior to final design release for the 300 deliverable sonobuoys. Messrs. Graff and Lamchak of the Naval Air Development Center, and Mr. Mellis, NAD Crane, were present during the test. No previously encountered problem reoccurred. Messrs. Widenhofer and Huntoon summarized the test, stating:

> This was a very successful field test. There was no recurrence of any problem previously encountered. Bill Graff, NADC Johnsville, and Bill Mellis, NAD Crane observed the tests and were satisfied with the performance. This concludes the engineering test phase of the Dual Depth D[IFAR] Program.

PX-49 at B244.

94b. During the test, ten dual depth DIFAR sonobuoys of the final design configuration were air dropped. PX-49 at B244. These sonobuoys contained modifications to overcome mechanical problems encountered on the previous airdrop. PX-49 at B244. Seven of the sonobuoys were dropped in deep mode and

three were dropped in shallow mode. PX-49 at B244. Four of the seven deep sonobouys operated as intended; one exhibited slight noise on directional signals; one had a 50 kHz deviation in the 7.5 kHz pilot; and one lost audio during deployment because of water in its probe. On two of the three shallow depth sonobuoys the parachute did not fully open, but there was no adverse affect on buoy operation. PX-49 at B245-46. As of March 21, 1972, the cause of the parachute problem could not be ascertained because Sparton had not yet obtained films of the launching. PX-49 at B245. The bearing data obtained during the test from all but two sonobuoys "appeared to be good." PX-49 at B246. Messrs. Widenhofer and Huntoon concluded that "it would appear that the modifications made to correct the various mechanical problems encountered on the last air drop have been very successful." PX-49 at B246.

94c. As of the March 3 report date, the computer printout of detailed bearing data had not yet arrived at Sparton. PX-49 at B246.

**95.** Sparton delivered 100 dual depth sonobuoys to the Navy on April 25, 1972. Government DD 250 forms memorialize in writing this transaction. Title to these 100 sonobuoys passed from Sparton to the Navy on April 25, 1972. **A445-48.**

*Government Response*:

The final sentence of this statement of fact states a legal conclusion, for which no response is required.

95. Sparton delivered 100 dual depth sonobuoys to the Navy on April 25, 1972. A Form DD 250 memorialize in writing this delivery. A445-48.

**96.** On April 28, 1972, Widenhofer issued a final report to Devereaux regarding Sparton's dual depth DIFAR "(AN/SSQ-53 (DD))" under Job No. 7400 and ECP 0465-2. This final report references the engineering tests of March 9, 1972, February 9-10, 1972, January 13, 1972, December 21, 1971, November 5, 1971, and August 31, 1971; it also references the July 20, 1971 scope of work for the dual depth DIFAR sonobuoy and the June 15, 1971 dual depth mechanical design considerations. **B251-78.** This report states that:

> [t]he expressed design philosophy followed under the ECP was to demonstrate the feasibility of using the principle of the float actuated release plate (the so-called upside down approach), as developed on the previous Deep DIFAR program, to create a reliable Dual Depth Difar design capable of being produced economically in large quantities -- the goal being necessarily subject to budget limitations. Meeting this goal required a major mechanical redesign and some modifications to the existing Difar electronics.

*Government Response*:

96. On April 28, 1972, Mr. Widenhofer prepared the "Job 7400 – Dual Depth D[IFAR] Final Report (AN/SSQ-53 (DD)), Contract No. N00019-69-C-0465 EXC 0465-2." PX-50 at B251-52. This final report references the

engineering tests report for tests conducted on the week of March 6, 1972; the test report for the test during the week of February 7, 1972; the test report for the test on January 13, 1972; the trip report for the testing on December 21, 1971; the test report for the shallow water air drop on November 5, 1971; the report for the engineering test on August 31, 1971; the July 20, 1971 scope of work document for the dual depth DIFAR sonobuoy; and Mr. Widenhofer's June 15, 1971 dual depth mechanical design considerations document. PX-50 at B251. This report states that:

> [t]he expressed design philosophy followed under the ECP was to demonstrate the feasibility of using the principle of the float actuated release plate (the so-called upside down approach), as developed on the previous Deep DIFAR program, to create a reliable Dual Depth Difar design capable of being produced economically in large quantities – the goal being necessarily subject to budget limitations. Meeting this goal required a major mechanical redesign and some modifications to the existing Difar electronics.

PX-50 at B251-52.

**97.** The purpose of this report was to describe the final design of Sparton's dual depth DIFAR sonobuoy, to discuss problems encountered and design modifications incorporated during development and to define those areas in need of further evaluation and/or redesign to achieve a reliable, producible sonobuoy design. In summary, the report notes that (a) Sparton's "...Engineering Development Phase of ECP 0465-2 was completed on March 9, 1972, with the highly successful airdrop of ten final design buoys[,]" (b) "[t]he

design has several unique mechanical design features, including a float pressure actuated release plate system, and a single part release plate[,]" (c) "[t]here are several mechanical features that make the Dual Depth Difar design unique from previous sonobuoy designs [including a]...design approach [which] utilizes a float pressure actuated release plate ...[wherein] the release mechanism is a simple one-piece, stamped, cold rolled steel plate...[that contains] hinges at the center line which bend for installation and bend again during actuation," (d) "[s]ets of tabs at opposite points on the Plate circumference engage slots in the sonobouy housing[,]" (e) "[b]rackets on the risers of the parachute system are engaged in slots between the sets of latch tabs on the plate[,]" (f) while there was an "essentially complete" layout and bill of material, "detailed [assembly] instruction sheets" and "... a full set of engineering drawings in the 900 series,... [there was] a lack of assembly drawings," and (g) as a result of (f) above, Sparton "Engineering personnel [were]... in direct supervision of fabrication of the 300 deliverable buoys." The report also refers to the "Dual Depth Difar layout [drawing] 900-4709," which incorporates the single piece bendable release plate illustrated in drawing No. 900-4623. The dry weight of the single piece release plate shown on drawing No. 900-4623 is approximately .4 lbs., not the 1.2

lbs. noted for a release plate assembly in ECP 0465-2.

**B1423.** In conclusion, Widenhofer stated that "[t]he basic design concepts have been shown, within the limitation of the engineering evaluation, to be reliable and producible." **B251-78.**

*Government Response*:

97a. The stated purpose of the Final Report was "to describe briefly the final design of Dual Depth D[IFAR] sonobuoy, to discuss the problems encountered and design modifications incorporated during development, and to define those areas in need of further evaluation and/or redesign to achieve a reliable, producible sonobuoy design." PX-50 at B252.

97b. In the summary section, the Final Report states:

> The Engineering Development Phase of ECP 0465-2 was completed on March 9, 1972, with the highly successful airdrop of ten final design buoys. The expected completion date for the 300 deliverable buoys is May 19, 1972. The design has several unique mechanical design features, including a float pressure actuated release plate system, and a single part release plate. Although a number of design problems were confronted during development, all were successfully overcome. The design has been simplified, somewhat, since original concept. The cable pack signal shunt was found to be unnecessary and a rather complicated cable spool retainer system was eliminated. There are several important areas and a few minor ones which merit further evaluation for producibility. However, none of these involve any basic design change.

PX-50 at B252.

97c. In the "Discussion of Mechanical Features" section, Mr. Widenhofer states:

> There are several mechanical features that make the Dual Depth D[IFAR] design unique from previous sonobuoy designs. First, the design approach utilizes a float pressure actuated release plate instead of a water impact plate. The release plate is ejected from the top end of the buoy when the $CO_2$ system fires. This system is not effected [sic] by water impact velocity or the angle of water entry. Second, the release mechanism is a simple one-piece, stamped, cold rolled steel plate. … The plate has "hinges" at the center line which bend for installation and bend again during actuation. Sets of tabs at opposite points on the Plate circumference engage slots in the sonobuoy housing. This design has a minimum of dimensions. It also has another important feature – during installation the hinges may be stretched, forcing the circumference in the area of the latch tabs tightly against the housing. This creates a zero clearance condition. As on the D[ICASS] and Deep D[IFAR] sonobuoy, a parachute is utilized as an integral system component. In this case, brackets on the risers of the parachute system are engaged in slots between the sets of latch tabs on the plate. … Third, a one-piece constant diameter housing may be used. Roundness is not a problem. … Fourth, the surface unit has its own housing resulting in a module unit which could be electrically checked and pressure checked prior to final assembly. This module has a plug-in twist lock float assembly, needing no fasteners.

PX-50 at B255, B260. In commenting on the final design, Mr. Widenhofer further offered:

> The Dual Depth D[IFAR] Design has been well documented within the limitations of the scope of the program. The layout is essentially complete[,] as is the bill of material. There is a full set of engineering drawings in the 900 series, however, there is a lack of assembly drawings. Some critical assembly drawings have been made – others consist of marked prints. In lieu of a complete set of assembly drawings, detailed instruction sheets have been written to cover all stages of assembly. …
>
> > Engineering personnel are in direct supervision of fabrication of the 300 deliverable buoys. It is their responsibility to build the buoys in the shortest possible time, while assuring that the quality of the finished buoys is maintained.

PX-50 at B265-66.

97d. The report includes a copy of "Dual Depth D[IFAR] layout [drawing] 900-4709," which incorporates the single piece bendable release plate illustrated in drawing No. 900-4623. PX-50 at B255.

97e. The cited references do not identify the dry weight of the single piece release plate shown on drawing No. 900-4623. PX-50; PX-210 at 1423.

97f. In addressing the producibility of the design, Mr. Widenhofer stated that "[t]he basic design concepts have been shown, within the limitation of the engineering evaluation, to be reliable and producible" and that "no changes of basic concepts are required to improve the reliability or producibility." B276.

**98.** In Sparton's business practice, 900 series drawings were known to be engineering type drawings, whereas 100 series drawings were known to be production drawings. **B797.** The parts of the 300 ECP sonobuoys delivered under Mod. 4 that made them dual depth were not manufactured from 100 series production drawings. Id. Since assembly drawings were necessary for any sonobuoy contractor to produce a sonobuoy utilizing production line assemblers, Sparton needed to manufacture first-piece samples and have engineers from Sparton's Jackson facility (Operations and Engineering departments) supervise (using existing 900 series drawings) the fabrication of the 300 sonobuoys delivered under ECP 0465-2. **B224, 243, 265, 797, 1424.** By March 29, 1972, the critical date, drawings from which Sparton could have

manufactured its dual depth sonobuoy did not exist. **B797, 1424.**

*Government Response*:

98a. Sparton used series designations for its drawings. Dep. of Boyle at 74:17 - 77:13. Series 100 drawings are for specially made parts; series 200 drawings were for components purchased from a manufacturer. Dep. of Boyle at 74:17 - 77:13. Series 900 drawings were drawings used by a design group during the design or redesign of an item. Dep. of Boyle at 74:17 - 77:13. The Series 900 drawings had generally not been fully tested and were not formatted to military standards. Dep. of Boyle at 74:17 - 77:13. Sparton considered the series 100 and 200 drawings to be "production drawings" once they were released by the engineering department for production use. Dep. of Boyle at 74:17 - 77:13. Sparton's practice with regard to retention of 900 series drawings was "haphazard": they may have been kept for years or destroyed in a few months. Dep. of Boyle at 79:8-14.

98b. The parts of the 300 ECP sonobuoys delivered under Mod. 4 that made them dual depth were not manufactured from 100 series production drawings. Dep. of Boyle at 79:8-14. Sparton manufactured "first-piece samples" and had engineers from Sparton's Jackson facility supervise in the fabrication of the 300 sonobuoys delivered under ECP 0465-2 using the 900 series drawings, marked prints of the production drawings and detailed instructions sheets have to cover all stages of assembly. PX-50 at B265-66. By March 29, 1972, the critical

date, drawings and other descriptions from which Sparton could have manufactured its dual depth sonobuoy did exist. PX-50 at B265-66.

F. The Completion OF Phase II Under ECP 0465-2 And The Award Of The 0585 Contract

**99.** On May 22, 1972, Widenhofer informed Hungerford that Sparton dual depth DIFAR sonobuoys were evaluated by the Navy off Bermuda during the week of May 15, 1972. They were compared with a standard DIFAR sonobuoy. All sonobuoys were preset in the deep mode. The target tracked by the sonobuoys was a submarine. Of the 22 sonobuoys airdropped by the Navy, the electronics in two of them never activated, and one sonobuoy had an audio oscillation at about 3-4 kHz. The Navy indicated to Sparton personnel that it was "...extremely pleased with the Sparton Dual Depth Difar performance." **B281-82.** The May 15, 1972 test was the first Navy test of Sparton's dual depth sonobuoy pursuant to the "Developmental Requirements" section of ECP 0465-2 which specified that said sonobuoys were "...submitted for test and evaluation." Id.

*Government Response*:

99a. On May 22, 1972, Mr. Widenhofer prepared a memorandum for Mr. Hungerford stating:

> An evaluation of the Sparton Dual Depth D[IFAR] Sonobuoy was performed by the Naval Air Development Center off Bermuda the

> week of May 15, 1972. A direct comparison of performance was made with Standard D[IFAR] Buoys."

PX-53 at B281. All sonobuoys were preset in the deep mode. PX-53 at B281. The target tracked by the sonobuoys was a submarine. PX-53 at B281. Of the 22 sonobuoys airdropped by the Navy, the electronics in two of them never "came on air," and one sonobuoy had an audio oscillation at about 8 kHz. PX-53 at B281.

99b. On June 7, 1972, Mr. Widenhofer prepared another memorandum to Mr. Hungerford, reporting further analysis by the Navy of the May 15, 1972 field test off Bermuda. PX-54 at B282. According to Mr. Widenhofer, the amended test results were that two buoys did not activate for reasons unknown and that one buoy had an audio oscillation at about 3-4 kHz. PX-54 at B282. Mr. Widenhofer also reported that he was informed by Mr. Rice, NADC, that "the Navy is extremely pleased with the Sparton Dual Depth D[IFAR] performance." PX-54 at B282.

