IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SPARTON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 92-580C<br>Chief Judge Edward Damich |

**SPARTON CORPORATION'S MOTION FOR LEAVE TO FILE A MEMORANDUM OF FACT AND LAW IN COMPLIANCE WITH THE COURT'S June 20, 2007 ORDER**

Sparton Corporation ("Sparton"), in compliance with the Court's June 20, 2007 Order, paragraph 2ciii(1), (Doc. 290), moves for leave to file its memorandum of fact and law in compliance with the Court's June 20, 2007 order. The Court's Order states (1) in subsection (a) that the memorandum shall set forth Plaintiff's conclusions of law with a complete exposition of the legal theory that supports each legal claim, and (2) in subsection (b) that Plaintiff shall explain, based upon its proposed findings of fact (hereafter "PPFF"), the factual basis upon which it relies to support its claims, and with respect to all facts, Plaintiff shall reference its proposed findings of fact by number. The memorandum is not to exceed 30 pages in length.

**MEMORANDUM**

Under each Roman numeral below, plaintiff will provide a section (a) that will correspond with subsection (a) and a

section (b) that will correspond with subsection (b) of paragraph 2ciii(1) of the Court's June 20, 2007 Order.

I. Infringement

(a) The defendant has infringed upon plaintiff's suit patents literally and/or under the doctrine of equivalents. Plaintiff's legal theory of infringement follows. The defendant has not identified any non-infringement defense in regard to the accused devices manufactured or used by or for the defendant by the Hazeltine, Sippican, Rockwell and Raytheon (excluding Magnavox) companies. Defendant's expert Hudson has indicated under oath that (1) he will not address these accused devices at trial and (2) said accused devices are sufficiently similar to the Sparton patented inventions. Nevertheless, if defendant's expert Hudson should change his mind, then plaintiff will establish the infringement of these Hazeltine, Sippican, Rockwell and Raytheon accused devices in the same manner by which it will establish infringement by Magnavox and Hermes.

The defendant contends that the patent releasable retaining means claim element, in section 112¶6 language, does not read upon structure contained in the accused devices manufactured or used by or for the defendant by the Magnavox and Hermes companies. In connection with the Court's interpretation of the "releasable retaining means" and "retaining means" claim elements of claims 1 and 7

respectively, Sparton will indicate (a) how the locking tabs 48 (when fitted through casing openings 62) on generally circular plate 38 perform the claim 1 function of "retaining said float means and apparatus within said casing" and (b) how the openings 54 and portions 60 (which permit the plate to deform and release from casing openings 62 upon inflation of said float means) on generally circular plate 38 perform the second claim 1 function of "permitting said float means and apparatus to deploy from said casing upper end upon said retaining means releasing from said casing." An analysis of claim 7 is similar. Sparton will then indicate that each of the accused devices contains a plate having tabs and openings and portions that perform, as noted at least in the plaintiff's claim charts, the identical function in exactly the same way as the "generally circular plate" 38 described in the 120 patent. In other words, Sparton will establish that the patented and accused plates perform exactly the recited claimed functions set forth in the "releasable retaining means" claim element, and perform these functions in exactly the same way. In this manner, Sparton will compare the corresponding structure for the "releasable retaining means" claim element in issue to the structure in the accused device that Sparton claims as corresponding. As a result, Sparton will conclude that there is literal infringement, as well as infringement under the doctrine of

equivalents, of the 120 patent by defendant's use of said accused devices.

