IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| Plaintiff, | ) | |
| | ) | No. 92-580 |
| v. | ) | |
| | ) | Chief Judge Damich |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**PRETRIAL BRIEF OF THE UNITED STATES**

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JOHN FARGO
Director

GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

February 13, 2008

TABLE OF CONTENTS

I. OBVIOUSNESS. . . . . . . . . . 1

A. THE CLAIMS OF THE '233 PATENT WOULD HAVE BEEN OBVIOUS AT THE TIME THE INVENTION WAS MADE. . . . . . . . . . 2
1. Scope and Content of the Prior Art . . . . . . . . . . 2
2. The Differences Between the Prior Art and the Claimed Invention. . . . . 4
3. The Level of Ordinary Skill in the Art.. . . . . . . . . 4
4. Secondary Considerations. . . . . . . . . . 6
5. Conclusion as to Obviousness of the '233 Patent. . . . . . . . . . 7

B. THE CLAIMS OF THE '120 PATENT WOULD HAVE BEEN OBVIOUS AT THE TIME THE INVENTIONS WERE MADE. . . . . . . . . . 8
1. Scope and Content of the Prior Art . . . . . . . . . . 8
2. The Differences Between the Prior Art and the Claimed Invention. . . . . 11
3. The Level of Ordinary Skill in the Art . . . . . . . . . . 12
4. Secondary Considerations. . . . . . . . . . 13
5. Conclusion as to Obviousness of the '120 Patent. . . . . . . . . . 13

II. THE UNITED STATES HAD A LAWFUL RIGHT TO USE THE CLAIMED INVENTIONS. . . . . . . . . . 14

III. INFRINGEMENT .. . . . . . . . . 18

A. DOCTRINE OF EQUIVALENTS . . . . . . . . . . 19

B. JUDICIAL ESTOPPEL PREVENTS SPARTON FROM SEEKING EQUIVALENTS AS TO MULTIPIECE RELEASE MECHANISMS. . . . . . . . . . 20

C. NONE OF THE MAGNAVOX SONOBUOYS INFRINGE EITHER THE '120 PATENT OR THE '233 PATENT. . . . . . . . . . 21

D. NONE OF THE HERMES SONOBUOYS INFRINGE EITHER THE '120 PATENT OR THE '233 PATENT. . . . . . . . . . 22

E. THE ROCKWELL SONOBUOYS DO NOT INFRINGE EITHER PATENT . . . . . . . . . . 23

F. THE RAYTHEON SONOBUOYS DO NOT INFRINGE THE '120 PATENT. . . . . . . . . . 24

G. THE HAZELTINE AND SIPPICAN SONOBUOYS AND BATHYTHERMOGRAPHS DO NOT INFRINGE THE '120 PATENT .. . . . . . . . . 24

H. THE SIPPICAN BATHYTHERMOGRAPHS ALSO LACK A "SIGNAL RECEIVING AND TRANSMITTING APPARATUS" . . . . . 24

IV. ACCOUNTING . . . . . 25

A. "REASONABLE AND ENTIRE COMPENSATION" UNDER 28 U.S.C. § 1498(a). . . . . . 25

B. THE REASONABLE ROYALTY RATE. . . . . 27

C. THE ROYALTY BASE . . . . . 28

D. PLAINTIFF'S LOST PROFITS CLAIM. . . . . 29

E. DELAY COMPENSATION. . . . . 30

V. CONCLUSION. . . . . 30

## TABLE OF AUTHORITIES

### CASES

*Applied Med. Res. Corp. v. U.S. Surgical Corp.*,
448 F.3d 1324 (Fed. Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Calhoun v. United States*,
453 F.2d 1385 (Ct. Cl. 1972). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Cross Medical Products v. Medtronic Sofamor Danek*,
424 F.3d 1293 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*de Graffenried v. United States*,
25 Cl. Ct. 209 (1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 29

*Decca Ltd. v. United States*,
640 F.2d 1156 (Ct. Cl. 1980). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 29

*Dolly, Inc. v. Spalding & Evenflo Companies, Inc.*,
16 F.3d 394 (Fed. Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Dow Chem. Co. v. United States*,
226 F.3d 1334 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 29

*Federal Crop Ins. Corp. v Merrill*,
332 U.S. 380 (1947).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Ferag AG v. Quipp, Inc.*,
45 F.3d 1562 (Fed. Cir.1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Freedman Seating Co. v. Am. Seating Co.*,
420 F.3d 1350 (Fed. Cir. 2005) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*G. L. Christian & Assoc. v. United States*,
312 F.2d 418 (Ct. Cl. 1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Gargoyles Inc. v. United States*,
37 Fed. Cl. 95 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 30

*Georgia-Pacific Corp. v. United States Plywood-Champion Papers, Inc.*,
318 F. Supp. 1116 (S. D. N. Y. 1970),
*modified,* 446 F. 2d 295 (2d Cir.),
*cert. denied*, 404 U.S. 870 (1970). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Graham v. John Deere Co.*,
383 U.S. 1(1966). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Hughes Aircraft Co. v. United States*,
31 Fed. Cl. 481 (1994)
*aff'd*, 86 F.3d 1566 (Fed. Cir. 1996),
*vacated on other grounds and remanded*, 520 U.S. 1183 (1997),
*reinstated*, 140 F.3d 1470 (Fed. Cir. 1998),
*cert. denied*, 525 U.S. 1177 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*Koito Mfg. Co. v. Turn-Key-Tech, LLC*,
381 F.3d 1142 (Fed. Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*KSR Int'l Co. v. Teleflex, Inc.*,
550 U.S. ----, 127 S. Ct. 1727 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 6

*LaBounty Mfg., Inc. v. United States Int'l. Trade Comm'n,*
958 F.2d 1066 (Fed. Cir. 1992) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*,
485 F.3d 1157 (Fed. Cir. 2007) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Leesona Corp. v. United States,*
599 F.2d 958 (Ct. Cl. 1979). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26

*Moore U.S.A., Inc. v. Standard Register Co.*,
229 F.3d 1091 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 24

*New Hampshire v. Maine*,
532 U.S. 742 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Newell Cos. v. Kenney Mfg. Co.*,
864 F.2d 757 (Fed. Cir. 1988) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Novartis Corp. v. Ben Venue Labs., Inc.,*
271 F.3d 1043 (Fed. Cir. 2001). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Ormco Corp. v. Align Tech. Inc.*,
463 F.3d 1299 (Fed. Cir. 2007) .. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Penda Corp. v. United States*,
29 Fed. Cl. 533 (Fed. Cl. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

*Pfizer, Inc. v. Apotex, Inc.*,

480 F.3d 1348 (Fed. Cir. 2007),
*rehearing en banc denied*, 488 F.3d 1377 (Fed. Cir. 2007),
*cert. denied*, 552 U.S. ___, 128 S. Ct. 110 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Porter v. United States*,
496 F.2d 583 (1974).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Procter & Gamble Co. v. Paragon Trade Brands, Inc.*,
989 F. Supp. 547 (D. Del. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Roberts Dairy Co. v. United States*,
530 F.2d 1342 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

*S.J. Amoroso Const. Co. v. United States*,
12 F.3d 1072 (Fed. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15

*Sparton Corp. v. United States*,
399 F.3d 1321 (Fed. Cir. 2005) (*Sparton II*). . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 8-11, 20

*Sparton Corp. v. United States*,
57 Fed. Cl. 455 (2003) (*Sparton I*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 20

*Sparton Corp. v. United States*,
68 Fed. Cl. 34 (2005) (*Sparton III*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 19, 21

*Standard Mfg. Co. v. United States*,
42 Fed. Cl. 748 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 30

*Tektronix Inc. v. United States*,
552 F.2d 343 (Ct. Cl. 1977),
*modified* 557 F.2d 265 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27, 29

