IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, Plaintiff, | ) | No. 92-580C |
| v. | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, Defendant. | ) | |

**DEFENDANT'S MOTION IN LIMINE TO PRECLUDE USE OF PLAINTIFF'S SETTLEMENT OFFER AS EVIDENCE OF REASONABLE COMPENSATION**

The United States hereby moves to preclude the use of plaintiff's settlement offer as evidence of reasonable compensation to be awarded in this case. Such use is barred by Fed. R. Evid. 408.

## I. JUSTIFICATION FOR FILING

No date was set for filing of motions in limine relating to matters presented in the pretrial briefs, as set forth in this motion. The Pretrial Order, Docket No. 290, ¶ 2.c.*i*.(4), sets January 22, 2008 as the date for filing "any objections, including motions in limine, to the opposing party's proposed witnesses or exhibits." As noted below, plaintiff's expert Dr. Donald Martin, does not rely on the settlement offer at issue here, but provides his own analysis. Not until plaintiff filed its pretrial brief did plaintiff rely on the settlement offer as part of its accounting analysis. Plaintiff's pretrial brief was filed on February 6, 2008. *See* Docket No. 306.

The filing of this motion 14 days after the filing of plaintiff's pretrial brief is reasonable in light of the issue presented and the government's timely filing of its own pretrial brief on February 13, 2008.

## II. FACTUAL BACKGROUND

On February 11, 1981, plaintiff submitted a letter to the Navy for the purpose of submitting an administrative claim for compensation in accordance with 28 U.S.C. § 1498(a) and section 9-404 of the Defense Acquisition Regulation. J80.1. In the letter, plaintiff stated it "believes it is entitled to a 5% royalty on all past and future sales of sonobuoys or other products utilizing the patented inventions." J80.1. After a series of communications between the Navy and plaintiff failed to resolve the claim, *see* DX-86 through DX-96, plaintiff filed the present suit.

While the administrative claim was pending, the Navy questioned plaintiff on the dates of conception and reduction to practice, particularly with respect to the release mechanism of the ECP. *See, generally*, DX-86 through DX-96. In response, plaintiff offered a number of internal documents and obtained affidavits of Messrs. James Widenhofer and Donald Depew, to support its arguments relating to the making of the claimed inventions. DX-93 through DX-95.

Plaintiff submitted the report of its economic expert, Dr. Donald Martin, on April 17, 2006, in accordance with RCFC 26(a)(2). PX-248. In a footnote, Dr. Martin stated: "It is my understanding that in the initial period of infringement, Sparton offered a settlement license to the U.S. Navy at a royalty rate of 5%" and indicated that he thought that this rate was "depressed" by "infringing competitors." P248.15 n.16. There is no indication in the report,

however, that Dr. Martin relied on this number for the purpose of formulating his own opinion as to the amount of compensation he believed was due plaintiff.

Then, on February 6, 2008, plaintiff filed its pretrial brief. Sparton Corp's Mot. for Leave to File a Mem. of Fact & Law in Compliance with the Court's June 20, 2007 Order, Docket No. 306 (Feb. 6, 2008) (Pl. Pretrial Brief). At page 9 of the brief, plaintiff states: "In connection with the reasonable royalty calculus, the predicate facts are that: (1) Sparton offered the Navy a settlement license about February 11, 1981 at a 5% rate on all sales of sonobuoys or other products utilizing the patented inventions …." Further, at page 12, plaintiff states: "These facts and conclusions and/or opinions justify a substantial increase in the 5% rate Sparton offered the Navy on February 11, 1981 (to near the said average 14% Sparton lost profit rate)…."

## III. DISCUSSION

### A. Plaintiff's Settlement Offer Is Not Admissible to Prove the Value of its Claim

Plaintiff presents its own settlement offer as evidence of the value of its claim and therefore – it reasons – the value of the reasonable compensation that it should be paid. Pl. Pretrial Br. at 9, 12. Plaintiff's use of the settlement offer in an attempt to establish the amount or value of the government's liability is clearly barred by Fed. R. Evid. 408.

