IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 92-580C |
| THE UNITED STATES, | ) | Chief Judge Edward Damich |
| Defendant. | ) | |

**MOTION FOR LEAVE TO COMPLY WITH THE COURT'S FEBRUARY 20, 2008 ORDER PERMITTING PLAINTIFF TO FILE AMENDED PROPOSED FINDINGS OF FACT REPLACING BATES CITATIONS WITH REFERENCE TO PLAINTIFF'S EXHIBIT NUMBERS**

Plaintiff hereby moves for leave to file its amended proposed findings of fact replacing bates citations with reference to plaintiff's exhibit numbers.

**AMENDED PROPOSED FINDINGS OF FACT**

I. BACKGROUND

A. The Evolution of the Submarine Threat

**1**. World War ("WW") I illustrated the effectiveness of the submarine as an attack vessel. **P171.4, 172.1-.2**. During WW II, the submarine was even more lethal. Id. The German submarine fleet almost single-handedly won the battle for the Atlantic. Id. About a month before the end of WWII, July 26, 1945, the infamous U.S.S. Indianapolis transported the Hiroshima and Nagasaki atomic bombs to the Tinian Island B-29 U.S. airbase. **P239.9-.10**. Four days later on its journey to the Philippines, it was sunk in 12 minutes by a

Japanese submarine. Id. This submarine claimed about 880 U.S. military lives. **P239.10-.11**.

**2.** Since WW II, the submarine has become an important warship in the Soviet Navy. **P174.4-.6, 172.1, 172.12, 173.2-.3, 240.4-.5, 241.45-.56.** Subsequent to WW II, there was a tremendous growth in the Soviet submarine fleet. Id. and **P241.4-.56.** As a result, the Soviet fleet soon had more submarines than any other Navy in the world. Id. Between 1962-1970, the Soviet Union produced many different classes of nuclear powered submarines having submerged missile launch capability with which to destroy targets hundreds of miles away. Id. and **P171.10-.13, 241.31-.43.** For example, the Soviet nuclear powered Yankee Submarine Class contained missiles having a range of about 1,500 statute miles (1 statute mile = 5,280 feet). Id. The Soviet nuclear powered Charley Submarine Class possessed cruise missiles capable of following an electronic map of terrain, flying at a low altitude and destroying a distant target. Id.

**3.** As a result of the capability of its submarines, the Soviets have issued subtle warnings to the U.S. when the Cold War had a tendency to "heat up." **P241.44.** On one such occasion, Soviet General Chervov stated that the Soviets might deploy submarines armed with nuclear missiles 100 miles off the U.S. coast. Id. Traveling time of missiles launched from Soviet submarines a few hundred (or a 1,000)

miles from a U.S. coastline would still be very short. Id. Such a strike would make it difficult for U.S. anti-missile forces to shoot them down. Id. Much worse, it would give the President little time to evaluate the attack and launch a counterattack. Id.

**4.** From the Soviets point of view, placing their submarines close enough to the U.S. coastline is an acceptable response to the deployment of American missiles, such as the Pershing II, close to Soviet borders. **P241.44.** Since the Yankee submarine missile range was about 1500 miles, the placement of a Yankee submarine 100 miles off the U.S. East and West coasts would enable said submarines to attack just about any city or target in the United States. Id.

**5.** Normally, the Soviets have a Yankee Class submarine on patrol off each U.S. (mainland) coastline with a third in transit to or from its home base port. **P241.44.** These submarines are positioned so that they may be close enough to their targets. Each of these submarines carries 16 missiles that can travel up to 3,000 kilometers (~1875 miles) and hit a target within 1,400 meters (~4666 feet or less than a mile).

**6.** The first Soviet Charley Class submarine appeared in 1968 and was able, as was the Soviet Yankee Class, to fire missiles from a submerged position. **P171.10-.13, 210.2-.3.** Boyle. These two submarines illustrated below further

helped fuel the Soviet Cold War threat which further prompted the U.S. Navy to seek a dual depth DIFAR sonobuoy. Id.

**7.** While a submarine's primary strategic role during the world wars was against surface warships and sea born logistic traffic, the evolution of submarine launched ballistic missiles and later cruise missiles has enabled the submarine to perform an even more important strategic role, that of striking at targets in an enemy's homeland. **P171.4-.5, 210.3.** Boyle. Indeed, no spot on earth is now beyond the reach of a submarine launched weapon. Id. Nuclear powered submarines are an underwater weapon system capable of world-wide deployment and destruction. Id. Nuclear powered submarines travel submerged at speeds at least equal to those of attacking surface vessels. Id. In its current role, the ballistic missile nuclear submarine is the ultimate deterrent, while its inherent survivability gives it a virtually guaranteed second strike defense role. Id.

B. The Sonobuoy Answer To The Threat

**8.** The U.S. Navy purchases hundreds of thousands of sonobuoys a year, mainly because they are expendable devices, i.e. they are used just once and thereafter self-destruct through a scuttling mechanism. Boyle, G. Martin, **P57.1-106.1, 107.2, 108.1-.2, 114.1-.2, 210.18-.19**. A sonobuoy is a sophisticated underwater electroacoustic device capable of detecting and locating the source of underwater sounds. Id. It is primarily used to detect, locate and classify submerged submarines. Id. To perform these functions, it is dropped into the ocean from a hunter aircraft or vessel ("the hunter"). Id. The sonobuoy detects underwater sounds, i.e. acoustic energy from a submarine, through the use of a transducer containing a hydrophone, converts them to electrical signals which are then transmitted by the hydrophone to a transmitter located in an electronics housing within the sonobuoy. Id. The sonobuoy transmitter transmits the electrical detection information to an antenna for transmission to the hunter. **P114.2, 176.1**.

**9.** There are three distinct types of sonobuoys. **P111.2-.6, 114.2-.3, 210.3-.4**. The passive sonobuoy is strictly a device for acoustic energy detection and does not reveal its presence to the hunted submarine. Id. A passive sonobuoy can detect with its hydrophone(s) the presence of even the most modern submarines at great distances and transmits this

detection information to the hunter. Id. The active sonobuoy is a miniature sonar system similar to those installed on ships. Id. The active sonobuoy uses a transducer that can transmit acoustic signals into the ocean through a projector and receive through its hydrophone(s) acoustic energy underwater. Id. The active sonobuoy transmits short pulses of sound into the ocean and locates the presence of a submarine by detecting the return pulses reflected by the target. Id. These return pulses are transmitted to the hunter and are used to measure the time taken for the pulses to reach the target and return to the sonobuoy. Id. From this time measurement, accurate distance information is computed. Id. The third type of sonobuoy is a special purpose type sonobuoy. Id. This sonobuoy type may measure the temperature of the ocean at various depths to determine the location of thermoclines (i.e. density-pressure and/or temperature differences between oceanic layers). Id. Instead of listening for acoustic energy with a hydrophone(s), like the passive or active sonobuoy, this sonobuoy may contain a probe for sensing water temperature and transmitting the temperature reading to hunter aircraft. Id. Generally speaking, the passive sonobuoys are used to detect the submarine target; then, the active sonobuoys are used to attack it. Id. and **P111.5, 114.2-.3.**

**10**. The AN/SSQ-53 ("SSQ-53" or "DIFAR") class sonobuoys are passive and called DIFAR sonobuoys because they are DIrectional Frequency Analysis and Recording devices. **P111.3, 114.2-.3, 176.6-.9, 210.3-.4**. Earlier types of passive sonobuoys had no useful directional sense. Id. A submarine could only be located by deploying patterns of three or more sonobuoys in a given area and plotting signals from all in an airplane or ship. Id. The location of a submarine was then derived through geometry. Id. This process was time consuming and was not effective against high speed submarines that could "run away" from the sonobuoy before the "location" process was completed. Id. Beginning with fleet use of SSQ-53 sonobuoys, which contained a built-in compass, an omnidirectional hydrophone and a directional hydrophone, the U.S. fleet was able to obtain detection and bearing information from a single SSQ-53 sonobuoy. Id. A pair of SSQ-53 sonobuoys provided the specific location of a targeted submarine. Id.

**11**. The SSQ-36 is a special purpose sonobuoy which determines a profile of ocean temperature and permits aircraft crews dropping their sonobuoys to plan search patterns based on these oceanic temperature readings. **P114.3, 111.2**.

**12**. The SSQ-62 class sonobuoys are active, commandable ones which provide range and bearing information about a target

submarine. **P111.5, 114.2-.3.** They are called DICASS sonobuoys, the acronym standing for Directional Command Active Sonobuoy System. Id. When this sonobuoy is deployed, it remains passive until commanded to an active function by an ASW aircraft. Id. This sonobuoy is used to provide simultaneous range, Doppler and bearing information for localizing and attacking subsurfaced targets. Id.

**13.** The SSQ-57 class sonobuoys are passively used to measure target submarine sound and ambient noise levels which assist aircraft personnel in the planning of a submarine search pattern. **P111.4, 114.3.**

**14.** The SSQ-77 class sonobuoys are passive also. **P111.6, 114.3.** These sonobuoys provide improved passive detection in deep water because they are highly sensitive. Id. To achieve this sensitivity, these sonobuoys use a vertical line array of omni-directional hydrophones which form directional beam patterns to increase detection range and help discriminate against noise. Id. They also utilize a standard DIFAR hydrophone to determine the bearing of detected submarines. Id. Thus, the passive SSQ-77 class sonobuoys are more effective than the passive SSQ-53 DIFAR sonobuoys in deep ocean areas. Id.

**15.** Prior to the development of the Sparton patented inventions, the deployment of the electronic or electrical receiving devices (e.g., hydrophone(s) within transducer(s))

contained within active, passive and special purpose production sonobuoys was through the bottom end of these sonobuoys. **P210.4.**

C. Sound Waves In The Ocean

**16.** Although sound waves propagate in the ocean, they are also absorbed (attenuated) by the ocean, with high frequencies being absorbed at a faster rate per unit distance than low frequencies. **P176.3.** There are varying factors which affect the propagation of sound waves in the ocean. Id. Among these are weather changes, density changes affected by changes in water pressure and/or temperature, water salinity changes, subsurface currents, changing ocean floor topography and the existence of macro and micro-organisms in the ocean. Id. Density changes in the oceans at the thermoclines, i.e. a thermocline is the interface between two or more layers of sea water each having different temperatures and thus densities, have a major influence on sound propagation and antisubmarine warfare (“ASW”) as they affect the velocity and direction of sound propagation. Id. The velocity of sound reaches a minimum in the permanent thermocline in the oceans, which may be found at depths hundreds of feet below the surface of the ocean. Id. Sound propagation in the ocean depths is reflected or refracted when sound waves strike a thermocline. Id. Thus, a submarine can remain undetected if traveling below or in a

thermocline if the detecting device is located above the thermocline. **P168.9-.16, 174.9-.17, 176.3, 210.4-.6**. Submariners learned quite well how to manage this information so as to hide their boats in and under the thermoclines. Id. The illustrations below show the reflection or refraction of sound waves as they strike a thermocline. **P171.6-.9**.

D. The Navy’s Need for a Dual Depth DIFAR Sonobuoy

**17.** Captain Peter Huchthausen, U.S. Navy retired, served aboard navy destroyers involved in ASW operations and search and rescue operations for the lost submarine USS Thresher.

**P242.1.** He participated in the Cuban Missile Crisis blockade, and his ship, the USS Blandy, forced a Soviet submarine to surface in the height of the Cuban Missile Crisis. Id. He also served as Chief Engineer aboard the destroyer USS Orleck and operated off the coast of Vietnam. Id. He commanded a River unit of ten river patrol boats in combat on the Mekong River. Id. He served as a Soviet naval submarine analyst and in ASW warfare positions on the staffs of Naval Forces Europe, the U.S. First and Third Fleets, and the Commander in Chief Pacific. Id. He was assigned as the

senior U.S. Naval Attaché to Yugoslavia and Romania and subsequently became the chief of attaché and human intelligence collection operations in Western Europe for the Defense Intelligence Agency. Id. He served three years in Moscow, 1987-1990, as the senior U.S. Naval Attaché to the USSR during the years immediately preceding the fall of the Soviet Union. Id.

**18.** Captain Huchthausen was personally knowledgeable of (a) the use by the Soviet submarines and U.S. ASW forces during the Cuban Missile Crisis of the hide and seek tactics employed by them vis-à-vis the thermocline layer and (b) the inability of U.S. ASW forces to detect one or more of these Soviet submarines sailing at deep depths, i.e. below the thermocline layer. Captain Huchthausen wrote a book, entitled "October Fury," about these hide and seek tactics. **P242.1-243.50**.

**19.** By September 1962, the Soviets, pursuant to a mission called Anadyr, installed ballistic missiles with nuclear warheads in Cuba causing the U.S. to create a naval blockade of Cuba preventing further Soviet military shipments from landing in Cuba. **P242.4, 243.9, 243.29.** Soviet Admiral Rybalko supervised the naval part of that mission, called Kama. Id. Pursuant to this mission, four Soviet Foxtrot attack submarines, each armed with a nuclear tipped torpedo, were to (a) covertly proceed to Cuba to reconnoiter

approaches to Cuba, (b) log acoustic conditions in these approaches and (c) enter the Cuban Port Mariel to make preparations for the arrival of seven ballistic missile submarines to home base there. **P243.4, 243.6.** The B-4, B-36, B-59 and B-130 Soviet submarines departed the Soviet Union for Cuba on October 1, 1962 to perform their covert mission. **P243.13-.18.** On October 20, 1962, two days before President Kennedy ordered the Cuban blockade, their mission changed, and they were ordered to curtail transits to Port Mariel and take combat patrols in the Sargasso Sea off the Islands of the Bahamas. **P243.27-.29.**

**20.** U.S. ASW forces in the Caribbean responsible for implementing the Cuban blockade consisted of carrier groups comprising destroyers and aircraft. **P243.10-.12.** The four Soviet attack submarines contained diesel engines, and as a result, they were required to snorkel or surface from time to time to recharge their batteries. **P243.13-.18.** The art of ASW, including the effect of a thermocline upon sound propagation and submarine detection above and below it was well understood by U.S. ASW and Soviet forces. **P243.10-.12.**

**21.** At the Caicos Passage near Cuba, the B-36 submarine settled below a thermocline to avoid acoustic detection until a Norwegian tanker ship arrived at which point the B-36 submarine slipped under the tanker to further avoid detection through the Caicos Passage. **P243.22-.26.** After

the tanker sailed away, the B-36 continued on its journey. **P243.25-.26.** On October 29, 1962, the B-36 was traveling 400 miles north of San Juan Puerto Rico in Caribbean waters having a constant temperature to depths of a 100 meters which made it difficult to hide under the isothermic layer. **P243.31.** The B-36 had plotted the hydroacoustic conditions, i.e. water temperature at various depths, to plot the thermocline layer. Id. As a result, the USS Cecil destroyer, which was the escort for the carrier USS Randolph, was able to detect the B-36 submarine because the isothermic layer was below 300 feet and that depth was too deep for a submarine to hide beneath. **P243.35.**

**22.** On October 31, 1962, the B-36 submarine was forced to surface, thereby not achieving the secrecy required of its mission as a result of being unable to hide below the isothermic layer. **P243.35-.40.** After remaining surfaced for two days, the B-36 submarine escaped by diving below the thermocline and resumed its patrol. **P243.40.** While on patrol, it went to periscope depth, only to determine that USS ships were near. Id. The B-36 descended below the thermocline layer and drifted off not being further detected. Id. It was ordered to return to the Soviet Union on November 7, 1962. Id.

**23.** The B-59 submarine initially sailed from the USSR at a deep depth to avoid detection on its journey to Cuba and

only surfaced to charge its batteries. **P243.20.** On October 29, 1962, the B-59 submarine was about 380 miles southeast of Bermuda and had no isothermic layer to hide beneath, inasmuch as it was traveling 60-100 meters below the surface, when it had to charge its batteries. **P243.31-.33.** It was detected by the USS carrier Randolph which had one of its escort destroyers, the USS Cony, track the B-59 submarine for 12 hours. Id. The B-59 submarine was forced to surface, thereby not achieving the secrecy required of its mission as a result of being unable to hide below the isothermic layer. Id.

**24**. On October 30, 1962, the USS Blandy destroyer, on which was Ensign Peter Huchthausen was located, was sailing 300 miles northeast of the Caicos Passage, east of Cuba and north of Haiti, when it received a message from a U.S. P3 aircraft that it had radar and visual contact of the B-130 submarine. **P243.41**. The B-130 determined that a U.S. destroyer had detected it, and as a result, it dove to 150 meters which was well below the thermocline layer it had measured when it was at 75 meters. **P243.41-.42**. By plotting the thermocline line and sailing beneath it where sound waves were refracted differently, the B-130 believed that its 150 meter depth would render it partially or completely invisible to the U.S. destroyer’s sonar, the SQS-23, which was actively scouring the ocean depths for the B-130.

