IN THE UNITED STATES COURT OF FEDERAL CLAIMS

EXHIBIT
P 155
Sparton v. US

| | |
|---|---|
| SPARTON CORPORATION,<br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br>Defendant. | No. 92-580C<br>Judge James P. Merow |

DECLARATION OF CHARLES F. BOYLE

I, Charles F. Boyle, declare and state under penalty of perjury that:

1. I received a Bachelor's degree in Electrical Engineering from the University of Kentucky. My employment at the Sparton Corporation ("Sparton") officially began in 1949 after I received my BSEE degree. I left Sparton in 1950, however, only to return in 1952. From 1952 through August 1990, I was continuously employed by Sparton, rising from the rank of design (junior) engineer to the position of Director of Operations of Sparton's Jackson, Michigan plant. In this position, I was in charge of all sonobuoy and other product manufacturing and engineering that were performed at Sparton's Jackson plant.

2. At Sparton, I was directly involved in all phases of Sparton sonobuoy development and manufacture as an engineer, section head and chief engineer over a 32 year span. I was in a decision-making position at Sparton for many years as Director of Sparton's Jackson, Michigan operations.

3. I have reviewed U.S. Patent Nos. 3,921,120 ("120 patent") and 4,029,233 ("233 patent") and their Patent Office file histories and have assisted in the preparation of the attached claim charts submitted with Sparton's Pretrial Submissions showing the correspondence between the claims and structure shown and described in the specifications of these patents. I hereby adopt these claim charts and believe them to be correct.

4. I have reviewed [redacted] among other documents, the 0465 contract, Mod. 4 to the 0465 contract, Sparton's March 17, 1971 letter to the Navy and ECP 0465-2. [redacted] These documents do indicate that experimental, not commercial, work was required to be performed under Mod. 4 and was proposed to be conducted under ECP 0465-2 per Sparton's March 17, 1971 letter. I have personal knowledge, and was in a position to know from

others (e.g. subordinates and parallel coworkers) who had personal knowledge, of many of the above noted documents and/or events referenced therein and was marked for copy on many internal Sparton documents referencing these events. As a Sparton employee in a managerial position, I was informed of many of these events as they were unfolding at Sparton. More specifically, I was in charge of the hydrophone design for the dual depth sonobuoys to be developed and supplied by Sparton to the Navy under Mod. 4. As regards the 1600 SSQ-53 sonobuoys, [redacted] delivered by Sparton to the Navy under the 0465 contract for Aircraft Drop tests, some of these 1600 sonobuoys were for Aircraft Drop Tests while others were production sonobuoys delivered to the Navy for typical use. The 0465 contract security classification contained in DD Form 254 indicates that any information relating to detection, bearing, military application, vulnerability to countermeasures, LOFAR signature characteristics and technical advances in the state of the art are classified secret and are not to be disclosed to members of the public (SPA 02172-02175).

5. [redacted] I was marked for copy on many [redacted] documents and have personal knowledge of the events and work referenced in [redacted]

[redacted] Sparton internal documents [redacted] given an SPA designation during the course of this litigation and were business records kept by Sparton in the ordinary course of its business. [redacted]

6. I have reviewed [redacted] the Gerry Martin and Henry Melvin Declarations and documents referenced therein relating to the Navy practice in purchasing production and experimental sonobuoy quantities. In the course of performing my Sparton responsibilities as section head, chief engineer and director of operations of Sparton's Jackson, Michigan plant, I became thoroughly and personally knowledgeable with such Navy practice in the sonobuoy industry. [redacted]. I was responsible for the initial Sparton-Navy contracts for the development of the AN/SSQ-50 (XN-1) and AN/SSQ-62 sonobuoys. These sonobuoys were developed by Sparton under initial contracts which were completely experimental in nature. Under the first SSQ-50 (XN-1) and SSQ-62 sonobuoy contracts, approximately 100 and 200 experimental sonobuoys, respectively, were delivered to the

Navy. These quantities were typical Navy purchases of experimental sonobuoys.

