IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| SPARTON CORPORATION, | ) | |
| Plaintiff, | ) | |
| | ) | No. 92-580 |
| v. | ) | |
| | ) | Chief Judge Damich |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

**POST-TRIAL BRIEF OF THE UNITED STATES ON APPLICATION OF THE CHRISTIAN DOCTRINE**

GREGORY G. KATSAS
Assistant Attorney General

JOHN FARGO
Director

GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

July 22, 2008

TABLE OF CONTENTS

I. FACTS . . . . . 1

A. THE '-0465 CONTRACT AND MOD 4. . . . . 2

B. DEEP DIFAR AND THE "SPIDER" RELEASE MECHANISM. . . . . 7

C. CONCEPTION AND REDUCTION TO PRACTICE OF THE CLAIMED INVENTION . . . . . 12

D. SPARTON'S ADMINISTRATIVE CLAIM. . . . . 23

E. THE FEDERAL CIRCUIT'S OPINION. . . . . 25

II. THE UNITED STATES HAD A LAWFUL RIGHT TO USE THE CLAIMED INVENTIONS. . . . . 26

A. UNDER THE *CHRISTIAN* DOCTRINE, MANDATORY CLAUSES ARE INCORPORATED BY OPERATION OF LAW.. . . . . 27

B. THE PATENT RIGHTS CLAUSE EXPRESSES A SIGNIFICANT OR DEEPLY INGRAINED STRAND OF PUBLIC PROCUREMENT POLICY . . . . . 27

C. THE PATENT RIGHTS CLAUSE WAS A MANDATORY CLAUSE.. . . . . 29

D. MOD 4 REQUIRED SPARTON TO PERFORM RESEARCH AND DEVELOPMENT WORK. . . . . 34

E. THE CLAIMED INVENTIONS WERE BOTH CONCEIVED AND FIRST ACTUALLY REDUCED TO PRACTICE IN PERFORMANCE OF MOD 4 . . . . . 35

III. CONCLUSION. . . . . 38

## TABLE OF AUTHORITIES

### CASES

*Federal Crop Ins. Corp. v Merrill*,
332 U.S. 380 (1947).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*G. L. Christian & Assoc. v. United States*,
312 F.2d 418,
*aff'd on reh'g*, 320 F.2d 345 (Ct. Cl. 1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*General Eng'g & Mach. Works v. O'Keefe*,
991 F.2d 775 (Fed. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Invitrogen Corp. v. Clontech Labs, Inc.*,
429 F.3d 1052 (Fed. Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Porter v. United States*,
496 F.2d 583 (Ct. Cl. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Roberts Dairy Co. v. United States*,
530 F.2d 1342 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 32

*S.J. Amoroso Const. Co. v. United States*,
12 F.3d 1072 (Fed. Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 33

*Sparton Corp. v. United States*,
399 F.3d 1321 (Fed. Cir. 2005) (*Sparton II*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Sparton Corp. v. United States*,
57 Fed. Cl. 455 (2003) (*Sparton I*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Sparton Corp. v. United States*,
68 Fed. Cl. 34 (2005) (*Sparton III*). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Yosemite Park & Curry Co. v. United States*,
582 F.2d 552 (Ct. Cl. 1978). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

*Z4 Techs., Inc. v. Microsoft Corp.*,
507 F.3d 1340 (Fed. Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

## STATUTES

28 U.S.C. § 1498. . . . . . . . . . 1, 26

35 U.S.C. § 102(b). . . . . . . . . . 1

35 U.S.C. § 103 . . . . . . . . . . 32

## REGULATIONS

32 C.F.R. § 7.103-2 (1969). . . . . . . . . . 3

32 C.F.R. § 9.107-1 (1969). . . . . . . . . . 28

32 C.F.R. § 9.107-1 (1971). . . . . . . . . . 28

32 C.F.R. § 9.107-2(c) (1969). . . . . . . . . . 30, 34

32 C.F.R. § 9.107-2(c) (1971). . . . . . . . . . 30, 34

32 C.F.R. § 9.107-3 (1969). . . . . . . . . . 30-32

32 C.F.R. § 9.107-3 (1971). . . . . . . . . . 30-32

32 C.F.R. § 9.107-4 (1969). . . . . . . . . . 30, 31

32 C.F.R. § 9.107-4 (1971). . . . . . . . . . 30, 31

32 C.F.R. § 9.107-5 (1969). . . . . . . . . . 3, 30, 31

32 C.F.R. § 9.107-5 (1971). . . . . . . . . . 30, 31

32 C.F.R. §§ 9.107-1 to -5 (1969). . . . . . . . . . 29

32 C.F.R. §§ 9.107-1 to -5 (1971). . . . . . . . . . 29

Memorandum of August 23, 1971, Government Patent Policy,
36 Fed. Reg. 16887-16892 (Aug. 23, 1971). . . . . . . . . . 28, 29

Memorandum of October 10, 1963 [Government Patent Policy],
28 Fed. Reg. 10943-10946 (Oct. 12, 1963). . . . . . . . . . 28

# TABLE OF APPENDICES

A Memorandum of October 10, 1963 [Government Patent Policy], 28 Fed. Reg. 10943-10946 (Oct. 12, 1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A1

B Memorandum of August 23, 1971, Government Patent Policy, 36 Fed. Reg. 16887-16892 (Aug. 23, 1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . A6

C Extract of Armed Services Procurement Regulation, 32 C.F.R., Part 9 (1969). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A13

D Extract of Armed Services Procurement Regulation, 32 C.F.R., Part 9 (1971). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . A32

**POST-TRIAL BRIEF OF THE UNITED STATES**
**ON APPLICATION OF THE CHRISTIAN DOCTRINE**

Sparton Corporation (Sparton) brought this case pursuant to 28 U.S.C. § 1498, seeking compensation for the unauthorized use of the claimed inventions of United States Patents Nos. 3,921,120 (the '120 patent) and 4,029,233 (the '233 patent) by or for the United States Navy (Navy). Complaint. This court found that the patent was invalid for being "on sale" under 35 U.S.C. § 102(b). *Sparton Corp. v. United States*, 57 Fed. Cl. 455 (2003) (*Sparton I*). The case is now on remand from the Federal Circuit, that court's opinion is reported as *Sparton Corp. v. United States*, 399 F.3d 1321 (Fed. Cir. 2005) (*Sparton II*). This court's Opinion and Order on Claim Construction, Docket No. 249, is reported as *Sparton Corp. v. United States*, 68 Fed. Cl. 34 (2005) (*Sparton III*).

## I. FACTS

Both the '120 patent and the '233 patent name James W. Widenhofer (Widenhofer) as the inventor and have an effective filing date of March 29, 1972. Complaint; Jt. Stip. Facts, Witnesses and Exhibits, Docket No. 299, 2 ¶ 9 (Feb. 4, 2008) (hereinafter Jt. Stip. Fact).

Magnavox Corporation and Sanders Associates, Inc. were selected by the Navy in the 1964-65 fiscal year time frame to design and develop the DIFAR sonobuoy (DIFAR). D17.2; Jt. Stip. Fact at 3-4, ¶ 20. The Navy assigned DIFAR sonobuoys the designation "AN/SSQ-53" (SSQ-53). Jt. Stip. Fact at 3-4, ¶ 20. The development of the original SSQ-53 spanned a 3-4 year time period, with production of the SSQ-53 sonobuoy first occurring in Fiscal Year 1968. D17.2; Jt. Stip. Fact at 4, ¶ 21. Sparton became a third supplier for SSQ-53 sonobuoys in Fiscal

Year 1969 when the Navy issued Sparton Contract No. N00019-69-C-0465 (the '-0465 contract). D17.2; Jt. Stip. Fact at 4, ¶ 22.

### A. The '-0465 Contract and Mod 4

In response to the Request for Proposals (RFP) N00019-68-C-0075, Sparton submitted to the Navy a proposal dated January 2, 1969 for production of DIFAR (SSQ-53) sonobuoys. D1.13-.98; D126.40:1-.41:12.[1] The DIFAR sonobuoy disclosed in the proposal included a listening device called a "hydrophone" which was deployed at a depth of approximately ninety (90) feet below the ocean surface. D126.40:1-.41:12. The components of the disclosed DIFAR sonobuoy were housed in a housing having a "release plate assembly" at its lower end (as deployed). D126.188:19-.191:3; D126.190:19-192:7; J142.1 & .31. Sparton's offer was accepted by Naval Air Systems Command (NAVAIR) and Sparton was awarded the '-0465 contract. D1.13 The '-0465 contract was effective March 5, 1969. D1.13 It consisted of (a) the '-0075 RFP and Sparton's offer (D1.21-.98); (b) an "Amendment No. 1" of January 3, 1969 (D1.20), and (c) an executed "Award/Contract" Standard Form 26 and ancillary documentation (D1.13-.19).

The original '-0465 contract was a multi-year fixed price supply contract based on Sparton's offer, dated January 3, 1968. Jt. Stip. Fact at 4, ¶ 23; D1.14. The "Supplies or Services" to be delivered by Sparton under the '-0465 contract included: (1) "AN/SSQ-53

[1] In accordance with the court's Order of July 1, 2008, Docket No. 370, we identify exhibits in the manner prescribed by the court's Pretial Order, Docket No. 290, ¶ 3 (June 20, 2007). Exhibit citations are in the general form: [D, J or P][exhibit number].[page number(s)]. Deposition transcript citations are the same, but add citation to the line numbers: [D, J or P][exhibit number].[page number(s)]:[line number(s)]. Citations to the transcript similarly provide page and line numbers in the form [page number]:[line number].

Sonobuoy[s]"; and (2) "Design Data." D1.14; D1.26-.27. The '-0465 contract included a clause titled "Engineering Change Procedure" (Clause A) (March 1968) (NAVAIR 430-2). D1.40. This clause required that any Engineering Change Proposal (ECP) affecting an item being procured under the '-0465 contract be submitted by Sparton to NAVAIR via the Contract Administration Office. The "Engineering Change Procedure" clause also provided that

> [e]ach ECP … shall be prepared and submitted in accordance with the provisions of Air Force-Navy Aeronautical [ANA] Bulletin No. 445, entitled "Engineering Changes to Weapons, Systems, Equipments and Facilities," dated 12 July 1963, and NAVAIR Supplement No. 1 thereto, dated 5 February 1968, and in accordance with any subsequent modification thereto or superseding document ordered in writing by the Procuring Contracting Officer prior to the date the ECP is submitted. If any such document modification or superseding document is ordered and affects the cost of performance of this contract, the contract price shall, pursuant to the procedures provided in the "Changes" clause, be equitably adjusted.

D1.40. The '-0465 contract also included a "Changes" clause which provided in pertinent part:

> The Contracting Officer may at any time, by a written order . . . make changes, within the general scope of this contract, in any one or more of the following: (i) Drawings, designs, or specifications, where the supplies to be furnished are to be specially manufactured for the Government in accordance therewith; (ii) method of shipment or packing; and (iii) place of delivery. If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this contract, whether changed or not changed by any such order, an equitable adjustment shall be made in the contract price or delivery schedule, or both, and the contract shall be modified in writing accordingly. Any claim by the Contractor for adjustment under this clause must be asserted within 30 days from the date of receipt by the Contractor of the notification of change ….

D1.25 (item 2); P3.5; 32 C.F.R. § 7.103-2 (1969). The '-0465 contract did not list any of the clauses in 32 C.F.R. § 9.107-5 (1969) as being incorporated by reference in the contract, nor did it contain modified versions of any of those clauses. D1.22 & .25; P3.5.

The SSQ-53 sonobuoy initially sold under the '-0465 contract incorporated a rotochute that slowed its descent from an airplane and vertically oriented the buoy so that it would impact the ocean at its bottom end. Jt. Stip. Fact at 4-5, ¶ 25; J142.19-.20 & .31; D126.55:8-.56:20. The SSQ-53 sonobuoy produced under the '-0465 contract had a release plate located at the bottom end of the sonobuoy housing which was caused to release from the housing by the sonobuoy's impact with the water. Jt. Stip. Fact at 4-5, ¶ 25; J142.19-.20 & .31; D126.59:3-19, .188:19-.189:3 & .190:19-.192:7. This permitted the components to exit the lower part of the housing and to descend to their operating depth. Jt. Stip. Fact at 4-5, ¶ 25; J142.19-.20 & .31; D126.59:3-19, .188:19-.189:3 & .190:19-.192:7.

The DIFAR hydrophone of the SSQ-53 sonobuoys produced under the original '-0465 contract deployed to a depth of 90 feet below the float and cable spool assembly. J142.18-.20. The Naval Air Development Center ('NADC') conducted theoretical studies and sea tests which confirmed that a deeper hydrophone would result in an improved submarine detection capability. Jt. Stip. Fact at 5, ¶ 26; D17.2-.3; D123.4 ¶ 2.1. Prior to November 1970, the Navy concluded that having a deeper depth sonobuoy sensor would be advantageous. D126.125:15-127:3;D132.5; *see also* D123.4.

The Navy made that information available to industry representatives through Navy Security Industrial Association (NSIA) meetings. D126.91:13-.94:4; Tr. (Boyle) 590:22-591:25, 593:12-594:3 & 3495:23-3497:16 (Apr. 23 & May 8, 2008); D92.1. The NSIA meetings were attended by industry representatives including Sparton and other sonobuoy contractors. DX-126 at D126.91:13-.94:4; Tr. (Boyle) 590:22-591:25, 593:12-594:3 & 3495:23-3497:16 (Apr. 23 & May 8, 2008). Sparton learned of the Navy's desire to implement dual depth capability (deep

depth and the traditional depth) through an NSIA meeting. D126.91:13-.94:4; Tr. (Boyle) 590:22-591:25, 593:12-594:3 & 3495:23-3497:16 (Apr. 23 & May 8, 2008). By at least March 1971, Sparton and other members of the sonobuoy community knew that the Navy was looking for a dual depth sonobuoy. D126.91:13-.94:4; Tr. (Boyle) 590:22-591:25, 593:12-594:3 & 3495:23-3497:16 (Apr. 23 & May 8, 2008).

The Naval Air Systems Command ('NAVAIR'), as a result of the fleet recommendations, NADC theoretical studies and sea tests, granted an Engineering Change Proposal ('ECP'), at about the same time, to each of three SSQ-53 producers to supply the Navy with 500 buoys deployable at 90 or 500 feet (Magnavox), 300 buoys at 90 or 1000 feet (Sanders), and 300 buoys at 90 or 1000 feet (Sparton). D17.4; D123.4 ¶ 3.1.

Sparton prepared and provided to the Navy an "unofficial" Engineering Change Proposal 0465-2, dated November 30, 1970. D121.21:22-22:13; D132.1; Tr. (Boyle) 410:2-410:19 (Apr. 22, 2008). It was reviewed by NADC employee William Graff. D121.21:22-22:13.

By letter dated March 17, 1971, Sparton submitted its "official" Engineering Change Proposal 0465-2 (the ECP) to contract N00019-69-C-0465 to the Navy. J11.1; J12.1-.2; D130.1-.15. Plaintiff's March 1971 ECP submission included: (1) a two-page cover letter dated March 17, 1971 (J11.1 & .3); (2) a two-page standard government Form ME-1017, titled "Engineering Change Proposal (For Use with ANA Bulletin No. 445)," filled out by plaintiff (J12.1-.2); and (3) a ten-page document titled "Engineering Change Proposal for the Dual Depth DIFAR Sonobuoy" (D130.1-.15). Engineering Change Proposal 0465-2 was incorporated in the '-0465 contract on July 13, 1971, when the Navy executed Modification 4 (Mod 4) to that contract.

D17.10-11 (citing effective date of Mod. 4 and ECP 0465-2 as both being July 13, 1971); D1.9 & .11.

The ANA Bulletin No. 445 referred to in the title of Form ME-1017 (J12.1) that accompanied the "Engineering Change Proposal for the Dual Depth DIFAR Sonobuoy" is "Air Force-Navy Aeronautical Bulletin – Engineering Changes to Weapons, Systems, Equipments, and Facilities," dated 12 July 1963. DX-235.1-.24. The ANA Bulletin No. 445 identified five types of engineering change proposals: "Preliminary," "Formal," "Secondary," "Compatibility," and "Expedited." D235.3-.4, ¶ 4.3. Sparton indicated in its March 17, 1971 cover letter and on the accompanying Form ME-1017 that its ECP was a "Preliminary"-type ECP. J11.1; J12.1, "Type" block. According to ANA Bulletin No. 445, a preliminary ECP may be used for the following purposes: (1) to furnish the procuring activity with available information relative to a proposed change, in order to permit a preliminary evaluation of the change; (2) to permit a preliminary choice of one of various alternative proposals; or (3) to facilitate early contractual coverage for changes that require study before a formal-type engineering change proposal can be submitted. D235.3-.4 at ¶ 4.3.2(a).

Although the ANA Bulletin required that all boxes of Form ME-1017 be filled in, D235.10 at ¶ 7.1, Sparton left blank the item titled "Development Status." J12.2. Plaintiff's response to the item titled "Production Effectivity" was "Future Procurement (if evaluation tests prove proposed merits)." J12.2.

Sparton submitted the ECP with the hope of providing an improved product capability that would be incorporated into future procurement. D126.115:7-14. Sparton proposed two phases to the work which would be done under the ECP. DX-130.15 at ¶ 2.0. Phase one covered

design and construction of engineering models and performance of sea tests. DX-130.15 at ¶ 2.0. Phase two required modification and delivery of one production lot of 300 AN/SSQ-53 sonobuoys designed for dual depth operation. DX-130.15 at ¶ 2.0. In its cover letter, Sparton further explained that the first phase would accomplish the "redesign, modification and test of engineering models to verify feasibility of [the] design approach." J11.1. Further, to accomplish phase one, the government agreed to furnish 35 Sparton AN/SSQ-53 sonobuoys and supply aircraft and support facilities for conducting engineering sea tests, and, for phase two, the government would furnish 300 additional sonobuoys. D130.15 at ¶ 4. Sparton offered to accept a modification to the '-0465 contract incorporating the ECP, and perform the work proposed in 7 and 1/2 months for a fixed price of $198,000. J11.1.

### B. Deep DIFAR and the "Spider" Release Mechanism

Between the late 1960's and early 1970, Sparton employee Widenhofer suggested deploying the SSQ-53 DIFAR sonobuoy to a depth of 1000 feet to Sparton's management by using (a) the top end of the sonobuoy as an exit for deployable sonobuoy internal components, (b) a release plate mechanism actuated by a force imparted by a float assembly to either retain or deploy the sonobuoy internal components within or from the sonobuoy housing, and (c) the sonobuoy housing as a descent vehicle to assist the rapid deployment of sonobuoy internal components to a deep depth. D17.5. Mr. Widenhofer called this deployment scheme the 'inverse' or 'upside-down' deployment design because all SSQ-53 production sonobuoys up to that time contained release plate assemblies located at the bottom of the sonobuoy to deploy sonobuoy components from the bottom end of the sonobuoy. D17.5-.6.

By September 16, 1970, Sparton had a proposed program and schedule for modifying the SSQ-53 sonobuoy to incorporate the capability of listening at a depth of 1000 feet. J13.1. Under this schedule, the mechanical design was to be complete on or about January 17, 1971, and 20 complete sonobuoys were to be tested on or about February 28, 1971. J13.2. In November 1970, Sparton's employee, Mr. Depew, was assigned the responsibility to prepare a technical description of Sparton's proposed dual depth sonobuoy in the proposal to be given to the Navy. D17.6; D95.102, ¶¶ 2 & 3; D113.1, ¶ 5. His technical description was to be hardware oriented and include a layout. D17.6; D113.2, ¶ 3. And, on December 2, 1970, James W. Widenhofer proposed a test program for Sparton's deep DIFAR sonobuoy design. J17.1. The purpose of the test was "[t]o evaluate the performance of the proposed inverse sonobuoy package with particular reference to the float pressure activated release plate design." J17.1, "Purpose". As of December 2, 1970, Sparton had completed much of the design effort for the inverse sonobuoy design. J17.3, "Test Date."

On or about December 8, 1970, James W. Widenhofer prepared a report entitled "Patent Information on a Float Pressure Actuated Release Plate Mechanism." D93.10-.15. The report is dated, on a handwritten version as having been signed on December 8, 1970 and on a typed version as having been signed on January 7, 1971. D93.11 & .15. The report defines a release plate as "a device which serves to retain the stowed components inside a common housing during storage, shipment and air descent." D93.10 & .14. Upon water entry, the release plate falls clear of the sonobuoy housing, allowing the various components to deploy. *Id.* The report describes operation of a float pressure actuated release plate which is "blown out of the top end of the sonobuoy" by pressure from the inflating stowed float located directly below the release plate.

*Id.* A handwritten note adjacent to Mr. Widenhofer's signature on the second page of the typed version states: "This idea was first documented in a report, 'Mechanical Feasibility Design for a Reference Sonobuoy' by J. Widenhofer and C. Werner dated 15 April 1970." D93.15.

Beartrap was a classified government program to which Sparton provided supplies or services as a contractor. Tr. (Boyle) 632:8-22 (Apr. 23, 2008) (Beartrap was wide-ranging). The paper entitled "Mechanical Feasibility Design for a Reference Sonobuoy" was prepared as part of the Beartrap program. J75.2 (Beartrap report was the first description of an upside-down design); Tr. (Boyle) 620:3-621:5 (Apr. 23, 2008); D239.22, item 15; D14.1 (Request by Sparton to retain five classified Beartrap documents including "Mechanical Feasibility Design for a Reference Sonobuoy" by J. Widenhofer and C. Werner, dated 15 April 1970, and the Beartrap Sensor Study). And another document – the Beartrap Sensor Study, dated January 1, 1971 – did survive, and it also describes the operation of an "upside-down" sonobuoy capable of a deployment depth of 3000 feet. D239.10, .12 & .22, item 15; Tr. 638:3-639:17 & 641:12-644.15 (Apr. 23, 2008).

Under the Deep DIFAR program, Sparton conducted an air-drop test of the deep DIFAR sonobuoy mechanical design at Key West, Florida on December 19, 1970, in accordance with Mr. Widenhofer's proposal of December 2, 1970. J19.1. Four of the six sonobuoys tested on December 19, 1970, "performed as intended," according to Mr. Widenhofer's report on the test. J19.1.

On February 18, 1971, Sparton tested six fully operational deep DIFAR sonobuoys at the Navy base in Key West, Florida. J21.1. The purpose of the tests was to evaluate the mechanical and electrical deep DIFAR design prior to constructing a final engineering lot of twenty sonobuoys. J21.1. The float-pressure-actuated release plate "operated as designed" on all units

tested according to Mr. Widenhofer's February 26, 1971 report on the testing. J21.3, ¶ 3. As a result of the February 18, 1971 test, Mr. Widenhofer concluded:

> The objective of the two 6 sonobuoy engineering tests has been achieved. The principles involved in the operation of the inverse sonobuoy design with a float pressure actuated release mechanism, or the so call [sic, called] "upside down" design, have been proven workable and, within the limited scope of the testing accomplished to date, reliable.
>
> With only minor modifications to the cable pack assembly, the design is acceptable for construction of the final engineering lot of twenty sonobuoys for the purpose of demonstrating Sparton's deep DIFAR capability.

J21.2, "Conclusions."

Figures 2A and 2B of Mr. Widenhofer's February 26, 1971, report illustrate the deployment sequence of the inverse sonobuoy design tested on February 18, 1971. J21.7-.8. In stage one of that deployment sequence, the sonobuoy enters the water, causing a battery to activate and inflate a float. J21.7. Inflation of the float triggers the release plate, causing the plate to disengage from the sonobuoy and jettison the parachute. J21.7. In stage two of that deployment sequence, the float, radio transmitter and battery rise to the water's surface, while the remainder of the buoy, including the housing, descends while paying out the cable, which is attached to the surface level assembly, through the top of the housing. J21.7. In stages three and four of that deployment sequence, the subsurface sonobuoy components exit from the top of the housing which then falls away. J21.8. Figure 2A of the February 26, 1971 report includes drawings which are substantially identical to figures 1 and 2 of the '120 and '233 patents. *Compare* J21.7 *with* J1.2 *and* J3.2. Figure 2B of the February 26, 1971 report includes a drawing which is essentially identical to figure 3 of the '120 and '233 patents. *Compare* J21.7 *with* J1.2 *and* J3.2. On about March 23, 1971, Mr. Widenhofer proposed a test program for identifying the

cause of the cable break in the deep DIFAR sonobuoy design tested on February 18, 1971. J26.1. Sparton had identified the design feature causing the cable break problem and modified the design tested on February 18, 1971, to incorporate two thin, narrow mylar strips at the lower end of the sonobuoy housing. J32.6. Addition of the strips cured the problem. J32.6.

Mr. Widenhofer submitted a "Final Report" concerning the deep DIFAR program on June 21, 1971, in which he stated:

> The Deep DIFAR program, Job 7400 is complete. The final engineering lot consisting of twenty sonobuoys has been assembled and is waiting a final determination as to how the buoys may best be utilized.

J32.1. One of the major design parameters for the deep DIFAR program was that it lend itself to an easy conversion to a dual depth DIFAR sonobuoy. J32.7.

Widenhofer designed a multi-piece plate mechanism, called a spider plate, for use in the mechanical design referenced in the September 1970 Program Schedule, which was used throughout the Deep DIFAR program. D17.7, .8-.9. The Sparton sonobuoys sea tested on February 18, 1971 contained the multi-piece spider plate mechanism. D17.7. Spider plates were known mechanisms, having been previously used as water impact release plates on earlier sonobuoys. *See* D232.42 (Section C-C); Tr. (Boyle) 662:5-663:7 (Apr. 23, 2008); Tr. (Hudson) 2330:11-2332:6 (May 2, 2008). Defendant's Exhibit 141 is a drawing of the upper end of the Deep DIFAR sonobuoy illustrating the location of the release mechanism. Tr. (Boyle) 652:3-657:8 (Apr. 23, 2008); D141.1. The drawing was prepared by Mr. Widenhofer. Id.; D126.177:14-178:20; D141.1. The drawing shows a "spider plate" from the SSQ-50 sonobuoy used as a float actuated release plate. Tr. (Boyle) 652:3-657:8 (Apr. 23, 2008); D141.1.

A "spider plate" is composed of three arms integral to a central ring, and had three tabs – each corresponding to an arm – that were attached the ends of the arms opposite the central ring. Tr. (Boyle) 652:3-657:8 (Apr. 23, 2008); D141.1; D232.42 (Section C-C). Each tab engaged an opening in the circumferential wall of the casing. Tr. (Boyle) 652:3-657:8 (Apr. 23, 2008); D141.1; D232.42 (Section C-C). In the operation of the Deep DIFAR, the expanding float applied a force to the bottom center of the plate, causing it to move upward, causing the spider arms to withdraw inward. Tr. (Boyle) 652:3-657:8 (Apr. 23, 2008); D141.1; D232.42 (Section C-C). The tabs would them be removed from the openings of the casing, allowing the release mechanism to fall free and the sonobuoy to deploy. Tr. (Boyle) 652:3-657:8 (Apr. 23, 2008); D141.1; D232.42 (Section C-C).

The nonpatented Widenhofer Deep DIFAR sonobuoy containing the spider plate was the one tested by Sparton to and through the July 13, 1971 execution of Mod 4. D17.10-.11.

### C. Conception and Reduction to Practice of the Claimed Invention

"Conception of the 120 and 233 claimed inventions occurred between July 29, 1971 and November 23, 1971, when this single part release plate was conceived for use in the dual depth sonobuoy." D17.13. Shortly before the award of the ECP, Mr. Widenhofer provided his views as to what modifications to the Deep DIFAR design should be considered for the Dual Depth DIFAR of the ECP. J31.1. His June 15, 1971 memorandum states: "Release Plate Design – Highly simplified designs are feasible and should be investigated at this time (a major cost feature). The existing design used on Deep DIFAR appears to be dependable." J31.2.

