IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| SPARTON CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 92-580C<br>Chief Judge Edward Damich |

**SPARTON CORPORATION'S POST TRIAL BRIEF ON THE CHRISTIAN DOCTRINE IN COMPLIANCE WITH THE COURT'S JULY 1, 2008 ORDER**

## I. FACTS

Magnavox Corporation ("Magnavox") and Sanders Associates, Inc. ("Sanders") were selected by the Navy in the 1964-65 fiscal year time frame to design and develop the DIFAR SSQ-53 sonobuoy. Doc. 299, Jt.Stip. Fact at 3-4, ¶20. The development of the original SSQ-53 sonobuoy spanned a 3-4 year time period, with production of the SSQ-53 sonobuoy first occurring in Fiscal Year 1968. Id. at 4, ¶21. Sparton Corporation ("Sparton") became a third supplier for SSQ-53 sonobuoys in Fiscal Year 1969 when the Navy issued Sparton contract No. N00019-69-C-0465 (the "'0465 contract"). Id. at 4, ¶22. The '0465 contract was awarded on March 5, 1969 and was a fixed-price supply contract. Id. at 4, ¶23. Underscored or bold words are for emphasis supplied. The '0465 contract does not identify and did not list any of the clauses in Armed Services Procurement Regulation ("ASPR") ¶9.107-5 (patent rights clauses) as being incorporated in

said contract either *in haec verba* or by reference. Id. at 4, 8, ¶¶24, 46.

The Naval Air Development Center ("NADC") had conducted theoretical studies and sea tests which confirmed that a deeper hydrophone would result in an improved submarine detection capability. Id. at 5, ¶26. As a result of fleet recommendations, NADC theoretical studies and sea tests, the Naval Air Systems Command ("NAVAIR") granted an Engineering Change Proposal ("ECP") at about the same time to each of the three SSQ-53 producers to supply the Navy with 500 sonobuoys deployable at 90 or 500 feet (Magnavox), 300 buoys at 90 or 1000 feet (Sanders) and 300 sonobuoys at 90 or 1000 feet (Sparton). Id. at 8, ¶42. The Sparton ECP, No. 0465-2, became effective on July 13, 1971 when the Navy executed Modification ("Mod.") 4 to the 0465 contract. Id. at 8, ¶43. ECP 0465-2 disclosed the Depew device, not the Widenhofer inventions disclosed and claimed in the suit patents. Id. at 8, ¶47; Sparton Corp. v. United States, 399 F.3d 1321 (Fed Cir. 2005). ECP 0465-2 referenced the '0465 fixed-price supply contract, and Sparton requested the delivery of 300 government furnished SSQ-53 sonobuoys therefrom. P5.1, 6.1, 6.3, 6.13.

The ASPR contains many sections, one of which pertains to the clauses to be included in contracts let by the Navy. Exhibit A, Section VII. The 1960 ASPR edition, for example,

contained about six parts. Id. Part 1, Section VII, addressed clauses for Fixed-Price Supply Contracts, while Parts 2-6 addressed Cost-Reimbursement Type Supply Contracts, Fixed-Price Research and Development Contracts, Cost-Reimbursement Type Research and Development Contracts, Personal Service Contracts, and Fixed-Price Construction Contracts respectively. Id. Under Part 1, Fixed-Price Supply Contracts, the ASPR sets forth in ¶7-103 "Required Clauses" to be included in Fixed-Price Supply Contracts. Id. A Patent Rights clause is not included in the required clauses of ¶7-103. Id. Paragraph 7-104 is entitled "Clauses To Be Used When Applicable[,]" Id. and under subparagraph 7-104.7, a patent rights clause is identified. Id. The same is true with respect to Cost-Reimbursement Type Supply Contracts and Fixed-Price Construction Contracts. Id. at ¶¶7-204.7 and 7-603.16 respectively. The same is not true with respect to Fixed-Price Research and Development Contracts and Cost-Reimbursement Type Research and Development Contracts wherein the "Required Clauses" paragraphs include the insertion of a Patent Rights clause. See ¶¶7-302, 7-402, 7-302.23 and 7-402.22. Id.