**100.** On May 25, 1972, ten days after the Navy's May 15, 1972 test of Sparton's dual depth sonobuoy, the Navy awarded Sparton the 0585 contract. **B628-82**. Under this contract, Sparton was required to provide inter alia (a) an "Engineering effort for Selectable Depth Capability" (item 2), (b) engineering efforts for a reliability and producibility program (items 6 and 8), (c) an SSQ-53 dual depth sonobuoy for "First Article Government Testing" (item 14), and (d) "Technical Manuals" (item 17). The Navy

reserved as an option the right to purchase 2000 SSQ-53 dual depth sonobuoys (item 18). **B628-33.** The 0585 contract contained a DD 254 form which indicated that information pertaining to the 0585 contract was not releasable to foreign nationals or personnel possessing reciprocal clearances without NAVAIR approval. The contract security classification specification identified the following information as classified: detection and bearing range, detection reliability, signature characteristics, vulnerability to countermeasures, military application and technical advances in the state of the art. **B1008-11.**

*Government Response*:

100. On May 25, 1972, the Navy awarded Sparton Contract No. N00019-72-C-0585, based on Sparton's offer dated May 19, 1972. PX-136 at B628-82. Under this contract, Sparton was required to provide inter alia (a) "Engineering effort for Launcher Envelope for helicopter and high speed and high altitude aircraft" (item 1); (b) "Engineering effort for Selectable Depth Capability" (item 2), (c) "Engineering effort Low Frequency Noise Reduction Program" (item 3); (d) "Engineering effort for Command Down Link Capability" (item 4); (e) "Engineering effort for Shipping/Launcher Container" (item 5); (f) for engineering efforts for a reliability and producibility program (items 6 and 8), (g) an SSQ-53 dual depth sonobuoy for "First Article Government Testing" (item 14), and (h) "Technical Manuals" (item 17). PX-136 at B630-31. The contract also provided the Navy with an option to purchase 2000 SSQ-53 dual depth

sonobuoys (item 18). PX-136 at B631. A Form DD 254 was prepared for the '-0585 contract, which indicated that information pertaining to the '-0585 contract was not releasable to foreign nationals but was releasable to personnel possessing reciprocal clearances without NAVAIR approval. PX-178 at 1009. Further, unclassified information could be publicly released with NAVAIR approval. PX-178 at 1009. The contract security classification specification identified the following information as classified: detection and bearing range, detection reliability, signature characteristics, vulnerability to countermeasures, military application and technical advances in the state of the art. PX-178 at 1010-11. It listed the following information as unclassified: the external view and contract information as to the numbers procured, delivery schedule and cost. PX-178 at 1010-11.

**101.** On June 9 and 13, 1972, Sparton delivered to the Navy 40 and 160 dual depth DIFAR sonobuoys pursuant to phase II of ECP 0465-2. These deliveries were memorialized in writing by DD 250 forms. Title to these sonobuoys passed from Sparton to the Navy on June 9 and 13, 1972 respectively. **A510-16.**

*Government Response*:

The last sentence states a legal conclusion, for which no response is required.

101. On June 9 and 13, 1972, Sparton delivered to the Navy 40 and 160 dual depth DIFAR sonobuoys pursuant to phase II of ECP 0465-2. DX-125. These deliveries were memorialized in writing by DD 250 forms. DX-125.

**102.** In all 300 dual depth sonobuoys delivered by Sparton to the Navy under Mod. 4, Sparton substituted the single piece bendable release plate shown below (and depicted in drawing No. 900-4623) for the Depew multipiece release plate mechanism proposed in ECP 0465-2. **B1052-84, 1428**.

*Government Response*:

102. In all 300 dual depth sonobuoys delivered by Sparton to the Navy under Mod. 4, Sparton substituted the single piece bendable release plate shown below (and depicted in drawing No. 900-4623) for the release plate mechanism proposed in ECP 0465-2. PX-181 at B1052-84; DX-219; DX-17.

**103.** On June 30, 1972, Widenhofer issued two memoranda pertaining to the Navy's sea test of Sparton dual depth sonobuoys off the coast of Hawaii during the week of June 19, 1972. This was the second Navy sea test of Sparton's dual depth DIFAR sonobuoys pursuant to the "Developmental

Requirements" section of ECP 0465-2. Results of the test were provided by the Navy to Sparton. **B284, 1424**.

*Government Response*:

103a. On June 30, 1972, Mr. Widenhofer prepared a one page memorandum to Mr. Hungerford pertaining to the "second Navy sea test which has included Sparton $D^2$ [sic, Dual Depth] D[IFAR] Buoys." PX-55 at B283. The test was conducted off the coast of Hawaii during the week of June 19, 1972. PX-55 at B283. Information relating to failure of the buoys to deploy normally was provided by the Navy to Sparton. PX-55 at B283. The information was provided by Don Miller of NADC. PX-55 at B283. No data printouts were provided to Sparton. PX-55 at B283.

103b. On July 12, 1972, Mr. Widenhofer prepared another one page memorandum to Mr. Hungerford regarding the Navy sea test of the Sparton Dual Depth DIFAR sonobuoys off Hawaii during the week of June 19, 1972. PX-56 at B284. The information in this memorandum was provided by Mr. Graff of NADC. PX-56 at B284. No data printouts were provided to Sparton. PX-56 at B284.

**104.** The Navy definitized the 0585 contract on March 15, 1973 at approximately the same time that it had completed testing the Magnavox, Sanders and Sparton ECP sonobuoys under actual service conditions, i.e., detection of Soviet submarines in different oceanic environments and

temperatures. **B685, 968.** On or about July 18, 1973, the Navy was informed that the Sparton dual depth design still had not been finalized. **B841.** In FY74 and 75, the Navy exercised its option under the 0585 contract and a limited pilot production of Sparton's dual depth sonobuoy commenced after successful first article testing. **B714, 721-25, 770-71.** The Navy's "...evaluation tests prove[d] the proposed merits [of the change under ECP 0465-2] under actual service conditions. A specification and nomenclature change then occurred, changing the designation of Saprton's dual depth sonobuoy from AN/SSQ-53 or SSQ-53("DD") to AN/-SSQ-53 (XN-1) to AN/SSQ-53A. **B710, 715-720, 736, 738, 740, 746, 748, 770-71, 776, 1052.**

*Government Response*:

104a. The Navy definitized the 0585 contract on March 15, 1973. PX-139 at B685. No evidence is available as to when the Navy completed testing of the Magnavox, Sanders and Sparton ECP. The Navy's testing was under actual service conditions, i.e., by fleet personnel, with fleet equipment and in fleet training operations under a variety of different oceanic environments and temperatures. PX-120 at B506-513. The testing did *not* involve detection of Soviet submarines, rather the testing involved participation of U.S. submarines. PX-120 at B506-513.

104b. On or about July 18, 1973, the Defense Supply Agency (DSA) conducted a technical evaluation of Sparton Colorado's participation in a

proposed production of sonobuoys under the '-0585 contract. PX-163 at B841. Sparton Colorado's work was said to relate to an "advanced SSQ-53 Sonobuoy," but the "advance" is not identified, nor is the nature of the work described in the document. PX-163 at B841-43. DSA was informed that the cost data for work to be performed at Sparton Colorado were "purely estimates" because the "design has not been finalized" and "the proposed material costs will be subject to change up until the design is finalized." PX-163 at B841. Mr. Hank Melvin, a Sparton accountant, provided DSA with a parts list, but did not identify which parts were applicable to the Sparton Colorado effort. PX-163 at B842; *see also* PX-143 at B712. Mr. Melvin did not provide engineering drawings. PX-163 at B842. Without the engineering drawings the Defense Contract Adminstrative Services Office (DCASO) could not make a "definite statement about the validity of the proposed parts cost." PX-163 at B842. DSA further indicated that DCASO opined that "Sparton's technique of using the time standard from another proposal" was "very questionable" and that "it will be impossible to make a statement about the reasonableness of the proposed labor hours." PX-163 at B842.

104c. The Navy modified the '-0585 contract to exercise an option authorizing a product improvement program that resulted in incorporation of the dual depth feature in production DIFAR sonobuoys during Fiscal Year 1974 and 1975. PX-141 at B710; PX-152 at B771; PX-154 at B778. Under the modified option, Sparton produced 500 dual depth sonobuoys. PX-140 at B695; PX-146 at B723. The Navy authorized Sparton to mark sonobuoys made under the

production improvement program as "AN/-SSQ-53 (XN-1)" sonobuoys. PX-148 at B738. A change in nomenclature from the AN/SSQ-53 to AN/SSQ-53A sonobuoys occurred on June 30, 1975, when the Navy published a new specification which incorporated the dual depth requirement for all future DIFAR sonobuoys. DX-223. DIFAR sonobuoys of all manufacturers that incorporated the dual depth function were subsequently designated as AN/SSQ-53A sonobuoys. DX-223.

**105.** The Sparton dual depth PIP/53A sonobuoy release plate supplied to the Navy by Sparton was configured as follows.

*Government Response*:

105. The Sparton dual depth AN/SSQ-53A sonobuoy release plate supplied to the Navy by Sparton under the product improvement program of the '-0865 contract was configured as follows.

**106.** The Sparton inventions covered by claims of the 120 and 233 patents in suit were procured by the Navy in the millions. **B285-87, 301-04, 355-60, 1425.**

"Sparton inventions covered by claims of the 120 and 233 patents were procured" states a conclusion of law, which requires no response. *But see* Testimony of Mr. Hudson.

106. The Navy procured large numbers of sonobuoys in the AN/SSQ-53, AN/SSQ-57, AN/SSQ-62, and AN/SSQ-77 configurations. Testimony of McGavock.

III.

A.

**106**. Sparton maintained exclusive control over the experimentation conducted under its deep and dual depth sonobuoy program through the critical date. Sparton retained ownership of the tested sonobuoy engineering models from the beginning of its deep DIFAR program in September 1970 to and through the completion of its dual depth DIFAR program on April 28, 1972 (subsequent to the critical date) which overlapped its performance under ECP 0465-2. The Navy did not own any Sparton dual depth sonobuoys until April 25, 1972, subsequent to the critical date. **A445-48**. Contemporaneous Sparton business records establish that Sparton generated in September 1970 an overall Program plan outlining the design and testing work thought needed to complete a deep DIFAR sonobuoy having a deep deployment depth capability. This Program was revised on March 16, 1971 and was then merged into Sparton's dual depth DIFAR program when the issuance of ECP 0465-2 was imminent. **B70-71**. Sparton's dual depth program was completed on April 28, 1972, shortly after Sparton began furnishing the Navy with

the 300 ECP 0465-2 sonobuoys. **B251-78.** Thus, a formal company test program was commenced in September 1970, was merged with a second related test program and was not completed until April 28, 1972 after the critical date, March 29, 1972. **B788-97.**

*Government Response*:

This statement is an argument an conclusion based on fact and attempts to encapsulate PPFF Nos. 46-105. It is inconsistent with at least PPFF Nos. 69, 94 and 95 and with PX-49 and PX-50.

**107.** The following tests were conducted outside Sparton facilities under the Sparton deep and dual depth programs: **1970** at Key West on December 19; **1971** at Key West on February 18, at NOL on April 3, at St. Croix on August 31, at Trumbull Lake in October, at Key West on November 5, and at St. Croix in December; and **1972** at St. Croix on January 13, at St. Croix on February 9-10, and at St. Croix on March 9. **B83-90, 115-28, 158-70, 181-90, 211-14, 216-42, 244-50, 265, 272-74.** Sparton prepared proposed test programs/plans for these tests, conducted them with ministerial assistance by Navy personnel at the noted facility and controlled the test procedures. **B74-77, 91-93, 106-12, 171-74.** When these tests were conducted, Sparton personnel were present and conducted, supervised and controlled the testing. Sparton

personnel developed the test results, reported the test details and nature of the tests and recorded their observations. **B78-81, 83-90, 115-128, 158-170, 181-190, 211-214, 244-250.** They even changed the format of a test when the occasion warranted. **B216-242.** Contrarily, the Navy ECP 0465-2 project engineer Graff, who observed the tests, did not prepare any reports thereon. **B544.** Only one Navy report of a Sparton test is of record. **A221-34.** That report does not disclose the structural components or operational details of the tested devices. **B1428.**

*Government Response*:

This PPFF is an argument and conclusion based on the facts asserted in PPFF Nos. 46, 48, 49, 50, 63, 78, 84, 90, 91 and 94. As those paragraphs indicate, the Navy provided Sparton much more than "ministerial assistance" and many of the tests were observed by Navy personnel knowledgeable in the technology and the testing procedures, as noted in the paragraphs cited above. Further, Mr. Graff was not the Navy ECP 0465-2 project engineer, as indicated in this proposed statement of fact. Rather, Mr. Graff was responsible for monitoring the sea testing similar to that which he had done with Magnavox. DX-121 (Dep of Graff) at 34:18-24. His role was to evaluate the dual depth sonobuoys of all three manufacturers to determine how they would perform compared to the standard SSQ-53 sonobuoys. DX-121 (Dep of Graff) at 43:15-21.

**108.** Although Navy facilities and equipment (e.g. P-3 aircraft, acoustic sound producer, recorder etc.) were used in these tests, and NADC personnel witnessed the tests on 12/70, 2/71, 11/71, 1/72, and 3/72 (NOL personnel witnessed 4/71 test), the tested sonobuoys as well as certain Sparton test equipment were brought by Sparton to the test sites and were thereafter loaded on the aircraft or boat to conduct the testing; subsequent to the testing, those sonobuoys not having sunk to the bottom of the ocean were retrieved by Sparton for inspection and rework when necessary and were transported back to Sparton. The Navy recognized that Sparton controlled the testing. During the February 9, 1972 test at St. Croix, NADC personnel requested Sparton to deploy "a Dual Depth DIFAR strum buoy." **B218.** Had the Navy controlled the testing, it would not have needed to ask Sparton to conduct this test. The two Sparton test reports that identify ECP 0465-2 establish that Sparton employees prepared the test plans, observed the tests, recorded the test results, corrected the problems encountered, redesigned tested hardware and reported conclusions to Sparton management. **B211-214, 244-250, 1428.**

*Government Response*:

This proposed statement of fact is an argument and conclusion based on the facts asserted in PPFF Nos. 46-94, above.

B.