Sparton will rely at least upon the following precedent to establish infringement. These cases require identity of function and the same or equivalent structure to establish literal infringement of a section 112¶6 claim element. This is the insubstantial differences test. Chuminatta Concrete Concepts Inc. v. Cardinal Industries Inc., 145 F.3d 1303 (Fed. Cir. 1998); WMS Gaming Inc. v. International Game Tech, 184 F.3d 1339 (Fed. Cir. 1999) (equivalent structure found); Al-Site Corp. v. VSI International Inc., 174 F.3d 1308 (Fed. Cir. 1999) (button and hole fastener equivalent to a hole fastener); Telemac Cellular Corp. v. Topp Telecom Inc., 247 F.3d 1316 (Fed. Cir. 2001) (literal infringement of 112¶6 claim limitation requires that accused device have structure for performing identical function identified in means clause and accused device incorporates same or equivalent structure to structure in specification as performing function); Micro Chem Inc. v. Great Plains Chem. Co., 194 F.3d 1250 (Fed. Cir. 1999) (112¶6 does not permit incorporation of structure from patent specification beyond that necessary to perform claimed function); Rite-Hite Corp. v. Kelley Co., Inc., 819 F.2d 1120 (Fed. Cir. 1987) (interchangeability is a useful consideration when determining whether two specific structures are equivalent);

McGinley v. Franklin Sports Inc., 262 F.3d 1339 (Fed. Cir. 2001) (structural equivalents found based upon insubstantial differences test); Odetics, Inc. v. Storage Tech. Corp., 185 F.3d 1259 (Fed. Cir. 1999); and Vulcan Eng'g Co., Inc. v. Fata Alum. Inc., 278 F.3d 1366 (Fed. Cir. 2002) (when a claimed function is performed in the accused system by the same or equivalent structure, literal infringement is established even though the claim element has capabilities in addition to that stated in claim).

(b) The factual basis underpinning plaintiff's infringement claim is that defendant's contractors by way of deposition and plaintiff's technical expert Boyle by way of infringement charts and his report acknowledge that the accused devices utilize release plates that perform the above noted two functions using the same or equivalent structure as described in the specification of the Sparton suit patents. The release plates in the accused devices contain tabs and holes and portions which perform the recited claim functions by using identical structure. See PPFF 140-156.

II. Damages

(1). Lost Profits

(a). Plaintiff is entitled to compensation from the defendant for its lost profits at 14%. Plaintiff claims lost profit damages under Panduit v. Stahlin Bros., 575 F.2d

1152 (6th Cir. 1978) as adopted in Gyromat v. Champion Spark Plugs, 735 F.2d 549 (Fed. Cir. 1984) and will establish a demand for the patented inventions as a result of the substantial manufacture and/or use of the patented inventions ($1 billion in sales) by defendant's contractors and plaintiff over the course of the relevant accounting period in this case. Plaintiff will establish that it had the capacity to manufacture the accused devices and its own patented inventions over the course of the relevant accounting period in this case. It bid on all the sonobuoys that defendant obtained from Sparton's competitors. These were the lost sales to Sparton's competitors who made the accused, infringing sonobuoys. Sparton's capacity to manufacture is evidenced by its highest volume manufacture in the relevant accounting period and its statements to the Navy that it could satisfy a Navy need to increase sonobuoy production in times of surge by manufacturing on a second shift. Sparton could also have increased its manufacturing capacity by obtaining additional sonobuoys from its Canadian subsidiary, Sparton of Canada. See SmithKline Diagnostics v. Helena Labs, 926 F.2d 1161 (Fed. Cir 1991). Lastly, since the Navy only purchased sonobuoys from suppliers that qualified their designs, Sparton is unaware of any non-infringing, but qualified, alternatives that existed in the relevant accounting period. See TWM Mfg v. Dura, (Fed. Cir.

1986) (willful infringement suggests absence of acceptable alternatives) and Grain Processing v. American Maize, 185 F.3d 1341 (Fed. Cir 1999) (to be acceptable alternative, product must have been available or on the market at time of infringement).