*Toro Co. v. White Consolidated Inds.*,
383 F.3d 1326 (Fed. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*TWM Mfg. Co. v. Dura Corp.*,
789 F.2d 895 (Fed. Cir. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*UMC Elec. Co. v. United States*,
816 F.2d 647 (Fed. Cir. 1987)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Vitronics Corp. v. Conceptronic, Inc.*,
90 F.3d 1576 (Fed. Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Warner-Jenkinson Co. v. Hilton-Davis Chemical* Co.,
520 U.S. 17, 21 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Wright v. United States*,
53 Fed. Cl. 466 (2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Yosemite Park & Curry Co. v. United States*,
582 F.2d 552 (Ct. Cl. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Z4 Technologies, Inc. v. Microsoft Corp.*,
507 F.3d 1340 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Zacharin v. United States*,
213 F.3d 1366 (Fed. Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

## STATUTES & CONSTITUTION

28 U.S.C. § 1498. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 14, 25, 26, 28-30

35 U.S.C. 102(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

35 U.S.C. § 103. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 9

Title 35, United States Code. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S. Constitution, Amendment V. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## REGULATIONS

32 C.F.R. § 9.107-1 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

32 C.F.R. §§ 9.107-1 thru 9.107-5 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

32 C.F.R. §§ 9.107-1 thru 9.107-5 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

32 C.F.R. §§ 9.107-2(c)(4) (1969).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

32 C.F.R. §§ 9.107-3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 18

Government Patent Policy,
36 Fed. Reg. 16887-16892 (Aug. 23, 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Statement of Government Patent Policy,
28 Fed. Reg. 10943-10946 (Oct. 12, 1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

# TABLE OF APPENDICES

A Statement of Government Patent Policy, 28 Fed. Reg. 10943-10946 (Oct. 12, 1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

B Government Patent Policy, 36 Fed. Reg. 16887-16892 (Aug. 23, 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . A6

C Extract of Armed Services Procurement Regulation, 32 C.F.R., Part 9 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A13

D Extract of Armed Services Procurement Regulation, 32 C.F.R., Part 9 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A32

**PRETRIAL BRIEF OF THE UNITED STATES**

Sparton Corporation brought this case pursuant to 28 U.S.C. § 1498, seeking compensation for the unauthorized use of the claimed inventions of United States Patents Nos. 3,921,120 (the '120 patent) and 4,029,233 (the '233 patent). Complaint. This court found that the patent was invalid for being "on sale" under 35 U.S.C. § 102(b). *Sparton Corp. v. United States*, 57 Fed. Cl. 455 (2003) (*Sparton I*). The case is now on remand from the Federal Circuit, that court's opinion is reported as *Sparton Corp. v. United States*, 399 F.3d 1321 (Fed. Cir. 2005) (*Sparton II*). This court's Opinion and Order on Claim Construction, Docket No. 249, is reported as *Sparton Corp. v. United States*, 68 Fed. Cl. 34 (2005) (*Sparton III*).

## I. OBVIOUSNESS

During the prior appeal, the Federal Circuit specifically left open the issue of whether the claimed inventions were rendered obvious by the addition of the device offered for sale in the ECP to the prior art. *Sparton II*, 399 F.3d at 1325 & n.4.

A patent is invalid "if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." 35 U.S.C. § 103; *Cross Medical Products v. Medtronic Sofamor Danek*, 424 F.3d 1293, 1321 (Fed. Cir. 2005). The Supreme Court has set out a framework to be used in determining whether an invention is obvious:

> Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs,

> failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented.

*Graham v. John Deere Co.*, 383 U.S. 1, 17-18,(1966); *KSR Int'l Co. v. Teleflex, Inc.*, 550 U.S. ___, 127 S. Ct. 1727, 1734 (2007). When evaluating obviousness, the controlling factor is the objective reach of the claim: neither the particular motivation nor the avowed purpose of the patentee controls. *KSR*, 127 S. Ct. at 1741-42. "Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed." *KSR*. 127 S. Ct. 1742.

### A. THE CLAIMS OF THE '233 PATENT WOULD HAVE BEEN OBVIOUS AT THE TIME THE INVENTION WAS MADE

We turn first to the obviousness of the release plate before addressing the obviousness of the sonobuoy. The '233 patent claims only a retaining plate for use in a sonobuoy in strictly structural terms. Claim 1, is the only independent claim and only claim at issue. J3.6.

#### 1. Scope and Content of the Prior Art

Application No. 345,871, from which the '120 and '233 patents claim priority, was filed by Sparton on March 29, 1973. DPFF 36. Thus, the prior art includes all public uses, sales or offers for sale, and printed publications in the public domain prior to March 29, 1972. *See* 35 U.S.C. 102(b).

Five release mechanisms are relevant to this discussion. The first is the Widenhofer Spider Plate mechanism which was reduced to practice prior to the ECP and was used in the first sonobuoys tested under Mod 4 and used in the Sparton's early DICASS sonobuoys. DPFF 92-103, 135-145, D17.7-.9 (Spider Plate mechanism was developed prior to ECP and is not patented), D17.12 (Spider Plate mechanism used in testing the deployment system after award of

ECP). The remaining references are release mechanisms described in other prior art sonobuoys and similar devices. DPFF 44-73. Of this group, the most relevant are Dinolfo (DPFF 56-59), Cotilla (DPFF 60-63) and Wojeciechowski (DPFF 64-67). Dinolfo teaches a circular, flat disc having tabs disposed around the periphery that engage the sonobuoy housing. DPFF 58 & Pl. Response. The plate bends at the junction of the locking tabs with the body rather in the center as in the patented invention. *Id.* Cotilla teaches the use of a deformable leaf spring that has tabs extending through a housing wall and that is held flat until activation. DPFF 60-63. Upon activation, the spring deforms, causing the tabs to retract and the lower half of the casing to be released. *Id.* Wojeciechowski teaches a disk-shaped release plate that is formed into a dome. DPFF 65. The force of water-impact causes the domed portion to flex, releasing tabs disposed around the periphery and allowing the sonobuoy to deploy. DPFF 65.

The Spider Plate mechanism, although composed of multiple parts, deforms during the deployment process. DPFF 135-143. Whether used as a water-impact release plate, as in the DICASS XN-2 sonobuoy (DPFF 93-94) or as a float-actuated release plate as in the August 31, 1971 test as part of the Mod 4 effort (DPFF 136-143, D17.12), the Spider Plate mechanism used a motive force (either water-impact or float expansion) to cause the central part of the mechanism to deform and thereby retract the tabs from the housing. DPFF 136-143.

Finally, the Depew device, which was on-sale through the ECP, is also prior art. DPFF 169-178. Sparton contends that the Depew device is not prior art because it was not adequately described. Pl. Br. at 15. The Depew device was fully described by Mr. Depew in his declaration in support of Sparton's administrative claim, where he explains and applies his notes and

drawings from 1969.[1] DPFF 175-178. The Depew device is generally circular and generally planar, albeit composed of several parts. DPFF 175-178.

**2. The Differences Between the Prior Art and the Claimed Invention**

The only significant differences between the claims of the '233 patent and the prior art are the specific configuration of the plate and that the single plate alone performs the entire function of the release mechanism. The '233 patent claims a single-piece release plate that is "generally planar," "deformable," having a "generally circular periphery," diametrically disposed "locking tabs" and a diametrically disposed hinge line. J3.6. The prior art shows all of these features, except the hinge line, being used in various combinations as release mechanisms for sonobuoys. And, as is discussed below, the weakened hinge line was well within the knowledge of practitioners of this art.