Federal Rule of Evidence 408, as amended in 2006, provides:

> (a) Prohibited uses. – Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount, or to impeach through a prior inconsistent statement or contradiction:
>
> > (1) furnishing or offering or promising to furnish – or accepting or offering or promising to accept – a valuable consideration in compromising or attempting to compromise the claim; and

> (2) conduct or statements made in compromise negotiations regarding the claim, ….
>
> (b) Permitted uses. – This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

Here, plaintiff unambiguously offers the settlement amount for the purpose of proving the amount of its claim. Plaintiff holds out the settlement amount as "predicate fact" needed for the determination of reasonable compensation and argues plaintiff should be awarded an amount substantially more than that settlement offer. Pl. Pretrial Br. 9, 12. The settlement offer, however, is clearly plaintiff's own "offer[] or promis[e] to accept" an amount in settlement of its claim. Thus, the settlement amount falls squarely within the bounds of the Rule.

And it would be error for the court to rely on an unaccepted settlement offer as the basis for determining the amount of compensation due. *Cheyenne River Sioux Tribe v. United States*, 806 F.2d 1046, 1050-52 (Fed. Cir. 1986) ("the trial court could not impose upon the parties a settlement to which they had not agreed"). In *Cheyenne River Sioux*, the Federal Circuit drew its logic from the Supreme Court's opinion in *United States v. Ward Baking Co.*, 376 U.S. 327 (1964).

*Ward Baking* involved price-fixing by a group of bakery companies. 376 U.S. 327-28. After settlement negotiations failed, the bakery companies requested, and the court imposed the bakery company's proposed "consent" degree. 376 U.S. 328-30. The Court concluded that the trial court erred entering the proposed anti-trust consent judgment over the government's objections. 376 U.S. at 333-35. The Court reasoned that the trial court's imposition of the

unaccepted settlement offer would preclude the government from seeking relief to which it may be entitled. *Id.*

Relying on *Ward Baking*, the *Cheyenne River Sioux* court recognized that the "critical point in both [*Ward Baking* and *Cheyenne River Sioux*] is the same: the trial court could not impose upon the parties a settlement to which they had not agreed." 806 F.2d at 1051. To do so, the court reasoned would discourage settlement discussions. 806 F.2d at 1050. Allowing previously rejected settlement offers to be used by a trial court as the basis for a judgment, would not "mitigate[] the antagonism and hostility that protracted litigation leading to judgment may cause." *Id.*

In this instance, there is even less reason to allow the use of the proposed settlement amount. It is plaintiff's own settlement offer, and not that of defendant. Like *Ward Baking*, plaintiff is seeking to have the court impose a bargain to which the parties were unable agree during the settlement process. Further, the settlement offer is not a "fact," but rather plaintiff's opinion as to the value of its claim. As pointed out in *Ward Baking* and *Cheyenne River Sioux*, such an opinion cannot substitute for the trial court's duty "to determine the merits and enter judgment accordingly." 806 F.2d at 1050.

For the reasons stated, the court must disregard the references to the offered amount and cannot consider the settlement offer in determining what compensation, if any, is appropriate in this case.

### B. THE SETTLEMENT DISCUSSIONS ARE ADMISSIBLE FOR OTHER PURPOSES

That the settlement offer is not admissible for purposes of determining the amount of compensation due, if any, does not mean that the documents are inadmissible, however. Historical facts disclosed and discussed by plaintiff during the settlement discussions are relevant and admissible in this case to establish facts surrounding the conception and reduction to practice of the invention, the structure of plaintiff's Deep DIFAR sonobuoy and the sonobuoy described in the ECP, and to the determination of the knowledge and skill of those having ordinary skill in the art. That these historical facts were first disclosed and discussed in the context of settlement discussions does not bring them within the scope of Rule 408.

As originally enacted, Fed. R. Evid. 408, provided that the "rule does not require the exclusion of any evidence otherwise discoverable merely because it is presented in the course of compromise negotiations." Fed. R. Evid. 408 (1974). That provision specifically permitted the admission of facts presented during compromise negotiations such as those presented by plaintiff during its settlement negotiations with the Navy. *Hughes Aircraft Co. v. United States*, 31 Fed. Cl. 481, 487 (1994) (company's "normal royalty rates available to competitors early in the patent term" were evidence that was "otherwise discoverable"), *aff'd*, 86 F.3d 1566 (Fed. Cir. 1996), *vacated by*, 520 U.S. 1183 (1997), *aff'd in pertinent part on remand,* 140 F.3d 1470 (Fed. Cir. 1998); *see also Ramada Development Co. v. Rauch*, 644 F.2d 1097, 1107 (5th Cir. 1981) (Rule 408's provision for "evidence otherwise discoverable" insures that "negotiations are not being used as a device to thwart discovery by making existing documents unreachable").