**P243.43.** The B-130 then held depth at 120 meters and drifted for hours while the destroyer circled two miles away. Id. The USS Blandy had classified its contact with the B-130 as a Soviet Foxtrot submarine. **P243.44.** The B-130 was finally forced to surface by the USS Blandy after the B-130 suffered casualties to all three diesel engines and only had one of them working with reduced power. **P243.45.** The USS Blandy had held the B-130 submerged for almost 17 hours and upon the surfacing of the B-130, the USS Blandy escorted the B-130 for an additional 24 hours. **P243.45-.46.** The B-130 was instructed by Moscow to rendezvous with a rescue tug and return home since it could no longer submerge with its malfunctioning engines. **P243.45.**

**25.** The B-4 submarine had passed through the Windward Passage between Cuba and Haiti on October 20, 1962 when it received the order to abort its transit to Port Mariel in Cuba and instead assume covert combat patrol. **P243.47.** The B-4 hid below a thermocline layer on its journey into Cuban waters through the Sargasso Sea off the Islands of the Bahamas. **P243.28, 243.47.** Then after passing through the Windward Passage between Cuba and Haiti, the B-4 headed south and around the southeastern point of Cuba to avoid contact with a host of U.S. ASW warships in the area. **P243.48.** On November 2, 1962, an S2F Tracker aircraft from the USS Independence carrier group and a helicopter obtained

radar contact on the B-4. Id. While the B-4 surfaced momentarily to receive orders from Moscow, a U.S. P2V aircraft detected the surfaced B-4. **P243.49.** The B-4 immediately submerged to a hundred meters to evade further detection by the aircraft. Id. After a few hours, the B-4 sailed at a depth of 60 meters which was just below the thermocline layer as plotted by the ship's navigator. **P243.50.** The thermocline layer had given them acoustic protection. Id. Despite all the sonobuoys being dropped to detect and locate the B-4, the U.S. lost contact with the B-4 and was unable to detect it again either on radar or with sonobuopy patterns. Id. When the B-4 was safe from detection, it surfaced to charge its batteries and resumed covert combat patrol. Id. The B-4 used a new RG-10 passive sonar to obtain early and greater range detection of U.S. shipping than its normal acoustic systems were capable of obtaining. Id. Whenever a U.S. ship came close to it, the B-4 descended to 120 meters below the thermocline layer to prevent detection. Id. The B-4 was the sole submarine that was not forced to surface by U.S. forces during the Cuban Missile Crisis as a result of its ability to avoid detection by hiding below the thermocline layer. Id. On November 20, 1962, the B-4 received orders to return home. Id.

**26.** About 2-3 years after the Cuban Missile Crisis, Magnavox and Sanders Corporations ("Magnavox and Sanders") were

selected by the Navy in the 1964-65 fiscal year time frame to design and develop the SSQ-53 sonobuoy. This development spanned a 3-4 year time period. Production of the SSQ-53 sonobuoy first occurred in fiscal year ("FY") 1968. Sparton was added by the Navy as an SSQ-53 third supplier in FY 1969 by virtue of contract N00019-69-C-0465 ("the 0465 contract"). **P2.1-3.16, 152.22.**

**27.** The SSQ-53 was the first production passive sonobuoy providing the Navy with both target detection and bearing information from a single sonobuoy. **P210.4.** The U.S. naval fleet was provided with production SSQ-53 sonobuoys and, upon using them at their deployed depth of 90 feet, recommended that they include a dual depth capability, i.e. the deployed hydrophone(s) functioning at a shallow 90 foot or deep 500 or 1,000 foot depth (below the 300 foot thermocline). **P120.1-.15.** The Naval Air Development Center ("NADC"), the Navy's sonobuoy research and development arm, had conducted theoretical studies and sea tests which confirmed that a deeper hydrophone would result in an improved submarine detection capability. **P120.4.**

**28.** According to the Navy, as told to its defense contractors at National Security Industrial Association ("NSIA") meetings, the Soviet Union had developed technology for rapidly sending submarines deep below the oceanic thermocline located hundreds of feet below the oceanic

surface. **P168.9-.16.** Sonobuoys deployed at a depth of 90 feet either could not detect or obtained reduced detection of these Soviet submarines because the thermocline, located between the targeted submarine below the thermocline and the deployed sonobuoy above the thermocline, prevented or impaired the transmission of submarine acoustic signals through the thermocline to the sonobuoy.[1] Id. A failure to rapidly and accurately detect these new, fast, deep diving Soviet submarines posed a national security threat the U.S. Navy needed to counter. Id.; **P210.6.**

**29.** The problem of obtaining a rapidly deploying deep depth sonobuoy persisted for years. **P120.4, 168.9-.16, 210.6.** The U.S. sonobuoy contractors were aware of it. Id. The U.S. Navy finally funded the three contractors manufacturing the SSQ-53 sonobuoy to solve the deep depth rapid deployment problem. **P120.4, 120.12.** The Sanders Associates and Magnavox Company were the original manufacturers of the SSQ-53 sonobuoy. Id. They attempted to solve the problem through conventional techniques. **P120.1-.15.** They lengthened the existing cable connecting the electronics to the upper part of the sonobuoy so that the electronics would deploy to a 1,000 foot depth. Id. Deployment of the electronics within the sonobuoy was effectuated through the lower end of the sonobuoy. Id.

[1] Underscoring is for emphasis supplied unless otherwise indicated.

**30.** On the other hand, Sparton, the third SSQ-53 manufacturer, recognized that this purported solution was ill advised. **P120.4** Rapid deployment was unobtainable with this approach. By the time the electronics deployed to depth under this purported solution, the submarine to be detected would have sped away, thus evading detection. **P168.9-.16, 210.6-.8.** Accordingly, the primary factor to the solution of developing a deep depth sonobuoy was the speed at which the sonobuoy could deploy its electronics. Id. Sparton departed from conventional wisdom and was the company which developed a rapidly deploying deep depth sonobuoy. Sparton solved one of our country's most pressing Cold War ASW problems. Id. That solution formed the basis of the two patented inventions in suit. Id.

**31**. As a result of U.S. fleet recommendations, NADC theoretical studies and sea tests, the Naval Air Systems Command ("NAVAIR"), the Navy's sonobuoy contracting arm, granted an Engineering Change Proposal ("ECP") at about the same time (FY70-72) to each of its three SSQ-53 producers, to supply the Navy with 500 buoys deployable at 90 or 500 feet (Magnavox), 300 buoys at 90 or 1000 feet (Sanders) and 300 buoys at 90 or 1000 feet (Sparton). **P120.4, 120.12, 177.11-.12.** The ECP effort with Sparton occurred under the 0465 contract as ECP 0465-2. **P120.12.** The U.S. Navy determined that 1,000 feet was an optimum deep depth for the

operation of its SSQ-53 sonobuoy. The Navy decided to remove Sanders from its mobilization base of qualified SSQ-53 suppliers when Sanders was unsuccessful in developing the deep depth deployment function in its SSQ-53 sonobuoy (which already contained a 90 foot shallow depth deployment function) under its ECP. **P152.22**.

**32**. Notwithstanding Sanders' failure, Sparton's ECP program was a huge success. Sparton's developmental ECP program led to deliveries in April and June 1972 (at about the same time the other contractors delivered their sonobuoys) of a developmental quantity of 300 dual depth sonobuoys with which the Navy was "extremely pleased," a specification and nomenclature change (from SSQ-53 to SSQ-53A) and the commencement of pilot production in FY74 under a follow-on contract N00019-72-C-0585 ("the 0585 contract"). **P53.1-.2, 136.1-.54, 155.22-.23, 177.11-.12**. The Navy concluded that "[t]he AN/SSQ-53A was developed as a part of a Product Improvement Program by Sparton in FY72 [ECP 0465-2]and limited production quantities were awarded solely to Sparton in FY74 and FY 75 [0585 contract]." **P152.22-.23**. The SSQ-53A was Sparton's dual depth sonobuoy and became the Navy's first dual depth DIFAR sonobuoy purchased to combat the Soviet nuclear submarine threat during the height of the Cold War and end of the Viet Nam War. **P210.6**.

**33**. Although the ECPs were issued and performed by the SSQ-53 producers, FY 1972 funding limitations prevented the Navy from entirely funding the "previously authorized SSQ-53 product improvement program," which involved "non-recurring" (engineering) costs with the three SSQ-53 producers. B776, 506, 778. In this regard, Sparton expended a substantial amount of its own funds to develop this new dual depth sonobuoy in the interests of national security to counter a threat perceived by our Navy. **P170.1-.4, 110.1-.3, 210.6**.

II. SPARTON EVENTS LEADING TO AND THROUGH THE ECP

A. Sparton's Deep Depth Sonobuoy Program

**34**. Sparton established a DIFAR research and development company sponsored program in the mid 1960s. **P175.1-.3, 210.6**. This program was soley funded by Sparton to assist in its efforts to obtain a Navy contract for the production of the SSQ-53 sonobuoy. Sparton obtained this contract in March 1969 in the form of the 0465 contract. **P2.1-.4, 210.7**.

**35**. Sparton was informed by the Navy in the mid-late 1960's or early in 1970 of its dual depth need and the reason which created it. **A109-112**. The 0465 contract executed March 5, 1969 was a fixed price supply contract which required Sparton to provide the Navy in the first program year with 50 SSQ-53 sonobuoys for first article testing, 1,600 SSQ-53 sonobuoys subjected to production sampling aircraft drop

tests prior to delivery for typical fleet use (with a Federal Stock Number to be assigned to them), and 200 technical manuals. In the second program year, Sparton was required to supply the Navy with 9,600 production SSQ-53 sonobuoys provided that the first article testing of Sparton's SSQ-53 sonobuoy was successful. **P2.1-.4.** Successful first article testing was required for and triggered the commencement of production. **P3.7-.16.**

**36.** The 0465 contract contained a security classification specification, DD Form 254, which indicated that any information relative to the following subjects was classified, such that its disclosure to the public was prohibited by law, 18 U.S.C. §793-94: detection range and reliability, bearing range, military application of sonobuoy and technical advances in the state of the art. **P2.1-3.16, 155.3, 157.4-158.4.** The 0465 contract did not contain a Patent Rights Clause. Id.

**37.** Between the late 1960s and early 1970, Sparton mechanical design engineer Widenhofer conceived of an idea for rapidly deploying the SSQ-53 DIFAR sonobuoy to a deep depth by using (a) the top end of the sonobuoy as an exit for deployable sonobuoy internal components, (b) a release plate mechanism actuated by a force imparted by a float assembly to either retain or deploy the sonobuoy internal components within or from the sonobuoy housing, and (c) the

sonobuoy housing as a descent vehicle to assist the rapid deployment of sonobuoy internal components to a deep depth. The idea was called an "inverse" or "upside-down" deployment design because all production sonobuoys up to that time routinely contained release plate assemblies located at the bottom of the sonobuoy to deploy sonobuoy components from the bottom end of a sonobuoy. The "upside-down" design completely departed from convention wisdom in the manner by which sonobuoy components should be deployed. **A205-08, P6.3-.13, 210.6-.8**.

**38**. On September 16, 1970, Sparton project engineer Devereaux issued a memorandum to his superior, lab manager Hungerford, which outlined a program schedule under company sponsored Job number 7400 for developing a 1,000 foot DIFAR sonobuoy. The proposed schedule concerned design modifications required for providing a deep 1,000 foot capability for the SSQ-53 sonobuoy. The major redesign areas were the hydrophone, electrical and mechanical sections. The mechanical design changes were considered the most extensive and required the greatest effort. **P7.1-.2**. This program was called a "Deep DIFAR" sonobuoy program because Sparton had already developed and produced the SSQ-53 sonobuoy for shallow depth operation. With a solution to rapid deployment for deep operation, Sparton would then

have a DIFAR sonobuoy capable of shallow or deep depth operation, i.e. a dual depth DIFAR sonobuoy. **P210.7-.8**.

**39**. The program schedule required the fabrication of six (6) dummy hydrophone engineering models and twenty (20) final hydrophone engineering models to be designed and constructed between December 13, 1970 and January 31, 1971. The preliminary mechanical design was to commence on November 1, 1970 and be completed by January 17, 1971. A drop test of six (6) mechanical dummy sonobuoy models was to occur on November 22, 1970, redesign was to follow and another drop test of fully operational models was to occur on January 10, 1971. Although the mechanical design was to be completed by January 17, 1971, the 20 engineering models constructed to that design were to be assembled and tested by February 21 and March 7, 1971, respectively. **P7.1-.2**.

**40**. On October 21, 1970, Devereaux informed Hungerford that it was not feasible to incorporate a battery package in Sparton's deep DIFAR sonobuoy to perform at a 1,000 foot depth and yet operate over an eight (8) hour period. Thus, battery life for this sonbouoy had to be shortened in any proposal to the Navy. **P8.1**.

**41**. On November 11, 1970, Sparton chief engineer Passman issued a memorandum to Hungerford addressing a proposal to be made to the Navy for a dual depth SSQ-53 DIFAR sonobuoy. Sparton's technical proposal for this dual depth SSQ-53

sonobuoy was to (a) contain manually selectable hydrophone depths of 90 and 1,000 feet, (b) tabulate equipment specification changes and additions, (c) be hardware oriented, (d) contain a layout and a diagrammatic assembly drawing identifying the location and function of all significant subassemblies, (e) avoid detailing parts and subassemblies in order to maintain flexibility of design, (f) emphasize common use of many critical items of the existing SSQ-53 sonobuoy, including the directional and omni-directional hydrophones, subsurface suspension system, and VHF transmitter, (g) state that the directional hydrophone had already been tested at pressures in excess of that required for 1,000 foot operation, and (h) indicate that only minor changes in the construction of the subsurface electronics housing was required to withstand the additional pressure involved in a 1,000 as distinguished from a 90 foot deployment. In describing the mechanical design approach, Passman wanted Sparton's proposal to emphasize the necessity for improvement in space utilization to accommodate additional cable and "the need for insuring rapid deployment [of components] to depth," with "no sacrifice in mechanical function and deployment reliability." The proposal was to include the following items: "(a) Introduction[,] (b) Scope of work[,] (c) Technical approach, electrical[,] (d) Technical approach,

mechanical[,] (e) Specification changes[,] (f) Proposed schedule (bar chart)[,] and (g) Related experience[.]" Sparton mechanical design engineer Depew was assigned the responsibility to prepare the technical mechanical description section of Sparton's proposed dual depth sonobuoy. **P162.1-.2**.

**42**. The scope of work to be contained in the Sparton proposal was to be divided into three major phases, each separately priced: "(a) Design, including six engineering models and sea test[,] (b) Qualification, including CD [contractor demonstration] tests, preproduction approval, manufacturing drawings, hand-book and design data items (MIL-D-18300)[,] and (c) Rebuild and deliver one production lot (500) of AN/SSQ-53 sonobuoys." In all three phases of the program it was assumed that GFE buoys were to be utilized from current production contracts. Sparton's schedule for completion of the proposal and estimate was as follows: (a) bill of material and sketches by November 16, 1970, (b) written material for proposal by November 16, 1970, (c) engineering estimate sheets by November 18, 1970 and (d) proposal and prices for delivery to the Naval Air Sea Center ("NASC") by November 30, 1970. **P162.2**.

**43**. A dual depth sonobuoy proposal was prepared by Sparton and was reviewed by NADC employee Graff. B963-65, 1012-51. That proposal contained a confidentiality legend which

prevented a disclosure of its contents by the Navy to any member of the public. **P179.1-.16, 210.8**.

**44**. On December 2, 1970, Widenhofer issued a memorandum to his superior Devereaux relating to a proposed test program for the Sparton 1,000 foot DIFAR preliminary mechanical design. The purpose of the test program was "[t]o evaluate the performance of the proposed inverse sonobuoy package with particular reference to the float pressure activated release plate design." Other areas of interest were "...the air deployment and subsequent descent with parachute and the deployment of various subsurface components of the sonobuoy." Six air deployable sonobuoys, which were mechanically operational only, were to be tested. The quantity of signal cable and the length of the suspension system were selected to permit deployment of components only to a depth of 75 feet. The sonobuoy was configured so that the total depth of the deployed unit would not exceed 65 feet. Widenhofer noted that testing in shallow water (65-75 feet) would "...maximize the evaluation of the float pressure activated release plate[,] [but would] limit the objectives for testing the 1,000-foot design." **P10.1-.2**.

**45**. The following personnel and equipment were required by Sparton from the Navy to conduct this proposed test because Sparton did not possess them: (a) one aircraft equipped with sonobuoy launchers; (b) an aircraft mounted high speed movie

camera; (c) one boat and crew; (d) divers with underwater still cameras; (e) a boat deck located high speed movie camera; (f) one Q-57 (or other passive) sonobuoy, and (g) receiving equipment for the Q-57 sonobuoy (to monitor squib fire). **P10.1.**

**46.** On December 20, 1970, Widenhofer issued a memorandum indicating that on December 19, 1970, Sparton had tested six experimental sonobuoys, mechanically operational only (no electronics or a hydrophone were included), in shallow water at the Navy's facility in Key West, Florida. These sonobuoys contained a Sparton deep DIFAR preliminary mechanical design. NADC personnel John Tenuto, Al Waynich and Bill Myers witnessed the test. Although no underwater photographs were taken during the test (because the water was murky) and no squib times were available, Widenhofer indicated that sonobuoy units 1 through 4 performed as intended (although unit 2 had a soft float), unit 5 lost its subsurface electronic unit and suspension system (as a result of a badly tied strain relief) and had a soft float, and the parachute on unit 6 did not deploy (although the release plate actuated to support the surface unit). **P11.1-.4.**

**47.** A multipiece spider release plate mechanism was incorporated by Widenhofer within the sonobuoys tested on December 19, 1970 and an illustration thereof is shown

below. A description of the construction and operation of the sonobuoys tested on December 19, 1970 is also contained below, except that the hydrophone and electronics referred to therein were not contained in the sonobuoys tested on December 19, 1971. **P160.1-.7**.

**48**. On February 26, 1971 Widenhofer issued a memorandum addressing a February 18, 1971 airdrop test of Sparton's preliminary deep DIFAR sonobuoy design at Key West, Florida. The purpose of this test was "[t]o evaluate the present mechanical and electrical designs prior to constructing a final engineering lot of twenty sonobuoys intended to demonstrate an acceptable design for a deep DIFAR." Naval personnel present during the test were John Tenuto and Al Waynich. Six fully operational sonobuoys were airdropped during this test. All six sonobuoys contained the Widenhofer multipiece spider plate mechanism. Four out of six of these sonobuoys tested on February 18, 1971 failed when cables therein snapped causing the lower electronics units attached thereto to fail and sink to the ocean floor. Although Widenhofer considered this a "serious problem," he also considered it to be "...a correctable malfunction of the cable spool...[and noted that] the problem is still being investigated." Widenhofer concluded in this memorandum that "[t]he objective [completion of a preliminary design, not the testing of the 20 sonobuoys to

determine the workability of the design] of the two 6 sonobuoy engineering tests has been achieved.” **P13.1-.8**.