7. I [redacted] agree with Mr. Graff's deposition testimony, at pages 36-37, to the extent that no commercially available sonobuoy in 1971 existed which had the dual depth capability the Navy needed and desired. Furthermore, the 300 sonobuoys delivered by Sparton under ECP 0465-2 were sent to Navy non-production facilities. In contrast, the standard SSQ-53 production sonobuoys manufactured by Sparton under the 0465 contract were sent to Navy supply centers for distribution to the Fleet and other naval depots. The Navy provided Sparton with specific instructions in regard to the nomenclature markings for the 300 Sparton dual depth sonobuoys (004881). These marking were not applicable to the normal production sonobuoys delivered by Sparton under the 0465 contract (004881).

8. [redacted] The Mod. 4 work [redacted] was performed by Sparton's Engineering Department in Jackson, Michigan, not Sparton's SSQ-53 production department in DeLeon Springs, Florida. This Engineering Department work was non-production work.

9. [redacted]



B0783

P155.5

Under information and belief, I can declare that it has been Navy practice for decades to utilize in sonobuoy contracts the ECP process to obtain contractor development work to improve the performance of production sonobuoys. Under information and belief, the Navy saves substantial funds by utilizing the ECP process in ongoing production contracts instead of awarding cost type research and development contracts for that same work.

[redacted]

11. I have recently examined a Sparton SSQ-53 Deep Depth DIFAR sonobuoy which was manufactured under Sparton's Deep DIFAR program. I have prepared the attached Description Of The Deep DIFAR Sonobuoy, which sonobuoy included a release plate assembly. I have reviewed the Affidavits and supporting documents of James Widenhofer and Donald Depew contained within defendant's Appendix, Exhibit 52 at A712-727. These Affidavits describe the release plate assembly to be used by Sparton in its ECP 0465-2 Dual Depth sonobuoy. This is the sonobuoy release plate proposed by Sparton (Depew) under ECP 0465-2 attached to Sparton's March 17, 1971 letter. This release plate assembly concept described by Depew corresponds to the ECP 0465-2 description: "As the float inflates it pushes a trigger plate located below the release-plate assembly. This action

disengages the release-plate latches from the sonobuoy housing and forcibly ejects the release-plate from the buoy" (A190). Mr. Depew was selected by Sparton, according to a Sparton memo dated November 11, 1970, to prepare the technical descriptions and/or layouts of ECP 0465-for a November 1970 submission to the Navy (SPA 37709-10).

12. I have compared the structure and operation of the release plate shown, described and claimed in the 120 and 233 patents in suit with the release plate assemblies illustrated in (a) my written Description Of Sparton's Deep DIFAR SSQ-53 sonobuoy and (b) the one illustrated in the Widenhofer and Depew Affidavits which was proposed in ECP 0465-2. The Sparton Deep Depth SSQ-53 sonobuoy release plate assembly and the one proposed by Sparton under ECP 0465-2 are not identical or equivalent to the release plate shown and described in the patents in suit. From a structural standpoint, the release plate shown and described in the patents in suit is a single piece plate which contains at least one opening to form a hinge line to provide a bending function along the hinge line to achieve the retaining and deploying (of the float and signal receiving and transmitting apparatus) functions specified in the 120 patent claims. From an operational standpoint, a bending function is performed by this single piece plate (a) to assist in the mounting of the plate during installation

to retain the float mechanism and/or signal receiving and transmitting apparatus within the sonobuoy casing and (b) to permit its release from the sonobuoy casing (when the float inflates and imparts a force to the underside of the plate) in order to deploy the float mechanism and/or signal receiving and transmitting apparatus from the sonobuoy casing upper end. As the 120 and 233 patent specifications state (Gov. Ex. 1 at p. A6, col. 6, ls. 3-11); Gov. Ex. 2 at A13, col. 6, ls. 11-19):

> When the float envelope 30 is inflated the forces exerted on the underside of the release plate 38 are substantially uniformly disposed over the entire area of the plate underside, causing the plate to hinge and deform as shown in FIG. 9 by bending of hinge portions 60. Such deformation withdraws the tabs 48 from their associated openings 52, and the continued rapid inflation of the envelope 30 rapidly ejects the release plate through the upper end of the casing.

13. In contrast, the ECP 0465-2 release plate assembly illustrated in the Widenhofer and Depew Affidavits is <u>not</u> a single piece plate with an opening which forms a hinge line, but instead is a multipiece configuration containing by way of example two sliding latch plates, which slide radially along a surface, two wire springs stressed to urge the two plates apart outwardly to engage the sonobuoy housing slots and a conical cam which functions to provide radial retraction of the two latch plates from the sonobuoy housing

slots. From an operational standpoint, a bending function is not performed by this release plate assembly. Instead, it relies upon spring compression and two radially movable latch plates which slide (radially retract) when the conical cam button is forced upward by float inflation. This release plate relies upon a totally different engineering principle than the one described in the patents in suit.