Sparton maintains a log of its engineering drawings. D126.23:8-10. On page 19 of Book No. 2 of that log, there is an entry stating: "900-4623, A, JWW, Sonobuoy Release Plate, 6-30-71, 8000, 100." D95.112-113. The entry indicates that James Widenhofer was responsible for the number 900-4623 being assigned to a sonobuoy release plate on June 30, 1971. D126.264:8-267:9 & 271:21-273:19; D95.11 &.112-.113. That does not mean the drawing existed on that day: under Sparton's documentation control scheme, a drawing number could be assigned before the drawing was created. D126.266:20-.267:8. Sparton mechanical drawings are assigned numbers sequentially. D126.17:19-20:17. A draftsman receives input from the design engineer in the form of a sketch or verbal guidance. DX-126 at D126.17:19-20:17. The size of a Sparton mechanical drawing is identified by the letters A, B, C, D, or E, A being the smallest. D126.22:10-23:7. The number assigned to a Sparton mechanical drawing is the same as the number assigned to the corresponding part. D126.20:10-13.

The ECP was incorporated into the '-0465 contract on July 13, 1971, when the Navy executed Mod 4. D1.9. Shortly thereafter, memorandum by R. T. White summarizes a meeting held on July 20, 1971, to discuss the work plan for supplying dual depth DIFAR sonobuoys under the ECP. J35.1-.2. Mr. Widenhofer attended that meeting. J35.1. The design of the ECP sonobuoy would be based on the Deep DIFAR sonobuoy design. J35.1. In reporting on items for the mechanical redesign, the memo stated, "[t]he release plate mechanism should be simplified." J35.2. The memorandum also indicates that the ECP effort would be accounted for under "Job 7400" by its use of that job number for the meeting. J35.1. A "job number" is a method by which Sparton accumulated or tracked costs for a project. Tr. (Boyle) 407:9-408:3 (Apr. 22, 2008). Here, Sparton used the same number, No. 7400, for both its "in-house" Deep

DIFAR project and its Dual Depth DIFAR project under the ECP. Tr. (Boyle) 407:9-409:6 (Apr. 22, 2008). However, the projects can be distinguished temporally because the Deep DIFAR ended with the Final Report on June 21, 1971 (J32.1) and the Dual Depth DIFAR "Job No. 7400" began with issuance of Mod. 4 on July 13, 1971 (D1.9).

On or about August 13, 1971, Mr. Widenhofer performed calculations to determine what pressure an inflating float must exert to bend a release plate. D95.4-.5 & .83-.95. And, on August 31, 1971, Sparton conducted engineering tests of its dual depth DIFAR design at St. Croix, U.S. Virgin Islands with Navy assistance. J43.1. Ten operational Deep DIFAR sonobuoys were dropped from an airplane into the sea. J42.1; J43.2. The sonobuoys used in the test were Deep DIFAR sonobuoys. J42.1; J43.2. According to test report prepared by Messrs. Widenhofer and Huntoon, the August 31, 1971 test demonstrated that the cable break problem observed at the drop tests of February 18, 1971 had been solved. J43.2. The report referenced "Job 7400" and also indicated that a problem identified during the test could "result in significant delay to successful conclusion of the dual depth DIFAR E.C.P." J43.1-.2. Then, on or about October 13 and 14, 1971, Mr. Widenhofer made calculations entitled "D2 Difar – Release Plate Bending Moment Considerations" in which he calculated the pressure that an inflating float must exert to bend a release plate. D95.4-.5 & .91-.95.

"By October 1971, Widenhofer considered the 'bending moment' of a 'new [single-piece release] plate design,' and made a 'Preliminary Layout' drawing 900-4709 of the dual depth sonobuoy with the new release plate design identified in Section AA by part No. 900-4263." D17.12 (bracketed material in original). Sparton drawing no. 900-4709 is titled "Preliminary Layout, Dual Depth DIFAR, 7400-1008," and dated October 10, 1971. The area of the drawing

labeled “Section AA” shows parts labeled “900-4623, Plate, Release, Steel,” “R-32, Rubber Band,” and “900-4746 Bridle Racket Assy, Steel.” J45.1 & .6. The release plate identified as "900-4623" in section AA of drawing no. 900-4709 is a generally circular steel plate having a pair of locking tabs which would be inserted into openings in the sonobuoy housing. J45.1. The plate also has three elongated openings along the diameter which form a hinge line. J45.1; D126.243:16-.248:7. The release plate shown in section AA of drawing no. 900-4709 has a pair of slots in each tab which serve as a receptacle for the bridle bracket assembly to which the parachute shroud lines are connected. J45.1; D126.243:16-.248:7. A line connecting the slots is perpendicular to the hinge line. J45.1; D126.243:16-.248:7.

On November 5, 1971, Sparton conducted an air-drop test of four dual depth sonobuoys at Key West, Florida, with Navy assistance. J53.1. The purpose of the test, according to a report by Mr. Widenhofer, was “[t]o evaluate the performance of the proposed dual depth DIFAR sonobuoy package with particular reference to the new single part float pressure activated release plate design,” among other features. J53.1. The report again references “Job No. 7400” and Mr. Widenhofer refers to the “schedule” as being “tight.” J53.1 & .4.

The single part float pressure activated release plate functioned normally on two of the four units tested on November 5, 1971, according to Mr. Widenhofer's test report. J53.2. The malfunctioning of the other two units was caused by the bottom casting of the sonobuoy separating from the housing. J53.2. This problem was caused by sheared screws attaching the bottom casting to the sonobuoy housing and could be fixed by simply using longer, stronger screws. J53.2. This malfunction was unrelated to the release plate design. J53.2. In his report based on the November 5, 1971 test, Mr. Widenhofer concluded that the designs for the single

part release plate, the parachute release mechanism, the parachute attachment system and the float attachment system were acceptable for further evaluation without modification. J53.2.

Sparton has further conceded that

> [t]he single piece release plate was also the subject of (a) an October 5, 1971 Sparton memo relating to a Proposed Test Program for the "new single part float pressure activated release plate design" and (b) a November 11, 1971 memo relating to a November 5, 1971 air drop test conducted to evaluate the performance of among other things the "new single part … release plate design …." (and parachute anchoring and release mechanism). Two out of four of the new single part release plates functioned normally in the November 5 test, such that Widenhofer considered the design "acceptable for further evaluation without modification."

D17.12-13.

"On November 23, 1971, a Sparton engineering drawing 900-4623 was created for the new single part release plate design." D17.13. On or about November 31, 1971, James Widenhofer initialed "C" sized drawing 900-4623 of a single part float pressure activated release plate. D126.249:13-250:9; J55.1. The "C" sized drawing is the second version of this drawing produced, as indicated by the numeral "2" located next to the drawing number. D126.249:13-250:9; J55.1. Mr. Widenhofer designed the release plate shown in the drawing 900-4623. D126.249:13-250:9; J55.1. The plate shown in drawing no. 900-4623 is generally circular. D126.250:17-.254:7; J55.1. The flat plate has a pair of locking tabs for engagement of the sonobuoy housing. D126.250:17-.254:7; J55.1. Three elongate openings at the diameter of the plate form a hinge line. D126.250:17-.254:7; J55.1. The plate would deform along the hinge line if sufficient force were applied. Slots within the tabs accept the bridle bracket assemblies to which the parachute shroud lines can be attached. D126.250:17-.254:7; J55.1. A line connecting the slots is perpendicular to the hinge line. D126.250:17-.254:7; J55.1.

On January 13, 1972, Sparton conducted an air-drop test of ten fully operational dual depth DIFAR sonobuoys at St. Croix with Navy assistance. J60.1-.2. The purpose of the January 13, 1972 test was to evaluate the dual depth DIFAR design prior to commitment of a final design to be applied to the ECP's 300 production sonobuoys. J60.2. As reported by Mr. Widenhofer, two problems noted at the previous test of November 5, 1971, had been corrected by the newer design. J60.2. The redesigned "float spacer can" performed as intended. J60.2. The problem of bottom casting separation was corrected by using larger screws to fasten the bottom plate to the sonobuoy housing. J60.2. The report references the '-0465 contract, ECP 0465-2, and Job 7400 (partially obscured in the upper right corner).

"Aircraft drop tests of the Sparton dual depth sonobuoy with single part release plate were conducted in January, February and March 1972, the last being conducted during the week of March 6, 1972." D17.13. The only major problem observed at the January 13, 1972 tests was a loss of electronic audio signal on five of the ten buoys tested. J60.1. A report of the testing co-authored by Mr. Widenhofer does not mention any malfunction of the upside-down deployment design or the release plate. J60.1-.2. Nor does the report indicate any relationship between the electronic failure and the upside-down deployment design. J60.1-.2.

On February 9, 1972, Sparton conducted an air-drop test of eight dual depth DIFAR sonobuoys at the St. Croix facility with Navy assistance. J63.2. Six of the eight buoys appeared to deploy normally. J63.2. Of the two that did not deploy normally, the first had a sea water leak around the plug in the cable weight assembly, and the second had a broken strap on the bottom end of the mass damper. J63.2. Mr. Widenhofer did not report any problems with the upside-down deployment design or the release plate. J63.2.

On February 10, 1972, Sparton conducted an "over-the-side" test on seven dual depth DIFAR sonobuoys at St. Croix with Navy assistance. J63.3. According to Mr. Widenhofer's report, all seven buoys deployed normally. J63.3. By February 28, 1972, all assemblies for the 300 dual depth DIFAR sonobuoys to be delivered under the ECP had been completed and released by the Sparton Engineering department. J64.1. As of that date, Sparton expected delivery of the 300 buoys to commence during April 1972. J64.1 The reports for both of the February tests also reference "Job No. 7400."

On March 9, 1972, Sparton conducted air-drop engineering tests of the dual depth DIFAR design on 10 sonobuoys at St. Croix with assistance from the Navy and VAST, a government contractor. D126.139:6-142:22; J65.1. The purpose of the March 9, 1972 test was to evaluate the overall performance parameters of the dual depth sonobuoy design prior to final design release for the 300 production sonobuoys to be delivered under the ECP. J65.1. Mr. Widenhofer's test report for the March 9, 1972 test states that the test was "very successful." J65.1. Mr. Widenhofer reported that Navy personnel Bill Graff and Bill Mellis observed the March 9, 1972 test and were satisfied with the performance of the buoys. J65.1. All 10 sonobuoys deployed normally at the test on March 9, 1972. J65.2. Mr. Widenhofer's report references the '-0465 contract, ECP 0465-2 and Job No. 7400. J65.1. This test was "very successful" and resulted in the release of the design for production of the 300 deliverable sonobuoys according to Mr. Widenhofer's Final Report on the dual depth DIFAR effort under the ECP, dated April 28, 1972 (Final Report). J66.2 & .22. The March 9 test concluded the engineering test phase of the dual depth DIFAR program and the engineering development phase of the ECP. J65.1; J66.2.

Mr. Widenhofer prepared a report dated April 28, 1972, identifying the subject of the report as "Job 7400 - Dual Depth Difar Final Report (AN/SSQ-53 (DD)) Contract No. N00019-69-C-0465 ECP 0465-2." J66.1. In the report, Mr. Widenhofer stated that "[a]lthough a number of design problems were confronted during development, all were successfully overcome." Modifications made to correct the mechanical problems encountered in previous tests were successful in the March 9 test. J66.2-3. As of the engineering test on March 9, "[t]he existing design on the sonobuoy top end, incorporating the parachute, the parachute retainer, and release plate, and the float spacer, ha[d] proven to be inexpensive and reliable" according to Mr. Widenhofer's Final Report on the dual depth DIFAR project. J66.26. Following the March 9 test, Mr. Widenhofer reported that improving reliability or producibility of the dual depth DIFAR design did not require any change to the basic design concept. J66.2, D73.14, D73.23.

Sparton used the March 9 test as the basis for releasing the dual depth DIFAR design for production of the 300 sonobuoys to be delivered under Mod 4 and the ECP. J66.23. When a drawing is "released" within Sparton Corporation, it is released for general use by the company, including for use by the manufacturing and purchasing departments. D126.193:22-195:8. The project engineer and the chief engineer for a product authorize the release of the drawings. D126.193:22-195:8. As of April 28, 1972, Sparton expected to complete the 300 ECP production sonobuoys by May 19, 1972. J66.2.

"The April 28, 1972 Widenhofer Final Report on the dual depth sonobuoy addresses the history of design problems encountered in Sparton's dual depth DIFAR program, the modifications made to the dual depth sonobuoy to solve these problems, and the number of sea

tests (3) performed on fully operational sonobuoys as well as other tests (4) performed on Sparton's dual depth sonobuoys." D17.14. The Final Report states that

> [a] shallow water airdrop of the preliminary mechanical design was run in November 1971. The purpose was to evaluate the newly designed hardware with particular reference to the float pressure actuated single part release plate with its unique parachute attachment system, the simplified parachute release mechanism, the twist lock float attachment system, and the rotary depth selector. All of the above systems proved to be acceptable.

J66.22.

The 300 Sparton dual depth sonobuoys were delivered to the Navy in three shipments dated April 25 (100 buoys), June 9 (40 buoys) and June 13, 1972 (160 buoys). D17.15. All 300 sonobuoys delivered to the Navy under Mod 4 to the '-0465 contract incorporated the single piece release plate shown in Drawing 900-4623. J66.23 (the March 9 test was "used as the basis of [sic, for] releasing the design for production of the 300 deliverable buoys"); D17.15-.16 ("Sparton substituted the single piece bendable release plate recited in all '120 and '233 patent claims for the Depew multi-piece release plate mechanism proposed in the ECP as incorporated in Mod 4.").

On April 25, 1972, the Navy received a shipment of 100 dual depth sonobuoys produced under the ECP. J76.1; D121.42:2-46:4. The sonobuoys were shipped to the attention of William Graff. J76.1; D121.42:2-43:15. At that time, William Graff was an electronic engineer at the Naval Air Warfare Center in Warminster, Pennsylvania. D121.2:3-10. The ECP sonobuoys were shipped to Mr. Graff so that he could then distribute them to Navy P-3 squadrons in the Atlantic fleet and the Pacific fleet as well as to those located in Hawaii, Bermuda, Iceland and the Mediterranean. D121.43:18-46:4. The squadrons were to test the ECP sonobuoys alongside standard SSQ-53 buoys. D121.43:18-46:4. The purpose of those tests conducted with ECP

sonobuoys was to evaluate the acoustical performance of the sonobuoys in various operating areas of the world where ocean temperatures and conditions differ. D121.43:18-46:4. The tests compared the operation of dual depth SSQ-53 sonobuoys to standard SSQ-53 sonobuoys to determine which would perform better under certain conditions. D121.43:18-46:4.

A second shipment of 160 sonobuoys was also distributed by Mr. Graff to the fleet for testing. D121.62:7-.65:19. Mr. Graff received data reports from these tests, which he analyzed and reported as he had with the first shipment. D121.63:1-.64:13. On the instructions of Mr. Graff, the remaining 40 Sparton dual depth sonobuoys produced under Mod 4 of the '-0465 contract were delivered to the Naval Air Station at Key West, Florida, on June 9, 1972. D121.64:14-67:10; J77.1.

The testing procedure used with the ECP sonobuoys was authored by William Graff, and is recorded in an "Evaluation Plan" for "Selectable Depth AN/SSQ-53 Sonobuoys," dated February 28, 1972. D121.47:20-49:20; D123.1 & .4. The purpose of the tests conducted according to the Evaluation Plan was "to evaluate the anticipated advantages of a deep hydrophone array with SSQ-53 DIFAR sonobuoys." D123.4.

The tests used dual depth sonobuoys produced by Magnavox, Sanders and Sparton, each produced according to an Engineering Change Proposal under an existing production contract. D121.50:7-53:22. The tests were not specifically directed to the Sparton sonobuoys. D121.50:7-53:22. The Sparton dual depth sonobuoy tested used the "upside-down" deployment design. D121.59:13-61:21. The Magnavox and Sanders models did not deploy in this manner. D121.59:13-61:21. In those models, the electronic components deployed from the bottom of the sonobuoy housing. D121.59:13-61:21. The Evaluation Plan does not mention the different

methods of deployment used by the different models because it would not be significant to the personnel conducting the tests. D121.59:13-61:21. The Evaluation Plan does not request any information be gathered on the deployment of the sonobuoys. DX-123.4 -.11. Mr. Graff was not interested in the specifics of each sonobuoy's design, but in how it performed in deep mode. D121.76:3-20.

During the testing supervised by Mr. Graff, Navy fleet squadrons conducted the tests in accordance with their standard operational tests involving tracking a submarine. D121.45:12-46:7. According to the test procedure, if a squadron planned to track a submarine using a DIFAR sonobuoy, it would also use a Dual Depth SSQ-53 sonobuoy for tracking at the same time in order to collect data from the two types of buoys in a uniform manner. D121.45:12-46:7. The "Evaluation Plan" instructed the Navy aircraft to: (1) deploy both a standard, shallow depth SSQ-53 sonobuoy and a dual depth sonobuoy set for deep depth in the same location; (2) fly to a second location 15 or 25 miles from the first; (3) deploy the two sonobuoys at the second location; (4) communicate with the participating submarine which would then proceed along a predetermined course; and (5) collect data from the sonobuoys. D123.6-.9.

The Navy's testing of dual depth sonobuoys according to the Evaluation Plan lasted approximately one year. D121.51:14-16. The data collected by the fleet was sent to William Graff at the Naval Air Development Center at Warminster, Pennsylvania. D121.48:13-49:13; D123.4. Mr. Graff prepared approximately four to six reports based on this data over the course of approximately a year for the Naval Air Systems Command. D121.52:6-57:18. In his reports based on this data, Mr. Graff stated that the sonobuoys operating at a deep depth showed an

improved detection capability because they were able to track a given submarine for a longer period of time as compared to those operating at a shallow depth. D121.51:14-.52.15 & .57:23-58:10. On this basis, Graff suggested that it was "worthwhile" adding dual depth capability to the SSQ-53 sonobuoy. D121.51:14-.52.15 & .57:23-58:10. Mr. Graff did not recommend the purchase of dual depth sonobuoys from any one manufacturer over those of the other two. D121.51:14 .52.15 & .53:16-.55:15. Because the testing of the dual depth sonobuoys was considered internal to the Navy, none of the three contractors who produced the sonobuoys were given any written reports regarding the results of the testing. D121.74:7 - .75:8. Mr. Graff or other Naval Air Development Center personnel provided only "unofficial" feedback to the contractors if they experienced a reliability problem with the sonobuoy during testing. D121.74:7-75:4.

The sonobuoys shipped to Key West were evaluated there according to the Evaluation Plan by a Navy squadron located in Key West known as "VX-1" whose mission was to evaluate new avionics systems. D121.64:14-65:24. Mr. Graff believed it was desirable to have the VX-1 squadron involved in evaluating the sonobuoys in order to have the sonobuoys distributed and tested by as many different squadrons within the fleet, and at as many different locations around the world, as possible. D121.72:22-.73:18.

### D. SPARTON'S ADMINISTRATIVE CLAIM

Sparton submitted an administrative claim to the Navy on February 11, 1981, requesting compensation for the unauthorized use of the inventions claimed in the '120 and '233 patents by Magnavox, Sippican and Hazeltine Corporations. J80.1. In furtherance of that claim, Attorney

Paul J. Ethington, in a letter dated February 27, 1992, provided amended responses on behalf of Sparton to requests by the Navy for information. The letter included numerous Sparton documents as attachments in response to the Navy's request. D95.1. The February 27 letter explained that "[a] thorough search has failed to locate any written material which is approximately contemporaneous with the ECP 465-2 and which provides a description of the configuration and operating principle of the release plate of the proposal of ECP465-2," and presumed that any records had been destroyed. D95.7. Mr. Ethington attached affidavits of James Widenhofer and Donald Depew as the "best evidence" of the design of the release plate. D95.7.

Both the Widenhofer and the Depew affidavits assert that the release plate assembly proposed by the ECP had two sliding latch plates which disengaged from the sonobuoy housing slots in response to the upward motion of the cam, as urged by the float inflation. D95.96-111.

In discussing the reduction to practice date of the '120 patent, the February 27 letter stated that, "[a]lthough not necessarily the earliest, there was a reduction to practice at least as early as the test on March 9, 1972, which is reported in Sparton report 'Job 7400 - Dual Depth Difar Final Report' by J. Widenhofer dated April 28, 1972…." D95.12; 66.1 & .26 (Apr. 28, 1972, DIFAR Final Report). With regard to the '233 patent, the February 27, 1992, letter stated, "[t]he conception date is believed to be in the period of about August 1971 to October 1971 as evidenced by the documents of Attachments 01, 02, 03, and 04, cited above. The first reduction to practice is believed to be March 9, 1972, as reported in the Widenhofer report of April 28, 1972, Attachment A." D95.12-13; D95.83-.95 (Attachments 01-04); J66.1 & .26.

Attachments 01, 02, 03 and 04 to the February 27, 1992 letter are, respectively: (1) hand-written sketches and calculations bearing the initials JWW of James W. Widenhofer, dated August 12, 1971 and entitled "DIFAR Release Plate Activation Pressure"; (2) hand-written sketches and calculations bearing the initials JWW of James W. Widenhofer, dated August 13, 1971 and entitled "DIFAR Release Plate Activation Pressure"; (3) hand-written sketches and calculations bearing the initials JWW of James W. Widenhofer, dated October 13, 1971 and entitled "DIFAR Release Plate Bending Moment Considerations"; and (4) hand-written sketches and calculations bearing the initials JWW of James W. Widenhofer, dated October 14, 1971 and entitled "DIFAR Release Plate Bending Moment Revision." D95.4-.5 (Attachments 01-04 were found in Widenhofer's personal files), D95.83-.95.

### E. THE FEDERAL CIRCUIT'S OPINION

In Sparton's appeal of this court's 2003 Opinion, the Court of Appeals for the Federal Circuit adopted the following facts relevant to the issue then on appeal and to the license issue presently before the court:

> On March 17, 1971, Sparton submitted an Engineering Change Proposal ("ECP") 0465-2 to the Navy under its existing contract, proposing to incorporate dual depth operating capability into the existing SSQ-53 DIFAR sonobuoy by modifying the design to incorporate an inverse deployment system. The sonobuoy device described in the ECP included a multi-piece release plate for either retaining or deploying the sonobuoy internal components within or from the sonobuoy housing. However, shortly after the ECP was issued, Sparton developed, and later tested, a sonobuoy having a single-piece release plate. This single-piece release plate performed better than previous release plates and was ultimately used in the modified SSQ-53s Sparton delivered to the Navy under the contract.
>
> On March 29, 1973, Sparton filed a patent application relating to a dual depth sonobuoy design. The '120 patent issued as a result and is directed to a

> sonobuoy deployment system. Sparton then filed a divisional application resulting in the '233 patent, which is drawn to a sonobuoy release plate. Both patents contain claim limitations drawn to a single piece release plate for a sonobuoy.

399 F.3d at 1323. And the Federal Circuit further held that

> the patented invention had not yet been conceived when the alleged offer for sale took place. "Plaintiff asserts that conception of the patented release plate did not occur until after Mod. 4 was adopted, and this fact is not disputed by Defendant for purposes of summary judgment."

399 F.3d at 1325 (quoting 57 Fed. Cl. at 468).

## II. THE UNITED STATES HAD A LAWFUL RIGHT TO USE THE CLAIMED INVENTIONS

This Court only has jurisdiction where "an invention described in and covered by a patent … is used or manufactured by or for the United States *without license of the owner thereof or lawful right to use or manufacture the same*." 28 U.S.C. § 1498 (emphasis added). Accordingly, where the Government obtains a right to use an invention by virtue of contract or other agreement, this court lacks jurisdiction over a claim for compensation. *Roberts Dairy Co. v. United States*, 530 F.2d 1342, 1359-60 (1976) ("a suit against the United States … under 28 U.S.C. § 1498 is only appropriate when the alleged infringement is accomplished by the United States or a United States contractor who does not have a license to practice the invention").

At issue in this case is whether a "patent rights clause" is incorporated by operation of law in Mod 4 to the '-0465 contract because Mod 4 changed the nature of the contract from one for supplies to one for research and development.

## A. UNDER THE *CHRISTIAN* DOCTRINE, MANDATORY CLAUSES ARE INCORPORATED BY OPERATION OF LAW

The *Christian* doctrine holds that a "mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract by operation of law." *S.J. Amoroso Const. Co. v. United States*, 12 F.3d 1072, 1075 (Fed. Cir. 1993); *G. L. Christian & Assoc. v. United States*, 312 F.2d 418, 426-27 (Ct. Cl. 1963), *aff'd on reh'g*, 320 F.2d 345 (1963). The policy may be statutory or administrative. *Christian,* 312 F.2d at 351 ("[i]t was important then, and it is important now, that procurement policies set by higher authority not be avoided or evaded (deliberately or negligently) by lesser officials, or by a concert of contractor and contracting officer"); *General Eng'g & Mach. Works v. O'Keefe*, 991 F.2d 775, 779 (Fed. Cir. 1993) ("[t]here is a [] need to protect *the significant policies* of superior administrators from sapping by subordinates"). The basis for the doctrine is that the government can be neither estopped nor bound where its agents act beyond their authority. *Amoroso Const.,* 12 F.3d at 1075 (citing *Federal Crop Ins. Corp. v Merrill*, 332 U.S. 380, 384 (1947); *Yosemite Park & Curry Co. v. United States*, 582 F.2d 552, 558 (Ct. Cl. 1978); and *Porter v. United States*, 496 F.2d 583, 590 (Ct. Cl. 1974)). Where an agent is required to include a clause but fails to do so, whether through neglect or malfeasance, the agent is acting beyond the agent's authority. *Amoroso Const.,* 12 F.3d at 1075.

## B. THE PATENT RIGHTS CLAUSE EXPRESSES A SIGNIFICANT OR DEEPLY INGRAINED STRAND OF PUBLIC PROCUREMENT POLICY

The significance of the patent rights clause to government procurement policy is demonstrated by the promulgation of two Presidential policy statements in 1963 and 1971.

President Kennedy's "Memorandum of October 10, 1963 [Government Patent Policy]," 28 Fed. Reg. 10943-10946 (Oct. 12, 1963) (the 1963 Policy Statement), established the patent policy which was in effect at the time the contract was issued. The policy established in the 1963 Policy Statement was subsequently incorporated in the Armed Services Procurement Regulations (ASPR). *Compare* 1963 Policy Statement, Policy §§ 1 & 4 *with* 32 C.F.R. § 9.107-1 (1969). Subsequently, President Nixon revised and reissued that policy in the "Memorandum of August 23, 1971, Government Patent Policy," 36 Fed. Reg. 16887-16892 (Aug. 23, 1971) (the 1971 Policy Statement). Appendix B. As with the 1963 Policy Statement, the 1971 Policy Statement was subsequently incorporated into the ASPR. *Compare* 1971 Policy Statement, Policy, §§ 1 & 4 *with* 32 C.F.R. §§ 9.107-1 (1971).

That two Presidents saw fit to insure that a uniform patent policy applied to all government agencies makes clear that the policy was viewed as being important. Indeed, both the 1963 Policy Statement and the 1971 Policy Statement expressly state the significance of the policy to insure a uniform treatment of rights made under government contracts. Appendix A at A2, 28 Fed. Reg. at 10943 ("there is need for greater consistency in agency practices in order to further the governmental and public interests in promoting the utilization of federally financed inventions"); Appendix B at A9 ¶ G, 36 Fed. Reg. at 16889 ("[t]he prudent administration of Government research and development calls for a Government-wide policy on the disposition of inventions made under Government contracts reflecting common principles and objectives").