The 1960 ASPR was amended by a 1963 edition. Exhibit B. As pertains to the Patent Rights clause noted above in regard to the 1960 ASPR, the 1963 ASPR was not different. Id. The Patent Rights clause noted in ¶7-104.7 stated "[i]n

accordance with the requirements of 9-107, insert the contract clause set forth therein." Id. The 1963 ASPR was amended in 1969, and by Revision 1, March 31, 1969, the Patent Rights clause formerly set forth in the Table Of Contents ¶7-104.7 was deleted, and in its stead the term "Reserved" was specified. Exhibit C. The Patent Rights clause, however, was still identified as a clause to be "Used When Applicable" in Cost-Reimbursement Type Supply Contracts and Fixed-Price Construction Contracts. Id. at ¶¶7-204.7 and 7-603.16 respectively. The Patent Rights clause was still a "Required Clause" in Fixed-Price Research and Development Contracts and Cost-Reimbursement Type Research and Development Contracts. See ¶¶7-302, 7-402, 7-302.23 and 7-402.22. Id. The actual text of ¶7-104.7 states, as did the Table Of Contents, "Reserved." Id. Revisions 6 and 8 of the 1969 ASPR edition also contain the "Reserved" legend for ¶7-104.7. Exhibit D. Revisions 9 and 10 of the 1969 ASPR edition dated April 30 and November 30, 1971 respectively retitled ¶7-104.7 "Contract Schedule Subline Items Not Separately Priced" and did not include a Patent Rights clause reference in its "Required Clauses" under ¶7-103 or "Clauses To Be Used When Applicable" under ¶7-104. Exhibits E and F.

The 1969 ASPR edition was amended by a 1973 edition. Exhibit G. Paragraph 7-104.7 was still titled "Contract

Schedule Subline Items Not Separately Priced[,]” and the 1973 ASPR did not include a Patent Rights clause in its “Required Clauses” under ¶7-103 or “Clauses To Be Used When Applicable” under ¶7-104. Id. The Patent Rights clause, however, was still a Required Clause in Fixed-Price Research and Development Contracts and Cost-Reimbursement Type Research and Development Contracts. See ¶¶7-302, 7-402, 7-302.23 and 7-402.22. Id. In the ASPR 1976 edition, which immediately preceded the Defense Acquisition Regulations, which superceded the ASPR, ¶7-104.7 dealing with Fixed-Price Supply Contracts remained entitled “Contract Schedule Subline Items Not Separately Priced” and did not refer to a Patent Rights Clause. Exhibit H.

## II. ARGUMENT

### A. The *Christian* Doctrine Is Inapplicable Because A Patent Rights Clause Was Not Mandatory In The Navy-Sparton ‘0465 Fixed-Price Supply Contract Or Mod. 4 Thereto

Defendant is not entitled to a license under the suit patents under the *Christian* doctrine, G.L. Christian & Assoc. v. United States, 312 F.2d 418, aff’d on reh’g, 320 F.2d 345, cert. denied, 375 U.S. 954 (1963) and as asserted by defendant the ASPR, ¶¶7.301, 7.302, 7.302-23 and 9.107 (especially 9.107-1, 9.107-4 and 9.107-5) (1968-1972), because a Patent Rights clause was not a mandatory clause for incorporation into the ‘0465 contract fixed-price supply contract. The Court of Claims in Christian held that the

standard termination clause should be implied into the Christian-U.S. fixed price construction contract in issue because ASPR §8.703 specified that "the following standard [termination] clause shall be inserted in all fixed price construction contracts …." 312 F.2d at 424. In other words, the termination clause's incorporation into the Christian-U.S. fixed price construction contract was mandatory under the ASPR procurement regulations for the specific contract type there in issue, a construction contract.

The Federal Circuit addressed the *Christian* doctrine in S.J. Amoroso Constr. Co. v. United States, 12 F.3d 1072 (1993) holding that a Buy American Act ("BAA") clause required to be included in a federal construction contract was incorporated by reference into said contract. The parties had erroneously included in their construction contract a BAA clause applicable to supply contracts. The Federal Circuit in Amoroso stated at 1075:

> Application of the Christian doctrine turns not on whether the clause was intentionally or inadvertently omitted, but on whether procurement policies are "avoided or evaded (deliberately or negligently) by lesser officials." G.L. Christian & Assoc., 320 F.2d at 351. The Christian doctrine "guard[s] the dominant legislative policy against ad hoc encroachment or dispensation by the executive" and prevents "hobbl[ing] the very policies which the appointed rule-makers consider significant enough to call for … mandatory regulation." Id.

In reaching its holding, the Federal Circuit reviewed (a) the federal construction contract BAA regulation clause and

statute in issue to determine whether the clause was mandatory for construction contracts, and (b) the parties' contemporaneous actions during the performance of said construction contract. Id. at 1075-77.

In IBI Security Service, Inc. v. United States, 19 Cl. Ct. 106 (1989), the Claims Court (Judge Nettesheim) ruled that a price adjustment clause, used by government officials in their prior practice before the subject regulations were promulgated, would not be included in the service contract in issue because the regulations governing this service contract did not require it. Id. at 108-09. In reaching its conclusion, the Court stated:

> When a court is asked to construe the meaning of an administrative regulation, deference to the agency's interpretation is in order. Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1964) "[T]he ultimate criterion is the administrative interpretation, which becomes of controlling weight unless it is plainly erroneous or inconsistent with the regulation." Bowles v. Seminole Rock Co., 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945); see Hilo Coast Processing Co. v. United States, 7 Cl. Ct. 175, 177 (1985) (agency construction need not be only reasonable one, or even result court would have reached, if it forms rational basis for the administrative conclusion)(citing cases).