**109.** A secrecy obligation was inherently imposed upon Navy and Sparton personnel in regard to performance under ECP 0465-2 (including the Navy testing of the Sparton dual depth sonobuoys subsequent to the critical date) by virtue of the military security classification specification, DD Form 254, contained within the 0465 contract which identified the following information as being classified: detection range and reliability, bearing range, military application of sonobuoy, and technical advances in the state of the art. **B813-14.** This information was classified secret or confidential and its disclosure to the public was prohibited by law, 18 U.S.C. §§793-94. **B781, 811-814.** This military security classification specification was also contained in the 0585 contract. **B1008-11.** As a result of the Navy's military security classification, Sparton's test work under ECP 0465-2 and the 0585 contract, as well as the Navy's testing of the patented inventions subsequent to the critical date, was cloaked in secrecy. Id.

*Government Response*:

109. A secrecy obligation was explicitly imposed upon Sparton personnel in regard to performance under ECP 0465-2 by virtue of the Navy's unilateral determination that some information relating to the sonobuoys was classified, including: detection range and reliability, bearing range, military application of

sonobuoy, and technical advances in the state of the art. PX-158 at B811-14. This information was classified secret or confidential and its disclosure to the persons who did not have a need to know and proper security clearance was prohibited by law, 18 U.S.C. §§793-94. PX-158 at B811-814. The Navy similarly classified information contained in the '-0585 contract. PX-178 at B1008-11. Notwithstanding the security classification, the Navy could allow technically proficient engineers, who had the appropriate security clearance, to see the sonobuoy, internal parts and other information. *See*, *e.g.*, PPSF Nos. 140-155 and Heading VI. Further, control over what was classified and how long it remained classified was strictly a Navy determination. *See* PPFF No. 140, below.

**110.** Sparton's performance under ECP 0465-2 provided the Navy with a new dual depth DIFAR capability, i.e. a technical advance in the state of the sonobuoy art that directly improved detection capability, i.e. "reliability." The performance of Sparton's patented dual depth sonobuoy was classified in accordance with 0465 contractual requirements. For example, the July 1, 1972 Sparton manual (describing the Sparton ECP 0465-2 sonobuoy and its deployment sequence) provided to the Navy (after the critical date) under ECP 0465-2 was classified. **B1052-84.** This manual states: (a) "[e]ach transmittal of this document outside the Department of Defense must have approval of the issuing Service" and (b) "[n]otice: [t]his material contains

information affecting the national defense of [sic] the United States within the meaning of the Espionage Laws, Title 18, U.S.C., section 793 and 794, the transmission or revelation of which in any manner to an unauthorized person is prohibited by law." **B1052.** Additionally, the February 28, 1972 Navy Evaluation Plan issued to test and evaluate Sparton's ECP sonobuoy was likewise classified, as were the reports generated thereunder after the critical date. **B503-18, 536, 975-78.** Based upon the classification of the Sparton July 1, 1972 manual (and the restrictions on its disclosure) and the Navy February 28, 1972 Evaluation Plan (and reports generated thereunder), as well as the 0465 and 0585 contract DD 254 classification requirements, the Navy was placed on notice that the Sparton dual depth sonobuoy deployment systems and the tests conducted thereon were cloaked in secrecy. **B1428-29.**

*Government Response*:

The Proposed Statement of Fact is legal and factual argument. As to the facts in the paragraph, *see* PPFF No. 109, above, and Testimony of Hudson.

**111.** The original Sparton dual depth proposal (**B1012-47**) provided to the Navy in November 1970 contained a restrictive data legend, preventing the Navy from disclosing its subject matter, i.e. the inverse sonobuoy design, to the public. **B1014.**

*Government Response*:

111. The inside front cover of the November 30, 1970 ECP 0465-2 bore the following restrictive legend:

> These data shall not be disclosed outside the government or be duplicated, used or disclosed in whole or in part for any purpose other than to evaluate the proposal, provided that if a contract is awarded to this offeror as a result of or in connection with the submission of such data, this legend shall be of no force or effect, and in such event this offeror will assert no rights against the government with respect to these data, unless based on patents or provisions in the contract. This restriction does not limit the government's right to use information contained in such data if it is obtained from another source.

PX-179 at B1014. Contrary to PPSF, this legend did *not* restrict the public, after award of ECP 0465-2, which contained the same legend, because a contract was awarded pursuant to the ECP and the legend is ineffective with respect to patents for the reasons that will be discussed in Defendant's brief.

**112.** The Navy project engineer responsible for ensuring Sparton's performance under ECP 0465-2 was NADC employee Graff. **B520-21.** While he observed some Sparton deep and dual depth ECP sonobuoy tests in 1971-72, he (and Navy fleet operators using Sparton's inventions subsequent to the critical date) was not knowledgeable of the proprietary hardware configuration of Sparton's deep depth and patented dual depth sonobuoys. **B1005.** Neither Navy personnel nor the public had an unrestricted view of the internal structural components of the Sparton deep or dual depth sonobuoys while

they were being tested at Naval facilities because the housing thereof shielded the identity and function of these components from public view. **B1429**. By observing any of the Sparton deep and dual depth sonobuoy tests, Navy personnel could not have learned of any Sparton confidential information pertaining to the tested sonobuoys, i.e. the identity of the components (as well as their function). Id.

*Government Response*:

112. Mr. Graff was not the "Navy project engineer responsible for ensuring Sparton's performance under ECP 0465-2," but he was a NADC employee responsible for monitoring the sea testing. Dep. of Graff: 34:18-24. His role was to evaluate the dual depth sonobuoys of all three manufacturers to determine how they would perform compared to the standard SSQ-53 sonobuoys. 43:15-21. Nothing in the record supports the conclusion that Mr. Graff was not knowledgeable regarding the design and operation of the ECP sonobuoys. Mr. Graff had reviewed the ECP proposal. PPFF No. 43. By observing any of the Sparton deep and dual depth sonobuoy tests and reviewing the material submitted to the Navy in support of the ECP, Navy personnel learned of all of the Sparton confidential information pertaining to the tested sonobuoys, i.e. the identity of the components (as well as their function). *See* DX-219 (Mod 4 sonobuoy).

**113.** The Sparton ECP 0465-2 sonobuoys were expendable because they contained a scuttling mechanism. **B1430**. When the Navy conducted tests on the Sparton dual depth sonobuoys

for approximately one year after the critical date, those sonobuoys were tested under standard operating conditions. **B503-18, 974-75.** In standard operation, the sonobuoys are scuttled (destroyed) after one use. **B1052, 1077.** It is highly unlikely that any member of the public could have been exposed to Sparton's patented inventions as a result of the Navy's standard use of them during its testing program pursuant to its February 28, 1972 Evaluation Plan. **B1430.**

*Government Response*:

113. The Sparton ECP 0465-2 sonobuoys were scuttled or the float deflated after the intended use because the devices are deemed expendable in actual use. Testimony of Hudson. When the Navy conducted tests on the Sparton dual depth sonobuoys for approximately one year after the critical date, those sonobuoys were tested under standard operating conditions. PX-120 at B503-18. In standard operation, the sonobuoys are scuttled (destroyed) after one use. Testimony of Boyle; Testimony of Hudson. It is *highly likely* that any member of the public could have been exposed to Sparton's patented inventions as a result of the Navy's standard use of them during its testing program pursuant to its February 28, 1972 Evaluation Plan since Navy personnel had access to the sonobuoys in both deployed and undeployed condition and conducted all testing without Sparton being present. *See* PPFF Nos. 93, 99, 101-103.

**114.** As a result of the 0465 contract military security classification specification prohibiting Navy and Sparton

personnel from disclosing classified information, and by the very nature of the Sparton deep or dual depth sonobuoys which were expendable (i.e. self-destructed after one use, during which use it operated for a limited number of hours), the Navy could not resell or reuse the Sparton deep or dual depth sonobuoys and the public did not have access to or an unrestricted view of them during Sparton's ECP tests prior to the critical date and the Navy's ECP tests for one year subsequent to the critical date. **B1430.**

*Government Response*:

This proposed statement of fact is argument and legal conclusion based on the assumptions that are untrue. In particular, the security classification did not preclude the Navy from disclosing information to other qualified members of the public and would not necessarily preclude the sale of such sonobuoys, had the Navy sought to do so. Further, the conclusion is contrary to Sparton's contentions in PPFF Nos. 140-155 and Heading VI.

**115.** Because of the competitive environment in the sonobuoy industry, there was no conduct by Sparton that would have led the Navy or the public to reasonably believe that the Sparton deep or dual depth sonobuoys were in the public domain. Nor is there any indication provided to Sparton that the Navy had such a perception. **B1430.**

*Government Response*:

115. The ECP would have led a reasonable person to believe that at least the device disclosed in that document was sold and in the public domain as of July 13, 1971. PPFF No. 59. The only available evidence indicates that the Navy did not believe that any of the Sparton sonobuoy design was proprietary after July 13, 1971. PPFF Nos. 140-155 and Heading VI.

C.

**116.** Sparton maintained detailed test records of its deep and dual depth sonobuoy programs. These records span the period September 1970 through July 1972 (ECP 0465-2 performance and deliveries and Navy May-June 1972 tests) and beyond (0585 contract), detail tests conducted in this period including dates, number of sonobuoys tested, persons who observed and conducted the testing, problems encountered, changes (including single piece release plate) made as a result of the tests, and conclusions drawn from each test. **B70-284.**

*Government Response*:

This proposed statement of fact is argument and conclusions based on PPFF Nos. 46-106.

D.

**117.** Sparton's March 17, 1971 letter, ECP 0465-2 and Mod. 4, establish the Navy's knowledge of the experimental nature of the work to be performed thereunder, and Sparton's need to sea test its dual depth sonobuoys at naval facilities and the Navy's need to perform sea tests on sonobuoys of this nature under actual service conditions. **B55-69.** The March 17 letter proposed "[t]he redesign, modification and test of engineering models to verify feasibility of design approach," and to "[m]odify and deliver 300 units...." **B55.** The ECP indicated that the work was divided into two phases. In the first phase, Sparton would "[d]esign and construct engineering models and perform sea tests." B69. In the second phase, Sparton would "[m]odify and deliver one production lot of 300...Sonobuoys for dual depth operation... and [d]eliver operating manual." Id. Sparton specifically informed the Navy that the change "...will add the [dual depth] capability to the AN/SSQ-53..." and the "300... units... [were being] modified... and submitted for [Navy] test and evaluation." **B57.** The Navy incorporated the ECP into Mod. 4 and thus accepted the proposed test plan. **B51.** This contractual agreement evidences not only Sparton's experimental purpose behind the ECP and the Navy's knowledge thereof, but also the Navy's acceptance of testing under actual service conditions as proposed by Sparton to

<u>"prove the proposed merits," i.e. workability, of its dual depth sonobuoys in their intended environment. **B51-69.**</u>

*Government Response*:

117a. Sparton's March 17, 1971 letter, ECP 0465-2 and Mod. 4, established the experimental nature of the work to be performed. PX-4. The Navy performed sea tests on Mod 4 sonobuoys to determine whether the dual depth buoy provided improved performance over standard DIFAR buoys in actual service conditions. PX-150.

117b. The March 17 letter proposed "[t]he redesign, modification and test of engineering models to verify feasibility of design approach," and to "[m]odify and deliver 300 units...." PX-4 at B55. The ECP indicated that the work was divided into two phases. PX-4 at B69. In the first phase, Sparton would "[d]esign and construct engineering models and perform sea tests." PX-4 at B69. In the second phase, Sparton would "[m]odify and deliver one production lot of 300 GFE [Government Furnished Equipment] Sonobuoys for dual depth operation" and "[d]eliver operating manual." PX-4 at B69. Sparton stated that its engineering change proposals would allow the Navy to "add the capability to the AN/SSQ-53 to operate at 1,000 ft. depth as well as 90 ft." PX-4 at B57. As part of the ECP, Sparton "recommended that 300 completed AN/SSQ-53 units be modified as described in the proposal and submitted for [Navy] test and evaluation." PX-4 at B57. The Navy incorporated the ECP into Mod. 4 and thus accepted the obligation to pay for research toward and development of a dual depth DIFAR sonobuoy and production of 335 sonobuoys, 300 of which were to

be provided in one lot for the Navy's own testing, as it saw fit. PX-4 at B51, B69.

117c. The '-0465 contract, which incorporated ECP 0465-2 through Modification P0004, does not require the Navy to use the sonobuoys, nor does it specify what disposition is to be made of the 300 sonobuoys to be delivered to the Navy. PX-4.

**118.** Navy ECP project engineer Graff, whose role was to monitor Sparton's ECP performance and evaluate Sparton's 300 ECP dual depth sonobuoys to ascertain their performance in comparison with the contract specification and a standard SSQ-53 sonobuoy, considered Sparton's dual depth sonobuoy tests to be "...in the nature of development tests...." **B527, 543-44, 958, 965-66, 992, 995-96, 1000-01**. So did the Navy when it concluded that "[t]he AN/SSQ-53A was developed as part of a Product Improvement Program [ECP 0465-2] by Sparton in FY 72...." **B770-71**.

*Government Response*:

118a. Mr. Graff, a Navy engineer, who established a testing protocol to measure the performance of all three contractors' dual depth sonobuoys against "shallow depth" standard SSQ-53 sonobuoy, considered Sparton's dual depth sonobuoy tests to be "in the nature of development tests." PX-121 at B544.

118b. A Navy request for authority to contract, dated March 28, 1979, states that "[t]he AN/SSQ-53A was developed as part of a Product Improvement Program by Sparton in FY 72." PX-152 at B770-71.

E.

**119.** Sparton's dual depth sonobuoy generally relates to an expendable sonobuoy containing a deployment mechanism and/or release plate contained therein, wherein designated sonobuoy components are rapidly deployed through the upper end of the sonobuoy housing. The dual depth sonobuoy is generally jettisoned from a P-3 aircraft, descends through the atmosphere by parachute, impacts the oceanic surface at various angles and speeds and under varying weather and sea conditions and rapidly deploys its components (through an electromechanical explosive system) to a desired depth (regardless of sea conditions) to detect hostile nuclear submarines traveling at speeds and depths to avoid detection. This sonobuoy experiences severe trauma in actual service conditions from operational deployment (being airdropped) until end of life (when the buoy is destructively scuttled within hours after deployment). **B1430-31.**

*Government Response*:

A substantial portion of this proposed statement of fact consists of conclusory statements not supported by citations.