(b) The factual predicate for the above is as follows. The Sparton inventions disclosed and claimed in the 120 and 233 patents solved a long felt need (at least 9 years) that existed and persisted in the sonobuoy art. The Navy recognized from at least as early as 1962 that it needed a rapidly deploying dual depth sonobuoy that could detect submarines below the oceanic thermocline layer. This need was a persistent one recognized by the Navy and those skilled in the sonobuoy art. As a result of its recognition of its need, the Navy issued its three SSQ-53 sonobuoy manufacturing contractors (Magnavox, Sanders and Sparton) ECPs under existing fixed price supply contracts to provide it with a dual depth sonobuoy capability so that it could detect submarines above and below the thermocline layer. Sanders failed to provide the Navy with a satisfactory dual depth sonobuoy and was dropped from the program by the Navy. Magnavox attempted to supply the Navy with a standard SSQ-53 sonobuoy having a longer cable, a rotochute and a water impact bottom plate, but switched from this sonobuoy configuration to Sparton’s patented configuration after it

obtained a disclosure of Sparton's patented invention in the period 1973-75. This long felt need in the sonobuoy art was never satisfied by another before Sparton's patented inventions.

In addition to the failed efforts of Magnavox and Sanders to solve the Navy's dual depth problem, Raytheon and Hazeltine likewise failed in their efforts to solve the Navy's problem until the Navy provided them with, and they copied, Sparton's patented inventions. The Sparton patented inventions were a commercial success. They were recognized by the Navy as being developed by Sparton, were purchased by the Navy in the hundreds of millions of dollars, were purchased by foreign governments with U.S. Navy approval, were praised by the Navy, resulted in follow-on contracts being awarded to Sparton, created a sonobuoy specification and nomenclature change, were incorporated within most sonobuoys purchased by the Navy from the late 1970s to today and permitted Sparton's competitors, when the Navy disclosed the Sparton inventions to them, (a) to enter the sonobuoy markets and compete with Sparton for procurements therein of infringing sonobuoys and (b) to reduce their costs and lower their prices thereby saving the Navy substantial funding. <u>See</u> PPFF 1-33 and 140-157.

(2) <u>Reasonable Royalty</u>

(a) Plaintiff is entitled to compensation from the defendant based upon a reasonable royalty at 10%. See the factors enunciated in Georgia-Pacific Corp. v. U.S. Plywood Corp., 318 F. Sipp. 1116 (S.D.N.Y. 1970).

(b) In connection with the reasonable royalty calculus, the predicate facts are that: (1) Sparton offered the Navy a settlement license about February 11, 1981 at a 5% rate on all sales of sonobuoys or other products utilizing the patented inventions; (2) Sparton's anticipated and actual profits for U.S. Navy sonobuoy procurement average about 14%, Sparton's profits are much higher for its international sales than its domestic sales of its patented inventions, and the following benefits have been obtained by defendant or its contractors from defendant's use and its infringing suppliers' manufacture of the patented inventions: (a) the Navy has been able to rapidly detect submarines below the isothermic oceanic layers and thus protect U.S. coastlines, ships and other interests from submarine blockade or attack; (b) the Navy's infringing suppliers were able to use Sparton's patented inventions in the manufacture of other sonobuoy types to enter or expand their involvement in the sonobuoy industry and compete with Sparton for the procurement of said sonobuoy types; (c) the Navy was able to obtain secondary sourcing for Sparton's patented sonobuoys by disclosing them to Sparton's competitors for copying

purposes and to reduce Sparton's competitors' costs and development and production time and thus Navy expense; (d) the Navy and its suppliers are using the Sparton patented inventions long after the expiration of the patents covering them, such that the Sparton patented inventions have been in use for about 30 years; and (e) the Navy has a substantially broader submarine detection range than ever before as a result of using the Sparton patented inventions; (3) Sparton may only sell its patented inventions internationally with the approval of (an export license from) the Navy, in view of the military nature of Sparton's patented inventions; (4) Sparton has had an established policy to maintain as proprietary and with exclusivity the technical and patented advances it makes in the sonobuoy art, and in view thereof, it does not for the most part actively engage in licensing its patents covering or technologically involving sonobuoys (notwithstanding that it contacted the Navy's suppliers of the infringing sonobuoys to obtain compensation when it learned that they were copying its patented inventions); (5) the commercial relationship between Sparton and defendant is one of supplier and customer, but the relationship between Sparton and the infringing suppliers is one that can be characterized as being direct competitors; (6) Sparton's infringing competitors have obtained an advantage of deriving profit from convoyed sales pertaining to the