**3. The Level of Ordinary Skill in the Art**

The art at issue is sonobuoy design. DPFF 42. The ordinary practitioner in that art has a bachelor's degree in mechanical engineering and at least some experience with sonobuoy design and functions. DPFF 43. For example, Mr. Widenhofer, the inventor, and Mr. Depew, who designed the release mechanism for the sonobuoy in ECP 0465-2, both hold bachelor's degrees in mechanical engineering. D170.1; D172.1. The expert witnesses in this case, Messrs. Boyle

---

[1] During the prior appeal, plaintiff argued that '[t]he Depew cam actuated multipiece release plate shown in Figure 1 of, and described in, ECP 0465-2 *is entirely different from and non-equivalent to* the inventions disclosed and claimed in the patents in suit." Reply Br. of Appellant Sparton Corp. 17 (June 9, 2004). At that time, however, plaintiff did not make the argument that it makes here, that there was a lack of enabling disclosure. In any event, Messrs Widenhofer and Depew were able to prepare their affidavits from memory 20 years after the ECP was filed. DPFF 174-178. That, together with detailed drawing in the ECP (D168.10-.11) and Mr. Depew's notes, are highly suggestive that other drawings and descriptions must have existed in 1972, albeit no longer in existence when this litigation began 20 years later.

and Hudson, also have degrees in mechanical engineering, as did several of the witnesses for the non-party manufacturers. D220.1; D211.2-.3 (Oullette); 214.2 (Balboni).

A person of ordinary skill in the art in 1972 would be familiar with the various systems that had been employed in the past, that person would also be aware of the size and volume constraints imposed by the Navy's launching equipment. And, as a trained engineer, the person of ordinary skill would be familiar with and able to apply the commonly known engineering principles. For example, the use of hinge line on a central diameter would be "obvious to any engineer because it creates the greatest bending moment." Hudson Report, D220.18; *see also* DPFF 58 (knowledge and application of Hooke's law in determining to what degree a metal will bend or fracture).

Another example of the knowledge of the person of skill in the art is the declaration of Mr. Depew. DPFF 168-178. In his declaration, Mr. Depew compares the engineering principles that underlie operation of the Depew device and a prior art water-impact release plate. DPFF 177. He then goes on to demonstrate that a person of ordinary skill would know how to apply those same engineering principles, although the motive force is different (*i.e.*, force provided by water-impact versus by an expanding float). DPFF 178; *see also* J2.54 (the inflating float envelope is used as an "expansible motor" providing a "powerful force" to release the plate). Although he is addressing the Depew device, rather than the invention claimed in the '233 patent, his analysis and its applicability to the knowledge of persons skilled in art holds true for both the Depew device and the claimed invention.

Further, Mr. Depew's statement finds a factual basis in Sparton's own development efforts. Sparton's Spider Plate mechanism was designed and used as a water-impact plate during

Sparton's development of a DICASS sonobuoy pursuant to Government contract No. N00019-69-C-0592. DPFF 92-103. In the DICASS XN-2 design, the Spider Plate mechanism was used as a water-impact release plate. DPFF 94. Mr. Widenhofer used substantially the same design in the Deep DIFAR as a float-actuated release plate. DPFF 136. And, pursuant to Mod 4 of the contract, Sparton made and tested the up-side down design using the Spider Plate mechanism during the August 31, 1971 sea test. D17.12.

Sparton's use of the Spider Plate mechanism also demonstrates another characteristic of those having skill in sonobuoy design: in order to make sonobuoys cost effective, the designer would try to utilize previous designs to the greatest extent possible and only change components to meet new requirements or to make needed improvements. For example, Sparton's DICASS claimed to use mechanical design features from the prior art SSQ-50 sonobuoy "to the fullest extent for like features." DPFF 100. In its ECP, Sparton similarly touted the use of proven design features from the SSQ-47 and SSQ-63 programs. D132.17.

**4. Secondary Considerations**

In *KSR,* 127 S. Ct. at 1739, the Supreme Court reiterated that, "where appropriate, [courts should] look at any secondary considerations that would prove instructive." Secondary considerations are only to be considered where *relevant* evidence of such considerations is presented to the court. *Ormco Corp. v. Align Tech. Inc.*, 463 F.3d 1299, 1312-13 (Fed. Cir. 2007). To be relevant, the evidence must demonstrate that the secondary consideration that is the subject of the evidence, such as commercial success, results from the claimed and novel features of the invention and not from other attributes of the commercial embodiment. *Id.* And, even when taken into account, secondary considerations "do not necessarily control the obviousness

conclusion." *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1372 (Fed. Cir. 2007) (citing *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988)), *rehearing en banc denied*, 488 F.3d 1377 (Fed. Cir. 2007), *cert. denied*, 552 U.S. ___, 128 S. Ct. 110 (2007). A strong case of obviousness may overcome even a strong showing of secondary considerations. *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.*, 485 F.3d 1157, 1162 (Fed. Cir. 2007).

Sparton asserts the presence of commercial success, long felt need, failure of others, copying and praise for the invention. Pl. Br. at 11-15. The commercial success of the invention is ineluctably tied to the question of infringement, a disputed issue in this case and Sparton's own use (for which Sparton has offered no expert testimony demonstrating that the commercial embodiment reads on the claims). Plaintiff's assertion of long-felt need is misplaced. Plaintiff's evidence does not demonstrate a long-felt need by the Navy, but only by persons who would not be buying sonobuoys. And plaintiff's assertion of failure of others and copying are equally meritless. The evidence does not support failure by anyone. At best, it demonstrates that the Navy encouraged other manufactures to use the similar designs, while Sparton stood mute. *See, e.g.*, PPFF 140. Sparton only asserted its patent rights five years later, after the usage of the upside down deployment scheme (but not the one-piece release plate) became common. PPFF 135[b] ('120 patent issued on November 18, 1975); DPFF 168 (claim filed Feb. 11, 1981)

### 5. Conclusion as to Obviousness of the '233 Patent

The release plate claimed in the '233 patent would have been obvious to one of ordinary skill in the art prior to March 29, 1972. Release plates of various configurations were well-known and the creation of variations required only routine skill in the art.

### B. THE CLAIMS OF THE '120 PATENT WOULD HAVE BEEN OBVIOUS AT THE TIME THE INVENTIONS WERE MADE

The '120 patent claims a sonobuoy having certain features, particularly a "signal receiving and transmitting apparatus" and a "releasable retaining means." JX-1.6.

#### 1. Scope and Content of the Prior Art

The most significant prior art comes from Sparton's own previous activities: its efforts to interest the government in procuring the "upside-down" design, its contract to develop a DICASS sonobuoy, and the sonobuoy depicted in Sparton's ECP 465-2, which was accepted by the Navy and through the Mod 4 Contract. While these devices are not the "claimed invention" of the '120 patent, *see Sparton II*, 339 F.3d at 1321, each of the devices embodies the claimed features, except the single-piece release plate.

In 1969 Sparton had been awarded the '-0465 contract to produce SSQ-53 sonobuoys. DPFF 105, 179, 180. Originally, the sonobuoys to be produced under that contract were of the conventional design, deploying out of the bottom of the housing. DPFF 79. Sparton provided the Navy with a written Engineering Change Proposal, No. 0465-2 (ECP). DPFF 152-156. The ECP contained a data rights restrictions that terminated "if a contract is awarded to this offeror as a result of …with the submission" of the proposal. DPFF 153-155, 157.

On July 13, 1971, the Navy executed Modification 0004 (Mod 4), which incorporated ECP 0465-2 into the contract. DPFF 163. By awarding Mod 4, the Navy obtained the right to use the data, including the design information contained in the ECP without restriction. DPFF 153-163. The award of Mod 4 also constituted a commercial sale of the ECP device. *See Zacharin v. United States*, 213 F.3d 1366, 1370 (Fed. Cir. 2000).