The 2006 amendment, however, eliminates the provision relating "evidence otherwise discoverable." Fed. R. Evid. 408 (2006). The Advisory Committee note to the rule makes clear that the elimination of that provision did not effect a change to the Rule's scope:

> The sentence of the Rule referring to evidence "otherwise discoverable" has been deleted as superfluous. The intent of the sentence was to prevent a party from trying to immunize admissible information, such as a pre-existing document, through the pretense of disclosing it during compromise negotiations. But even without the sentence, the Rule cannot be read to protect pre-existing information simply because it was presented to the adversary in compromise negotiations.

Fed. R. Evid. 408, Advisory Comm. Note to 2006 Amendments (citations omitted). Thus, the historical facts and the affidavits of Messrs Widenhofer and Depew remain admissible at trial.

In any event, plaintiff relied on affidavits of Messrs Widenhofer and Depew and the Deep DIFAR description during the prior appeal in support of its argument that the ECP did not place the claimed invention on sale. Brief of Appellant Sparton Corp. at 7-8 (Feb. 10, 2004) (citing to A816-22 & A823-38 of the Joint Appendix) (Attachment 1); Nonconfidential Joint Appendix, Volume V, Index at xii (Attachment 2). Accordingly, any objection to the use of the historical facts has been waived. *See, e.g.*, *Living Designs, Inc. v. E.I. Dupont de Nemours & Co.* 431 F.3d 353, 368 & n.13 (9th Cir. 2005) (objection based on Fed. R. 408 waived by failure to object at trial).

## IV. CONCLUSION

For the reasons stated above, plaintiff's reliance on the amount of its 1981 settlement offer is barred by Fed. R. Evid. 408. Accordingly, the court must disregard the references to the offered amount and cannot consider that amount in determining what compensation, if any, is appropriate in this case.

Respectfully submitted

JEFFREY S. BUCHOLTZ
Acting Assistant Attorney General

JOHN FARGO
Director

*s/Gary L. Hausken*

GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

February 20, 2008

Attorneys for Defendant, United States

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 92-580C<br><br>Chief Judge Edward J. Damich |

**DEFENDANT'S MOTION IN LIMINE TO PRECLUDE USE OF PLAINTIFF'S SETTLEMENT OFFER AS EVIDENCE OF REASONABLE COMPENSATION**

# ATTACHMENT 1

03-5169

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SPARTON CORPORATION

Plaintiff-Appellant

v.

THE UNITED STATES

Defendant-Appellee

---

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS IN CV-92-580C, CHIEF JUDGE EDWARD DAMICH

---

# BRIEF OF APPELLANT SPARTON CORPORATION

Steven Kreiss
1120 Connecticut Avenue N.W.
Suite 240
Washington D.C. 20036
Attorney For Plaintiff-Appellant

February ~~9~~ 10, 2004

called an "inverse" or "upside-down" deployment design because all production sonobuoys up to that time routinely contained release plate assemblies located at the bottom of the sonobuoy to deploy sonobuoy components from the bottom end of a sonobuoy. The "upside-down" design completely departed from conventional wisdom in the manner by which sonobuoy components should be deployed. It is critical to note that, although the "upside-down design" was conceived in the late 1960s-1970 time frame, the **conception of the claimed inventions did not occur at this time.**

In September 1970, Sparton's project engineer, Devereaux, prepared a **Program Schedule** to complete a design phase and then a testing phase "to demonstrate an acceptable design for [Sparton's] Deep DIFAR" sonobuoy. A70-73, 83, 135. In November 1970, Sparton employee Depew was assigned the responsibility to prepare a technical description of Sparton's proposed dual depth sonobuoy in a proposal to be given to the Navy. A839-40. His technical description was to be hardware oriented and include a layout. Id. Depew conceived of a release plate (not the patented one) to be used with the "inverse sonobuoy design." A823-838. **Depew's plate** is a multipiece mechanism and was the one incorporated into ECP 0465-2. Id.