**49**. A description of the construction and operation of the sonobuoy tested on February 18, 1971 is as follows and refers to the three figures which follow: The sonobuoy consists of numerous parts and assemblies all stowed within a cylindrical casing (1). The casing is closed on the lower end and serves as a descent vehicle. The lower end is provided with a weight (2). A directional hydrophone and an omnidirectional hydrophone (22) are located adjacent to the bottom end weight. The subsurface electronics assembly (23) is positioned above and adjacent to the hydrophone elements. A damper element and associated compliant cable subassembly (24) is located between the subsurface electronics assembly and a cable spool wound with flexible cable (25). A sea water activated battery (26) that provides power to the electronics assemblies and a sea water activated squib battery (18) that activates the float inflation system is intermediate the surface electronics assembly (3) and the cable spool. Underwater acoustic signals transduced to an electrical analog by a hydrophone are imparted to the subsurface electronics assembly and then are transmitted, by a line driver, to the surface electronics assembly, which contains a VHF transmitter, by means of a signal path existing through the compliant cable, the flexible cable

wound on the cable spool and its extension (27) through the bulkhead (28) at the bottom of the surface electronics assembly. There is a flexible wire interconnection between the bottom of the surface electronics assembly and the VHF transmitter. Radio frequency ("RF") energy is coupled from the VHF transmitter to the base of the antenna (29), which is located within the float assembly, by a flexible coaxial cable (30) located above the VHF transmitter and below the float assembly. An RCA phone plug and socket (31) facilitate connection of the flexible coaxial cable to the transmitter output.

A surface electronics/float assembly (3) resides near the upper end adjacent to the release mechanism (21. A parachute (4) and parachute release device (5) reside above the release mechanism. The float (6) is stowed within and is attached to the surface unit by means of a collar (7) which is a necked down portion of the surface electronics housing. The float cup (8) is positioned over and around the float. The closed end of the float cup is attached to a piston (9). The piston is guided and held in place by a support plate (10) and a milled plate (11). The two plates are separated by a load spring (12) which allows for variations in the length of the subassemblies that are contained within the sonobuoy casing. A spider plate with a central ring (13) resides on the shoulder of a piston (15).

The spider plate is made from cold rolled steel. It has three long narrow legs attached to and extending radially from the central ring. The legs have large tensile strength along their length axis but are drawn easily in a direction perpendicular to the plane that contains the three legs. An enlarged end on each of the three legs engages with a key hole feature in each of three latches (16). The latches are located in positions such that they each retain a fiber housing (22) and extend through and engage the sonobuoy casing. The arms of the spider plate (17) are located above the milled plate. The radius plate in conjunction with the milled plate capture the spider plate and associated latches in a sandwich like fashion. The radius plate has a center hole with a large radius on the side adjacent to the spider plate.

When the Deep DIFAR sonobuoy is deployed into the ocean, sea water causes the sea water squib battery (18) to be activated which in turn fires a squib actuated bottle piercing mechanism (19) that results in the opening of two $CO_2$ bottles (20) causing $C0_2$ to inflate the float. As the float inflates, pressure is applied to the float cup (8) resulting in upward movement of the float cup and the attached piston (15). As the piston passes through the hole in the radius plate, (17) the thin arms of the spider plate are drawn around the radius. Continued upward movement of

the piston results in the spider arms and attached latches moving inward until the latches (16) disengage from the sonobuoy casing, whereupon the release mechanism along with the parachute housing and attached parachute are forcefully ejected. This action permits the surface electronics assembly to exit through the top end of the casing, and the casing with the balance of its contents descend to operating depth whereupon the casing is shed and the subsurface components assume their operating configuration. **P160.1-.7.**

**50.** In four of the six sonobuoys tested on February 18, 1971, the following sonobuoy components did not function properly: “signal receiving and transmitting apparatus” and “flexible cable means”. **P13.1-.8, 210.9-.10.** The February 18, 1971 sonobuoys did contain a “signal receiving and transmitting apparatus” (in the form of a hydrophone and its electronics for converting acoustic signals to electrical ones and transmitting them to a vhf transmitter for conversion to radio frequency signals and then transmitting them to an antenna for radiation to an aircraft/boat) and “flexible cable means” (in the form of cables, coils and wires connecting the “signal...apparatus” with an inflatable float). Id.

**51.** On March 8, 1971 Widenhofer issued a memorandum indicating that a proposed test program was developed by Sparton for evaluating descent vehicle characteristics of its deep DIFAR sonobuoy at the Naval Ordnance Laboratory

("NOL") 100 foot tank facility. The purpose of the test program was to evaluate the "serious" "cable break problem" experienced during the February 18, 1971 test by identifying "the cause of the cable breaks" and "...evaluat[ing]...modifications intended to correct the problem." This evaluation was justified on the basis that "...the cable breaks are not due simply to a 'cable pack problem.'" Widenhofer also acknowledged that Sparton did not possess the facilities required to evaluate "...these type of problems as they require "[a] deep tank of large diameter with view ports and movie camera coverage for the full depth." He also acknowledged that sea tests were of limited value because movie coverage of deployment during sea tests was "impossible." **P13.2, 14.1-.3**.

**52**. In another March 8, 1971 Sparton memorandum concerning the evaluation of the "cable break problem," Widenhofer noted that "[t]he unique nature of the deep DIFAR design invites a close scrutiny of all conceivable cable break possibilities in an attempt to better understand the peculiarities inherent in the inverse approach to sonobuoy design." **P15.1-.10**.

**53**. As a result of the "serious" cable pack problem, an updated schedule for the completion of the Sparton deep depth DIFAR program, Job 7400, was prepared by Devereaux for his superior Hungerford on March 16, 1971. This updated

schedule was necessary for two reasons: first, the test data for the final 20 sonobuoy units had not been taken and was contingent on Sparton's making of necessary arrangements with VAST, the Navy's facility contractor, at St. Croix; and second, the NOL test was required to be added to the schedule "...due to the design uncertainties related to the cause of cable failures during the Key West drop tests." Devereaux believed that the completion of the preliminary mechanical design would occur on April 4, 1971, with the building and testing of the 20 engineering models occurring between April 11-25, 1971. **P16.1-.2**

B. Sparton's March 17, 1971 ECP
And Mod. 4 To The 0465 Contract

**54.** On or about March 17, 1971 Sparton submitted to the Navy a letter and enclosed engineering change proposal for an experimental test program which would result in Sparton's supply of 300 sonobuoys to the Navy "for test and evaluation[.]" These sonobuoys were not intended for normal fleet use. **P210.10.** Sparton proposed to perform a 7-1/2 month program which would accomplish the following:

> The redesign, modification and test of engineering models to verify feasibility of design approach. Sparton's method of adding the dual depth capability is outlined in the enclosed ECP.
>
> Modify and deliver 300 units in accordance with conditions described in the enclosed ECP.

In order to construct and test the engineering models and deliver the 300 modified units per the ECP, Sparton requested 335 completed (GFE) SSQ-53 units to be made available from the 0465 contract. **P5.1-.2, 155.2-.3.**

**55.** The formal ECP 0465-2 attached to Sparton's March 17, 1971 letter justified the requested change by indicating that "[t]his proposed change will add the capability to the AN/SSQ-53 to operate at 1,000 ft. depth as well as 90 ft." Sparton completed the "Developmental Requirements" section of the ECP by recommending "...that 300 completed AN/SSQ-53 units be modified as described in the proposal and submitted for test and evaluation." Sparton noted that it knew of no "Alternative Solutions." Importantly, production effectivity of the change was to occur in "Future Procurement," but only "...if evaluation tests prove the proposed merits [of the change]." This proposed engineering change was not to affect other SSQ-53 sonobuoy units required to be delivered by Sparton under the 0465 contract. On page 10 section 1.0 of the ECP, a "Statement of Work" was proposed. Sparton segregated the work into two phases:

> Phase 1: Design and construct engineering models and perform sea tests.
>
> Phase 2: (1) Modify and deliver one production lot of 300 GFE AN/SSQ-53 sonobuoys for dual depth operation.
>
> (2) Deliver operating manual.

Sparton proposed to use “Thirty-Five (35) GFE Sparton AN/SSQ-53 Sonobuoys” for Phase 1 and “Three Hundred (300) GFE Sparton AN/SSQ-53 Sonobuoys” for Phase 2. The 335 completed SSQ-53 sonobuoys were to be shipped “in place,” and no “drop tests” were to be required for the 335 sonobuoys. **P6.1-.13, 155.2-.3.**

**56.** The language in Phase 1, to wit: “Design and construct engineering models and perform sea tests” represents experimental work. So does Sparton requesting “...aircraft and support facilities for <u>engineering sea tests</u>.” Even the 300 deliverable units, which were modified “for dual depth operation,” represent experimental work because (a) government furnished equipment had to be <u>modified</u> and <u>reconstructed</u> before it could be supplied to the Navy and (b) the 300 units, according to the ECP, were being “...submitted for test and evaluation.” **P6.1-.13, 155.2-.3.** Sparton submitted the ECP to the Navy because it desired the Navy to defray in part Sparton’s development program costs, inasmuch as it was the Navy that requested a solution to the dual depth problem. **P210.10.**

**57.** Pursuant to his assignment to prepare a technical mechanical description of Sparton’s proposed dual depth sonobuoy in ECP 0465-2, Sparton employee Depew conceived of using a multipiece release plate mechanism (he had earlier thought of using as a water impact plate) shown below with

the "inverse sonobuoy design" described in the ECP. The DePew plate is the one described in ECP 0465-2 and corresponds to the ECP 0465-2 description: "As the float inflates, it pushes a trigger plate located below the release plate assembly. This action disengages the release plate from the buoy." **P155.6-.7, 161.1-.16, 6.8**. The DePew release plate, i.e. a water impact plate, needed to be redesigned in order to function as a float activated release plate. Boyle.

**58.** Widenhofer was aware of the preparation of ECP 0465-2, but did not actively enage in its preparation. Id. His multipiece Spider plate mechanism was not described or proposed in ECP 0465-2. **P155.6-.7, 161.1-.16, 6.8**

**59.** On July 13, 1971, ECP 0465-2 and Sparton's March 17, 1971 letter proposal were incorporated into the 0465 contract as Mod. 4. The Navy was knowledgeable that experimental, i.e. redesign and testing, work was to be performed under Mod. 4, that 300 Sparton SSQ-53 sonobuoys, modified for dual depth operation, were to be submitted by Sparton to the Navy for test and evaluation purposes and that production of a Sparton dual depth SSQ-53 sonobuoy was contingent upon the Navy's evaluation tests proving the proposed merits of the engineering change. **P4.1-6.13, 155.2-.3.**

**60**. The Depew multipiece release plate mechanism proposed for incorporation into the 300 sonobuoys to be provided to the Navy under Mod. 4 of the 0465 contract was projected as having a dry weight of 1.2 lbs. **P6.11B67.**

C. Events Subsequent To The Sparton March 17, 1971 ECP But Prior To Conception of the 120 and 233 Patented Inventions

**61**. On March 23, 1971, Widenhofer issued a memorandum containing a proposed Sparton test program at NOL designed "...to identify the cause of the cable breaks on the February Deep DIFAR sea test, ..." by studying: (1) "[t]he effects of 'Initial Plunge' conditions[,]" including "(a) Initial high cable drag[,] (b) Initially high relative descent rate[,] (c) Hydrodynamic lift force on cable pack assembly[,] [and] (d) Initial descent vehicle stability[,]" (2) "[s]tability or instability [of sonobuoy descent] and its effect on cable payoff[,]" (3) "[s]hock absorber deployment, the mass damper deployment, and the release of the subsurface unit from the sonobuoy housing[,]" and (4) "[c]haracteristic descent times for a DIFAR subsurface unit and for the last 90 feet of a deep DIFAR subsurface unit." **P17.1-.7.**

**62**. By March 30, 1971, Sparton was informed by its Engineering department that 20 final hydrophone engineering models were ready to be delivered to Sparton's sonobuoy group. **P18.1-.2.**

**63**. On April 6, 1971, Widenhofer issued a memorandum indicating that on April 3, 1971, he conducted deep DIFAR tests at NOL on four Sparton deep DIFAR sonobuoys to evaluate descent vehicle characteristics “...to identify the cause of the cable breaks on the February Deep DIFAR sea test, to evaluate modifications intended to correct the cable break problem, and to examine other areas of concern in the deployment sequence....” One Navy tank operator and two photographers were involved in the test. Four sonobuoys, mechanically operational only, were tested in accordance with Widenhofer’s proposed test plan. Although Widenhofer concluded that no sound conclusions could be drawn until the films taken during the test were viewed, he did make a few observations: “1. [t]he new design descent vehicle is more stable during descent than the ‘February’ design descent vehicle[;] 2. [t]he shock absorber design has a good safety margin[;] 3. [t]he key arrangement between the cable pack assembly and the subsurface electronics housing must be modified to prevent jamming[;] 4. [h]ydraulic forces acting on the cable pack assembly during ‘Initial Plunge’ may be the cause of the cable breaks[;] [and] 5. [t]he stretched length of compliant rubber on a DIFAR suspension system may not meet the required specified depth.” **P19.1-.14**.

**64**. On May 3, 1971, Sparton knew that official Navy approval for the design and development of a Sparton dual depth DIFAR was imminent. Sparton employees were informed to "... develop a test program and schedule including any necessary sea tests at Key West or elsewhere, which would ascertain all the deep DIFAR cable parameters and their limits by May 17, 1971." **P20.1**. Sparton did not want the cable break problem to derail its development efforts. **P210.10**.

**65**. On May 21, 1971, Passman informed Sparton program manager Rice that the twenty 1,000 foot sonobuoy models had been completed, tested, packed and were ready for airdrop testing. The Sparton project group was instructed to retain these sonobuoys and make no firm arrangements for drop testing them pending negotiations with the Navy, i.e. the Naval Air Sea Center ("NASC"), and receipt of the SSQ-53 dual depth ECP. Passman indicated that, in the event Sparton was unsuccessful in its attempt to sell these buoys to the Navy for special test purposes, Sparton should proceed with its plan to run an engineering drop test of them as part of its dual depth development program. At this point in time the Sparton deep DIFAR program was merging with and into its dual depth DIFAR program, also identified as Job No. 7400. **P21.1, 155.15**.

**66**. On June 15, 1971, Widenhofer issued a memorandum indicating the mechanical design considerations necessary

for the development of a Sparton dual depth DIFAR. The purpose of the memo was (a) to indicate the mechanical design effort required in a dual depth DIFAR program and (b) to review design problems to be encountered in that program. The mechanical design considerations for the dual depth DIFAR were based on an examination of the existing deep DIFAR design. Widenhofer suggested eleven design considerations, of which the third stated as follows: "3. Release Plate Design - Highly simplified designs [of the release plate] are feasible and should be investigated at this time (a major cost feature). The existing design used on deep DIFAR appears to be dependable. It could be somewhat simplified and made less expensive." **P22.1-.3**.

**67**. On June 21, 1971, Widenhofer issued a final report under Job #7400 for the Sparton deep DIFAR sonobuoy. The purpose of this final report was to describe the final mechanical design of the deep DIFAR sonobuoy. The final engineering lot of 20 sonobuoys had been assembled, were awaiting final evaluation and were awaiting final determination as to how they could best be utilized. They were never tested under Sparton's deep DIFAR program to demonstrate an acceptable design for Sparton's deep DIFAR sonobuoy. **P155.15**. Modifications had been made to Sparton's deep DIFAR design as a result of the testing it had conducted at NOL to correct the cable break problem encountered during the

February 18, 1971 airdrop test. Widenhofer noted that, "[t]hese modifications and others made since the February air drop have not been evaluated by air deployment and sea testing." As a result, he concluded that "...the reliability of said changes [the major modifications to the deep DIFAR design] has not been established." **P23.1-.8**.

**68**. The layout for the deep DIFAR design with multipiece spider plate mechanism had been finished; a bill of material for that design had also been completed; there was a full set of engineering part drawings for this sonobuoy; no assembly drawings, however, had been prepared for this deep DIFAR sonobuoy design by June 21, 1971. Assembly drawings were necessary to manufacture this deep DIFAR sonobuoy. **P23.1-.8, 155.19**.

**69**. In his June 21, 1971 final report, Widenhofer also commented upon the cable break design problem encountered during the February 18, 1971 test of Sparton's deep DIFAR sonobuoy. He stated that "[t]he cable break problem, thought initially to be an easily correctable, 'cable pack' defect, turned out to be quite elusive. Much effort was invested in a study of the many possible causes of cable breakage. Many in-house tests were performed in an attempt to pin down the cause. The result of this study was a definite recommendation for a descent vehicle dynamic study at the NOL 100 foot tank facility." As a result of this NOL

study, Widenhofer determined "...that the cable pack was withdrawing from the descent vehicle prematurely [due to] 'initial plunge' conditions... [and] would spin on its side until the signal cable would catch [and sever] in a [sharp edged] slot milled into the ballast weight attached to the cable spool." Based on this determination, Widenhofer suggested that the cable pack problem could be solved by the incorporation of two thin narrow mylar strips attached to the lower end of the sonobuoy housing. The upper ends of the two strips could be sandwiched between layers of cable on the cable spool. This solution would prevent the cable spool from separating from the descent vehicle until it reached approximately 850 feet. The proposed solution to the cable break problem, however, had not been sea tested. The workability of this change had not been established as of June 21, 1971. **P23.1-.8**.

**70**. Shock and vibration had not been considered as parameters during the design of the deep DIFAR sonobuoy. These aspects of the sonobuoy had not been investigated. There was some concern that the surface electronics section design was marginal in this respect. Eleven major mechanical design considerations were suggested to convert the Sparton deep depth DIFAR sonobuoy design to one with a dual depth capability. The "Release Plate Design" was one of the eleven considerations. **P23.1-.8**.