14. Similarly, the release plate assembly contained within the Deep DIFAR sonobuoy was multipiece and contained for example three spider arms with round enlarged end tips, a doughnut ring shaped center of which the three spider arms are an integral part, a piston for insertion into the doughnut hole, support plates for the piston, three latch brackets into which the round enlarged end tips of the spider arms engage and plates supporting the assembly. This Deep DIFAR sonobuoy release plate assembly was not a single piece plate and did not contain an opening which formed a hinge line. From an operational standpoint, a bending function along the direction of the opening, which forms a hinge line, is not performed by this release plate assembly. The process by which the spider plate retracts is a drawing process which permits the spider arms to pull the latch brackets free of the sonobuoy housing when the piston is pushed into the center hole of the spider plate. Furthermore, the spider plate does not physically engage

slots in the sonobuoy housing, as called for in the claims of the patents in suit. The spider plate arms ends fit within latches that engage slots within the sonobuoy housing. This release plate relies upon a totally different engineering principle than the one described in the patents in suit.

15. I have reviewed the March 21, 1972 Sparton memo(SPA 02953-02959), on which I was marked for copy, prepared by Widenhofer and Huntoon. On the third page of this document, it indicates that "[b]earing data from all buoys except channels 7 & 15 appeared to be good." The next sentence in the document is significant and states: [t]he computer printout of detailed bearing data has not yet arrived." This computer printout information was important to an evaluation of the test during the week of March 6, 1972. The observed bearing data during the test must be checked against known bearing data to verify that the sonobuoy electronics, including the detection function performed by the signal receiving means in the 120 patent claims, are performing properly during and subsequent to deployment. A deployment system, if not working properly, can adversely affect the performance of the electronic parts contained within a sonobuoy.

16. I have reviewed many documents, including two Sparton program schedules (SPA 02779-80 and 02813-14), to

ascertain Sparton's testing plan for its SSQ-53 Deep Depth Sonobuoy and to determine whether the February 18, 1971 Sparton test of its Deep DIFAR sonobuoy established the workability of the device for its intended environment. The first Program Schedule prepared by Sparton employee Neil Devereaux on September 16, 1970, proposed two drop tests to derive a complete mechanical design. Six mechanical dummy units and an unidentified number of sonobuoys were proposed for these two tests. Importantly, Sparton proposed to test the complete design using 20 engineering models subsequent to the number of sonobuoys used to derive the complete mechanical design. The period between the derivation of the preliminary design to the completion of the mechanical design was slightly over 2 1/2 months, November 1, 1970 to January 17, 1971 (SPA 02780). Subsequent to the completion of the mechanical design, Sparton proposed to build and then test the 20 engineering models of its Deep Depth DIFAR Sonobuoy. The test of the 20 engineering models was projected for March 1971 and thus was to occur a little over 1 1/2 months after the completion of the mechanical design on January 17, 1971 and about 5 weeks after 20 final hydrophone engineering models were constructed.

17. This Program Schedule was revised by Mr. Deveraux on March 16, 1971. In the March 16, 1971 revised Program Schedule, the construction of the 20 final hydrophone models

was now scheduled for March 21, 1971, and the complete mechanical design was to be completed on April 4, 1971, subsequent to Sparton's March 17, 1971 letter and ECP 0465-2. Furthermore, a new item was added to this revised Program Schedule. An NOL cable deployment test was scheduled for the end of March 1971. The construction and testing of the 20 engineering models was to be completed in late April 1971. The original Program Schedule in 1970, the revised Program Schedule on March 16, 1971 and the February 26, 1971 Sparton memo regarding the February 18, 1971 Key West drop test establish that Sparton considered further testing necessary to establish the workability of a new deployment system for its Deep DIFAR sonobuoy. In actuality, Sparton had conducted a test of 6 dummy (without electrical components) sonobuoys in December 1970 (SPA 02787-02790) and 6 fully operational sonobuoys on February 18, 1971. None of the 20 sonobuoys Sparton projected for test, however, were tested by the end of February 1971. There was thus an insufficient number of sonobuoys tested by the end of February 1971, according to Sparton's business program schedule, to determine the workability of this new deployment system, which is critical to sonobuoy operation and performance.