Both policy statements required the agency to retain at least a royalty free license in any invention made "in the course of or under" any contract "where a purpose of the contract is the conduct of experimental, developmental or research work." 1963 Policy Statement, Appendix A

at A2-5, 28 Fed. Reg. at 10943-46; 1971 Policy Statement, Appendix B at A9-12, 36 Fed. Reg. at 16889-892. Thus, although exact division of rights could vary to some degree, the policy statements always provided that the government would have at least a license in inventions made in the course of or under government research and development contracts. The policy expressed in these statements meets the requirement of the *Christian* Doctrine that the policy express a significant or deeply ingrained strand of public procurement policy.

### C. The Patent Rights Clause Was a Mandatory Clause

A patent rights clause was a mandatory clause in contracts for research and development in the 1969-1972 time frame. At that time, military contracts were governed by the Armed Services Procurement Regulation (ASPR), a predecessor of the Federal Acquisition Regulation. The pertinent provisions of which are in ASPR sections 9.107-3, -4, and -5. Two versions of the ASPR provisions were in force during the relevant time period. The first was in force from 1968 and remained in force until amended in 1970. 32 C.F.R. §§ 9.107-1 to -5 (1969). The second version became effective in 1970, and remained in force during the remainder of the relevant period. 32 C.F.R. §§ 9.107-1 to -5 (1971). The former was included in the ASPR when the '-0465 contract was awarded; the second when Mod 4 was awarded. The 1969 and 1971 versions, however, are substantially the same for purposes of this discussion. *Compare* 32 C.F.R. §§ 9.107-1 to -5(1969) *with* 32 C.F.R. §§ 9.107-1 to -5 (1971).

For purposes of the regulations, a "contract" is defined as "any actual or proposed contract, agreement, … or other arrangement … entered into with or for the benefit of the Government *where a purpose of the contract is the conduct of experimental, developmental or*

*research work*." 32 C.F.R. § 9.107-2(c)(3) (1969); 32 C.F.R. § 9.107-2(c)(3) (1971). Further, "made" in relation to an invention, is defined as "the conception or first reduction to practice of such invention in the course of or under the contract." 32 C.F.R. § 9.107-2(c)(4)(1969); 32 C.F.R. § 9.107-2(c)(4)(1971).

The ASPR required the inclusion of a clause granting the Government at least a royalty free license to make and use the invention (hereinafter a "patent rights clause") in "research and development" contracts. 32 C.F.R. § 9.107-3 & -5 (1969); 32 C.F.R. § 9.107-3 & -5 (1971). The regulation defines three categories of procurement situations that may arise in proposed research and development contracts and provides three patent rights clauses that are to be used, one for each situation. 32 C.F.R. § 9.107-3 & -5 (1969); 32 C.F.R. § 9.107-3 & -5 (1971). Category I included those contracts "in a field of science or technology in which there is little significant experience outside of work funded by the Government, or where the Government has been the principal developer in the field, and the acquisition of exclusive rights at the time of contracting might confer on the contractor a preferred or dominant position." 32 C.F.R. §§ 9.107-3(a)(3) (1969); 32 C.F.R. §§ 9.107-3(a)(3) (1971). For contracts in Category I, the Government "shall normally acquire … the principal or exclusive rights … in and to any invention made in the course of or under" such a contract. For situations covered by Category I, the clause at 32 C.F.R. § 9.107-5(a) was required. 32 C.F.R. §§ 9.107-3(a), -4(b) & -5(a) (1969); 32 C.F.R. §§ 9.107-3(a), -4(b) & -5(a) (1971). That clause includes a provision that generally grants title to the invention to the Government, but, "as a minimum," requires that the Government retain an "irrevocable, nonexclusive and royalty-free license to practice and have practiced each [] Subject

Invention." 32 C.F.R. § 9.107-5(a), clause ¶ (i) (1969); 32 C.F.R. § 9.107-5(a), clause ¶ (i) (1971); *see* A25, A45.

Category II includes contracts "where the purpose of the contract is to build upon existing knowledge or technology to develop information [or] products … for use by the Government" and the contractor has commercial interests in fields that are directly related to the subject matter of the contract. 32 C.F.R. §§ 9.107-3(b) (1969); 32 C.F.R. §§ 9.107-3(b) (1971). In those cases, the principal rights were to be left with the contractor, "subject to the Government's acquiring at least an irrevocable non-exclusive license … for governmental purposes." 32 C.F.R. § 9.107-3(b), -4(c), -5(b), clause ¶ (b) (1969); 32 C.F.R. § 9.107-3(b), -4(c), -5(b), clause ¶ (b) (1971).

Category III are those contracts where the commercial interests of the contractor are not sufficiently established. In such cases, the contracting officer was to make a determination of ownership of the rights after the contractor had provided information to sufficiently identify the invention and its commercial plans. 32 C.F.R. §§ 9.107-3(c) (1969); 32 C.F.R. §§ 9.107-3(c) (1971). Under Category III, however, the regulation required that "[i]n any event, the Government shall acquire at least a nonexclusive royalty-free license … for Governmental purposes." 32 C.F.R. §§ 9.107-3(c), -4(d), -5(a) & (c) (1969) (specifying that in situations specified in Category III, the clause at 32 C.F.R. § 9.107-5(a) was to be inserted, with modification to clause ¶ (h), not relevant here); 32 C.F.R. §§ 9.107-3(c), -4(d), -5(a) & (c) (1971) (same).

Thus, the regulations required that the Government would always retain *at least* a royalty free license for any invention conceived or actually reduced to practice under a "research and development" contract that falls in any of the three patent rights clauses. Such a license is

sufficient to preclude this court from exercising jurisdiction over plaintiff's claim. *Roberts Dairy*, 530 F.2d at 1359-60.

Further, it is clear the inventions in this case fall within Category I or II. Sparton had referred to the 300 sonobuoys delivered under the ECP as an "experimental quantity," P249.12; Tr. (Boyle) 827:10-829:14 (Apr. 24, 2008), and that the 300 sonobuoys were delivered for Navy test and evaluation, P249.12; Tr. (Boyle) 827:10-829:14 (Apr. 24, 2008).[2] The ECP also indicated that the "Production Effectivity" would only occur in "Future Procurement (if evaluation tests prove proposed merits)." J12.2.

The sonobuoy art is "a field of science or technology in which there is little significant experience outside of work funded by the Government, or where the Government has been the principal developer in the field," 32 C.F.R. §§ 9.107-3(a)(3) (1969); 32 C.F.R. §§ 9.107-3(a)(3) (1971). The Government bore the majority of the cost of the development of the SSQ-53 sonobuoys at issue here, granting engineering changes to each of its three contractors in order to develop alternatives. D123.4, ¶¶ 2.2 & 3.1; D17.4. And Sparton claimed that one of its corporate officers complained that Sparton was not getting enough research money from the Navy, which lead to the Navy awarding a small study contract to Sparton. Tr. (Boyle) 621:23-

---

[2] Sparton's "experimental use" argument arose in the context of claiming that the activities under the ECP were not "prior art" for purposes of the 35 U.S.C. § 103 obviousness inquiry. The Government disagreed because the invention was reduced to practice before the critical date and the sale of the 300 sonobuoys was "commercial." It is not inconsistent that a sale can be viewed as "commercial" for purposes of section 103, and yet still be "research, development or experimentation" for purposes of the *Christian* Doctrine. For purposes of section 103, the experimentation must be that of the inventor. Here, as Mr. Boyle points out, the experimentation that is being conducted is that of the Navy. P249.12; Tr. (Boyle) 827:10-829:14 (Apr. 24, 2008).

630.9. Indeed, Sparton publicly reported that approximately two-thirds of its research and development in the sonobuoy field was funded by the government. D310.4.

Sonobuoys are a field in which the Government's efforts in the support of research were pervasive. And the Government's role is not surprising since sonobuoys are items that have little, if any, practical use outside of the military. And, Sparton produced no evidence at the trial, that it had ever sold any sonobuoys in the commercial marketplace: the only sales were to the United States or foreign military sales.

While it is true that the contract here was originally denominated a "supply and services" contract and was for the production of an existing design of sonobuoy, that characterization cannot dictate the result. To allow subordinate officials to control the disposition of patent rights through the machination of the contracting process would allow the very conduct that the *Christian* doctrine is meant to prohibit. The *Christian* doctrine ensures the proper adherence to the policy by precluding "*ad hoc* encroachment or dispensation" by government agents not entrusted with making such policy decisions. *Amoroso Const.,* 12 F.3d at 1075. The doctrine thus precludes government agents from changing established government policy by their unilateral action.

To allow a Navy contracting officer to unilaterally avoid the Presidential directives by sleight of hand – changing the scope of a "supply" contract to one that has as its objective research and development, without addition of a patent rights clause – would frustrate the objectives of the President in establishing the policy. As both the 1963 Policy Statement and 1971 Policy Statement express, the purpose of the policy directive is to insure that agencies, not

only contracting officers, do not engage in ad hoc decisions that benefit their immediate purpose, but ill serve the government in the end.

And such is the case here. Using existing "supply or services" contracts to Sparton, Sanders and Magnavox as a vehicle to conduct "research and development" work no doubt met the Navy's goal of obtaining improved SSQ-53 sonobuoys faster than had the agency awarded new contracts to the same suppliers. But in the agency's race to that end, it ignored the regulatory requirement that it protect the public fisc by requiring, at least, a license in any invention made in the course of or under the contracts. The contracting officer's failure, whether intentional or not, was contrary to the uniform policy established by Presidential directive and controlling regulation. It was *ultra vires*.

### D. Mod 4 Required Sparton to Perform Research and Development Work

In order to be a Subject Invention under the regulations, the contract must be one where "a purpose … is the conduct of experimental, developmental or research work." 32 C.F.R. § 9.107-2(c)(3) (1969); 32 C.F.R. § 9.107-2(c)(3) (1971). The '-0465 contract, as modified by Mod 4, was such a contract.

It beyond cavil, that Mod 4 to the '-0465 contract had research and development of a dual depth sonobuoy as its primary purpose. Sparton's ECP states as much. The cover states that the purpose is to "verify feasibility of [the] design approach." J11.1. And the accompanying Form ME-1017 indicated that the proposed design would only be incorporated into production during "future procurement." J12.1. And the statement of work stated that Sparton, in phase one, would design and construct engineering models and perform sea tests. DX-130.15 at ¶ 2.0.

Further, each of the three SSQ-53 contractors received a similar engineering change modification at approximately the same time to address the same issue. Indeed, the ultimate goal of all three engineering change modifications, was to produce a small quantity of sonobuoys so that the Navy could obtain data from routine use of the dual depth sonobuoys and thereafter evaluate their efficacy.

### E. THE CLAIMED INVENTIONS WERE BOTH CONCEIVED AND FIRST ACTUALLY REDUCED TO PRACTICE IN PERFORMANCE OF MOD 4

There is also no question that Mr. Widenhofer's plate is the claimed invention of the '233 patent and is the corresponding structure to the claimed "releaseable retaining means" of the '120 patent. Plaintiff has conceded that it is. D17.15 ("The 300 dual depth sonobuoys were delivered to the Navy in three shipments …. Sparton substituted the single piece bendable release plate recited in all 120 and 233 patent claims for the Depew multipiece release plate mechanism proposed in the ECP as incorporated in Mod 4." (citation omitted)); Tr. (Boyle) 3739:21 - 3743:22 (May 9, 2008) (only difference between the deployment of the sonobuoy described in the ECP and claimed invention was the release mechanism). Comparison of the October 10, 1971 drawing to the drawings and claims of each patent also demonstrates that the drawings are identical in all respects to claim 1 of the '233 patent and the description and drawing that is the corresponding structure to the "releaseable retaining means" in the '120 patent. J1.3, fig. 7; J1.6, col 5, lns 10-27; J3.3, fig. 7; J3.6, col 5, lns 9-26 & col 6, lns 33-51; J45.1.

Sparton has also conceded that the claimed inventions were conceived *after* the award of Mod 4, both during the administrative claim and before the Federal Circuit. *See Invitrogen Corp. v. Clontech Labs, Inc.*, 429 F.3d 1052, 1063 (Fed. Cir. 2005) (conception is the inventor's

formation of a permanent idea of the complete and operative invention, and is sufficiently definite that it provides one skilled in the art with enough guidance to understand that a particular solution to the problem at hand has been achieved); D95.12-.13 & .83-.95 ("[t]he conception date is believed to be in the period of about August 1971 to October 1971 as evidenced by the documents of Attachments 01, 02, 03, and 04); D17.13 ("Conception of the 120 and 233 claimed inventions occurred between July 29, 1971 and November 23, 1971…"). And it is clear from both the concessions and from the supporting facts that the conception occurred in performance of the contract.

First, the entire "upside-down" deployment system *except the release mechanism* had been constructed and extensively tested in the Sparton Deep DIFAR project and the Beartrap project. J75.2 (Beartrap report was the first description of the upside-down design); Tr. (Boyle) 620:3-621:5 (Apr. 23, 2008); D239.10, .12 & .22, item 15 (January 1, 1971, Beartrap Sensor Study describing deployment of an "upside-down" sonobuoy); Tr. 638:3-639:17 & 641:12-644.15 (Apr. 23, 2008). Thus, all that remained to form the complete inventions of the '120 and '233 patent was for Mr. Widenhofer to conceive of and incorporate the single-piece release plate. Second, shortly before the award of Mod 4, Mr. Widenhofer informed his superiors at Sparton that a simpler, less expensive release mechanism should be considered for use in the dual depth sonobuoy. Third, shortly after the award of Mod 4, Mr. Widenhofer attended a meeting regarding the Mod 4/Job No. 7400 effort in which, on July 20, 1972, Sparton decide that the release mechanism should be simplified. Finally, Mr. Widenhofer, then set about on a two-month project to redesign the release mechanism, ending with the completion of the November

23, 1972 drawing no. 900-4623. These facts thus support the conclusion that the release plate was conceived in performance of the Mod 4 contract.

It is equally clear that the first actual reduction to practice of the claimed inventions occurred in performance of the contract. *See Z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1352 (Fed. Cir. 2007) (actual reduction to practice requires that an embodiment meeting all of the limitations of the claims have worked for its intended purpose). That conclusion is compelled by Mr. Widenhofer's April 28, 1972 Final Report. In the Final Report, he describes five tests of the upside-down deployment system (one in November 1971, one in January 1972, two in February 1972, and finally one in March 1972). We submit that any one of these tests could be considered the first actual reduction to practice because in reporting each test, Mr. Widenhofer recognized that the deployment system, and in particular the release plate, worked for its intended purpose. But it is unnecessary to choose between these dates, because each of the five tests was conducted under Mod 4 to the '-0465 contract and, therefore, any one of the tests would constitute a first actual reduction to practice under that contract. Certainly, after the March 9, 1972 test Mr. Widenhofer stated that the test was "very successful" and the design was released for production of the 300 sonobuoys required under the contract. To be sure, Mr. Widenhofer's own words regarding the March 9, 1972 test demonstrate that – *at the latest* – by the completion of that test, he was convinced that the upside-down deployment system, with the single piece release mechanism, worked for its intended purpose. Certainly, that test is the *latest* date by which the invention was first actually reduced to practice. And Mr. Widenhofer's April 28, 1972 Final Report, clearly identifies that each of the five tests as having been conducted performance of the Mod 4 contract and under "Job No. 7400."

## III. CONCLUSION

For the reasons stated above, one of the patent rights clauses specified in § 1.307-5 of the Armed Services Procurement Regulation was required to be inserted in the '-0465 contract, as modified by Mod 4. Therefore, under the *Christian* doctrine, the patent rights clause must be incorporated by operation of law. When so incorporated, the United States has the a lawful right to use the claimed inventions because they were conceived and first reduced to practice under the Mod 4 contract.

Respectfully submitted,

GREGORY G. KATSAS
Assistant Attorney General

JOHN FARGO
Director

*s/Gary L. Hausken*
GARY L. HAUSKEN
Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, D. C. 20530
Telephone: (202) 307-0342
Facsimile: (202) 307-0345

July 22, 2008

Appendix A

Memorandum of October 10, 1963 [Government Patent Policy],
28 Fed. Reg. 10943-10946 (Oct. 12, 1963)

# Memorandum of October 10, 1963

## [GOVERNMENT PATENT POLICY]

*Memorandum for the Heads of Executive Departments and Agencies*

Over the years, through Executive and Legislative actions, a variety of practices has developed within the Executive Branch affecting the disposition of rights to inventions made under contracts with outside organizations. It is not feasible to have complete uniformity of practice throughout the Government in view of the differing missions and statutory responsibilities of the several departments and agencies engaged in research and development. Nevertheless, there is need for greater consistency in agency practices in order to further the governmental and public interests in promoting the utilization of federally financed inventions and to avoid difficulties caused by different approaches by the agencies when dealing with the same class of organizations in comparable patent situations.

From the extensive and fruitful national discussions of government patent practices, significant common ground has come into view. First, a single presumption of ownership does not provide a satisfactory basis for government-wide policy on the allocation of rights to inventions. Another common ground of understanding is that the Government has a responsibility to foster the fullest exploitation of the inventions for the public benefit.

Attached for your guidance is a statement of government patent policy, which I have approved, identifying common objectives and criteria and setting forth the minimum rights that government agencies should acquire with regard to inventions made under their grants and contracts. This statement of policy seeks to protect the public interest by encouraging the Government to acquire the principal rights to inventions in situations where the nature of the work to be undertaken or the Government's past investment in the field of work favors full public access to resulting inventions. On the other hand, the policy recognizes that the public interest might also be served by according exclusive commercial rights to the contractor in situations where the contractor has an established non-governmental commercial position and where there is greater likelihood that the invention would be worked and put into civilian use than would be the case if the invention were made more freely available.

Wherever the contractor retains more than a non-exclusive license, the policy would guard against failure to practice the invention by requiring that the contractor take effective steps within three years after the patent issues to bring the invention to the point of practical application or to make it available for licensing on reasonable terms. The Government would also have the right to insist on the granting of a license to others to the extent that the invention is required for public use by governmental regulations or to fulfill a health need, irrespective of the purpose of the contract.

The attached statement of policy will be reviewed after a reasonable period of trial in the light of the facts and experience accumulated. Accordingly, there should be continuing efforts to monitor, record, and evaluate the practices of the agencies pursuant to the policy guidelines.

This memorandum and the statement of policy shall be published in the FEDERAL REGISTER.

JOHN F. KENNEDY

## STATEMENT OF GOVERNMENT PATENT POLICY

### BASIC CONSIDERATIONS

A. The government expends large sums for the conduct of research and development which results in a considerable number of inventions and discoveries.

B. The inventions in scientific and technological fields resulting from work performed under government contracts constitute a valuable national resource.

C. The use and practice of these inventions and discoveries should stimulate inventors, meet the needs of the government, recognize the equities of the contractor, and serve the public interest.

D. The public interest in a dynamic and efficient economy requires that efforts be made to encourage the expeditious development and civilian use of these inventions. Both the need for incentives to draw forth private initiatives to this end, and the need to promote healthy competition in industry must be weighed in the disposition of patent rights under government contracts. Where exclusive rights are acquired by the contractor, he remains subject to the provisions of the antitrust laws.

E. The public interest is also served by sharing of benefits of government-financed research and development with foreign countries to a degree consistent with our international programs and with the objectives of U.S. foreign policy.

F. There is growing importance attaching to the acquisition of foreign patent rights in furtherance of the interests of U.S. industry and the government.

G. The prudent administration of government research and development calls for a government-wide policy on the disposition of inventions made under government contracts reflecting common principles and objectives, to the extent consistent with the missions of the respective agencies. The policy must recognize the need for flexibility to accommodate special situations.

POLICY

SECTION 1. The following basic policy is established for all government agencies with respect to inventions or discoveries made in the course of or under any contract of any government agency, subject to specific statutes governing the disposition of patent rights of certain government agencies.

(a) Where

(1) a principal purpose of the contract is to create, develop or improve products, processes, or methods which are intended for commercial use (or which are otherwise intended to be made available for use) by the general public at home or abroad, or which will be required for such use by governmental regulations; or

(2) a principal purpose of the contract is for exploration into fields which directly concern the public health or public welfare; or

(3) the contract is in a field of science or technology in which there has been little significant experience outside of work funded by the government, or where the government has been the principal developer of the field, and the acquisition of exclusive rights at the time of contracting might confer on the contractor a preferred or dominant position; or

(4) the services of the contractor are

(i) for the operation of a government-owned research or production facility; or

(ii) for coordinating and directing the work of others,

the government shall normally acquire or reserve the right to acquire the principal or exclusive rights throughout the world in and to any inventions made in the course of or under the contract. In exceptional circumstances the contractor may acquire greater rights than a nonexclusive license at the time of contracting, where the head of the department or agency certifies that such action will best serve the public interest. Greater rights may also be acquired by the contractor after the invention has been identified, where the invention when made in the course of or under the contract is not a primary object of the contract, *provided* the acquisition of such greater rights is consistent with the intent of this Section 1(a) and is a necessary incentive to call forth private risk capital and expense to bring the invention to the point of practical application.

(b) In other situations, where the purpose of the contract is to build upon existing knowledge or technology to develop information, products, processes, or methods for use by the government, and the work called for by the contract is in a field of technology in which the contractor has acquired technical competence (demonstrated by factors such as know-how, experience, and patent position) directly related to an area in which the contractor has an established nongovernmental commercial position, the contractor shall normally acquire the principal or exclusive rights throughout the world in and to any resulting inventions, subject to the government acquiring at least an irrevocable non-exclusive royalty free license throughout the world for governmental purposes.

(c) Where the commercial interests of the contractor are not sufficiently established to be covered by the criteria specified in Section 1(b), above, the determination of rights shall be made by the agency after the invention has been identified, in a manner deemed most likely to serve the public interest as expressed in this policy statement, taking particularly into account the intentions of the contractor to bring the invention to the point of commercial application and the guidelines of Section 1(a) hereof, *provided* that the agency may prescribe by regulation special situations where the public interest in the availability of the inventions would best be served by permitting the contractor to acquire at the time of contracting greater rights than a non-exclusive license. In any case the government shall acquire at least a non-exclusive royalty free license throughout the world for governmental purposes.

(d) In the situation specified in Sections 1(b) and 1(c), when two or more potential contractors are judged to have presented proposals of equivalent merit, willingness to grant the government principal or exclusive rights in resulting inventions will be an additional factor in the evaluation of the proposals.

(e) Where the principal or exclusive (except as against the government) rights in an invention remain in the contractor, he should agree to provide written reports at reasonable intervals, when requested by the government, on the commercial use that is being made or is intended to be made of inventions made under government contracts.

(f) Where the principal or exclusive (except as against the government) rights in an invention remain in the contractor, unless the contractor, his licensee, or his assignee has taken effective steps within three years after a patent issues on the invention to bring the invention to the point of practical application or has made the invention available for licensing royalty free or on terms that are reasonable in the circumstances, or can show cause why he should retain the principal or exclusive rights for a further period of time, the government shall have the right to require the granting of a license to an applicant on a non-exclusive royalty free basis.

(g) Where the principal or exclusive (except as against the government) rights to an invention are acquired by the contractor, the government shall have the right to require the granting of a license to an applicant royalty free or on terms that are reasonable in the circumstances to the extent that the invention is required for public use by governmental regulations or as may be necessary to fulfill health needs, or for other public purposes stipulated in the contract.

(h) Where the government may acquire the principal rights and does not elect to secure a patent in a foreign country, the contractor may file and retain the principal or exclusive foreign rights subject to retention by the government of at least a royalty free license for governmental purposes and on behalf of any foreign government pursuant to any existing or future treaty or agreement with the United States.

SEC. 2. Government-owned patents shall be made available and the technological advances covered thereby brought into being in the shortest time possible through dedication or licensing and shall be listed in official government publications or otherwise.

SEC. 3. The Federal Council for Science and Technology in consultation with the Department of Justice shall prepare at least annually a report concerning the effectiveness of this policy, including recommendations for revision or modification as necessary in light of the practices and determinations of the agencies in the disposition of patent rights under their contracts. A patent advisory panel is to be established under the Federal Council for Science and Technology to

(a) develop by mutual consultation and coordination with the agencies common guidelines for the implementation of this policy, consistent with existing statutes, and to provide over-all guidance as to disposition of inventions and patents in which the government has any right or interest; and

(b) encourage the acquisition of data by government agencies on the disposition of patent rights to inventions resulting from federally-financed research and development and on the use and practice of such inventions, to serve as basis for policy review and development; and

(c) make recommendations for advancing the use and exploitation of government-owned domestic and foreign patents.

SEC. 4. *Definitions:* As used in this policy statement, the stated terms in singular and plural are defined as follows for the purposes hereof:

(a) Government agency—includes any Executive department, independent commission, board, office, agency, administration, authority, or other government establishment of the Executive Branch of the Government of the United States of America.

(b) "Invention" or "Invention or discovery"—includes any art, machine, manufacture, design, or composition of matter, or any new and useful improvement thereof, or any variety of plant, which is or may be patentable under the Patent Laws of the United States of America or any foreign country.

(c) Contractor—means any individual, partnership, public or private corporation, association, institution, or other entity which is a party to the contract.

(d) Contract—means any actual or proposed contract, agreement, grant, or other arrangement, or sub-contract entered into with or for the benefit of the government where a purpose of the contract is the conduct of experimental, developmental, or research work.

(e) "Made"—when used in relation to any invention or discovery means the conception or first actual reduction to practice of such invention in the course of or under the contract.

(f) Governmental purpose—means the right of the Government of the United States (including any agency thereof, state, or domestic municipal government) to practice and have practiced (made or have made, used or have used, sold or have sold) throughout the world by or on behalf of the Government of the United States.

(g) "To the point of practical application"—means to manufacture in the case of a composition or product, to practice in the case of a process, or to operate in the case of a machine and under such conditions as to establish that the invention is being worked and that its benefits are reasonably accessible to the public.

[F.R. Doc. 63-10888; Filed, Oct. 11, 1963; 9:21 a.m.]

Appendix B

Government Patent Policy,
36 Fed. Reg. 16887-16892 (Aug. 23, 1971)

# Presidential Documents

## Title 3—The President

MEMORANDUM OF AUGUST 23, 1971

## Government Patent Policy

**Memorandum for Heads of Executive Departments and Agencies**

THE WHITE HOUSE,
*Washington, August 23, 1971.*

On October 10, 1963, President Kennedy forwarded to the Heads of Executive Departments and Agencies a Memorandum and Statement of Government Patent Policy for their guidance in determining the disposition of rights to inventions made under Government-sponsored grants and contracts. On the basis of the knowledge and experience then available, this Statement first established Government-wide objectives and criteria, within existing legislative constraints, for the allocation of rights to inventions between the Government and its contractors.

It was recognized that actual experience under the Policy could indicate the need for revision or modification. Accordingly, a Patent Advisory Panel was established under the Federal Council for Science and Technology for the purpose of assisting the agencies in implementing the Policy, acquiring data on the agencies' operations under the Policy, and making recommendations regarding the utilization of Government-owned patents. In December 1965, the Federal Council established the Committee on Government Patent Policy to assess how this Policy was working in practice, and to acquire and analyze additional information that could contribute to the reaffirmation or modification of the Policy.