Id. at 110.

In the case at bar, the defendant does not derive a license under the patents in suit in light of the above noted legal principles. The '0465 contract is a fixed-price

sonobuoy production supply contract that contained no Patent Rights clause. Sparton and the Navy executed Mod. 4 to the ‘0465 contract by using the Changes clause in their ‘0465 contract to improve the performance of the production SSQ-53 sonobuoys being delivered under said contract. This was entirely proper for the Navy to do under the Changes clause of the subject ‘0465 contract.

This follows because service departments have general authority to enter into contracts, including the terms and conditions thereof. Christian, supra at 349, citing as statutory authority 10 U.S.C. §2301 et seq. Defendant has not established and can not establish that the Changes clause was improperly used by the Navy and Sparton to improve the SSQ-53 sonobuoy being procured under the base ‘0465 contract.

A review of the ASPR compels a conclusion that defendant’s license defense under the *Christian* doctrine should be dismissed. From 1960 thru *circa* March 1969, the Navy had only discretionary authority to include a Patent Rights clause in a fixed price supply contract. See ¶7.104.7, Exhibits A and B. Such a clause, however, was not required to be included in such fixed-price supply contracts. Id., ¶7.103. When revision 1 to the 1969 ASPR edition was promulgated *circa* March 31, 1969, the Navy’s discretionary authority to include a Patent Rights clause in

a fixed-price supply contract no longer existed and remained nonexistent through the life of the ASPR. See Exhibits C-H, ¶7.104.7. Accordingly, when Mod. 4 was properly executed in July 1971 under the Changes clause to the '0465 contract, the Navy did not have regulatory authority to include a Patent Rights clause in the '0465 contract or Mod. 4 thereto. Under the *Christian* doctrine, these ASPR changes compel a conclusion that a Patent Rights clause was not mandatory for inclusion into the '0465, or any fixed-price supply, contract. The opposite was true. It could not by discretion be included in a fixed-price supply contract.

The ASPR regulations pertaining to fixed-price supply contracts not only do not mandate the insertion of a Patent Rights clause, they also preclude its insertion therein by operation of law, discretion or otherwise. This is true even if development work is performed by a contractor pursuant to the Government's acceptance of an ECP resulting in a formal modification to a fixed-price production supply contract. Using the Changes clause to modify a fixed-price production supply contract and improve the performance of the supplied product does not convert a production supply contract or any modification thereto into a research and development contract. The ASPR draws a clear distinction between Fixed-Price Supply Contracts and Fixed-Price Research And Development Contracts and Cost-Reimbursement

Type Research And Development Contracts. Compare ¶7.100 to ¶¶7.301 et seq. and 7.400 et seq. Sparton and the Navy (experienced contracting parties) knew the difference between the two. Both were also on constructive notice (the ASPR) of this difference as well as the fact that a Patent Rights clause could not be included in a Fixed-Price Supply Contract but was mandatory in Fixed-Price Research And Development Contracts and Cost-Reimbursement Type Research And Development Contracts.

Based upon a long standing (decades), deeply ingrained Navy procurement practice (policy) to obtain development work using ECPs under fixed-price production supply contracts – which the Navy employed in the Sparton, Magnavox and Sanders contracts - and the Navy's interpretation of the relevant procurement regulations to permit same, to which deference must be given under IBI, supra, no Patent Rights clause should be incorporated into a fixed-price supply contract, such as the one here in suit, merely because a modification thereto, pursuant to an approved engineering change, required the contractor to perform development work. A rational basis exists for this Navy construction of the ASPR because it invokes the Changes clause in fixed-price production supply contracts to obtain an improved product. It is not required to execute a separate research and

development contract at increased cost to the public to obtain this development work on an existing product.

The parties’ contemporaneous actions during the performance of the subject ‘0465 production supply contract support the conclusion that a Patent Rights clause should not be incorporated therein under the *Christian* doctrine. At no time in the performance of the subject contract did Sparton inform or report to the Navy that subject inventions or no subject inventions were made thereunder as required by the ASPR standard Patent Rights provisions and clauses referenced by the defendant. Similarly, the Navy never requested Sparton to report subject inventions under the ‘0465 contract or any modification thereto. Neither contracting party suggested to or discussed with the other that Patent Rights could or should be conveyed to the Government under the subject contract. The opposite was known to both parties because a Patent Rights clause was never included in, or proposed for, the ‘0465 contract or any modification thereto. To require it now, decades after the completion of the contract, changes the agreement of the parties without statutory or regulatory authority mandating said change.