119. Sparton's dual depth sonobuoy is a specific device, having a specific design. DX-219 (Mod 4 sonobuoy). The sonobuoys in question are usually jettisoned from an aircraft in flight, currently either a helicopter or an S-3 or P-3 fixed-wing aircraft; descends through the atmosphere by parachute; impacts the water and deploys its components to a desired depth (depending on sea conditions) to listen for hostile nuclear submarines. Testimony of Boyle; Testimony of Hudson.

**120.** In view of the Navy's need to obtain a dual depth DIFAR capability, the Navy awarded Magnavox, Sanders and Sparton ECPs to existing contracts at about the same time, circa 1970-71, to receive these contractors' dual depth sonobuoy samples at about the same time, circa 1972. **B967-68.** The length of the Sparton ECP test period (7 and 1/2 months), Sparton's need to conduct sea tests of engineering models and the need for Navy actual service condition tests to prove the merits of the modified sonobuoys were three features expressly disclosed to the Navy in the ECP. **B58.** The Navy had comparable information from Sparton's competitors. **B506, 514.** The Navy was in an excellent position to determine the reasonableness of these three

Sparton ECP features. Id. The Navy's acceptance of Sparton's ECP through its incorporation into Mod. 4 establishes that these three Sparton ECP features were reasonable. The Navy at no time objected to any of these ECP features. **B1430.**

*Government Response*:

A substantial portion of this proposed statement of fact consists of conclusory statements not supported by the citations.

120. The Navy awarded Magnavox, Sanders and Sparton ECPs to existing contracts at about the same time and received the three contractors' dual depth sonobuoy at about the same time. PX-177 at B967-68. Sparton set the length of the Sparton ECP program as "7 and 1/2 months after ECP approval." PX-4 at B58, B69. Sparton also identified one of the necessary activities during the program as being Sparton's need to conduct sea tests of engineering models before delivery of 300 sonobuoys to the Navy. PX-4 at B69. The Navy did not object to Sparton's schedule or to the need for testing, but did limit its remuneration to Sparton for the project to $198,000, unless an equitable adjustment to the contract was substantiated and granted. PX-4 at B51.

**121.** Sparton's competitors (a) validated sonobuoy designs, including like deployment systems therein, through a number of contractor demonstration tests and over a period of time which corresponds to Sparton's test period under ECP 0465-2, (b) recognized a need to sea test their sonobuoys and (c) the Navy's need to test an experimental sonobuoy under

actual service conditions. For example, Rockwell projected a 10 month period from design to contractor demonstration of its SSQ-53B sonobuoy, during which time 17 and 32 sonobuoys were earmarked, with Navy approval, for lab and flight testing respectively to obtain "a statistically valid set of test results." **B847-48, 851.** Hazeltine projected a period of more than one year from sonobuoy design to contractor validation testing of its SSQ-77 VLAD sonobuoy, during which time 35 sonobuoys were to be tested. **B859, 864.** Similarly, the SSQ-53 sonobuoy was developed by Magnavox and Sanders over a 3 year period with dozens of sea tests being performed thereon. **B959-62.**

*Government Response*:

The first and last sentences are conclusory statements, unsupported by the citations provided.

121. In developing its SSQ-53B sonobuoy, Rockwell projected a 10 month period from design to contractor demonstration, during which time, Rockwell planned to use 32 sonobuoys for its lab and flight testing to obtain "a statistically valid set of test results" and planned to provide another 17 sonobuoys to the Navy for the Navy's utilization in Navy testing. PX-164 at B847-48; PX-165 at B851. Hazeltine projected a period of more than one year from sonobuoy design to validation testing of its SSQ-77 VLAD sonobuoy, during which time 35 sonobuoys were to be tested, including 10 supplied to the Navy for its internal testing. PX-166 at B859; PX-167 at B864.

**122.** All three competing DIFAR contractors were required by the Navy to furnish the latter with dual depth sonobuoy samples. Magnavox supplied the Navy with 500 sample sonobuoys while Sanders and Sparton were required to supply the Navy with 300 sample sonobuoys each. **B514.** In the sonobuoy industry, commercial quantities were in the thousands and tens of thousands, whereas experimental quantities were in the hundreds. **B285-377, 427-518.** The 300 sonobuoy samples sent by Sparton to the Navy were considered by the Navy, and particularly the Navy project engineer Graff having ECP 0465-2 responsibility, to be a limited developmental quantity necessary for testing under actual service conditions. **B57, 143-44, 243, 251-52, 255, 264-65, 544, 988, 992.** As a result, the Navy's ECP 0465-2 project engineer requested the U.S. fleet to use the ECP sonobuoy samples only in a deep depth mode in view of their limited number and since the Navy already knew how the standard SSQ-53 performed in a shallow mode. **B988.**

*Government Response*:

122a. All three competing dual depth DIFAR contractors were required by the Navy to furnish the latter with one lot of dual depth sonobuoys, as part of the contract. Magnavox supplied the Navy with 500 dual depth sonobuoys while Sanders and Sparton

were required to supply the Navy with 300 dual depth sonobuoys each. PX-120 at B514. In general, sonobuoys are bought in lots of 800 to 3000 sonobuoys. PX-172 at B903.

122b. The "production lot" of 300 sonobuoys sent by Sparton to the Navy were required by the '-0465 contract, which incorporated ECP 0465-2. PX-4 at B69. NADC requested U.S. fleet users to utilize the dual depth DIFAR sonobuoys only in a deep depth mode in view of their limited number. PX-120 at B506.

**123.** Sparton's conduct in supplying the Navy with 300 modified sonobuoys was consistent with industry custom for supplying experimental sonobuoy samples for Navy test and evaluation. **B1431.** Sparton did not possess the following resources needed for testing its ECP sonobuoys under actual service conditions; Soviet or U.S. submarines to emit acoustic signals, P-3 aircraft to launch these sonobuoys in sea environments, a boat, aircraft and boat mounted cameras and Navy avionics to receive sonobuoy signals and record test results. The only Navy facilities which contained these resources and could accommodate sea testing of contractor experimental sonobuoys was at Key West or St. Croix. **B1431.** As a result of not possessing the above resources, Sparton needed to test its experimental deep and dual depth sonobuoys at the Key West/St. Croix Naval facilities. Nevertheless, it was customary in the sonobuoy art for the Navy to test experimental sonobuoys having a new

capability, separate and apart from contractor testing, under operational conditions (e.g. weather, ocean surface, noise, depth and temperature, thermoclines, etc.) different than those in existence at Key West/St. Croix. **B971-72, 1431-32.** In this manner, the Navy could ascertain if a new experimental sonobuoy capability was workable, or provided better results than other sonobuoys, under all operating conditions. **B971-72.** In this regard, the Navy needed and obtained 260 Sparton dual depth sonobuoy samples for submission to Navy fleet P-3 aircraft squadrons located in the Atlantic, Pacific, Mediterranean, Hawaii, Bermuda and Iceland sea theaters to test the acoustical performance thereof alongside a standard SSQ-53 sonobuoy in various sea environments having different conditions and temperatures. **B969-86.** The Navy also needed and obtained 40 Sparton dual depth sonobuoy samples for submission to the Navy Key West facility for test by NADC and a VX-1 (P-3) squadron whose mission was to perform only developmental testing. **B991-1003.** The Navy tested some or all of these Sparton dual depth sonobuoy samples by tracking Soviet submarines. **B976.**

*Government Response*:

123a. Sparton's conduct in supplying the Navy with 300 modified sonobuoys was consistent with what it was obligated to do in accordance with its engineering change proposal, as incorporated in the '-0465 contract. PX-4 at 69.

Sparton did not possess the following resources needed for testing its ECP sonobuoys under actual service conditions; Soviet or U.S. submarines to emit acoustic signals, P-3 aircraft to launch these sonobuoys in sea environments, a boat, aircraft and boat mounted cameras, Navy avionics to receive sonobuoy signals and record test results, and the financial resources to conduct such testing. Testimony of Boyle. The only Navy facilities which Navy contractors were authorized to use for sea testing of experimental or developmental sonobuoys was at Key West or St. Croix. Testimony of Boyle. As a result of not possessing the above resources, Sparton needed to test its experimental deep and dual depth sonobuoys at the Key West/St. Croix Naval facilities. Testimony of Boyle.

123b. It was customary in the sonobuoy art for the Navy to test experimental or developmental sonobuoys separate and apart from contractor testing both for function and under operational conditions. Testimony of Boyle. In this manner, the Navy could ascertain if a new experimental sonobuoy capability was workable, or provided better results than other sonobuoys, under necessary operating conditions. Testimony of Boyle. In this regard, the Navy contracted for one production lot of 300 Sparton dual depth sonobuoys, which Mr. Graff of NADC distributed to aircraft squadrons assigned to the Atlantic, Pacific, and Mediterranean fleet operations for the purpose of testing the performance of the deep depth setting alongside a standard SSQ-53 sonobuoy in various sea conditions. B969-86. The Navy also needed and obtained 40 Sparton dual depth sonobuoy samples for submission to the Navy's Key West facility for

testing by NADC and a VX-1 (P-3) squadron whose mission was to perform only developmental testing. PX-4 at B69; PX-177 at B991-1003.

123c. The Navy tested some or all of these Sparton dual depth sonobuoy samples by tracking U.S. submarines. PX-120 at B508-13.

**124.** The Navy provided each of the three DIFAR contractors with unofficial feedback concerning the reliability of its sonobuoy (**B1003-04**) and provided NAVAIR with classified data that established that the dual depth sonobuoy samples performed better at tracking Soviet submarines than the standard SSQ-53 sonobuoy. **B972, 980, 984-85, 987-88, 997-98, 1001-03, 1005-07.**

*Government Response*:

124. NADC provided the three DIFAR contractors with unofficial feedback concerning the reliability of their respective sonobuoys. DX-121 (Dep. of Graff) at 135:7 - 136:8. Mr. Graff provided only "unofficial feedback" because the fleet testing was "none of their business." DX-121 (Dep. of Graff) at 135:7 - 136:8. The only information he provided was if something went wrong with a sonobuoy in terms of reliability. DX-121 (Dep. of Graff) at 135:7 - 136:8. Mr. Graff provided NAVAIR with a report that summarized the fleet data, which showed that the dual depth sonobuoys performed better in the operational tests made by the fleet than the standard SSQ-53 sonobuoys. PX-177 at B977-79. The report was classified and no copy was retained. PX-177 at B978.

**125.** In the period May-June 1972, the Navy indicated its satisfaction with the Sparton dual depth sonobuoys (in comparison with the standard SSQ-53), proved the proposed merits of the ECP 0465-2 sonobuoys in accordance with ECP expressed intentions and awarded Sparton the follow-on 0585 PIP contract. **B57, 281, 283, 628-682, 796, 1424, 1431.**

*Government Response*:

125. On May 25, 1972, the Navy awarded Sparton Contract No. N00019-72-C-0585, based on a negotiated agreement. PX-136 at B628. The '-0585 contract called for a "product design improvement program" that required engineering effort for helicopter launch; high speed and high altitude aircraft launch; a selectable depth capability; a low frequency noise reduction program; a command down link capability; a new shipping container; a high producibility program; and reliability, environmental and "end-to-end" testing efforts. PX-136 at B628-38. Under the '-0585 contract, the engineering effort was limited to the construction of 243 sonobuoys and the Navy had the option to buy one lot of 2000 additional sonobuoys. PX-136 at B631-32.

F.

**126.** As a result of the Navy's pressing need for a dual depth DIFAR sonobuoy, Sparton undertook the risk of developing one by instituting a deep and then a dual depth sonobuoy program. As each step in the development process

was taken, Sparton's development costs increased. In order to defray these increasing development costs and utilize equipment, e.g. P-3 aircraft, avionics, a boat, and cameras, uniquely in the possession of the Navy, Sparton submitted ECP 0465-2 to the Navy. Sparton's business records establish that Sparton incurred a $108,000 loss, after being paid $282,000 by the Navy, under ECP 0465-2. **B358, 424.** Sparton was required by the Navy to bear this loss and assume substantial risk in this program because the Navy was unable to completely fund the ECP work of its three Difar contractors in FY72. **B506, 776, 778, 355-58, 424-26, 1418.**

*Government Response*:

126. Pursuant to the terms of the contract that it freely entered, and subject to terms that it proposed, Sparton was obligated to develop and provide 300 dual depth sonobuoys to the Navy for a fixed contract price. PX-4 at B51, B69. Through Modifications P0009 and P0011 of the '-0465 contract, the total negotiated amount for the dual depth effort was determined to be $282,000.00. DX-1. In order to obtain a contract that would benefit it, Sparton submitted ECP 0465-2 to the Navy. PX-4 at B51, B55. Sparton's business records do not establish that Sparton incurred any loss, but do demonstrate that it was paid $282,000 by the Navy, under ECP 0465-2. PX-110 at B424. Sparton freely entered into Modification P0004, P0009 and P0011 to the '-0465 contract which provided for payment by the Navy of a fixed price, and therefore Sparton assumed any risk in its expenses that would exceed it costs. PX-4 at B51, B55.

G.

**127.** Sparton did not advertise, promote or disclose its dual depth sonobuoys to the public (including foreign nations who purchased sonobuoys from Sparton) outside the 1 year grace period. ECP 0465-2 and Mod. 4 represent nothing more than a cost defrayal arrangement between customer and supplier, whereby the latter was incurring substantial developmental costs to solve a pressing defense need of the former in the interests of national security. **B1432.**

*Government Response*:

127. There is no evidence that Sparton advertised, promoted or disclosed its dual depth sonobuoys to anyone other than the United States Navy. PX-4. ECP 0465-2 and Mod. 4 represent nothing more than a firm fixed price contract for development, testing and manufacture of a dual depth sonobuoy between customer and supplier. PX-4.