infringing sonobuoys; (7) the duration of defendant's infringing use (from first infringing use to patent expiration) is approximately 12 and ¼ years for the 120 patent and 13 and ¾ years for the 233 patent; (8) the Sparton patented inventions have been highly commercially successful; (9) the Sparton patented inventions represent major departures from and advances in sonobuoy technology (as is evidenced by a change by the Navy in sonobuoy nomenclature for the Sparton patented inventions and the use by the Navy of Sparton's patented inventions for approximately 30 years) because prior Navy sonobuoys could not rapidly detect submarines below the isothermic oceanic layers, obtain multi-depth submarine detection capability and achieve the Navy's ASW objective as it does with the Sparton patented inventions; (10) the Navy has made widespread use (and its suppliers have enjoyed substantial sales) of the Sparton patented inventions and has procured them in most all sonobuoy models manufactured by its suppliers; (11) the profits obtained by Sparton and its infringing competitors from sales of sonobuoys covered by the patents in suit are attributable to the advantages provided to the Navy through use of these patented inventions from the 1970's to this date; and (12) the realizable profit from the sales of the infringing sonobuoys that should be credited to the patented inventions is the

entire profit from said sales as distinguished from non-patented components, business risks and other features added by the infringers (little business risk was involved in view of the Navy providing Sparton's competitors with the Sparton patented inventions in order for them to copy said patented inventions rather than to "reinvent the wheel" when manufacturing the infringing sonobuoys). These facts and conclusions and/or opinions justify a substantial increase in the 5% rate Sparton offered the Navy on February 11, 1981 (to near the said average 14% Sparton lost profit rate), particularly since *inter alia* these Sparton patented inventions: were significant technical achievements in the sonobuoy art; spawned new sonobuoy manufacturing lines; were copied by Sparton's competitors with Navy assistance and authorization; satisfied a long felt need in the sonobuoy industry which failed in its attempt to satisfy said need; were highly commercially successful; were the subject of 14% profit margins in Sparton's U.S. sales; and were the subject of still higher profit margins realized by Sparton's foreign sales where competition did not create a price erosion or where no competition occurred. As a result of the Navy providing Sparton's competitors with Sparton's patented inventions, this enabled said competitors to produce comparable sonobuoys that infringe the patents in suit and to compete with Sparton in bidding for government contracts,

which as a matter of economics would result in depressed process and profits for Sparton. Sparton and its competitors sold their sonobuoys covered by the suit patents at positive margins. The term of defendant's license would be until the expiration of the later of the two suit patents. The demand for the patented product was driven solely by the buyer's (Navy's) urgent need for a deep depth sonobuoy that could be rapidly deployed, and the patented inventions were developed to meet and did meet a specific need and thus the entire profit from the sale of the infringing sonobuoys is attributable to the patented features. There was a substantial reduction in the R&D costs and business risk borne by Sparton's competitors as a result of the Navy providing the patented inventions to them for copying purposes.

Based upon a total contract value of $770,378,863 and a reasonable royalty rate of 10%, reasonable royalty damages, without prejudgment interest, due Sparton are $77,037,886, and reasonable royalty damages, with prejudgment interest, due Sparton are $249,834,756. See PPFF 158-163, and 165.

(2) Royalty Base

(a) The entire market value rule applies in this case and results in a royalty base of $770,378,863.00.

(b) The predicate facts for this royalty base are the contract values contained in a chart. PPFF 164-165.

III. Validity

(1) Non-obviousness

(a) The Sparton patented inventions were non-obvious under the 35 U.S.C. §103 standard articulated and applied in Graham v. John Deere, 383 U.S. 1 (1966).