Plaintiff contends that the Depew device is not prior art. Pl. Br. at 15. But, it is the

*sonobuoy* that was the subject of the sale. And to be prior art under Section 103, it need not be reduced to practice or enable the claimed invention. *Ferag AG v. Quipp, Inc.*, 45 F.3d 1562 (Fed. Cir.1995) ("the on-sale bar is triggered by the use, sale, or offer for sale of subject matter which '… would have rendered the claimed invention obvious by its addition to the prior art,'" quoting *UMC Elec. Co. v. United States*, 816 F.2d 647, 656 (Fed. Cir. 1987)); *LaBounty Mfg., Inc. v. United States Int'l. Trade Comm'n,* 958 F.2d 1066, 1071 & n.3 (Fed. Cir. 1992) (devices … on sale before the critical date are references against the claimed invention under § 103).

Whether or not it enables a person to construct the Depew device, the ECP certainly is enabling with respect to the upside-down deployment scheme, with a "releaseable retaining means" and the lay out of a sonobuoy with a float-actuate release mechanism. DPFF 149, 163-165, 172-178, 234-243. Indeed, it is virtually identical to the drawings and description of the patent other than the release mechanism. *Compare* JX-1 with DX-130. Thus, the ECP at least teaches how to construct and use the upside-down design (which can use the Spider Plate mechanism, Depew device, the claimed plate or any of the other release mechanisms accused here as the "releaseable retaining means") and certainly placed that design in the public domain. And, as we have previously discussed, constructing release mechanisms was routine and well within the knowledge of those skilled in the art. *See* section I.B.3.

Since the Depew plate is within the literal scope of the "retaining means" limitation, it performs the claimed function, in the same way, to obtain the same result. Nonetheless, the Federal Circuit held that "both patents contain claim limitations drawn to a single piece release plate." *Sparton II*, 399 F.3d at 1322; *see also Id.*, 399 F.3d at 1323 ("the government concedes,

and the parties do not dispute, the release mechanism *described*[2] in the '120 and '233 patents is not the release mechanism that was part of the original design proposed in the ECP," quoting *Sparton II*, 399 F.3d at 1323 (emphasis added)).

The development of the DICASS sonobuoy is instructive because it demonstrates a step-by-step conversion from a water-impact release mechanism to a float-actuated release mechanism contemporaneous with the development of the claimed invention. From 1969 through November 1971, Sparton was the contractor performing Government contract No. N00019-69-C-0592. DPFF 92-99. In 1970, Sparton reported the design incorporating a water-impact release mechanism that was substantially the same as the Spider Plate mechanism of the Deep DIFAR design. DPFF 93; *and compare* DPFF 94 & D232.40-.42 *with* DPFF 137 & PX-160 at B0816, B0822. By the end of 1970, Sparton had received approval of the mechanical design from the Navy; that design used a drogue chute rather than a rotochute. DPFF 96-98. According to a September 1971 Sparton report, a drogue chute required less space than a rotochute and would not endanger the float, eliminating the need for a time delay between rotochute separation and float inflation. DPFF 101, 102. DPFF 99-102.

Sparton continued its development of the DICASS sonobuoy under Government contract N00019-72-C-0341, as the AN/SSQ-62 (XN-4). During April - June, 1972 (*i.e.*, after the critical date), the release mechanism was changed from one that was a water-impact design to a "float-actuated" release mechanism. DPFF 167.

The use of parachutes to retard the descent of sonobuoys was well-known in 1972

---

[2] The government's stipulation went to what was described in the specification of the suit patents, not to what was claimed. Nonetheless, the Federal Circuit seems to have read the lack of dispute between the parties as limiting the scope of all claims of the patents.

according to Mr. Boyle. D126.371-.373. And the use of the sonobuoy housing to aid the descent of a hydrophone to operating depth was also known in the art, through the SSQ-39 (XN-1) report and briefings by the Navy. DPFF 47; DX-126.61-.62. In the early 1960s, Magnavox developed and tested the AN/SSQ-39 (XN-1). DPFF 44. The final engineering report for the SSQ-39 (XN-1) was made publicly available through the records of the Defense Data Center (now the Defense Technical Information Center) no later than the end of 1965. DPFF 45-46. The SSQ-39 (XN-1) used a rotochute to retard the fall of the sonobuoy through the air. DPFF 48-49. Upon water entry, the SSQ-39 (XN-1) would sink for a short period, then the rotochute would be jettisoned. *Id*. Immediately after the rotochute falls away, gas generators begin inflating a float bag. *Id*. The casing would then be used as a descent vehicle, paying out the transmission cable from the top of the casing as it descends. *Id*. Near the end of the payout, the hydrophone preamplifier and the hydrophones pay out of the top of the casing. *Id*.

### 2. The Differences Between the Prior Art and the Claimed Invention

It is undisputed that the ECP describes all of the limitations of the invention claimed in the '120 patent, except the "single piece release plate" that is the "releasable retaining means." D.17.13 ("Conception of the 120 and 233 claimed inventions occurred …when this single part release plate was conceived for use in the dual depth sonobuoy"); *Sparton II*, 399 F.3d at 1322 ("[b]oth patents contain claim limitations drawn to a single piece release plate for a sonobuoy"); *Sparton III*, 68 Fed. Cl. at 42 ("the corresponding structure for the 'retaining means' of claims 1 and 7 is the generally circular release plate 38 shown in the specification in FIGS. 5-7, 9 & 10, and described in more detail at col. 5, ll. 10-27, and equivalents thereof"). The sonobuoy of the ECP contained all other limitations of the claims of the '120 patent. D220.17-.19.

### 3. The Level of Ordinary Skill in the Art

In addition to the description of the person of ordinary skill in section I.B.3, *ante*, the level of skill in the art is demonstrated by contemporaneous developments in the art and Mr. Depew's affidavit. At some time in the late 1960s or early 1970s, Sparton and other sonobuoy manufactures became aware of the Navy's interest in developing and SSQ-53 sonobuoy that would operate at deeper depths than those that were then in the Navy's operational inventory. DPFF 104-106, 150-152. Mr. Widenhofer suggested to Sparton that deployment to deeper depths would be enhanced by using what he referred to as the "upside-down" deployment scheme, in which the sonobuoy components were deployed from the housing through the top end as the housing descended through the water. DPFF 106, 107.

Sparton opened an in-house program to develop a Deep DIFAR sonobuoy, "Job 7400." DPFF 108-113, 134. From December 19, 1970 through February 18, 1971, Sparton tested Deep DIFAR sonobuoys that incorporated the upside down deployment scheme. DPFF 114-134. On June 21, 1971, Mr. Widenhofer declared: "The Deep DIFAR program, Job 7400 is complete. The final engineering lot consisting of twenty sonobuoys has been assembled and is waiting a final determination as to how the buoys may best be utilized." DPFF 134; DX-39.1. The Deep DIFAR sonobuoy contained all the limitations of claims 1 and 7 of the '120 patent, except the single piece release plate. *Compare* JX-1 *with* DPFF 142-145' D28.6-.8, D33.4-.7. As a means for releasing the sonobuoy for deployment, the Deep DIFAR sonobuoys used a multi-piece mechanism known as the Spider Plate that had been designed by Mr. Widenhofer. DPFF 136-145; *see also* D17.6 -.7.

Sparton's activity on the DICASS sonobuoy, together with the Deep DIFAR and the ECP,

demonstrate an orderly and systematic process of converting from rotochutes to parachutes over a two year period starting in 1970. Once the conversion to a parachute was made, the use of a float-actuated release mechanism was logical next step in order to save space and simplify the device. This logic is further explained by Mr. Depew, when he stated that float-actuated release plates operate "on the same principle" as water-impact release plates. DPFF 178.