Although Depew designed his multipiece plate mechanism and described it in the ECP, Widenhofer designed another multipiece plate mechanism, called a spider plate, for use in the mechanical design referenced in the September 1970 Program Schedule. A816-822. The Sparton sonobuoys sea tested February 18, 1971 contained the multipiece spider plate mechanism. The September 1970 Program Schedule was revised on March 16, 1971 because a cable break problem occurred during a February 18, 1971 test. A104.[2] Although Widenhofer stated in his February 26, 1971 report that the "cable break" problem involved "only minor modifications to the cable pack assembly," he also noted that "... the problem is still being investigated." A83-90. And it was investigated at NOL. On March 8, 1971, Widenhofer concluded that "...the cable breaks are not due simply to a 'cable pack problem.'" A94.[3] Devereaux, Widenhofer's supervisor, informed the Sparton program head, Hungerford, that the NOL test "...was determined to

---

[2] This cable problem caused a failure in the cable means and receiving and transmitting means elements of all 120 patent claims during the February 18, 1971 test. A83-90, 1421-22.

[3] Six possible causes were considered. B94. Mr. Widenhofer indicated that "[t]he unique nature of the deep DIFAR design invites a close scrutiny of all conceivable cable break possibilities in an attempt to better understand the peculiarities inherent in the inverse approach to sonobuoy design." A94.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 92-580C |
| v. | ) | |
| | ) | Chief Judge Edward J. Damich |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT'S MOTION IN LIMINE TO PRECLUDE USE OF PLAINTIFF'S SETTLEMENT OFFER AS EVIDENCE OF REASONABLE COMPENSATION**

# ATTACHMENT 2

VOLUME V PAGES 628-868

03-5169

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

---

SPARTON CORPORATION

Plaintiff-Appellant

v.

UNITED STATES

Defendant-Appellee

---

APPEAL FROM THE UNITED STATES COURT OF FEDERAL CLAIMS IN CV-92-580C, CHIEF JUDGE EDWARD DAMICH

---

NONCONFIDENTIAL JOINT APPENDIX

VOLUME V PAGES 628-868

Steven Kreiss
1120 Connecticut Avenue N.W.
Suite 240
Washington D.C. 20036
Attorney For Plaintiff-Appellant
(202) 347-6382

July 1, 2004

## VOLUME V


| DESCRIPTION | PAGE |
|---|---|
| DD 254 Form under Contract N00019-69-C-0465 (SPA 02172-02175) | A0811 |
| Description of the Deep DIFAR Sonobuoy | A0816 |
| Affidavits of James Widenhofer and Donald Depew and Exhibits thereto | A0823 |
| Sparton Internal Memo to R. Hungerford from B. Passman dated November 11, 1970 (SPA 37709-37710) | A0839 |
| Defense Supply Agency Inter-Office Memo dated July 18, 1973 (002130-002132) | A0841 |
| Rockwell Business Plan Revision dated June 6, 1980 (Pickrell Dep. Ex. 13) ***(Confidential Memo by Rockwell chronicling its design and development program for its SSQ-53B sonobuoy)*** | A0844 |
| Selected portions of deposition transcript of Don Pickrell, Jr. ***(Confidential Deposition of Rockwell's Vice President explaining the information contained on A0844 and A847-48)*** | A0851 |
| Selected portions of Hazeltine DIFAR PreAward notes and presentations dated October 9-10, 1979 (Kuhn Dep. Ex. 5) (021505-06, 021510, 021532, 021539, 021541, 021544, 021546, 021549-50) ***(Confidential Memo by Hazeltine explaining its design and development program for its DIFAR sonobuoy)*** | A0859 |

## DESCRIPTION OF THE DEEP DIFAR SONOBUOY

Figure 1 is a sectional view of the Deep DIFAR sonobuoy. Figure 2 is an enlarged, detail sectional view or the top end of the Deep DIFAR sonobuoy illustrating the upper electronics assembly, the release plate mechanism, the parachute and parachute release device. Figure 3 is a plan and elevation view of the spider plate and one of three associated latches that are the key elements in the release mechanism.