**71**. Per a Sparton July 10, 1971 memorandum, the twenty 1,000 foot SSQ 53 sonobuoys completed under Job 7400 were to be used by Sparton's Engineering department as it saw fit. It was planned that some of the 20 sonobuoy units would "...be drop tested to gain further confidence in the design and some of them..[would] be modified and drop tested to check out design revisions." **P24.1**.

D. Sparton's Dual Depth DIFAR Program Subsequent To The March 17, 1971 ECP Offer And Mod. 4 Sale

**72**. A meeting was held at Sparton on July 20, 1971 to discuss the work plan for supplying 300 dual depth DIFAR sonobuoys under ECP 0465-2. This meeting was memorialized in a memorandum written by Sparton assistant chief engineer White on July 20, 1971. It was decided at this meeting that the 300 modified sonobuoys referenced in the ECP were to be delivered to the Navy 7 1/2 months from July 13, 1971. The amount of design time included in the ECP was "rather small" as a result of Sparton's completion of the deep DIFAR sonobuoy design work under Job #7400. The design philosophy under the ECP was to supply the Navy with 300 sonobuoys to "...demonstrate the feasibility of a design... capable of being produced with further refinements." The design of the 300 units was not to be "...limited to merely proving an engineering approach, nor...[would] the design be suitable

for producing large quantities." **P25.1-.2, 210.21, 59.2-60.5, 33.1-.2, 40.1-.6**.

**73.** There were two mechanical redesign items addressed at this meeting, the second of which was: "b. The release plate mechanism should be simplified. It may be advisable to make a drop test of mechanical dummy units in order to check out a new release plate design prior to the engineering drop test of six complete sonobuoys." Rice had indicated that the 20 deep DIFAR sonobuoys from Job #7400 were available for Engineering department use, and ten "...should be drop tested as soon as possible...to gain more confidence in the existing design." **P25.1-.2**.

**74.** On July 29, 1971, Widenhofer proposed to develop for the dual depth DIFAR sonobuoy a low cost low pressure heat sealed polyurethane film surface float. A preliminary investigation had proven the feasibility of this type of float. **P26.1-.10**.

**75.** On August 3, 1971, Devereaux issued a memorandum indicating that Sparton would commence evaluating engineering model subsurface electronics stacks and hydrophones for use on the ECP contract. Although Sparton wished to start tests on the 300 deliverable ECP sonobuoys at its Jackson engineering facility, it needed at that facility a final stack test station similar to that used in its DeLand production facility and a version of Sparton

employee J. Voegeli's new hydrophone test box to commence testing. **P27.1**.

**76**. On August 9, 1971, Devereaux indicated in a memorandum that the original plan was to use the Q-57 hydrophones on the GFE sonobuoys shipped from Sparton's DeLand, Florida plant for the dual depth DIFAR. However, the 20 deep DIFAR engineering models used a small, modified SSQ-41 type omnihydrophone. It was apparent, morever, that the SSQ-57 type omni-hydrophone on the GFE sonobuoys was prohibitively large. Accordingly, Devereaux proposed to remove the SSQ-57 type omnihydrophone on each GFE SSQ-53 sonobuoy and replace it at Sparton's Jackson, Michigan plant with an SSQ-41 type for each of the 300 dual depth DIFAR sonobuoys to be supplied under ECP 0465-2. **P28.1**.

**77**. In August 1971, Widenhofer was investigating release plate activation pressures to derive an acceptable plate design and disclosed in his work notes a "bending function" in connection with this design. **A273-79**.

**78**. On August 31, 1971, Sparton conducted an engineering test at St. Croix of 10 deep DIFAR sonobuoys. One of the tested sonobuoys sank without resurfacing; one activated with no audio; but the balance of the eight sonobuoys deployed normally. There were no broken cables, such that it was believed that the "serious cable break problem...has been solved." All sonobuoy units, however, exhibited a

strong, strum problem at approximately 30 hertz, preventing accurate bearing data from being taken. Widenhofer noted that "[t]he strum problem could result in a significant delay to successful conclusion of the dual depth DIFAR E.C.P." As a result, Sparton contemplated "...a test series at Trumbull Lake to determine the source of the strum." The August 31 test was observed by NADC employee Bill Graff. **P30.1-31.13**.

**79**. By October 1971, Widenhofer was considering the "bending moment" of a "new [single piece release] plate design," and made a "Preliminary Layout" drawing No. 900-4709 of the dual depth sonobuoy with new release plate design identified in Section AA by part No. 900-4623. **A293-98, P40.1-.6**.

**80**. On October 5, 1971, Widenhofer proposed another test program to evaluate the performance of the proposed dual depth DIFAR sonobuoy with particular reference to a "...new single part float pressure activated release plate design, the parachute retainer mechanism, the parachute attachment, the float attachment system, and depth selector operation." Sparton needed the following Navy equipment and personnel to assist in conducting the tests desired because Sparton did not possess same: an aircraft equipped with sonobuoy launchers; aircraft mounted high speed movie camera; 2 boats with crews; one for observation and one for recovery; divers with underwater still cameras; and a deck located high speed

movie camera. Six air deployable sonobuoys, mechanically operational only, were to be tested. The quantity of signal cable and the length of the suspension system were to be selected to permit complete deployment of individual stowed components in a water depth of 75 feet. Three units were to function in a shallow depth mode, and the other three were to function in a deep depth mode. The deployed configuration for the "deep depth" mode was to include a short length of signal cable directly below the surface unit, a short compliant rubber "shock absorber" directly above a cable spool with a ballast weight, a shortened prewound compliant rubber-signal cable, a standard DIFAR damper, and a standard configured subsurface assembly. The total depth of the deployed unit was not to exceed 70 feet. Visual observations were to be taken by a pair of divers, and pictures were to be taken of any unusual condition. Sparton was to recover the sonobuoy housing and miscellaneous parts. The suggested test date was November 1-5, 1971. **P32.1-.4**.

**81**. On October 12, 1971. Widenhofer issued a memorandum to Hungerford in connection with the Q-47 float suggested for use with Sparton's dual depth sonobuoy. Widenhofer desired to use dual depth DIFAR sonobuoy floats having a gauge pressure of 4.0 psig nominal with the existing 16 gram $CO_2$ capacity. Widenhofer intended to phase in this float

modification during the first scheduled fully operational air drop during the first week of December 1971. **P34.1.**

**82.** In October 1971, Sparton conducted a test series at its Trumbull Lake test facility in hopes of reproducing the strum condition experienced in the August 31, 1971 test. No usable data was obtained from this Trumbull Lake test series due to power harmonics in the water and poor ground return in the fresh water. **P50.15, 50.24**.

**83.** On October 21, 1971, Sparton electrical design engineer Huntoon informed Sparton that conversion of the SSQ-53 DIFAR auxiliary board for use in Sparton's dual depth DIFAR sonobuoy required changing nine electrical components, two of which related to the life-timer circuit and seven of which related to the DC-DC converter circuit. Huntoon also recommended that Sparton include a one megohm resistor to raise the level of the phase pilot by 1.5 db and a 6.8 k resistor to compensate for the phase change caused by the increased output capacity of the omnihydrophone. These two changes were necessary because of the different characteristics of the longer cable and the Q-41 type omni directional hydrophone required for the dual depth DIFAR sonobuoy. **P35.1-.36.1**.

**84.** On November 10, 1971, Deveraux requested Rice to arrange for a December 1971, engineering sea test at St. Croix. **P37.1**. On November 11, 1971, Widenhofer issued a report of

a November 5, 1971 test at Key West of a “new single part float pressure activated release plate design, the parachute release mechanism, the parachute attachment system, the float attachment system, and the depth selector mechanism.” Three government employees, including John Tenuto, Bob Irwin and Ed Koszarek were present during the test. During the November 5, 1971 test, four mechanically operational dual depth sonobuoys were air dropped. Two of the sonobuoys were preset to deploy in a deep mode and two were preset to a shallow mode. The hydrophone was set to deploy at 70 feet in either mode for purposes of this test. Only four of the six sonobuoys were air dropped due to difficulties encountered with the Navy’s P-3 aircraft. The air drops occurred at an altitude of 500 feet and at an air speed of 250 knots. The following results were noted. All parachute release mechanisms operated normally. All parachute attachment systems functioned well. Air descent was stable on all sonobuoys. The float attachment system functioned as intended. The release plate functioned normally on two units, numbers 1 and 2, but did not function properly on units 3 and 4 because the bottom casting - sonobuoy housing bottom - separated from the sonobuoy housing shortly after water entry. The depth selector mechanism functioned normally on two units, numbers 1 and 2, but because of bottom casting separation, normal deployment was not

possible for units 3 and 4. Unit 1 also had a float puncture caused by a deformed float spacer can. Widenhofer concluded that the following designs were acceptable for further evaluation without modification: 1) the new parachute release mechanism; 2) the new parachute attachment system; 3) the single part release plate; and 4) the twist lock float attachment system. Notwithstanding these conclusions, the following problem areas needed further modification: 1) the float spacer can design needed to be revised since it had a tendency to jam, caused a float leak and could cause a release plate failure; 2) the depth selector mechanism needed strengthening because in one unit, the mechanism jarred loose when the sonobuoy was bumped hard against the boat; 3) the bottom casting needed larger and stronger screws because it separated from the sonobuoy housing as a result of sheared screws. Widenhofer believed that the bottom casting separation problem required further evaluation. Recommendations were made to solve these problem areas. Because of difficulty experienced with scheduling test aircraft, no underwater photography was possible. Since the tests occurred late in the afternoon, the last two buoys, 5 and 6, were not airdropped because (a) the test aircraft was low on fuel and returning to base and (b) sufficient data had been obtained from the four sonobouys that were air dropped. Widenhofer recommended that future

proposed test plans specifically request from the Navy an early morning start to avoid logistical problems. **P38.1-.10**.

**85**. On November 16, 1971, Devereaux established test procedures and the role of the Sparton Quality Control department for Job No. 7400. Although the exact setup for these procedures existed only at Sparton's Deland facility, where the SSQ-53 standard shallow depth sonobuoy was being manufactured, Sparton's Jackson plant had similar apparatus with which to perform some equivalent tests on the dual depth DIFAR sonobuoys. There were, however, exceptions. For example, the dual depth DIFAR hydrophone was smaller, less sensitive and was required to function at a 1000 foot depth as compared with the standard DIFAR hydrophone which was set to function at a 100 foot depth. Hence, the appropriate pressure for 1000 foot operations needed to be used in these test procedures for the following assemblies: hydrophone, subsurfrace electronics and mass damper and cable assembly. **P39.1-.4**.

**86**. On November 23, 1971, drawing number 900-4623 was prepared showing the release plate which is illustrated in the patents in suit. **P33.1-.2**. This drawing number is the one identified in the October 1971 Preliminary Layout drawing No. 900-4709.

E. <u>The Completion of Phase I Under ECP 0465-2</u>

**87.** On December 22, 1971, White provided Passman with a summary of dual depth DIFAR engineering labor costs under Job No. 7400-1008. Three cost groups were provided in attachment 1 of the summary. The first group was a March 15, 1971 estimate which formed the basis for ECP contractual negotiations. The second group was Sparton's Engineering department estimate of the Job dated July 22, 1971. The last group was an estimate through November of 1971. Sparton noted that the November 5, 1971 drop test of mechanical dummies was not included in the original scope of work under ECP 0465-2. The largest increase in Sparton's cost was Sparton's Operations department's estimate for the construction and testing of 300 buoys. **P41.1-.5**.

**88.** In December 1971, Sparton attempted to conduct a hydrophone strum test at the St. Croix Naval facility, but was unable to study the strum due to a lack of sufficient water current differential. **P50.17, 50.24**.

**89.** On January 19, 1972, Widenhofer informed White that there was a delay in the completion of Sparton's Model Shop dual depth DIFAR sonobuoy parts. Widenhofer indicated that he may be unable to meet Sparton's planned test date for the week of February 7, 1972 as a result of not having sufficient Model Shop parts. He provided White with a list of outstanding Model Shop work orders affecting the final engineering drop test and the construction of the 300

deliverable sonobuoys under ECP 0465-2. **P43.1-.2**. Parts for the 300 deliverable sonobuoys were being made in Sparton's Model Shop. On January 19, 1972, Widenhofer again informed Sparton of overdue parts orders. One part, the ballast weight, affected the engineering drop test schedule for the week of February 7, 1972. It appeared that the assembly of the 300 deliverable sonobuoys under ECP 0465-2 would be delayed by a lack of parts. Widenhofer needed to know when he could expect the needed parts. **P44.1**.

**90**. On January 31, 1972, Widenhofer and Huntoon issued a report to Devereaux regarding an airdrop test of ten fully operational (including electronic sections) dual depth DIFAR sonobuoys at the Navy's VAST test site in St. Croix, Virgin Islands, on January 13, 1972. The purpose of the test was to evaluate the dual depth DIFAR design prior to commitment to a final design for the 300 deliverable sonobuoys. Two Navy employees, Graff and Lamchak, were present during the test. During the January 13 test, six sonobuoys were dropped in a deep mode and four were dropped in a shallow mode. The four shallow mode sonobuoys deployed and operated normally. While all six deep sonobuoys deployed and operated normally, one "major problem" was experienced. Five of the six tested deep sonobouys experienced intermittent and finally loss of audio, a failure in the "signal receiving and transmitting apparatus" and "flexible

cable means" apparatus. The problem was determined to be related to cable damage caused when the cable packs were wound around defective plastic cable spools. The cable breaks occurred near the strain relief grommet at the extreme end of the 900 foot cable. The problem was corrected. Four comments were made by Widenhofer. First, the initial mechanical design had been modified to exclude the complicated cable pack retainer strap mechanism included in the prior design. This resulted in a significant simplification of the system. Second, the redesigned float spacer can performed as intended, correcting a problem noted in the November 5 airdrop. Third, the bottom plate (casting) separation problem noted in the November 5, 1971 airdrop was corrected. Larger screws were used to fasten the bottom plate to the housing. Fourth, the signal shunt around the cable pack was determined not to be necessary. Two other minor problems were noted. A float was found to have a ground clip pulled loose, and all four shallow sonobuoys exhibited slightly bent depth selector latch tabs. Widenhofer recommended certain design modifications for these problems. Widenhofer noted that the resurfacing time for the dual depth DIFAR design is approximately two to four seconds. To achieve this result, the inflation system squib had to fire quickly between .12 and .50 seconds. Thus, initial deployment, i.e. separation between surface unit and

descent vehicle, had to occur before the sonobuoy had slowed to terminal velocity. He concluded that initial impact occurs at about 90 feet per second, and initial deployment could occur anywhere from 60 feet per second down to 20 feet per second. He theorized that since the float acts like a dive break, separation between surface unit and descent vehicle may be quite violent. Evidence from past airdrops indicated that this violence had been a factor in premature cable pack deployment where a high hydraulic force pulled the cable pack from the descent vehicle. He suggested that a small increase in the squib firing time would alleviate or even eliminate the violence of the initial deployment.

**P45.1-.4**.

**91**. On February 17, 1972, Widenhofer and Huntoon issued another test report with regard to a dual depth DIFAR engineering test at St. Croix on February 9-10, 1972. Seven dual depth DIFAR sonobuoys were airdrop tested on February 9, 1972. Five and three sonobuoys were set in deep and shallow modes respectively. A standard DIFAR sonobuoy (channel 10) was dropped over the side of the boat for comparison purposes. One deep set sonobuoy (channel 6) did not deploy normally because it lost audio 32 seconds after activation. One shallow set sonobuoy (channel 12) also did not deploy normally because its electronics activated without any modulation. Three other deep set sonobuoys

(channels 2, 7, and 8) had a sonic frequency response of approximately -20 db, which rolled off drastically above 1.2 kHz. One shallow sonobuoy (channel 17) transmitted intermittently and sank before recovery. One deep set sonobuoy (channel 5) lost all audio after one and one-half hours of operation. Channels 2, 5 and 12 were recovered without subsurface assemblies. After troubleshooting the tested sonobuoys, six (channels 2, 7, 8, 12, 15, 17) had wiring errors, one had a frayed Chinese finger (channel 5), one had a leak in the ballast weight (channel 6), one had a cable break at the bottom of the mass damper (channel 12), and one scuttled shortly after normal deployment (channel 17). On February 10, 1972, seven dual depth sonobuoys were dropped over the side of a boat. Of those seven, five lost their probe (channels 20, 22, 24, 25, 28), and five (channels 18, 24, 25, 28, 16) appeared to perform satisfactorily. Notwithstanding that two channels (24, 25) were damaged by the boat, one (channel 20) had an intermittent signal caused by a cable break at 912 feet; and one (channel 22) had a frayed Chinese finger. Based upon the problems encountered during this test, Huntoon and Widenhofer concluded that (a) extra subassemblies would need to be constructed "...for the express purpose of serving as first piece samples...[,]" (b) "[f]irst piece samples of all subassemblies will be provided, and prime personnel will be

briefed on assembly procedures[,]" (c) [w]e have not proven out the deployment characteristics of the Dual Depth DIFAR as yet [,]" and (d) "[o]ne more field test will be required." As of February 17, 1972, Sparton was awaiting receipt of the computer printout of the RF and bearing data. **P47.1-.27**.

**92**. A Sparton meeting was held on February 28, 1972. The following points were addressed: Materials were ordered for the 300 sonobuoy units to be supplied to the Navy. One hundred and twenty new castings were to be transferred from Sparton's DeLand facility to the Jackson plant. All assemblies were completed and released by Sparton's Engineering department. Sparton's Operations department in Jackson was working on the modification and assembly of the 300 sonobuoys, but needed "first piece samples" and Engineering department assistance to complete its task. It was believed that delivery under ECP 0465-2 would commence in April, 1972. **P48.1**.