18. Other documentary indicia supports the above conclusion. During the February 18, 1971 test, the

electronics in the lower unit of 4 of the 6 sonobuoys tested was lost because the cable broke between 70 and 85 feet below the surface of the ocean. Thus 2/3 of the tested sonobuoys lost their lower unit during deployment. With respect to the 120 patent claims, the structure which failed to properly function during the February 18, 1971 test corresponded to two claim elements, i.e., the "flexible cable means" and the "signal receiving and transmitting apparatus." A review of inventor Widenhofer's February 26, 1971 report also reveals that, while he was very enthusiastic about his Deep DIFAR design, he believed that "only minor modifications to the cable pack assembly" were necessary, and when made, the design was "acceptable" for construction of the final engineering lot of twenty sonobuoys for the purpose of demonstrating Sparton's deep DIFAR capability" (SPA 2793). Thus, Widenhofer knew that the 20 engineering models were earmarked for testing to demonstrate Sparton's Deep DIFAR capability. Mr. Widenhofer specifically stated in his February 26, 1971 memo that the "...twenty sonobuoys [were] intended to demonstrate an acceptable design for a deep DIFAR" (SPA 02792). Accordingly, the purpose of drop testing the first twelve sonobuoys in December 1970 and February 1971 was to derive a mechanical design before the construction and testing of the final twenty sonobuoys to demonstrate the workability of the

design in a limited testing program. Although Mr. Widenhofer concluded that "only minor modifications [were necessary] to the cable pack assembly," he did note that "...the problem is still being investigated" (SPA 02795). On March 8, 1971, he concluded that "...the cable breaks are not due simply to a 'cable pack problem'" (SPA 02803). Six possible causes were considered. Mr. Widenhofer indicated that "[t]he unique nature of the deep DIFAR design invites a close scrutiny of all conceivable cable break possibilities in an attempt to better understand the peculiarities inherent in the inverse approach to sonobuoy design." (SPA 02803).

19. Mr. Devereaux, Widenhofer's supervisor, informed the program head, Mr. Hungerford, that the program schedule had to be updated as a result of an NOL test which "...was determined to be necessary due to the design uncertainties related to the cause of cable failures during the Key West drop tests" (SPA 02813). Based upon the Devereaux March 16, 1971 memo, in which he clearly indicated that there were "design uncertainties related to the cause of cable failures...," the Deep DIFAR program schedule was revised on March 16, 1971. On March 23, 1971, shortly after the March 17, 1971 Sparton letter and ECP 0465-2 were submitted to the Navy, Widenhofer prepared a proposed NOL test program (SPA 02815). The NOL tests were conducted by Sparton on two

dummy sonobuoys on April 1, 1971 (SPA 02824). By this time, the February 1971 Deep DIFAR mechanical design had changed and was being tested at NOL along with the old February 1971 design (SPA 02824). Approximately a month later, Sparton was aware that there was an imminent "...official go-ahead for the design and development of a dual depth DIFAR, and as a result, Sparton desired to develop a test program schedule for "necessary sea tests...[to] ascertain all the deep DIFAR (deep and shallow) cable parameters and their limits..." (SPA 02838). Shortly thereafter, by May 21, 1971, the 20 engineering models were ready for drop test, but these sonobuoys were on hold pending "receipt of the AN/SSQ-53 Dual Depth ECP" (SPA 02839). If these 20 engineering models could not be sold "to the Navy for special test purposes," then Sparton planned "to run an Engineering drop test [with them] as part of ...[its] dual depth development program" (SPA 02839)

20. At this point in time, May-June 1971, the Sparton Deep DIFAR program was merging with its dual depth DIFAR program. The 20 engineering Deep DIFAR models that were constructed in accordance with Sparton's Program Schedule in September, 1970, as revised in March, 1971, were supposed to be tested to demonstrate Sparton's Deep DIFAR capability. However, they were not tested under the Deep DIFAR program, but were considered by Sparton either for sale to the Navy

for "special test purposes" or for use as part of Sparton's dual depth development program which was to be sponsored by the Navy under ECP 0465-2 the approval for which was thought to be imminent (SPA 02878-39). Based upon the imminent issue of the ECP, Widenhofer prepared a June 15, 1971 memo describing the mechanical design considerations for incorporating the existing Deep DIFAR design into a Dual Deep DIFAR design (SPA 02840). One of those design considerations involved an investigation into "[h]ighly simplified designs" for the release plate (SPA 02841). Since the sale or test of the twenty engineering deep depth models was projected under the dual depth program, Widenhofer prepared a "Final Report" on the Deep DIFAR program which he considered "completed" (SPA 02843-44). In a typical "Final Report," he considered the "Final Design," "Design Problems Encountered," "Design Modifications" made to the sonobuoy, "Possible Problems in the Final Design" and "Modification [considerations] for Dual Depth" which included the "Release Plate Design" (SPA 02843-2850).