The efforts of both the Committee and the Panel have provided increased knowledge of the effects of Government patent policy on the public interest. More specifically, the studies and experience over the past 7 years have indicated that:

(a) A single presumption of ownership of patent rights to Government-sponsored inventions either in the Government or in its contractors is not a satisfactory basis for Government patent policy, and that a flexible, Government-wide policy best serves the public interest;

(b) The commercial utilization of Government-sponsored inventions, the participation of industry in Government research and development programs, and commercial competition can be influenced by the following factors: the mission of the contracting agency; the purpose and nature of the contract; the commercial applicability and market potential of the invention; the extent to which the invention is developed by the contracting agency; the promotional activities of the contracting agency; the commercial orientation of the contractor and the extent of his privately

financed research in the related technology; and the size, nature and research orientation of the pertinent industry;

(c) In general, the above factors are reflected in the basic principles of the 1963 Presidential Policy Statement.

Based on the results of the studies and experience gained under the 1963 Policy Statement certain improvements in the Policy have been recommended which would provide (1) agency heads with additional authority to permit contractors to obtain greater rights to inventions where necessary to achieve utilization or where equitable circumstances would justify such allocation of rights, (2) additional guidance to the agencies in promoting the utilization of Government-sponsored inventions, (3) clarification of the rights of States and municipal governments in inventions in which the Federal Government acquires a license, and (4) a more definitive data base for evaluating the administration and effectiveness of the Policy and the feasibility and desirability of further refinement or modification of the Policy.

I have approved the above recommendations and have attached a revised Statement of Government Patent Policy for your guidance. As with the 1963 Policy Statement, the Federal Council shall make a continuing effort to record, monitor and evaluate the effects of this Policy Statement. A Committee on Government Patent Policy, operating under the aegis of the Federal Council for Science and Technology, shall assist the Federal Council in these matters.

This memorandum and statement of policy shall be published in the Federal Register.

Richard Nixon

## Statement of Government Patent Policy

### Basic Considerations

A. The Government expends large sums for the conduct of research and development which results in a considerable number of inventions and discoveries.

B. The inventions in scientific and technological fields resulting from work performed under Government contracts constitute a valuable national resource.

C. The use and practice of these inventions and discoveries should stimulate inventors, meet the needs of the Government, recognize the equities of the contractor, and serve the public interest.

D. The public interest in a dynamic and efficient economy requires that efforts be made to encourage the expeditious development and civilian use of these inventions. Both the need for incentives to draw forth private initiatives to this end, and the need to promote healthy competition in industry must be weighed in the disposition of patent rights under Government contracts. Where exclusive rights are acquired by the contractor, he remains subject to the provisions of the antitrust laws.

E. The public interest is also served by sharing of benefits of Government-financed research and development with foreign countries to a degree consistent with our international programs and with the objectives of U.S. foreign policy.

F. There is growing importance attaching to the acquisition of foreign patent rights in furtherance of the interests of U.S. industry and the Government.

G. The prudent administration of Government research and development calls for a Government-wide policy on the disposition of inventions made under Government contracts reflecting common principles and objectives, to the extent consistent with the missions of the respective agencies. The policy must recognize the need for flexibility to accommodate special situations.

### Policy

Section 1. The following basic policy is established for all Government agencies with respect to inventions or discoveries made in the course of or under any contract of any Government agency, subject to specific statutes governing the disposition of patent rights of certain Government agencies.

(a) Where

(1) a principal purpose of the contract is to create, develop or improve products, processes, or methods which are intended for commercial use (or which are otherwise intended to be made available for use) by the general public at home or abroad, or which will be required for such use by governmental regulations; or

(2) a principal purpose of the contract is for exploration into fields which directly concern the public health, public safety, or public welfare; or

(3) the contract is in a field of science or technology in which there has been little significant experience outside of work funded by the Government, or where the Government has been the principal developer of the field, and the acquisition of exclusive rights at the time of contracting might confer on the contractor a preferred or dominant position; or

(4) the services of the contractor are

(i) for the operation of a Government-owned research or production facility; or

(ii) for coordinating and directing the work of others,

the Government shall normally acquire or reserve the right to acquire the principal or exclusive rights throughout the world in and to any inventions made in the course of or under the contract.

In exceptional circumstances the contractor may acquire greater rights than a nonexclusive license at the time of contracting where the head of the department or agency certifies that such action will best serve the public interest. Greater rights may also be acquired by the contractor after the invention has been identified where the head of the department or agency determines that the acquisition of such greater rights is consistent with the intent of this Section 1(a) and is either a necessary incentive to call forth private risk capital and expense to bring the invention to the point of practical application or that the Government's contribution to the invention is small compared to that of the contractor. Where an identified invention made in the course of or under the contract is not a primary object of the contract, greater rights may also be acquired by the contractor under the criteria of Section 1(c).

(b) In other situations, where the purpose of the contract is to build upon existing knowledge or technology, to develop information, products, processes, or methods for use by the Government, and the work called for by the contract is in a field of technology in which the contractor has acquired technical competence (demonstrated by factors such as know-how, experience, and patent position) directly related to an area in which the contractor has an established nongovernmental commercial position, the contractor shall normally acquire the principal or exclusive rights throughout the world in and to any resulting inventions.

(c) Where the commercial interests of the contractor are not sufficiently established to be covered by the criteria specified in Section 1(b) above, the determination of rights shall be made by the agency after the invention has been identified, in a manner deemed most likely to serve the public interest as expressed in this policy statement, taking particularly into account the intentions of the contractor to bring the invention to the point of commercial application and the guidelines of Section 1(a) hereof, provided that the agency may prescribe by regulation special situations where the public interest in the availability of the inventions would best be served by permitting the contractor to acquire at the time of contracting greater rights than a nonexclusive license.

(d) In the situations specified in Sections 1(b) and 1(c), when two or more potential contractors are judged to have presented proposals of equivalent merit, willingness to grant the Government principal or exclusive rights in resulting inventions will be an additional factor in the evaluation of the proposals.

(e) Where the principal or exclusive rights in an invention remain in the contractor, he should agree to provide written reports at reasonable intervals, when requested by the Government, on the commercial use that is being made or is intended to be made of inventions made under Government contracts.

(f) Where the principal or exclusive rights in an invention remain in the contractor, unless the contractor, his licensee, or his assignee has taken effective steps within three years after a patent issues on the invention to bring the invention to the point of practical application or has made the invention available for licensing royalty-free or on terms that are reasonable in the circumstances, or can show cause why he should retain the principal or exclusive rights for a further period of time, the Government shall have the right to require the granting of a nonexclusive or exclusive license to a responsible applicant(s) on terms that are reasonable under the circumstances.

(g) Where the principal or exclusive rights to an invention are acquired by the contractor, the Government shall have the right to require the granting of a nonexclusive or exclusive license to a responsible applicant(s) on terms that are reasonable in the circumstances (i) to the extent that the invention is required for public use by governmental regulations, or (ii) as may be necessary to fulfill health or safety needs, or (iii) for other public purposes stipulated in the contract.

(h) Whenever the principal or exclusive rights in an invention remain in the contractor, the Government shall normally acquire, in addition to the rights set forth in Sections 1(e), 1(f), and 1(g),

(1) at least a nonexclusive, nontransferable, paid-up license to make, use, and sell the invention throughout the world by or on behalf of the Government of the United States (including any Government agency) and States and domestic municipal governments, unless the agency head determines that it would not be in the public interest to acquire the license for the States and domestic municipal governments; and

(2) the right to sublicense any foreign government pursuant to any existing or future treaty or agreement if the agency head determines it would be in the national interest to acquire this right; and

(3) the principal or exclusive rights to the invention in any country in which the contractor does not elect to secure a patent.

(i) Whenever the principal or exclusive rights in an invention are acquired by the Government, there may be reserved to the contractor a revocable or irrevocable nonexclusive royalty-free license for the practice of the invention throughout the world; an agency may reserve the right to revoke such license so that it might grant an exclusive license when it determines that some degree of exclusivity may be necessary to encourage further development and commercialization of the invention. Where the Government has a right to acquire the principal or exclusive rights to an invention and does not elect to secure a patent in a foreign country, the Government may permit the contractor to acquire such rights in any foreign country in which he elects to secure a patent, subject to the Government's rights set forth in Section 1(h).

SEC. 2. Under regulations prescribed by the Administrator of General Services, Government-owned patents shall be made available and the technological advances covered thereby brought into being in the shortest time possible through dedication or licensing, either exclusive or nonexclusive, and shall be listed in official Government publications or otherwise.

SEC. 3. The Federal Council for Science and Technology in consultation with the Department of Justice shall prepare at least annually a report concerning the effectiveness of this policy, including recommendations for revision or modification as necessary in light of the practices and determinations of the agencies in the disposition of patent rights under their contracts. The Federal Council for Science and Technology shall continue to

(a) develop by mutual consultation and coordination with the agencies common guidelines for the implementation of this policy, consistent with existing statutes, and to provide overall guidance as to disposition of inventions and patents in which the Government has any right or interest; and

(b) acquire data from the Government agencies on the disposition of patent rights to inventions resulting from federally financed research and development and on the use and practice of such inventions to serve as bases for policy review and development; and

(c) make recommendations for advancing the use and exploitation of Government-owned domestic and foreign patents.

Each agency shall record the basis for its actions with respect to inventions and appropriate contracts under this statement.

SEC. 4. Definitions: As used in this policy statement, the stated terms in singular and plural are defined as follows for the purposes hereof:

(a) *Government agency*—includes any executive department, independent commission, board, office, agency, administration, authority, Government corporation, or other Government establishment of the executive branch of the Government of the United States of America.

(b) *States*—means the States of the United States, the District of Columbia, Puerto Rico, the Virgin Islands, American Samoa, Guam and the Trust Territory of the Pacific Islands.

(c) *Invention, or Invention or discovery*—includes any art, machine, manufacture, design, or composition of matter, or any new and useful improvement thereof, or any variety of plant, which is or may be patentable under the Patent Laws of the United States of America or any foreign country.

(d) *Contractor*—means any individual, partnership, public or private corporation, association, institution, or other entity which is a party to the contract.

(e) *Contract*—means any actual or proposed contract, agreement, grant, or other arrangement, or subcontract entered into with or for the benefit of the Government where a purpose of the contract is the conduct of experimental, developmental, or research work.

(f) *Made*—when used in relation to any invention or discovery means the conception or first actual reduction to practice of such invention in the course of or under the contract.

(g) *To the point of practical application*—means to manufacture in the case of a composition or product, to practice in the case of a process, or to operate in the case of a machine and under such conditions as to establish that the invention is being worked and that its benefits are reasonably accessible to the public.

[FR Doc.71-12623 Filed 8-25-71;10:41 am]

Appendix C

Extract of Armed Services Procurement Regulation,
32 C.F.R., Part 9 (1969)

# CODE OF FEDERAL REGULATIONS

## TITLE 32

Parts 9 to 39

Revised as of January 1, 1969

CONTAINING A CODIFICATION OF DOCUMENTS OF GENERAL APPLICABILITY AND FUTURE EFFECT AS OF JANUARY 1, 1969

*With Ancillaries*

Published by the Office of the Federal Register, National Archives and Records Service
General Services Administration, as a Special Edition of the Federal Register
Pursuant to Section 11 of the Federal Register Act as Amended

51



# SUBCHAPTER A—ARMED SERVICES PROCUREMENT REGULATIONS—(Continued)

## PART 9—PATENTS, DATA, AND COPYRIGHTS


Sec.
9.000 Scope of part.

Subpart A—Patents

9.100 Scope of subpart.
9.101 [Reserved]
9.102 Authorization and consent.
9.102–1 Authorization and consent in contracts for supplies or services.
9.102–2 Authorization and consent in contracts for research or development.
9.103 Patent indemnification of Government by contractor.
9.103–1 Patent indemnification in formally advertised contracts—commercial status predetermined.
9.103–3 Patent indemnification in negotiated contracts.
9.103–4 Waiver of indemnity by the Government.
9.104 Notice and assistance.
9.106 Classified contracts.
9.106–1 Classified contracts—contracting officer's duties.
9.106–2 Classified contracts relating to atomic energy.
9.107 Patent rights under contracts for research and development.
9.107–1 Introduction.
9.107–2 General.
9.107–3 Policy.
9.107–4 Procedures.
9.107–5 Clauses for domestic contracts.
9.107–6 Clause for foreign contracts.
9.107–7 Contracts relating to atomic energy.
9.107–8 Contracts placed for NASA.
9.107–9 Contracts relating to space.
9.108 Patent rights under contracts for personal services.
9.109 Administration of patent rights clauses.
9.109–1 Applicability.
9.109–2 Follow-up by Government.
9.109–3 Maintenance and use of records of performance.
9.109–4 Conveyance of invention rights to Government.
9.109–5 Register of Government rights in inventions.
9.110 Reporting of royalties—anticipated or paid.
9.111 Refund of royalties.
9.112 Adjustment of royalties.

Subpart B—Data and Copyrights

9.200 Scope of subpart.
9.201 Definitions.
9.202 Acquisition of rights in technical data.
9.202–1 Background.
9.202–2 Policy.
Sec.
9.202–3 Procedures.
9.203 Contract clauses.
9.204 Contract clauses; special.
9.204–1 Limitation on Government's right of publication for sale to the general public.
9.204–2 Production of motion pictures, histories, and other works.
9.204–3 Histories and other works.
9.205 Contracts for acquisition of existing works.
9.205–1 Off-the-shelf purchase of books and similar items.
9.205–2 Purchase of existing motion pictures or television recordings.
9.206 Contracts to be performed outside the United States.
9.207 Data—Withholding of payment.
9.207–1 General.
9.207–2 Clauses.

Subpart C—Foreign License and Technical Assistance Agreements

9.301 General.
9.301–1 Background.
9.301–2 Policy.
9.302 Foreign license and technical assistance agreements between the Government and domestic concerns.
9.303 Supply contracts between the Government and a foreign government or concern.
9.304 Foreign license and technical assistance agreements between domestic concern and foreign government or concern.
9.304–1 International Traffic in Arms Regulations.
9.304–2 Review of agreements.

Subpart D—Processing of Licenses, Assignments, and Infringement Claims

9.401 Policy.
9.402 Statutes pertaining to administrative claims of infringement.
9.403 Claims for copyright infringement.
9.404 Requirements for filing an administrative claim for patent infringement.
9.405 Indirect notice of patent infringement claims.
9.406 Investigation and administrative disposition of claims.
9.407 Notification and disclosure to claimants.
9.408 Settlement of indemnified claims.
9.409 Patent releases, license agreements, and assignments.
9.409–1 Required clauses.
9.409–2 Clauses to be used when applicable.
9.409–3 Additional clauses—contracts except running royalty contracts.

tional security, such application should be placed under an order of secrecy or the issuance of a patent should be otherwise delayed under pertinent U.S. statutes or regulations.

(c) Where the subject matter of this contract is classified for reasons of security, the Contractor shall not file, or cause to be filed in any country, other than in the United States as provided in (a) and (b) of this clause, an application or registration for a patent containing any of said subject matter without first obtaining written approval of the Contracting Officer.

(d) When filing any patent application coming within the scope of this clause, the Contractor shall observe all applicable security regulations covering the transmission of classified subject matter, and shall also promptly furnish to the Contracting Officer the serial number, filing date, and name of country of any such patent application. When transmitting the application to the U.S. Patent Office, the Contractor shall by separate letter identify by agency and number the contract or contracts which require security classification markings to be placed on the application.

[32 F.R. 522, Jan. 1, 1967]

### § 9.106–1 Classified contracts—contracting officer's duties.

(a) Upon receipt from the contractor of a patent application, not yet filed, which has been submitted by the contractor in compliance with paragraphs (a) or (b) of the clause in § 9.106, the contracting officer shall ascertain the proper security classification of the patent application. Upon a determination that the application contains classified material, the contracting officer shall inform the contractor of any instructions deemed necessary or advisable relating to transmittal of the application to the United States Patent Office in accordance with procedures in the Department of Defense Industrial Security Manual for Safeguarding Classified Security Information. If the material is classified "Secret" or higher, the contracting officer shall make every effort to notify the contractor of the determination within 30 days pursuant to paragraph (a) of the clause.

(b) In the case of all applications filed under the provisions of this section, the contracting officer, upon receiving the application serial number, the filing date, and the information furnished by the contractor under paragraph (d) of the clause, shall promptly submit that information to personnel having cognizance of patent matters in order that necessary steps may be taken to insure the security of the application.

(c) A request for the approval referred to in paragraph (c) of the clause in § 9.106 must be considered and acted upon promptly in order to avoid the loss of valuable patent rights of the contractor.

[32 F.R. 523, Jan. 1, 1967]

### § 9.106–2 Classified contracts relating to atomic energy.

Where the contract contains a Patent Rights clause which includes paragraph (l) of § 9.107–7, the instructions contained in such paragraph shall be followed in processing information regarding any Subject Invention (Classified or Unclassified), relating to the production or utilization of special nuclear material or atomic energy.

[32 F.R. 523, Jan. 1, 1967]

### § 9.107 Patent rights under contracts for research and development.

[29 F.R. 9754, July 21, 1964]

### § 9.107–1 Introduction.

On October 10, 1963, the President promulgated a Statement of Government Patent Policy applicable to all Executive Departments and Agencies (28 F.R. 10943–10946, October 12, 1963). This Statement is set forth almost verbatim in §§ 9.107–2 and 9.107–3. Essentially, the goal of the Statement of Government Patent Policy is to promote the development of inventions resulting from Federally sponsored research, so that the public can benefit from early civilian use of such inventions. The Statement identifies three categories of procurement situations in which the use of three different patent rights clauses will best serve this goal. In a first category of procurement situations, the goal of the Policy will be best served by the Government acquiring title to the inventions. In the second category, where the contractor has demonstrated a technical competence in the area and an ability to commercialize his inventions, the Policy Statement calls for the contractor or grantee to obtain title to the resulting patent, subject to a license in the Government. In such a situation, the normal incentives provided by the patent system are sufficient guarantee that the inventions will be exploited and developed for civilian use. In the third and final category, the division of patent rights is deferred until the invention is disclosed. This may be necessary where

57



the commercial interests of the contractor are not sufficiently established to give title to the contractor at the time of contracting. This brief general summary of the Policy Statement does not attempt, of course, to define the categories with precision; and, in any event, exceptions to the general rules are provided by the Policy for special situations.

[29 F.R. 9754, July 21, 1964]

**§ 9.107-2 General.**

(a) *Basic considerations.* (1) The Government expends large sums for the conduct of research and development which results in a considerable number of inventions and discoveries.

(2) The inventions in scientific and technological fields resulting from work performed under Government contracts constitute a valuable national resource.

(3) The use and practice of these inventions and discoveries should stimulate inventors, meet the needs of the Government, recognize the equities of the contractor, and serve the public interest.

(4) The public interest in a dynamic and efficient economy requires that efforts be made to encourage the expeditious development and civilian use of these inventions. Both the need for incentives to draw forth private initiatives to this end and the need to promote healthy competition in industry must be weighed in the disposition of patent rights under Government contracts. Where exclusive rights are acquired by the contractor, he remains subject to the provisions of the antitrust laws.

(5) The public interest is also served by sharing of benefits of Government-financed research and development with foreign countries to a degree consistent with our international programs and with the objectives of United States foreign policy.

(6) There is growing importance attaching to the acquisition of foreign patent rights in furtherance of the interest of United States industry and the Government.

(7) The prudent administration of Government research and development calls for a Government-wide policy on the disposition of inventions made under Government contracts reflecting common principles and objectives, to the extent consistent with the missions of the respective agencies. The policy must recognize the need for flexibility to accommodate special situations.

(b) *Availability of Government-owned patents.* Government-owned patents shall be made available and the technological advances covered thereby brought into being in the shortest time possible through dedication or licensing and shall be listed in official Government publications or otherwise.

(c) *Definitions.* As used in §§ 9.107—9.107-9, the stated terms are defined as follows:

(1) "Invention or invention or discovery" includes any art, machine, manufacture, design or composition of matter, or any new and useful improvement thereof, or any variety of plant, which is or may be patentable under the Patent Laws of the United States of America or any foreign country;

(2) "Contractor" means any individual, partnership, public or private corporation, association, institution, or other entity which is a party to the contract;

(3) "Contract" means any actual or proposed contract, agreement, grant, or other arrangement, or subcontract entered into with or for the benefit of the Government where a purpose of the contract is the conduct of experimental, developmental, or research work;

(4) "Made," when used in relation to any invention or discovery, means the conception or first actual reduction to practice of such invention in the course of or under the contract;

(5) "Governmental purpose" means the right of the Government of the United States (including any agency thereof, state, or domestic municipal government) to practice and have practiced (make or have made, use or have used, sell or have sold) throughout the world by or on behalf of the Government of the United States.

(6) "To the point of practical application" means to manufacture in the case of a composition or product, to practice in the case of a process, or to operate in the case of a machine or system and, in each case, under such conditions as to establish that the invention is being worked and that its benefits are reasonably accessible to the public.

[29 F.R. 9755, July 21, 1964]

**§ 9.107-3 Policy.**

(a) *Category I.* The Government shall normally acquire or reserve the right to acquire the principal or exclusive rights throughout the world in and to

any inventions made in the course of or under a contract where:

(1) A principal purpose of the contract is to create, develop or improve products, processes, or methods which are intended for commercial use (or which are otherwise intended to be made available for use) by the general public at home or abroad, or which will be required for such use by governmental regulations; or

(2) A principal purpose of the contract is for exploration into fields which directly concern the public health or public welfare; or

(3) The contract is in a field of science or technology in which there has been little significant experience outside of work funded by the Government, or where the Government has been the principal developer of the field, and the acquisition of exclusive rights at the time of contracting might confer on the contractor a preferred or dominant position; or

(4) The services of the contractor are

(i) For the operation of a Government-owned research or production facility; or

(ii) For coordinating and directing the work of others.

In exceptional circumstances, the contractor may acquire greater rights than a nonexclusive license at the time of contracting, where the Secretary certifies that such action will best serve the public interest. Greater rights than a nonexclusive license may be acquired by the contractor after the invention has been identified, where the invention when made in the course of or under the contract is not a primary object of the contract: *Provided*, The acquisition of such greater rights is consistent with the intent of this section and is a necessary incentive to call forth private risk capital and expense to bring the invention to the point of practical application.

(b) *Category II*. In other situations, where the purpose of the contract is to build upon existing knowledge or technology to develop information, products, processes, or methods for use by the Government, and the work called for by the contract is in a field of technology in which the contractor has acquired technical competence (demonstrated by factors such as know-how, experience, and patent position) directly related to an area in which the contractor has an established nongovernmental commercial position, the contractor shall normally acquire the principal or exclusive rights throughout the world in and to any resulting inventions, subject to the Government's acquiring at least an irrevocable nonexclusive royalty-free license throughout the world for governmental purposes.

(c) *Category III*. Where the commercial interests of the contractor are not sufficiently established to be covered by the criteria specified in paragraph (b) of this section, the final determination of rights shall be made by the contracting officer after the invention has been identified, in a manner deemed most likely to serve the public interest as expressed in this Policy Statement (see § 9.107-2 and other paragraphs of this section), taking particularly into account the intentions of the contractor to bring the invention to a point of commercial application and the guidelines of paragraph (a) of this section: *Provided*, That in the special situations set forth in § 9.107-4(c)(2), the contractor may acquire at the time of contracting greater rights than a nonexclusive license. In any case, the Government shall acquire at least a nonexclusive royalty-free license throughout the world for Governmental purposes.

(d) In the Category II and Category III situations, when two or more potential contractors are judged to have presented proposals of equivalent merit, willingness to grant the Government principal or exclusive rights in resulting inventions will be an additional factor in the evaluation of the proposals. In no event will contractors be asked to state their willingness to grant the Government principal or exclusive patent rights prior to a determination that proposals of equivalent merit have been presented.

(e) Where the principal or exclusive (except as against the Government) rights in an invention remain in the contractor, he should agree to provide written reports at reasonable intervals, when requested by the Government, on the commercial use that is being made or is intended to be made of inventions made under Government contracts.

(f) Where the principal or exclusive (except as against the Government) rights in an invention remain in the contractor, unless the contractor, his licensee, or his assignee has taken effective steps within three years after a patent issues on the invention to bring the invention to the point of practical appli-

57



cation or has made the invention available for licensing royalty-free or on terms that are reasonable in the circumstances, or can show cause why he should retain the principal or exclusive rights for a further period of time, the Government shall have the right to require the granting of a license to an applicant on a nonexclusive royalty-free basis.

(g) Where the principal or exclusive (except as against the Government) rights to an invention are acquired by the contractor, the Government shall have the right to require the granting of a license to an applicant royalty-free or on terms that are reasonable in the circumstances to the extent that the invention is required for public use by governmental regulations or as may be necessary to fulfill health needs, or for other public purposes stipulated in the contract.

(h) Where the Government may acquire the principal rights and does not elect to secure a patent in a foreign country, the contractor may file and retain the principal or exclusive foreign rights subject to retention by the Government of at least a royalty-free license for governmental purposes and on behalf of any foreign government pursuant to any existing or future treaty or agreement with the United States.

[29 F.R. 9755, July 21, 1964, as amended at 30 F.R. 6003, Apr. 29, 1965]

## § 9.107–4 Procedures.

(a) After appropriate consultation with legal, patent, and technical advisors, the contracting officer shall determine whether the Government or the contractor should acquire the principal or exclusive rights (hereafter these rights are referred to as "title") to any or all inventions made in the course of or under each contract and shall document the contract file to support his determination. The basic considerations and policy set forth above together with procedures in this part shall govern the making of this determination. The Preaward Patent Rights Documentation Checklist set forth in paragraph (h) of this section may be used in determining the appropriate Patent Rights clause to be incorporated in a request for proposals in procurements involving experimental, developmental, or research work. If the contracting officer determines that the Patent Rights (Title) clause (§ 9.107–5(a)) is applicable, that clause shall be the only Patent Rights clause used. If it is determined that the Patent Rights (Title) clause (§ 9.107–5(a)) is not applicable, the contracting officer shall include both the Patent Rights (License) (§ 9.107–5(b)) and Patent Rights (Deferred) (§ 9.107–5(c)) clauses in the request for proposals together with the statement: "The contracting officer will determine during negotiation which of these two patent rights clauses will be used in the contract, and the determination will be made in accordance with the guidelines set forth in ASPR 9–107." Except where the Patent Rights (Title) clause is applicable, DD Form 1564, "Preaward Patent Rights Documentation", may be included in each request for proposal. In the case of an unsolicited proposal, the contractor may be requested to complete that DD Form. The Checklist and the DD Form, if used, shall be made a part of the contract file.

(b) Category I—Where the contracting officer determines that proposed experimental, developmental, or research work falls within Category I set forth in § 9.107–3(a), the Patent Rights (Title) clause set forth in § 9.107–5(a) shall be included in the contract. When said determination is based on § 9.107–3(a)(3) notice to that effect will be included in the solicitation. If the contractor to whom the award is to be made challenges the applicability of this provision, the contracting officer will review the basis for his determination and provide the contractor with the reason for his conclusion. If the contracting officer and the contractor cannot then resolve the issue, the contracting officer will promptly forward the problem to the Head of the Procuring Activity for resolution. If award of the contract cannot be delayed, the contracting officer may proceed with the procurement pending resolution of the issue, provided the contract contains the Patent Rights (Title) clause set forth in § 9.107–5(a), accompanied by the following statement: "Contractor agrees to accept the Patent Rights Clause which is ultimately determined, in accordance with departmental procedures, to be the appropriate one." The contracting officer shall consider the following in making his determination:

(1) In the situation in Category I(i) in § 9.107–3(a), a principal purpose of the contract or a series of related contracts must be research or development work on an end item (a product or process) either (i) intended for use in the civilian economy, or (ii) which the general public

will be required by governmental regulation to use. End items of this nature would most likely be found in the field of Civil Defense.