B. Defendant's Reliance Upon The Patent Rights Clause Expressing A Significant Or Deeply Ingrained Strand Of Public Procurement Policy Is Misplaced

Defendant contends that the Patent Rights clause expresses a significant or deeply ingrained strand of public procurement policy. Def. Br. 27-29. Defendant relies upon two Presidential policy statements. Id. Defendant fails to appreciate, however, that the Presidential policy statements are realized in the ASPR provisions relating to Fixed-Price Research And Development Contracts and Cost-Reimbursement Type Research And Development Contracts. Exhibits A-H, ¶¶7-302.23 and 7-402.22. The Presidential policy statements, however, are inapplicable to fixed-price supply contracts. It is clear, moreover, that the Changes clause represents a significant or deeply ingrained strand of public procurement policy relating to fixed-price supply contracts. This follows because the Changes clause is a required clause in Fixed-Price Supply Contracts. ¶7-103.2. This can not be said of the Patent Rights clause vis-à-vis Fixed-Price Supply Contracts. See the above referenced history of the Patent Rights clause vis-à-vis Fixed-Price Supply Contracts. When the ASPR was changed *circa* March 1969 to delete the Government's discretionary authority to include a Patent Rights clause in a fixed-price supply contract, the Changes clause clearly trumped the Patent Rights clause (assuming *arguendo* it had a deeply ingrained strand of public

procurement policy) as a significant or deeply ingrained strand of public procurement policy relating to fixed-price supply contracts.

Although the gist of the defendant's argument under the *Christian* doctrine is that the Navy's action in accepting ECPs to obtain its objective of obtaining an improved SSQ-53 sonobuoy product was *ultra vires* (Def. Br. 29-34), defendant's argument misses its mark because defendant can not establish that the Navy's use of the '0465 contract's Changes clause was improper or that the Patent Rights clause is a significant or deeply ingrained strand of public procurement policy relating to fixed-price supply contracts. General Eng'g & Mach. Works v. O'Keefe, 991 F.2d 775 (Fed. Cir. 1993). This Court should not change the nature of the '0465 contract or its Mod. 4 in issue from a fixed-price supply contract governed by ¶7.100 et seq. to a research and development type contract under ¶¶7.301 and 7.400 et seq. The *Christian* doctrine does not support/require this change.

C. The Defendant Has Not Established That The Claimed Inventions Were Conceived Or First Actually Reduced To Practice In The Performance Of Mod. 4 Of The '0465 Contract

The Federal Circuit has held in this case that the Depew device was the subject matter of Mod. 4 of the '0465 contract and that the claimed inventions were substituted for the Depew device when Sparton delivered to the Navy the 300 sonobuoys required under Mod. 4. Sparton Corp. v.

United States, supra. This holding was predicated upon the fact that Sparton never communicated to the Navy its intent to substitute the claimed inventions for the Depew device under Mod. 4. The defendant has the burden of proof on this issue. Technical Development Corp. v. United States, 597 F.2d 733 (Ct. Cl. 1979). The defendant has not met its burden of proof and has not established that the conception or first actual reduction to practice of the claimed inventions occurred in the performance of the ‘0465 contract, Mod.4. No evidence was presented by defendant showing that Mod. 4 of the ‘0465 contract covered the claimed inventions when the conception or first actual reduction to practice of the claimed inventions occurred. No evidence was presented that Mr. Widenhofer charged his time to Mod. 4 of the ‘0465 contract. Defendant mistakenly assumes that all inventions made by a contractor – even those for which the Government does not compensate a contractor –under an in-house effort, but bear some relationship to a government contract, are “in the performance” of that government contract. Defendant has failed to establish that the claimed inventions were made “in the performance” of Mod. 4 of the ‘0465 contract.

D. The CFC Has Already Ruled On The Conception And Reduction To Practice Issues

Sparton has already presented its contention to the CFC on the conception and reduction to practice issues. The CFC

has ruled on these issues. Sparton Corp. v. United States, 57 Fed. Cl. 455 (2003). Defendant's brief appears to contest this ruling. Sparton contends that the reduction to practice of the claimed inventions occurred in the summer of 1972 when the inventions were tested under actual service conditions by the Navy. Defendant has failed to establish that the March 1972 tests or the summer of 1972 tests of the claimed inventions were in the performance of Mod. 4.

**III. CONCLUSION**

Defendant's *Christian* doctrine license defense should be dismissed.

Respectfully submitted,
Sparton Corporation, Plaintiff

Dated: August 12, 2008

s/Steven Kreiss
Steven Kreiss
Attorney for Plaintiff
1120 Connecticut Avenue NW
Suite 433
Washington D.C. 20036
Telephone: (202) 347-6382
Facsimile: (202) 347-7711