**128.** Sparton owned its patented inventions and controlled their testing through the critical date, maintained their confidentiality pursuant to the classification specification, DD Form 254, in the 0465 contract, and even marked its 1970 dual depth proposal with a confidentiality legend. Sparton informed no one of its dual depth sonobuoy configurations during its performance of ECP 0465-2. The

Sparton dual depth sonobuoys were inherently shielded (encased in housing) from public view through the critical date. No Sparton rival was prevented from conceiving Sparton's dual depth sonobuoys or deriving another solution to the Navy's problem. The Navy's issuance of ECPs to Sanders and Magnavox to promote competition in finding a solution to its dual depth problem corroborates this conclusion. **B1432.**

*Government Response*:

This statement is argument, opinions and conclusions for which the only citation of authority are the conclusory statements of Mr. Boyle. The statements are not sufficiently supported.

**129.** Sparton did nothing to commercially exploit the DePew dual depth sonobuoy. Sparton included no provision in its March 17, 1971 letter and ECP 0465-2 requiring the Navy to purchase commercial quantities of its DePew dual depth sonobuoy. Instead, the Navy was advised in the ECP of the developmental stage of Sparton's dual depth sonobuoy and that production effectivity was to occur only after the Navy satisfactorily proved the proposed merits of the dual depth sonobuoys. Accordingly, the 300 modified Sparton sonobuoys were sent by the Navy to its fleet, VX-1 squadron, and NADC Key West facility for developmental testing, not normal fleet use. **B1432-33.** When sonobuoys were intended for

normal fleet use, they had federal stock numbers assigned to them and the fleet was provided with a number of manuals to inform each operator of the manner by which to utilize the sonobuoys described therein. **B40-41**, the Navy 0465 contract requiring Sparton to provide the Navy with production sonobuoys with federal stock numbers to be assigned to them at a later date and 200 manuals describing the operation of said sonobuoys. In the case of ECP 0465-2 and Mod. 4, however, Sparton was only required to provide the Navy with one manual and 300 sonobuoys without federal stock numbers. Since the fleet had many operators, one manual was insufficient to inform fleet operators of the manner by which to operate Sparton's experimental dual depth sonobuoys. Thus, the 300 ECP 0465-2 sonobuoys were not intended for fleet use. **B1422**.

*Government Response*:

This statement is argument, opinions and conclusions for which the only citation of authority are the conclusory statements of Mr. Boyle. The statements are not sufficiently supported.

IV.

**130.** The ECP-0465-2 disclosure does not enable, with or without the DePew notebook disclosure (**B838**), one of ordinary skill in the art to make the dual depth sonobuoy disclosed therein without undue experimentation either as of

the time the ECP-0465-2 disclosure was submitted to the Navy in March 1971 or incorporated within Mod. 4 to the 0465 contract in July 1971. Accordingly, the ECP 0465-2 dual depth sonobuoy disclosure, with Depew multipiece release plate assembly, is not prior art against the patents in suit. **B829-38, 1427.** Boyle.

*Government Response*:

This proposed statement is a conclusion of law and not a statement of fact.

**131.** The Depew ECP 0465-2 multipiece release plate mechanism was never manufactured or tested, was never constructed for use of test with an inverse sonobuoy design (a dual depth sonobuoy) and was not the subject of any Sparton patent application, publicly disseminated document, public use or Sparton engineering or production drawing from which a person skilled in the sonobuoy art could practice or produce the device. It was simply theorized in a sketch of a sonobuoy bottom plate design (the opposite of what was needed for use with an inverse sonobuoy design as proposed in ECP-0465-2) contained in DePew's engineering notebook and was maintained at Sparton under a cloak of secrecy. **B829-38, 1427.**

*Government Response*:

This statement is argument, opinions and conclusions for which the only citation of authority are the conclusory statements of Mr. Boyle. The statements are not sufficiently supported.

**132.** The nature of the ECP-0465-2 disclosure was complex. **B57-69.** No other solutions were known to solve the dual depth sonobuoy problem which had existed for many years. **B57.** This is the reason the Navy issued ECPs to all three SSQ-53 sonobuoy producers at about the same time to solve its dual depth sonobuoy problem. **B503-518.** The prior art did not contain any dual depth sonobuoy that could satisfy the Navy's need for a solution. Id. When faced with solving the same problem that faced Sparton, Magnavox and Sanders took a predictable approach by merely increasing the length of sonobuoy cable in a standardized SSQ-53 sonobuoy (with rotochute and bottom plate) to achieve a solution to the Navy's problem. Id. On the other hand, Sparton took an unpredictable, new approach to the problem as outlined in ECP-0465-2. Id., **B55-69.** The ECP-0465-2 disclosure, as attached to Sparton's March 17, 1971 letter proposal, indicates that the period of experimentation, including the design and construction of engineering models and the performance of sea tests, to the final manufacture of 300

sonobuoy samples was to span 7 ½ months. **B55, 58.** The Sparton ECP-0465-2 disclosure and March 17, 1971 letter proposal specify that redesign and modification work were to be conducted and sea tests were to be performed on engineering models as part of a preliminary phase before the manufacturing phase occurred. **B55, 69.** Thus, extensive experimentation was contemplated in the ECP disclosure before sonobuoy manufacture could occur. Id. The cost of this experimentation and manufacture was to be $198,000.00. **B55.** There was no direction given by DePew as to how to make a release plate mechanism that would function with the other sonobuoy components shown in the ECP Fig. 1 packaging layout, especially the conical cam protruding through the release plate assembly. **B62-63.** The Fig. 1 packaging layout does not illustrate the trigger plate located below the release plate assembly which releases said assembly latches (not shown) from the sonobuoy housing when the float inflates. **B64-65.** The nature and quantity of the actual design and experimentation work conducted by Sparton (a) pursuant to ECP-0465-2 and Sparton's own in-house sponsored programs is specified under heading II herein and (b) in regard to the 1971-72 development of a release plate is specified under heading II, subheadings D and E above.

*Government Response*:

The first six sentences and the ninth sentence of the proposed statement of fact are not supported by the cited references.

132. The ECP-0465-2 disclosure, as attached to Sparton's March 17, 1971 letter proposal, indicates that the "program," including the design and construction of engineering models, the performance of sea tests, the manufacture of one production lot consisting of 300 sonobuoys was to span 7 ½ months. PX-4 at B69. The Sparton ECP-0465-2 disclosure and March 17, 1971 letter proposal specify that redesign and modification work were to be conducted and sea tests were to be performed on engineering models as part of a preliminary phase before the manufacturing phase occurred. PX-4 at B55, 69. The cost of this experimentation and manufacture was to be $198,000.00. PX-4 at B55. Other than Figure 1 of the ECP, there was no direction given by DePew as to how to make a release plate mechanism that would function with the other sonobuoy components shown in the ECP Fig. 1 packaging layout, especially the conical cam protruding through the release plate assembly. PX-4 at B62-63.

**133.** DePew therorized in his Sparton confidential engineering notebook a sketch of a water impact bottom plate that may have been useful in combination with the inverse sonobuoy design disclosed in ECP-0465-2. **B838.** This water impact bottom plate, however, needed to be redesigned, modified and sea tested in accordance with the requirements of ECP-0465-2. **B55-69.** Contemporaneous with the 1971-72

events in issue, Sparton needed approximately 9-10 months to design and develop the release plate covered by the suit patents. See heading II, subheadings D and E above. Undue experimentation was required to enable one of ordinary skill in the art to make the release plate disclosed in ECP-0465-2 or the one sketched in the DePew Sparton confidential engineering notebook. Id.

*Government Response*:

The second sentence of this proposed statement of fact is not supported by the cited reference. The last sentence states a conclusion of law, not a fact.

133. DePew's engineering notebook demonstrates that he understood that the water impact bottom plate could easily be adapted to use in combination with the inverse sonobuoy design disclosed in ECP 0465-2. PX-161 at B838. Mr. Widenhofer spent less than three months designing the single piece release plate and less than four months testing the plate. DX-46 through DX-73.

**134.** The Sparton Depew multipiece release plate mechanism proposed by Sparton under ECP 0465-2 is substantially different than and unobvious in view of the release plate 38 shown, described and recited as a "releasable retaining means," (120 patent cl. 1) "retaining means" (120 patent cl. 7) or "retainer plate" (233 patent cl. 1) in the patents in suit. From a structural standpoint, the release plate 38 shown and described in the patents in suit is a single

piece, bendable plate which contains at least one opening 54 to form a hinge line, 54, 60 to provide a bending function along the hinge line to achieve the retaining and deploying (of the float and/or signal receiving and transmitting apparatus) functions specified in the 120 patent claims. From an operational standpoint, a bending function is performed by this single piece plate (a) to assist in the mounting of the plate during installation to retain the float mechanism 30 and/or signal receiving and transmitting apparatus 24, 26 within the sonobuoy casing 10 and (b) to permit its release from the sonobuoy casing (when the float inflates and imparts a force to the underside of the plate) in order to deploy the float mechanism 30 and/or signal receiving and transmitting apparatus 24, 26 from the sonobuoy casing upper end 14. As the 120 and 233 patent specifications state (A6, col. 6, ls. 3-11); (A13, col. 6, ls. 11-19):

> When the float envelope 30 is inflated the forces exerted on the underside of the release plate 38 are substantially uniformly disposed over the entire area of the plate underside, causing the plate to hinge and deform as shown in FIG. 9 by bending of hinge portions 60. Such deformation withdraws the tabs 48 from their associated openings 52, and the continued rapid inflation of the envelope 30 rapidly ejects the release plate through the upper end of the casing. B784-88.

*Government Response*:

This proposed statement of fact consists of legal conclusions and opinions for which no citation of evidence is provided. Accordingly, no response can be provided.

**135[sic, 135a].** In contrast structurally, the ECP 0465-2 Depew release plate assembly illustrated in **B838 and B62-67** is not a single piece bendable plate with an opening which forms a hinge line, but instead is a multipiece configuration containing by way of example two sliding latch plates, which slide radially along a surface, two wire springs stressed to urge the two plates apart outwardly to engage the sonobuoy housing slots and a conical cam which functions to provide radial retraction of the two latch plates from the sonobuoy housing slots. Id. From an operational standpoint, a bending function is not performed by this Depew release plate assembly. Instead, it relies upon spring compression and two radially movable latch plates which slide (radially retract) when the conical cam button is forced upward by float inflation. This release plate relies upon a totally different engineering principle for its function than the one described in the patents in suit. **B786-87.**

*Government Response*:

135a. The ECP 0465-2 Depew release mechanism illustrated in PX-161 at B838 and PX-4 at B62-67 is not a single piece bendable plate with an opening which forms a hinge line. As described in PX-161 at B829-38, the Depew release mechanism is a multipiece configuration containing two sliding latch plates, which slide radially in slots along the top of a base plate, two wire springs stressed to urge the two plates apart outwardly to engage the sonobuoy housing slots and a conical cam which functions to provide radial retraction of the two latch plates from the sonobuoy housing slots. PX-161 at 828. From an operational standpoint, the Depew mechanism relies upon spring compression and two radially movable latch plates which slide when the conical cam button is forced upward by inflation of the float. PX-161 at 828.

V.

**135 [sic, 135b]**. After Sparton filed Application No. 345,871 on March 29, 1973, the U.S. Patent & Trademark Office ("PTO") issued on April 18, 1974, a restriction requirement which caused Sparton to elect for prosecution purposes either Group I claims 1-9, 15 & 16 drawn to a sonobuoy deployment system in class 116, subclass 124B or Group II claims 10-14 drawn to a retainer plate in class 220, subclass 40. **B1108-09**. On May 1, 1974, Sparton elected to prosecute the Group I claims and reserved its right to file a divisional application to prosecute the Group II

claims. B1111. After approximately three Office Actions, a formal Notice of Allowance was mailed to Sparton by the PTO on June 18, 1975, and the 120 patent issued on November 18, 1975. **B1085-1150, 1146**. Based upon its issuance, the 120 patent is presumed valid. The defendant asserts that the 120 patent claims are invalid under 35 U.S.C. §103 in view of (a) the references cited in the 120 patent file history: Tatnall, Cotilla, Maes, Ballard, Kirby, Talbot, and Widenhofer (**B1151-1194)** and (b) the Adler reference, the Bannister reference, the Halberg reference, an SSQ-39 (XN-1) device, and Hazeltine SSQ-77 VLAD work. These alleged references, singly or in combination, do not teach or disclose every claim limitation in the 120 patent claims in suit and do not render the inventions defined therein or the differences between the 120 patent claims in suit and the asserted prior art obvious. **Boyle rebuttal expert report**. The Adler, Bannister and Halberg references are not in the field of Mr. Widenhofer's endeavor or reasonably pertinent to the problem with which he was concerned. Id.

*Government Response*:

The fourth and subsequent sentences of this proposed statement of fact are opinions or conclusions of law, not fact, for which no response is required.

135b. Sparton's Application No. 345,871 was received in the U.S. Patent & Trademark Office ("PTO") on March 29, 1973. PX-182 at 1089. On April 18,

1974, the examiner issued a restriction requirement which required Sparton to elect to prosecution of either the claims in Group I (claims 1-9, 15 & 16, drawn to a sonobuoy deployment system in class 116, subclass 124B) or the claims in Group II (claims 10-14 drawn to a retainer plate in class 220, subclass 40). PX-182 at B1108-09. On May 1, 1974, Sparton elected to prosecute the Group I claims. PX-182 at B1111. The prosecution ended with a Notice of Allowance which was mailed to Sparton by the PTO on June 18, 1975. PX-182 at 1146. The 120 patent issued on November 18, 1975. PX-182 at 1085.

**137** [sic, 136]. Sparton filed Application No. 612, 698, which matured into the 233 patent, on September 12, 1975 as a divisional case to prosecute the Group II claims identified in the restriction requirement issued on April 18, 1974 during the prosecution of the 120 patent Application No. 345, 871. **B1195-1236.** The 233 patent issued on June 14, 1977. **B1195-1236.** The defendant asserts that the 233 patent claims are invalid under 35 U.S.C. §103 in view of (a) the references cited in the 233 patent file history: Wojciechowski, Elliott, Taylor, Dinolfo, Mahoney, Nordin, Wittenberg, Miller, Langdon, Train, and Philip and (b) the Adler reference, the Bannister reference, the Halberg reference, an SSQ-39 (XN-1) device, and Hazeltine SSQ-77 VLAD work. These alleged references, singly or in combination, do not teach or disclose every claim limitation

in the 233 patent claims in suit and do not render the inventions defined therein or the differences between the 233 patent claims in suit and the asserted prior art obvious. **Boyle report.** The Adler, Bannister and Halberg references are not prior art.