(b) The alleged references, singly or in combination, asserted by defendant against the suit patents do not teach or disclose every claim limitation in the suit patent claims in suit. Defendant has failed to establish a prima facie case of obviousness. Defendant's expert witness Hudson failed to consider the following secondary considerations which are well established in this case. These secondary considerations are: the commercial success of the patented inventions through the sales made by Sparton and its competitors; the long felt need (as early as the Cuban Missile Crisis) in the art to rapidly detect submarines traveling below the thermocline layer; the failed efforts of others (Magnavox and Sanders) to solve the same problem the Sparton inventor did contemporaneous with the efforts of said others; the failed efforts of others (Raytheon and Hazeltine) to solve the same problem the Sparton inventor did subsequent to the effort of the Sparton inventor; the substantial copying by Sparton's competitors of the patented inventions; and the praise bestowed on the patented

inventions by the Navy and Sparton's competitors. See PPFF 27-32 and 135-155

(2) The Depew Device Is Not Prior Art

(a) The Depew device is not prior art because Sparton's engineering change proposal ECP 0465-2 (even in conjunction with Depew's confidential notebook) was not an enabling disclosure. See Space Systems/Loral, Inc. v. Lockheed Martin Corp., 271 F.3d 1076 (Fed. Cir. 2001) (on sale disclosure not enabling because claimed element not designed or tested and thus device in disclosure was not ready for patenting); Brown v. 3M, 265 F.3d 1349 (Fed. Cir. 2001) (reference not enabled); and Amgen Inc. v. Hoechst Marion Roussel, Inc., 314 F.3d 1313 (Fed. Cir. 2003) which states at 1354: "A claimed invention cannot be anticipated by a prior art reference if the allegedly anticipatory disclosures cited as prior art are not enabled. Long ago, our predecessor court recognized that a non-enabled disclosure cannot be anticipatory (because it is not truly prior art) if that disclosure fails to 'enable one of skill in the art to reduce the disclosed invention to practice.' In re Borst, 345 F.2d 851, 855 145 USPQ 554, 557 (CCPA 1962); accord In re Donohue, [766 F.2d 531, 533, 226 USPQ 619, 621 (Fed. Cir. 1985)]."

The Depew device is not prior art because of experimental use negation. The following experimental use

negation factors apply: control over the testing; the existence of testing records; secrecy; the nature of the testing; contract documentation; and industry custom to provide samples.

(b) The Depew device was never manufactured or tested or fully designed. The ECP establishes the intent of the parties to the contract. Sparton maintained detailed test records, maintained control over its testing under the ECP, maintained secrecy, and provided samples to the U.S. Navy per industry custom. See PPFF 106-123 and 130-134.

IV. License

(a) Defendant is not entitled to a license under the suit patents under the Christian doctrine, G.L. Christian & Assoc. v. United States, 312 F.2d 418, aff'd on reh'g, 320 F.2d 345, cert. denied, 375 U.S. 954 (1963) and Armed Forces Procurement Regulations, §§7.301, 7.302, 7.302-23 and 9.107 (especially 9.107-1, 9.107-4 and 9.107-5) (1968-1972), because a patent rights clause was not a mandatory clause for incorporation into a fixed price supply contract such as the 0465 contract. The Court of Claims in Christian held that, since appropriated funds were at issue, the standard termination clause should be implied into the Christian-U.S. fixed price construction contract because ASPR §8.703 specified that "the following standard [termination] clause shall be inserted in all fixed price construction contracts

… ." 312 F.2d at 424. In other words, the termination clause's incorporation into the Christian-U.S. fixed price construction contract was mandatory under the ASPR procurement regulations. The Federal Circuit addressed the *Christian* doctrine in S.J. Amoroso Constr. Co. v. United States, 12 F.3d 1072 (1993) holding that a Buy American Act ("BAA") clause required to be included in a federal construction contract was incorporated by reference into said contract. The parties had erroneously included in their construction contract a BAA clause applicable to supply contracts. The Federal Circuit in Amoroso stated at 1075:

> Application of the Christian doctrine turns not on whether the clause was intentionally or inadvertently omitted, but on whether procurement policies are "avoided or evaded (deliberately or negligently) by lesser officials." G.L. Christian & Assoc., 320 F.2d at 351. The Christian doctrine "guard[s] the dominant legislative policy against ad hoc encroachment or dispensation by the executive" and prevents "hobbl[ing] the very policies which the appointed rule-makers consider significant enough to call for … mandatory regulation." Id.