**4. Secondary Considerations**

Plaintiff's brief does not distinguish between secondary considerations applicable to the '120 patent claims and those that may be applicable to the '233 patent claims. Accordingly, our prior discussion, section I.B.4, *ante*, adequately addresses whether plaintiff has demonstrate evidence of secondary considerations in the context of the obviousness of the '120 patent.

**5. Conclusion as to Obviousness of the '120 Patent**

The invention of the '120 patent is an obvious variation of the sonobuoy that was placed on sale through ECP 0465-2 and the Mod 4 contract. As Mr. Hudson explains, the main difference between the prior art and the "single-piece" release plate is the motive force used to initiate the release. D220.14-D220.17. Mr. Hudson is joined by Mr. Depew who demonstrates how an engineer at the time could adapt a water-impact release plate for use with a float-actuated release plate, using the motive force of the inflating float rather than the force imparted by impacting the bottom of the sonobuoy on water. DPFF 319-321; D170.3-.4. Further, a device similar to the Spider Plate mechanism was designed and used as a water-impact plate during Sparton's development of a DICASS sonobuoy pursuant to a Government contract as early as August 1971. DPFF 92-103; 167-178. Subsequently, Mr. Widenhofer used the same Spider Plate mechanism (or a substantially similar device) in the Deep DIFAR design sonobuoy, as part

of a float release mechanism. DPFF 136-143.

Further, it is apparent that release mechanisms are easily developed and common place. Mr. Widenhofer was satisfied with the performance of the Spider Plate mechanism, but was looking for a less-expensive design. DPFF 192. Widenhofer and Depew, between them designed three release mechanism for the Job 7400 alone. And Mr. Widenhofer required less than three months to come up with the single-piece release plate. DPFF 192-206.

## II. THE UNITED STATES HAD A LAWFUL RIGHT TO USE THE CLAIMED INVENTIONS

This Court only has jurisdiction where "an invention described in and covered by a patent … is used or manufactured by or for the United States *without license of the owner thereof or lawful right to use or manufacture the same*." 28 U.S.C. § 1498 (emphasis added). Accordingly, where the Government obtains a right to use an invention by virtue of contract or other agreement, this court lacks jurisdiction over a claim for compensation. *Roberts Dairy Co. v. United States*, 208 Ct. Cl. 830, 530 F.2d 1342, 1359-60 (1976) ("a suit against the United States in the Court of Claims under 28 U.S.C. § 1498 is only appropriate when the alleged infringement is accomplished by the United States or a United States contractor who does not have a license to practice the invention").

The *Christian* doctrine holds that a "mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law." *S.J. Amoroso Const. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993); *G. L. Christian & Assoc. v. United States*, 312 F.2d 418, 426-27 (Ct. Cl. 1963). The basis for the Doctrine is that the Government can be neither estopped nor bound where its agents act beyond their authority. *Amoroso Const.,* 12 F.3d at 1075 (citing *Federal Crop Ins.*

*Corp. v Merrill*, 332 U.S. 380, 384 (1947); *Yosemite Park & Curry Co. v. United States*, 582 F.2d 552, 558 (Ct. Cl. 1978); *Porter v. United States*, 496 F.2d 583, 590 (1974)). And, where an agent is required to include a clause but fails to do so, whether through neglect or malfeasance, the agent is acting beyond the agent's authority. *Amoroso Const.,* 12 F.3d at 1075. The *Christian* doctrine ensures the proper adherence to the legislative policy by precluding "*ad hoc* encroachment or dispensation" by government agents not entrusted with making such policy decisions. *Id.*

A patent rights clause was a mandatory clause in contracts for research and development in the 1969-1972 time frame. From 1969 through 1971, the Armed Services Procurement Regulation required the inclusion of a clause granting the Government at least a royalty free license to make and use the invention (hereinafter a "patent rights clause") in "research and development" contracts. 32 C.F.R. §§ 9.107-1 thru 9.107-5 (1969); 32 C.F.R. §§ 9.107-1 thru 9.107-5 (1971).[3] The pertinent provisions of the regulations were promulgated under, and consistent with, President Kennedy's Statement of Government Patent Policy, 28 Fed. Reg. 10943-10946 (Oct. 12, 1963) and President Nixon's Government Patent Policy, 36 Fed. Reg. 16887-16892 (Aug. 23, 1971). Appendices A & B; *see also* 32 C.F.R. § 9.107-1 (1969). The regulation divided contracts into three categories.

Category I included those contracts "in a field of science or technology in which there is little significant experience outside of work funded by the Government, or where the Government has been the principal developer in the field, and the acquisition of exclusive rights

---

[3] The 1969 and 1971 versions of the regulation are substantially the same for purposes of this discussion. For brevity, reference will be made to the 1969 version. Both regulations are provided in Appendices C and D.

at the time of contracting might confer on the contractor a preferred or dominant position." 32 C.F.R. §§ 9.107-3(a)(3) (1969). For contracts in Category I, the Government "shall normally acquire … the principal or exclusive rights … in and to any invention made in the course of or under" such a contract. "Made" is defined in the regulation as meaning "the conception or first actual reduction to practice of such invention in the course of or under the contract." 32 C.F.R. §§ 9.107-2(c)(4) (1969).

Category II includes contracts "where the purpose of the contract is to build upon existing knowledge or technology to develop information[ or] products … for use by the Government" and the contractor has commercial interests in fields that are directly related to the subject matter of the contract. 32 C.F.R. §§ 9.107-3(b) (1969). In those cases, the principal rights were to be left with the contractor, "subject to the Government's acquiring at least an irrevocable non-exclusive license … for governmental purposes." *Id.*

Category III are those contracts where the commercial interests of the contractor are not sufficiently established. In such cases, the contracting officer was to make a determination of ownership of the rights after the contractor had provided information to sufficiently identify the invention and its commerical plans. 32 C.F.R. §§ 9.107-3(c) (1969). Under Category III, however, the regulation required that "[i]n any event, the Government shall acquire at least a nonexclusive royalty-free license … for Governmental purposes." *Id.*

Thus, under the regulations, the Government would always retain *at least* a royalty free license for any invention conceived or actually reduced to practice under a contract that falls in any of the three categories. Such a license is sufficient to preclude this court from exercising jurisdiction over plaintiff's claim. *Roberts Dairy*, 530 F.2d at 1359-60.

The inventions of both the '120 and '233 patents were conceived and reduced to practice during, and in furtherance of, mod 4 to the '0465 contract. Sparton contended during its appeal that the invention was conceived between July 29, 1971 and November 23, 1971. DPFF 31. Significantly, the earlier date, July 29, 1971, is after the award of Mod 4, which was effective July 13, 1971. DPFF 163. Sparton's own records demonstrate that Mr. Widenhofer attended an internal Sparton meeting on July 20, 1971, where those in attendance concluded that the release plate mechanism should be simplified. DPFF 198. Mr. Widenhofer performed calculations related to the characteristics of the release plate and prepared drawings of the new plate from August through October of 1971. DPFF 199, 202-205; D17.11-.13. From November 5, 1971 through March 9, 1972, Sparton conducted tests of sonobuoys that included the new release plate. DPFF 206-232. Each test was performed under the Mod. 4 contract and each demonstrated that the new plate worked for its intended function. DPFF 206-232. Mr. Widenhofer considered the March 9, 1972 test to be "successful" and stated that the single-piece release plate had proven "inexpensive and reliable." DPFF 229. The March 9 test concluded the engineering test phase of the dual depth DIFAR and the engineering development phase of the ECP. DPFF 227. As of that date, the inventions had been actually reduced to practice in the performance of the government contract. *Z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1352 (Fed. Cir. 2007) (establishing actual reduction to practice requires proof that the inventor constructed an embodiment that met all the limitations of the claims and determined that the invention would work for its intended purpose).