The sonobuoy consists of numerous parts and assemblies all stowed within a cylindrical casing (1). The casing is closed on the lower end and serves as a descent vehicle. The lower end is provided with a weight (2). A directional hydrophone and an omnidirectional hydrophone (22) are located adjacent to the bottom end weight. The subsurface electronics assembly (23) is positioned above and adjacent to the hydrophone elements. A damper element and associated compliant cable subassembly (24) is located between the subsurface electronics assembly and a cable spool wound with flexible cable (25). A sea water activated battery (26) that provides power to the electronics assemblies and a sea water activated squib battery (18) that activates the float inflation system is intermediate the surface electronics assembly (3) and the cable spool. Underwater acoustic signals transduced to an electrical analog are imparted to

the subsurface electronics assembly by the hydrophone assembly and then are transmitted, by a line driver, to the surface electronics assembly, which contains a VHF Transmitter, by means of a signal path existing through the compliant cable, the flexible cable wound on the cable spool and its extension (27) through the bulkhead (28) at the bottom of the surface electronics assembly. There is a flexible wire interconnection between the bottom of the surface electronics assembly and the VHF Transmitter. RF energy is coupled from the VHF transmitter to the base of the antenna (29), which is located within the float assembly, by a flexible coaxial cable (30) located above the VHF Transmitter and below the float assembly. An RCA phone plug and socket (31) facilitate connection of the flexible coax cable to the transmitter output.

A surface electronics/float assembly (3) resides near the upper end adjacent to the release mechanism (21). A parachute (4) and parachute release device (5) reside above the release mechanism. The float (6) is stowed within and is attached to the surface unit by means of a collar (7) which is a necked down portion of the surface electronics housing. The float cup (8) is positioned over and around the float. The closed end of the float cup is attached to a piston (9). The piston is guided and held in place by a support plate (10) and a milled plate (11). The two plates

are separated by a load spring (12) which allows for variations in the length of the subassemblies that are contained within the sonobuoy casing. A spider plate with a central ring (13) resides on the shoulder of the piston (15). The spider plate is made from cold rolled steel. It has three long narrow legs attached to and extending radially from the central ring. The legs have large tensile strength along their length axis but are drawn easily in a direction perpendicular to the plane that contains the three legs. An enlarged end on each of the three legs engages with a key hole feature in each of three latches (16). The latches are located in positions such that they each retain the fiber housing (22) and extend through and engage the sonobuoy casing. The arms of the spider plate (17) are located above the milled plate. The radius plate in conjunction with the milled plate capture the spider plate and associated latches in a sandwich like fashion. The radius plate has a center hole with a large radius on the side adjacent to the spider plate.

When the Deep DIFAR sonobuoy is deployed into the ocean, sea water causes the sea water squib battery (18) to be activated which in turn fires a squib actuated bottle piercing mechanism (19) that results in opening of two $CO_2$ bottles (20) causing $CO_2$ to inflate the float. As the float inflates, pressure is applied to the float cup (8) resulting

in upward movement of the float cup and the attached piston (15). As the piston passes through the hole in the radius plate (17) the thin arms of the spider plate are drawn around the radius. Continued upward movement of the piston results in the spider arms and attached latches moving inward until the latches (16) disengage from the sonobuoy casing, whereupon the release mechanism along with the parachute housing and attached parachute are forcefully ejected. This action permits the surface electronics assembly to exit through the top end of the casing and the casing with the balance of its contents descend to operating depth whereupon the casing is shed and the subsurface components assume their operating configuration.


21
3
18
26
25
1
24
23
22
2

FIGURE 2.




B0

FIGURE 3




B0822

IN RE SPARTON CORPORATION

ADMINISTRATIVE CLAIM NO. S153
BUOY DEPLOYMENT PATENTS

ATTACHMENT M

AFFIDAVIT OF JAMES WIDENHOFER

James W. Widenhofer, residing at 6650 Clark Lake Road, Jackson, Michigan 49201, being duly sworn, deposes and says that:

1) I am an employee of Sparton Corporation of Jackson, Michigan and for the past twenty-six years I have been employed by Sparton in the Electronics Division in Jackson, Michigan. I graduated from Indiana Institute of Technology in 1964 with a degree of Bachelor of Science in Mechanical Engineering. I have been engaged in the development and design of sonobuoys for twenty-six years. I am the inventor of several patented inventions including those in U.S. Patent Nos. 3,921,120 and 4,029,233 which, I understand, are involved in the subject Administrative Claim No. S153.