**93**. On February 28, 1972, NADC employee Graff issued a classified Evaluation Plan for the dual depth sonobuoys to be supplied by Magnavox, Sanders and Sparton. **P120.1-.15**. Graff requested the fleet to use the sonobuoy samples only in a deep mode, in view of their limited number and since the Navy already knew how the standard SSQ-53 DIFAR performed in a shallow mode. **P120.1-.15, 177.32**.

**94**. On March 21, 1972, Widenhofer and Huntoon issued a report regarding a dual depth DIFAR engineering test at St. Croix on March 9, 1972. The purpose of the test was to evaluate the overall performance parameters of the dual depth sonobuoy design prior to final design release for the 300 deliverable sonobuoys. Navy employees Graff, Lamchak and Mellis were present during the test. No previously encountered problem reoccurred. Widenhofer and Huntoon considered this test to conclude Sparton's "...engineering test phase of the Dual Depth Difar Program." Ten dual depth DIFAR final design configuration sonobuoys were airdropped. These sonobuoys contained modifications to overcome mechanical problems encountered on the previous airdrop. Seven of the sonobuoys were dropped in deep mode and three were dropped in shallow mode. Four of the seven deep sonobouys operated as intended; one exhibited slight noise on directional signals; one had a 50 kHz deviation in the 7.5 kHz pilot; and one lost audio during deployment because of water in its probe. Two of the three shallow depth sonobuoys had a parachute abnormality. As of March 21, 1972, the cause of the parachute problem could not be ascertained because Sparton had not yet obtained launch films from the Navy. While the bearing data taken by Sparton during the test "appeared to be good," the Navy's computer printout of detailed bearing data had not yet

arrived at Sparton for comparison purposes with Sparton's bearing data. Thus, by March 21, 1972, Sparton could not ascertain if the "signal receiving and transmitting apparatus" and "flexible cable means" were functioning properly. Similarly, Sparton could not have ascertained by March 21, 1972 whether the functioning of the release plate had any adverse affect upon the bearing information provided by its dual depth sonobuoy. Bearing information was the key to the uniqueness of the DIFAR sonobuoy. In a contemporaneous document, Sparton considered the obtention of this bearing information to be "very important." **P49.1-.7, 158.1-.4, 180.2, 210.11**.

**95**. Sparton delivered 100 dual depth sonobuoys to the Navy on April 25, 1972. Government DD 250 forms memorialize in writing this transaction. Title to these 100 sonobuoys passed from Sparton to the Navy on April 25, 1972. **A445-48**.

**96**. On April 28, 1972, Widenhofer issued a final report to Devereaux regarding Sparton's dual depth DIFAR "(AN/SSQ-53 (DD))" under Job No. 7400 and ECP 0465-2. This final report references the engineering tests of March 9, 1972, February 9-10, 1972, January 13, 1972, December 21, 1971, November 5, 1971, and August 31, 1971; it also references the July 20, 1971 scope of work for the dual depth DIFAR sonobuoy and the June 15, 1971 dual depth mechanical design considerations. **P50.1-.28**. This report states that:

> [t]he expressed design philosophy followed under the ECP was to demonstrate the feasibility of using the principle of the float actuated release plate (the so-called upside down approach), as developed on the previous Deep DIFAR program, to create a reliable Dual Depth Difar design capable of being produced economically in large quantities -- the goal being necessarily subject to budget limitations. Meeting this goal required a major mechanical redesign and some modifications to the existing Difar electronics.

**97.** The purpose of this report was to describe the final design of Sparton's dual depth DIFAR sonobuoy, to discuss problems encountered and design modifications incorporated during development and to define those areas in need of further evaluation and/or redesign to achieve a reliable, producible sonobuoy design. In summary, the report notes that (a) Sparton's "...Engineering Development Phase of ECP 0465-2 was completed on March 9, 1972, with the highly successful airdrop of ten final design buoys[,]" (b) "[t]he design has several unique mechanical design features, including a float pressure actuated release plate system, and a single part release plate[,]" (c) "[t]here are several mechanical features that make the Dual Depth Difar design unique from previous sonobuoy designs [including a]...design approach [which] utilizes a float pressure actuated release plate ...[wherein] the release mechanism is a simple one-piece, stamped, cold rolled steel plate...[that contains]

hinges at the center line which bend for installation and bend again during actuation," (d) "[s]ets of tabs at opposite points on the Plate circumference engage slots in the sonobouy housing[,]" (e) "[b]rackets on the risers of the parachute system are engaged in slots between the sets of latch tabs on the plate[,]" (f) while there was an "essentially complete" layout and bill of material, "detailed [assembly] instruction sheets" and "... a full set of engineering drawings in the 900 series,... [there was] a lack of assembly drawings," and (g) as a result of (f) above, Sparton "Engineering personnel [were]... in direct supervision of fabrication of the 300 deliverable buoys." The report also refers to the "Dual Depth Difar layout [drawing] 900-4709," which incorporates the single piece bendable release plate illustrated in drawing No. 900-4623. The dry weight of the single piece release plate shown on drawing No. 900-4623 is approximately .4 lbs., not the 1.2 lbs. noted for a release plate assembly in ECP 0465-2. **P210.11**. In conclusion, Widenhofer stated that "[t]he basic design concepts have been shown, within the limitation of the engineering evaluation, to be reliable and producible." **P50.1-.28**.

**98**. In Sparton's business practice, 900 series drawings were known to be engineering type drawings, whereas 100 series drawings were known to be production drawings. **P155.19**.

The parts of the 300 ECP sonobuoys delivered under Mod. 4 that made them dual depth were not manufactured from 100 series production drawings. Id. Since assembly drawings were necessary for any sonobuoy contractor to produce a sonobuoy utilizing production line assemblers, Sparton needed to manufacture first-piece samples and have engineers from Sparton's Jackson facility (Operations and Engineering departments) supervise (using existing 900 series drawings) the fabrication of the 300 sonobuoys delivered under ECP 0465-2. **P47.9, 48.1, 50.15, 155.19, 210.12**. By March 29, 1972, the critical date, drawings from which Sparton could have manufactured its dual depth sonobuoy did not exist. **P155.19, 210.12**.

F. The Completion OF Phase II Under ECP 0465-2 And The Award Of The 0585 Contract

**99.** On May 22, 1972, Widenhofer informed Hungerford that Sparton dual depth DIFAR sonobuoys were evaluated by the Navy off Bermuda during the week of May 15, 1972. They were compared with a standard DIFAR sonobuoy. All sonobuoys were preset in the deep mode. The target tracked by the sonobuoys was a submarine. Of the 22 sonobuoys airdropped by the Navy, the electronics in two of them never activated, and one sonobuoy had an audio oscillation at about 3-4 kHz. The Navy indicated to Sparton personnel that it was "...extremely pleased with the Sparton Dual Depth Difar

performance.” **P53.1-.2.** The May 15, 1972 test was the first Navy test of Sparton’s dual depth sonobuoy pursuant to the “Developmental Requirements” section of ECP 0465-2 which specified that said sonobuoys were “...submitted for test and evaluation.” Id.

**100.** On May 25, 1972, ten days after the Navy’s May 15, 1972 test of Sparton’s dual depth sonobuoy, the Navy awarded Sparton the 0585 contract. **P136.1-.55.** Under this contract, Sparton was required to provide inter alia (a) an “Engineering effort for Selectable Depth Capability” (item 2), (b) engineering efforts for a reliability and producibility program (items 6 and 8), (c) an SSQ-53 dual depth sonobuoy for “First Article Government Testing” (item 14), and (d) “Technical Manuals” (item 17). The Navy reserved as an option the right to purchase 2000 SSQ-53 dual depth sonobuoys (item 18). **P136.1-.6.** The 0585 contract contained a DD 254 form which indicated that information pertaining to the 0585 contract was not releasable to foreign nationals or personnel possessing reciprocal clearances without NAVAIR approval. The contract security classification specification identified the following information as classified: detection and bearing range, detection reliability, signature characteristics, vulnerability to countermeasures, military application and technical advances in the state of the art. **P171.1-.4.**

**101**. On June 9 and 13, 1972, Sparton delivered to the Navy 40 and 160 dual depth DIFAR sonobuoys pursuant to phase II of ECP 0465-2. These deliveries were memorialized in writing by DD 250 forms. Title to these sonobuoys passed from Sparton to the Navy on June 9 and 13, 1972 respectively. **A510-16**.

**102**. In all 300 dual depth sonobuoys delivered by Sparton to the Navy under Mod. 4, Sparton substituted the single piece bendable release plate shown below (and depicted in drawing No. 900-4623) for the Depew multipiece release plate mechanism proposed in ECP 0465-2. **P181.1-.33, 210.16**.

**103.** On June 30, 1972, Widenhofer issued two memoranda pertaining to the Navy's sea test of Sparton dual depth sonobuoys off the coast of Hawaii during the week of June 19, 1972. This was the second Navy sea test of Sparton's dual depth DIFAR sonobuoys pursuant to the "Developmental Requirements" section of ECP 0465-2. Results of the test were provided by the Navy to Sparton. **P56.1, 210.12.**

**104.** The Navy definitized the 0585 contract on March 15, 1973 at approximately the same time that it had completed testing the Magnavox, Sanders and Sparton ECP sonobuoys under actual service conditions, i.e., detection of Soviet submarines in different oceanic environments and temperatures. **P139.1, 177.12.** On or about July 18, 1973, the Navy was informed that the Sparton dual depth design still had not been finalized. **P163.1.** In FY74 and 75, the Navy exercised its option under the 0585 contract and a

limited pilot production of Sparton's dual depth sonobuoy commenced after successful first article testing. **P144.2, 146.1-.5, 152.22-.23**. The Navy's "...evaluation tests prove[d] the proposed merits [of the change under ECP 0465-2] under actual service conditions. A specification and nomenclature change then occurred, changing the designation of Saprton's dual depth sonobuoy from AN/SSQ-53 or SSQ-53("DD") to AN/-SSQ-53 (XN-1) to AN/SSQ-53A. **P141.1, 145.1-.6, 148.1, 149.2, 149.4, 150.6, 151.2, 152.22-.23, 153.1, 181.1**.

**105**. The Sparton dual depth PIP/53A sonobuoy release plate supplied to the Navy by Sparton was configured as follows.

**106.** The Sparton inventions covered by claims of the 120 and 233 patents in suit were procured by the Navy in the millions. **P57.1-.3, 62.1-.4, 107.1-108.2, 210.13**.

III. THE APPLICATION OF THE EXPERIMENTAL USE DOCTRINE NEGATES THE TRIGGERING OF THE ON-SALE BAR UNDER 35 U.S.C. §102(b) AS IT PERTAINS TO THE DEPEW DEVICE AND PRECLUDES SAID DEVICE FROM BECOMING PRIOR ART AGAINST THE SUIT PATENTS

A. Sparton Maintained Control Over Its Deep And Dual Depth Sonobuoy Program Experimentation Through The Critical Date

**106.** Sparton maintained exclusive control over the experimentation conducted under its deep and dual depth sonobuoy program through the critical date. Sparton retained ownership of the tested sonobuoy engineering models from the beginning of its deep DIFAR program in September 1970 to and through the completion of its dual depth DIFAR program on April 28, 1972 (subsequent to the critical date) which overlapped its performance under ECP 0465-2. The Navy did not own any Sparton dual depth sonobuoys until April 25, 1972, subsequent to the critical date. **A445-48.**

Contemporaneous Sparton business records establish that Sparton generated in September 1970 an overall Program plan outlining the design and testing work thought needed to complete a deep DIFAR sonobuoy having a deep deployment depth capability. This Program was revised on March 16, 1971 and was then merged into Sparton's dual depth DIFAR program when the issuance of ECP 0465-2 was imminent. **P7.1-.2**. Sparton's dual depth program was completed on April 28, 1972, shortly after Sparton began furnishing the Navy with the 300 ECP 0465-2 sonobuoys. **P50.1-.28**. Thus, a formal company test program was commenced in September 1970, was merged with a second related test program and was not completed until April 28, 1972 after the critical date, March 29, 1972. **P155.10-.19**.

**107**. The following tests were conducted outside Sparton facilities under the Sparton deep and dual depth programs: **1970** at Key West on December 19; **1971** at Key West on February 18, at NOL on April 3, at St. Croix on August 31, at Trumbull Lake in October, at Key West on November 5, and at St. Croix in December; and **1972** at St. Croix on January 13, at St. Croix on February 9-10, and at St. Croix on March 9. **P13.1-.8, 19.1-.14, 30.1-.13, 38.1-.10, 45.1-.4, 47.1-.27, 49.1-.7, 50.15, 50.22-.24**. Sparton prepared proposed test programs/plans for these tests, conducted them with ministerial assistance by Navy personnel at the noted

facility and controlled the test procedures. **P10.1-.4, 14.1-.3, 17.1-.7, 32.1-.4**. When these tests were conducted, Sparton personnel were present and conducted, supervised and controlled the testing. Sparton personnel developed the test results, reported the test details and nature of the tests and recorded their observations. **P11.1-.4, 13.1-.8, 19.1-.14, 30.1-31.13, 38.1-.10, 45.1-.4, 49.1-.7**. They even changed the format of a test when the occasion warranted. **P47.1-.27**. Contrarily, the Navy ECP 0465-2 project engineer Graff, who observed the tests, did not prepare any reports thereon. **P121.26**. Only one Navy report of a Sparton test is of record. **A221-34**. That report does not disclose the structural components or operational details of the tested devices. **P210.16**.

**108**. Although Navy facilities and equipment (e.g. P-3 aircraft, acoustic sound producer, recorder etc.) were used in these tests, and NADC personnel witnessed the tests on 12/70, 2/71, 11/71, 1/72, and 3/72 (NOL personnel witnessed 4/71 test), the tested sonobuoys as well as certain Sparton test equipment were brought by Sparton to the test sites and were thereafter loaded on the aircraft or boat to conduct the testing; subsequent to the testing, those sonobuoys not having sunk to the bottom of the ocean were retrieved by Sparton for inspection and rework when necessary and were transported back to Sparton. The Navy recognized that

Sparton controlled the testing. During the February 9, 1972 test at St. Croix, NADC personnel requested Sparton to deploy "a Dual Depth DIFAR strum buoy." **P47.3.** Had the Navy controlled the testing, it would not have needed to ask Sparton to conduct this test. The two Sparton test reports that identify ECP 0465-2 establish that Sparton employees prepared the test plans, observed the tests, recorded the test results, corrected the problems encountered, redesigned tested hardware and reported conclusions to Sparton management. **P45.1-.4, 49.1-.7, 210.16.**

B. Experimentation By Sparton And The Navy, Both Prior And Subsequent To The Critical Date, Under ECP-0465-2 And The 0585 Contract Was Performed Under A Cloak of Secrecy

**109.** A secrecy obligation was inherently imposed upon Navy and Sparton personnel in regard to performance under ECP 0465-2 (including the Navy testing of the Sparton dual depth sonobuoys subsequent to the critical date) by virtue of the military security classification specification, DD Form 254, contained within the 0465 contract which identified the following information as being classified: detection range and reliability, bearing range, military application of sonobuoy, and technical advances in the state of the art. **P158.3-.4.** This information was classified secret or confidential and its disclosure to the public was prohibited by law, 18 U.S.C. §§793-94. **P155.3, 158.1-.4.** This military security classification specification was also contained in

the 0585 contract. **P178.1-.4.** As a result of the Navy's military security classification, Sparton's test work under ECP 0465-2 and the 0585 contract, as well as the Navy's testing of the patented inventions subsequent to the critical date, was cloaked in secrecy. Id.

**110.** Sparton's performance under ECP 0465-2 provided the Navy with a new dual depth DIFAR capability, i.e. a technical advance in the state of the sonobuoy art that directly improved detection capability, i.e. "reliability." The performance of Sparton's patented dual depth sonobuoy was classified in accordance with 0465 contractual requirements. For example, the July 1, 1972 Sparton manual (describing the Sparton ECP 0465-2 sonobuoy and its deployment sequence) provided to the Navy (after the critical date) under ECP 0465-2 was classified. **P181.1-.33.** This manual states: (a) "[e]ach transmittal of this document outside the Department of Defense must have approval of the issuing Service" and (b) "[n]otice: [t]his material contains information affecting the national defense of [sic] the United States within the meaning of the Espionage Laws, Title 18, U.S.C., section 793 and 794, the transmission or revelation of which in any manner to an unauthorized person is prohibited by law." **P181.1.** Additionally, the February 28, 1972 Navy Evaluation Plan issued to test and evaluate Sparton's ECP sonobuoy was likewise classified, as were the

reports generated thereunder after the critical date. **P120.15, 121.18, 177.19-.22**. Based upon the classification of the Sparton July 1, 1972 manual (and the restrictions on its disclosure) and the Navy February 28, 1972 Evaluation Plan (and reports generated thereunder), as well as the 0465 and 0585 contract DD 254 classification requirements, the Navy was placed on notice that the Sparton dual depth sonobuoy deployment systems and the tests conducted thereon were cloaked in secrecy. **P210.16-.17**.

**111**. The original Sparton dual depth proposal (**P179.1-.36**) provided to the Navy in November 1970 contained a restrictive data legend, preventing the Navy from disclosing its subject matter, i.e. the inverse sonobuoy design, to the public. **P179.3**.

**112**. The Navy project engineer responsible for ensuring Sparton's performance under ECP 0465-2 was NADC employee Graff. **P121.2-.3**. While he observed some Sparton deep and dual depth ECP sonobuoy tests in 1971-72, he (and Navy fleet operators using Sparton's inventions subsequent to the critical date) was not knowledgeable of the proprietary hardware configuration of Sparton's deep depth and patented dual depth sonobuoys. **P177.49**. Neither Navy personnel nor the public had an unrestricted view of the internal structural components of the Sparton deep or dual depth sonobuoys while they were being tested at Naval facilities

because the housing thereof shielded the identity and function of these components from public view. **P210.17.** By observing any of the Sparton deep and dual depth sonobuoy tests, Navy personnel could not have learned of any Sparton confidential information pertaining to the tested sonobuoys, i.e. the identity of the components (as well as their function). Id.