21. Shortly after the ECP 0465-2 became effective on July 13, 1971, Sparton decided to use some of the twenty Deep depth sonobuoys for drop tests "...to gain further confidence in the design..." (SPA 02851). The design philosophy under the ECP was to "demonstrate the feasibility of a design" and prove "an engineering approach" (SPA

02852). The dual depth design to be realized under the ECP was not supposed to "...be suitable for producing large quantities" of sonobuoys (SPA 02852).

22. On August 31, 1971 Sparton conducted its first sea test on a Dual Depth DIFAR sonobuoy and concluded that the "serious cable break problem[,] which affected four of six units on the last [February 18, 1971] air drop and which necessitated a special test series at the Naval Ordinance Laboratory, has been solved," but a new problem -- low frequency mechanically induced strum lines -- which impaired electrical performance was observed (SPA 02869). Sparton has conducted many sonobuoy development programs. It is typical in a sonobuoy development program to solve one problem only to have another surface. That is precisely what occurred in the dual depth DIFAR development program (SPA 02868-02880).

23. As a result of the additional apparatus needed and design modifications required for a dual depth DIFAR sonobuoy (SPA 02843-2850), Widenhofer conceived of a single piece release plate to reduce the needed sonobuoy volume for a release plate (SPA 02885). This plate was the subject of (a) an October 5, 1971 Sparton memo relating to a Proposed Test Program for the "new single part float pressure activated release plate design" (SPA 02881-84) and (b) a November 11, 1971 memo relating to a November 5, 1971 air

drop test conducted to evaluate the performance of among other things the new plate design (SPA 02890).

24. The Widenhofer Final Report on the Dual Depth Sonobuoy discusses the History of Design Problems Encountered in the Dual Depth DIFAR program, and the modifications made to the dual depth sonobuoy to solve these problems, the number of sea tests (3) performed on fully operational sonobuoys and other tests (4) performed on the sonobuoys (SPA 02960-02987). The Final Report also addresses The Possible Problem Areas in the Final Design and a Summary of Problem Areas (SPA 02984-02986). Sparton believed that further development effort was needed to determine the workability of this dual depth sonobuoy. The Navy also desired a further development effort and awarded Letter Contract N00019-72-C-0585 ("0585 Contract") to improve the product. On June 7, 1972, subsequent to the issuance of the 0585 Letter Contract, Widenhofer reported that he was informed by the Navy that it had tested Sparton's dual depth sonobuoy with satisfactory results, such that the Navy was "extremely pleased" with Sparton's Dual Depth DIFAR sonobuoy performance (SPA 02991). Based upon these Navy comments, Sparton developed the necessary confidence in its dual depth sonobuoy to know that it had a device that was workable for its intended environment.

25. The Final Report further indicates that, although the Dual Depth DIFAR Design was well documented within the limitations of the scope of the program, the layout and bill of material for that design were essentially, but not totally, complete (SPA 02973). While there was a full set of Sparton 900 series engineering part drawings by April 28, 1972, there was a lack of assembly drawings by that date. Assembly drawings are necessary for any sonobuoy contractor to produce a sonobuoy in production quantities utilizing production line assemblers. In Sparton's business practice, 900 series drawings were known to be engineering type drawings, whereas 100 series drawings were production drawings. Thus, the parts of the Mod. 4 300 sonobuoys that made it dual depth were not manufactured from production drawings. By March 29, 1972, manufacturing drawings did not exist at Sparton from which Sparton could have manufactured its dual depth sonobuoy. In fact, by July 18, 1973, the Sparton design still had not been finalized, and the Navy was so informed (002130-32).

Executed On March 16, 1999 Charles F. Boyle

Charles F. Boyle



B0797

P155.19