(2) In the situation in Category I(ii) in § 9.107-3(a), a principal purpose of the contract must be directly concerned with the public health or public welfare (e.g., drugs, medical instruments, water desalinization, and weather modification or control), and not solely items of only military application.

(3) Under Category I(iii) in § 9.107-3(a), the contract must be for an end product in a field of science or technology in which, at the time the contract is entered into, there has been little or no significant experience except for work funded by the Government or where the Government has been the principal developer. If the contracting officer determines that the proposed contract is in such a field of science or technology, he then shall determine whether the contractor would likely get a preferred or dominant commercial position in that field if he were permitted to acquire title to inventions made under the contract. It would be inequitable to other commercial manufacturers or sources to permit a contractor to acquire such a preferred or dominant commercial position based principally upon work funded by the Government.

(4) Under Category I(iv)(A) in § 9.107-3(a), a contract for the operation of a Government-owned production facility must call for experimental, developmental, or research work at such a facility. In Category I(iv)(B) the words "coordinating and directing the work of others" do not refer to the normal prime contractor-subcontractor relationship, but refer instead to a relationship in which a potential organizational conflict-of-interest exists. See § 1.113-2.

Notwithstanding any determination in accordance with this paragraph, in exceptional circumstances the contractor may acquire greater rights than a nonexclusive license at the time of contracting if the Secretary certifies that such action will best serve the public interest.

(c) Category II: Where the contracting officer determines that proposed experimental, developmental, or research work does not fall within Category I but does fall within Category II set forth in § 9.107-3(b) or within the special situations set forth in subparagraph (2) of this paragraph, the Patent Rights (License) clause set forth in § 9.107-5(b) shall be included (except when greater rights are acquired by the Government pursuant to § 9.107-3(d)).

(1) In determining whether such work falls within Category II, the contracting officer shall first determine whether the work is in a field of technology directly related to an area in which the contractor has an "established nongovernmental commercial position." In making this determination, the contracting officer should recognize that the ultimate goal of the policy is to move inventions into the stream of commerce through domestic sales or exports or through domestic and foreign licensing programs. A nongovernmental commercial position can be based upon sales or licensing of military or nonmilitary items to foreign governments, multinational organizations, or foreign nationals. In determining whether a contractor has an established nongovernmental commercial position, the contracting officer will consider and evaluate each known factor which relates to the contractor's ability and willingness to move inventions into the stream of commerce. Factors which typically should be considered as appropriate are:

(i) Whether the contractor is known in the trade as a manufacturer or source of products or services in the area involved; and

(ii) Whether the contractor either (*a*) is regularly engaged in the sale or licensing, whether domestic or foreign, of such products or services to the general public (including business concerns), foreign governments, multinational organizations or foreign nationals; or (*b*) has a record of developing nongovernmental commercial markets for inventions in the area involved.

(iii) Have a record of developing nongovernmental commercial markets for inventions in the area involved. A nongovernmental commercial position shall be deemed to include sales of military items to foreign governments or multinational organizations or licensing programs with respect thereto, as well as the export of nonmilitary items to foreign governments or foreign nationals or foreign licensing programs in connection therewith.

(2) The following are the special situations where the public interest in the availability of inventions would best be served by permitting the contractor to acquire greater rights than a nonexclu-

sive license at the time the contract is entered into:

(i) An educational or nonprofit institution has a definite, established policy, approved and promulgated by its governing body, of retaining title to inventions made by its employees or of requiring its employees to assign title to such inventions to a patent holding entity for the benefit of the institution, and which patent policy has been approved by the Department of Defense;

(ii) A newly-formed research and development contractor or a new independent, research and development division or subsidiary of an older contractor has a definite program for establishing a nongovernmental commercial position which is dependent on the protection afforded by title in inventions which may be made in the course of or under the contract (a contractor or division established more than five years shall not be considered "newly-formed");

*Provided, however,* That, in either case the procurement involved does not fall within Category I.

(d) *Category III.* Where the contracting officer determines that proposed experimental, developmental, or research work falls within Category III (set forth in § 9.107-3(c)) because it is not covered by the instructions in paragraphs (b) and (c) of this section, the Patent Rights (Deferred) clause in § 9.107-5(c) shall be included. However, in the case of prospective contractors organized for profit only considered under paragraph (c) of this section, the contracting officer shall affirmatively determine that the proposed contractor does not have a qualifying commercial position before the Deferred Clause is used, thereby settling as many questions as possible at the time of contracting. Many educational institutions or nonprofit organizations do not wish to acquire patents or do not have an approved patent policy; in such cases, the contract may include either the Patent Rights (Title) clause in § 9.107-5(a) or the Patent Rights (Deferred) clause in § 9.107-5(c), as appropriate. In the event an educational or nonprofit institution files an application for approval of its patent policy (see paragraph (c)(2)(i) of this section) the above procedure shall be followed pending such approval, and in such cases the contract may provide for substitution of the Patent Rights (License) clause in § 9.107-5 (b), in lieu of the patents rights clause used at the time of contracting, if such approval is obtained, except in procurements where the contemplated work under contract falls within the provisions of § 9.107-3(a).

(e) Where a contractor has acquired the title to an invention under a contract, the contracting officer may, in accordance with § 9.107-5, request written reports from the contractor as to:

(1) The commercial use that is being made or is intended to be made of such invention; and

(2) The steps taken by the contractor to bring the invention to the point of practical application, or to make the invention available for licensing.

(f) In the special cases covered by the sections listed below, the contracting officer shall follow the instructions and include the clauses required in such sections:

(1) Section 9.107-6, concerning foreign contracts;

(2) Section 9.107-7, concerning contracts relating to atomic energy;

(3) Section 9.107-8, concerning contracts placed for the National Aeronautics and Space Administration;

(4) Section 9.107-9, concerning contracts relating to space; and

(5) Section 9.108, concerning contracts for personal services.

(g) By definition, the term "contract" includes subcontracts; hence, the policy in §§ 9.107-2 and 9.107-3 applies where a purpose of a subcontract is experimental, developmental, or research work. So that the policy is carried out at all contract and subcontract levels, subcontracts generally shall include the same patent rights provision (Title or License) contained in the prime contract. However, there may be exceptions to this general rule, as for example where the prime contract comes within subparagraphs (3) or (4) in § 9.107-3(a), but the subcontract is not subject to the same considerations. Another exception, though less likely, may occur where the prime contract is subject to the provisions of Category II, but the nongovernmental commercial position of the subcontractor is not sufficiently established and, consequently, the subcontract falls within the provisions of Category III.

(h) *Preaward patent rights documentation checklist.*

(Authorized for local reproduction)

PREAWARD PATENT RIGHTS DOCUMENTATION CHECKLIST

Procurement Identification: ________________

Purpose of Proposed Procurement: ________________

1. Is a principal purpose of the proposed contract, either by itself or as one of a series of directly related contracts, to create, develop or improve an end item intended for use in the civilian economy? [1] (See ASPR 9-107.3 (a)(i) and 9-107.4(b)(1).) ________ ☐ Yes ☐ No
   If "Yes," identify the end item and briefly describe its intended use in the civilian economy.
2. Is a principal purpose of the proposed contract, either by itself, or as one of a series of directly related contracts to create, develop or improve an end item which will be required for use by the general public by a Government regulation ________ ☐ Yes ☐ No
   If "Yes," identify the end item and cite applicable regulation. (See ASPR 9-107.3(a)(i) and 9-107.4(b)(1).)
3. Is a principal purpose of the contract exploration into a field directly concerned with public health or public welfare (as distinguished from items predominantly of military concern)? (See ASPR 9-107.3(a)(ii) and 9-107.4(b)(2).) ________ ☐ Yes ☐ No
   If "Yes," identify such principal purpose of the contract and briefly describe its relationship to the public health or public welfare.
4. Is the contract for procurement in a field of science or technology in which there has been little significant experience outside of work funded by the Government? [2] (See ASPR 9-107.3(a)(iii) and 9-107.4(b)(3).) ________ ☐ Yes ☐ No
   If "Yes," briefly describe such field.
5. Is the contract for procurement in a field of science or technology in which the Government has been the principal developer of the field? [2] (See ASPR 9-107.3(a)(iii) and 9-107.4(b)(3).) ________ ☐ Yes ☐ No
   If "Yes," briefly describe such field.
6. If the answer to either 4 or 5 is "Yes," would the contractor be likely to get a preferred or dominant commercial position in that field if he were permitted to acquire title to inventions made under the contract? (See ASPR 9-107.3(a)(iii) and 9-107.4(b)(3).) ________ ☐ Yes ☐ No
   Explain the answer.
7. Does the contract require that the contractor both (i) provide services for operation of a Government-owned research or production facility and (ii) perform experimental, developmental or research work at that facility? (See ASPR 9-107.3(a)(iv)(A) and 9-107.4(b)(4).) ________ ☐ Yes ☐ No
8. Does the contract require contractor to coordinate and direct the work of others (as distinguished from the normal contractor-subcontractor relationship) which might result in a potential organizational conflict of interest? [4] (See ASPR 1-113.2, Appendix G, and 9-107.3(a)(iv)(B), 9-107.4(b)(4).) ________ ☐ Yes ☐ No
   If "Yes," explain briefly why such a potential conflict of interest is considered to exist.

________________

(Typed name, office, and signature of person completing this form)

The Patents Rights (Title) Clause, ASPR 9-107.5(a), will ____ will not ____ be used in the solicitation. (Give reasons for determination.)

________________

(Typed name and signature of contracting officer or representative)

[1] The contract or series of contracts need not necessarily require delivery of the end item. The end item may be a product, a process or data.

[2] The mere fact that the Government has been or is the principal funder or developer funder or developer in a field of science or technology which encompasses the piece of hardware.

[29 F.R. 9756, July 21, 1964, as amended at 30 F.R. 12005, Sept. 21, 1965; 32 F.R. 523, Jan. 18, 1967; 33 F.R. 15391, Oct. 17, 1968]

57



**§ 9.107-5 Clauses for domestic contracts.**

(a) *Patent Rights (Title) Clause.* If the contracting officer has determined that the contract comes within § 9.107-4 (b) or (d), he shall include the following clause in the contract. This clause provides for the Government to acquire title in "Subject Inventions," subject to the contractor's retaining a royalty-free license in such inventions; however, the Government may permit the contractor, under certain circumstances, to acquire greater rights than the license.

PATENT RIGHTS (TITLE) (SEPTEMBER 1968)

(a) *Definitions used in this clause.* (1) "Subject Invention" means any invention or discovery, whether or not patentable, conceived, or first actually reduced to practice in the course of or under this contract. The term "Subject Invention" includes, but is not limited to, any art, method, process, machine, manufacture, design, or composition of matter, or any new and useful improvement thereof, or any variety of plant, which is or may be patentable under the patent laws of the United States of America or any foreign country.

(2) "Governmental purpose" means the right of the Government of the United States (including any agency thereof, State or domestic municipal government) to practice and have practiced (make or have made, use or have used, sell or have sold) any Subject Invention throughout the world by or on behalf of the Government of the United States.

(3) "Contract" means any contract, agreement, grant, or other arrangement, or subcontract entered into with or for the benefit of the Government where a purpose of the contract is the conduct of experimental, developmental, or research work.

(4) "Subcontract and subcontractor means any subcontract or subcontractor of the Contractor, any lower-tier subcontract or subcontractor under this contract.

(5) "To bring to the point of practical application" means to manufacture in the case of a composition or product, to practice in the case of a process, or to operate in the case of a machine or system and, in each case, under such conditions as to establish that the invention is being worked and that its benefits are reasonably accessible to the public.

(b) *Rights granted to the Government.* Except as provided in (e) and (h) of this clause, the Contractor agrees to grant the Government all right, title, and interest in and to each Subject Invention (made by the Contractor), subject to the reservation of a nonexclusive and royalty-free license to the Contractor. The license shall extend to existing and future associated and affiliated companies, if any, within the corporate structure of which the Contractor is a part and shall be assignable to the successor of that part of the Contractor's business to which such Invention pertains. Nothing contained in this Patent Rights clause shall be deemed to grant any rights with respect to any invention other than a Subject Invention.

(c) *Invention disclosures and reports.* (1) With respect to Subject Inventions (made by the Contractor), except those which are obviously unpatentable under the patent laws of the United States, the Contractor shall furnish to the Contracting Officer:

(i) A written disclosure of each invention within six (6) months after conception or first actual reduction to practice, whichever occurs first under this contract, sufficiently complete in technical detail to convey to one skilled in the art to which the Invention pertains a clear understanding of the nature, purpose, operation, and to the extent known the physical, chemical, or electrical characteristics of the Invention; when unable to submit a complete disclosure, the Contractor shall within said six (6) month period submit a disclosure which includes all such technical detail then known to him and shall, unless the Contracting Officer authorizes a different period, submit all other technical detail necessary to complete the disclosure within three (3) months of the expiration of said six (6) month period.

(ii) Interim reports at least every twelve (12) months, the initial period of which shall commence with the date of this contract, each report listing all such Inventions conceived or first actually reduced to practice more than six (6) months prior to the date of the report and not listed on a prior interim report, or certifying that there are no such unreported Inventions;

(iii) Prior to final settlement of this contract, a final report listing all such Inventions including all those previously listed in interim reports, or certifying that there are no such unreported Inventions (This Final Report and any Interim Report under (ii) above shall be submitted on DD Form 882 or other format acceptable to the Contracting Officer.);

(iv) Information in writing, as soon as practicable, of the date and identity of any public use, sale, or publication of such Invention made by or known to the Contractor or of any contemplated publication by the Contractor;

(v) Upon request, such duly executed instruments and other papers (prepared by the Government) as are deemed necessary to vest in the Government the rights granted it under this clause and to enable the Government to apply for and prosecute any patent application, in any country, covering such Invention where the Government has the right under this clause to file such application; and

(vi) Upon request, an irrevocable power of attorney to inspect and make copies of each U.S. patent application filed by, or on behalf of, the Contractor covering any such Invention.

(2) With respect to each Subject Invention in which the Contractor has been granted greater rights under paragraph (h) of this clause, the Contractor agrees to provide written reports at reasonable intervals, when requested by the Government as to:

(i) The commercial use that is being made or is intended to be made of such Invention;

(ii) The steps taken by the Contractor to bring the Invention to the point of practical application, or to make the Invention available for licensing.

(d) *Subcontracts.* (1) The Contractor shall, unless otherwise authorized or directed by the Contracting Officer, include a patent rights clause containing all the provisions of this Patent Rights clause except provision (g) in any subcontract hereunder where a purpose of the subcontract is the conduct of experimental, developmental, or research work. In the event of refusal by a subcontractor to accept this Patent Rights clause, or if in the opinion of the Contractor this Patent Rights clause is inconsistent with the policy set forth in ASPR 9-107.2 and 9-107.3, the Contractor:

(i) Shall promptly submit a written report to the Contracting Officer setting forth the subcontractor's reasons for such refusal or the reasons Contractor is of the opinion that the inclusion of this clause would be so inconsistent, and other pertinent information which may expedite disposition of the matter; and

(ii) Shall not proceed with the subcontract without the written authorization of the Contracting Officer.

The Contractor shall not, in any subcontract or by using such a subcontract as consideration therefor, acquire any rights to Subject Inventions for his own use (as distinguished from such rights as may be required solely to fulfill his contract obligations to the Government in the performance of this contract). Reports, instruments, and other information required to be furnished by a subcontractor to the Contracting Officer under the provisions of such a patent rights clause in a subcontract hereunder may, upon mutual consent of the Contractor and the subcontractor (or by direction of the Contracting Officer) be furnished to the Contractor for transmission to the Contracting Officer.

(2) The Contractor, at the earliest practicable date, shall also notify the Contracting Officer in writing of any subcontract containing a patent rights clause, furnish to the Contracting Officer a copy of such subcontract, and notify him when such subcontract is completed. It is understood that the Government is a third party beneficiary of any subcontract clause granting rights to the Government in Subject Inventions, and the Contractor hereby assigns to the Government all the rights that the Contractor would have to enforce the subcontractor's obligations for the benefit of the Government with respect to Subject Inventions. If there are no subcontracts containing patent rights clauses, a negative report is required. The Contractor shall not be obligated to enforce the agreements of any subcontractor hereunder relating to the obligations of the subcontractor to the Government in regard to Subject Inventions.

(e) *Domestic filing of patent applications by contractor.* (1) If greater rights are granted in and to a Subject Invention pursuant to paragraph (h) of this clause, the Contractor shall file in due form and within six (6) months of the granting of such greater rights a U.S. Patent application claiming the Invention referred to in said paragraph, and shall furnish, as soon as practicable, the serial number and filing date of each such application and the patent number of any resulting patent. As to each Invention in which the Contractor has been given greater rights, the Contractor shall notify the Contracting Officer at the end of the six (6) month period if he has failed to file or caused to be filed a patent application covering such invention. If the Contractor has filed or caused to be filed such an application within the six (6) month period, but elects not to continue prosecution of such application, he shall notify the Contracting Officer not less than sixty (60) days before the expiration of the response period. In either of the situations covered by the two immediately preceding sentences, the Government shall be entitled to all rights, title, and interest in such Invention subject to the reservation to the Contractor of a license as specified in paragraph (b).

(2) The following statement shall be included within the first paragraph of any patent application filed and any patent issued on an Invention which was made under Government contract or subcontract thereunder: "The Invention herein described was made in the course of or under a contract or subcontract thereunder (or grant) with (here state the Department or Agency)."

(f) *Foreign filing of patent applications.* (1) If the Contractor acquires greater rights in a Subject Invention pursuant to paragraph (h) of this clause and has filed a U.S. patent application claiming the Invention, the Contractor, or those other than the Government deriving rights from the Contractor, shall as between the parties hereto, have the exclusive right, subject to the rights of the Government under paragraph (i) of this clause, to file applications on the Inventions in each foreign country within:

(i) Nine (9) months from the date a corresponding U.S. patent application is filed;

(ii) Six (6) months from the date permission is granted to file foreign applications where such filing has been prohibited for security reasons; or

(iii) Such longer period as may be approved by the Contracting Officer.

The Contractor shall notify the Contracting Officer of each foreign application filed and, upon written request of the Contracting Officer, furnish an English translation of such application, and, convey to the Gov-

57



ernment the entire right, title, and interest in the Invention in each foreign country in which an application has not been filed within the time specified above, subject to the reservation of a royalty-free license as specified in paragraph (b).

(2) If the Contratcor does not acquire greater rights pursuant to paragraph (h) of this clause and the Government determines not to file a patent application on any Subject Invention (made by the Contractor) in any particular foreign country, the Contracting Officer, upon request of the Contractor, may authorize the Contractor to file a patent application on such Invention in such foreign country and retain ownership thereof, subject to an irrevocable, nonexclusive and royalty-free license to practice and have practiced such Subject Invention throughout the world for Governmental purposes, including the practice of each such Subject Invention (i) in the manufacture, use, and disposition of any article or material, (ii) in the use of any method, or (iii) in the performance of any service, acquired by or for the Government or with funds derived through the Military Assistance Program of the Government or funds otherwise derived through the Government.

(g) *Withholding of payment.* (1) Final payment under this contract shall not be made before the Contractor delivers to the Contracting Officer the final report required by (c)(1)(iii), all written invention disclosures required by (c)(1)(i), and all information as to subcontracts required by (d)(ii).

(2) If at any time before final payment under this contract the Contractor fails to deliver an interim report required by (c)(1)(ii), or a written invention disclosure required by (c)(1)(i), the Contracting Officer shall withhold from payment $50,000 or five percent (5%), of the amount of this contract whichever is less (or whatever lesser sum is available if payments have exceeded ninety-five percent (95%) of the amount of this contract) until the Contractor corrects all such failures.

(3) After payments total eighty percent (80%) of the amount of this contract, and if no amount is required to be withheld under (2) above, the Contracting Officer may, if he deems such action warranted because of the Contractor's performance under the Patent Rights clause of this contract or other known Government contracts, withhold from payment such sum as he considers appropriate, not exceeding $50,000 or five percent (5%), of the amount of this contract whichever is less, to be held as a reserve until the Contractor delivers all the reports, disclosures, and information specified in (1) above. Subject to the five percent (5%) or $50,000 limitation, the sum withheld under this subparagraph (3) may be increased or decreased from time to time at the discretion of the Contracting Officer.

(4) No amount shall be withheld under this paragraph (g) while the amount specified by this paragraph is being withheld under other provisions of this contract. The total amount withheld under (2) and (3) above shall not exceed $50,000 or five percent (5%), of the amount of this contract whichever is less. The withholding of any amount or subsequent payment thereof to the Contractor shall not be construed as a waiver of any rights accruing to the Government under this contract. This paragraph shall not be construed as requiring the Contractor to withhold any amounts from a subcontractor to enforce compliance with the patent provision of a subcontract. As used in this paragraph (g), "this contract" means "this contract as from time to time amended." In cost-type contracts, "amount of this contract" means "estimated cost of this contract."

(h) *Contractor's request for greater rights.* The Contractor at the time of first disclosing a Subject Invention pursuant to paragraph (c)(1)(i) of this clause, but not later than three (3) months thereafter, may submit in writing to the Contracting Officer, in accordance with applicable regulations, a request for greater rights than the license reserved to the Contractor in paragraph (b) of this clause if:

(i) The Invention is not the primary object of this contract; and

(ii) The acquisition of such greater rights is consistent with the intent of ASPR 9-107.3 (a) and is necessary to call forth private risk capital and expense to bring the Invention to the point of practical application.

The Contracting Officer will review the Contractor's request for greater rights and will notify the Contractor whether such request is granted in whole or in part. Any rights granted to the contractor shall be subject to, but not necessarily limited to, the provisions of paragraph (i) of this clause.

(i) *Reservation of Rights to the Government.* (1) In the event greater rights in any Subject Invention are vested in or granted to the Contractor pursuant to paragraph (h) above, such greater rights shall, as a minimum, be subject to an irrevocable, nonexclusive and royalty-free license to practice and have practiced each such Subject Invention (made by the Contractor) throughout the world for Governmental purposes, and including the practice of each such Subject Invention (i) in the manufacture, use, and disposition of any article or material, (ii) in the use of any method, or (iii) in the performance of any service, acquired by or for the Government or with funds derived through the Military Assistance Program of the Government or funds otherwise derived through the Government.

(2) In the event greater rights are vested in the Contractor, the Contractor further agrees to and does hereby grant to the Government the right to require the granting of a license to an applicant under any such Invention:

(i) On a nonexclusive, royalty-free basis, unless the Contractor, his licensee or his assignee demonstrates to the Government, at

its request, that effective steps have been taken within three (3) years after a patent issues on such Invention to bring the Invention to the point of practical application or that the Invention has been made available for licensing royalty-free or on terms that are reasonable in the circumstances, or can show cause why the title should be retained for a further period of time; or

(ii) Royalty-free or on terms that are reasonable in the circumstances to the extent that the Invention is required for public use by Governmental regulations or as may be necessary to fulfill health needs, or for other public purposes stipulated in the Schedule of this contract.

(j) *Right to disclose subject inventions.* The Government may duplicate and disclose reports and disclosures of Subject Inventions required to be furnished by the Contractor pursuant to this Patent Rights clause.

(k) *Forfeiture of rights in unreported subject inventions.* The Contractor shall forfeit to the Government all rights in any Subject Invention which he fails to report to the Contracting Officer at or prior to the time he (i) files or causes to be filed a United States or foreign application thereon, or (ii) submits the final report required by (c)(iii) of this clause, whichever is later: *Provided,* That the Contractor shall not forfeit rights in a Subject Invention if (A) contending that the invention is not a Subject Invention, he nevertheless reports the invention and all the facts pertinent to his contention to the Contracting Officer within the time specified in (i) or (ii) above, or (B) he establishes that the failure to report was due entirely to causes beyond his control and without his fault or negligence. The Contractor shall be deemed to hold any such forfeited Subject Invention, and the patent applications and patents pertaining thereto, in trust for the Government pending written assignment of the Invention. The rights accruing to the Government under this paragraph shall be in addition to and shall not supersede any other rights which the Government may have in relation to unreported Subject Inventions. Nothing contained herein shall be construed to require the Contractor to report any invention which is not in fact a Subject Invention.

(l) *Examination of records relating to inventions.* The Contracting Officer, or his authorized representative shall, until the expiration of three (3) years after final payment under this contract, have the right to examine any books, records, documents, and other supporting data of the Contractor which the Contracting Officer or his authorized representative shall reasonably deem directly pertinent to the discovery or identification of Subject Inventions or to compliance by the Contractor with the requirements of this clause.

(b) *Patent rights (license) clause.* Where the contracting officer has determined that the proposed contract comes within § 9.104–4(c) and not within § 9.107–4(b), he shall include the following clause in the contract. This clause provides for the contractor to retain title to "Subject Inventions" and for the Government to acquire a royalty-free license and the additional right to grant sublicenses.

PATENT RIGHTS (LICENSE) (SEPTEMBER 1968)

(a) *Definitions used in this clause.* (1) "Subject Invention" means any Invention or discovery, whether or not patentable, conceived or first actually reduced to practice in the course of or under this contract. The term "Subject Invention" includes, but is not limited to, any art, method, process, machine, manufacture, design or composition of matter, or any new and useful improvement thereof, or any variety of plant, which is or may be patentable under the patent laws of the United States of America or any foreign country.

(2) "Government purpose" means the right of the Government of the United States (including any agency thereof, state or domestic municipal government) to practice and have practiced (make or have made, use or have used, sell or have sold) and Subject Invention throughout the world by or on behalf of the Government of the United States.

(3) "Contract" means any contract, agreement, grant, or other arrangement, or subcontract entered into with or for the benefit of the Government where a purpose of the contract is the conduct of experimental, developmental, or research work.

(4) "Subcontract and subcontractor" mean any subcontract or subcontractor of the Contractor, any lower-tier subcontract or subcontractor under this contract.

(5) "To bring to the point of practical application" means to manufacture in the case of a composition or product, to practice in the case of a process, or to operate in the case of a machine or system and, in each case, under such conditions as to establish that the Invention is being worked and that its benefits are reasonably accessible to the public.

(b) *Rights granted to the Government.* (1) The Contractor agrees to and does hereby grant to the Government an irrevocable, nonexclusive, and royalty-free license to practice and have practiced each Subject Invention (made by the Contractor) throughout the world for Government purposes, and including the practice of each such Subject Invention (i) in the manufacture, use, and disposition of any article or material, (ii) in the use of any method, or (iii) in the performance of any service, acquired by or for the Government or with funds derived through the Military Assistance Program of the Government or funds otherwise derived through the Government.

(2) The Contractor further agrees to grant, upon the request of the Government,

a license under any Subject Invention (made by the Contractor) to:

(i) Any applicant on a nonexclusive, royalty-free basis, unless the Contractor, his licensee, or his assignee demonstrates to the Government, at its request, that effective steps have been taken within three years after a patent issues on such Invention to bring the Invention to the point of practical application or that the Invention has been made available for licensing royalty-free or on terms that are reasonable in the circumstances, or can show cause why the principal or exclusive rights should be retained for a further period of time;

(ii) Any applicant royalty-free or on terms that are reasonable in the circumstances to the extent that the Invention is required for public use by governmental regulations or as may be necessary to fulfill health needs, or for other public purposes stipulated in the Schedule of this contract.

Nothing contained in this Patent Rights clause shall be deemed to grant any rights with respect to any invention other than a Subject Invention.