*Government Response*:

The third and subsequent sentences in this proposed statement of fact are argument or conclusions of law for which no response is required.

136. Sparton's Application No. 612,698 was received in the PTO on September 12, 1975. JX-3.1. The application claims to be a division of Application No. 345,871. PX-190 at B1196. The applicant sought to prosecute the non-elected Group II claims identified in the restriction requirement issued on April 18, 1974. PX-190 at B1196. The '233 patent issued on June 14, 1977. JX-3.1.

**137.** The Sparton inventions disclosed and claimed in the 120 and 233 patents solved a long felt need (at least 9 years) that existed and persisted in the sonobuoy art. See proposed findings 1-33.

*Government Response*:

*See* Defendant's responses to PPFF Nos. 1-33.

**138.** The Navy recognized from at least as early as 1962 that it needed a rapidly deploying dual depth sonobuoy that could

detect submarines below the oceanic thermocline layer. Id. This need was a persistent one recognized by the Navy and those skilled in the sonobuoy art. Id. As a result of its recognition of its need, the Navy issued its three SSQ-53 sonobuoy manufacturing contractors (Magnavox, Sanders and Sparton) ECPs under existing fixed price supply contracts to provide it with a dual depth sonobuoy capability so that it could detect submarines above and below the thermocline layer. See proposed finding 31. Sanders failed to provide the Navy with a satisfactory dual depth sonobuoy and was dropped from the program by the Navy. See proposed findings 31 and 32. Magnavox attempted to supply the Navy with a standard SSQ-53 sonobuoy having a longer cable, a rotochute and a water impact bottom plate, but switched from this sonobuoy configuration to Sparton's patented configuration after it obtained a disclosure of Sparton's patented invention in the period 1973-75. See proposed finding 29 and accounting base chart for the Magnavox SSQ-53A sonobuoy. This long felt need in the sonobuoy art was never satisfied by another before Sparton's patented inventions. See proposed finding 32. In addition to the failed efforts of Magnavox and Sanders to solve the Navy's dual depth problem, Raytheon and Hazeltine likewise failed in their efforts to solve the Navy's problem until the Navy provided them with, and they copied, Sparton's patented inventions.

*Government Response*:

138. There is no evidence suggesting when the Navy first concluded that a dual depth sonobuoy would be advantageous. As a result of the Navy's recognition of the potential advantage of a dual depth sonobuoy, the Navy issued its three SSQ-53 sonobuoy manufacturing contractors (Magnavox, Sanders and Sparton) ECPs under existing fixed price supply contracts to provide it with a dual depth sonobuoy capability so that it could detect submarines above and below the thermocline layer. PX-152 at B770. Sanders was later dropped from the program by the Navy as a result of an unsuccessful product improvement program. PX-152 at B770. Magnavox successfully supplied the Navy with a standard AN/SSQ-53 sonobuoy having a longer cable, a rotochute and a water impact bottom plate in 1972. Magnavox switched from that design to the AN/SSQ-53B design, which has not been accused of infringing. Testimony of McGavock.

**139.** The Sparton patented inventions were a commercial success. **Boyle Report.** They were recognized by the Navy as being developed by Sparton, were purchased by the Navy in the hundreds of millions of dollars, were purchased by foreign governments with U.S. Navy approval, were praised by the Navy, resulted in follow-on contracts being awarded to Sparton, created a sonobuoy specification and nomenclature change, were incorporated within most sonobuoys purchased by the Navy from the late 1970s to today and permitted

Sparton's competitors, when the Navy disclosed the inventions to them, (a) to enter the sonobuoy markets and compete with Sparton for procurements therein and (b) to reduce their costs and lower their prices thereby saving the Navy substantial funding. See proposed findings 32, 140-143 **B1425.**

*Government Response*:

This proposed statement of fact consists of legal and factual conclusions and opinions for which no citation to factual exhibits is provided. Accordingly, no response can be provided.

VI.

A. Raytheon

**140.** The Raytheon Company was chosen by the Navy to develop the active SSQ-62 sonobuoy. **B1293.** Raytheon encountered serious mechanical deployment problems with its SSQ-62 sonobuoy. **B1300-01.** The mechanical engineer in charge of Raytheon's sonobuoy component deployment, Charles Ouellette, informed Navy personnel at the Naval Air Development Center ("NADC") of Raytheon's deployment problems. **B1300-02.** NADC personnel advised Mr. Ouellette that Raytheon should "not reinvent the wheel." **B1301.** At the NADC laboratory, piece parts of the Sparton patented inventions in suit were on display for all contractors to inspect and analyze at

monthly review meetings. **B1298.** Ouellette was shown Sparton's plate. Id. He copied it and conceded as much in his deposition. **B1298-1302.** The Raytheon single piece, bendable plate is disclosed below. Note the elongated opening and hinge line.

*Government Response*:

No citation is provided for the drawing incorporated in this proposed statement of fact.

140a. The Raytheon Company was chosen by the Navy to develop the active SSQ-62 sonobuoy. PX-202 at B1293. Raytheon engineers had seen parts from Sparton, Magnavox and other manufacturer's buoys at laboratories of NADC Johnsville during attendance at bi-monthly meetings with the Navy. PX-202 at B1298. The parts were just laying around in the labs. PX-202 at B1298-99.

140b. Raytheon encountered malfunctions at certain water entry angles with its SSQ-62 sonobuoy. PX-202 at B1300-01. The consensus of the Raytheon engineers was that the Navy did not want Raytheon to "reinvent the wheel." PX-202 at B1301-02. Raytheon suggested using two half-ring housings and a deformation plate, as shown in Oullette Exhibit 15 (DX-213). PX-202 at B1301-02.

B. Hazeltine

**141.** Subsequent to the production of Sparton's patented dual depth sonobuoy, Hazeltine copied Sparton's patented

inventions to reduce its cost to compete with Sparton in producing a vertical line array DIFAR ("VLAD"), called the SSQ-77. **B853-64, 1306-1332.**

*Government Response*:

141. Subsequent to the production of Sparton's patented dual depth sonobuoy, Hazeltine leveraged off of Sparton's and Magnavox's production DIFAR designs in producing a vertical line array DIFAR ("VLAD"), called the SSQ-77. PX-166 at B853-64; PX-203 at B1306-1332. There is no evidence that Hazeltine was aware of the Sparton patents or had access to the "patented design." PX-166 at B853-64; PX-203 at B1306-1332.

**142.** Allen T. Hudson is the government technical expert in this case. He was employed by the Raytheon Company from 1967 to September, 1972. **HT. 8-15.** In 1971, at Raytheon, Mr. Hudson first began working in the sonobuoy area. Id. While employed at Raytheon, he worked on the SSQ 62 sonobuoy program. Id. While working on the SSQ 62 sonobuoy program for Raytheon, he observed that the components of the sonobuoy were deployed through the lower end of the sonobuoy. **HT. 17-18.** No Raytheon SSQ 62 sonobuoy had a float actuated release plate while he was working there. Id.

*Government Response*:

Testimony of Alan Hudson.

**143.** In September, 1972, Mr. Hudson became employed by the Hazeltine Company as a senior mechanical engineer and became the lead mechanical engineer on the VLAD sonobuoy. **HT. 29-30.** When he arrived at Hazeltine, in September, 1972, the VLAD sonobuoy program was already in development and on its second developmental contract. Id. Under its first contract, Hazeltine constructed sonobuoys and placed them in water for testing, called an over the side design. **HT. 32-34.** Hazeltine obtained a contract to convert the over the side design to an air deployable package. Id. He was given the responsibility of designing the components to provide an air launched sonobuoy. Id. As lead mechanical engineer, all other mechanical engineers in the program reported to him. Id. From September, 1972 through March, 1974, when they demonstrated the VLAD sonobuoy to the Navy, he developed the VLAD sonobuoy. **HT. 39**. In March, 1974, Mr. Hudson no longer worked on the VLAD sonobuoy program, but instead worked on the Hazeltine SSQ-79 program. **HT. 48.**

*Government Response*:

Testimony of Alan Hudson.

**144.** Sometime in 1975, or 1976, Mr. Hudson saw a Sparton SSQ-53A sonobuoy at Hazeltine which contained a float actuated release plate. **HT. 66-71.** Hazeltine performed some acoustic measurements on this Sparton SSQ-53A sonobuoy. Id. The Sparton SSQ-53A sonobuoy was a complete production buoy with a float actuated release plate, and it (as well as the release plate) was disassembled at Hazeltine. Id. The Hazeltine VLAD program personnel evaluated the Sparton SSQ-53A sonobuoy. Id. He did not see a Magnavox float actuated release plate. **HT. 70**. He talked with others about the Sparton release plate and thought it was a "good engineering design." **HT. 75-76.** He recalled how it functioned. **HT. 70-78**. It was a bendable plate, the bending being caused by the inflation of a float. Id. Mr. Hudson, and those under his direction, designed the float actuated release plate used on the Hazeltine SSQ-77 VLAD sonobuoy. **HT. 80, 130-132**. Hazeltine first built a float actuated release plate in 1975. **HT. 48-49.** Mr. Hudson discontinued his Hazeltine employment in 1979. **HT. 58, 61, 63**.

*Government Response*:

Testimony of Alan Hudson.

**145.** At about the time (1979) Mr. Hudson discontinued his Hazeltine employment, Hazeltine personnel hosted a meeting

with the Navy to discuss potential entry into the SSQ-53B sonobuoy market. **B853-64.** Hazeltine informed the Navy that it had made an analysis of the Sparton/Magnavox SSQ-53A, future Hazeltine SSQ-53 units would be configured more toward the Sparton/Magnavox design, Hazeltine was in the position of "the +best of two worlds – whatever Haz. cannot develop, [it] will pig-back/ on the MX/SP design (Chinese copy[,]" and it would leverage off the Sparton/Magnavox design to produce the SSQ-53B sonobuoy. Id. The Navy considered Hazeltine's SSQ-53B sonobuoy to be a "Chinese copy" of Sparton's design. **B855**. Hazeltine was attempting to parlay its VLAD sonobuoy experience to its DIFAR sonobuoy experience to show commonalty benefits between the two. **B853-64.** Hazeltine believed that, by leveraging off the Sparton/Magnavox design upon which it made a hardware analysis, it obtained the lowest technical risk, obtained the most rapid approach to cost reduction per unit to maintain market share, and fixed its current sonobuoy performance problems. Id. Hazeltine's objective was to establish itself as one of the "Big 3" domestic production sonobuoy sources. Id. Hazeltine noted that a multi-depth function was not included in its present design and that the use of the Sparton approach validated under Sparton's ECP buoy provided a solid design. Id. Furthermore, Hazeltine concluded that its sponsored R&D program along with

leveraging off of the Sparton and Magnavox designs is producing considerable cost reductions on both its VLAD and DIFAR programs, said cost reductions being necessary to be competitive. Id. and **BATES 21507-21576.**

*Government Response*:

Testimony of Alan Hudson.

**146.** The Hazeltine VLAD SSQ-77 sonobuoy release plate was configured as follows.

C. Sippican

**147.** Hudson's "copying" efforts had only just begun. He became employed as a program engineer by the Sippican Corporation in 1979 following his Hazeltine employment. **HT.**

*Government Response*:

Testimony of Alan Hudson.

**147.** Sippican had no ongoing sonobuoy program, although it desired to enter the sonobuoy market, when Mr. Hudson commenced employment there. Id. He immediately started working on an SSQ-36 sonobuoy, also called the AXBT, and had total mechanical and electrical responsibility under the AXBT program. **HT. 146, 149.** When he arrived at Sippican, it

had no float actuated release plate design. **HT. 153.** In a period of 2-4 months after he arrived, he had designed Sippican's float actuated release plate. Id. and **HT. 168.** In that 2-4 month period, however, no plate hardware had been constructed. Id. Sippican reviewed only one float actuated release plate design for its AXBT sonobuoy. **HT.**

*Government Response*:

Testimony of Alan Hudson.

**154.** While other designs were considered, none were used or further considered. Id. In the 3-4 month time frame from his start on the program, Sippican made the decision to use a float actuated release plate mechanism in the AXBT. **HT.**

*Government Response*:

Testimony of Alan Hudson.

**155.** Mr. Hudson used the Hazeltine float actuated release plate design. **HT. 155-56.** He "tried to draw upon our previous experience-that was the experience that I had." Id. After testing the device, he made the decision to use the float actuated release plate. **HT. 158.** The whole developmental program for the AXBT took ten months. **HT158-59.** The Hudson/Sippican SSQ-36 plate is illustrated below.

*Government Response*:

Testimony of Alan Hudson.

**148.** The illustrated plate is a copy of the Hazeltine plate, which was a "Chinese copy" of the Sparton plate. Sippican then incorporated its SSQ-36 plate in its SSQ-77 VLAD sonobuoy line. It had purchased this sonobuoy line, by novation, from Hazeltine when the latter decided to depart the sonobuoy business. This SSQ-77A Hudson/Sippican single piece, bendable plate is shown below.

*Government Response*:

Testimony of Alan Hudson.

**149.** Sippican was optimistic regarding the purchase of Hazeltine's SSQ-77 sonobuoy business because it had the benefit of years of Hazeltine experience, and it believed that this head start was "important." **Bates 23032-23050.** The Navy approved the Sippican purchase of Hazeltine's sonobuoy business in 1984 because (a) the Navy's fundings and efforts invested in the Hazeltine design would be salvaged, (b) a third producing supplier would be in place three years earlier than other methods, and (c) rapid

qualification by Sippican would save the Navy $15 million in development funds. **Bates 23026-031, 23643-74.**

*Government Response*:

The material cited in support of this proposed statement of fact does not appear to be included on Sparton's Exhibit List, nor does it appear to be included in the exhibits provided. Accordingly, no response is required.