In reaching its holding, the Federal Circuit reviewed (a) the federal construction contract BAA regulation clause and statute in issue to determine whether the clause was mandatory for construction contracts, and (b) the parties' contemporaneous actions during the performance of said construction contract. Id. at 1075-77. In IBI Security Service, Inc. v. United States, 19 Cl. Ct. 106 (1989), the

Claims Court (Judge Nettesheim) ruled that a price adjustment clause, used by government officials in their prior practice before the subject regulations were promulgated, would not be included in the service contract in issue because the regulations governing this service contract did not require it. Id. at 108-09. In reaching its conclusion, the Court stated:

> When a court is asked to construe the meaning of an administrative regulation, deference to the agency's interpretation is in order. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964) "[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); see Hilo Coast Processing Co. v. United States, 7 Cl. Ct. 175, 177 (1985) (agency construction need not be only reasonable one, or even result court would have reached, if it forms rational basis for the administrative conclusion)(citing cases).

Id. at 110.

(b) The defendant does not derive a license under the patents in suit in light of the above noted legal principles. The 0465 contract is a fixed price sonobuoy production supply contract that contained no patent rights clause. Sparton and the Navy executed a modification (Mod. 4) to the 0465 contract by using the contract's changes clause to improve the performance of the production SSQ-53 sonobuoy being delivered under said contract. This was

entirely proper for the Navy to do under the changes clause of the subject contract. The ASPR regulations pertaining to fixed price production supply contracts do not mandate the insertion of a patent rights clause. This is true even if development work is performed by a contractor pursuant to the Government's acceptance of an engineering change proposal resulting in a formal modification to a fixed price production supply contract. Using the changes clause to modify a fixed price production supply contract and improve the performance of the supplied product does not convert the production supply contract or any modification thereto into a research and development contract. The ASPR draws a distinction between production supply contracts and research and development contracts. Sparton and the Navy (experienced contracting parties) knew the difference between the two. Based upon a long standing (decades), deeply ingrained Navy procurement practice (policy) to obtain development work using ECPs under fixed price production supply contracts and the Navy's interpretation of the relevant procurement regulations to permit same, to which deference must be given, no patent rights clause should be incorporated into a fixed price production supply contract, such as the one here in suit, merely because a modification thereto, pursuant to an approved engineering change, requires the contractor to perform development work.

A rational basis exists for this Navy construction because it is permitted to invoke the changes clause in a fixed price production supply contract, instead of executing a separate research and development contract, to obtain this development work.

The parties' contemporaneous actions during the performance of the subject production supply contract support the conclusion that a patent rights clause should not be incorporated therein under the *Christian* doctrine. At no time in the performance of the subject contract did Sparton inform or report to the Navy that subject inventions or no subject inventions were made thereunder as required by the ASPR standard patent rights provisions and clauses referenced by the defendant. Similarly, the Navy never requested Sparton to report subject inventions under the 0465 contract or any modification thereto. Neither contracting party suggested to or discussed with the other that patent rights could or should be conveyed to the Government under the subject contract. The opposite was known to both parties because a patent rights clause was never included in, or proposed for, the 0465 contract or any modification thereto. To require it now, decades after the completion of the contract, changes the agreement of the parties without statutory or regulatory authority mandating said change. See PPFF 27, 35, and 36.

Lastly, defendant is not entitled to a license under the suit patents by virtue of the '0133 contract because the patented inventions were neither conceived nor first actually reduced to practice in the performance of said contract. Technical Development Corp. v. United States, 597 F.2d 733 (Ct. Cl. 1979).

Respectfully submitted,
Sparton Corporation, Plaintiff

Dated: February 6, 2008

s/Steven Kreiss

Steven Kreiss
Attorney for Plaintiff
1120 Connecticut Avenue NW
Suite 433
Washington D.C. 20036
Telephone: (202) 347-6382
Facsimile: (202) 347-7711