There is also no question that Mr. Widenhofer's plate is the claimed invention of the '233 patent and is the corresponding structure to the claimed "releaseable retaining means" of the '120

patent. Plaintiff concedes that it is. PPFF 102. Comparison of the October 10, 1971 drawing to the drawings and claims of each patent demonstrates that the drawings are identical in all respects, and claim 1 of the '233 patent reads on the drawing. JX-1; DX-45. Thus, the only question left for determination by the court is whether the Mod 4 contract was required to include a patent rights clause under the *Christian* doctrine.

Sparton's efforts under Mod 4 to the '-0465 contract fall within either Category I or Category II of § 9.107-3. Although the'-0465 contract was a "supply and service" contract for the production of sonobuoys, it is undisputed that the purpose of Mod 4 was to develop or improve a product for the Navy. D17.9-.11. Specifically, the objective of Mod 4 and the ECP was to produce an improved AN/SSQ-53 sonobuoy with a deeper depth capability than the SSQ-53 sonobuoys then being produced, and to provide the capability to choose between that deeper depth and the shallower depth of the then-extant sonobuoys. DPFF 234-243; D130.15; D17.10-.14. Further, the Government is the only substantial customer for sonobuoys, and thus the Mod 4 effort inherently was also to "develop …products … for use by the Government." Accordingly, the Mod 4 contract effort could be placed in either Category I or Category II of § 9.107-3. Under either category, the government should have received at least a non-exclusive license to use the patented inventions and, therefore, the government has a lawful right to use the claimed inventions.

## III. INFRINGEMENT

In order to infringe a claim of a patent, each limitation of the claim must be present in the accused device or method either literally or by equivalents. *See Koito Mfg. Co. v. Turn-Key-Tech, LLC*, 381 F.3d 1142, 1149 (Fed. Cir. 2004). Having already construed the claims, the

court need only compare the properly construed claim to the accused device. *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1581-82 (Fed. Cir. 1996). If at least one limitation of each claim is not present in the accused device, then there is no infringement. *Dolly, Inc. v. Spalding & Evenflo Companies, Inc.*, 16 F.3d 394, 398 (Fed. Cir. 1994). Thus, Sparton bears the burden of proving infringement as to each of the accused devices. *See Novartis Corp. v. Ben Venue Labs., Inc.,* 271 F.3d 1043, 1046 (Fed. Cir. 2001).

With respect to the ‘120 patent, each of the accused sonobuoys lacks the “releaseable retaining means” limitation[4] of claims 1 and 7 that corresponds to the substantially circular plate in the specification. And, the AN/SSQ-36 bathythermographs do not have structure comparable to the “signal receiving and sending apparatus” limitation of claims 1 and 7 of the ‘120 patent. As for claim 1 of the ‘233 patent, the determination of infringement hinges on four limitations of claim 1: “generally planar body,” “generally circular periphery,” “locking tabs radially extending,” and “elongated opening diametrically defined in said body member.”

### A. DOCTRINE OF EQUIVALENTS

A structure that does not literally infringe a claim may nonetheless infringe under the doctrine of equivalents. *Warner-Jenkinson Co. v. Hilton-Davis Chemical* Co., 520 U.S. 17, 21 (1997). “Doctrine of equivalents” refers to the equivalency of an element or part of the claimed invention with one that is substituted in the accused product. *Warner-Jenkinson*, 520 U.S. at 29. In order to prove infringement under the doctrine of equivalents, the patentee must prove that a substituted feature performs substantially the same function in substantially the same way to achieve substantially the same result as the limitation of the claim. The function-way-result test

[4] There is no substantial difference between the “releaseable retaining means” of claim 1 and the “retaining means releasably mounted” in claim 7. *Sparton III*, 68 Fed. Cl. at 42.

must be performed for each claim limitation that is not literally present in the accused device. *Warner-Jenkinson*, 520 U.S. at 39-40. The doctrine of equivalents cannot be used to vitiate any claim limitation. *Warner-Jenkinson*, 520 U.S. at 29-30. Nor can it enlarge the scope of the claims. *Dolly*, 16 F.3d at 398.

### B. JUDICIAL ESTOPPEL PREVENTS SPARTON FROM SEEKING EQUIVALENTS AS TO MULTIPIECE RELEASE MECHANISMS

Plaintiff is further precluded from claiming that multi-piece release mechanisms infringe the '120 patent by judicial estoppel or, alternatively by law of the case. *See New Hampshire v. Maine*, 532 U.S. 742 (2001) (judicial estoppel); *Toro Co. v. White Consolidated Inds.*, 383 F.3d 1326 (Fed. Cir. 2004) (law of the case). This court and the Federal Circuit accepted plaintiff's contention that "[t]he Depew cam actuated multipiece release plate shown in Figure 1 of, and described in ECP 0465-2 *is entirely different from and non-equivalent to* the inventions disclosed and claimed in the patents in suit." Reply Br. of Appellant Sparton Corp. 17 (June 9, 2004) (emphasis added); *Sparton II*, 399 F.3d at 1223; *Sparton I*, 57 Fed. Cl. at 470. Having achieved reversal of the summary judgment by distinguishing multi-piece release mechanisms from the claimed invention, plaintiff cannot now seek to claim that multi-piece release mechanisms infringe the claims of the '120 and '233 patents.

At trial, the application of judicial estoppel or law of the case will be particularly important with respect to the "releaseable retaining means" of claims 1 and 7 of the '120 patent. In order to literally infringe a claim having a means-plus-function limitation, the relevant structure in the accused device must "perform the identical function recited in the claim and be identical or equivalent to the corresponding structure in the specification" of the patent. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1333-34 (Fed. Cir. 2006). The claimed

function is "retaining said float means and apparatus within said casing and permitting said float means and apparatus to deploy from said casing upper end . . . ." *Sparton III*, 68 Fed. Cl. at 42. That function, however, was also performed by the Spider Plate, used in sonobuoys tested under the Mod 4 contract and the Depew device described in the ECP. DPFF 135-145, 172-178. Thus, whether either of these two devices would infringe, either literally or under the doctrine of equivalents, depends solely on whether the Spider Plate mechanism or Depew device is identical or equivalent to the single-piece release plate described in the specification. *Sparton III*, 68 Fed. Cl. at 42. Sparton's statement's make clear that multiple piece release mechanisms like the Spider Plate mechanism and Depew device are certainly not identical and not even equivalent to the claimed structure. Reply Br. of Appellant Sparton Corp. 17 (June 9, 2004). This is consistent with the '120 patent which describes the release plate as being "economical" and "positive and foolproof" in its operation, in short, a simplification over previously-used methods. JX-1, col 6, lns16-19.

### C. NONE OF THE MAGNAVOX SONOBUOYS INFRINGE EITHER THE '120 PATENT OR THE '233 PATENT

For purposes of this discussion, all of the accused Magnavox sonobuoys are substanially the same. DPFF 329-354. Each of the patents, however, must be addressed separately because the "release plate" of the '233 patent is not necessarily co-extensive with the "releaseable retaining means" of the '120 patent. To be sure, the claimed inventions of the '120 patent are directed to a sonobuoy having a "release plate" that functions as the sole structure in the "releaseable retaining means." In looking to whether a device contains an element corresponding to a means plus function limitation, the court must look to all corresponding structure.

The release mechanism of the accused Magnavox sonobuoys is not a "releaseable

retaining" means as claimed in the '120 patent. DPFF 330-337. With respect to the '120 patent, the Maganvox retaining mechanism is composed of two parts – the retaining plate and the parachute cup – which work in concert to retain the float. DPFF 336. Further, the parachute cup holds the rectangular retainer plate in place. Neither alone could accomplish that function. And, similarly, both must release before the float and "signal receiving and sending apparatus" can deploy. Therefore, the Magnavox release mechanism is not the "single piece release plate" of the claimed invention. *See also* Section III.A.4, *ante.* Finally, the Magnavox release mechanism is not "generally planar" and not circular, as disclosed in the patent. The plate is generally planar, but rectangular in configuration. DPFF 331. The parachute cup is circular in cross-section, but not flat: it is a cylinder. DPFF 331.