2) In 1971, as an employee of Sparton Electronics, I was a mechanical design engineer primarily engaged in designing the mechanical systems of sonobuoys. I had a general knowledge of the design activities of Sparton Electronics in regard to mechanical design of sonobuoys.

3) I was aware in the early part of 1970 of the preparation of engineering change proposal ECP465-2 to incorporate dual depth operation capability in the AN/SSQ-53 sonobuoy under Contract N00019-69-C-0465 but I was not actively engaged in the preparation of it. I was then familiar with the engineering changes which were proposed by ECP465-2 which included the drawing identified as Figure 1 Sonobuoy Packaging Layout. That drawing is a sectional view

of the sonobuoy and includes a part labeled "RELEASE PLATE ASSEMBLY."

4) The drawing attached hereto and identified as Exhibit M-1 (one page) is a copy of a portion of Figure 1 of ECP465-2 and includes the part labeled "RELEASE PLATE ASSEMBLY."

5) The drawing attached hereto and identified as Exhibit M-2 (one page) was made January 20, 1992 by Donald R. Depew with my cooperation to depict the plan view and the sectional elevation view of the release plate assembly which is depicted only in sectional elevation view in Figure 1 of ECP465-2.

6) The attached description entitled "Float-Inflation Actuated Release Plate" and attached hereto as Exhibit M-3 (one page) was prepared by Donald R. Depew with my cooperation and signed by him on January 20, 1992.

7) To the best of my knowledge and belief, the drawing attached as Exhibit M-2 and the description attached as Exhibit M-3, taken together, accurately describe the configuration and operating principles of the release plate assembly of ECP465-2.

8) I am not aware of any documents other than Figure 1 of ECP465-2, now in existence, which describe or depict the configuration or operation of the release plate assembly

in Figure 1 of ECP465-2. It is my understanding that Sparton personnel have made an exhaustive search to find any such documents and that no such documents have been found.

James W. Widenhofer

Date: 21 February 1992

STATE OF MICHIGAN)
)ss
COUNTY OF JACKSON)

On this 21st day of February, 1992, personally appeared before me James W. Widenhofer, to me known to be the person named in and who executed the above instrument, and acknowledged that he executed the same for the uses and purposes therein mentioned.

Judith Anne Camp
JUDITH ANNE CAMP
Notary ...
My Commission ...

(SEAL)

A000714


MAIN
BATTE
RETAI
SURFACE
ELECTRONICS
FLOAT
STOWAGE
REMOVE
RELEASE
PLATE
ASSEMBLY
PARACHUTE
STOWAGE
TEST SOCKET
ACCESSIBLE
THROUGH
PORT IN
FABRIC FLOAT
WALL
PARACHUTE
SHROUD LINE
ANCHOR EYES
PARACHUTE
RETAINER
PLATE —
A000715

EXHIBIT




Inflation-Actuated Release-Plate Assembly

Float-Inflation Actuated Release Plate

This float-inflation actuated release plate comprises:

(a) a base plate, somewhat smaller than the sonobuoy housing ID;

(b) an anti-cocking guide skirt, attached to the bottom of the base plate;

(c) two sliding latch plates, attached by guide screws and included slots to slide radially along the top surface of the base plate;

(d) two wire springs, engaging axial holes in the slide plates and stressed to urge the two plates apart outwardly to engage slots in the sonobuoy housing wall;

(e) a soft foam ring loading cushion, bonded to the under surface of the base plate;

(f) a pneumatic-force pusher plate, bonded to the under surface of the foam loading ring and against which the inflating float pushes upward;

(g) a conical cam button, attached to the top of the pusher plate by means of a drive rivet and washer, and attached with its upper, small-diameter cam end interposed between the two latch plates and engaging them both.