**113.** The Sparton ECP 0465-2 sonobuoys were expendable because they contained a scuttling mechanism. **P210.18.** When the Navy conducted tests on the Sparton dual depth sonobuoys for approximately one year after the critical date, those sonobuoys were tested under standard operating conditions. **P120.1-.15, 177.18-19.** In standard operation, the sonobuoys are scuttled (destroyed) after one use. **P181.1, 181.26.** It is highly unlikely that any member of the public could have been exposed to Sparton's patented inventions as a result of the Navy's standard use of them during its testing program pursuant to its February 28, 1972 Evaluation Plan. **P210.18.**

**114.** As a result of the 0465 contract military security classification specification prohibiting Navy and Sparton personnel from disclosing classified information, and by the very nature of the Sparton deep or dual depth sonobuoys which were expendable (i.e. self-destructed after one use, during which use it operated for a limited number of hours), the Navy could not resell or reuse the Sparton deep or dual

depth sonobuoys and the public did not have access to or an unrestricted view of them during Sparton's ECP tests prior to the critical date and the Navy's ECP tests for one year subsequent to the critical date. **P210.18.**

**115.** Because of the competitive environment in the sonobuoy industry, there was no conduct by Sparton that would have led the Navy or the public to reasonably believe that the Sparton deep or dual depth sonobuoys were in the public domain. Nor is there any indication provided to Sparton that the Navy had such a perception. **P210.18.**

C. Sparton Maintained Detailed Test Records Of Its Deep And Dual Depth Sonobuoy Program Experimentation

**116.** Sparton maintained detailed test records of its deep and dual depth sonobuoy programs. These records span the period September 1970 through July 1972 (ECP 0465-2 performance and deliveries and Navy May-June 1972 tests) and beyond (0585 contract), detail tests conducted in this period including dates, number of sonobuoys tested, persons who observed and conducted the testing, problems encountered, changes (including single piece release plate) made as a result of the tests, and conclusions drawn from each test. **P7.1-56.1.**

D. The Navy's Knowledge Of The Experimentation

**117.** Sparton's March 17, 1971 letter, ECP 0465-2 and Mod. 4, establish the Navy's knowledge of the experimental nature of

the work to be performed thereunder, and Sparton's need to sea test its dual depth sonobuoys at naval facilities and the Navy's need to perform sea tests on sonobuoys of this nature under actual service conditions. **P5.1-6.13.** The March 17 letter proposed "[t]he redesign, modification and test of engineering models to verify feasibility of design approach," and to "[m]odify and deliver 300 units...." **P5.1.** The ECP indicated that the work was divided into two phases. In the first phase, Sparton would "[d]esign and construct engineering models and perform sea tests." B69. In the second phase, Sparton would "[m]odify and deliver one production lot of 300...Sonobuoys for dual depth operation... and [d]eliver operating manual." Id. Sparton specifically informed the Navy that the change "...will add the [dual depth] capability to the AN/SSQ-53..." and the "300... units... [were being] modified... and submitted for [Navy] test and evaluation." **P6.1.** The Navy incorporated the ECP into Mod. 4 and thus accepted the proposed test plan. **P4.1.** This contractual agreement evidences not only Sparton's experimental purpose behind the ECP and the Navy's knowledge thereof, but also the Navy's acceptance of testing under actual service conditions as proposed by Sparton to "prove the proposed merits," i.e. workability, of its dual depth sonobuoys in their intended environment. **P4.1-6.13.**

**118.** Navy ECP project engineer Graff, whose role was to monitor Sparton's ECP performance and evaluate Sparton's 300 ECP dual depth sonobuoys to ascertain their performance in comparison with the contract specification and a standard SSQ-53 sonobuoy, considered Sparton's dual depth sonobuoy tests to be "...in the nature of development tests...." **P121.19, 121.25-.26, 177.2, 177.9-.10, 177.36, 177.39-.40, 177.44-.45.** So did the Navy when it concluded that "[t]he AN/SSQ-53A was developed as part of a Product Improvement Program [ECP 0465-2] by Sparton in FY 72...." **P152.22-.23.**

E. The Navy's Need To Test And Evaluate Experimental Sonobuoys Led to A Custom In This Particular Technical Field

**119.** Sparton's dual depth sonobuoy generally relates to an expendable sonobuoy containing a deployment mechanism and/or release plate contained therein, wherein designated sonobuoy components are rapidly deployed through the upper end of the sonobuoy housing. The dual depth sonobuoy is generally jettisoned from a P-3 aircraft, descends through the atmosphere by parachute, impacts the oceanic surface at various angles and speeds and under varying weather and sea conditions and rapidly deploys its components (through an electromechanical explosive system) to a desired depth (regardless of sea conditions) to detect hostile nuclear submarines traveling at speeds and depths to avoid detection. This sonobuoy experiences severe trauma in

actual service conditions from operational deployment (being airdropped) until end of life (when the buoy is destructively scuttled within hours after deployment). **P210.18-.19.**

**120.** In view of the Navy's need to obtain a dual depth DIFAR capability, the Navy awarded Magnavox, Sanders and Sparton ECPs to existing contracts at about the same time, circa 1970-71, to receive these contractors' dual depth sonobuoy samples at about the same time, circa 1972. **P177.11-.12.** The length of the Sparton ECP test period (7 and 1/2 months), Sparton's need to conduct sea tests of engineering models and the need for Navy actual service condition tests to prove the merits of the modified sonobuoys were three features expressly disclosed to the Navy in the ECP. **P6.2.** The Navy had comparable information from Sparton's competitors. **P120.4, 120.12.** The Navy was in an excellent position to determine the reasonableness of these three Sparton ECP features. Id. The Navy's acceptance of Sparton's ECP through its incorporation into Mod. 4 establishes that these three Sparton ECP features were reasonable. The Navy at no time objected to any of these ECP features. **P210.18.**

**121.** Sparton's competitors (a) validated sonobuoy designs, including like deployment systems therein, through a number

of contractor demonstration tests and over a period of time which corresponds to Sparton's test period under ECP 0465-2, (b) recognized a need to sea test their sonobuoys and (c) the Navy's need to test an experimental sonobuoy under actual service conditions. For example, Rockwell projected a 10 month period from design to contractor demonstration of its SSQ-53B sonobuoy, during which time 17 and 32 sonobuoys were earmarked, with Navy approval, for lab and flight testing respectively to obtain "a statistically valid set of test results." **P164.4-.5, 165.1-.5**. Hazeltine projected a period of more than one year from sonobuoy design to contractor validation testing of its SSQ-77 VLAD sonobuoy, during which time 35 sonobuoys were to be tested. **P166.7, 167.2-.5**. Similarly, the SSQ-53 sonobuoy was developed by Magnavox and Sanders over a 3 year period with dozens of sea tests being performed thereon. **P177.3-.6**.

**122**. All three competing Difar contractors were required by the Navy to furnish the latter with dual depth sonobuoy samples. Magnavox supplied the Navy with 500 sample sonobuoys while Sanders and Sparton were required to supply the Navy with 300 sample sonobuoys each. **P120. 12**. In the sonobuoy industry, commercial quantities were in the thousands and tens of thousands, whereas experimental quantities were in the hundreds. **P57.1-108.19, 111.1-120.5**. The 300 sonobuoy samples sent by Sparton to the Navy were

considered by the Navy, and particularly the Navy project engineer Graff having ECP 0465-2 responsibility, to be a limited developmental quantity necessary for testing under actual service conditions. **P6.1, 25.1-.2, 48.1, 50.1-.2, 50.5, 50.14-.15, 121.26, 177.32, 177.36**. As a result, the Navy's ECP 0465-2 project engineer requested the U.S. fleet to use the ECP sonobuoy samples only in a deep depth mode in view of their limited number and since the Navy already knew how the standard SSQ-53 performed in a shallow mode. **P177.32**.

**123**. Sparton's conduct in supplying the Navy with 300 modified sonobuoys was consistent with industry custom for supplying experimental sonobuoy samples for Navy test and evaluation. **P210. 19**. Sparton did not possess the following resources needed for testing its ECP sonobuoys under actual service conditions; Soviet or U.S. submarines to emit acoustic signals, P-3 aircraft to launch these sonobuoys in sea environments, a boat, aircraft and boat mounted cameras and Navy avionics to receive sonobuoy signals and record test results. The only Navy facilities which contained these resources and could accommodate sea testing of contractor experimental sonobuoys was at Key West or St. Croix. **P210. 19**. As a result of not possessing the above resources, Sparton needed to test its experimental deep and dual depth sonobuoys at the Key West/St. Croix Naval

facilities. Nevertheless, it was customary in the sonobuoy art for the Navy to test experimental sonobuoys having a new capability, separate and apart from contractor testing, under operational conditions (e.g. weather, ocean surface, noise, depth and temperature, thermoclines, etc.) different than those in existence at Key West/St. Croix. **P177.15-.16, 210. 19-.20.** In this manner, the Navy could ascertain if a new experimental sonobuoy capability was workable, or provided better results than other sonobuoys, under all operating conditions. **P177.15-.16.** In this regard, the Navy needed and obtained 260 Sparton dual depth sonobuoy samples for submission to Navy fleet P-3 aircraft squadrons located in the Atlantic, Pacific, Mediterranean, Hawaii, Bermuda and Iceland sea theaters to test the acoustical performance thereof alongside a standard SSQ-53 sonobuoy in various sea environments having different conditions and temperatures. **P177.13-.30.** The Navy also needed and obtained 40 Sparton dual depth sonobuoy samples for submission to the Navy Key West facility for test by NADC and a VX-1 (P-3) squadron whose mission was to perform only developmental testing. **P177.35-.47.** The Navy tested some or all of these Sparton dual depth sonobuoy samples by tracking Soviet submarines. **P177.20.**

**124.** The Navy provided each of the three Difar contractors with unofficial feedback concerning the reliability of its

sonobuoy (**P177.47-.48**) and provided NAVAIR with classified data that established that the dual depth sonobuoy samples performed better at tracking Soviet submarines than the standard SSQ-53 sonobuoy. **P177.16, 177.24, 177.28-.29, 177.31-.32, 177.41-.42, 177.45-.47, 177.49-.51**.

**125**. In the period May-June 1972, the Navy indicated its satisfaction with the Sparton dual depth sonobuoys (in comparison with the standard SSQ-53), proved the proposed merits of the ECP 0465-2 sonobuoys in accordance with ECP expressed intentions and awarded Sparton the follow-on 0585 PIP contract. **P6.1, 53.1, 55.1, 136.1-.55, 155.18, 210. 12, 210.19**.

F. Sparton's Monetary Loss Under ECP 0465-2 Evidences Experimental Use

**126.** As a result of the Navy's pressing need for a dual depth DIFAR sonobuoy, Sparton undertook the risk of developing one by instituting a deep and then a dual depth sonobuoy program. As each step in the development process was taken, Sparton's development costs increased. In order to defray these increasing development costs and utilize equipment, e.g. P-3 aircraft, avionics, a boat, and cameras, uniquely in the possession of the Navy, Sparton submitted ECP 0465-2 to the Navy. Sparton's business records establish that Sparton incurred a $108,000 loss, after being paid $282,000 by the Navy, under ECP 0465-2. **P107.4, 110.1**.

Sparton was required by the Navy to bear this loss and assume substantial risk in this program because the Navy was unable to completely fund the ECP work of its three Difar contractors in FY72. **P120.4, 153.1, 154.1, 107.1-.4, 110.1-.3, 210.6.**

G. Sparton Did Not Commercialize Its Inventions Prior To The Critical Date

**127.** Sparton did not advertise, promote or disclose its dual depth sonobuoys to the public (including foreign nations who purchased sonobuoys from Sparton) outside the 1 year grace period. ECP 0465-2 and Mod. 4 represent nothing more than a cost defrayal arrangement between customer and supplier, whereby the latter was incurring substantial developmental costs to solve a pressing defense need of the former in the interests of national security. **P210.20.**

**128.** Sparton owned its patented inventions and controlled their testing through the critical date, maintained their confidentiality pursuant to the classification specification, DD Form 254, in the 0465 contract, and even marked its 1970 dual depth proposal with a confidentiality legend. Sparton informed no one of its dual depth sonobuoy configurations during its performance of ECP 0465-2. The Sparton dual depth sonobuoys were inherently shielded (encased in housing) from public view through the critical date. No Sparton rival was prevented from conceiving

Sparton's dual depth sonobuoys or deriving another solution to the Navy's problem. The Navy's issuance of ECPs to Sanders and Magnavox to promote competition in finding a solution to its dual depth problem corroborates this conclusion. **P210.20.**

**129.** Sparton did nothing to commercially exploit the DePew dual depth sonobuoy. Sparton included no provision in its March 17, 1971 letter and ECP 0465-2 requiring the Navy to purchase commercial quantities of its DePew dual depth sonobuoy. Instead, the Navy was advised in the ECP of the developmental stage of Sparton's dual depth sonobuoy and that production effectivity was to occur only after the Navy satisfactorily proved the proposed merits of the dual depth sonobuoys. Accordingly, the 300 modified Sparton sonobuoys were sent by the Navy to its fleet, VX-1 squadron, and NADC Key West facility for developmental testing, not normal fleet use. **P210.20-.21**. When sonobuoys were intended for normal fleet use, they had federal stock numbers assigned to them and the fleet was provided with a number of manuals to inform each operator of the manner by which to utilize the sonobuoys described therein. **P3.6-.7**, the Navy 0465 contract requiring Sparton to provide the Navy with production sonobuoys with federal stock numbers to be assigned to them at a later date and 200 manuals describing the operation of said sonobuoys. In the case of ECP 0465-2 and Mod. 4,

however, Sparton was only required to provide the Navy with one manual and 300 sonobuoys without federal stock numbers. Since the fleet had many operators, one manual was insufficient to inform fleet operators of the manner by which to operate Sparton's experimental dual depth sonobuoys. Thus, the 300 ECP 0465-2 sonobuoys were not intended for fleet use. **P210.10**.

## IV. THE DEPEW DEVICE IS NOT PRIOR ART AGAINST THE SUIT PATENTS BECAUSE ITS DISCLOSURE IS NOT ENABLING SUCH THAT IT COULD NOT HAVE BEEN MADE WITHOUT UNDUE EXPERIMENTATION

**130.** The ECP-0465-2 disclosure does not enable, with or without the DePew notebook disclosure (**P161.16**), one of ordinary skill in the art to make the dual depth sonobuoy disclosed therein without undue experimentation either as of the time the ECP-0465-2 disclosure was submitted to the Navy in March 1971 or incorporated within Mod. 4 to the 0465 contract in July 1971. Accordingly, the ECP 0465-2 dual depth sonobuoy disclosure, with Depew multipiece release plate assembly, is not prior art against the patents in suit. **P210.15**. Boyle.

**131.** The Depew ECP 0465-2 multipiece release plate mechanism was never manufactured or tested, was never constructed for use of test with an inverse sonobuoy design (a dual depth sonobuoy) and was not the subject of any Sparton patent application, publicly disseminated document, public use or Sparton engineering or production drawing from which a

person skilled in the sonobuoy art could practice or produce the device. It was simply theorized in a sketch of a sonobuoy bottom plate design (the opposite of what was needed for use with an inverse sonobuoy design as proposed in ECP-0465-2) contained in DePew's engineering notebook and was maintained at Sparton under a cloak of secrecy.

**P210.15.**

**132.** The nature of the ECP-0465-2 disclosure was complex.

**P6.1.13.** No other solutions were known to solve the dual depth sonobuoy problem which had existed for many years.

**P6.1.** This is the reason the Navy issued ECPs to all three SSQ-53 sonobuoy producers at about the same time to solve its dual depth sonobuoy problem. **P120.1-.15.** The prior art did not contain any dual depth sonobuoy that could satisfy the Navy's need for a solution. Id. When faced with solving the same problem that faced Sparton, Magnavox and Sanders took a predictable approach by merely increasing the length of sonobuoy cable in a standardized SSQ-53 sonobuoy (with rotochute and bottom plate) to achieve a solution to the Navy's problem. Id. On the other hand, Sparton took an unpredictable, new approach to the problem as outlined in ECP-0465-2. Id., **P5.1-6.13.** The ECP-0465-2 disclosure, as attached to Sparton's March 17, 1971 letter proposal, indicates that the period of experimentation, including the design and construction of engineering models and the

performance of sea tests, to the final manufacture of 300 sonobuoy samples was to span 7 ½ months. **P5.1, 6.2.** The Sparton ECP-0465-2 disclosure and March 17, 1971 letter proposal specify that redesign and modification work were to be conducted and sea tests were to be performed on engineering models as part of a preliminary phase before the manufacturing phase occurred. **P5.1, 6.13.** Thus, extensive experimentation was contemplated in the ECP disclosure before sonobuoy manufacture could occur. Id. The cost of this experimentation and manufacture was to be $198,000.00. **P5.1.** There was no direction given by DePew as to how to make a release plate mechanism that would function with the other sonobuoy components shown in the ECP Fig. 1 packaging layout, especially the conical cam protruding through the release plate assembly. **P6.6-.7.** The Fig. 1 packaging layout does not illustrate the trigger plate located below the release plate assembly which releases said assembly latches (not shown) from the sonobuoy housing when the float inflates. **P6.8-.9.** The nature and quantity of the actual design and experimentation work conducted by Sparton (a) pursuant to ECP-0465-2 and Sparton's own in-house sponsored programs is specified under heading II herein and (b) in regard to the 1971-72 development of a release plate is specified under heading II, subheadings D and E above.