(c) *Invention disclosures and reports.* With respect to Subject Inventions (made by the Contractor), except those which are obviously unpatentable under the patent laws of the United States, the Contractor shall furnish to the Contracting Officer:

(i) A written disclosure of each such Invention within six (6) months after conception or first actual reduction to practice, whichever occurs first under this contract, sufficiently complete in technical detail to convey to one skilled in the art to which the Invention pertains a clear understanding of the nature, purpose, operation, and to the extent known, the physical, chemical, or electrical characteristics of the Invention, together with a written statement making an election as to whether a United States patent application claiming the Invention will be filed by or on behalf of the Contractor; provided, where the Contractor elects to file but is unable to submit a complete disclosure, the Contractor shall within said six (6) months period submit a disclosure which includes all such technical detail then known to him and shall, within six (6) months after his election to file (or such longer period as may be authorized by the Contracting Officer under (d)(i) below), submit all other technical detail necessary to complete the disclosure or a copy of the patent application;

(ii) Interim reports at least every twelve (12) months, the initial period of which shall commence with the date of this contract, each report listing all such Inventions conceived or first actually reduced to practice more than six (6) months prior to the date of the report and not listed on a prior interim report, or certifying that there are no such unreported Inventions;

(iii) Prior to final settlement of this contract, a final report listing all such Inventions including all those previously listed in interim reports, or certifying that there are no such unreported Inventions (This Final Report and any Interim Report under (ii) above shall be submitted on DD Form 882 or other format acceptable to the Contracting Officer.); and

(iv) Written reports at reasonable intervals, prior to and after final settlement, when requested by the Government as to—

(A) The commercial use that is being made or is intended to be made of such Invention;

(B) The steps taken by the Contractor to bring the Invention to the point of practical application, or to make the Invention available for licensing.

(d) *Domestic Filing.* In connection with each Subject Invention referred to in (c)(i) above:

(i) If the Contractor has elected to file a United States patent application claiming such Invention, the Contractor shall, within six (6) months after the election (or such longer period, not to exceed one (1) year after such election, as may be authorized by the Contracting Officer), file or cause to be filed such application in due form, shall notify the Contracting Officer of such filing, and shall deliver to the Contracting Officer, within two (2) months after such filing or within two (2) months of the first written disclosure of such invention if a patent application previously has been filed, a duly executed license, in triplicate, fully confirmatory of all rights to which the Government is entitled under this clause; if the Contractor does not file or cause to be filed such application, he shall so notify the Contracting Officer within the six (6) month period or such longer period as may be authorized above.

(ii) The following statement shall be included within the first paragraph of the specification of any patent application filed and any patent issued on an invention which was made under a Government contract or subcontract thereunder: "The Invention herein described was made in the course of or under a contract or subcontract thereunder, (or grant) with (here state the Department or Agency)."

(iii) If the Contractor has elected not to file or cause to be filed a United States patent application claiming such Invention, or has made the contrary election but has not filed or cause to be filed such application within six (6) months after the election, or such longer period as may be authorized above, the Contractor shall:

(A) Inform the Contracting Officer in writing, as soon as practicable, of the date and identity of any public use, or publication of such Invention made by or known to the Contractor or of any contemplated publication by the Contractor;

(B) Upon written request, convey to the Government the Contractor's entire right, title and interest in such Invention by delivering to the Contracting Officer such duly executed instruments (prepared by the

Government) of assignment and application, and such other papers as are deemed necessary to vest in the Government the entire right, title, and interest aforesaid, and the right to apply for and prosecute patent applications covering such Invention throughout the world, subject to the reservation of a nonexclusive and royalty-free license to the Contractor (and to his existing and future associated and affiliated companies, if any, within the corporate structure of which the Contractor is a part) which license shall be assignable to the successor of that part of the Contractor's business to which such Invention pertains;

(iv) The Contractor shall furnish promptly to the Contracting Officer on request an irrevocable power of attorney to inspect and make copies of each United States patent application filed by or on behalf of the Contractor covering any such Invention; and

(v) In the event the Contractor, or those other than the Government deriving rights from the Contractor, elects not to continue prosecution of any such United States patent application filed by or on behalf of the Contractor, the Contractor shall so notify the Contracting Officer not less than sixty (60) days before the expiration of the response period and, upon written request, deliver to the Contracting Officer such duly executed instruments (prepared by the Government) as are deemed necessary to vest in the Government the entire right, title, and interest in such Invention and the application, subject to the reservation as specified in paragraph (d)(iii)(B) of this clause;

(e) *Foreign filing.* The Contractor, or those other than the Government deriving rights from the Contractor, shall as between the parties hereto, have the exclusive right, subject to the rights of the Government under paragraph (b) of this clause, to file applications on Subject Inventions (made by the Contractor) in each foreign country within:

(i) Nine (9) months from the date a corresponding United States application is filed, or nine (9) months from the date the Contractor discloses a Subject Invention under paragraph (c)(i) above with an election not to file a United States application;

(ii) Six (6) months from the date permission is granted to file foreign applications where such filing had been prohibited for security reasons; or

(iii) Such longer period as may be approved by the Contracting Officer.

The Contractor shall notify the Contracting Officer of each foreign application filed and, upon written request of the Contracting Officer, furnish an English translation of such foreign application, and convey to the Government the entire right, title, and interest in each such Subject Invention in each foreign country in which an application has not been filed within the time above specified, subject to the reservation as specified in paragraph (d)(iii)(B) of this clause.

(f) *Withholding of payment.* (1) Final payment under this contract shall not be made before the Contractor delivers to the Contracting Officer the final report required by (c)(iii), all written Invention disclosures required by (c)(i), all confirmatory licenses required by (d)(i), and all information as to subcontracts required by (g).

(2) If at any time before final payment under this contract the contractor fails to deliver an interim report required by (c)(ii), a written invention disclosure required by (c)(i), or a confirmatory license required by (d)(i), the contracting officer shall withhold from payment $50,000 or five percent (5%) of the amount of this contract whichever is less (or whatever lesser sum is available if payments have exceeded ninety-five percent (95%) of the amount of this contract) until the contractor corrects all such failures.

(3) After payments total eighty percent (80%) of the amount of this contract, and if no amount is required to be withheld under (2) above, the Contracting Officer may, if he deems such action warranted because of the Contractor's performance under the Patent Rights clause of this contract or other known Government contracts, withhold from payment such sum as he considers appropriate, not exceeding $50,000 or five percent (5%), of the amount of this contract, whichever is less, to be held as a reserve until the Contractor delivers all the reports, disclosures, licenses, and information specified in (1) above. Subject to the five percent (5%) or $50,000 limitation, the sum withheld under this subparagraph (3) may be increased or decreased from time to time at the discretion of the Contracting Officer.

(4) No amount shall be withheld under this paragraph (f) while the amount specified by this paragraph is being withheld under other provisions of this contract. The total amount withheld under (2) and (3) above shall not exceed $50,000 or five percent (5%) of the amount of this contract whichever is less. The withholding of any amount or subsequent payment thereof to the Contractor shall not be construed as a waiver of any rights accruing to the Government under this contract. This paragraph shall not be construed as requiring the Contractor to withhold any amounts from a subcontractor to enforce compliance with the patent provision of a subcontract. As used in this paragraph (f), "this contract" means "this contract as from time to time amended." In cost-type contracts, "amount of this contract" means "estimated cost of this contract."

(g) *Subcontracts.* (1) The Contractor shall, unless otherwise authorized or directed by the Contracting Officer, include a patent rights clause containing all of the provisions of this Patent Rights clause except provision (f) in any subcontract hereunder where a purpose of the subcontract is the conduct of experimental, developmental, or research

work. In the event of refusal by a subcontractor to accept this Patent Rights clause, or if in the opinion of the Contractor this Patent Rights clause is inconsistent with the policy set forth in ASPR 9-107.2 and 9-107.3, the Contractor:

(i) Shall promptly submit a written report to the Contracting Officer setting forth the subcontractor's reason for such refusal or the reasons the Contractor is of the opinion that the inclusion of this clause would be so inconsistent, and other pertinent information which may expedite disposition of the matter; and

(ii) Shall not proceed with the subcontract without the written authorization of the Contracting Officer.

The Contractor shall not, in any subcontract or by using such a subcontract as consideration therefor, acquire any rights to Subject Inventions for his own use (as distinguished from such rights as may be required solely to fulfill his contract obligations to the Government in the performance of this contract). Reports, instruments, and other information required to be furnished by a subcontractor to the Contracting Officer under the provisions of such a patent rights clause in a subcontract hereunder may, upon mutual consent of the Contractor and the subcontractor (or by direction of the Contracting Officer) be furnished to the Contractor for transmission to the Contracting Officer.

(2) The Contractor, at the earliest practicable date, shall also notify the Contracting Officer in writing of any subcontract containing a patent rights clause, furnish to the Contracting Officer a copy of such subcontract, and notify him when such subcontract is completed. It is understood that the Government is a third party beneficiary of any subcontract clause granting rights to the Government in Subject Inventions, and the Contractor hereby assigns to the Government all the rights that he would have to enforce the subcontractor's obligations for the benefit of the Government with respect to Subject Inventions. If there are no subcontracts containing patent rights clauses, a negative report is required. The Contractor shall not be obligated to enforce the agreements of any subcontractor hereunder relating to the obligations of the subcontractor to the Government in regard to Subject Inventions.

(h) *Licenses granted by contractor to others subject to Government's rights.* The Contractor recognizes that the Government, or a foreign government with funds derived through the Military Assistance Program or otherwise through the U.S. Government, may contract for property or services with respect to which the vendor may be liable to the Contractor for royalties for the use of a Subject Invention on account of such a contract. The Contractor further recognizes that it is the policy of the Government not to pay in connection with its contracts, or to allow to be paid in connection with contracts made with funds derived through the Military Assistance Program or otherwise through the U.S. Government, charges for use of patents in which the Government holds a royalty-free license. In recognition of this policy, the Contractor agrees to participate in and make appropriate arrangements for the exclusion of such charges from such contracts or for the refund of amounts received by the Contractor with respect to any such charges not so excluded.

(i) *Rights to disclose subject inventions.* The Government may duplicate and disclose reports and disclosures of Subject Inventions required to be furnished by the Contractor or a subcontractor pursuant to this Patent Rights clause.

(j) *Forfeiture of rights in unreported subject inventions.* The Contractor shall forfeit to the Government all rights in any Subject Invention which he fails to report to the Contracting Officer at or prior to the time he (i) files or causes to be filed a United States or foreign application thereon, or (ii) submits the final report required by (c)(iii) of this clause, whichever is later: *Provided,* That the Contractor shall not forfeit rights in a Subject Invention if (A) contending that the invention is not a Subject Invention, he nevertheless reports the invention and all facts pertinent to his contention to the Contracting Officer within the time specified in (i) or (ii) above, or (B) he establishes that the failure to report was due entirely to causes beyond his control and without his fault or negligence. The Contractor shall be deemed to hold any such forfeited Subject Invention, and the patent applications and patents pertaining thereto, in trust for the Government pending written assignment of the invention. The rights accruing to the Government under this paragraph shall be in addition to and shall not supersede any other rights which the Government may have in relation to unreported Subject Inventions. Nothing contained herein shall be construed to require the Contractor to report any invention which is not in fact a Subject Invention.

(k) *Examination of records relating to inventions.* The Contracting Officer or his authorized representative shall, until the expiration of three (3) years after final payment under this contract. have the right to examine any books, records, documents, and other supporting data of the Contractor which the Contracting Officer or his authorized representative shall reasonably deem directly pertinent to the discovery or identification of Subject Inventions or to compliance by the Contractor with the requirements of this clause.

(c) *Patent Rights (Deferred) Clause.* Where the contracting officer has determined that the proposed contract comes within § 9.107-4(d), he shall include in the contract the Patent Rights (Title) clause set forth in paragraph (a) of this

section, except that the name of the clause shall be changed to "Patent Rights (Deferred)" and paragraph (h) of that clause shall be replaced by the following paragraph (h). The clause, when so modified, differs from the clause set forth in paragraph (a) of this section only in the circumstances under which the Government may permit the contractor to acquire greater rights than the license.

(h) *Contractor's request for greater rights.* The Contractor at the time of disclosing a Subject Invention pursuant to paragraph (c) of this clause, but not later than three (3) months thereafter, may submit in writing to the Contracting Officer, in accordance with applicable regulations, a request for greater rights in such Invention than the license reserved to the Contractor in paragraph (b) of this clause. Each such request shall include, but need not be limited to, information concerning the Contractor's intention and plan to bring the Invention to the point of commercial application. The Contracting Officer shall review the Contractor's request for greater rights and shall notify the Contractor whether, and the extent to which, such request is granted. Any rights granted to the Contractor shall be subject to the provisions of (i) of this clause (MAY 1964).

[32 F.R. 524, Jan. 18, 1967, as amended at 32 F.R. 4260, Mar. 18, 1967; 33 F.R. 7399, May 18, 1968; 33 F.R. 19922, Dec. 28, 1968]

### § 9.107–6 Clause for foreign contracts.

A patent rights clause shall be included in every contract having as one of its purposes experimental, developmental, or research work which is to be performed outside the United States, its possessions, or Puerto Rico. Except as provided in § 9.107–8 with respect to contracts on behalf of the National Aeronautics and Space Administration, the clauses authorized in accordance with § 9.107–5 may be used; however, any clause may be replaced by any other clause tailored to meet requirements peculiar to foreign procurement *provided* the replacement clause incorporates the principles of the clause being replaced.

[29 F.R. 9760, July 21, 1964]

### § 9.107–7 Contracts relating to atomic energy.

(a) Except as provided in paragraph (b) of this section, the following paragraph shall be inserted as a part of the Patent Rights clause set forth in § 9.107–5(b) in all research or development contracts relating to atomic energy.

(1) With respect to any Subject Invention made by employees of the Contractor (except clerical and manual labor personnel who do not have access to technical data), and relating to the production or utilization of special nuclear material or atomic energy within the purview of the Atomic Energy Acts of 1946 (42 U.S.C. 1801–1819) and of 1954 (42 U.S.C. 2011–2296), the Contractor agrees:

(i) To furnish to the U.S. Atomic Energy Commission (hereinafter in this paragraph (1) referred to as "the Commission") through the Contracting Officer complete information regarding such Subject Invention, the Commission to have the sole and conclusive power to determine whether and where a patent application shall be filed, and to determine the disposition of the title to and rights under any such application or any patent that may issue thereon;

(ii) To obtain the execution of and deliver to the Commission, all documents relating to each Subject Invention and to do all things necessary or proper to carry out any determination of the Commission, made under (1)(i) above;

(iii) Unless otherwise authorized in writing by the Commission to obtain patent agreements from all such employees to effectuate the purposes of this paragraph (1); and

(iv) Unless otherwise authorized in writing by the Commission, to insert this paragraph (1) in all subcontracts.

No claim for pecuniary award or compensation under the provisions of the Atomic Energy Acts of 1946 and 1954 shall be asserted by the Contractor or his employees with respect to any Subject Invention covered by this paragraph (OCTOBER 1966).

(b) Where the work to be performed or the material or equipment to be furnished by the contractor is of such character that any such Subject Inventions that may be made will probably (1) relate only incidentally (and not directly) to some phase of the basic research or development work which the Atomic Energy Commission conducts or sponsors, (2) relate to a field or work in which the contractor has an established industrial and patent position, or (3) result from routine development or production work by the contractor, a provision authorizing the contractor to retain license rights may be incorporated in the paragraph set forth in paragraph (a) of this section. Any such provision or any deviation from the paragraph set forth in paragraph (a) of this section, which the Military Department concerned proposes to authorize, shall be forwarded in accordance with Departmental procedures to the Atomic Energy Commission for recommendation and shall not be authorized except with the concurrence of the Atomic Energy Commission.

[29 F.R. 9760, July 21, 1964, as amended at 32 F.R. 528, Jan. 18, 1967]

in and to inventions, the Contractor agrees to be bound by all provisions of Executive Order 10096, dated January 23, 1950, and any orders, rules, regulations, or the like issued thereunder.

(b) The Contractor shall: (i) Make written disclosure promptly to the Contracting Officer of all inventions of the Contractor which are conceived or first reduced to practice during the term of this contract, and sign and execute all papers necessary for conveying to the Government the right to which the Government is entitled in accordance with the determination made under the provisions of Executive Order 10096, or (ii) certify to the Contracting Officer that, to the best of the Contractor's knowledge and belief, no inventions have been conceived or first reduced to practice during the term of this contract.

(b) Where it is contemplated that research, experimental, or developmental work will not be involved, paragraph (b) of the clause may be omitted. Upon written request by the prospective contractor and approval by the Head of the Procuring Activity or his authorized representative, the clause may be modified or omitted where:

(1) The period of employment is to be not more than 90 days in any 1 calendar year; or

(2)(i) The period of employment called for in the contract or in any renewal thereof is more than 90 days but not more than 1 year of full-time service, and

(ii) The prospective contractor is bound by an obligation which existed prior to entering into the proposed contract with the Government and which was not entered into in contemplation thereof, and the discharge of which would be inconsistent with the discharge of any obligation arising under Executive Order 10096.

[32 F.R. 528, Jan. 18, 1967]

### § 9.109 Administration of patent rights clauses.

The President's Statement of Government Patent Policy (see § 9.107) provides that every appropriate effort should be made to realize for the Government and the public the benefit of inventions and discoveries resulting from experimental, research and development contracts even where the inventions are an incidental product of the work. It is important that the Government be in a position to know and exercise its rights in order to avoid payment of royalties on inventions in which it has rights and to defend itself against unjustified claims and suits for patent infringement. To attain these ends, contracts having patent rights clauses should be so administered that:

(a) Subject Inventions are identified and reported as required by the contract clauses;

(b) The rights of the Government in such Inventions are established;

(c) The rights of the Government are documented by formal instruments such as licenses or assignments; and

(d) When appropriate, patent applications on Subject Inventions are timely filed and prosecuted by contractors or by the Government.

[32 F.R. 528, Jan. 18, 1967]

### § 9.109-1 Applicability.

The following policies and procedures apply to all contracts having patent rights clauses, except that these policies and procedures may be modified in their application to a foreign contract so as to be consistent with local law and custom and the provisions of the patent rights clause of the particular contract (see §§ 1.109 and 9.107-6).

[32 F.R. 528, Jan. 18, 1967]

### § 9.109-2 Follow-up by Government.

(a) Each Department shall maintain "followup" systems to assure that Subject. Inventions are identified and that the Government's rights therein are established and protected. Followup activities for contracts which include as part of a patent rights clause either the paragraph set forth in § 9.107-7(a) or the NASA clause referenced in § 9.107-8 (a) shall be coordinated with the Atomic Energy Commission and the National Aeronautics and Space Administration, respectively.

(b) When it is determined after the award of a contract that the contractor or subcontractor may not have a clear understanding of the rights and obligations of the parties under a patent rights clause, a postaward orientation conference or letter should be used to explain these rights and obligations (see Subpart R, Part 1 of this chapter).

(c) The contracting officer administering the contract shall be responsible for receiving invention disclosures, reports, confirmatory instruments, notices, requests, and other documents and information submitted by the contractor pursuant to a patent rights clause. Where the contractor fails to furnish documents or information called for by

Appendix D

Extract of Armed Services Procurement Regulation,
32 C.F.R., Part 9 (1971)

# Code of Federal Regulations

**TITLE 32**

**Parts 9 to 39**

**Revised as of January 1, 1971**

CONTAINING A CODIFICATION OF DOCUMENTS OF GENERAL APPLICABILITY AND FUTURE EFFECT AS OF JANUARY 1, 1971

*With Ancillaries*

Published by the Office of the Federal Register
National Archives and Records Service
General Services Administration
as a Special Edition of the Federal Register

# SUBCHAPTER A—ARMED SERVICES PROCUREMENT REGULATIONS—(Continued)

## PART 9—PATENTS, DATA, AND COPYRIGHTS


Sec.
9.000 Scope of part.

Subpart A—Patents

9.100 Scope of subpart.
9.101 [Reserved]
9.102 Authorization and consent.
9.102–1 Authorization and consent in contracts for supplies or services.
9.102–2 Authorization and consent in contracts for research or development.
9.103 Patent indemnification of Government by contractor.
9.103–1 Patent indemnification in formally advertised contracts—commercial status predetermined.
9.103–3 Patent indemnification in negotiated contracts.
9.103–4 Waiver of indemnity by the Government.
9.104 Notice and assistance.
9.106 Classified contracts.
9.106–1 Classified contracts—contracting officer's duties.
9.106–2 Classified contracts relating to atomic energy.
9.107 Patent rights under contracts for research and development.
9.107–1 Introduction.
9.107–2 General.
9.107–3 Policy.
9.107–4 Procedures.
9.107–5 Clauses for domestic contracts.
9.107–6 Clause for foreign contracts.
9.107–7 Contracts relating to atomic energy.
9.107–8 Contracts placed for NASA.
9.107–9 Contracts relating to space.
9.108 Patent rights under contracts for personal services.
9.109 Administration of patent rights clauses.
9.109–1 Applicability.
9.109–2 Follow-up by Government.
9.109–3 Maintenance and use of records of performance.
9.109–4 Conveyance of invention rights to Government.
9.109–5 Register of Government rights in inventions.
9.110 Reporting of royalties—anticipated or paid.
9.111 Refund of royalties.
9.112 Adjustment of royalties.

Subpart B—Data and Copyrights

9.200 Scope of subpart.
9.201 Definitions.
9.202 Acquisition of rights in technical data.
9.202–1 Background.
9.202–2 Policy.
9.202–3 Procedures.

Sec.
9.203 Contract clauses.
9.204 Contract clauses; special.
9.204–1 Limitation on Government's right publication for sale to the gener public.
9.204–2 Production of motion pictures, hi tories, and other works.
9.204–3 Histories and other works.
9.205 Contracts for acquisition of existi works.
9.205–1 Off-the-shelf purchase of books a similar items.
9.205–2 Purchase of existing motion pi tures or television recordings.
9.206 Contracts to be performed outsi the United States.
9.207 Data—Withholding of payment.
9.207–1 General.
9.207–2 Clauses.

Subpart C—Foreign License and Technical Assistance Agreements

9.301 General.
9.301–1 Background.
9.301–2 Policy.
9.302 Foreign license and technical assis ance agreements between t Government and domestic co cerns.
9.303 Supply contracts between the Go ernment and a foreign gover ment or concern.
9.304 Foreign license and technical a sistance agreements betwe domestic concern and foreign go ernment or concern.
9.304–1 International Traffic in Arms Reg lations.
9.304–2 Review of agreements.

Subpart D—Processing of Licenses, Assignmen and Infringement Claims

9.401 Policy.
9.402 Statutes pertaining to administ tive claims of infringement.
9.403 Claims for copyright infringement
9.404 Requirements for filing an admi istrative claim for patent infring ment.
9.405 Indirect notice of patent infring ment claims.
9.406 Investigation and administrati disposition of claims.
9.407 Notification and disclosure claimants.
9.408 Settlement of indemnified claims.
9.409 Patent releases, license agreemen and assignments.
9.409–1 Required clauses.
9.409–2 Clauses to be used when applicat
9.409–3 Additional clauses—contracts cept running royalty contracts
9.409–4 Additional clauses—contracts p viding for payment of a runn royalty.

tional security, such application should be placed under an order of secrecy or the issuance of a patent should be otherwise delayed under pertinent U.S. statutes or regulations.

(c) Where the subject matter of this contract is classified for reasons of security, the Contractor shall not file, or cause to be filed in any country, other than in the United States as provided in (a) and (b) of this clause, an application or registration for a patent containing any of said subject matter without first obtaining written approval of the Contracting Officer.

(d) When filing any patent application coming within the scope of this clause, the Contractor shall observe all applicable security regulations covering the transmission of classified subject matter, and shall also promptly furnish to the Contracting Officer the serial number, filing date, and name of country of any such patent application. When transmitting the application to the U.S. Patent Office, the Contractor shall by separate letter identify by agency and number the contract or contracts which require security classification markings to be placed on the application.

(e) The substance of this clause shall be included in all subcontracts which cover or are likely to cover classified subject matter.

[32 F.R. 522, Jan. 1, 1967, as amended at 35 F.R. 6832, Apr. 30, 1970]

### § 9.106-1 Classified contracts—contracting officer's duties.

(a) Upon receipt from the contractor of a patent application, not yet filed, which has been submitted by the contractor in compliance with paragraphs (a) or (b) of the clause in § 9.106, the contracting officer shall ascertain the proper security classification of the patent application. Upon a determination that the application contains classified material, the contracting officer shall inform the contractor of any instructions deemed necessary or advisable relating to transmittal of the application to the United States Patent Office in accordance with procedures in the Department of Defense Industrial Security Manual for Safeguarding Classified Security Information. If the material is classified "Secret" or higher, the contracting officer shall make every effort to notify the contractor of the determination within 30 days pursuant to paragraph (a) of the clause.

(b) In the case of all applications filed under the provisions of this section, the contracting officer, upon receiving the application serial number, the filing date, and the information furnished by the contractor under paragraph (d) of the clause, shall promptly submit that information to personnel having cognizance of patent matters in order that necessary steps may be taken to insure the security of the application.

(c) A request for the approval referred to in paragraph (c) of the clause in § 9.106 must be considered and acted upon promptly in order to avoid the loss of valuable patent rights of the Government or the contractor.

[32 F.R. 523, Jan. 1, 1967, as amended at 35 F.R. 6832, Apr. 30, 1970]

### § 9.106-2 Classified contracts relating to atomic energy.

Where the contract contains a Patent Rights clause which includes paragraph (l) of § 9.107-7, the instructions contained in such paragraph shall be followed in processing information regarding any Subject Invention (Classified or Unclassified), relating to the production or utilization of special nuclear material or atomic energy.

[32 F.R. 523, Jan. 1, 1967]

### § 9.107 Patent rights under contracts for research and development.

[29 F.R. 9754, July 21, 1964]

### § 9.107-1 Introduction.

On October 10, 1963, the President promulgated a Statement of Government Patent Policy applicable to all Executive Departments and Agencies (28 F.R. 10943-10946, October 12, 1963). This Statement is set forth almost verbatim in §§ 9.107-2 and 9.107-3. Essentially, the goal of the Statement of Government Patent Policy is to promote the development of inventions resulting from Federally sponsored research, so that the public can benefit from early civilian use of such inventions. The Statement identifies three categories of procurement situations in which the use of three different patent rights clauses will best serve this goal. In a first category of procurement situations, the goal of the Policy will be best served by the Government acquiring title to the inventions. In the second category, where the contractor has demonstrated a technical competence in the area and an ability to commercialize his inventions, the Policy Statement calls for the contractor or grantee to obtain title to the resulting patent, subject to a license in the Government. In such a situation, the normal incentives provided by the patent system are sufficient guarantee that the inventions will be exploited and developed for civilian use. In the third and

final category, the division of patent rights is deferred until the invention is disclosed. This may be necessary where the commercial interests of the contractor are not sufficiently established to give title to the contractor at the time of contracting. This brief general summary of the Policy Statement does not attempt, of course, to define the categories with precision; and, in any event, exceptions to the general rules are provided by the Policy for special situations.

[29 F.R. 9754, July 21, 1964]

## § 9.107-2 General.

(a) *Basic considerations.* (1) The Government expends large sums for the conduct of research and development which results in a considerable number of inventions and discoveries.

(2) The inventions in scientific and technological fields resulting from work performed under Government contracts constitute a valuable national resource.

(3) The use and practice of these inventions and discoveries should stimulate inventors, meet the needs of the Government, recognize the equities of the contractor, and serve the public interest.