149. In 1984, Sippican purchased the sonobuoy business of Hazeltine, including Hazeltine's design and other technical data, as part of a business transaction. DX-214 at 25:5-14. Sippican purchased all of the technical data from Hazeltine as part of a business transaction. DX-214 at 183:5 - 184:15. Contract No. N00163-81-C-0372 was novated from Hazeltine to Sippican. DX-214 at 175:10 - 178:22. Sippican's technical information and drawings were subsequently transferred to Hermes as part of a sale of its sonobuoy business. DX-214 at 179:5-24.

D. Rockwell

**150.** Subsequent to the production of Sparton's patented dual depth sonobuoy, Rockwell copied Sparton's patented inventions to reduce its cost to compete with Sparton in producing an the SSQ-53B sonobuoy. **B913-20, 1333-1404.** Rockwell was able to enter the sonobuoy business by virtue of receiving the designs of its competitors, including Sparton's, from the Navy. **B1378, 1388, 1396.** In a contemporaneous document, Rockwell stated that "[s]onobuoy

development occurred under IR&D funds from 1979 through 1985. The development occurred in two phases: the first phase was obtaining basic knowledge in sonobuoy design (i.e., copy of Magnavox/Sparton design) and the second phase was for development of new and improved hardware." **B1400.**

*Government Response*:

150. The SSQ-53B sonobuoys procured under these contracts included a release mechanism for releasing the float, cable and hydrophone from the casing during deployment. DX-204; DX-205; DX203 at 44:18-48:3 & 82:3-83:12. The release mechanism in these sonobuoys is released when the float is inflated. DX-204; DX-205; DX203 at 44:18-48:3 & 82:3-83:12. The release mechanism consists of two parts: a "buckle plate" and "retainer plate." DX-204; DX-205; DX203 at 44:18-48:3 & 82:3-83:12.

151. The Rockwell SSQ-53B sonobuoy release plate was configured as follows.

*Government Response*:

151. The Rockwell buckle plate and retainer plate are configured as shown in the drawing below:




DX-204.

E. Hermes And Magnavox

**152.** Rockwell's SSQ-53B competition, Hermes, had received a Navy contract in 1976 to qualify and produce the SSQ-53A sonobuoy. **B867, 869.** That Hermes buoy did not employ a single piece, bendable plate to assist in the performance of the sonobuoy deployment function. **LT 40-41.** The Hermes SSQ-53A sonobuoy project was a "disaster," as conceded by its own program manager. **LT 50.** Hermes failed to qualify as an SSQ-53A producer. Id. To salvage its sonobuoy program, Hermes requested and received from the Navy, at least as early as 1977, Sparton's patented inventions. **LT 151.** After

discussions with the Navy, Hermes terminated its SSQ-53A qualification effort and commenced its SSQ-53B program. **LT 50.** In the period 1980-81, Hermes abandoned the use of its first generation SSQ-53A plate and designed for its SSQ-53B sonobuoy a second generation single piece, bendable plate patterned after the Sparton patented inventions. **LT 51-52.** Its configuration is as follows. Note the two elongated openings at the ends of the plate which cause the plate to bend and release, under float pressure, from the sonobuoy upper end.

*Government Response*:

152. Hermes, received a Navy contract in 1976 to qualify and produce a SSQ-53A sonobuoy. PX-151 at B867, B869. The original 1976 design of the Hermes sonobuoy did not employ a single piece, bendable plate to assist in the performance of the sonobuoy deployment function. DX-193 at 40-41. The Hermes SSQ-53A sonobuoy project was a "disaster." DX-193 at 50. Hermes then re-designed the release mechanism. The second design for the release mechanism is shown and described in DX-195 [Logan Exhibit 6]. DX-193 at 42:13-28. That design was used for SSQ-53B sonobuoys in the latter part of Contract No. N00019-76-C-0507, and for all of Contracts Nos. N00163-83-C-0066 and N00163-84-C-0003. DX-193 at 42:18 - 43:14. It could have been developed in the 1977-1980 time period (DX-193 at 43:6-11), but may have been developed as late as 1983 (DX-193 at 49:10-20). Mr. Logan estimated that the redesign effort

to go from the first design to the second took approximately one to two years. DX-193 at 102:8-103:28.

The second design consists of five parts: two half ring housings, a float cap, a pressure plate and a parachute release bender. DX-196; DX-193 at 124:4-17. The float cap allows the float to put even pressure on the pressure plate and release bender. DX-193 at 202:27-203:15. If it were not present, the inflating float would go wherever it could find the least resistance. DX-193 at 202:27 - 203:15. The pressure plate is a tight fit and forces the release bender to bend at the ends. DX-193 at 203:11-15. The parachute bender bends in two locations, at each end of the bender. DX-193 at 124:4-12. The line marked “bend line” is an error; the release bender does not bend in the center, it bends at both ends. DX-193 at 126:16-23. There is a raised portion on the pressure plate, marked “component” in DX-26, which serves to keep the release bender in place. DX-193 at 125:7-13. The pressure plate is circular. DX-193 at 132:27-133:1. In operation, pressure from the float bag pushes on the float cap, which applies a force to the pressure plate and release bender, causing it to “fold over” and release the half ring housings. DX-193 at 124:4-12 & 202:21-203:18. Release of the half ring housings, in turn, releases the parachute and allow the remaining components of the sonobuoy out of the housing. DX-193 at 124:4-12 &130:13-21.

**153.** A third generation single piece, bendable plate was also developed by Hermes for its more recently produced sonobuoy product lines. This third generation plate was used by Hermes in conjunction with Sippican's SSQ-77A design, which was novated to Hermes. The Sippican one hole release plate was interchangeable with Hermes' two hole plate.

*Government Response*:

153. The third design for the release mechanism is shown and described in DX-196 [Logan Exhibit 12]. DX-193 at 52:2-11. It was used on the Hermes SSQ-53D, 53E and SSQ-77B model sonobuoys manufactured under the contracts identified in Logan Exhibit 12 (DX-196). DX-193 at 52:14-18.

The third release mechanism design consists of two parts: a parachute release housing and a float cap. DX-193 at 135:3-136:28. The third design is known at Hermes as a "release mechanism," not a "release plate." DX-193 at 197:8-17. The float cap is a necessary part of the release mechanism. DX-193 at 197:17-198:3. It provides a hard surface to push against the release housing. *Id.* If it were not present, the float bag would not properly apply pressure to the bottom release housing. *Id.* The parachute release housing is a plastic part. DX-193 at 135:27-136:2. The release housing has two locking tabs on each "side" of the housing. DX-193 at 135:3-15 & 139:27-140:5. There is a "release plate" or "cross horizontal bar" in the release housing of the third design that is similar to the release bender of the second design. DX-27; DX-193 at 135:27-136:8 & 142:20-143:13. A bend line is correctly located on the "release plate" depicted in

DX-27, although there is no scoring or other indication on the plastic part. DX-193 at 135:27-136:5. The bend line marks the center of the area that bends; the bending actually occurs across the entire “release plate.” 143:20-144:8. The “release plate” or horizontal bar is not a separate part, but is molded into the parachute release housing, which is one plastic part. DX-193 at 199:16-20. The “release plate” has a “plug tab” in the center, on the under side. DX-193 at 136:6-13. In operation, the inflation of the float applies a force to the float cap, which applies a force to the “plug tab.” DX-193 at 140:6-141:28 & 197:17-201:15. Application of the force to the “plug tab” causes the “release plate” to bend, thereby causing the locking tabs on the sides of the release housing to disengage from the slots in the sides of the sonobuoy housing. *Id.*

**154.** The Hermes second generation single piece, bendable release plate with two holes is similar in structure to either of the Magnavox plates used on its SSQ-53A line. Although the Hermes SSQ-53B plate had two elongated openings equi-distant from the center of the plate, Magnavox interchanged a two opening (equi-distant from plate center) plate with one that had one opening through the center of the plate. Both plates, shown below, were depicted by Magnavox on its production drawing as being interchangeable. A Magnavox illustration of this interchangeability is provided below. A more recent version of the Magnavox plate

contains three openings, i.e. one in the center and two equi-distant from the center.

*Government Response*:

154. The Hermes second generation single piece, bendable release plate with two holes is only similar in structure to the Magnavox plates used on its SSQ-53A line in that both groups of plates were substantially rectangular and not substantially circular. Further, the Hermes second generation plates, like the Magnavox plates, could not function alone, they require additional parts, such as the parachute cup and other parts to perform the claimed function. Hudson Report, DX-220.

Although the Hermes SSQ-53B plate had two elongated openings equi-distant from the center of the plate, Magnavox interchanged a two opening (equi-distant from plate center) plate with one that had one opening through the center of the plate. But while Hermes plates had the openings near the outer ends of the plate, the Magnavox plates with two holes placed the holes near the center. Both Magnavox plates, were depicted by Magnavox on its production drawing as being interchangeable. The Hermes plates would not be interchangeable with the Magnavox plates and retainer ring, nor would the Magnavox plate be interchangeable with the Hermes plate in the Hermes design. A more recent version of the Magnavox plate contains three openings, i.e. one in the center and two equi-distant from the center.

**155.** Each of the above release plates, in combination with their sonobuoy deployment systems and components, infringes Sparton's suit patents literally or under the doctrine of equivalents. **See charts 1-23 in former pretrial submission volumes I and II and Boyle expert and rebuttal reports.** In the 120 patent, the locking tabs 48 (when fitted through casing openings 62) on generally circular plate 38 perform the claimed function of "retaining said float means and apparatus within said casing" and (b) the openings 54 and portions 60 (which permit the plate to deform and release from casing openings 62 upon inflation of said float means) on generally circular plate 38 perform the claimed function of "permitting said float means and apparatus to deploy from said casing upper end upon said retaining means releasing from said casing." Each of the accused devices contains a plate having tabs and openings and portions that perform, as noted at least in the claim chart first Pretrial Submission Appendix Exhibits 4, 6, 8, 9, 12, 15, 17, 19, 20, and 23, exactly the same function in exactly the same way as the "generally circular plate" 38 described in the 120 patent. The patented and accused plates perform exactly the recited claimed functions set forth in the "releasable retaining means" claim element, and perform these functions in exactly the same way. As a result, there is literal infringement, as well as infringement under the doctrine of equivalents

where noted in Sparton's claim charts, of the 120 and 233 patents by defendant's use of said accused devices. **See Boyle expert report.**

*Government Response*:

155. This statement is an opinion or conclusion and not a statement of fact. Accordingly, the Government is not obligated to respond. The government disputes this testimony of Mr. Boyle. *See* Report of A. Hudson, DX-220. As a result, there is no literal infringement, no infringement under the doctrine of equivalents as noted in Mr. Hudson's report.

VII. LOST PROFITS OR IN THE ALTERNATIVE A REASONABLE ROYALTY PLUS DELAY COMPENSATION

**156.** The Audit 121 Chart (prepared by Sparton) contained in Exhibit 25 of Volume II of Sparton's Appendix to its previous Pretrial Submissions is based upon Sparton computer printouts included within said Exhibit 25 from which Sparton's profits were ascertained from Navy contracts under which it produced sonobuoys covered by the patents in suit. **GM report.** Sparton's lost profits, by percentage rate (about 14%), may be gleaned from Exhibits 25 and 26, and such rate should also be used in the calculation of a reasonable royalty. Exhibit 26 identifies unsuccessful Sparton bids (even when Sparton was awarded a portion of the Navy bid package) on Navy contracts for the production of sonobuoys covered by the patents in suit. The sonobuoys bid

by Sparton, the sonobuoys actually manufactured by Sparton and the sonobuoys actually delivered by Sparton's competitors to the Navy were covered by the patents in suit. Exhibits 24-26 establish (a) the demand for the sonobuoys covered by the patents in suit (most of the sonobuoys delivered to the Navy by its suppliers in the compensable infringing period incorporate the Sparton patented inventions), (b) Sparton's belief contemporaneously with the submission of said bids that it had the capacity to satisfy said demand and manufacture said sonobuoys had it been awarded the Navy contracts to produce all the infringing sonobuoys identified in Pretrial Submissions Appendix Volume II Exhibit 24, and (c) there was a sales diversion to Sparton's competitors as a result of the Navy's desire to obtain secondary and/or U.S. alternative sources for producing infringing sonobuoys. Sparton had the capacity to satisfy said demand and manufacture said sonobuoys had it been awarded the Navy contracts for the production of all infringing sonobuoys identified in Pretrial Submissions Appendix Exhibit 24. Sparton's records establish that Sparton possessed sufficient facilities (at least 3 plants such as Sparton of Canada, the Jackson, Michigan facility and the DeLeon Springs facility) and manpower thereat to produce the infringing sonobuoys had Sparton been awarded

the contracts let to the competitors for said sonobuoy sales. **GM and DJ reports.**

*Government Response*:

This statement is an opinion or conclusion and not a statement of fact. Accordingly, the Government is not obligated to respond. The government disputes this testimony of Messrs. Martin and Johnson. *See* Report of McGavock, DX-221.

**157.** With respect to each of the below identified markets, Sparton is and/or was a direct competitor for the infringing sales. The SSQ-53A infringing sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately September 1980 to October 1985; the SSQ-53B infringing sonobuoy delivery market was a one party (Hermes) market with the infringing period being from approximately August 1981 to December 1981, was a one party (Hazeltine) market with the infringing period being from approximately August 1982 to March 1983, was a one party (Rockwell) market with the infringing period being from approximately May 1984 to August 1984, was a two party (Rockwell and Hermes) market with the infringing period being from approximately December 1984 to September 1985, and was a one party (Hermes) market with the infringing period being from approximately October 1985 to December 1989 – Hermes being the predominant infringing supplier of

SSQ-53B sonobuoys; the SSQ-53D infringing sonobuoy delivery market was a two party (Magnavox and Hermes) market with the infringing period being from approximately November 1989 to June 1994; the SSQ-53E infringing sonobuoy delivery market was a two party (Magnavox and Hermes) market with the infringing period being from approximately December 1992 to June 1994; the SSQ-62 infringing sonobuoy delivery market was a one party (Raytheon) market with the infringing period being from approximately September 1980 to January 1983; the SSQ-62A infringing sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately August 1981 to July 1993; the SSQ-62B infringing sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately April 1982 to October 1993 and was essentially a one party (Raytheon) market with the infringing period being from approximately 1981-82; the SSQ-62C infringing sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately February 1992 to May 1994; the VLAD infringing sonobuoy delivery market was a one party (Hazeltine) market with the infringing period being from approximately September 1980 to May 1987; the SSQ-77A infringing sonobuoy delivery market was a two party (Magnavox and Sippican) market with the infringing period being from approximately December 1980 to

June 1987 and was a two party (Magnavox and Hermes) market with the infringing period being from approximately June 1987 to July 1993; the SSQ-77B infringing sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately September 1989 to June 1994; the SSQ-57B infringing sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately March 1990 to June 1992; and the SSQ-36BTS infringing sonobuoy delivery market was a one party (Sippican) market with the infringing period being from approximately August 1980 to December 1980. Where a one party infringing market, as noted above, exists or substantially exists (e.g. SSQ-53A, 53B, 62, 62A, 62B, 62C, VLAD, 77B, 57B, and 36) and Sparton had the capability of manufacturing the Navy-desired infringing sonobuoys, causation exists and is established such that Sparton would have obtained the infringing sales it lost to its competitor(s). **GM report.**

*Government Response*:

This statement is an opinion or conclusion and not a statement of fact. Accordingly, the Government is not obligated to respond. The government disputes this testimony of Mr. Martin. *See* Report of McGavock, DX-221.