For the same reasons, the Magnavox retainer plate does not infringe the claims of the '233 patent. All of the claims of the '233 patent contain a limitation requiring that the plate be "generally circular." J3.6. None of the Magnavox plates are "generally circular," nor do they have "locking tabs [that are] radially extending," and most do not have an "elongated opening diametrically defined in said body member." DPFF 331, 348, 350, 352, 354. Nor are the Magnavox plates equivalent. *Freedman Seating Co. v. Am. Seating Co.*, 420 F.3d 1350, 1358 (Fed. Cir. 2005) ("[A]n element of an accused product …is not, as a matter of law, equivalent to a limitation of the claimed invention if such a finding would entirely vitiate the limitation"); *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000).

### D. None of the Hermes Sonobuoys Infringe either the '120 Patent or the '233 Patent

Hermes produced three release mechanisms, only two of which are at issue here. DPFF 384. The first generation device contained a multi-part release mechanism that is not accused of

infringement. Pl. Response to DPFF 368. The second generation contained a multi-piece release mechanism including a "parachute release bender." DPFF 372-378. And the third generation has a cylindrical plastic part with an integral plastic bar. DPFF 384.

The second generation release mechanism does not infringe the '120 or the '233 patent claims for the same reasons that the Magnavox sonobuoys do not infringe. The second generation release mechanism is a multi-piece device including at least two half-ring housings, a pressure plate, a float cap and a "parachute release bender." DPFF 372-378. All of these parts work in concert to perform the "retaining" and "releasing" function. DPFF 372-378. The design is similar to the Magnavox design and does not infringe either the '120 or the '233 patent for the same reasons. Specifically, plaintiff cannot assert infringement due to its prior position distinguishing multi-piece release mechanisms. *See* Section IV.A.3, *ante.*

Hermes third generation design also does not infringe the claims of '120 or '233 patent. DPFF 379-384. It is not made of metal, but of plastic. *Id.* It does not have a circular plate but a small rectangular cross bar built into a cylinder. *Id.* The cross bar does not have tabs on the end, but the cylinder has tabs on its face. *Id.* The cross-bar is not flat, but has a large "plug tab" at the center. Although it is a single piece, the third generation design is not generally flat, but cylindrical. *Id.*

### E. THE ROCKWELL SONOBUOYS DO NOT INFRINGE EITHER PATENT

The Rockwell AN/SSQ-53 sonobuoys used a multi-piece release mechanism consisting of two plates, a "buckle plate" and a "retainer plate." DPFF 363. The Rockwell sonobuoys do not infringe the '120 patent because the Rockwell sonobuoys contain a multi-piece release plate. *See* section IV.A.3, *ante*; DPFF 362-363.

The Rockwell sonobuoy "buckle plate" also does not infringe the claims of the '233 patent. The Rockwell "buckle plate" is not generally circular, rather it is generally hexagonal or polygonal. DPFF 63. *Freedman Seating*, 420 F.3d at 1358; *Moore*, 229 F.3d at 1106.

### F. The Raytheon Sonobuoys Do Not Infringe the '120 Patent

The Raytheon sonobuoys also employ a multi-piece release mechanism. The mechanism consists of a "deformation plate" or "release plate" and a "parachute cup." DPFF 365; D212.3. The parachute cup is a hollow cylinder to which the parachute shroud lines are attached. D212.3. The deformation plate is seated within the cylinder of the parachute cup, with tabs that extend through openings in the cup and into corresponding openings in the sonobuoy housing. D212.3.

### G. The Hazeltine and Sippican Sonobuoys and Bathythermographs Do Not Infringe the '120 Patent

The release mechanism of the Hazeltine and Sippican sonobuoys and bathythermographs are similar in structure to the Raytheon sonobuoys. DPFF 355-361. For the same reasons addressed to the Raytheon sonobuoys above, the Hazeltine and Sippican sonobuoys and bathythermographs do not infringe the '120 patent.

### H. The Sippican Bathythermographs Also Lack a "signal receiving and transmitting apparatus"

The Sippican bathythermographs (AN/SSQ-36) also do not infringe the '120 patent because they lack a "signal receiving and transmitting apparatus." J1.6. The bathythermographs use a thermistor probe to continuously gather ocean temperature information. DPFF 17-18. Nor do bathythermographs infringe under the Doctrine of Equivalents. The thermistor probe of the bathythermograph does not perform substantially the same function, nor does it obtain substantially the same result.

The thermistor probe does not "receive" acoustic signals from the water (a function of the signal receiving and transmitting apparatus). J1.5, col 3, lns 65-66 ("to permit the signals ultimately received by the transducer [] to be transmitted"). Instead, it provides information from which the temperature can be determined. DPFF 17-18. Thus, the function is very different. And the result is also substantially different, no accoustic information is transmitted to the aircraft, only information regarding the temperature of the water. *Id.*

## IV. ACCOUNTING

Mr. McGavock will testify as to the appropriate royalty rate, calculation of the royalty base and the correct calculation of delay compensation, as well as to tabulate the proper total compensation to be awarded. A complete recitation of the opinions to which he is expected to testify are contained in his expert report. *See* DX-221. Recognizing that there are many issues relating to liability yet to be resolved by the court, Mr. McGavock has provided individual analysis for each of the contracts for the accused sonobuoys. Once the court has determined which of those sonobuoys, if any, are included within the royalty base, the final calculation can be accomplished by use of the information provided. The United States is prepared to provide such a calculation upon notice from the court.

### A. "Reasonable and Entire Compensation" under 28 U.S.C. § 1498(a)

Section 1498(a) of Title 28 grants the Government the right to use any invention covered by a United States patent. In return, the Government is required to provide "reasonable and entire compensation" for the use of the invention. 28 U.S.C. § 1498. Due to the distinct nature of section 1498, the entire range of remedies available under Title 35 for suits between private parties is not available. *Leesona Corp. v. United States,* 599 F.2d 958, 966 (Ct. Cl. 1979).

Remedies such as treble damages or damages for inducing infringement by others are not permitted under § 1498(a). *See id.* at 968-69.

While § 1498(a) is a statutory remedy, this court and its predecessors have consistently concluded that "reasonable and entire compensation" under § 1498(a) is equivalent to "just compensation" under the Fifth Amendment. See *Penda Corp. v. United States*, 29 Fed.Cl. 533, 573 (Fed. Cl. 1993) (citing *Calhoun v. United States*, 453 F.2d 1385, 1391, 1395 (Ct. Cl. 1972). And, therefore, the court has "traditionally searched the law of eminent domain for legal precedents and principles to apply in determining the 'reasonable and entire compensation.'" *Leesona,* 599 F.2d at 966. As with the Fifth Amendment, the goal is to provide compensation for "what the owner has lost, not what the taker has gained." *Leesona*, 599 F.2d at 969. Courts have therefore typically rejected damages analyses based on the benefit conferred to the Government by the patented invention (*see Dow Chem. Co. v. United States*, 226 F.3d 1334, 1348 (Fed. Cir. 2000)), as well as attempts by the patent owner to recover that which it never lost. *See Standard Mfg. Co. v. United States*, 42 Fed. Cl. 748, 761 (1999). Reasonable and entire compensation under § 1498 "implies that only a reasonable, not an excessive, royalty should be allowed where the United States is the user – even though the patentee, as a monopolist, might be able to exact excessive gains from private users." *Tektronix Inc. v. United States*, 552 F.2d 343, 349 (Ct. Cl. 1977), *modified* 557 F.2d 265 (1977).