This all functions together to provide for the radial retraction of the two latch plates from their engagement in the housing-wall slots in response to the upward motion of the cam, as urged by the float inflation. The upward moving cam bears an ever larger diameter surface against the latch-plate bearing surfaces and so causes them each to be retracted inward, away from their engagement in the housing slots. During the upward motion of the cam against the latch plates, the plates were kept from rising as well by means of the four guide-slot screw heads. During the insertion of this assembly into the sonobuoy housing, the two latch plates are manually retracted, compressing the two wire springs, so permitting the latch tips to be totally free of interference with the housing wall or slots. Once in place, the latchs are released to spring outward into engagement with the housing slots.

20 January 92

Donald R Deper

IN RE SPARTON CORPORATION
ADMINISTRATIVE CLAIM NO. S153
BUOY DEPLOYMENT PATENTS

ATTACHMENT N

AFFIDAVIT OF DONALD R. DEPEW

Donald R. Depew, residing at 5397 Draper Road, Jackson, Michigan 49201, being duly sworn, deposes and says that:

1) I am an employee of Sparton Corporation of Jackson, Michigan. For the past thirty years I have been employed by Sparton in the Electronics Division in Jackson, Michigan. I graduated from the University of Illinois in 1966 with a degree of Bachelor of Science in Mechanical Engineering. I have been engaged in the conceptual formulation and design of sonobuoys for thirty years.

2) In 1971, as an employee of Sparton Electronics, I was a senior mechanical design engineer primarily engaged in preparation of technical proposals relating to sonobuoys.

3) It is my present recollection that, in the early part of 1970, I worked on the preparation of engineering change proposal ECP-465-2 to incorporate dual depth operation capability to the AN/SSQ-53 sonobuoy under Contract N00019-69-C-0465. I have recently examined ECP465-2 and I recognize, as my own work, the drawing identified as "Figure 1 Sonobuoy Packaging Layout." That drawing is a sectional view of the sonobuoy and includes a part labeled "RELEASE PLATE ASSEMBLY."

4) The drawing attached hereto and identified as Exhibit N-1 (one page) is a copy of a portion of Figure 1 of ECP465-2 which includes the part labeled "RELEASE PLATE ASSEMBLY."

A000718

5) The drawing attached hereto and identified as Exhibit N-2 (one page) was made and signed by me on January 20, 1992 with the cooperation of James Widenhofer to depict the plan view and the sectional elevation view of the release plate assembly which is depicted only in sectional elevation view in Figure 1 of ECP465-2.

6) The attached description entitled "Float-Inflation Actuated Release Plate" and attached hereto as Exhibit N-3 (one page) was prepared by me in cooperation with James Widenhofer and signed by me on January 20, 1992.

7) To the best of my knowledge and belief, the drawing attached as Exhibit N-2 and the description attached as Exhibit N-3, taken together, accurately describe the configuration and operating principles of the release plate assembly of ECP465-2.

8) I am not aware of any documents other than Figure 1 of ECP465-2, now in existence, which describe or depict the configuration or operation of the release plate assembly in Figure 1 of ECP465-2. It is my understanding that Sparton personnel have made an exhaustive search to find any such documents and that no such documents have been found.

9) However, Exhibit N-4 (one page) attached hereto is a photocopy of the back side of one full sheet which is dated 3/20/69. This Exhibit also shows the front side of part of the following sheet in the spiral notebook, which is dated 3/21 on its back side. Exhibit N-4 shows, in the part below the spiral binding, sketches which depict a sonobuoy release plate of the water impact type comprising a pair of slide plates which interlock with the sonobuoy casing which

slide inwardly to release the interlock upon water impact. Exhibit N-5 is a photocopy of the front side of the full sheet of Exhibit N-4. (Exhibit N-5 also includes the back side of part of the preceding sheet in the notebook which is dated 3/20/69.) I believe that the sketches shown in Exhibit N-5 were made on 3/20/69 because these sketches are on the front side of a sheet which is dated 3/20/69 on its back side, which immediately follows a sheet dated 3/20/69 on its back side, and which immediately precedes two pages dated 3/21 and 3/21/69. It was my practice to make entries in chronological order in spiral notebooks. The notebook from which Exhibits N-4 and N-5 were copied was found among my personal records in my own search for documents which describe or depict a configuration or operation of the release plate assembly in Figure 1 of ECP-0465-2. All of the sketches and other information on Exhibits N-4 and N-5 are in my handwriting.