**133.** DePew therorized in his Sparton confidential engineering notebook a sketch of a water impact bottom plate that may have been useful in combination with the inverse sonobuoy design disclosed in ECP-0465-2. This water impact bottom plate, however, needed to be redesigned, modified and sea tested in accordance with the requirements of ECP-0465-2. **P5.1, 6.13.** Contemporaneous with the 1971-72 events in issue, Sparton needed approximately 9-10 months to design and develop the release plate covered by the suit patents. <u>See</u> heading II, subheadings D and E above. Undue experimentation was required to enable one of ordinary skill in the art to make the release plate disclosed in ECP-0465-2 or the one sketched in the DePew Sparton confidential engineering notebook. <u>Id</u>.

**134.** The Sparton Depew multipiece release plate mechanism proposed by Sparton under ECP 0465-2 is substantially different than and unobvious in view of the release plate 38 shown, described and recited as a “releasable retaining means,” (120 patent cl. 1) “retaining means” (120 patent cl. 7) or “retainer plate” (233 patent cl. 1) in the patents in suit. From a structural standpoint, the release plate 38 shown and described in the patents in suit is a single piece, bendable plate which contains at least one opening 54 to form a hinge line, 54, 60 to provide a bending function

along the hinge line to achieve the retaining and deploying (of the float and/or signal receiving and transmitting apparatus) functions specified in the 120 patent claims. From an operational standpoint, a bending function is performed by this single piece plate (a) to assist in the mounting of the plate during installation to retain the float mechanism 30 and/or signal receiving and transmitting apparatus 24, 26 within the sonobuoy casing 10 and (b) to permit its release from the sonobuoy casing (when the float inflates and imparts a force to the underside of the plate) in order to deploy the float mechanism 30 and/or signal receiving and transmitting apparatus 24, 26 from the sonobuoy casing upper end 14. As the 120 and 233 patent specifications state (A6, col. 6, ls. 3-11); (A13, col. 6, ls. 11-19):

> When the float envelope 30 is inflated the forces exerted on the underside of the release plate 38 are substantially uniformly disposed over the entire area of the plate underside, causing the plate to hinge and deform as shown in FIG. 9 by bending of hinge portions 60. Such deformation withdraws the tabs 48 from their associated openings 52, and the continued rapid inflation of the envelope 30 rapidly ejects the release plate through the upper end of the casing. B784-88.

**135**. In contrast structurally, the ECP 0465-2 Depew release plate assembly illustrated in **P6.11** is not a single piece bendable plate with an opening which forms a hinge line, but

instead is a multipiece configuration containing by way of example two sliding latch plates, which slide radially along a surface, two wire springs stressed to urge the two plates apart outwardly to engage the sonobuoy housing slots and a conical cam which functions to provide radial retraction of the two latch plates from the sonobuoy housing slots. Id. From an operational standpoint, a bending function is not performed by this Depew release plate assembly. Instead, it relies upon spring compression and two radially movable latch plates which slide (radially retract) when the conical cam button is forced upward by float inflation. This release plate relies upon a totally different engineering principle for its function than the one described in the patents in suit. **P155.8-.9**.

V. THE CLAIMS OF THE 120 AND 233 PATENTS IN SUIT ARE VALID

**135**. After Sparton filed Application No. 345,871 on March 29, 1973, the U.S. Patent & Trademark Office ("PTO") issued on April 18, 1974, a restriction requirement which caused Sparton to elect for prosecution purposes either Group I claims 1-9, 15 & 16 drawn to a sonobuoy deployment system in class 116, subclass 124B or Group II claims 10-14 drawn to a retainer plate in class 220, subclass 40. **P182.24-.25**. On May 1, 1974, Sparton elected to prosecute the Group I claims and reserved its right to file a divisional application to prosecute the Group II claims. **P182.27**. After

approximately three Office Actions, a formal Notice of Allowance was mailed to Sparton by the PTO on June 18, 1975, and the 120 patent issued on November 18, 1975. **P182.1-.66, 183.62.** Based upon its issuance, the 120 patent is presumed valid. The defendant asserts that the 120 patent claims are invalid under 35 U.S.C. §103 in view of (a) the references cited in the 120 patent file history: Tatnall, Cotilla, Maes, Ballard, Kirby, Talbot, and Widenhofer (**P183.1-189.6)** and (b) the Adler reference, the Bannister reference, the Halberg reference, an SSQ-39 (XN-1) device, and Hazeltine SSQ-77 VLAD work. These alleged references, singly or in combination, do not teach or disclose every claim limitation in the 120 patent claims in suit and do not render the inventions defined therein or the differences between the 120 patent claims in suit and the asserted prior art obvious. **Boyle rebuttal expert report, PX 249**. The Adler, Bannister and Halberg references are not in the field of Mr. Widenhofer's endeavor or reasonably pertinent to the problem with which he was concerned. Id.

**136**. Sparton filed Application No. 612, 698, which matured into the 233 patent, on September 12, 1975 as a divisional case to prosecute the Group II claims identified in the restriction requirement issued on April 18, 1974 during the prosecution of the 120 patent Application No. 345, 871. **P190.1-.42.** The 233 patent issued on June 14, 1977. **P190.1-**

**.42.** The defendant asserts that the 233 patent claims are invalid under 35 U.S.C. §103 in view of (a) the references cited in the 233 patent file history: Wojciechowski, Elliott, Taylor, Dinolfo, Mahoney, Nordin, Wittenberg, Miller, Langdon, Train, and Philip and (b) the Adler reference, the Bannister reference, the Halberg reference, an SSQ-39 (XN-1) device, and Hazeltine SSQ-77 VLAD work. These alleged references, singly or in combination, do not teach or disclose every claim limitation in the 233 patent claims in suit and do not render the inventions defined therein or the differences between the 233 patent claims in suit and the asserted prior art obvious. **Boyle report, PX 249.** The Adler, Bannister and Halberg references are not prior art.

**137.** The Sparton inventions disclosed and claimed in the 120 and 233 patents solved a long felt need (at least 9 years) that existed and persisted in the sonobuoy art. See proposed findings 1-33.

**138.** The Navy recognized from at least as early as 1962 that it needed a rapidly deploying dual depth sonobuoy that could detect submarines below the oceanic thermocline layer. Id. This need was a persistent one recognized by the Navy and those skilled in the sonobuoy art. Id. As a result of its recognition of its need, the Navy issued its three SSQ-53 sonobuoy manufacturing contractors (Magnavox, Sanders and

Sparton) ECPs under existing fixed price supply contracts to provide it with a dual depth sonobuoy capability so that it could detect submarines above and below the thermocline layer. See proposed finding 31. Sanders failed to provide the Navy with a satisfactory dual depth sonobuoy and was dropped from the program by the Navy. See proposed findings 31 and 32. Magnavox attempted to supply the Navy with a standard SSQ-53 sonobuoy having a longer cable, a rotochute and a water impact bottom plate, but switched from this sonobuoy configuration to Sparton's patented configuration after it obtained a disclosure of Sparton's patented invention in the period 1973-75. See proposed finding 29 and accounting base chart for the Magnavox SSQ-53A sonobuoy. This long felt need in the sonobuoy art was never satisfied by another before Sparton's patented inventions. See proposed finding 32. In addition to the failed efforts of Magnavox and Sanders to solve the Navy's dual depth problem, Raytheon and Hazeltine likewise failed in their efforts to solve the Navy's problem until the Navy provided them with, and they copied, Sparton's patented inventions.

**139.** The Sparton patented inventions were a commercial success. **Boyle Report, PX 249.** They were recognized by the Navy as being developed by Sparton, were purchased by the Navy in the hundreds of millions of dollars, were purchased by foreign governments with U.S. Navy approval, were praised

by the Navy, resulted in follow-on contracts being awarded to Sparton, created a sonobuoy specification and nomenclature change, were incorporated within most sonobuoys purchased by the Navy from the late 1970s to today and permitted Sparton's competitors, when the Navy disclosed the inventions to them, (a) to enter the sonobuoy markets and compete with Sparton for procurements therein and (b) to reduce their costs and lower their prices thereby saving the Navy substantial funding. See proposed findings 32, 140-143 **P210.13.**

## VI. THE NAVY'S DISCLOSURE OF SPARTON'S PATENTED INVENTIONS TO SPARTON'S COMPETITORS LED TO WIDESPREAD INFRINGEMENT

### A. Copying By Raytheon

**140.** The Raytheon Company was chosen by the Navy to develop the active SSQ-62 sonobuoy. **P202.7.** Raytheon encountered serious mechanical deployment problems with its SSQ-62 sonobuoy. **P202.14-.15.** The mechanical engineer in charge of Raytheon's sonobuoy component deployment, Charles Ouellette, informed Navy personnel at the Naval Air Development Center ("NADC") of Raytheon's deployment problems. **P202.14-.16.** NADC personnel advised Mr. Ouellette that Raytheon should "not reinvent the wheel." **P202.15.** At the NADC laboratory, piece parts of the Sparton patented inventions in suit were on display for all contractors to inspect and analyze at monthly review meetings. **P202.12.** Ouellette was shown

Sparton's plate. Id. He copied it and conceded as much in his deposition. **P202.12-.16.** The Raytheon single piece, bendable plate is disclosed below. Note the elongated opening and hinge line. **PX 254**

B. Copying By Hazeltine

**141.** Subsequent to the production of Sparton's patented dual depth sonobuoy, Hazeltine copied Sparton's patented inventions to reduce its cost to compete with Sparton in producing a vertical line array DIFAR ("VLAD"), called the SSQ-77. **P166.1-.10, 167.1-.5, 203.1-.27.** Allen T. Hudson is the government technical expert in this case. He was employed by the Raytheon Company from 1967 to September, 1972. **P245.9-.16.** In 1971, at Raytheon, Mr. Hudson first

began working in the sonobuoy area. Id. While employed at Raytheon, he worked on the SSQ 62 sonobuoy program. Id. While working on the SSQ 62 sonobuoy program for Raytheon, he observed that the components of the sonobuoy were deployed through the lower end of the sonobuoy. **P245.18-.19.** No Raytheon SSQ 62 sonobuoy had a float actuated release plate while he was working there. Id.

**143.** In September, 1972, Mr. Hudson became employed by the Hazeltine Company as a senior mechanical engineer and became the lead mechanical engineer on the VLAD sonobuoy. **P245.30-.31.** When he arrived at Hazeltine, in September, 1972, the VLAD sonobuoy program was already in development and on its second developmental contract. Id. Under its first contract, Hazeltine constructed sonobuoys and placed them in water for testing, called an over the side design. **P245.33-.35.** Hazeltine obtained a contract to convert the over the side design to an air deployable package. Id. He was given the responsibility of designing the components to provide an air launched sonobuoy. Id. As lead mechanical engineer, all other mechanical engineers in the program reported to him. Id. From September, 1972 through March, 1974, when they demonstrated the VLAD sonobuoy to the Navy, he developed the VLAD sonobuoy. **P245.40.** In March, 1974, Mr. Hudson no longer worked on the VLAD sonobuoy program, but instead worked on the Hazeltine SSQ-79 program. **P245.49.**

**144.** Sometime in 1975, or 1976, Mr. Hudson saw a Sparton SSQ-53A sonobuoy at Hazeltine which contained a float actuated release plate. **P245.67-.72.** Hazeltine performed some acoustic measurements on this Sparton SSQ-53A sonobuoy. Id. The Sparton SSQ-53A sonobuoy was a complete production buoy with a float actuated release plate, and it (as well as the release plate) was disassembled at Hazeltine. Id. The Hazeltine VLAD program personnel evaluated the Sparton SSQ-53A sonobuoy. Id. He did not see a Magnavox float actuated release plate. **P245.71.** He talked with others about the Sparton release plate and thought it was a "good engineering design." **P245.76-.77.** He recalled how it functioned. **P245.71-79.** It was a bendable plate, the bending being caused by the inflation of a float. Id. Mr. Hudson, and those under his direction, designed the float actuated release plate used on the Hazeltine SSQ-77 VLAD sonobuoy. **P245.81, 245.95-.97.** Hazeltine first built a float actuated release plate in 1975. **P248.49-.50.** Mr. Hudson discontinued his Hazeltine employment in 1979. **P245.59, 245.62, 245.64.**

**145.** At about the time (1979) Mr. Hudson discontinued his Hazeltine employment, Hazeltine personnel hosted a meeting with the Navy to discuss potential entry into the SSQ-53B sonobuoy market. **P166.1-.10, 167.1-.5.** Hazeltine informed the Navy that it had made an analysis of the Sparton/Magnavox SSQ-53A, future Hazeltine SSQ-53 units

would be configured more toward the Sparton/Magnavox design, Hazeltine was in the position of "the +best of two worlds – whatever Haz. cannot develop, [it] will pig-back/ on the MX/SP design (Chinese copy[,]" and it would leverage off the Sparton/Magnavox design to produce the SSQ-53B sonobuoy. Id. The Navy considered Hazeltine's SSQ-53B sonobuoy to be a "Chinese copy" of Sparton's design. **P166.3.** Hazeltine was attempting to parlay its VLAD sonobuoy experience to its DIFAR sonobuoy experience to show commonalty benefits between the two. **P166.1-.10, 167.1-.5.** Hazeltine believed that, by leveraging off the Sparton/Magnavox design upon which it made a hardware analysis, it obtained the lowest technical risk, obtained the most rapid approach to cost reduction per unit to maintain market share, and fixed its current sonobuoy performance problems. Id. Hazeltine's objective was to establish itself as one of the "Big 3" domestic production sonobuoy sources. Id. Hazeltine noted that a multi-depth function was not included in its present design and that the use of the Sparton approach validated under Sparton's ECP buoy provided a solid design. Id. Furthermore, Hazeltine concluded that its sponsored R&D program along with leveraging off of the Sparton and Magnavox designs is producing considerable cost reductions on both its VLAD and DIFAR programs, said cost reductions

being necessary to be competitive. Id. and **PX 257**, **BATES 21507-21576.**

**146.** The Hazeltine VLAD SSQ-77 sonobuoy release plate was configured as follows. **PX 257.**

C. Copying By Sippican

**147.** Hudson's "copying" efforts had only just begun. He became employed as a program engineer by the Sippican Corporation in 1979 following his Hazeltine employment. **P245.104.** Sippican had no ongoing sonobuoy program, although it desired to enter the sonobuoy market, when Mr. Hudson commenced employment there. Id. He immediately started working on an SSQ-36 sonobuoy, also called the AXBT,

and had total mechanical and electrical responsibility under the AXBT program. **P245.103, 245.106.** When he arrived at Sippican, it had no float actuated release plate design. **P245.110.** In a period of 2-4 months after he arrived, he had designed Sippican's float actuated release plate. Id. and **P245.125.** In that 2-4 month period, however, no plate hardware had been constructed. Id. Sippican reviewed only one float actuated release plate design for its AXBT sonobuoy. **P245.111.** While other designs were considered, none were used or further considered. Id. In the 3-4 month time frame from his start on the program, Sippican made the decision to use a float actuated release plate mechanism in the AXBT. **P245.112.** Mr. Hudson used the Hazeltine float actuated release plate design. **P245.112-.113.** He "tried to draw upon our previous experience-that was the experience that I had." Id. After testing the device, he made the decision to use the float actuated release plate. **P245.115.** The whole developmental program for the AXBT took ten months. **P245.115-.116.** The Hudson/Sippican SSQ-36 plate is illustrated below.