(4) The public interest in a dynamic and efficient economy requires that efforts be made to encourage the expeditious development and civilian use of these inventions. Both the need for incentives to draw forth private initiatives to this end and the need to promote healthy competition in industry must be weighed in the disposition of patent rights under Government contracts. Where exclusive rights are acquired by the contractor, he remains subject to the provisions of the antitrust laws.

(5) The public interest is also served by sharing of benefits of Government-financed research and development with foreign countries to a degree consistent with our international programs and with the objectives of United States foreign policy.

(6) There is growing importance attaching to the acquisition of foreign patent rights in furtherance of the interest of United States industry and the Government.

(7) The prudent administration of Government research and development calls for a Government-wide policy on the disposition of inventions made under Government contracts reflecting common principles and objectives, to the extent consistent with the missions of the respective agencies. The policy must recognize the need for flexibility to accommodate special situations.

(b) *Availability of Government-owned patents.* Government-owned patents shall be made available and the technological advances covered thereby brought into being in the shortest time possible through dedication or licensing and shall be listed in official Government publications or otherwise.

(c) *Definitions.* As used in §§ 9.107—9.107-9, the stated terms are defined as follows:

(1) "Invention or invention or discovery" includes any art, machine, manufacture, design or composition of matter, or any new and useful improvement thereof, or any variety of plant, which is or may be patentable under the Patent Laws of the United States of America or any foreign country;

(2) "Contractor" means any individual, partnership, public or private corporation, association, institution, or other entity which is a party to the contract;

(3) "Contract" means any actual or proposed contract, agreement, grant, or other arrangement, or subcontract entered into with or for the benefit of the Government where a purpose of the contract is the conduct of experimental, developmental, or research work;

(4) "Made," when used in relation to any invention or discovery, means the conception or first actual reduction to practice of such invention in the course of or under the contract;

(5) "Governmental purpose" means the right of the Government of the United States (including any agency thereof, state, or domestic municipal government) to practice and have practiced (make or have made, use or have used, sell or have sold) throughout the world by or on behalf of the Government of the United States.

(6) "To the point of practical application" means to manufacture in the case of a composition or product, to practice in the case of a process, or to operate in the case of a machine or system and, in each case, under such conditions as to establish that the invention is being worked and that its benefits are reasonably accessible to the public.

[29 F.R. 9755, July 21, 1964]

## § 9.107-3 Policy.

(a) *Category I.* The Government shall normally acquire or reserve the

right to acquire the principal or exclusive rights throughout the world in and to any inventions made in the course of or under a contract where:

(1) A principal purpose of the contract is to create, develop or improve products, processes, or methods which are intended for commercial use (or which are otherwise intended to be made available for use) by the general public at home or abroad, or which will be required for such use by governmental regulations; or

(2) A principal purpose of the contract is for exploration into fields which directly concern the public health or public welfare; or

(3) The contract is in a field of science or technology in which there has been little significant experience outside of work funded by the Government, or where the Government has been the principal developer of the field, and the acquisition of exclusive rights at the time of contracting might confer on the contractor a preferred or dominant position; or

(4) The services of the contractor are

(i) For the operation of a Government-owned research or production facility; or

(ii) For coordinating and directing the work of others.

In exceptional circumstances, the contractor may acquire greater rights than a nonexclusive license at the time of contracting, where the Secretary certifies that such action will best serve the public interest. Greater rights than a nonexclusive license may be acquired by the contractor after the invention has been identified, where the invention when made in the course of or under the contract is not a primary object of the contract: *Provided,* The acquisition of such greater rights is consistent with the intent of this section and is a necessary incentive to call forth private risk capital and expense to bring the invention to the point of practical application.

(b) *Category II.* In other situations, where the purpose of the contract is to build upon existing knowledge or technology to develop information, products, processes, or methods for use by the Government, and the work called for by the contract is in a field of technology in which the contractor has acquired technical competence (demonstrated by factors such as know-how, experience, and patent position) directly related to an area in which the contractor has an established nongovernmental commercial position, the contractor shall normally acquire the principal or exclusive rights throughout the world in and to any resulting inventions, subject to the Government's acquiring at least an irrevocable nonexclusive royalty-free license throughout the world for governmental purposes.

(c) *Category III.* Where the commercial interests of the contractor are not sufficiently established to be covered by the criteria specified in paragraph (b) of this section, the final determination of rights shall be made by the contracting officer after the invention has been identified, in a manner deemed most likely to serve the public interest as expressed in this Policy Statement (see § 9.107–2 and other paragraphs of this section), taking particularly into account the intentions of the contractor to bring the invention to a point of commercial application and the guidelines of paragraph (a) of this section: *Provided,* That in the special situations set forth in § 9.107–4(c)(2), the contractor may acquire at the time of contracting greater rights than a nonexclusive license. In any case, the Government shall acquire at least a nonexclusive royalty-free license throughout the world for Governmental purposes.

(d) In the Category II and Category III situations, when two or more potential contractors are judged to have presented proposals of equivalent merit, willingness to grant the Government principal or exclusive rights in resulting inventions will be an additional factor in the evaluation of the proposals. In no event will contractors be asked to state their willingness to grant the Government principal or exclusive patent rights prior to a determination that proposals of equivalent merit have been presented.

(e) Where the principal or exclusive (except as against the Government) rights in an invention remain in the contractor, he should agree to provide written reports at reasonable intervals, when requested by the Government, on the commercial use that is being made or is intended to be made of inventions made under Government contracts.

(f) Where the principal or exclusive (except as against the Government) rights in an invention remain in the contractor, unless the contractor, his licensee, or his assignee has taken effective steps within three years after a patent

issues on the invention to bring the invention to the point of practical application or has made the invention available for licensing royalty-free or on terms that are reasonable in the circumstances, or can show cause why he should retain the principal or exclusive rights for a further period of time, the Government shall have the right to require the granting of a license to an applicant on a nonexclusive royalty-free basis.

(g) Where the principal or exclusive (except as against the Government) rights to an invention are acquired by the contractor, the Government shall have the right to require the granting of a license to an applicant royalty-free or on terms that are reasonable in the circumstances to the extent that the invention is required for public use by governmental regulations or as may be necessary to fulfill health needs, or for other public purposes stipulated in the contract.

(h) Where the Government may acquire the principal rights and does not elect to secure a patent in a foreign country, the contractor may file and retain the principal or exclusive foreign rights subject to retention by the Government of at least a royalty-free license for governmental purposes and on behalf of any foreign government pursuant to any existing or future treaty or agreement with the United States.

[29 F.R. 9755, July 21, 1964, as amended at 30 F.R. 6003, Apr. 29, 1965]

### § 9.107-4 Procedures.

(a) After appropriate consultation with legal, patent, and technical advisors, the contracting officer shall determine whether the Government or the contractor should acquire the principal or exclusive rights (hereafter these rights are referred to as "title") to any or all inventions made in the course of or under each contract and shall document the contract file to support his determination. The basic considerations and policy set forth above together with procedures in this part shall govern the making of this determination. The Preaward Patent Rights Documentation Checklist set forth in paragraph (h) of this section may be used in determining the appropriate Patent Rights clause to be incorporated in a request for proposals in procurements involving experimental, developmental, or research work. If the contracting officer determines that the Patent Rights (Title) clause (§ 9.107-5(a)) is applicable, that clause shall be the only Patent Rights clause used. If it is determined that the Patent Rights (Title) clause (§ 9.107-5(a)) is not applicable, the contracting officer shall include both the Patent Rights (License) (§ 9.107-5(b)) and Patent Rights (Deferred) (§ 9.107-5(c)) clauses in the request for proposals together with the statement: "The contracting officer will determine during negotiation which of these two patent rights clauses will be used in the contract, and the determination will be made in accordance with the guidelines set forth in ASPR 9-107." Except where the Patent Rights (Title) clause is applicable, DD Form 1564, "Preaward Patent Rights Documentation", may be included in each request for proposal. In the case of an unsolicited proposal, the contractor may be requested to complete that DD Form. The Checklist and the DD Form, if used, shall be made a part of the contract file.

(b) Category I—Where the contracting officer determines that proposed experimental, developmental, or research work falls within Category I set forth in § 9.107-3(a), the Patent Rights (Title) clause set forth in § 9.107-5(a) shall be included in the contract. When said determination is based on § 9.107-3(a)(3) notice to that effect will be included in the solicitation. If the contractor to whom the award is to be made challenges the applicability of this provision, the contracting officer will review the basis for his determination and provide the contractor with the reason for his conclusion. If the contracting officer and the contractor cannot then resolve the issue, the contracting officer will promptly forward the problem to the Head of the Procuring Activity for resolution. If award of the contract cannot be delayed, the contracting officer may proceed with the procurement pending resolution of the issue, provided the contract contains the Patent Rights (Title) clause set forth in § 9.107-5(a), accompanied by the following statement: "Contractor agrees to accept the Patent Rights Clause which is ultimately determined, in accordance with departmental procedures, to be the appropriate one." The con-

tracting officer shall consider the following in making his determination:

(1) In the situation in Category I(i) in § 9.107-3(a), a principal purpose of the contract or a series of related contracts must be research or development work on an end item (a product or process) either (i) intended for use in the civilian economy, or (ii) which the general public will be required by governmental regulation to use. End items of this nature would most likely be found in the field of Civil Defense.

(2) In the situation in Category I(ii) in § 9.107-3(a), a principal purpose of the contract must be directly concerned with the public health or public welfare (e.g., drugs, medical instruments, water desalinization, and weather modification or control), and not solely items of only military application.

(3) Under Category I(3) in § 9.107-3 (a), the contract must be for an end product in a field of science or technology in which, at the time the contract is entered into, there has been little or no significant experience except for work funded by the Government or where the Government has been the principal developer. If the contracting officer determines that the proposed contract is in such a field of science or technology, he then shall determine whether the contractor would likely get a preferred or dominant commercial position in that field if he were permitted to acquire title to inventions made under the contract. It would be inequitable to other commercial manufacturers or sources to permit a contractor to acquire such a preferred or dominant commercial position based principally upon work funded by the Government. When said determination is based on § 9.107-3(a)(3), notice to that effect will be included in the solicitation. If the contractor to whom the award is to be made challenges the applicability of this provision, the contracting officer will review the basis for his determination and provide the contractor with the reason for his conclusion. If the contracting officer and the contractor cannot then resolve the issue, the contracting officer will promptly forward the problem to the head of the procuring activity for resolution. If award of the contract cannot be delayed, the contracting officer may proceed with the procurement pending resolution of the issue, provided the contract contains the Patent Rights (Title) clause set forth in § 9.107-5(a), accompanied by the following statement: "Contractor agrees to accept the Patent Rights Clause which is ultimately determined, by the head of the procuring activity, to be the appropriate one."

(4) Under Category I(iv)(A) in § 9.107-3(a), a contract for the operation of a Government-owned production facility must call for experimental, developmental, or research work at such a facility. In Category I(iv)(B) the words "coordinating and directing the work of others" do not refer to the normal prime contractor-subcontractor relationship, but refer instead to a relationship in which a potential organizational conflict-of-interest exists. See § 1.113-2.

Notwithstanding any determination in accordance with this paragraph, in exceptional circumstances the contractor may acquire greater rights than a nonexclusive license at the time of contracting if the Secretary certifies that such action will best serve the public interest.

(c) Category II: Where the contracting officer determines that proposed experimental, developmental, or research work does not fall within Category I but does fall within Category II set forth in § 9.107-3(b) or within the special situations set forth in subparagraph (2) of this paragraph, the Patent Rights (License) clause set forth in § 9.107-5(b) shall be included (except when greater rights are acquired by the Government pursuant to § 9.107-3(d)).

(1) In determining whether such work falls within Category II, the contracting officer shall first determine whether the work is in a field of technology directly related to an area in which the contractor has an "established nongovernmental commercial position." In making this determination, the contracting officer should recognize that the ultimate goal of the policy is to move inventions into the stream of commerce through domestic sales or exports or through domestic and foreign licensing programs. A nongovernmental commercial position can be based upon sales or licensing of military or nonmilitary items to foreign governments, multinational organizations, or foreign nationals. In determining whether a contractor has an established nongovernmental commercial position,

the contracting officer will consider and evaluate each known factor which relates to the contractor's ability and willingness to move inventions into the stream of commerce. Factors which typically should be considered as appropriate are:

(i) Whether the contractor is known in the trade as a manufacturer or source of products or services in the area involved; and

(ii) Whether the contractor either (*a*) is regularly engaged in the sale or licensing, whether domestic or foreign, of such products or services to the general public (including business concerns), foreign governments, multinational organizations or foreign nationals; or (*b*) has a record of developing nongovernmental commercial markets for inventions in the area involved.

(iii) Have a record of developing nongovernmental commercial markets for inventions in the area involved. A nongovernmental commercial position shall be deemed to include sales of military items to foreign governments or multinational organizations or licensing programs with respect thereto, as well as the export of nonmilitary items to foreign governments or foreign nationals or foreign licensing programs in connection therewith.

(2) The following are the special situations where the public interest in the availability of inventions would best be served by permitting the contractor to acquire greater rights than a nonexclusive license at the time the contract is entered into:

(i) An educational or nonprofit institution has a definite, established policy, approved and promulgated by its governing body, of retaining title to inventions made by its employees or of requiring its employees to assign title to such inventions to a patent holding entity for the benefit of the institution, and which patent policy has been approved by the Department of Defense;

(ii) A newly-formed research and development contractor or a new independent, research and development division or subsidiary of an older contractor has a definite program for establishing a nongovernmental commercial position which is dependent on the protection afforded by title in inventions which may be made in the course of or under the contract (a contractor or division established more than five years shall not be considered "newly-formed");

*Provided, however,* That, in either case the procurement involved does not fall within Category I.

(d) *Category III.* Where the contracting officer determines that proposed experimental, developmental, or research work falls within Category III (set forth in § 9.107-3(c)) because it is not covered by the instructions in paragraphs (b) and (c) of this section, the Patent Rights (Deferred) clause in § 9.107-5(c) shall be included. However, in the case of prospective contractors organized for profit only considered under paragraph (c) of this section, the contracting officer shall affirmatively determine that the proposed contractor does not have a qualifying commercial position before the Deferred Clause is used, thereby settling as many questions as possible at the time of contracting. Many educational institutions or nonprofit organizations do not wish to acquire patents or do not have an approved patent policy; in such cases, the contract may include either the Patent Rights (Title) clause in § 9.107-5(a) or the Patent Rights (Deferred) clause in § 9.107-5(c), as appropriate. In the event an educational or nonprofit institution files an application for approval of its patent policy (see paragraph (c)(2)(i) of this section) the above procedure shall be followed pending such approval, and in such cases the contract may provide for substitution of the Patent Rights (License) clause in § 9.107-5(b), in lieu of the patents rights clause used at the time of contracting, if such approval is obtained, except in procurements where the contemplated work under contract falls within the provisions of § 9.107-3(a).

(e) Where a contractor has acquired the title to an invention under a contract, the contracting officer may, in accordance with § 9.107-5, request written reports from the contractor as to:

(1) The commercial use that is being made or is intended to be made of such invention; and

(2) The steps taken by the contractor to bring the invention to the point of practical application, or to make the invention available for licensing.

(f) In the special cases covered by the sections listed below, the contracting

officer shall follow the instructions and include the clauses required in such sections:

(1) Section 9.107–6, concerning foreign contracts;

(2) Section 9.107–7, concerning contracts relating to atomic energy;

(3) Section 9.107–8, concerning contracts placed for the National Aeronautics and Space Administration;

(4) Section 9.107–9, concerning contracts relating to space; and

(5) Section 9.108, concerning contracts for personal services.

(g) By definition, the term "contract" includes subcontracts; hence, the policy in §§ 9.107–2 and 9.107–3 applies where a purpose of a subcontract is experimental, developmental, or research work. So that the policy is carried out at all contract and subcontract levels, subcontracts generally shall include the same patent rights provision (Title or License) contained in the prime contract. However, there may be exceptions to this general rule, as for example where the prime contract comes within subparagraphs (3) or (4) in § 9.107–3(a), but the subcontract is not subject to the same considerations. Another exception, though less likely, may occur where the prime contract is subject to the provisions of Category II, but the nongovernmental commercial position of the subcontractor is not sufficiently established and, consequently, the subcontract falls within the provisions of Category III.

(h) *Preaward patent rights documentation checklist.*

(Authorized for local reproduction)

PREAWARD PATENT RIGHTS DOCUMENTATION CHECKLIST

Procurement Identification:________________________________________
Purpose of Proposed Procurement:__________________________________

1. Is a principal purpose of the proposed contract, either by itself or as one of a series of directly related contracts, to create, develop or improve an end item intended for use in the civilian economy?[1] (See ASPR 9–107.3 (a)(i) and 9–107.4(b)(1).) ---------- ☐ Yes ☐ No

If "Yes," identify the end item and briefly describe its intended use in the civilian economy.

2. Is a principal purpose of the proposed contract, either by itself, or as one of a series of directly related contracts to create, develop or improve an end item which will be required for use by the general public by a Government regulation ---------- ☐ Yes ☐ No

If "Yes," identify the end item and cite applicable regulation. (See ASPR 9–107.3(a)(i) and 9–107.4(b)(1).)

3. Is a principal purpose of the contract exploration into a field directly concerned with public health or public welfare (as distinguished from items predominantly of military concern)? (See ASPR 9–107.3(a)(ii) and 9–107.4(b)(2).) ---------- ☐ Yes ☐ No

If "Yes," identify such principal purpose of the contract and briefly describe its relationship to the public health or public welfare.

4. Is the contract for procurement in a field of science or technology in which there has been little significant experience outside of work funded by the Government?[2] (See ASPR 9–107.3(a)(iii) and 9–107.4(b)(3).) ---------- ☐ Yes ☐ No

If "Yes," briefly describe such field.

5. Is the contract for procurement in a field of science or technology in which the Government has been the principal developer of the field?[2] (See ASPR 9–107.3(a)(iii) and 9–107.4(b)(3).) ---------- ☐ Yes ☐ No

If "Yes," briefly describe such field.

6. If the answer to either 4 or 5 is "Yes," would the contractor be likely to get a preferred or dominant commercial position in that field if he were permitted to acquire title to inventions made under the contract? (See ASPR 9–107.3(a)(iii) and 9–107.4(b)(3).) ---------- ☐ Yes ☐ No

Explain the answer.

7. Does the contract require that the contractor both (i) provide services for operation of a Government-owned research or production facility and (ii) perform experimental, developmental or research work at that facility? (See ASPR 9–107.3(a)(iv)(A) and 9–107.4(b)(4).) ---------- ☐ Yes ☐ No

Footnotes at end of checklist.

8. Does the contract require contractor to coordinate and direct the work of others (as distinguished from the normal contractor-subcontractor relationship) which might result in a potential organizational conflict of interest? (See ASPR 1–113.2, Appendix G, and 9–107.3(a)(iv)(B), 9–107.4(b)(4).) ---------------------------------------------------- ☐ Yes ☐ No

If "Yes," explain briefly why such a potential conflict of interest is considered to exist.

-----------------------------------

(Typed name, office, and signature of person completing this form)

The Patents Rights (Title) Clause, ASPR 9–107.5(a), will ---- will not ---- be used in the solicitation. (Give reasons for determination.)

-----------------------------------

(Typed name and signature of contracting officer or representative)

[1] The contract or series of contracts need not necessarily require delivery of the end item. The end item may be a product, a process or data.

[2] The mere fact that the Government has been or is the principal funder or developer funder or developer in a field of science or technology which encompasses the piece of hardware.

[29 F.R. 9756, July 21, 1964, as amended at 30 F.R. 12005, Sept. 21, 1965; 32 F.R. 523, Jan. 18, 1967; 33 F.R. 15391, Oct. 17, 1968; 35 F.R. 8437, May 29, 1970]

## § 9.107–5 Clauses for domestic contracts.

(a) *Patent Rights (Title) Clause.* If the contracting officer has determined that the contract comes within § 9.107–4 (b) or (d), he shall include the following clause in the contract. This clause provides for the Government to acquire title in "Subject Inventions," subject to the contractor's retaining a royalty-free license in such inventions; however, the Government may permit the contractor, under certain circumstances, to acquire greater rights than the license.

PATENT RIGHTS (TITLE) (DECEMBER 1969)

(a) *Definitions used in this clause.* (1) "Subject Invention" means any invention or discovery, whether or not patentable, conceived, or first actually reduced to practice in the course of or under this contract. The term "Subject Invention" includes, but is not limited to, any art, method, process, machine, manufacture, design, or composition of matter, or any new and useful improvement thereof, or any variety of plant, which is or may be patentable under the patent laws of the United States of America or any foreign country.

(2) "Governmental purpose" means the right of the Government of the United States (including any agency thereof, State or domestic municipal government) to practice and have practiced (make or have made, use or have used, sell or have sold) any Subject Invention throughout the world by or on behalf of the Government of the United States.

(3) "Contract" means any contract, agreement, grant, or other arrangement, or subcontract entered into with or for the benefit of the Government where a purpose of the contract is the conduct of experimental, developmental, or research work.

(4) "Subcontract and subcontractor means any subcontract or subcontractor of the Contractor, any lower-tier subcontract or subcontractor under this contract.

(5) "To bring to the point of practical application" means to manufacture in the case of a composition or product, to practice in the case of a process, or to operate in the case of a machine or system and, in each case, under such conditions as to establish that the invention is being worked and that its benefits are reasonably accessible to the public.

(b) *Rights granted to the Government.* Except as provided in (e) and (h) of this clause, the Contractor agrees to grant the Government all right, title, and interest in and to each Subject Invention (made by the Contractor), subject to the reservation of a nonexclusive and royalty-free license to the Contractor. The license shall extend to existing and future associated and affiliated companies, if any, within the corporate structure of which the Contractor is a part and shall be assignable to the successor of that part of the Contractor's business to which such Invention pertains. Nothing contained in this Patent Rights clause shall be deemed to grant any rights with respect to any invention other than a Subject Invention.

(c) *Invention disclosures and reports.* (1) With respect to Subject Inventions (made by the Contractor), except those which are obviously unpatentable under the patent laws of the United States, the Contractor shall furnish to the Contracting Officer:

(i) A written disclosure of each invention within six (6) months after conception or first actual reduction to practice, whichever occurs first under this contract, sufficiently complete in technical detail to convey to one skilled in the art to which the Invention pertains a clear understanding of the nature, purpose, operation, and to the extent known the physical, chemical, or elec-

trical characteristics of the Invention; when unable to submit a complete disclosure, the Contractor shall within said six (6) month period submit a disclosure which includes all such technical detail then known to him and shall, unless the Contracting Officer authorizes a different period, submit all other technical detail necessary to complete the disclosure within three (3) months of the expiration of said six (6) month period.

(ii) Interim reports at least every twelve (12) months, the initial period of which shall commence with the date of this contract, each report listing all such Inventions conceived or first actually reduced to practice more than six (6) months prior to the date of the report and not listed on a prior interim report, or certifying that there are no such unreported Inventions;

(iii) Prior to final settlement of this contract, a final report listing all such Inventions including all those previously listed in interim reports, or certifying that there are no such unreported Inventions (This Final Report and any Interim Report under (ii) above shall be submitted on DD Form 882 or other format acceptable to the Contracting Officer.);

(iv) Information in writing, as soon as practicable, of the date and identity of any public use, sale, or publication of such Invention made by or known to the Contractor or of any contemplated publication by the Contractor;

(v) Upon request, such duly executed instruments and other papers (prepared by the Government) as are deemed necessary to vest in the Government the rights granted it under this clause and to enable the Government to apply for and prosecute any patent application, in any country, covering such Invention where the Government has the right under this clause to file such application; and

(vi) Upon request, an irrevocable power of attorney to inspect and make copies of each U.S. patent application filed by, or on behalf of, the Contractor covering any such Invention.

(2) With respect to each Subject Invention in which the Contractor has been granted greater rights under paragraph (h) of this clause, the Contractor agrees to provide written reports at reasonable intervals, when requested by the Government as to:

(i) The commercial use that is being made or is intended to be made of such Invention;

(ii) The steps taken by the Contractor to bring the Invention to the point of practical application, or to make the Invention available for licensing.

(d) *Subcontracts.* (1) The Contractor shall, unless otherwise authorized or directed by the Contracting Officer, include a patent rights clause containing all the provisions of this Patent Rights clause except provision (g) in any subcontract hereunder where a purpose of the subcontract is the conduct of experimental, developmental, or research work. In the event of refusal by a subcontractor to accept this Patent Rights clause, or if in the opinion of the Contractor this Patent Rights clause is inconsistent with the policy set forth in ASPR 9-107.2 and 9-107.3, the Contractor:

(i) Shall promptly submit a written report to the Contracting Officer setting forth the subcontractor's reasons for such refusal or the reasons Contractor is of the opinion that the inclusion of this clause would be so inconsistent, and other pertinent information which may expedite disposition of the matter; and

(ii) Shall not proceed with the subcontract without the written authorization of the Contracting Officer.

The Contractor shall not, in any subcontract or by using such a subcontract as consideration therefor, acquire any rights to Subject Inventions for his own use (as distinguished from such rights as may be required solely to fulfill his contract obligations to the Government in the performance of this contract). Reports, instruments, and other information required to be furnished by a subcontractor to the Contracting Officer under the provisions of such a patent rights clause in a subcontract hereunder may, upon mutual consent of the Contractor and the subcontractor (or by direction of the Contracting Officer) be furnished to the Contractor for transmission to the Contracting Officer.

(2) The Contractor, at the earliest practicable date, shall also notify the Contracting Officer in writing of any subcontract containing a patent rights clause, furnish to the Contracting Officer a copy of such subcontract, and notify him when such subcontract is completed. It is understood that the Government is a third party beneficiary of any subcontract clause granting rights to the Government in Subject Inventions, and the Contractor hereby assigns to the Government all the rights that the Contractor would have to enforce the subcontractor's obligations for the benefit of the Government with respect to Subject Inventions. If there are no subcontracts containing patent rights clauses, a negative report is required. The Contractor shall not be obligated to enforce the agreements of any subcontractor hereunder relating to the obligations of the subcontractor to the Government in regard to Subject Inventions.

(e) *Domestic filing of patent applications by contractor.* (1) If greater rights are granted in and to a Subject Invention pursuant to paragraph (h) of this clause, the Contractor shall file in due form and within six (6) months of the granting of such greater rights a U.S. Patent application claiming the Invention referred to in said paragraph, and shall furnish, as soon as practicable, the serial number and filing date of each such application and the patent number of any resulting patent. As to each Invention in which the Contractor has been given greater rights, the Contractor shall notify the Contracting Officer at the end of the six (6) month period if he has failed to

file or caused to be filed a patent application covering such invention. If the Contractor has filed or caused to be filed such an application within the six (6) month period, but elects not to continue prosecution of such application, he shall notify the Contracting Officer not less than sixty (60) days before the expiration of the response period. In either of the situations covered by the two immediately preceding sentences, the Government shall be entitled to all rights, title, and interest in such Invention subject to the reservation to the Contractor of a license as specified in paragraph (b).

(2) The following statement shall be included within the first paragraph of any patent application filed and any patent issued on an Invention which was made under Government contract or subcontract thereunder: "The Invention herein described was made in the course of or under a contract or subcontract thereunder (or grant) with (here state the Department or Agency)."

(f) *Foreign filing of patent applications.* (1) If the Contractor acquires greater rights in a Subject Invention pursuant to paragraph (h) of this clause and has filed a U.S. patent application claiming the Invention, the Contractor, or those other than the Government deriving rights from the Contractor, shall as between the parties hereto, have the exclusive right, subject to the rights of the Government under paragraph (i) of this clause, to file applications on the Inventions in each foreign country within:

(i) Nine (9) months from the date a corresponding U.S. patent application is filed;

(ii) Six (6) months from the date permission is granted to file foreign applications where such filing has been prohibited for security reasons; or

(iii) Such longer period as may be approved by the Contracting Officer.