**158.** In connection with the reasonable royalty calculus are that: (1) Sparton offered the Navy a settlement license

about February 11, 1981 at a 5% rate on all sales of sonobuoys or other products utilizing the patented inventions; (2) Sparton's anticipated and actual profits for U.S. Navy sonobuoy procurement average about 14% (as shown in said Exhibits 25 and 26), Sparton's profits are much higher for its international sales than its domestic sales of its patented inventions, and the following benefits have been obtained by defendant or its contractors from defendant's use and its infringing suppliers' manufacture of the patented inventions: (a) the Navy has been able to rapidly detect submarines below the isothermic oceanic layers and thus protect U.S. coastlines, ships and other interests from submarine blockade or attack; (b) the Navy's infringing suppliers were able to use Sparton's patented inventions in the manufacture of other sonobuoy types to enter or expand their involvement in the sonobuoy industry and compete with Sparton for the procurement of said sonobuoy types; (c) the Navy was able to obtain secondary sourcing for Sparton's patented sonobuoys by disclosing them to Sparton's competitors for copying purposes and to reduce Sparton's competitors' costs and development and production time and thus Navy expense; (d) the Navy and its suppliers are using the Sparton patented inventions long after the expiration of the patents covering them, such that the Sparton patented inventions have been in use for about 30

years; and (e) the Navy has a substantially broader submarine detection range than ever before as a result of using the Sparton patented inventions; (3) Sparton may only sell its patented inventions internationally with the approval of (an export license from) the Navy, in view of the military nature of Sparton's patented inventions, even though Sparton has international patent coverage over the subject patented inventions; (4) Sparton has had an established policy to maintain as proprietary and with exclusivity the technical and patented advances it makes in the sonobuoy art, and in view thereof, it does not for the most part actively engage in licensing its patents covering or technologically involving sonobuoys (notwithstanding that it contacted the Navy's suppliers of the infringing sonobuoys to obtain compensation when it learned that they were copying its patented inventions); (5) the commercial relationship between Sparton and defendant is one of supplier and customer, but the relationship between Sparton and the infringing suppliers is one that can be characterized as being direct competitors; (6) Sparton's infringing competitors have obtained an advantage of deriving profit from convoyed sales pertaining to the infringing sonobuoys; (7) the duration of defendant's infringing use (from first infringing use to patent expiration) is approximately 12 and ¼ years for the 120

patent and 13 and ¾ years for the 233 patent; (8) the Sparton patented inventions have been highly commercially successful; (9) the Sparton patented inventions represent major departures from and advances in sonobuoy technology (as is evidenced by a change by the Navy in sonobuoy nomenclature for the Sparton patented inventions and the use by the Navy of Sparton's patented inventions for approximately 30 years) because prior Navy sonobuoys could not rapidly detect submarines below the isothermic oceanic layers, obtain multi-depth submarine detection capability and achieve the Navy's ASW objective as it does with the Sparton patented inventions; (10) the Navy has made widespread use (and its suppliers have enjoyed substantial sales) of the Sparton patented inventions and has procured them in most all sonobuoy models manufactured by its suppliers; (11) the profits obtained by Sparton and its infringing competitors from sales of sonobuoys covered by the patents in suit are attributable to the advantages provided to the Navy through use of these patented inventions from the 1970's to this date; and (12) the realizable profit from the sales of the infringing sonobuoys that should be credited to the patented inventions is the entire profit from said sales as distinguished from non-patented components, business risks and other features added by the infringers (little business risk was involved in view

of the Navy providing Sparton's competitors with the Sparton patented inventions in order for them to copy said patented inventions rather than to "reinvent the wheel" when manufacturing the infringing sonobuoys). These facts and conclusions and/or opinions justify a substantial increase in the 5% rate Sparton offered the Navy on February 11, 1981 (to near the said average 14% Sparton lost profit rate), particularly since *inter alia* these Sparton patented inventions: were significant technical achievements in the sonobuoy art; protect the American people, the U.S. coastlines and our servicemen and servicewomen serving abroad on ships and near oceans; spawned new sonobuoy manufacturing lines; were copied by Sparton's competitors with Navy assistance and authorization; satisfied a long felt need in the sonobuoy industry which failed in its attempt to satisfy said need; were highly commercially successful; were the subject of 14% profit margins in Sparton's U.S. sales; and were the subject of still higher profit margins realized by Sparton's foreign sales where competition did not create a price erosion or where no competition occurred. **GM report.**

*Government Response*:

This statement is an opinion or conclusion and not a statement of fact. Accordingly, the Government is not obligated to respond. The government disputes this testimony of Mr. Martin. *See* Report of McGavock, DX-221.

**159.** Additionally, (1) Sparton offered the Navy a settlement license about February 11, 1981 at a 5% rate on all sales of sonobuoys or other products utilizing the patented inventions; (2) Sparton's anticipated and actual profits for U.S. Navy sonobuoy procurement average about 14% (as shown in said Exhibits 25 and 26), Sparton's profits are much higher for its international sales than its domestic sales of its patented inventions, and the following benefits have been obtained by defendant or its contractors from defendant's use and its infringing suppliers' manufacture of the patented inventions: (a) the Navy has been able to rapidly detect submarines below the isothermic oceanic layers and thus protect U.S. coastlines, ships and other interests from submarine blockade or attack; (b) the Navy's infringing suppliers were able to use Sparton's patented inventions in the manufacture of other sonobuoy types to enter or expand their involvement in the sonobuoy industry and compete with Sparton for the procurement of said sonobuoy types; (c) the Navy was able to obtain secondary sourcing for Sparton's patented sonobuoys by disclosing them

to Sparton's competitors for copying purposes and to reduce Sparton's competitors' costs and development and production time and thus Navy expense; (d) the Navy and its suppliers are using the Sparton patented inventions long after the expiration of the patents covering them, such that the Sparton patented inventions have been in use for about 30 years; and (e) the Navy has a substantially broader submarine detection range than ever before as a result of using the Sparton patented inventions; (3) Sparton may only sell its patented inventions internationally with the approval of (an export license from) the Navy, in view of the military nature of Sparton's patented inventions, even though Sparton has international patent coverage over the subject patented inventions; (4) Sparton has had an established policy to maintain as proprietary and with exclusivity the technical and patented advances it makes in the sonobuoy art, and in view thereof, it does not for the most part actively engage in licensing its patents covering or technologically involving sonobuoys (notwithstanding that it contacted the Navy's suppliers of the infringing sonobuoys to obtain compensation when it learned that they were copying its patented inventions); (5) the commercial relationship between Sparton and defendant is one of supplier and customer, but the relationship between Sparton and the infringing suppliers is one that can be

characterized as being direct competitors; (6) Sparton's infringing competitors have obtained an advantage of deriving profit from convoyed sales pertaining to the infringing sonobuoys; (7) the duration of defendant's infringing use (from first infringing use to patent expiration) is approximately 12 and ¼ years for the 120 patent and 13 and ¾ years for the 233 patent; (8) the Sparton patented inventions have been highly commercially successful; (9) the Sparton patented inventions represent major departures from and advances in sonobuoy technology (as is evidenced by a change by the Navy in sonobuoy nomenclature for the Sparton patented inventions and the use by the Navy of Sparton's patented inventions for approximately 30 years) because prior Navy sonobuoys could not rapidly detect submarines below the isothermic oceanic layers, obtain multi-depth submarine detection capability and achieve the Navy's ASW objective as it does with the Sparton patented inventions; (10) the Navy has made widespread use (and its suppliers have enjoyed substantial sales) of the Sparton patented inventions and has procured them in most all sonobuoy models manufactured by its suppliers; (11) the profits obtained by Sparton and its infringing competitors from sales of sonobuoys covered by the patents in suit are attributable to the advantages provided to the Navy through use of these patented

inventions from the 1970's to this date; and (12) the realizable profit from the sales of the infringing sonobuoys that should be credited to the patented inventions is the entire profit from said sales as distinguished from non-patented components, business risks and other features added by the infringers (little business risk was involved in view of the Navy providing Sparton's competitors with the Sparton patented inventions in order for them to copy said patented inventions rather than to "reinvent the wheel" when manufacturing the infringing sonobuoys). These facts and conclusions and/or opinions justify a substantial increase in the 5% rate Sparton offered the Navy on February 11, 1981 (to near the said average 14% Sparton lost profit rate), particularly since *inter alia* these Sparton patented inventions: were significant technical achievements in the sonobuoy art; protect the American people, the U.S. coastlines and our servicemen and servicewomen serving abroad on ships and near oceans; spawned new sonobuoy manufacturing lines; were copied by Sparton's competitors with Navy assistance and authorization; satisfied a long felt need in the sonobuoy industry which failed in its attempt to satisfy said need; were highly commercially successful; were the subject of 14% profit margins in Sparton's U.S. sales; and were the subject of still higher profit margins realized by Sparton's foreign sales where

competition did not create a price erosion or where no competition occurred. **GM report**.

*Government Response*:

This statement is an opinion or conclusion and not a statement of fact. Accordingly, the Government is not obligated to respond. The government disputes this testimony of Mr. Martin. *See* Report of McGavock, DX-221.

**160.** As a result of the Navy providing Sparton's competitors with Sparton's patented inventions, this enabled said competitors to produce comparable sonobuoys that infringe the patents in suit and to compete with Sparton in bidding for government contracts, which as a matter of economics would result in depressed process and profits for Sparton. Sparton and its competitors sold their sonobuoys covered by the suit patents at positive margins. **DM report.**

*Government Response*:

This statement is an opinion or conclusion and not a statement of fact. Accordingly, the Government is not obligated to respond. The government disputes this testimony of Mr. Martin. *See* Report of McGavock, DX-221.

**161.** The term of defendant's license would be until the expiration of the later of the two suit patents. **DM report.**

*Government Response*:

This statement is an opinion or conclusion and not a statement of fact. Accordingly, the Government is not obligated to respond. The government disputes this testimony of Mr. Martin. *See* Report of McGavock, DX-221.

Notwithstanding the forgoing objection, Mr. McGavock agrees that the duration of the license is until the last to expire of the two patents in suit. DX-221.

**162.** The demand for the patented product was driven solely by the buyer's (Navy's) urgent need for a deep depth sonobuoy that could be rapidly deployed, and the patented inventions were developed to meet and did meet a specific need and thus the entire profit from the sale of the infringing sonobuoys is attributable to the patented features. **DM report.**

*Government Response*:

This statement is an opinion or conclusion and not a statement of fact. Accordingly, the Government is not obligated to respond. The government disputes this testimony of Mr. Martin. *See* Report of McGavock, DX-221.

**163.** There was a substantial reduction in the R&D costs and business risk borne by Sparton's competitors as a result of the Navy providing the patented inventions to them for copying purposes. **DM report.**

*Government Response*:

This statement is an opinion or conclusion and not a statement of fact. Accordingly, the Government is not obligated to respond. The government disputes this testimony of Mr. Martin. *See* Report of McGavock, DX-221.

**164.** Based upon a total contract value of $770,378,863 and a lost profit margin of 14%, lost profit damages, without prejudgment interest, due Sparton are $106,774,511, and lost profit damages, with prejudgment interest, due Sparton are $346,270,972. One year, constant maturity U.S. Treasury bills, plus 2%, is used to calculate the delay compensation due Sparton. **DM report.**

*Government Response*:

This statement is an opinion or conclusion and not a statement of fact. The government disputes this testimony of Mr. Martin. *See* Report of McGavock, DX-221.

Although the Government contends that it does not infringe, Mr. McGavock has calculated the actual sales of sonobuoys and related materials and services for each of the accused sonobuoys and bathythermographs. Further, Mr. McGavock will testify that, if any sonobuoys are found to infringe, the appropriate royalty rate is 1% if the ‘120 patent is held to have been infringed or 0.5% if only the ‘233 patent is found to have been infringed, and that Sparton has failed to prove any entitlement to lost profits. And Mr. McGavock will testify

that the appropriate measure of delay compensation should be based on the One-year Constant Maturity Treasury Rate. Report of McGavock, DX-221.

**165.** Based upon a total contract value of $770,378,863 and a reasonable royalty rate of 10%, reasonable royalty damages, without prejudgment interest, due Sparton are $77,037,886, and reasonable royalty damages, with prejudgment interest, due Sparton are $249,834,756. **DM report.**

*Government Response*:

This statement is an opinion or conclusion and not a statement of fact. Accordingly, the Government is not obligated to respond. The government disputes this testimony of Mr. Martin. *See* Report of McGavock, DX-221.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

JOHN FARGO
Director

GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

November 19, 2007

Attorneys for Defendant, United States

CERTIFICATE OF SERVICE

I certify that a copy of the foregoing "Defendant's Response To Sparton's Proposed Findings Of Fact" was deposited with Federal Express for overnight delivery this 19th day of November 2007, addressed to:

Steven Kreiss, Esquire
1120 Connecticut Avenue
Suite240
Washington, D.C. 20036

________________________________

Elizabeth D. Elliott
Administrative Assistant
Department of Justice
Telephone: (202) 305-9847