Generally, "reasonable and entire compensation" under § 1498(a) has two components. First, compensation includes the "value of the license, determined ordinarily as of the time the Government takes the license." *Decca Ltd. v. United States*, 640 F.2d 1156, 1167 (Ct. Cl. 1980). The other component is delay compensation: compensation for the delay in payment from the

time of when the Government acquired the license until payment. *Id.* at 1168.

### B. THE REASONABLE ROYALTY RATE

"Where an established royalty rate for the patented inventions is shown to exist, that rate will usually be adopted as the best measure of reasonable and entire compensation." *Tektronix*, 552 F.2d at 349. When no established, comparable royalty exists, "courts typically set the reasonable royalty by determining the royalty rate that the parties would have negotiated had they willingly engaged in license negotiations at the time of the taking." *de Graffenried v. United States*, 25 Cl. Ct. 209, 217 (1992). This "hypothetical negotiation" or "willing seller-willing buyer test" has been widely applied and discussed by this court, as well as the district courts. *See, e.g. Standard Mfg.*, 42 Fed. Cl. at 763-77; *see also Georgia-Pacific Corp. v. United States Plywood-Champion Papers, Inc.,* 318 F. Supp. 1116, 1120 (S. D. N. Y. 1970), *modified,* 446 F. 2d 295 (2d Cir.), *cert. denied*, 404 U.S. 870 (1970).

Absent a relevant, established royalty for the patent-in-suit, courts often look to the 15-factor approach of *Georgia-Pacific.* 318 F. Supp. at 1120. While the *Georgia-Pacific* factors are not exhaustive, and not all apply to every factual situation, they have been widely used by courts (including this court) in determining a reasonable royalty. *See, e.g.,Wright*, 53 Fed. Cl. 466; *Standard Mfg*., 42 Fed. Cl. at 763; *Gargoyles Inc. v. United States*, 37 Fed. Cl. 95, 104-05 (1997). For the purposes of the hypothetical negotiation, it is assumed that the patent at issue is valid and enforceable, although the validity is actually disputed. *See Procter & Gamble Co. v. Paragon Trade Brands, Inc.*, 989 F. Supp. 547, 606 (D. Del. 1997).

The royalty rate is dependent on, and inversely related to, the base that has been selected. *See Wright v. United States*, 53 Fed. Cl. 466, 475 (2002) ("a court may reduce the royalty rate

where the government procurement was voluminous"). *Hughes Aircraft Co. v. United States*, 31 Fed. Cl. 481, 488 (1994) (noting that "[i]t is axiomatic that the larger the potential compensation base to which a royalty rate will be applied, the lower will be the rate."), *aff'd*, 86 F.3d 1566 (Fed. Cir. 1996), *vacated on other grounds and remanded*, 520 U.S. 1183 (1997), *reinstated*, 140 F.3d 1470 (Fed. Cir. 1998), *cert. denied*, 525 U.S. 1177 (1999).

The hypothetical negotiation in § 1498(a) cases differs from those in district court actions. For example, the license taken by the Government is always nonexclusive, and the patent owner cannot prevent the Government from taking the license. *See Penda*, 29 Fed. Cl. at 573. Furthermore, while it is the Government that ultimately takes the license, "[i]n the context of a hypothetical negotiation, however, it is sometimes more appropriate to consider the hypothetical licensee to be the manufacturer of the product, rather than the government." *Id.* at 575.

Mr. McGavock used both analytical tools and the *Georgia-Pacific* approach in formulating his opinion, D221.45-.60, and in analyzing Dr. Martin's opinions, D221.60-.67. Mr. McGavock concluded that a reasonable royalty would be 1% of the procurement cost for all sonobuoys found to have infringed the '120 patent alone or both the '120 and '233 patents. For those sonobuoys found to have infringed only the claims of the '233 patent, Mr. McGavock concluded that a 0.5% (one-half of one percent) royalty would be reasonable.

### C. The Royalty Base

Once the parameters of the hypothetical negotiation have been set, courts typically determine the appropriate royalty base. The appropriate royalty base is fact-dependent; there is no absolute rule that governs what must be included. For example, courts have considered

information that was not known at the time of the negotiation. *See de Graffenreid*, 25 Cl. Ct. at 220-21; *see also TWM Mfg. Co. v. Dura Corp.*, 789 F.2d 895, 901 (Fed. Cir. 1986).

In this case, which sonobuoys – if any – infringe is disputed. But the identity of the accused devices and the total cost of the procurement are largely undisputed. Mr. McGavock's comparison of the sonobuoy cost under Sparton's expert report to his expert report showed that the parties differ by less than 1% over the $770 million potential base. D221.37. The majority of that difference is the result of two issues: (1) plaintiff's claim for a royalty based on the termination costs of contract No. N00163-83-C-0068, which are unrelated to the cost of any sonobuoys that were delivered to the government, and (2) plaintiff's inclusion of AN/SSQ-110 sonobuoys, which have not been accused previously.

### D. PLAINTIFF'S LOST PROFITS CLAIM

Plaintiff asserts that it is entitled to the profits that it lost to its competitors through infringing sales. An insuperable obstacle to plaintiff's claim is that section 1498 does not permit recovery for lost business opportunities. *Decca Ltd.*, 640 F.2d at 1176; *see also, Dow*, 266 F.3d at 1348 (award of damages based on benefit conferred theory was improper where more conventional and substantiated royalty calculation was available); *Decca*, 640 F.2d at 1172. Further, "if lost profits are ever to be awarded under § 1498, it should be only *after the strictest proof* that the patentee would actually have earned and retained those sums …." *Tektronix,* 552 F.2d at 349 (emphasis added). Plaintiff's evidence simply does not rise to that level.

Mr. McGavock has presented his opinion regarding this claim. D221.39-.43. He concludes that plaintiff and its experts have failed to demonstrate what profits Sparton would have made and retained because they failed to demonstrate Sparton had adequate manufacturing

capacity to exploit the potential additional demand, have failed to show what additional incremental costs would have been incurred in meeting the additional demand and have failed to show what sales could have been achieved and what profits could have been earned. D221.43

### E. Delay Compensation

In addition to a reasonable royalty, a prevailing plaintiff in an action under § 1498(a) is entitled to recover delay compensation as part of the judgment. *See Standard Mfg.*, 42 Fed. Cl. at 777. Determining delay compensation is left to the discretion of the trial court. *Id.* In recent cases, this court has adopted short-term Treasury bill rates, such as 1-year T-bills, as the proper rate of return. *See Standard Mfg.*, 42 Fed. Cl. at 778; *Gargoyles*, 37 Fed. Cl. at 109. T-bills rates, which are considered a risk-free rate of return, are appropriate because there is no risk associated with payments of judgments by this court. *Gargoyles*, 37 Fed. Cl. at 109. Mr. McGavock also concluded that the appropriate measure of delay compensation in this case is the One-year Constant Maturity Treasury Rate, compounded annually, using a mid-year convention. D221.69. Mr. McGavock applied that rate in his report.

## V. CONCLUSION

For the reasons stated above, the claims of the patents in suit would have been obvious to those skilled in the art at the time they were made or the government had a license or other lawful right to use the claimed inventions. To the extent that the patents are valid, the evidence demonstrates that the Magnavox, Hermes and Rockwell sonobuoys do not infringe either patent, and the Raytheon, Hazeltine and Sippican sonobuoys and bathythermographs do not infringe the ‘120 patent. If an accounting is necessary, it should be made in accordance with Mr. McGavock’s report.

Respectfully submitted,

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JOHN FARGO
Director

*s/Gary L. Hausken*
GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

February 13, 2008