10) The sketches of Exhibit N-5 represent a sonobuoy release plate of the water impact type which is similar, in principle, to that of Exhibit N-4. The view immediately below the spiral binder of N-5 is a cross-sectional view showing an inverted cup which would fit into the open bottom end of a sonobuoy casing. Within the cup is a sheet metal, saucer-shaped disk which carries a V-shaped actuator at its center and which "oil cans" from the lower position shown to the higher, over-center position, also shown, when the

sonobuoy impacts the water. The sketch immediately below the cross-sectional view is a plan view of a release plate which comprises two complementary slide plates each of which has two radial locking tabs which interlock with slots in the lower end of the casing at an elevation just below the top inner surface of the cup described above. One arm of the V-shaped actuator is seated against a flat place on one slide plate and the other arm is seated against a flat place on the other slide plate. When the saucer-shaped disk "oil cans" upon water impact, the actuator arms collapse, extending outwardly, to move the slide plates to retract the locking tabs radially inwardly to release the interlock with the sonobuoy casing.

11) The Exhibit N-5 shows that I had knowledge of water impact release plates using complementary slide plates at least as early as March 20, 1969 which was almost two years before the date of submission of the ECP-0465-2, namely March 17, 1971. The release plate of the ECP-0465-2, as shown in Exhibits N-1, N-2 and N-3, operates on the same principle as the release plate of Exhibit N-5 except that the former is actuated by a cam which is moved by the force

of the float inflation whereas the latter is actuated by the arms of the V-shaped actuator which are moved by "oil canning" of a saucer-shaped disk upon impact with the water.

Donald R. Depew
Donald R Depew
Date: 21 February 1992

STATE OF MICHIGAN)
)ss
COUNTY OF JACKSON)

On this 21st day of February, 1992, personally appeared before me Donald R. Depew, to me known to be the person named in and who executed the above instrument, and acknowledged that he executed the same for the uses and purposes therein mentioned.

Judith Anne Camp
JUDITH ANNE CAMP
Notary Public, Jackson County MI
My Commission Expires May 27, 1995

(SEAL)

A000722

EXHIBIT N1




A000723

B0834

A0834




Inflation-Actuated Release-Plate Assembly

A000724

EXHIBIT

## Float-Inflation Actuated Release Plate

This float-inflation actuated release plate comprises:

(a) a base plate, somewhat smaller than the sonobuoy housing ID;

(b) an anti-cocking guide skirt, attached to the bottom of the base plate;

(c) two sliding latch plates, attached by guide screws and included slots to slide radially along the top surface of the base plate;

(d) two wire springs, engaging axial holes in the slide plates and stressed to urge the two plates apart outwardly to engage slots in the sonobuoy housing wall;

(e) a soft foam ring loading cushion, bonded to the under surface of the base plate;

(f) a pneumatic-force pusher plate, bonded to the under surface of the foam loading ring and against which the inflating float pushes upward;

(g) a conical cam button, attached to the top of the pusher plate by means of a drive rivet and washer, and attached with its upper, small-diameter cam end interposed between the two latch plates and engaging them both.

This all functions together to provide for the radial retraction of the two latch plates from their engagement in the housing-wall slots in response to the upward motion of the cam, as urged by the float inflation. The upward moving cam bears an ever larger diameter surface against the latch-plate bearing surfaces and so causes them each to be retracted inward, away from their engagement in the housing slots. During the upward motion of the cam against the latch plates, the plates were kept from rising as well by means of the four guide-slot screw heads. During the insertion of this assembly into the sonobuoy housing, the two latch plates are manually retracted, compressing the two wire springs, so permitting the latch tips to be totally free of interference with the housing wall or slots. Once in place, the latchs are released to spring outward into engagement with the housing slots.

20 January 92

Donald R Deper

B0836

A000725

EXHIB



3-20-

$\alpha = TAN^{-1}(a/b)$ = A... (a/E - ...)

$c - b = .120$ $b = c - .12...$

$a^2 + b^2 - c^2 = 0$

$a^2 + c^2 - .24c - c^2 + .0144 = 0$

$a = .44$

$c = (a^2 + .0144)/.24 = .87$ (a = .44)

.262 ... 22





A000726

B08

EXHIBIT N





B0838

A000727