**148.** The illustrated plate is a copy of the Hazeltine plate, which was a “Chinese copy” of the Sparton plate. Sippican then incorporated its SSQ-36 plate in its SSQ-77 VLAD sonobuoy line. It had purchased this sonobuoy line, by novation, from Hazeltine when the latter decided to depart the sonobuoy business. This SSQ-77A Hudson/Sippican single piece, bendable plate is shown below. **PX 256.**

**149.** Sippican was optimistic regarding the purchase of Hazeltine's SSQ-77 sonobuoy business because it had the benefit of years of Hazeltine experience, and it believed that this head start was "important." **PX 256, Bates 23032-23050.** The Navy approved the Sippican purchase of Hazeltine's sonobuoy business in 1984 because (a) the Navy's fundings and efforts invested in the Hazeltine design would be salvaged, (b) a third producing supplier would be in

place three years earlier than other methods, and (c) rapid qualification by Sippican would save the Navy $15 million in development funds. **PX 256, Bates 23026-031, 23643-74.**

D. Copying By Rockwell

**150.** Subsequent to the production of Sparton's patented dual depth sonobuoy, Rockwell copied Sparton's patented inventions to reduce its cost to compete with Sparton in producing an the SSQ-53B sonobuoy. **P173.1-.8, 204.1-207.7.** Rockwell was able to enter the sonobuoy business by virtue of receiving the designs of its competitors, including Sparton's, from the Navy. **P205.5, 205.15, 206.2**. In a contemporaneous document, Rockwell stated that "[s]onobuoy development occurred under IR&D funds from 1979 through 1985. The development occurred in two phases: the first phase was obtaining basic knowledge in sonobuoy design (i.e., copy of Magnavox/Sparton design) and the second phase was for development of new and improved hardware." **P207.3, PX 255.**

**151.** The Rockwell SSQ-53B sonobuoy release plate was configured as follows. **PX 255.**

E. Copying By Hermes And Magnavox

**152.** Rockwell's SSQ-53B competition, Hermes, had received a Navy contract in 1976 to qualify and produce the SSQ-53A sonobuoy. **P168.9-.12, 168.17-.20.** That Hermes buoy did not employ a single piece, bendable plate to assist in the performance of the sonobuoy deployment function. **PX 244** The Hermes SSQ-53A sonobuoy project was a "disaster," as

conceded by its own program manager. **PX 244.** Hermes failed to qualify as an SSQ-53A producer. Id. To salvage its sonobuoy program, Hermes requested and received from the Navy, at least as early as 1977, Sparton's patented inventions. **PX 244.** After discussions with the Navy, Hermes terminated its SSQ-53A qualification effort and commenced its SSQ-53B program. **PX 244.** In the period 1980-81, Hermes abandoned the use of its first generation SSQ-53A plate and designed for its SSQ-53B sonobuoy a second generation single piece, bendable plate patterned after the Sparton patented inventions. **PX 244.** Its configuration is as follows. Note the two elongated openings at the ends of the plate which cause the plate to bend and release, under float pressure, from the sonobuoy upper end. **PX 244.**

**153.** A third generation single piece, bendable plate was also developed by Hermes for its more recently produced sonobuoy product lines. This third generation plate was used by Hermes in conjunction with Sippican's SSQ-77A design, which was novated to Hermes. The Sippican one hole

release plate was interchangeable with Hermes' two hole plate. **PX 244.**

**154.** The Hermes second generation single piece, bendable release plate with two holes is similar in structure to either of the Magnavox plates used on its SSQ-53A line. Although the Hermes SSQ-53B plate had two elongated openings equi-distant from the center of the plate, Magnavox interchanged a two opening (equi-distant from plate center) plate with one that had one opening through the center of the plate. Both plates, shown below, were depicted by Magnavox on its production drawing as being interchangeable. A Magnavox illustration of this interchangeability is provided below. A more recent version of the Magnavox plate contains three openings, i.e. one in the center and two equi-distant from the center. **PX 250-52.**

**155.** Each of the above release plates, in combination with their sonobuoy deployment systems and components, infringes Sparton's suit patents literally or under the doctrine of equivalents. **See charts 1-23 in former pretrial submission volumes I and II and Boyle expert and rebuttal reports, PX**

**214-234, 249.** In the 120 patent, the locking tabs 48 (when fitted through casing openings 62) on generally circular plate 38 perform the claimed function of "retaining said float means and apparatus within said casing" and (b) the openings 54 and portions 60 (which permit the plate to deform and release from casing openings 62 upon inflation of said float means) on generally circular plate 38 perform the claimed function of "permitting said float means and apparatus to deploy from said casing upper end upon said retaining means releasing from said casing." Each of the accused devices contains a plate having tabs and openings and portions that perform, as noted at least in the claim chart first Pretrial Submission Appendix Exhibits 4, 6, 8, 9, 12, 15, 17, 19, 20, and 23, exactly the same function in exactly the same way as the "generally circular plate" 38 described in the 120 patent. The patented and accused plates perform exactly the recited claimed functions set forth in the "releasable retaining means" claim element, and perform these functions in exactly the same way. As a result, there is literal infringement, as well as infringement under the doctrine of equivalents where noted in Sparton's claim charts, of the 120 and 233 patents by defendant's use of said accused devices. **<u>See</u> Boyle expert report, PX 249.**

## VII. SPARTON IS ENTITLED TO DAMAGES IN THE FORM OF LOST PROFITS OR IN THE ALTERNATIVE A REASONABLE ROYALTY PLUS DELAY COMPENSATION

**156.** The Audit 121 Chart (prepared by Sparton) contained in Exhibit 25 of Volume II of Sparton's Appendix to its previous Pretrial Submissions is based upon Sparton computer printouts included within said Exhibit 25 from which Sparton's profits were ascertained from Navy contracts under which it produced sonobuoys covered by the patents in suit. **GM report, PX 246.** Sparton's lost profits, by percentage rate (about 14%), may be gleaned from Exhibits 25 and 26, and such rate should also be used in the calculation of a reasonable royalty. Exhibit 26 identifies unsuccessful Sparton bids (even when Sparton was awarded a portion of the Navy bid package) on Navy contracts for the production of sonobuoys covered by the patents in suit. The sonobuoys bid by Sparton, the sonobuoys actually manufactured by Sparton and the sonobuoys actually delivered by Sparton's competitors to the Navy were covered by the patents in suit. Exhibits 24-26 establish (a) the demand for the sonobuoys covered by the patents in suit (most of the sonobuoys delivered to the Navy by its suppliers in the compensable infringing period incorporate the Sparton patented inventions), (b) Sparton's belief contemporaneously with the submission of said bids that it had the capacity to satisfy said demand and manufacture said sonobuoys had it been

awarded the Navy contracts to produce all the infringing sonobuoys identified in Pretrial Submissions Appendix Volume II Exhibit 24, and (c) there was a sales diversion to Sparton's competitors as a result of the Navy's desire to obtain secondary and/or U.S. alternative sources for producing infringing sonobuoys. Sparton had the capacity to satisfy said demand and manufacture said sonobuoys had it been awarded the Navy contracts for the production of all infringing sonobuoys identified in Pretrial Submissions Appendix Exhibit 24. Sparton's records establish that Sparton possessed sufficient facilities (at least 3 plants such as Sparton of Canada, the Jackson, Michigan facility and the DeLeon Springs facility) and manpower thereat to produce the infringing sonobuoys had Sparton been awarded the contracts let to the competitors for said sonobuoy sales. **GM and DJ reports, PX 246, 247.**

**157.** With respect to each of the below identified markets, Sparton is and/or was a direct competitor for the infringing sales. The SSQ-53A infringing sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately September 1980 to October 1985; the SSQ-53B infringing sonobuoy delivery market was a one party (Hermes) market with the infringing period being from approximately August 1981 to December 1981, was a one party (Hazeltine) market with the infringing period being from

approximately August 1982 to March 1983, was a one party (Rockwell) market with the infringing period being from approximately May 1984 to August 1984, was a two party (Rockwell and Hermes) market with the infringing period being from approximately December 1984 to September 1985, and was a one party (Hermes) market with the infringing period being from approximately October 1985 to December 1989 – Hermes being the predominant infringing supplier of SSQ-53B sonobuoys; the SSQ-53D infringing sonobuoy delivery market was a two party (Magnavox and Hermes) market with the infringing period being from approximately November 1989 to June 1994; the SSQ-53E infringing sonobuoy delivery market was a two party (Magnavox and Hermes) market with the infringing period being from approximately December 1992 to June 1994; the SSQ-62 infringing sonobuoy delivery market was a one party (Raytheon) market with the infringing period being from approximately September 1980 to January 1983; the SSQ-62A infringing sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately August 1981 to July 1993; the SSQ-62B infringing sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately April 1982 to October 1993 and was essentially a one party (Raytheon) market with the infringing period being from approximately 1981-82; the SSQ-62C infringing

sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately February 1992 to May 1994; the VLAD infringing sonobuoy delivery market was a one party (Hazeltine) market with the infringing period being from approximately September 1980 to May 1987; the SSQ-77A infringing sonobuoy delivery market was a two party (Magnavox and Sippican) market with the infringing period being from approximately December 1980 to June 1987 and was a two party (Magnavox and Hermes) market with the infringing period being from approximately June 1987 to July 1993; the SSQ-77B infringing sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately September 1989 to June 1994; the SSQ-57B infringing sonobuoy delivery market was a one party (Magnavox) market with the infringing period being from approximately March 1990 to June 1992; and the SSQ-36BTS infringing sonobuoy delivery market was a one party (Sippican) market with the infringing period being from approximately August 1980 to December 1980.  Where a one party infringing market, as noted above, exists or substantially exists (e.g. SSQ-53A, 53B, 62, 62A, 62B, 62C, VLAD, 77B, 57B, and 36) and Sparton had the capability of manufacturing the Navy-desired infringing sonobuoys, causation exists and is established such that Sparton would

have obtained the infringing sales it lost to its competitor(s). **GM report, PX 246.**

**158.** In connection with the reasonable royalty calculus are that: (1) Sparton offered the Navy a settlement license about February 11, 1981 at a 5% rate on all sales of sonobuoys or other products utilizing the patented inventions; (2) Sparton's anticipated and actual profits for U.S. Navy sonobuoy procurement average about 14% (as shown in said Exhibits 25 and 26), Sparton's profits are much higher for its international sales than its domestic sales of its patented inventions, and the following benefits have been obtained by defendant or its contractors from defendant's use and its infringing suppliers' manufacture of the patented inventions: (a) the Navy has been able to rapidly detect submarines below the isothermic oceanic layers and thus protect U.S. coastlines, ships and other interests from submarine blockade or attack; (b) the Navy's infringing suppliers were able to use Sparton's patented inventions in the manufacture of other sonobuoy types to enter or expand their involvement in the sonobuoy industry and compete with Sparton for the procurement of said sonobuoy types; (c) the Navy was able to obtain secondary sourcing for Sparton's patented sonobuoys by disclosing them to Sparton's competitors for copying purposes and to reduce Sparton's competitors' costs and development and production

time and thus Navy expense; (d) the Navy and its suppliers are using the Sparton patented inventions long after the expiration of the patents covering them, such that the Sparton patented inventions have been in use for about 30 years; and (e) the Navy has a substantially broader submarine detection range than ever before as a result of using the Sparton patented inventions; (3) Sparton may only sell its patented inventions internationally with the approval of (an export license from) the Navy, in view of the military nature of Sparton's patented inventions, even though Sparton has international patent coverage over the subject patented inventions; (4) Sparton has had an established policy to maintain as proprietary and with exclusivity the technical and patented advances it makes in the sonobuoy art, and in view thereof, it does not for the most part actively engage in licensing its patents covering or technologically involving sonobuoys (notwithstanding that it contacted the Navy's suppliers of the infringing sonobuoys to obtain compensation when it learned that they were copying its patented inventions); (5) the commercial relationship between Sparton and defendant is one of supplier and customer, but the relationship between Sparton and the infringing suppliers is one that can be characterized as being direct competitors; (6) Sparton's infringing competitors have obtained an advantage of

deriving profit from convoyed sales pertaining to the infringing sonobuoys; (7) the duration of defendant's infringing use (from first infringing use to patent expiration) is approximately 12 and ¼ years for the 120 patent and 13 and ¾ years for the 233 patent; (8) the Sparton patented inventions have been highly commercially successful; (9) the Sparton patented inventions represent major departures from and advances in sonobuoy technology (as is evidenced by a change by the Navy in sonobuoy nomenclature for the Sparton patented inventions and the use by the Navy of Sparton's patented inventions for approximately 30 years) because prior Navy sonobuoys could not rapidly detect submarines below the isothermic oceanic layers, obtain multi-depth submarine detection capability and achieve the Navy's ASW objective as it does with the Sparton patented inventions; (10) the Navy has made widespread use (and its suppliers have enjoyed substantial sales) of the Sparton patented inventions and has procured them in most all sonobuoy models manufactured by its suppliers; (11) the profits obtained by Sparton and its infringing competitors from sales of sonobuoys covered by the patents in suit are attributable to the advantages provided to the Navy through use of these patented inventions from the 1970's to this date; and (12) the realizable profit from the sales of the infringing sonobuoys

that should be credited to the patented inventions is the entire profit from said sales as distinguished from non-patented components, business risks and other features added by the infringers (little business risk was involved in view of the Navy providing Sparton’s competitors with the Sparton patented inventions in order for them to copy said patented inventions rather than to “reinvent the wheel” when manufacturing the infringing sonobuoys). These facts and conclusions and/or opinions justify a substantial increase in the 5% rate Sparton offered the Navy on February 11, 1981 (to near the said average 14% Sparton lost profit rate), particularly since *inter alia* these Sparton patented inventions: were significant technical achievements in the sonobuoy art; protect the American people, the U.S. coastlines and our servicemen and servicewomen serving abroad on ships and near oceans; spawned new sonobuoy manufacturing lines; were copied by Sparton’s competitors with Navy assistance and authorization; satisfied a long felt need in the sonobuoy industry which failed in its attempt to satisfy said need; were highly commercially successful; were the subject of 14% profit margins in Sparton’s U.S. sales; and were the subject of still higher profit margins realized by Sparton’s foreign sales where competition did not create a price erosion or where no competition occurred. **GM report, PX 246.**

**159.** Additionally, (1) Sparton offered the Navy a settlement license about February 11, 1981 at a 5% rate on all sales of sonobuoys or other products utilizing the patented inventions; (2) Sparton's anticipated and actual profits for U.S. Navy sonobuoy procurement average about 14% (as shown in said Exhibits 25 and 26), Sparton's profits are much higher for its international sales than its domestic sales of its patented inventions, and the following benefits have been obtained by defendant or its contractors from defendant's use and its infringing suppliers' manufacture of the patented inventions: (a) the Navy has been able to rapidly detect submarines below the isothermic oceanic layers and thus protect U.S. coastlines, ships and other interests from submarine blockade or attack; (b) the Navy's infringing suppliers were able to use Sparton's patented inventions in the manufacture of other sonobuoy types to enter or expand their involvement in the sonobuoy industry and compete with Sparton for the procurement of said sonobuoy types; (c) the Navy was able to obtain secondary sourcing for Sparton's patented sonobuoys by disclosing them to Sparton's competitors for copying purposes and to reduce Sparton's competitors' costs and development and production time and thus Navy expense; (d) the Navy and its suppliers are using the Sparton patented inventions long after the expiration of the patents covering them, such that the

Sparton patented inventions have been in use for about 30 years; and (e) the Navy has a substantially broader submarine detection range than ever before as a result of using the Sparton patented inventions; (3) Sparton may only sell its patented inventions internationally with the approval of (an export license from) the Navy, in view of the military nature of Sparton's patented inventions, even though Sparton has international patent coverage over the subject patented inventions; (4) Sparton has had an established policy to maintain as proprietary and with exclusivity the technical and patented advances it makes in the sonobuoy art, and in view thereof, it does not for the most part actively engage in licensing its patents covering or technologically involving sonobuoys (notwithstanding that it contacted the Navy's suppliers of the infringing sonobuoys to obtain compensation when it learned that they were copying its patented inventions); (5) the commercial relationship between Sparton and defendant is one of supplier and customer, but the relationship between Sparton and the infringing suppliers is one that can be characterized as being direct competitors; (6) Sparton's infringing competitors have obtained an advantage of deriving profit from convoyed sales pertaining to the infringing sonobuoys; (7) the duration of defendant's infringing use (from first infringing use to patent

expiration) is approximately 12 and ¼ years for the 120 patent and 13 and ¾ years for the 233 patent; (8) the Sparton patented inventions have been highly commercially successful; (9) the Sparton patented inventions represent major departures from and advances in sonobuoy technology (as is evidenced by a change by the Navy in sonobuoy nomenclature for the Sparton patented inventions and the use by the Navy of Sparton's patented inventions for approximately 30 years) because prior Navy sonobuoys could not rapidly detect submarines below the isothermic oceanic layers, obtain multi-depth submarine detection capability and achieve the Navy's ASW objective as it does with the Sparton patented inventions; (10) the Navy has made widespread use (and its suppliers have enjoyed substantial sales) of the Sparton patented inventions and has procured them in most all sonobuoy models manufactured by its suppliers; (11) the profits obtained by Sparton and its infringing competitors from sales of sonobuoys covered by the patents in suit are attributable to the advantages provided to the Navy through use of these patented inventions from the 1970's to this date; and (12) the realizable profit from the sales of the infringing sonobuoys that should be credited to the patented inventions is the entire profit from said sales as distinguished from non-patented components, business risks and other features added

by the infringers (little business risk was involved in view of the Navy providing Sparton's competitors with the Sparton patented inventions in order for them to copy said patented inventions rather than to "reinvent the wheel" when manufacturing the infringing sonobuoys). These facts and conclusions and/or opinions justify a substantial increase in the 5% rate Sparton offered the Navy on February 11, 1981 (to near the said average 14% Sparton lost profit rate), particularly since *inter alia* these Sparton patented inventions: were significant technical achievements in the sonobuoy art; protect the American people, the U.S. coastlines and our servicemen and servicewomen serving abroad on ships and near oceans; spawned new sonobuoy manufacturing lines; were copied by Sparton's competitors with Navy assistance and authorization; satisfied a long felt need in the sonobuoy industry which failed in its attempt to satisfy said need; were highly commercially successful; were the subject of 14% profit margins in Sparton's U.S. sales; and were the subject of still higher profit margins realized by Sparton's foreign sales where competition did not create a price erosion or where no competition occurred. **GM report, PX 246**.

**160.** As a result of the Navy providing Sparton's competitors with Sparton's patented inventions, this enabled said competitors to produce comparable sonobuoys that infringe

the patents in suit and to compete with Sparton in bidding for government contracts, which as a matter of economics would result in depressed process and profits for Sparton. Sparton and its competitors sold their sonobuoys covered by the suit patents at positive margins. **DM report, PX 248.**

**161.** The term of defendant's license would be until the expiration of the later of the two suit patents. **DM report, PX 248.**

**162.** The demand for the patented product was driven solely by the buyer's (Navy's) urgent need for a deep depth sonobuoy that could be rapidly deployed, and the patented inventions were developed to meet and did meet a specific need and thus the entire profit from the sale of the infringing sonobuoys is attributable to the patented features. **DM report, PX 248.**

**163.** There was a substantial reduction in the R&D costs and business risk borne by Sparton's competitors as a result of the Navy providing the patented inventions to them for copying purposes. **DM report, PX 248.**

**164.** Based upon a total contract value of $770,378,863 **, (PX 246, 235)** and a lost profit margin of 14% (**PX 236**) lost profit damages, without prejudgment interest, due Sparton are $106,774,511, and lost profit damages, with prejudgment interest, due Sparton are $346,270,972. One year, constant

maturity U.S. Treasury bills, plus 2%, is used to calculate the delay compensation due Sparton. **DM report, PX 248.**

**165.** Based upon a total contract value of $770,378,863 and a reasonable royalty rate of 10%, reasonable royalty damages, without prejudgment interest, due Sparton are $77,037,886, and reasonable royalty damages, with prejudgment interest, due Sparton are $249,834,756. **DM report, PX 248.**

Respectfully submitted,
Sparton Corporation, Plaintiff

Dated: February 27, 2008

s/Steven Kreiss

Steven Kreiss
Attorney for Plaintiff
1120 Connecticut Avenue NW
Suite 433
Washington D.C. 20036
Telephone: (202) 347-6382
Facsimile: (202) 347-7711