The Contractor shall notify the Contracting Officer of each foreign application filed and, upon written request of the Contracting Officer, furnish an English translation of such application, and, convey to the Government the entire right, title, and interest in the Invention in each foreign country in which an application has not been filed within the time specified above, subject to the reservation of a royalty-free license as specified in paragraph (b).

(2) If the Contratcor does not acquire greater rights pursuant to paragraph (h) of this clause and the Government determines not to file a patent application on any Subject Invention (made by the Contractor) in any particular foreign country, the Contracting Officer, upon request of the Contractor, may authorize the Contractor to file a patent application on such Invention in such foreign country and retain ownership thereof, subject to an irrevocable, nonexclusive and royalty-free license to practice and have practiced such Subject Invention throughout the world for Governmental purposes, including the practice of each such Subject Invention (i) in the manufacture, use, and disposition of any article or material, (ii) in the use of any method, or (iii) in the performance of any service, acquired by or for the Government or with funds derived through the Military Assistance Program of the Government or funds otherwise derived through the Government.

(g) *Withholding of payment.* (1) Final payment under this contract shall not be made before the Contractor delivers to the Contracting Officer the final report required by (c)(1)(iii), all written invention disclosures required by (c)(1)(i), and all information as to subcontracts required by (d)(ii).

(2) If at any time before final payment under this contract the Contractor fails to deliver an interim report required by (c)(1)(ii), or a written invention disclosure required by (c)(1)(i), the Contracting Officer shall withhold from payment $50,000 or five percent (5%), of the amount of this contract whichever is less (or whatever lesser sum is available if payments have exceeded ninety-five percent (95%) of the amount of this contract) until the Contractor corrects all such failures.

(3) After payments total eighty percent (80%) of the amount of this contract, and if no amount is required to be withheld under (2) above, the Contracting Officer may, if he deems such action warranted because of the Contractor's performance under the Patent Rights clause of this contract or other known Government contracts, withhold from payment such sum as he considers appropriate, not exceeding $50,000 or five percent (5%), of the amount of this contract whichever is less, to be held as a reserve until the Contractor delivers all the reports, disclosures, and information specified in (1) above. Subject to the five percent (5%) or $50,000 limitation, the sum withheld under this subparagraph (3) may be increased or decreased from time to time at the discretion of the Contracting Officer.

(4) No amount shall be withheld under this paragraph (g) while the amount specified by this paragraph is being withheld under other provisions of this contract. The total amount withheld under (1), (2), and (3) above shall not exceed $50,000 or five percent (5%) of the amount of this contract whichever is less. The withholding of any amount or subsequent payment thereof to the Contractor shall not be construed as a waiver of any rights accruing to the Government under this contract. This paragraph shall not be construed as requiring the Contractor to withhold any amounts from a subcontractor to enforce compliance with the patent provision of a subcontract. As used in this paragraph (g), "this contract" means "this contract as from time to time amended." In cost-type contracts, "amount of this contract" means "estimated cost of this contract."

(h) *Contractor's request for greater rights.* The Contractor at the time of first disclosure of a Subject Invention pursuant to paragraph

(c)(1)(i) of this clause, but not later than three (3) months thereafter, may submit in writing to the Contracting Officer, in accordance with applicable regulations, a request for greater rights than the license reserved to the Contractor in paragraph (b) of this clause if:

(i) The Invention is not the primary object of this contract; and

(ii) The acquisition of such greater rights is consistent with the intent of ASPR 9-107.3 (a) and is necessary to call forth private risk capital and expense to bring the Invention to the point of practical application.

The Contracting Officer will review the Contractor's request for greater rights and will notify the Contractor whether such request is granted in whole or in part. Any rights granted to the contractor shall be subject to, but not necessarily limited to, the provisions of paragraph (i) of this clause.

(i) *Reservation of Rights to the Government.* (1) In the event greater rights in any Subject Invention are vested in or granted to the Contractor pursuant to paragraph (h) above, such greater rights shall, as a minimum, be subject to an irrevocable, nonexclusive and royalty-free license to practice and have practiced each such Subject Invention (made by the Contractor) throughout the world for Governmental purposes, and including the practice of each such Subject Invention (i) in the manufacture, use, and disposition of any article or material, (ii) in the use of any method, or (iii) in the performance of any service, acquired by or for the Government or with funds derived through the Military Assistance Program or the Government or funds otherwise derived through the Government.

(2) In the event greater rights are vested in the Contractor, the Contractor further agrees to and does hereby grant to the Government the right to require the granting of a license to an applicant under any such Invention:

(i) On a nonexclusive, royalty-free basis, unless the Contractor, his licensee or his assignee demonstrates to the Government, at its request, that effective steps have been taken within three (3) years after a patent issues on such Invention to bring the Invention to the point of practical application or that the Invention has been made available for licensing royalty-free or on terms that are reasonable in the circumstances, or can show cause why the title should be retained for a further period of time; or

(ii) Royalty-free or on terms that are reasonable in the circumstances to the extent that the Invention is required for public use by Governmental regulations or as may be necessary to fulfill health needs, or for other public purposes stipulated in the Schedule of this contract.

(j) *Right to disclose subject inventions.* The Government may duplicate and disclose reports and disclosures of Subject Inventions required to be furnished by the Contractor pursuant to this Patent Rights clause.

(k) *Forfeiture of rights in unreported subject inventions.* The Contractor shall forfeit to the Government all rights in any Subject Invention which he fails to report to the Contracting Officer at or prior to the time he (i) files or causes to be filed a United States or foreign application thereon, or (ii) submits the final report required by (c)(iii) of this clause, whichever is later: *Provided,* That the Contractor shall not forfeit rights in a Subject Invention if (A) contending that the invention is not a Subject Invention, he nevertheless reports the invention and all the facts pertinent to his contention to the Contracting Officer within the time specified in (i) or (ii) above, or (B) he establishes that the failure to report was due entirely to causes beyond his control and without his fault or negligence. The Contractor shall be deemed to hold any such forfeited Subject Invention, and the patent applications and patents pertaining thereto, in trust for the Government pending written assignment of the Invention. The rights accruing to the Government under this paragraph shall be in addition to and shall not supersede any other rights which the Government may have in relation to unreported Subject Inventions. Nothing contained herein shall be construed to require the Contractor to report any invention which is not in fact a Subject Invention.

(l) *Examination of records relating to inventions.* The Contracting Officer, or his authorized representative shall, until the expiration of three (3) years after final payment under this contract, have the right to examine any books, records, documents, and other supporting data of the Contractor which the Contracting Officer or his authorized representative shall reasonably deem directly pertinent to the discovery or identification of Subject Inventions or to compliance by the Contractor with the requirements of this clause.

(b) *Patent rights (license) clause.* Where the contracting officer has determined that the proposed contract comes within § 9.104-4(c) and not within § 9.107-4(b), he shall include the following clause in the contract. This clause provides for the contractor to retain title to "Subject Inventions" and for the Government to acquire a royalty-free license and the additional right to grant sublicenses.

PATENT RIGHTS (LICENSE) (DECEMBER 1969)

(a) *Definitions used in this clause.* (1) "Subject Invention" means any Invention or discovery, whether or not patentable, conceived or first actually reduced to practice in the course of or under this contract. The term "Subject Invention" includes, but is not limited to, any art, method, process, machine, manufacture, design or composition of matter, or any new and useful improvement thereof, or any variety of plant,

which is or may be patentable under the patent laws of the United States of America or any foreign country.

(2) "Government purpose" means the right of the Government of the United States (including any agency thereof, state or domestic municipal government) to practice and have practiced (make or have made, use or have used, sell or have sold) and Subject Invention throughout the world by or on behalf of the Government of the United States.

(3) "Contract" means any contract, agreement, grant, or other arrangement, or subcontract entered into with or for the benefit of the Government where a purpose of the contract is the conduct of experimental, developmental, or research work.

(4) "Subcontract and subcontractor" mean any subcontract or subcontractor of the Contractor, any lower-tier subcontract or subcontractor under this contract.

(5) "To bring to the point of practical application" means to manufacture in the case of a composition or product, to practice in the case of a process, or to operate in the case of a machine or system and, in each case, under such conditions as to establish that the Invention is being worked and that its benefits are reasonably accessible to the public.

(b) *Rights granted to the Government.* (1) The Contractor agrees to and does hereby grant to the Government an irrevocable, nonexclusive, and royalty-free license to practice and have practiced each Subject Invention (made by the Contractor) throughout the world for Government purposes, and including the practice of each such Subject Invention (i) in the manufacture, use, and disposition of any article or material, (ii) in the use of any method, or (iii) in the performance of any service, acquired by or for the Government or with funds derived through the Military Assistance Program of the Government or funds otherwise derived through the Government.

(2) The Contractor further agrees to grant, upon the request of the Government, a license under any Subject Invention (made by the Contractor) to:

(i) Any applicant on a nonexclusive, royalty-free basis, unless the Contractor, his licensee, or his assignee demonstrates to the Government, at its request, that effective steps have been taken within three years after a patent issues on such Invention to bring the Invention to the point of practical application or that the Invention has been made available for licensing royalty-free or on terms that are reasonable in the circumstances, or can show cause why the principal or exclusive rights should be retained for a further period of time;

(ii) Any applicant royalty-free or on terms that are reasonable in the circumstances to the extent that the Invention is required for public use by governmental regulations or as may be necessary to fulfill health needs, or for other public purposes stipulated in the Schedule of this contract.

Nothing contained in this Patent Rights clause shall be deemed to grant any rights with respect to any invention other than a Subject Invention.

(c) *Invention disclosures and reports.* With respect to Subject Inventions (made by the Contractor), except those which are obviously unpatentable under the patent laws of the United States, the Contractor shall furnish to the Contracting Officer:

(i) A written disclosure of each such Invention within six (6) months after conception or first actual reduction to practice, whichever occurs first under this contract, sufficiently complete in technical detail to convey to one skilled in the art to which the Invention pertains a clear understanding of the nature, purpose, operation, and to the extent known, the physical, chemical, or electrical characteristics of the Invention, together with a written statement making an election as to whether a United States patent application claiming the Invention will be filed by or on behalf of the Contractor; provided, where the Contractor elects to file but is unable to submit a complete disclosure, the Contractor shall within said six (6) months period submit a disclosure which includes all such technical detail then known to him and shall, within six (6) months after his election to file (or such longer period as may be authorized by the Contracting Officer under (d)(i) below), submit all other technical detail necessary to complete the disclosure or a copy of the patent application;

(ii) Interim reports at least every twelve (12) months, the initial period of which shall commence with the date of this contract, each report listing all such Inventions conceived or first actually reduced to practice more than six (6) months prior to the date of the report and not listed on a prior interim report, or certifying that there are no such unreported Inventions;

(iii) Prior to final settlement of this contract, a final report listing all such Inventions including all those previously listed in interim reports, or certifying that there are no such unreported Inventions (This Final Report and any Interim Report under (ii) above shall be submitted on DD Form 882 or other format acceptable to the Contracting Officer.); and

(iv) Written reports at reasonable intervals, prior to and after final settlement, when requested by the Government as to—

(A) The commercial use that is being made or is intended to be made of such Invention;

(B) The steps taken by the Contractor to bring the Invention to the point of practical application, or to make the Invention available for licensing.

(d) *Domestic Filing.* In connection with each Subject Invention referred to in (c)(i) above:

(i) If the Contractor has elected to file a United States patent application claiming such Invention, the Contractor shall, within

six (6) months after the election (or such longer period, not to exceed one (1) year after such election, as may be authorized by the Contracting Officer), file or cause to be filed such application in due form, shall notify the Contracting Officer of such filing, and shall deliver to the Contracting Officer, within two (2) months after such filing or within two (2) months of the first written disclosure of such invention if a patent application previously has been filed, a duly executed license, in triplicate, fully confirmatory of all rights to which the Government is entitled under this clause; if the Contractor does not file or cause to be filed such application, he shall so notify the Contracting Officer within the six (6) month period or such longer period as may be authorized above.

(ii) The following statement shall be included within the first paragraph of the specification of any patent application filed and any patent issued on an invention which was made under a Government contract or subcontract thereunder: "The Invention herein described was made in the course of or under a contract or subcontract thereunder, (or grant) with (here state the Department or Agency)."

(iii) If the Contractor has elected not to file or cause to be filed a United States patent application claiming such Invention, or has made the contrary election but has not filed or cause to be filed such application within six (6) months after the election, or such longer period as may be authorized above, the Contractor shall:

(A) Inform the Contracting Officer in writing, as soon as practicable, of the date and identity of any public use, or publication of such Invention made by or known to the Contractor or of any contemplated publication by the Contractor;

(B) Upon written request, convey to the Government the Contractor's entire right, title and interest in such Invention by delivering, to the Contracting Officer such duly executed instruments (prepared by the Government) of assignment and application, and such other papers as are deemed necessary to vest in the Government the entire right, title, and interest aforesaid, and the right to apply for and prosecute patent applications covering such Invention throughout the world, subject to the reservation of a nonexclusive and royalty-free license to the Contractor (and to his existing and future associated and affiliated companies, if any, within the corporate structure of which the Contractor is a part) which license shall be assignable to the successor of that part of the Contractor's business to which such Invention pertains;

(iv) The Contractor shall furnish promptly to the Contracting Officer on request an irrevocable power of attorney to inspect and make copies of each United States patent application filed by or on behalf of the Contractor covering any such Invention; and

(v) In the event the Contractor, or those other than the Government deriving rights from the Contractor, elects not to continue prosecution of any such United States patent application filed by or on behalf of the Contractor, the Contractor shall so notify the Contracting Officer not less than sixty (60) days before the expiration of the response period and, upon written request, deliver to the Contracting Officer such duly executed instruments (prepared by the Government) as are deemed necessary to vest in the Government the entire right, title, and interest in such Invention and the application, subject to the reservation as specified in paragraph (d)(iii)(B) of this clause;

(e) *Foreign filing.* The Contractor, or those other than the Government deriving rights from the Contractor, shall as between the parties hereto, have the exclusive right, subject to the rights of the Government under paragraph (b) of this clause, to file applications on Subject Inventions (made by the Contractor) in each foreign country within:

(i) Nine (9) months from the date a corresponding United States application is filed, or nine (9) months from the date the Contractor discloses a Subject Invention under paragraph (c)(i) above with an election not to file a United States application;

(ii) Six (6) months from the date permission is granted to file foreign applications where such filing had been prohibited for security reasons; or

(iii) Such longer period as may be approved by the Contracting Officer.

The Contractor shall notify the Contracting Officer of each foreign application filed and, upon written request of the Contracting Officer, furnish an English translation of such foreign application, and convey to the Government the entire right, title, and interest in each such Subject Invention in each foreign country in which an application has not been filed within the time above specified, subject to the reservation as specified in paragraph (d)(iii)(B) of this clause.

(f) *Withholding of payment.* (1) Final payment under this contract shall not be made before the Contractor delivers to the Contracting Officer the final report required by (c)(iii), all written Invention disclosures required by (c)(i), all confirmatory licenses required by (d)(i), and all information as to subcontracts required by (g).

(2) If at any time before final payment under this contract the contractor fails to deliver an interim report required by (c)(ii), a written invention disclosure required by (c)(i), or a confirmatory license required by (d)(i), the contracting officer shall withhold from payment $50,000 or five percent (5%) of the amount of this contract whichever is less (or whatever lesser sum is available if payments have exceeded ninety-five percent (95%) of the amount of this contract) until the contractor corrects all such failures.

(3) After payments total eighty percent (80%) of the amount of this contract, and if no amount is required to be withheld under (2) above, the Contracting Officer may, if he deems such action warranted because of the Contractor's performance under the Patent Rights clause of this contract or other known Government contracts, withhold from payment such sum as he considers appropriate, not exceeding $50,000 or five percent (5%), of the amount of this contract, whichever is less, to be held as a reserve until the Contractor delivers all the reports, disclosures, licenses, and information specified in (1) above. Subject to the five percent (5%) or $50,000 limitation, the sum withheld under this subparagraph (3) may be increased or decreased from time to time at the discretion of the Contracting Officer.

(4) No amount shall be withheld under this paragraph (f) while the amount specified by this paragraph is being withheld under other provisions of this contract. The total amount withheld under (1), (2), and (3) above shall not exceed $50,000 or five percent (5%), of the amount of this contract whichever is less. The withholding of any amount or subsequent payment thereof to the Contractor shall not be construed as a waiver of any rights accruing to the Government under this contract. This paragraph shall not be construed as requiring the Contractor to withhold any amounts from a subcontractor to enforce compliance with the patent provision of a subcontract. As used in this paragraph (f) "this contract" means "this contract as from time to time amended." In cost-type contracts, "amount of this contract" means "estimated cost of this contract."

(g) *Subcontracts.* (1) The Contractor shall, unless otherwise authorized or directed by the Contracting Officer, include a patent rights clause containing all of the provisions of this Patent Rights clause except provision (f) in any subcontract hereunder where a purpose of the subcontract is the conduct of experimental, developmental, or research work. In the event of refusal by a subcontractor to accept this Patent Rights clause, or if in the opinion of the Contractor this Patent Rights clause is inconsistent with the policy set forth in ASPR 9-107.2 and 9-107.3, the Contractor:

(i) Shall promptly submit a written report to the Contracting Officer setting forth the subcontractor's reason for such refusal or the reasons the Contractor is of the opinion that the inclusion of this clause would be so inconsistent, and other pertinent information which may expedite disposition of the matter; and

(ii) Shall not proceed with the subcontract without the written authorization of the Contracting Officer.

The Contractor shall not, in any subcontract or by using such a subcontract as consideration therefor, acquire any rights to Subject Inventions for his own use (as distinguished from such rights as may be required solely to fulfill his contract obligations to the Government in the performance of this contract). Reports, instruments, and other information required to be furnished by a subcontractor to the Contracting Officer under the provisions of such a patent rights clause in a subcontract hereunder may, upon mutual consent of the Contractor and the subcontractor (or by direction of the Contracting Officer) be furnished to the Contractor for transmission to the Contracting Officer.

(2) The Contractor, at the earliest practicable date, shall also notify the Contracting Officer in writing of any subcontract containing a patent rights clause, furnish to the Contracting Officer a copy of such subcontract, and notify him when such subcontract is completed. It is understood that the Government is a third party beneficiary of any subcontract clause granting rights to the Government in Subject Inventions, and the Contractor hereby assigns to the Government all the rights that he would have to enforce the subcontractor's obligations for the benefit of the Government with respect to Subject Inventions. If there are no subcontracts containing patent rights clauses, a negative report is required. The Contractor shall not be obligated to enforce the agreements of any subcontractor hereunder relating to the obligations of the subcontractor to the Government in regard to Subject Inventions.

(h) *Licenses granted by contractor to others subject to Government's rights.* The Contractor recognizes that the Government, or a foreign government with funds derived through the Military Assistance Program or otherwise through the U.S. Government, may contract for property or services with respect to which the vendor may be liable to the Contractor for royalties for the use of a Subject Invention on account of such a contract. The Contractor further recognizes that it is the policy of the Government not to pay in connection with its contracts, or to allow to be paid in connection with contracts made with funds derived through the Military Assistance Program or otherwise through the U.S. Government, charges for use of patents in which the Government holds a royalty-free license. In recognition of this policy, the Contractor agrees to participate in and make appropriate arrangements for the exclusion of such charges from such contracts or for the refund of amounts received by the Contractor with respect to any such charges not so excluded.

(i) *Rights to disclose subject inventions.* The Government may duplicate and disclose reports and disclosures of Subject Inventions required to be furnished by the Contractor or a subcontractor pursuant to this Patent Rights clause.

(j) *Forfeiture of rights in unreported subject inventions.* The Contractor shall forfeit to the Government all rights in any Subject Invention which he fails to report to the Contracting Officer at or prior to the time he

(i) files or causes to be filed a United States or foreign application thereon, or (ii) submits the final report required by (c)(iii) of this clause, whichever is later: *Provided*, That the Contractor shall not forfeit rights in a Subject Invention if (A) contending that the invention is not a Subject Invention, he nevertheless reports the invention and all facts pertinent to his contention to the Contracting Officer within the time specified in (i) or (ii) above, or (B) he establishes that the failure to report was due entirely to causes beyond his control and without his fault or negligence. The Contractor shall be deemed to hold any such forfeited Subject Invention, and the patent applications and patents pertaining thereto, in trust for the Government pending written assignment of the invention. The rights accruing to the Government under this paragraph shall be in addition to and shall not supersede any other rights which the Government may have in relation to unreported Subject Inventions. Nothing contained herein shall be construed to require the Contractor to report any invention which is not in fact a Subject Invention.

(k) *Examination of records relating to inventions.* The Contracting Officer or his authorized representative shall, until the expiration of three (3) years after final payment under this contract, have the right to examine any books, records, documents, and other supporting data of the Contractor which the Contracting Officer or his authorized representative shall reasonably deem directly pertinent to the discovery or identification of Subject Inventions or to compliance by the Contractor with the requirements of this clause.

(c) *Patent Rights (Deferred) Clause.* Where the contracting officer has determined that the proposed contract comes within § 9.107–4(d), he shall include in the contract the Patent Rights (Title) clause set forth in paragraph (a) of this section, except that the name of the clause shall be changed to "Patent Rights (Deferred)" and paragraph (h) of that clause shall be replaced by the following paragraph (h). The clause, when so modified, differs from the clause set forth in paragraph (a) of this section only in the circumstances under which the Government may permit the contractor to acquire greater rights than the license.

(h) *Contractor's request for greater rights.* The Contractor at the time of disclosing a Subject Invention pursuant to paragraph (c) of this clause, but not later than three (3) months thereafter, may submit in writing to the Contracting Officer, in accordance with applicable regulations, a request for greater rights in such Invention than the license reserved to the Contractor in paragraph (b) of this clause. Each such request shall include, but need not be limited to, information concerning the Contractor's intention and plan to bring the Invention to the point of commercial application. The Contracting Officer shall review the Contractor's request for greater rights and shall notify the Contractor whether, and the extent to which, such request is granted. Any rights granted to the Contractor shall be subject to the provisions of (i) of this clause (MAY 1964).

[32 F.R. 524, Jan. 18, 1967, as amended at 32 F.R. 4260, Mar. 18, 1967; 33 F.R. 7399, May 18, 1968; 33 F.R. 19922, Dec. 28, 1968; 35 F.R. 6832, Apr. 30, 1970]

## § 9.107–6 Clause for foreign contracts.

A patent rights clause shall be included in every contract having as one of its purposes experimental, developmental, or research work which is to be performed outside the United States, its possessions, or Puerto Rico. Except as provided in § 9.107–8 with respect to contracts on behalf of the National Aeronautics and Space Administration, the clauses authorized in accordance with § 9.107–5 may be used; however, any clause may be replaced by any other clause tailored to meet requirements peculiar to foreign procurement *provided* the replacement clause incorporates the principles of the clause being replaced.

[29 F.R. 9760, July 21, 1964]

## § 9.107–7 Contracts relating to atomic energy.

(a) Except as provided in paragraph (b) of this section, the following paragraph shall be inserted as a part of the Patent Rights clause set forth in § 9.107–5(b) in all research or development contracts relating to atomic energy.

(1) With respect to any Subject Invention made by employees of the Contractor (except clerical and manual labor personnel who do not have access to technical data), and relating to the production or utilization of special nuclear material or atomic energy within the purview of the Atomic Energy Acts of 1946 (42 U.S.C. 1801–1819) and of 1954 (42 U.S.C. 2011–2296), the Contractor agrees:

(i) To furnish to the U.S. Atomic Energy Commission (hereinafter in this paragraph (1) referred to as "the Commission") through the Contracting Officer complete information regarding such Subject Invention, the Commission to have the sole and conclusive power to determine whether and where a patent application shall be filed, and to determine the disposition of the title to and rights under any such application or any patent that may issue thereon;

(ii) To obtain the execution of and deliver to the Commission, all documents relating to each Subject Invention and to do all things necessary or proper to carry out any

graph set forth below, in lieu of paragraph (b)(1) of the Patent Rights clause prescribed in § 9.107–5(b) shall be inserted, except as provided in § 9.107–8, in any contract having as one of its purposes the performance of research and development work under a space program, project, or task:

(b) *Rights granted to the Government.* (1) The Contractor agrees to and does hereby grant to the Government an irrevocable, nonexclusive, and royalty-free license to practice and have practiced each Subject Invention (made by the Contractor) throughout the world for Governmental purposes, including the practice of each such Subject Invention (i) in the manufacture, use, and disposition of any article or material, (ii) in the use of any method, or (iii) in the performance of any service, acquired by or for the Government or with funds derived through the Military Assistance Program of the Government or funds otherwise derived through the Government. In addition, the Government shall have the right to grant licenses to others, under such terms and conditions as may be prescribed, for the practice of such Subject Invention throughout the world in the design, development, manufacture, operation, maintenance, and testing of communications satellite systems, and of equipment, components, and ground tracking, transmitting and receiving facilities therefor (OCTOBER 1966).

[32 F.R. 528, Jan. 18, 1967]

## § 9.108 Patent rights under contracts for personal services.

(a) Except as provided in paragraph (b) of this section, the following clause, which is based on Executive Order 10096, shall be inserted in all contracts with individuals who are to render personal services.

PATENTS (DECEMBER 1953)

(a) For the purpose of determining the rights of the Government and the Contractor in and to inventions, the Contractor agrees to be bound by all provisions of Executive Order 10096, dated January 23, 1950, and any orders, rules, regulations, or the like issued thereunder.

(b) The Contractor shall: (i) Make written disclosure promptly to the Contracting Officer of all inventions of the Contractor which are conceived or first reduced to practice during the term of this contract, and sign and execute all papers necessary for conveying to the Government the right to which the Government is entitled in accordance with the determination made under the provisions of Executive Order 10096, or (ii) certify to the Contracting Officer that, to the best of the Contractor's knowledge and belief, no inventions have been conceived or first reduced to practice during the term of this contract.

(b) Where it is contemplated that research, experimental, or developmental work will not be involved, paragraph (b) of the clause may be omitted. Upon written request by the prospective contractor and approval by the Head of the Procuring Activity or his authorized representative, the clause may be modified or omitted where:

(1) The period of employment is to be not more than 90 days in any 1 calendar year; or

(2)(i) The period of employment called for in the contract or in any renewal thereof is more than 90 days but not more than 1 year of full-time service, and

(ii) The prospective contractor is bound by an obligation which existed prior to entering into the proposed contract with the Government and which was not entered into in contemplation thereof, and the discharge of which would be inconsistent with the discharge of any obligation arising under Executive Order 10096.

[32 F.R. 528, Jan. 18, 1967]

## § 9.109 Administration of patent rights clauses.

The President's Statement of Government Patent Policy (see § 9.107) provides that every appropriate effort should be made to realize for the Government and the public the benefit of inventions and discoveries resulting from experimental, research and development contracts even where the inventions are an incidental product of the work. It is important that the Government be in a position to know and exercise its rights in order to avoid payment of royalties on inventions in which it has rights and to defend itself against unjustified claims and suits for patent infringement. To attain these ends, contracts having patent rights clauses should be so administered that:

(a) Subject Inventions are identified and reported as required by the contract clauses;

(b) The rights of the Government in such Inventions are established;

(c) The rights of the Government are documented by formal instruments such as licenses or assignments; and

(d) When appropriate, patent applications on Subject Inventions are timely filed and prosecuted by contractors or by the Government.

[32 F.R. 528, Jan. 18, 1967]